**McMANIMON, SCOTLAND
 & BAUMANN, LLC**
75 Livingston Avenue, Second Floor
Roseland, New Jersey 07068
(973) 622-1800
Richard D. Trenk, Esq. (rtrenk@msbnj.com)
Robert S. Roglieri, Esq. (rroglieri@msbnj.com)

*Counsel to Debtor and Debtor-in-Possession,
The Diocese of Camden, New Jersey*

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>THE DIOCESE OF CAMDEN, NEW JERSEY,<br><br>Debtor. | Chapter 11<br><br>Case No. 20-21257 (JNP) |

**DISCLOSURE STATEMENT PURSUANT TO
SECTION 1125 OF THE BANKRUPTCY CODE DESCRIBING
CHAPTER 11 PLAN PROPOSED BY THE DEBTOR-IN-POSSESSION**

PLEASE READ THIS DISCLOSURE STATEMENT ("DISCLOSURE STATEMENT") CAREFULLY. THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN OF REORGANIZATION.  THE DIOCESE BELIEVES THAT THIS PLAN IS IN THE BEST INTEREST OF THE CREDITORS AND THAT THE PLAN IS FAIR AND EQUITABLE.  THE DIOCESE URGES THAT THE VOTER ACCEPT THE PLAN.

# TABLE OF CONTENTS

**PAGE**

DISCLAIMER .................................................................................................................. 1
ARTICLE I. ..................................................................................................................... 2
INTRODUCTION ............................................................................................................ 2
ARTICLE II. .................................................................................................................... 2
PURPOSE OF THIS DISCLOSURE STATEMENT........................................................ 2
ARTICLE III..................................................................................................................... 3
CONFIRMATION PROCEDURES ................................................................................. 3
   A.   Requirements for Confirmation ............................................................................ 3
   B.   Persons Potentially Eligible to Vote on the Plan ................................................. 4
   C.   Solicitation and Confirmation Hearing Notice ..................................................... 4
   D.   Plan Voting Procedures......................................................................................... 5
      a.   Deadline For Voting For or Against the Plan ................................................ 5
      b.   Acceptance of Plan ....................................................................................... 6
   E.   Time and Place of the Confirmation Hearing ...................................................... 6
   F.   Procedure for Objections to Confirmation of the Plan ........................................ 6
   G.   Identity of Person to Contact for More Information Regarding the Plan .............. 7
ARTICLE IV. ................................................................................................................... 8
BACKGROUND AND SUMMARY OF CHAPTER 11 CASE ...................................... 8
   A.   Background of Debtor........................................................................................... 8
      a.   The Roman Catholic Church ........................................................................ 8
      b.   The Diocese of Camden ............................................................................. 10
      c.   The Parishes ................................................................................................ 11
      d.   Independent Catholic Schools (Elementary and Secondary)........................... 11
      e.   Catholic Ministry Entities ......................................................................... 13
         i.   Catholic Charities, Diocese of Camden, Inc........................................ 13
         ii.   The Diocesan Housing Services Corporation of the Diocese of Camden,
Incorporated ..................................................................................................... 15
            1.  Senior Housing Services........................................................... 15
            2.  Other Housing Services............................................................ 16
         iii.   St. Mary's Catholic Home, Delaware Township, NJ.................... 16
         iv.   Bishop McCarthy Residence, Vineland, NJ ................................. 17
         v.   Our Lady's Residence, Pleasantville, NJ...................................... 17
   B.   The Debtor's Management ................................................................................. 17
      a.   Background of the Most Reverend Dennis J. Sullivan ..................................... 17
      b.   Background of Reverend Robert E. Hughes..................................................... 18
      c.   Professional Background of Laura J. Montgomery ......................................... 19
   C.   The Debtor's Assets ........................................................................................... 20
   D.   Retirement Programs .......................................................................................... 21
      a.   Pension Plan for Priests of the Diocese of Camden.......................................... 21
      b.   Pension Plan for Certain Lay Employees of the Diocese of Camden.............. 22
      c.   Post-Retirement Benefits Plan for Priests of the Diocese of Camden ............. 23
      d.   The Diocese of Camden Retirement Plan......................................................... 23
   E.   Trust Funds and Foundations.............................................................................. 24

a.  Diocese of Camden Trusts, Inc. ........................................................... 24
b.  The Diocese of Camden Healthcare Foundation ............................. 25
c.  The Tuition Assistance Fund, Inc. ................................................... 26
d.  The Sharkey Family Charitable Trust .............................................. 26
e.  The Frank J. and Rosina W. Suttill Catholic Foundation ................ 26
F.  Other Catholic Entities. ............................................................................ 26
a.  Sacred Heart Residence for Priests, Inc. ......................................... 26
b.  Catholic Business Network of South Jersey, Inc. ............................ 26
c.  The Catholic-Jewish Commission of Southern N.J., Incorporated.................. 27
d.  The Catholic Star Herald .................................................................. 27
e.  The Collegium Center for Faith and Culture ................................... 27
f.  VITALity Catholic Healthcare Services .......................................... 27
g.  The Camden Center for Law and Social Justice .............................. 29
h.  Guadalupe Family Services, Inc. ..................................................... 30
G.  Parish Trusts. ............................................................................................ 30
H.  Catholic Cemeteries ................................................................................. 32
I.  The Debtor's Prepetition Capital Structure. .............................................. 33
a.  Revolving Line of Credit .................................................................. 33
b.  Other Unsecured Debt. ...................................................................... 34
J.  Survivor Claims Against the Diocese ....................................................... 34
a.  New Jersey Independent Victim Compensation Program ................. 36
b.  Steps Taken by the Diocese to Protect Children............................... 37
i.  Memorandum of Understanding ................................................. 38
ii.  Charter for the Protection of Children and Young People............ 38
iii.  Other Actions Taken by the Diocese ......................................... 39
K.  Litigation Involving Public Nuisance Claim ............................................ 39
L.  Events Precipitating the Chapter 11 Filing ............................................... 40
ARTICLE V. ......................................................................................................... 40
THE DIOCESE'S BANKRUPTCY ...................................................................... 40
A.  The Diocese's Chapter 11 Filing .............................................................. 40
a.  First Day Orders................................................................................ 40
b.  Appointment of Tort Claimants' Committee .................................... 42
c.  Appointment of Trade Creditors' Committee ................................... 42
d.  Employment of Professionals and Advisors ..................................... 42
i.  Debtor's Professionals ................................................................ 42
ii.  Tort Claimants' Committee Professionals .................................. 43
iii.  Trade Creditors' Committee Professionals ................................. 43
e.  Claims Process and Bar Date ............................................................ 43
i.  Schedules and Statement of Financial Affairs ............................ 43
ii.  Section 341(a) Meeting of Creditors........................................... 43
f.  Other Significant Events During the Bankruptcy ............................. 43
B.  Adversary Proceedings ............................................................................. 45
C.  Mediation with the Tort Claimants' Committee and Insurance Carriers.............. 46
D.  Production of Discovery to the Tort Claimants' Committee ...................... 46
E.  Current and Historical Conditions ............................................................ 47
ARTICLE VI. ........................................................................................................ 48

SUMMARY OF THE PLAN OF REORGANIZATION ................................................. 48
  A.  What Creditors Will Receive Under the Proposed Plan ..................................... 48
  B.  Classification of Claims and Interests.............................................................. 48
    a.  Unclassified Claims ................................................................................. 48
    b.  Unimpaired Classes of Claims.................................................................. 48
    c.  Impaired Classes of Claims ...................................................................... 49
ARTICLE VII. ..................................................................................................... 49
TREATMENT OF UNCLASSIFIED CLAIMS .......................................................... 49
  A.  Administrative Expenses Claims ..................................................................... 49
  B.  Priority Tax Claims ........................................................................................ 49
  C.  U.S. Trustee Fees. .......................................................................................... 50
  D.  Fee Claims. .................................................................................................... 50
ARTICLE VIII. .................................................................................................... 51
TREATMENT OF CLAIMS AND INTERESTS ......................................................... 51
  A.  Estimates of Claims ....................................................................................... 51
  B.  Treatment of Class 1 (Priority Non-Tax Claims). ............................................ 52
  C.  Treatment of Class 2 (General Unsecured Claims). .......................................... 52
  D.  Treatment of Class 3 (Underfunded Pension Claims) ....................................... 52
  E.  Treatment of Class 4 (Tort Claims Other Than Unknown Tort Claims)............. 53
  F.  Treatment of Class 5 (Unknown Tort Claims). ............................................... 54
  G.  Treatment of Class 6A (Abuse Related Contingent Claims). ............................. 54
  H.  Treatment of Class 6B (Abuse Related Contingent Claims). ............................. 55
ARTICLE IX. ...................................................................................................... 55
MEANS OF EFFECTUATING THE PLAN .............................................................. 55
  A.  Trust Formation and Funding. ........................................................................ 55
  B.  Vesting of Assets in Reorganized Debtor. ....................................................... 56
  C.  Causes of Action. ........................................................................................... 56
  D.  Post-Confirmation Conversion/Dismissal. ....................................................... 57
ARTICLE X. ....................................................................................................... 57
THE TRUST ........................................................................................................ 57
  A.  Establishment of Trust. .................................................................................. 57
  B.  Allocations Within and Distribution and Payments from the Trust. ................... 57
  C.  Tax Matters. ................................................................................................... 58
  D.  Appointment of the Trust Administrator. ........................................................ 58
  E.  Rights and Responsibilities of Trust Administrator.......................................... 58
  F.  Investment Powers; Permitted Cash Expenditures. .......................................... 59
  G.  Registry of Beneficial Interests...................................................................... 59
  H.  Non-Transferability of Interests...................................................................... 60
  I.  Termination.................................................................................................... 60
  J.  Immunity; Liability; Indemnification. ............................................................ 60
  K.  Treatment of Tort Claims............................................................................... 61
ARTICLE XI. ...................................................................................................... 63
EFFECT OF PLAN ON CLAIMS AND INTERESTS ................................................. 63
  A.  General Injunction. ........................................................................................ 63
  B.  Channeling Injunction.................................................................................... 63
  C.  Exculpation; Limitation of Liability. .............................................................. 64

iv

D.   Disclosure ........................................................................................... 65
ARTICLE XII. ......................................................................................................... 66
PROVISIONS GOVERNING DISTRIBUTIONS GENERALLY ............................... 66
A.   Disbursing Agent. ................................................................................ 66
B.   Payments and Distributions. ................................................................ 66
C.   Allowance and Disallowance of Claims. .............................................. 67
D.   Resolution of Disputed Administrative Expense Claims and Disputed Claims... 67
ARTICLE XIII. ........................................................................................................ 68
TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ......... 68
A.   Executory Contracts and Unexpired Leases. ....................................... 68
B.   Bar to Rejection Damages. ................................................................... 68
ARTICLE XIV ......................................................................................................... 68
EFFECTS OF CONFIRMATION ............................................................................. 68
A.   Authority to Effectuate Plan. ............................................................... 68
B.   Binding Effect. ..................................................................................... 69
C.   Discharge of the Debtor. ...................................................................... 69
D.   Release and Discharge of the Committee. ............................................ 69
E.   Continued Corporate Existence ........................................................... 69
ARTICLE XV. ......................................................................................................... 70
RETENTION OF JURISDICTION .......................................................................... 70
ARTICLE XVI. ........................................................................................................ 72
MISCELLANEOUS PROVISIONS OF THE PLAN ................................................. 72
A.   Amendment or Modification of this Plan. ............................................ 72
B.   Revocation or Withdrawal of this Plan. ............................................... 72
C.   Reports. ................................................................................................ 72
D.   Severability of Plan Provisions. .......................................................... 72
E.   No Interest. ........................................................................................... 73
F.   Allocation of Distributions Between Principal and Interest. ................ 73
G.   Notices. ................................................................................................ 73
H.   Plan Controls Disclosure Statement..................................................... 73
I.   Filing of Additional Documents. ......................................................... 73
J.   Reservation of Rights. .......................................................................... 73
K.   Rules of Interpretation; Computation of Time...................................... 73
L.   Successors and Assigns......................................................................... 74
M.   Waiver of Subordination....................................................................... 74
N.   Post-Effective Date Professional Fees. ................................................ 74
O.   Governing Law. .................................................................................... 74
P.   Headings. .............................................................................................. 74
Q.   No Admissions...................................................................................... 75
ARTICLE XVII. ....................................................................................................... 75
RISK FACTORS/TAX CONSEQUENCES................................................................ 75
A.   Tax Consequences of Plan ................................................................... 75
B.   Risk Factors ......................................................................................... 76
a.   Risk of Non-Confirmation of the Plan......................................... 76
b.   The Debtor May Object to the Amount or Classification of a Claim............... 76
c.   Risk of Additional or Larger Claims ........................................... 77

4817-6551-8030, v. 2

    d.    Historical Financial Information of the Debtor ................................................. 77

ARTICLE XVIII. ......................................................................................................... 77

FEASIBILITY OF THE PLAN ..................................................................................... 77

ARTICLE XIX. ............................................................................................................. 78

BEST INTERESTS TEST ............................................................................................. 78

ARTICLE XX. .............................................................................................................. 79

RECOMMENDATION ................................................................................................. 79

4817-6551-8030, v. 2

## DISCLAIMER

THIS DISCLOSURE STATEMENT FOR THE CHAPTER 11 PLAN OF REORGANIZATION OF THE DIOCESE OF CAMDEN, NEW JERSEY (THE "**DEBTOR**" OR THE "**DIOCESE**", ATTACHED AS EXHIBIT A (THE "**PLAN**") AND RELATED MATERIALS DELIVERED HEREWITH, ARE BEING PROVIDED BY THE DEBTOR TO KNOWN HOLDERS OF CLAIMS AND INTERESTS PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE.[1]

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT EXCEPT AS EXPRESSLY INDICATED HEREIN. THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION AND BELIEF. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING. NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, NOR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTOR OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

---

[1] Capitalized terms used but not defined herein shall have the same meaning ascribed to such term in the Plan.

## ARTICLE I.
## INTRODUCTION

On October 1, 2020 (the "Petition Date"), the Diocese commenced its bankruptcy case by filing a voluntary petition pursuant to Chapter 11 of Title 11 of the United States Code (the "Code"), 11 U.S.C. § 301, et seq.  Chapter 11 of the Code allows the Debtor to propose a plan of reorganization.   After the Petition Date, the Diocese has remained in possession of its assets and management of its mission as debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE PLAN OF REORGANIZATION (the "Plan") WHICH IS ANNEXED HERETO AS **EXHIBIT A**.  The Plan constitutes a chapter 11 plan of reorganization.  Except as set forth in the Plan or otherwise provided by order of the Bankruptcy Court, Distributions will occur on the Effective Date or as soon thereafter as is practicable and at various intervals thereafter.  In the Dicoese's opinion, the treatment of Claims under the Plan provides a greater recovery for Creditors than that which is likely to be achieved under other alternatives.  **Accordingly, the Diocese believes that Confirmation of the Plan is in the best interests of all Creditors and, therefore, urge all Creditors to vote to accept the Plan.**

## ARTICLE II.
## PURPOSE OF THIS DISCLOSURE STATEMENT

This Disclosure Statement summarizes what is in the Plan and tells you certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan.  This Disclosure Statement contains the following exhibits: (i) the Plan (**Exhibit A**); (ii) Financial Projections (**Exhibit B**); (iii) Order Approving the Disclosure Statement (**Exhibit C**); (iv) proposed Trust Agreement (**Exhibit D**); (v) the Debtor's liquidation analysis (**Exhibit E**); and the Tort Claim Distribution Plan (**Exhibit F**).

READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:

(1)     WHO CAN VOTE OR OBJECT,

(2)     THE PROPOSED TREATMENT OF YOUR CLAIM (i.e., what your claim will receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOU WOULD RECEIVE IN A CHAPTER 7 LIQUIDATION,

(3)     THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY,

(4)     WHAT THE COURT WILL CONSIDER WHEN DECIDING WHETHER TO CONFIRM THE PLAN,

(5)     THE EFFECT OF CONFIRMATION, AND

2

(6)      THE FEASIBILITY OF THE PLAN.

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how this Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as the Disclosure Statement. If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

Bankruptcy Code Section 1125 requires a Disclosure Statement to contain "adequate information" concerning the Plan. The term "adequate information" is defined in Code Section 1125(a) as "information of a kind, and in sufficient detail," about the Debtor and its operations "that would enable a hypothetical reasonable investor typical of holders of claims or interests" of the Debtor to make an informed judgment about accepting or rejecting the Plan. The Bankruptcy Court ("Court") has determined that the information contained in this Disclosure Statement is adequate, and it has approved this document in accordance with Bankruptcy Code Section 1125.

This Disclosure Statement is provided to each creditor whose claim has been scheduled by the Debtor or who have filed a proof of claim against the Debtor as of the date of approval of this Disclosure Statement. Under the Bankruptcy Code, your acceptance of the Plan may not be solicited unless you receive a copy of this Disclosure Statement prior to or concurrently with such solicitation.

## ARTICLE III.
## CONFIRMATION PROCEDURES

**THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. IF THE COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS IN THE CHAPTER 11 CASES.**

If the Plan is confirmed, the Distributions provided for in the Plan will be in exchange for, and in complete satisfaction, discharge and release of, all Claims against the Debtor or any of its assets or properties, including any Claim accruing after the Petition Date and before the Effective Date. As of the Effective Date of the Plan, all Holders of Claims and Interests will be precluded from asserting any Claim against the Debtor, the Reorganized Debtor or their assets, or other interests in the Debtor or the Reorganized Debtor based on any transaction or other activity of any kind that occurred before the Effective Date except as otherwise provided in the Plan. In addition, the Plan provides for a channeling injunction based on a contribution to the Plan by the Covered Parties.

### A. Requirements for Confirmation

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THIS PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX. The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues,

3

which they may wish to consider, as well as certain deadlines for filing claims.  The Debtor CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

The Bankruptcy Court will confirm the Plan only if it meets all of the applicable requirements of section 1129 of the Bankruptcy Code. Among the requirements for confirmation in these Chapter 11 Cases are that the Plan (a) is accepted by Impaired Classes that have the right to vote; and (b) the Plan is feasible. The Bankruptcy Court must also find that:

      1.     the Plan has classified Claims and Interests in a permissible manner;

      2.     the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and

      3.     the Plan has been proposed in good faith. <u>See</u> 11 U.S.C. §§ 1123, 1129.

## B. <u>Persons Potentially Eligible to Vote on the Plan</u>

In determining acceptance of the Plan, votes will only be counted if submitted by a creditor whose claim is duly scheduled by the Debtor as undisputed, non-contingent and unliquidated, or who, prior to the hearing on confirmation of the Plan, has filed with the Court a proof of claim which has not been disallowed or suspended prior to computation of the votes on the Plan.  The Ballot Form that you received does not constitute a proof of claim.  If you are uncertain whether your claim has been correctly scheduled, you should check the Debtor's Schedules, which are on file at the office of the Clerk of the Bankruptcy Court located at: United States Bankruptcy Court, Mitchell H. Cohen U.S. Courthouse, 400 Cooper Street, Fourth Floor, Camden, New Jersey 08101.  The Clerk of the Bankruptcy Court will not provide this information by telephone.  The Debtor's Schedules are also available at https://cases.primeclerk.com/camdendiocese.

The following are the unclassified Claims: Fee Claims, Administrative Expense Claims, U.S. Trustee Fees, and Priority Tax Claims. Unclassified Claims are not Impaired by the Plan. Each Holder of an unclassified Claim is conclusively presumed to have accepted the Plan and, therefore, is not entitled to vote to accept or reject the Plan.

Classes 6A and 6B are fully Impaired and are not receiving any Distributions under the Plan and, pursuant to Section 1126(g) of the Bankruptcy Code, are conclusively presumed to have rejected the Plan.  Classes 2, 3, 4, and 5 are Impaired under the Plan and are entitled to vote on the Plan.

## C. <u>Solicitation and Confirmation Hearing Notice</u>

All Holders of Claims in Classes 2, 3, 4, and 5 will receive (i) notice of the Confirmation Hearing (defined below) (the "<u>Confirmation Hearing Notice</u>") and (ii) a Ballot.  All other creditors and parties in interest not entitled to vote on the Plan will receive a copy of the Confirmation Hearing Notice and a Notice of Non-Voting Status (as defined in the Disclosure Statement Order). Because of the significant cost of printing and mailing the Disclosure Statement and Plan, copies of the Disclosure Statement and Plan will be available in electronic format online at https://cases.primeclerk.com/camdendiocese.

4

### D.  **Plan Voting Procedures**

The Ballots received by Holders of impaired Claims do not constitute a proof of claim.  If a creditor is uncertain whether its claim has been correctly scheduled, the creditor should check the Debtor's Schedules, which are on file at the Office of the Clerk of the Bankruptcy Court located at: United States Bankruptcy Court for the District of New Jersey, U.S. Post Office and Courthouse, 401 Market Street, Camden, New Jersey 08101. The Clerk of the Bankruptcy Court will not provide this information by telephone.

Alternatively, a creditor may obtain copies of the Debtor's schedules on the website of Prime Clerk, LLC, the Debtor's Claims and Noticing Agent (the "Claims and Noticing Agent"), at https://cases.primeclerk.com/camdendiocese.

### a.  **Deadline For Voting For or Against the Plan**

In order for a Ballot to count, the creditor must (1) complete, date and properly execute the Ballot and (2) properly deliver the Ballot to the Claims and Noticing Agent by either mail or overnight courier to the Claims and Noticing Agent at the following address:

> The Diocese of Camden, New Jersey Ballot Processing Center
> c/o Prime Clerk LLC
> 830 3rd Avenue, 9th Floor
> New York, New York 10022

The Claims and Noticing Agent must **ACTUALLY RECEIVE** original ballots by mail or overnight delivery on or before _____ ___, **2021 at 5:00 p.m.** (prevailing Eastern Time) (the "Voting Deadline"). Except as otherwise provided, you may not change your vote once the Claims and Noticing Agent receives your ballot.

Any ballot that is timely received, that contains sufficient information to permit the identification of the claimant and that is cast as an acceptance or rejection of the Plan will be counted and will be deemed to be cast as an acceptance or rejection, as the case may be, of the Plan.

The following ballots will not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected:

1.      any ballot received after the Voting Deadline, unless the Debtor grants an extension of the Voting Deadline with respect to such ballot;

2.      any ballot that is illegible or contains insufficient information to permit the identification of the claimant;

3.      any ballot cast by a person or entity that does not hold a Claim in a class that is entitled to vote to accept or reject the Plan;

4817-6551-8030, v. 2

4.      any ballot cast for a Claim designated as unliquidated, contingent or disputed or as zero or unknown in amount and for which no Rule 3018(a) motion has been filed by the Rule 3018(a) motion deadline;

5.      any ballot timely received that is cast in a manner that indicates neither acceptance nor rejection of the Plan or that indicates both acceptance and rejection of the Plan;

6.      any unsigned ballot; or

7.      any ballot that is electronically submitted.

**Voting Questions.** If there are any questions regarding the provisions or requirements for voting to accept the Plan or require assistance in completing a Ballot, creditors may contact counsel to the Debtor, Richard D. Trenk or Robert S. Roglieri at 973-622-1800.

## b.  Acceptance of Plan

The acceptance of the Plan by impaired creditors is important.  In order for the Plan to be accepted by impaired creditors, a majority in number (*i.e.,* more than half) and two-thirds in dollar amount of the impaired classes that vote must vote to accept the Plan. The Debtor urges that creditors vote to accept the Plan.  **CREDITORS ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY RETURN THEIR BALLOT.  PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY IDENTIFY THE EXACT AMOUNT OF THE CREDITOR'S CLAIM AND THE NAME OF THE CREDITOR.**

## E.   Time and Place of the Confirmation Hearing

The hearing at which the Court will determine whether to confirm the Plan (the "Confirmation Hearing") will take place on _____ ___, **2021 at __:00 __.m. (prevailing Eastern Time)** in Courtroom 4C of the United States Bankruptcy Court for the District of New Jersey, Mitchell H. Cohen U.S. Courthouse, 400 Cooper Street, 4th Floor, Camden, New Jersey, 08101The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the hearing.

## F.   Procedure for Objections to Confirmation of the Plan

Any objection to confirmation of the Plan must (a) be in writing; (b) state the name and address of the objecting party and the amount of the claim of such party; and (c) state with particularity the grounds for the objection.  Any objection must be filed with the Court and served so as to be actually received on or before _____ ___, **2021 at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline") by:

| | |
|---|---|
| *The Debtor and Reorganized Debtor* | Richard D. Trenk, Esq.<br>Robert S. Roglieri, Esq.<br>McManimon, Scotland, & Baumann, LLC<br>75 Livingston Avenue, Second Floor<br>Roseland, New Jersey 07068<br>rtrenk@msbnj.com<br>rroglieri@msbnj.com |
| *The Official Committee of Tort Claimant Creditors (the "Tort Claimants' Committee")* | Jeffrey Prol, Esq.<br>Brent Weisenberg, Esq.<br>Lowenstein Sandler LLP<br>One Lowenstein Drive<br>Roseland, New Jersey 07068<br>JProl@lowenstein.com<br>BWeisenberg@lowenstein.com |
| *The Official Committee of Trade Creditors (the "Trade Creditors' Committee")* | Warren J. Martin Jr., Esq.<br>John S. Mairo, Esq.<br>Rachel A. Parisi, Esq.<br>Porzio, Bromberg & Newman, P.C.<br>100 Southgate Parkway, P.O. Box 1997<br>Morristown, NJ 07962-1997<br>wjmartin@pbnlaw.com<br>jsmairo@pbnlaw.com<br>raparisi@pbnlaw.com |
| *The Office of the United States Trustee* | Jeffrey M. Sponder, Esq.<br>Lauren Bielskie, Esq.<br>Office of the United States Trustee<br>for the District of New Jersey<br>One Newark Center<br>1085 Raymond Boulevard, Suite 2100<br>Newark, New Jersey 07102<br>Jeffrey.M.Sponder@usdoj.gov<br>Lauren.Bielskie@usdoj.gov |

**Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court.**

### G.  Identity of Person to Contact for More Information Regarding the Plan

Any interested party desiring further information about the Plan should contact the Debtor's counsel, Richard D. Trenk, Esq. or Robert S. Roglieri, Esq. at McManimon, Scotland, & Baumann, LLC, 75 Livingston Avenue, Second Floor, Roseland, New Jersey 07068, telephone (973) 622-1800.

4817-6551-8030, v. 2

## ARTICLE IV.
## BACKGROUND AND SUMMARY OF CHAPTER 11 CASE

### A.  Background of Debtor

### a.  The Roman Catholic Church

It is a matter of faith that the Catholic Church (the "Church")[2] was founded by Jesus Christ to carry out the mission to teach, sanctify and serve the needs of others.  The Church is a worldwide community with over 1.2 billion members who adhere to a common creed.  The *Code of Canon Law*[3] establishes the internal organizational structure and procedures to be followed within the Church.  Canon Law also identifies property rights and agency relationships among the various structures within the community of the Church.

While the Church is organized in a hierarchical structure, it is not a monolithic corporate entity.  A variety of organizations operate in ecclesiastical harmony to carry out the mission of the Church.  The Church is organized by territorial districts, the most common of which is a diocese.[4] A diocese usually is defined by a geographic area and is created to serve the community of Latin Rite Catholics present in that area.  The bishop of a diocese is appointed by the Pope.[5]

Within the territory of a diocese are separately constituted parishes.[6]  Like a diocese, a parish usually is defined territorially.[7]

"Juridic persons" are constituted pursuant to Canon Law or by a special grant of competent authority given through a decree, and they have perpetual existence unless extinguished in accordance with Canon Law.  Juridic persons within the Church are either aggregates of persons or things, ordered for a purpose which is in keeping with the mission of the Church.  Similar to the civil law concept of a corporation, a juridic person is distinct and separate from any natural person, and from other juridic persons.  A public juridic person is a type of juridic person that fulfills its

---

[2] As used herein, "Church" means the universal Catholic Church (*i.e.,* the "one, holy, catholic and apostolic church" of Catholic belief, seated in the Vatican and headed by Pope Francis).  For the avoidance of doubt, particular places of worship are referred to herein as "churches" without capitalization.

[3] Canon Law comes from several sources of Church law that together establish the internal organizational structure and relationships among the entities and organizations that comprise the Church.  Canon Law was originally codified in 1917, and revised by Pope John Paul II on January 25, 1983.  See 1983 Code of Canon Law c. 1-1752 (1983) ("Canon Law").

[4] Canon Law, c. 369.
[5] Id. at c. 377 § 1.

[6] Id. at c. 374.

[7] Id. at c. 515.

purposes in the name of the Church.  Dioceses and parishes are separate public juridic persons in canon law.[8]

Each public juridic person owns all the property it has acquired.  A juridic person possesses property in order to carry out its mission to teach, sanctify and serve.  These purposes are broadly defined as the conduct of worship, the support of employees and ministers, and the works of the apostolate.[9]  Canon Law requires the ownership of property to be protected by valid means under secular civil law, and permits the formation of secular legal entities, like the Diocese and parishes located within its ecclesiastical boundaries to hold property and conduct the business of a public juridic person.

The administration of property is the responsibility of a public juridic person's administrator,[10] such as a diocesan bishop over the property of a diocese or a pastor over the property of a parish.  The administrator of the property of a public juridic person must exercise this responsibility in concert with a Finance Council.[11]  It is a fundamental canonical understanding that property owned by one public juridic person cannot be simultaneously owned or controlled by another.

The persons who populate a diocese or a parish are first of all those who are baptized and live in communion with the successor of St. Peter (the Pope, otherwise known as the Supreme Pontiff of the Roman Catholic Church) and those in communion with him.[12]  Among the baptized are laypersons and clerics.[13]  Clerics are also called sacred ministers and perform many of the liturgical services within the worship of the Church.  Clerics are deacons, priests or bishops.  There are other individuals, called "Religious," who contribute to the mission of the Church by joining together through common life and the profession of the evangelical counsels of poverty, chastity, and obedience.[14]  Religious may be either laypersons or clerics.  If a Religious is not a cleric, that person is referred to as a sister or brother.

In the Diocese, there are 4 communities of Religious men, and 15 communities of Religious women.

---

[8] Juridic personality is articulated in 1983 Code in canons 113-123.

[9] 1983 Code c. 1254.  The works of the apostolate include activities associated with easing human suffering, promoting the general welfare, and advancing the social mission of the Church:  feeding the hungry, clothing the poor, welcoming the stranger, caring for the sick and offering education - and any other activity that can promote the good of an individual and society.

[10] Id. at c. 1279 § 1.

[11] Id. at c. 1280.

[12] Id. at c. 204.

[13] Id. at c. 207 § 1.

[14] Id. at c. 207 § 2.

### b. **The Diocese of Camden**

Catholics who lived in New Jersey were initially the responsibility of the Diocese of Baltimore until 1808, when South New Jersey passed under the authority of the Diocese of Philadelphia. On August 15, 1830, Bishop Francis Kenrick dedicated the St. Mary's Church in Pleasant Mills, New Jersey. St. Mary's Church was the fourth Catholic church in New Jersey and the first in the area that makes up present-day Diocese of Camden. The first parish and school were established at St. Mary's, Gloucester in 1849 and 1859, respectively.

In 1853, the Diocese of Newark was created and South New Jersey passed under the authority of the Diocese of Newark. Catholics in the area remained under the care of the Diocese of Newark until 1881 when the Diocese of Trenton was established.

With continued growth in the Catholic population during the first decades of this century, Pope Pius XI on December 9, 1937 established the Diocese of Camden. This also marked the time that New Jersey, previously part of the ecclesiastical province of New York, became a separate province, with the metropolitan see at Newark, which established it as an archdiocese.

Under New Jersey Law, the Diocese is an incorporated legal entity formed pursuant to New Jersey's Religious Corporations Law, Title 16 of the *Revised Statutes of New Jersey*, with its own corporate structure and governance, separate from the Parishes and schools, which are other Catholic entities within its territory (collectively, the "Other Catholic Entities"). The Other Catholic Entities are separate civil corporations, several of which predate the establishment of the Diocese, with their own employees and which maintain their own books, records, bank accounts and employee payrolls. These Other Catholic Entities are not debtors in this chapter 11 proceeding and have not otherwise sought relief under the Bankruptcy Code.

The juridic person of the Diocese of Camden was canonically established on December 9, 1937. Thereafter, on June 17, 1938, a corporation was formed to constitute the Diocese of Camden under N.J.S.A. 16:15-9 to 16:15-17. By statute, N.J.S.A. 16:15-10, the five trustees of the Diocese are the Bishop, the Vicar General and the Chancellor and two priests of the Diocese whom they elect.

The Diocese serves a 6-county region in Southern New Jersey. There are currently 62 parishes (each, a "Parish," and collectively, the "Parishes") which serve approximately 486,368 Catholic individuals in the territory of the Diocese. The Parishes are incorporated under N.J.S.A. 16:15-1 to 16:15-8.

In addition, there are four "missions" within the Diocese. Three of them, Mater Ecclesiae Chapel, Inc., Saint Yi Yun Il John Cherry Hill Korean Catholic Mission, Inc., and Saint Andrew Kim Korean Catholic Mission, Inc. are organized and operated as nonprofit corporations in accordance with Title 15A of New Jersey Law. These missions are not considered to be "parishes" under Canon Law since they serve specific communities that cross Parish boundaries. They cannot be incorporated under N.J.S.A. 16:15-1, *et seq.*, which only provides for the incorporation of Catholic parishes, although their respective corporate governance structures mirror that of a Title 16 parish. The fourth mission is Padre Pio Shrine in Buena Borough, N.J., Inc., which is a non-profit membership corporation of which the Diocese is the member.

These Parishes are served by 124 active Diocesan priests, 88 retired Diocesan priests, 31 Religious priests that reside in the Diocese, 15 extern priests[15], 66 active permanent deacons serving in the Diocese, 38 retired permanent deacons living in the Diocese, and 15 permanent deacons serving outside the Diocese.[16]   Deacons are men ordained for the ministry of the word (catechetics and preaching), service to the poor, and liturgical assistance.  Deacons may preside at baptisms, officiate at marriages, and provide for the funeral rites apart from the celebration of the Eucharist.

### c.   The Parishes

The secular legal embodiments of the Parishes extant within the Diocese are incorporated, and function pursuant to, separate provisions of the Religious Corporation Law that provide for the incorporation and operations of Dioceses.  Pursuant to N.J.S.A. 16:15-1 and 15-3, each of the Parish Corporations is governed by a Board of Trustees comprised of the Bishop, the Vicar General of the Diocese, the Pastor of the Parish and two lay members of the Parish.

Each Parish corporation owns the real and personal property that is used in its ministry. Each Parish pays its own employees, has its own taxpayer/employer identification number, holds its own meetings, and appoints its own councils and committees.

In 2019, throughout the 62 parishes in the Diocese, there were 548 marriages, 3,335 baptisms, 2,902 First Communions, and 2,980 Confirmations.

### d.   Independent Catholic Schools (Elementary and Secondary)

There are twenty-two (22) elementary schools operated in conjunction with the Diocese. With the exception of the Bishop McHugh Regional School in Dennis Township in Cape May County, each elementary school is owned by the respective parish where it is located, although most are regional schools that serve multiple parishes. The Bishop James T. McHugh Regional School, Inc. (Pre-K through 8th Grade), located in Cape May County, is a separate nonprofit corporation whose trustees are *ex officio* the pastors of parishes in that County. Additionally, the junior high school (7th and 8th grades) affiliated with Gloucester Catholic High School in Gloucester City in Camden County is owned by St. Mary's Church, Gloucester, and the pre-K-12th grade Wildwood Catholic Academy in Wildwood, in Cape May County, is owned by Notre Dame de la Mer Parish, Wildwood, N.J..  Additionally, there are four elementary schools (three of which are in Camden, and one of which is in Pennsauken), which are owned by Parishes but operated by Catholic Partnership Schools, Camden, N.J., Inc.

St. Joseph Child Development Center, Inc., which was incorporated in 2003, operates a pre-school daycare program and facilitates early childhood education in Camden, New Jersey for approximately 120 children ages 2½ through 6.  The pastor of St. Joseph's Pro-Cathedral is an *ex*

---

[15] An extern priest is a priest incardinated in another diocese or institute of consecrated life who comes with the permission of the diocesan bishop to exercise ministry in the territory of the Diocese.  Incardination is the bond that exists between a cleric and a diocese or institute of consecrated life.

[16] The statistics cited in this paragraph are as of December 31, 2019.

*officio* trustee, and the other trustees are appointed by the Bishop. The current trustees are the pastor, Reverend Jaime Hostios, and the lay trustees: Mr. James Catrambone and Ms. Frances Montgomery.

There are five high schools affiliated with the Diocese. Three of these high schools are Title 15A nonprofit corporations: (i) Camden Catholic High School located in Cherry Hill, New Jersey (incorporated as Camden Catholic High School, Cherry Hill, N.J.); (ii) Holy Spirit High School located in Absecon, New Jersey (incorporated as Holy Spirit High School, Absecon, N.J.); and (iii) Pope Paul VI High School located in Haddon Township, New Jersey (incorporated as Pope Paul VI High School, Haddon Township, N.J.). The Bishop of the Diocese is the member of the corporation and he appoints the trustees and certain corporate officers and has certain reserved powers. Gloucester Catholic High School is located in Gloucester City, New Jersey; it is part of St. Mary's Church, Gloucester and is not separately incorporated. Wildwood Catholic Academy (pre-kindergarten through 12th grade) is located in Wildwood, New Jersey; it is part of Notre Dame de la Mer Parish in Wildwood and is not separately incorporated.

The projected census for the 22 Catholic grammar schools operated in conjunction with the Diocese for the 2020-2021 school year is 5,016 students. This includes the students in kindergarten through 8th grade at Wildwood Catholic Academy in Wildwood, the students at Bishop McHugh Regional School in Dennis Township in Cape May County, and the students at the junior high school affiliated with Gloucester Catholic High School in Gloucester City in Camden County. This figure does not include the four schools operated by Catholic Partnership Schools, Camden, N.J., Inc.

The projected census for Catholic high schools affiliated with the Diocese of Camden for the 2020-2021 school year is 2,446 students.

A breakdown of enrollment at each school as of September 23, 2020 is annexed to the Father Hughes' Declaration at Exhibit H. [ECF 3].

While each of the schools set forth herein are independently owned by the Parishes, except as otherwise noted herein, these schools are subject to the general supervision of the Diocese's Superintendent of Schools, their budgets must be approved by the Diocese, and they must comply with the Diocese's child protection policies.

Based on a projected census of 5,016 grammar school students for 2020-2021 and the sending municipality's per pupil expenditure to educate these students, a financial burden of over $108 million would be incurred if these students were educated in public schools. These figures do not include the students in the three grammar schools in Camden City and the one grammar school in Pennsauken Township, which are administered by Catholic Partnership Schools.

With respect to the high schools, based on a projected census of 2,446 high school students for 2020-2021, and the sending municipality's per pupil expenditure to educate these students, a financial burden of $51.2 million would be incurred if these students were educated in public schools. These figures do not include the students enrolled in the three private Catholic high schools (Bishop Eustace Preparatory School in Pennsauken, Our Lady of Mercy Academy in Newfield, and St. Augustine's Preparatory School in Richland).

### e.  Catholic Ministry Entities

There are several nonprofit corporations that work to carry out various ministries of the Church within the territory of the Diocese (collectively, the "Catholic Ministry Entities").  All the Catholic Ministry Entities were created under the New Jersey Nonprofit Corporation law or other New Jersey organizational statutes to carry out a variety of works of the apostolate.

The Catholic Ministry Entities include the following:

### i.  Catholic Charities, Diocese of Camden, Inc.

Catholic Charities, Diocese of Camden, Inc. ("Catholic Charities") was incorporated in 2000 and assumed the operations of Catholic Social Services, Diocese of Camden.  Catholic Social Services, Diocese of Camden had been established in 1971 through the merger of Catholic Charities of the Diocese of Camden, N.J. and Catholic Aid Society of the Diocese of Camden, New Jersey.

Catholic Charities is a nonprofit New Jersey corporation governed by its trustees.  The trustees include (all serving *ex officio*): the Bishop of the Diocese, the Vicar General of the Diocese, and the Chancellor of the Diocese.  In addition, these three trustees elect an additional two trustees for Catholic Charities.  The current *ex officio* trustees are Bishop Dennis Sullivan, Reverend Robert Hughes and Reverend Jason Rocks, and the elected trustees are Sister Helen Cole and Mr. Robert DiStanislao.  The affairs, property, business and policies of Catholic Charities are under the charge, control and direction of the trustees.

Catholic Charities participates in the Church's social mission by recognizing the inherent dignity and worth of all people and responding with sincere Christian compassion to the corporeal needs of the poor and marginalized.  The purpose of Catholic Charities is to aid, support, advise, and conduct, by itself or in cooperation with any religious, charitable, benevolent or education corporation, a wide variety of human services for the benefit of all people in need within the Diocese without regard to religious, racial, ethnic or economic background.  In accordance with Catholic Social Teaching, Catholic Charities creates programs designed to serve the most vulnerable populations, while also guiding them towards a life of self-sufficiency.  These populations include: (i) those affected by housing and financial crises or disasters; (ii) refugees, immigrants, and asylees; (iii) veterans and their families; (iv) those struggling with mental health or addiction who are in need of counseling; (v) individuals looking for employment; (vi) the incarcerated; and (vii) families considering adoption.

Catholic Charities operates based on the following scripture from Matthew 25:35:

> *For I was hungry and you gave me food,*
> *I was thirsty and you gave me drink,*
> *I was a stranger and you welcomed me,*
> *I was naked and you clothed me,*
> *I was sick and you visited me,*
> *I was in prison and you came to me.*

4817-6551-8030, v. 2

Catholic Charities' headquarters is located at 1845 Haddon Avenue, Camden, New Jersey. In addition to its headquarters, Catholic Charities has a Family and Community Services Center in each of the New Jersey counties within the territory of the Diocese. These are located in Westville (Gloucester County), Atlantic City (Atlantic County), Rio Grande (Cape May County), Vineland (Cumberland County), Bridgeton (Cumberland County), Salem City (Salem County), and Penns Grove (Salem County). The headquarters is the Family and Community Services Center in Camden County. Through the Family and Community Services Centers, those in need have access to a wide array of services including food pantries, housing counseling, rental assistance, nutrition education, thrift stores, utilities assistance, SNAP (food stamps) enrollment, and a community resource warehouse.

Catholic Charities employs approximately eighty (80) people and has a budget of approximately $8 million per year. Over half of Catholic Charities' budget is obtained from grants from government entities. In addition, the Diocese provides approximately $3 million per year, mainly through an annual fund-raising appeal.

Specifically, with respect to veterans, the Catholic Charities' Veteran Services Program is designed to assist homeless veterans in leaving homelessness through meaningful, competitive employment and permanent housing. The Veteran Services Program focuses a significant portion of its time on preventing homelessness within the veteran community. Through a $1.6 million grant from the United States Department of Veterans Affairs, Catholic Charities provides various assistance to veterans. Catholic Charities assists homeless veterans in finding and procuring safe and secure places to live. Approximately $500,000 of the grant from Veterans Affairs is specifically designated for rental assistance. Catholic Charities provides up to four months of rental assistance to qualifying veterans. These services can be provided to veterans and their families who live at 35% of the area median income.

Catholic Charities also receives approximately $1 million in grants from the New Jersey Department of Community Affairs. These grants support the following homeless programs:

      a.     Homeless Prevention and Rapid Rehousing Program, which provides up to six months of rental assistance;

      b.     Supportive Services for Homeless People, which provides up to one month of rental assistance; and

      c.     The Homeless Prevention Program, which also provides rental assistance to struggling families.

In 2019, Catholic Charities served 17,143 people within the Diocese's territory. The 2019 Annual Report is annexed to the Reverend Hughes' Declaration at Exhibit I. [ECF 3].

The following entities also fall under the responsibility of Catholic Charities.

### ii.  **The Diocesan Housing Services Corporation of the Diocese of Camden, Incorporated**

The Diocesan Housing Services Corporation of the Diocese of Camden, Incorporated ("Diocesan Housing Services") is a nonprofit membership corporation, which was incorporated in 2000.  Diocesan Housing Services provides housing services to persons in need, including low- and moderate-income families, the disabled, and senior citizens.

Catholic Charities is the member of Diocesan Housing Services.  The trustees of Diocesan Housing Services are Peter O'Connor, Esq. (President), Ms. Alma Johnson (Vice President), Mrs. Laura J. Montgomery (Secretary/Treasurer), Monsignor John Burton, Reverend Thomas Newton, Mr. Joseph Fahy, Mr. William Murray and Reverend Walter Norris, Esq.

In total, Diocesan Housing Services serves approximately 1,100 residents in 847 units across 9 locations in Southern New Jersey.

### 1.  **Senior Housing Services**

The Diocese is the sponsor of Shepherd's Farm, a senior housing development located in West Deptford in Gloucester County.  The development is owned by Shepherd's Farm Senior Housing at West Deptford, Inc., a nonprofit corporation, a majority of whose trustees are appointed by the Diocese.

Diocesan Housing Services is a sponsor or developer and the manager of the following affordable senior housing developments:

a.  **Stonegate at St. Stephen** is located in Pennsauken in Camden County.  Stonegate at St. Stephen, Inc., a nonprofit corporation, owns the development.  Diocesan Housing Services appoints a majority of the trustees.

b.  **Haven House** is located in North Cape May in Cape May County.  Haven House at St. John of God, Inc., a nonprofit corporation, owns the development.  Diocesan Housing Services appoints a majority of the trustees.

c.  **Village at St. Peter's** is located in Pleasantville in Atlantic County.  Village at St. Peter's, Inc., a nonprofit corporation, is the General Partner in the partnership which owns the development.  Diocesan Housing Services appoints the trustees.

d.  **Benedict's Place** is located in Cherry Hill in Camden County.  Benedict's Place, Inc., a nonprofit corporation, is the General Partner in the partnership which owns the development.  Diocesan Housing Services appoints the trustees.

e.  **Stonegate II** is located in Pennsauken in Camden County.  Diocesan Housing Services is the sole member of SG II MM, LLC, which is the Managing Member of the limited liability company which owns the development.

15

f.    **Victorian Towers** is located in Cape May in Cape May County.  Diocesan Housing Services is the sole member of DHSC Cape May LLC, which has a 50% interest in the Managing Member of the limited liability company that owns the development.

## 2.  Other Housing Services

**Village Apartments of Cherry Hill, N.J., Inc.** is a nonprofit corporation, which was incorporated in 1981, and owns an affordable housing development for seniors and disabled individuals located in Cherry Hill in Camden County.  The trustees are the trustees of the Diocese or individuals approved by the Diocese.  The current trustees are Bishop Dennis Sullivan, Reverend Jason Rocks, Monsignor John Burton and Reverend Joseph Szolack and Reverend Robert E. Hughes.  Diocesan Housing Services manages the property.

Diocesan Housing Services manages **Davenport Village**, an affordable family housing development located in Hainesport in Burlington County, and controls the partnership which owns the development.  The General Partner of the partnership is Domicilium Corporation, a nonprofit corporation, which was incorporated in 2000 and whose trustees are elected by Diocesan Housing Services.  The current trustees are Reverend Walter Norris, Esq., Mr. Felix Torres-Colon, and Mr. George Tutwiler.

**Bishop Guilfoyle Housing Fund, Inc.** is a nonprofit membership corporation, which was incorporated in 2017 and supports the work of Diocesan Housing Services.  Diocesan Housing Services is its sole member and appoints its trustees.  The current trustees are Monsignor John Burton, Monsignor Thomas Morgan, and Reverend Joseph Perreault.

**DHS Communities, Inc.** is a nonprofit membership corporation, which was incorporated in 2019 and provides housing to people with autism spectrum disorder and similar disabilities.  Diocesan Housing Services is the sole member and appoints the trustees.  The current trustees are Mr. James Reynolds, Mr. Robert Waite, and Mr. Stephen Schoch.

### iii.  St. Mary's Catholic Home, Delaware Township, NJ

St. Mary's Catholic Home, Delaware Township, NJ is a nonprofit membership corporation that formerly operated a nursing home and residential health care facility in Cherry Hill, New Jersey (formerly known as "Delaware Township").  The nursing home and care facility was sold in 2015.[17]  Catholic Charities is the member.

The entity continues to own land in Cherry Hill, portions of which were conveyed for Village Apartments in 1981 and for Benedicts Place in 2012.  In addition, other facilities have

---

[17] On December 14, 2015, the Healthcare Foundation entered into a Guaranty and Suretyship Agreement (the "Agreement") with Center Management Group, LLC and its affiliates (collectively, "CMG"), as the buyers of (i) St. Mary's Catholic Home, (ii) Bishop McCarthy Residence, and (iii) Our Lady's Residence (collectively, the "Nursing Homes").  Pursuant to the Agreement, the Healthcare Foundation unconditionally guaranteed and became the surety for certain claims that may arise between CMG and the former owners of the Nursing Homes.  In connection with the Agreement, the Healthcare Foundation pledged an investment account it owns that is held at PNC Bank. The maximum amount of the guaranty under the Agreement is $8,000,000 for years 2-8 of the Agreement.  On December 14, 2023, the Agreement will expire by its own terms.

16

been constructed on this property (Sacred Heart Residence for Priests, its ancillary residences, and a convent).[18]

### iv.  Bishop McCarthy Residence, Vineland, NJ

Bishop McCarthy Residence, Vineland, NJ is a nonprofit membership corporation that formerly operated a nursing home and residential health care facility in Vineland, New Jersey.[19] Bishop McCarthy Residence was sold in 2015.  The member is Catholic Charities.

### v.  Our Lady's Residence, Pleasantville, NJ

Our Lady's Residence, Pleasantville, NJ is a nonprofit membership corporation that formerly operated a nursing home and residential health care facility in Pleasantville, New Jersey, which was sold in 2015.[20]  The member is Catholic Charities.

### B.  The Debtor's Management

### a.  Background of the Most Reverend Dennis J. Sullivan

The Most Reverend Dennis J. Sullivan, D.D. was appointed as the eighth Bishop of the Diocese by Pope Benedict XVI on January 8, 2013 and was installed as Bishop on February 12, 2013.

Bishop Sullivan was born in the Bronx on March 17, 1945.  He was educated at St. Anthony Parish Elementary School and Mount St. Michael Academy in the Bronx.  Thereafter, Bishop Sullivan attended Iona College in New Rochelle, New York, but left after his second year to enter St. Joseph's Seminary in Yonkers, New York.  There, Bishop Sullivan earned a bachelor's degree in 1967 and a Master of Divinity in 1970.

Bishop Sullivan was ordained a priest for the Archdiocese of New York in 1971.  From 1971 to 1981, he served as assistant pastor at the Parish of St. Elizabeth's Church in Manhattan, the Church of the Ascension in Manhattan, and Saints Philip and James Church in the Bronx. From 1982 to 2002, he was assigned to St. Teresa's Church in Manhattan, and from 2002 to 2004 he was assigned to Saints John and Paul Church in Larchmont, New York.

Bishop Sullivan also was ordained as an Auxiliary Bishop for the Archdiocese of New York in 2004 and served eight years as Vicar General of the Archdiocese under Cardinal Timothy Dolan, and the late Cardinal Edward Egan.

---

[18] The net proceeds from this sale were used to fund The Diocese of Camden Healthcare Foundation, Inc.

[19] The net proceeds from this sale were used to fund The Diocese of Camden Healthcare Foundation, Inc.

[20] The net proceeds from this sale were used to fund The Diocese of Camden Healthcare Foundation, Inc.

4817-6551-8030, v. 2

In 1999, the Bishop was named a Prelate of Honor to His Holiness (with the title "Monsignor").  Throughout his ministry, Bishop Sullivan has served on a variety of boards and committees, including:

        a.        The Presbyteral Council of the Archdiocese of New York as representative of South Manhattan priests;

        b.        The Lower East Side Catholic Area Conference, a pastoral agency;

        c.        The Inter Parish Finance Committee, which assists poor parishes;

        d.        Cabrini Immigrant Services;

        e.        Immigrant Social Service, Inc., an agency that provides services for Asian-American youth;

        f.        Two Bridges Neighborhood Association, which built 2,200 moderate income apartments;

        g.        The Catholic Campaign for Human Development Committee, which is part of the United States Conference of Catholic Bishops for a two-year term; and

        h.        At the United States Catholic Conference of Bishops, as the representative of Region II to the Committee for the Protection of Children and Young People.

In March 2020, pursuant to Canon Law, when Bishop Sullivan became 75 years old, he submitted his resignation to the Vatican.  No action has been taken and Bishop Sullivan continues to serve.

### b. Background of Reverend Robert E. Hughes

The Reverend Robert E. Hughes is the Vicar General of the Roman Catholic Diocese of Camden and the Vice President of the civil corporation, The Diocese of Camden, New Jersey.  He has served in such capacity since December 3, 2013.

He was raised within the territory[21] of the Diocese, having lived in West Berlin, New Jersey and Voorhees, New Jersey.  In 1981, he graduated from Paul VI High School in Haddonfield, New Jersey, one of the high schools affiliated with the Diocese.

Following high school, he attended La Salle University in Philadelphia, PA for two years to study pre-med before entering the seminary.  He was assigned to St. Pius X Seminary in Dalton, Pennsylvania.  He graduated from the University of Scranton in 1985 with a Bachelor of Arts in Philosophy.

Thereafter, he attended the Pontifical North American College in Rome, Italy, where he studied for five years, receiving the equivalent of a Master's Degree in Sacred Theology from the

---

[21] The territory of the Diocese is coextensive with the following six (6) counties: Atlantic, Camden, Cape May, Cumberland, Gloucester, and Salem.

Pontifical University of St. Thomas in Rome in 1988.  In 2001, he also received a Master's Degree in Education from Seton Hall University.

On August 4, 1990, he was ordained by the Most Reverend James T. McHugh at the Cathedral of the Immaculate Conception in Camden, New Jersey.  On that same date, he was assigned to Holy Saviour Church in Westmont, New Jersey by Bishop McHugh as an assistant pastor.  He served in that capacity until July 2, 1996, when he was assigned to St. Francis de Sales Church in Barrington, New Jersey.  From August 14, 1999 to June 20, 2000, he was assigned to St. Mary's Church in Gloucester City, New Jersey.  From June 20, 2000 through June 17, 2002, he was assigned to Mary, Mother of the Church in Bellmawr, New Jersey.  Thereafter, from June 17, 2002 through July 5, 2003, he served as the Parochial Vicar in Residence for St. Thomas More Church in Cherry Hill, New Jersey.  From July 5, 2003 through February 1, 2014, he served as Pastor of the Church of the Holy Family in Washington Township, Gloucester County.

In addition, from July 2, 1996 through 1999, he served as a Religion and Latin teacher and the chairperson of the Religion Department at Paul VI High School.  Thereafter, on August 26, 1999, he was appointed the Vice Principal of Gloucester Catholic High School.

On October 10, 2001, he was appointed the President of Paul VI High School.  In that capacity, he administered the School in conjunction with the Principal until 2003.  In 2005, he was again appointed as the President of Paul VI High School and served in that capacity for two three-year terms.

In addition to his roles as a Pastor and school administrator during this time period, Reverend Hughes served as the Vicar for Pastoral Life for the Diocese from January of 2003 through January of 2006 and as a Consultant to the College of Consultors from September of 2009 through November of 2011.  He also served on the Diocesan Liturgical Commission, the Continuing Education & Spiritual Formation of Priests Committee, the Liturgical Art & Architecture Committee, the Priest Personnel Board and the Presbyteral Council.

On August 16, 2011, Reverend Hughes was appointed as the Chancellor of the Diocese. Reverend Hughes was appointed as the Vicar General on December 3, 2013.  The Vicar General is essentially the chief operations officer of the Diocese.  All departments within the Diocese report to him.  On a regular basis, he oversees the Diocesan operations, the cemeteries, housing, charitable activities of the Diocese, and relationships with the parishes, schools, housing operations and Catholic Charities.  As Vicar General, he serves these various ministries and programs within the Diocese in any way possible as the need arises.

### c.  Professional Background of Laura J. Montgomery

Laura J. Montgomery is the Diocesan Finance Officer and the Bishop's Delegate for Temporalities for the Diocese.

In 1985, Ms. Montgomery graduated from Drexel University with a Bachelor of Science in Business Administration focused on accounting.  In 1988, she successfully completed the Uniform Certified Public Accountant Examination.

4817-6551-8030, v. 2

Ms. Montgomery has nearly 30 years of experience working in finance and accounting roles for non-profit organizations. From June 1996 to August 2001, she was the Director of Accounting Services for the Archdiocese of Philadelphia after having worked as Assistant Treasurer and in other financial positions beginning in November 1990. From August 2001 through January 2004, she was the Controller for Project H.O.M.E., a non-profit organization that focuses on breaking the cycle of homelessness and poverty and alleviating the underlying causes of poverty.

In January 2004, Ms. Montgomery became the Controller for Catholic Charities, Diocese of Camden, Inc. and The Diocesan Housing Services Corporation of the Diocese of Camden, Incorporated and later added four nursing homes associated with the Diocese. In 2015, she became the Director of Finance for the Diocese of Camden. In 2018, she became the Chief Financial Officer and Diocesan Finance Officer and Bishop's Delegate for Temporalities of the Diocese. The position of Finance Officer is established under Can. 494 §1 of Canon Law, which requires: "every diocese, after having heard the College of Consultors and the Finance Council, the Bishop is to appoint a Finance Officer who is truly expert in Financial affairs and absolutely distinguished for honesty."

## C. **The Debtor's Assets**

Under New Jersey law, the Diocese is an incorporated legal entity formed pursuant to Article 2 of Chapter 15 of Title 16 of the Revised Statutes of New Jersey (N.J.S.A. 16:15-9 to 15-17) with its own corporate structure and governance separate and distinct from the other Catholic entities located in the same geographic area.

Gross revenue and support ("Gross Revenue") ffor the current fiscal year (July 1, 2020 through November 30, 2020) is approximately $18.1 million. Gross Revenue for the fiscal year ending on June 30, 2020 was approximately $49.5 million while expenses were approximately $58.2 million. Gross Revenue for the fiscal year ending on June 30, 2019 was approximately $50.7 million and expenses were approximately $64.8 million. Expenses include non-cash items including depreciation and reserves.

The primary source of funds used by the Diocese to support its daily operations comes from parish assessments. The Diocese assesses parishes a percentage of their annual Ordinary Income. Assessments are due on a monthly basis and provide financial support for pastoral, education, religious personnel development (education and care of priest and seminarians), youth and administrative program areas. Additional sources of operating funds include: (i) revenue from the *House of Charity – Bishop's Annual Appeal* and the Diocesan share (30%) of the *Catholic Strong* appeal; (ii) contributions and bequests from the faithful and grants from the Diocese of Camden Trusts, Inc. and the Diocese of Camden HealthCare Foundation, Inc.; and (iii) realized investment gains.

The House of Charity – Bishop's Annual Appeal is an annual campaign undertaken early in the calendar year, the proceeds of which are used to support various ministerial and social service programs. As of June 30, 2020, pledges for the House of Charity – Bishop's Annual Appeal were over $916,000 to be collected through June 30, 2021. The House of Charity provides the day-to-day operational income that supports the pastoral, charitable and social ministries of the

Diocese, including Catholic Charities, support for seminarian education and housing for retired priests, support for VITALity Catholic Healthcare Services, support for Catholic education including special education, as well as support for our various pastoral ministries. Monies that are raised in this fiscal year are expended next fiscal year. Without the House of Charity, the Diocese could not fulfill its mission.

The Catholic Strong Campaign ("CSC") was a capital campaign that sought to raise $40 million to primarily benefit the parishes. Of the funds raised through the CSC, 70% was designated solely for the parishes. Their needs include updates to physical plant, new or expanded youth and pastoral ministries, and the hiring of staff to support parish programs. Thirty (30%) percent of the funds raised are designated for the Diocese for supporting stronger faith, stronger service and stronger Catholic schools. These are restricted funds. As of June 30, 2020, the CSC had $40.5 million in pledges, of which $20.7 million has been collected and $13.3 million has been distributed, or deposited to the credit of the parishes accounts in the Revolving Fund..

### D. Retirement Programs

The Diocese administers several retirement programs for the priests and lay employees of the Diocese.

### a. Pension Plan for Priests of the Diocese of Camden

As part of its retirement programs, the Diocese has a Pension Plan for Priests of the Diocese of Camden (the "Priest Pension Plan"). The Priest Pension Plan is a non-contributory defined benefit plan covering all incardinated priests in good standing of the Diocese. The Priest Pension Plan qualifies as a church institution under the Internal Revenue Code and is, therefore, not subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), nor are the Priest Pension Plan's benefits guaranteed by the Pension Benefit Guarantee Corporation. The Priest Pension Plan is exempt from federal income tax under provisions of Section 501(c)(3) of the Internal Revenue Code. The Priest Pension Plan is covered under Code Section 414(e) - Church Plans.

Priests who serve in a Diocesan assignment for at least 25 years begin receiving benefits upon retirement with approval from the Ordinary of the Roman Catholic Diocese of Camden. Priests with less than 25 years, but at least 10 years of service receive a reduced benefit upon retirement. Under the Priest Pension Plan, normal retirement age is 70 with mandatory retirement at age 75. The Priest Pension Plan permits early retirement at age 65 due to permanent mental or physical disability, or with the approval of the Bishop.

Retired priests received $2,284 and $2,222 per month for the years ended June 30, 2019 and 2018, respectively, if they live outside a rectory or Diocesan facility. If the priest lives in a rectory or a Diocesan facility, the monthly benefit to the participant was $1,374 and $1,337 for the years ended June 30, 2019 and 2018, respectively, with the difference being paid each month to the parish or Diocesan facility providing residence. If a priest receives a pension benefit from another source, the monthly benefit is reduced by the amount of the outside benefit.

Contributions to the Priest Pension Plan are assessed by the Diocese to the parishes and affiliated organizations being served by priests in a Diocesan assignment. For the years ended

June 30, 2019 and 2018, the amount assessed on behalf of each priest was $7,000 and $6,650, respectively.  As of the filing date, this plan was not fully funded.

### b.  Pension Plan for Certain Lay Employees of the Diocese of Camden

As part of its retirement programs, the Diocese has a Pension Plan for Certain Lay Employees of the Diocese of Camden (the "Lay Pension Plan").  The Lay Pension Plan is a non-contributory defined benefit plan covering certain employees of the Diocese and affiliated organizations designated by the Diocese as entitled to adopt the Lay Pension Plan. The Lay Pension Plan qualifies as a church institution under the Internal Revenue Code and is, therefore, not subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), nor are the Lay Pension Plan's benefits guaranteed by the Pension Benefit Guarantee Corporation.  The Lay Pension Plan is exempt from federal income tax under provisions of Section 501(c)(3) of the Internal Revenue Code.  The Plan is covered under Code Section 414(e) - Church Plans.

An employee became eligible to participate in the Lay Pension Plan after age 21 and completing one full year of service to the Diocese or other affiliated organization. An employee received a 100% vested benefit after ten years of credited service.  Effective July 1, 2009, participation in the Lay Pension Plan was frozen for employees hired on or after such date.  Current Lay Pension Plan participants continue to participate in the Lay Pension Plan with no change. Any former participant who vested and left the Diocese can re-enter the Plan upon rehire. Non-vested former employees can re-enter the Lay Pension Plan within two years from the date of separation unless such participant was separated as part of a merger or closure in which case the participant may re-enter within four years of separation.  Additionally, a participant is enrolled in the Lay Pension Plan as of his or her date of eligibility, and the participating organization is billed for his or her contribution.

The Lay Pension Plan provides for normal retirement on the last day of the month coinciding with or next following the later of the date the participant attains age 65 or the tenth anniversary of the date he or she becomes a plan participant.  The Lay Pension Plan permits early retirement for participants on the last day of the month in which a participant attains age 62, or the tenth anniversary of the date he or she becomes a plan participant, if later.  Benefits under early retirement are reduced by 1/2 of 1% for each month prior to normal retirement date.

A participant who retires on or after his or her normal retirement date is entitled to an annual pension benefit equal to 1.4% of annual earnings for the first ten years of credited service plus 1.8% of annual earnings for the next fifteen years of credited service plus 2.2% of annual earnings for the remaining years of credited service.  In no event does a participant receive less than $100 per month in full retirement.

In the event of the death of a vested active or vested terminated participant, a death benefit is paid to the employee's eligible spouse beginning when the deceased participant would have reached the age of 65.  The benefit is equal to one-half of the amount the eligible employee would have received had the employee retired the day before the employee's death and elected a 50% contingent annuitant option.

4817-6551-8030, v. 2

Contributions to the Lay Pension Plan are assessed by the Diocese to each participating organization. For each of the years ended June 30, 2019 and 2018, these assessments were made based upon 13.5% and 13% of participating employees' W-2 salaries for the years ended December 31, 2018 and 2017, respectively. As of the filing date, this plan was also underfunded.

### c.  Post-Retirement Benefits Plan for Priests of the Diocese of Camden

As part of its retirement programs, the Diocese has a Post-Retirement Benefits Plan for Priests of the Diocese of Camden (the "Priest Post-Retirement Plan"). The Priest Post-Retirement Plan is a non-contributory defined benefit plan that provides health benefits and automobile insurance for all incardinated priests in good standing of the Diocese. The Priest Post-Retirement Plan qualifies as a church institution under the Internal Revenue Code and is, therefore, not subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), as amended. The Priest Post-Retirement Plan is exempt from federal income tax under provisions of Section 501(c)(3) of the Internal Revenue Code. The Priest Post-Retirement Plan is covered under Code Section 414(e) - Church Plans.

Under the Priest Post-Retirement Plan, participants who have served in a Diocesan assignment for at least 25 years receive health benefits (medical, dental, vision and prescription) upon retirement with approval from the Ordinary of the Roman Catholic Diocese of Camden. Normal retirement age is 70 with mandatory retirement at age 75. The Priest Post-Retirement Plan permits early retirement at age 65 due to permanent mental or physical disability, or with approval of the Bishop. Participants who retire at age 70 and have at least 10 years of service in a Diocesan assignment also receive full health benefits upon retirement. Automobile insurance premiums are also paid by the Priest Post-Retirement Plan for certain priests.

The Diocese assesses the parishes and affiliated organizations in which priests are serving for the Priests Post-Retirement Plan. For the years ended June 30, 2019 and 2018, the amount contributed on behalf of each priest was $3,000 and $2,850, respectively. As of the filing date, this plan was also underfunded.

### d.  The Diocese of Camden Retirement Plan

As part of its retirement programs, the Diocese has established The Diocese of Camden Retirement Plan (the "Lay Retirement Plan"). The Lay Retirement Plan is a non-contributory defined contribution "profit sharing" plan covering certain employees of the Diocese and affiliated organizations designated by the Diocese as entitled to adopt the Lay Retirement Plan. The Lay Retirement Plan qualifies as a church institution under the Internal Revenue Code and is, therefore, not subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA). The Lay Retirement Plan is exempt from federal income tax under provisions of Section 501(c)(3) of the Internal Revenue Code. The Plan is covered under Code Section 414(e) - Church Plans.

An employee becomes eligible to participate in the Lay Retirement Plan after age 21 and completing one full year of service. An employee has a 100% vested benefit after ten years of credited service.

Employer discretionary contributions are allocated to a participant's account as a uniform percentage of the employee's annual earnings. Each participant's account is credited with

23

contributions, allocated forfeitures and earnings thereon. The benefit to which a participant is entitled is the benefit that can be provided by the participant's vested balance.

The Lay Retirement Plan provides for normal retirement on the first day of the calendar year month immediately following the date the participant attains age 65 with ten years of credited service. A participant's normal form of distribution is a single lump sum cash distribution. A participant who has not terminated employment and has attained age 59-1/2 may elect a withdrawal of all, or any portion of, his/her vested account benefit.

A person who terminates employment is entitled to elect to receive a distribution of all or any portion of his/her vested account benefit as soon as reasonably possible following the termination date. The participant may elect to receive a distribution of any deferred amount at any time.

The Diocese assesses participating organizations to the Plan. For each of the years ended June 30, 2019 and 2018, assessments were made based upon 3% of participating employees' W-2 wages for each of the years ended December 31, 2018 and 2017.

The benefit of a participant who is not vested is retained by the Diocese, as the Trustee of the Lay Retirement Plan, and deposited into the forfeiture account after that participant has incurred two consecutive one-year breaks in service, and is applied to reduce employer contributions under the Lay Retirement Plan or to pay Lay Retirement Plan expenses. At June 30, 2019 and 2018, the forfeiture balance was $10,609 and $10,369, respectively. As of the filing date, this plan was also underfunded.

### E.  Trust Funds and Foundations

#### a.  Diocese of Camden Trusts, Inc.

The Diocese of Camden Trusts, Inc. ("DOC Trusts") is a separate legal entity from the Diocese, formed in 2001, and is more fully described in Reverend Hughes' Declaration. DOC Trusts is organized for the purpose of assisting the Diocese in fulfilling its religious, charitable and educational mission by providing funding for education, religious personnel development, health care needs, canonically required offices and long-term capital needs.

The Bishop of the Diocese is the member. The current trustees are Monsignor Thomas Morgan, Judge Joseph Rodriguez, and Kenneth J. Bossong, Esq.

The Board of Trustees of DOC Trusts is responsible for the overall governance of DOC Trusts. The Board of Trustees of DOC Trusts is assisted by the Diocese's Investment Committee with respect to the investment of the DOC Trusts' assets. All of the investments are managed based on the Diocese of Camden Trusts, Inc. Statement of Investment Policies and Objectives.

The Investment Committee's oversight of the portfolio includes:

     a.  Developing sound and consistent investment objectives, policies, and guidelines that each investment manager can use in formulating corresponding investment strategies and decisions;

      b.      Assuring that DOC Trusts' asset allocations among various asset classes and styles meet the allocations directed by the trustees;

      c.      Determining the number of managers and investment styles/strategies for the equity, bond, and alternative strategy allocations;

      d.      Selecting qualified investment managers;

      e.      Monitoring and evaluating each investment manager's portfolio and performance to insure that the investment policy guidelines are being adhered to and that objectives and goals are being achieved;

      f.      Taking appropriate action to replace an investment manager.;

      g.      Communicating clearly the duties and responsibilities of each investment manager; and

      h.      Reviewing investment portfolio data quarterly and monthly flash reports.

The investments of DOC Trusts are administered by Cobble Hill Financial Services, Inc. ("Cobble Hill"), which acts as the investment consultant and advisor for the Diocese and DOC Trusts.

As set forth below, DOC Trusts has pledged certain of its investment accounts as collateral for the Diocese's line of credit with PNC Bank.

### b.   The Diocese of Camden Healthcare Foundation

The Diocese of Camden Healthcare Foundation, Inc. (the "Healthcare Foundation") is a separate legal entity from the Diocese, formed in 2015, and is more fully described in Reverend Hughes' Declaration. Doc No. 3, ¶ 101.  The Healthcare Foundation assists in funding the development, implementation and ongoing support of healthcare programs.

The Bishop of the Diocese is its member.  The current trustees are Mary Bettina Kemps, R.N., Judge Donald Smith, and Reverend Monsignor Peter M. Joyce.

The Board of Trustees is responsible for the overall governance of the Healthcare Foundation.  All of the investments are managed based on the Diocese of Camden Healthcare Foundation, Inc. Statement of Investment Policies and Objectives and are managed by the Investment Committee..

The investments of the Healthcare Foundation are administered by Cobble Hill Financial Services, Inc. ("Cobble Hill"), which acts as the investment consultant and advisor for the Healthcare Foundation.

The Foundation was assigned the net proceeds of the purchase price of the sale of three nursing homes in 2015 pursuant to the Order and Opinion of the Honorable Deborah Silverman Katz, Assignment Judge.  As part of the transaction, $10 million must remain in an account with

PNC Bank (the "Control Account") until December 14, 2023 as a guarantee of certain covenants in the transaction.

### c.  The Tuition Assistance Fund, Inc.

The Tuition Assistance Fund, Inc. (the "Tuition Fund") is a nonprofit membership corporation that was incorporated in 1980.  The Tuition Fund provides tuition assistance to needy families whose children attend schools affiliated with the Diocese.  The members are, ex officio, the Bishop of the Diocese, the Vicar for Administration, and the Chancellor of the Diocese.  The current members are Bishop Dennis Sullivan, Reverend Robert Hughes and Reverend Jason Rocks.  In addition, there are five trustees:  (i) the Bishop or his designee; (ii) the Superintendent of Catholic Schools or his/her designee; and (iii) three trustees elected by the members.

### d.  The Sharkey Family Charitable Trust

The Sharkey Family Charitable Trust (the "Sharkey Family Trust") was established in 1988 to contribute to Catholic organizations and engage in activities supported by the Church.  The Sharkey Family Trust regularly provides scholarships for students in Catholic secondary schools. There are three trustees, two of whom are appointed by the Bishop of the Diocese, and the third of whom is elected by the two appointed trustees.  The current trustees are Reverend Robert Hughes, Reverend Jason Rocks, and Mrs. Laura J. Montgomery.

### e.  The Frank J. and Rosina W. Suttill Catholic Foundation

The Frank J. and Rosina W. Suttill Catholic Foundation (the "Suttill Foundation") is a nonprofit membership corporation and was incorporated in 1972.  The principal purpose of the Suttill Foundation is to provide a scholarship program for students from Camden to attend college. The members are the Bishop of the Diocese, the Vice President of the Diocesan Corporation, and an individual selected by the Diocese.  The current members are Bishop Dennis Sullivan, Reverend Robert Hughes, and Reverend Joseph Szolack.  There are two Priest Directors (trustees) and one Lay Director (trustee) who are appointed by the Bishop.  The current directors are Reverend Joseph Szolack, Reverend Robert Hughes, and Mrs. Laura J. Montgomery.

### F.  Other Catholic Entities

### a.  Sacred Heart Residence for Priests, Inc.

Sacred Heart Residence for Priests, Inc. (the "Residence") is a nonprofit corporation that was incorporated in 1996 to provide accommodations for retired priests.  The three trustees are, *ex officio*, the Bishop for the Diocese, the Vicar General of the Diocese, and the Vicar for Priests. The current trustees are Bishop Dennis Sullivan, Reverend Robert Hughes, and Reverend Nicholas Dudo.

### b.  Catholic Business Network of South Jersey, Inc.

Catholic Business Network of South Jersey Inc. (the "Network") is a nonprofit membership corporation that was incorporated in 2016 and is intended to strengthen and support the application of faith and charity in the marketplace.  The Bishop of the Diocese is the member.

### c.  The Catholic-Jewish Commission of Southern N.J., Incorporated

The Catholic Jewish Commission of Southern N.J., Incorporated (the "Commission") is a nonprofit membership corporation that was incorporated in 2002 and is intended to promote communication between the Jewish and the Catholic communities.  The members are the Jewish Federation of Southern New Jersey and the Diocese.

### d.  The Catholic Star Herald

The *Catholic Star Herald* (the "Herald") is a nonprofit corporation that was incorporated in 1951 to publish newspapers, journals, magazines and books.  It publishes thirty-six (36) issues per year.  The Bishop, the Vicar General, and the Chancellor are *ex officio* trustees and they elect two priests as the other trustees.  The *ex officio* trustees are Bishop Dennis Sullivan, Reverend Robert Hughes, and Reverend Jason Rocks.  The elected trustees are Reverend Monsignor John Burton and Reverend Joseph Szolack.

### e.  The Collegium Center for Faith and Culture

The Collegium Center for Faith and Culture (the "Collegium Center") is a nonprofit membership corporation that was incorporated in 1994 to engage in evangelization, and spiritual and moral formation.  Since 2003, the Diocese has been the member.

### f.  VITALity Catholic Healthcare Services

VITALity Catholic Healthcare Services ("VITALity") is a department of the Diocese and provides various healthcare services within the Diocese.  VITALity began in 2015 with funding from The Diocese of Camden Healthcare Foundation, Inc. (the "Healthcare Foundation").  VITALity employs approximately 30 people, including registered nurses, social workers, chaplains and associate chaplains.  VITALity is funded through the Diocese and grants from the Healthcare Foundation.  In 2019, VITALITY had annual funding of $2,383,964, which came from the House of Charity/Bishop's Annual Appeal ($916,105), the Healthcare Foundation ($1,347,856), and a grant through Diocesan Housing Services ($120,000).  A copy of the 2019 Annual Report is annexed to the Reverend Hughes' Declaration at Exhibit J.  [ECF 3].

VITALity provides the following programs and missions, amongst others:

a.      Staffed by registered nurses and social workers, VITALity Care Coordination provides assistance to individuals and families to navigate healthcare options and support services available.  VITALity gives guidance and assistance to help access medical services that are needed, as well as monitor and oversee those services to evaluate their quality and effectiveness.  The most used services through VITALity's Care Coordination Programs are home health aides, insurance assistance, housing/assisted living, nutritional services/Meals on Wheels, utility assistance, Catholic Charities referrals, prescription assistance, mental health counseling, transportation and in-home medical care.  VITALity provides assistance to individuals in completing Medicaid applications for expanded Medicaid in New Jersey.  This is a long, complicated, and detailed process.

b.      Through the Hospital Chaplaincy Program, VITALity ensures that all parishioners have timely access to Catholic Chaplains when hospitalized. Priest chaplains are partnered with deacons, religious sisters or lay ministers, as associate chaplains to administer pastoral care to patients, families and hospital staff. The chaplaincy team helps in coordinating the visits of parish Extraordinary Ministers of the Eucharist; maintaining communication with the local parishes and pastors to inform them of parishioners that are hospitalized; and assisting patients being discharged to access other health-related services. Through the Hospital Chaplaincy Program, VITALity gave the following care in 2019:

1.  Pastoral care visits with patients: 128,863

2.  Pastoral care visits with staff and families: 14,276

3.  Holy Communion distributed: 68,625

4.  Sacrament of the Sick administered: 4,563

5.  Pastoral care hours by chaplains and associate chaplains:  25,116

c.      Ministry to Persons with Disabilities, which facilitates access to spiritual development for persons with disabilities.  The Ministry works to evangelize and serve persons with disabilities in the Diocese, so that they may be affirmed in all aspects of their faith life and reach their full potential as baptized members of the Church.  In this regard, VITALity assists families in finding transitional care after persons with disabilities age out of the education system and assist families in applying for state aid and grants.

d.      Ministry of the Deaf, which facilitates access to spiritual development for the deaf.  The Ministry works to evangelize and serve the deaf in the Diocese of Camden, so that they may be affirmed in all aspects of their faith life and reach their full potential as baptized members of the Church.  VITALity provides for a special mass each Sunday for deaf individuals.  In addition, VITALity establishes programs in the Parishes to provide opportunity for deaf individuals to gather in social environments.

e.      Parish Nurses Program, which provides parishioners ongoing access to trained registered nurses at their parish. These nurses can screen, educate, and coordinate care needs, all with an added spiritual dimension, allowing seniors and those dealing with health challenges, to stay healthy and more effectively deal with chronic medical conditions in order to remain safe and independent at home, while continuing to be a vital part of their community.  The parish nurse ministries sponsor programs such as "Opioid Prevention and Awareness", "Alzheimer's Awareness", and "The Dangers of Vaping".  In addition, VITALity works to ensure that each Parish has an AED in all facilities for emergencies.

f.      The Resource and Referral Help Line (1-888-26VITAL) is available 24/7 and provides information on programs and services within the parish or community to address pertinent issues related to aging and disability.  Callers are connected to the resource they need to provide appropriate care and support.  Live email chats also provide additional access and a means to connect with VITALity staff.

g.      With the support of VITALity, three Parishes provide daily programs for physical activity, nutritious meals, social interaction and recreation, spiritual exercises along with health screening and monitoring for the elderly.  VITALity currently supports the three Senior Social Day Centers: (i) "The Renaissance Center Senior Ministry" at St. Andrew the Apostle in Gibbsboro, New Jersey; (ii) "Prime Timers" at Church of the Incarnation in Mantua, New Jersey; and (iii) "Golden Slippers Senior Ministry at St. Simon Stock in Berlin, New Jersey.  VITALity assists the Parishes in organizing senior day centers, including providing grants for renovations to Senior Day Centers areas of the Parish and ensuring there is appropriate programming and activities.  VITALity also provides a grant for 50% of the salary of the director for each Senior Day Centers up to $16,000 per year.  While the Senior Day Centers were closed due to COVID-19, isolation for seniors was even more pronounced, with individuals confined to their own homes and separated from their loved ones.  As a result, VITALity continued to ensure that seniors were provided with social activities and, in this regard, supported the Renaissance Center in having weekly Zoom meetings for its seniors.  The weekly sessions lasted approximately two hours, with the first hour devoted to Bible study or a fun activity like trivia, while the second half of the meetings are time to chat amongst themselves.  Prior to COVID-19, the Senior Day Centers served approximately 60-100 seniors each.

h.      The Stephen Ministry is a program through which selected parishioners of a parish are trained and organized to help provide one on one confidential Christian care to parishioners of parishes and communities.  Trained Stephen Ministers are paired with individuals in order to help them through any crisis, including the loss of a loved one, divorce, grief, terminal illness, loss of job, hospitalization, loneliness, being a caregiver to a loved one, and other stresses and challenges.  Stephen Ministers receive at least 50 hours or training through the Stephen Ministry International Christian program or from "Stephen Leaders" within the Parish.  Currently, there are 15 Stephen Ministry Parishes with 36 trained "Stephen Leaders" and 295 trained "Stephen Ministers," all of whom are volunteers.

Even during COVID-19 and the subsequent lockdown orders, VITALity has continued to provide assistance to the community.  From January 1 through July 31, 2020, VITALity provided for: (i) 613 intakes, compared to 585 during the same time period in 2019; (ii) 486 in person visits by a nurse or social worker, compared to 705 during the same time period in 2019; and (iii) 1,124 phone consultations by a nurse or social worker, compared to 425 during the same time period in 2019.  In total, VITALity has served approximately 4,000 persons from January 1, 2020 through July 31, 2020.

In addition, VITALity has approximately 2,000 participants in its "Life to the Fullest" program, which is a health and well-being membership program.  "Life to the Fullest" is a free program available to all residents 65 and older.  As a member, participants receive quarterly newsletters with upcoming events, health topics and information about VITALity programs.

### g.   **The Camden Center for Law and Social Justice**

The Camden Center for Law and Social Justice (the "Center") (i) provides direct legal services to poor or moderate income individuals and families in the City of Camden and its

4817-6551-8030, v. 2

environs; (ii) promotes justice for all under the law through education, cooperation with other legal service providers, and litigation of wide impact; and (iii) brings together individuals and agencies to advocate for social justice and the vindication of individual rights through the law.

Reverend David Brooks incorporated the Center on December 23, 1993. The certificate of incorporation was filed with the New Jersey Department of the Treasury on December 29, 1993.

The Center is a New Jesey nonprofit legal services corporation that provides services to clients who are the victims of domestic violence and offers immigration services. It also helps those who cannot afford to pay for legal services, or who can only pay at a reduced rate. It is supported by the Diocese at the rate of $50,000 per year, plus in-kind support such as office space. The rest of its income is obtained from government grants, direct donations, and fees. Support from the Diocese is about 9-12% of its budget each year. It has offices in Camden, Atlantic City, and Bridgeton, and has 2,500-3,500 contacts per year for legal advice, attendees at information sessions, and clients.

### h.  **Guadalupe Family Services, Inc.**

Guadalupe Family Services, Inc. ("GFS") was incorporated in 1995 with the belief that the complex needs of urban family life in North Camden must be better served. From its offices in North Camden, GFS offers clinical counseling and direct social services focusing on families in distress. These services are offered with particular sensitivity to the cultural needs of the community. GFS directly serves one thousand persons annually.

GFS offers professional counseling, in English and Spanish, for individuals and families for anxiety, depression, PTSD, grief and loss, sexual abuse, behavioral problems, school problems, and more. Through its Community Adolescents Striving for Achievement program (CASA), GFS provides a safe, empowering, and enriching environment for underserved, inner-city Camden youth enabling them to develop a strong sense of self, healthy relationships and a vision for their future. CASA teaches Camden youth necessary life skills to overcome adversity and experience success and fulfillment through academic, social, spiritual, and service programs.

GFS is supported by the Diocese at the rate of $20,000 per year and operates in property owned by The Parish of the Cathedral of the Immaculate Conception.

### G.  **Parish Trusts**

The Diocese holds investments in the following accounts:

a.      PNC Bank NA as Custodian under agreement dated 12/12/11 for Diocese of Camden CHFS - Special Gifts;

b.      PNC Bank NA as Custodian under agreement dated 12/12/11 for Diocese of Camden Stock CHFS;

c.      PNC Bank NA as Custodian under agreement dated 12/12/11 for Diocese of Camden CHFS - Targeted General; and

d.     PNC Bank NA as Custodian under agreement dated 12/12/11 for Diocese of Camden CHFS - Treasury General.

These accounts hold funds in trust for the Parishes in accordance with the Trust Agreements.

In addition to the investment of Diocese funds, the Diocese also holds and invests certain Parish funds. Each of the Parishes are separately formed and incorporated under civil law. The finances of these entities are maintained separate and apart from the Diocese. Each Parish has a Trust Agreement, an example of which provides, in relevant part, as follows:

> WHEREAS the Diocese has held for purposes of management and investment certain assets which are the property of St. Elizabeth Ann Seton, Absecon, NJ, a juridic person of the Roman Catholic Church operating pursuant to Canon 515 of the aforesaid Code of Canon Law, and a religious corporation of New Jersey operating pursuant to Title 16:15-1, et seq. of the aforementioned Revised Statutes (and which is hereinafter referred to as "the Parish" or "the Beneficiary"), which maintains an office at 591 New Jersey Avenue in Absecon, NJ, in the County of Atlantic in the State of New Jersey, and has attributed interest on such funds to such Beneficiary; and

> WHEREAS the Diocese wishes to memorialize the trustee relationship which governs its holding of certain funds of the Parish in custody, which trustee relationship has existed since it first undertook to so hold such funds in custody;

> NOW, THEREFORE, the Diocese does hereby publish and affirm the fact that such Trust Assets (as hereinafter defined) of the Parish as it holds in custody are held as a charitable trust, for the exclusive use and benefit of the said Parish, and with the equitable ownership thereof being vested in the said Parish, on the terms and conditions hereinafter set forth; and

> . . .

> 1.2 Trust Assets

> (a) The assets of the Trust (which are also referred to herein as the funds of the Trust) consist of such amounts that the Parish may have from time to time consigned to the Trustee for management and investment, together with such interest attributable thereto which the Trustee and the Beneficiary understand to be fixed at three percentum (3%) on an annualized basis.

> (b) The assets of the Trust may, in the discretion of the Trustee, be commingled with its own assets and with other assets

31

which it holds in trust, and the Trustee is expressly authorized and empowered to do so; provided, however, that the Trustee shall maintain such records so as to make the assets held upon behalf of the Beneficiary readily identifiable, and records of such accounting must be maintained in the trust records by the Trustee and be readily available to the Beneficiary for inspection during normal business hours.

(c) The assets of this Trust shall be used to further the religious, charitable and educational purposes of the Beneficiary and shall not be subject (in whole or in part) to voluntary or involuntary assignment, anticipation, or legal process, or to the claims of creditors of the Trustee, or the creditors of any other entity whose assets are held in trust by the Trustee. . .

Each of the parish trust agreements (collectively, the "Trust Agreements") mirror this agreement. The Diocese has operated in conformance with the Trust Agreements. While the Diocese administers and monitors the Parishes' liquid assets and provides administrative services related to the Parish, all Parish assets are separate and distinct from the Diocese assets and fully accounted for in such a manner. The Parish funds are not property of the Diocese's bankruptcy estate.

These accounts are managed by Cobble Hill and are in the custody of PNC Bank.

## H. **Catholic Cemeteries**

The Diocese administers several Catholic Cemeteries within its territory. The Diocese has been serving Catholic families in this capacity since before the establishment of the Diocese of Camden in 1937. There are fifteen Diocesan cemeteries throughout the six counties in southern New Jersey. The fifteen locations are as follows: (i) Calvary Cemetery and Mausoleum in Cherry Hill, NJ; (ii) New St. Mary Cemetery and Mausoleum in Bellmawr, NJ; (iii) Gate of Heaven Cemetery in Berlin, NJ; (iv) St. Joseph Cemetery in Swedesboro, NJ; (v) St. Mary's Cemetery in Williamstown, NJ; (vi) All Saints Cemetery and Mausoleum in Newfield, NJ; (vii) Our Lady of Assumption Cemetery in Pleasant Mills, NJ; (viii) Our Lady of Victories in Landisville, NJ; (ix) Holy Cross Cemetery and Mausoleum in Mays Landing, NJ; (x) Sacred Heart Cemetery and Mausoleum in Vineland, NJ; (xi) St. Casimir's Cemetery in Woodbine, NJ; (xii) St. Bernard Cemetery in Dorothy, NJ; (xiii) St. Elizabeth's Cemetery in Goshen, NJ; (xiv) Resurrection Cemetery in Clermont, NJ; and (xv) St. Mary's Cemetery and Mausoleum in Cape May, NJ.

The Catholic Cemeteries offer in-ground and above-ground burial options such as cemetery plots, cremation graves, chapel and garden mausoleums, and cremation niches.

The cemeteries are not separately incorporated. Except as set forth herein, the above-referenced cemeteries are owned by parishes, but administered and operated by the Diocese. The Diocese owns the land for All Saints Cemetery and Mausoleum in Newfield, New Jersey and Resurrection Cemetery in Clermont, New Jersey.

32

There are also numerous other cemeteries in the Diocese, which are owned, operated and managed by the Parishes. Those cemeteries are not listed here.

The employees of the cemeteries are members of Teamsters Local Union No. 676 (the "Union"). The Union is the sole and exclusive representative for all full-time cemetery field workers/foremen employed by the Diocese. The Diocese is current on all its obligations to the Union.

The Diocese has a fiduciary responsibility to ensure that its cemeteries be provided for in perpetuity with adequate funding. The Diocese has limited reserves for maintaining the cemeteries in perpetuity. The Diocese has been advised by its financial advisers that, as part of its reorganization, it must establish reserves for the care and maintenance of the cemeteries. Pursuant to Court Order, the Debtor assumed a contract with Perpetualcareadequacy.com for the purpose of conducting a perpetual care analysis to fulfill the above noted needs of the cemeteries.

## I.    The Debtor's Prepetition Capital Structure

### a.    Revolving Line of Credit

On December 9, 2011, the Diocese entered into a Loan Agreement with PNC Bank, National Association ("PNC") for a revolving line of credit (the "Loan") wherein the Diocese may borrow the lesser of (a) $25 million dollars or (b) 90% of the margin value of the "Pledged Collateral" (as defined in the Loan Agreement).

In addition to the Loan Agreement, the Diocese and PNC entered into a Committed Line of Credit Note (the "Note"). Pursuant to the note, the Loan carries a rate of interest equal to (a) the Daily LIBOR Rate plus (b) the "Applicable Margin" (as that term is defined in the Note). The current "Applicable Margin" is .55%. Interest payments are due monthly and the entire principal balance of the Loan is due upon expiration of the Loan. The original expiration date of the Loan was December 9, 2014, which was extended to December 9, 2017, and further extended to December 9, 2020. PNC is aware of this filing for reorganization and we are working with them to continue or amend the Loan.

In connection with, and as security for, the Loan, DOC Trusts entered into a Pledge Agreement with PNC. Through the Pledge Agreement, DOC Trusts pledged the following collateral as security for the Loan: all investment property held in security account nos. xx-xx-xxx-xxx7115;    xx-xx-xxx-xxx7123;    xx-xx-xxx-xxx7131;    xx-xx-xxx-xxx7149;    xx-xx-xxx-xxx7157; xx-xx-xxx-xxx7165; and xx-xx-xxx-xxx7173 maintained with PNC Investments, LLC in its capacity as custodian (collectively, the "Pledged Accounts"), all assets credited to the Accounts and all additions, substitutions, replacements, proceeds, income, dividends and distributions thereon.

In addition to the Pledge Agreement, the Diocese of Camden Trusts, Inc. entered into a Guaranty and Suretyship Agreement (the "Guaranty") with PNC, whereby the Diocese of Camden Trusts, Inc. unconditionally guaranteed and became the surety for, the prompt payment of all amounts due under the Loan.

33

On December 11, 2017, the Diocese entered into an Amendment with PNC. Pursuant to the Amendment, the expiration date of the Loan was extended to December 9, 2020.

As of September 30, 2020, the outstanding balance of the Loan is $22,807,500. The value of the Pledged Accounts as of September 30, 2020 was $81.7 million.

### b. Other Unsecured Debt

The Diocese owed its vendors approximately $2,000,000 as of the Petition Date. These claims are for the delivery of goods and services to the Diocese, which are used in the operation of the Diocese's business, including providing support for its ministries and other outreach programs.

### J. Survivor Claims Against the Diocese

The Diocese publicly released the names of fifty-six (56) priests (which was reduced to fifty-five (55) after further review) and one (1) deacon of the Diocese who have been credibly accused of abuse of minors. These fifty-five (55) priests are a small percentage of the more than 800 priests who have faithfully served the people of South Jersey since the Diocese was founded in 1937.

However, as Bishop Sullivan has made clear:

> To be certain, the darkest stain on the Catholic Church in the last century was the sexual abuse of minors by priests. Unfortunately, we have all learned that this "filth," as Pope Benedict correctly called it, was more pervasive than anyone imagined, or even thought possible.
>
> . . .
>
> As we have done often, we pray that God will continue to look after the victims and survivors of the priest sex abuse scandal. We ask that He give them hope, provide them with healing and bring comfort to their wounded souls.

See Reverend Hughes' Declaration at Exhibit A. [ECF 3].

Similarly, Bishop Sullivan made the following remarks at the Evening of Prayer for the Victims of Abuse and Reparation for the Sins of the Church at Our Lady of Hope Parish on September 27, 2018:

> [P]ermit me to begin by begging for forgiveness:
>
> • To those who have suffered abuse by a minister of the Church of Camden, I am sorry;

34

- To those who tried to bring that abuse to light, but did not experience the caring concern they deserved, I am sorry;

- To the family members of the abused who have watched the effects of that abuse impact their family, I am sorry;

- To the people of South Jersey whose expectations of the Catholic Church have been shattered, I am sorry;

- To those whose faith in the institutional Church has been shaken by these most recent reports, I am sorry;

- To our many good priests who acutely suffer the effects of this scandal, I am sorry.

May our prayer tonight and our prayers in the future move us into action for the purification of our Church and for the healing of the pain of the victims of abuse who have been scarred and wounded by the actions of sinful priests and bishops. Lord, send healing and mercy to these wounded members of the family of God. What they have suffered at the consecrated hands of church ministers shames us and calls us to respond with the love and truth of Jesus Christ. But, words will not do it. They are not enough. There must be actions. Concrete, actions on behalf of the victims and specific actions — decisions on the manner the church will conduct itself when a member of the clergy commits a crime.

To the laity who are with us this evening for this prayer service — the Church needs your help at one of its darkest moments. You, the lay faithful are as much the Church as we your ordained ministers are Church. You must insist that we change how we do business. Help us to purify our Church. Help us to address this crisis. Help us to realize much needed change. Insist that the Church rid itself of the culture that allowed this situation to develop. Sinful Priests and Bishops have damaged the Body of Christ. Those wounds must be healed.

You, the lay faithful, have a right to be angry, disgusted, confused, frustrated, disillusioned and bewildered by what you have learned about this scandal. How it has been mistakenly handled by some bishops and Church authorities; how victims of priests were further victimized by shepherds of the Church who showed no concern for their suffering sheep; how truth was kept hidden. You, the lay faithful of the Church must insist that this never happen again. There has been colossal failure that has caused serious damage to

35

our ability to preach the Gospel and to engage our culture with its
message and truth.

<u>See</u> Reverend Hughes' Declaration at Exhibit B.  [ECF 3].

From 1990 to 2019, the Diocese paid 99 settlements to abuse victims totaling
approximately $10,120,000 (approximately $102,222 per claim).  In addition, the Diocese has
expended approximately $945,000 to provide therapeutic assistance to victims.

On December 1, 2019, amendments to New Jersey's statute of limitations went into effect
allowing individuals to assert claims of child abuse regardless of when it is reported to have
occurred, and to file claims against institutions and individuals, even if those claims had already
expired and/or were dismissed because they were filed late.  Additionally, the new law also
expands the statute of limitations for victims to bring claims of child sexual abuse to age 55 or
until seven years from the time that an alleged victim became aware of his/her injury, whichever
comes later.

From December 1, 2019 through the Petition Date, fifty-five (55) lawsuits were filed
against the Diocese by plaintiffs who are seeking damages as a result of alleged abuse, three (3) of
which have been voluntarily withdrawn.  In addition, demand letters and or notices have been
received from other claimants who have not  commenced lawsuits against the Diocese.

The Diocese does not belive it has insurance coverage for any claims that occurred before
November 27, 1969.  From November 27, 1969 to November 27, 1972, the Diocese had insurance
coverage for sex abuse claims with INA, which is now Chubb.  From November 27, 1972 to
November 27, 1987 the Diocese had underlying coverage with Lloyd's of London ("<u>Lloyds</u>"),
with a self-insured retention of $50,000 from 1973 to 1975 and $75,000 from 1975 to 1987, and
also had excess layers and aggregates.  There was no coverage at all for sex abuse claims from
November 27, 1987 to November 27, 1988.  On November 27, 1988 coverage began with the
National Risk Retention Group, which continues to the present, but with a self-insured retention
of $250,000.  In addition, per a settlement agreement with Lloyds dated April 29, 2010 and May 5,
2010, the Diocese does not have coverage for any abuse claims for which money was demanded
before October 22, 2009, or for claims identified in said settlement agreement.  However, the
settlement agreement does not preclude coverage for claimants who were only receiving payments
for therapy, and for claimants who were unknown to the Diocese.

### a.  <u>New Jersey Independent Victim Compensation Program</u>

Beginning on June 15, 2019, the Roman Catholic Archdiocese of Newark and the dioceses
of Camden, Metuchen, Paterson and Trenton established the Independent Victim Compensation
Program ("<u>IVCP</u>") to begin accepting claims related to the abuse of minors by priests of these
dioceses.  The Diocese paid over $842,000 for the IVCP administration.

The IVCP is administered by Kenneth R. Feinberg and Camille S. Biros (collectively, the
"<u>IVCP Administrators</u>"), two noted victims' compensation experts who have designed and
administered similar compensation programs for the Catholic Dioceses in New York and
Pennsylvania.  They also have administered similar programs for the September 11th Victim
Compensation Fund, the Hokie Spirit Memorial Fund (Virginia Tech shootings), Deepwater

Horizon/BP oil spill fund, the Penn State abuse claims, Aurora, Colorado shooting victim relief fund, The Newtown-Sandy Hook Community Foundation, the One Fund (2013 Boston Marathon bombings), and the Archdiocese of New York Independent Reconciliation and Compensation Program.  The IVCP Administrators act independently in evaluating and compensating individual claims.

The IVCP provided for:

      a.      The complete independence of the two administrators in determining eligibility and the amount of compensation.

      b.      The program was completely voluntary; no individual claimant was required to participate.

      c.      All payments authorized by the administrators came from funds which the Diocese borrowed; no public money was used to compensate victims.

      d.      A signed release was only required if the individual victim accepted the amount offered by the administrators, in which the victim agreed not to engage in any further litigation against the particular diocese.

      e.      The program gave first priority to claimants who previously filed a claim directly with diocesan officials about abuse, prior to the establishment of the IVCP.

The Diocese did not fund IVCP payments by using money: (i) donated by the people of the Diocese to support parishes, schools, and charitable works; (ii) given to the *House of Charity-Bishop's Annual Appeal* or the *Catholic Strong* campaigns; or (iii) given by a donor for a specific ministry or apostolate.

Through the IVCP, the Diocese has resolved seventy-one (71) claims since the IVCP began, but 141 claims remain pending.  Of those 141 claims, offers were made by the IVCP to twenty-one (21) of those claimants before the effective suspension of the IVCP on August 1, 2020.  The Diocese anticipates, therefore, that in excess of 141 individuals may assert abuse claims for which they may seek to hold the Diocese responsible.  This is in addition to the fifty-two (52) lawsuits that are currently pending.

Through the IVCP Administrators, seventy-one (71) claims were resolved with payments totaling $8,102,500 (average claim settled for approximately $114,000).  Effective July 31, 2020, the Diocese suspended its participation in the operation of the IVCP due to its fiscal realities, which were worsened by the COVID-19 pandemic.

### b.  <u>Steps Taken by the Diocese to Protect Children</u>

In 2002, there was widespread recognition on the part of both civil and church authorities that the abuse and exploitation of minor children by Catholic priests was a serious problem that needed to be urgently and comprehensively addressed.  The Catholic dioceses in New Jersey, including the Diocese of Camden, responded by entering into a *Memorandum of Understanding* with the New Jersey Division of Law and Public Safety and the twenty-one prosecutors of the

counties in which each diocese is located. In addition, the United States Conference of Catholic Bishops addressed this issue by adopting the *Charter for the Protection of Children and Young People* and, at the request of the Conference of Bishops, the Holy See approved the *Essential Norms for Diocesan/Eparchial Policies Dealing with Allegations of Sexual Abuse of Minors by Priests or Deacons.*

### i.  Memorandum of Understanding

In the December 2002 *Memorandum of Understanding* (the "MOU"), the Attorney General of New Jersey, the twenty-one county prosecutors of New Jersey, and New Jersey's Catholic bishops, including the Bishop of Camden, pledged "their continuing commitment to work together to protect victims of crimes," acknowledging "the value of cooperation and communication and the need to have in place clearly defined policies and procedures so that all employees" of Catholic dioceses and parishes "know what they are expected to do" when they have cause to believe that criminal activity – primarily the exploitation or abuse of children – has been committed. See Reverend Hughes' Declaration at Exhibit C. [ECF 3]. The MOU added that the parties "are committed to addressing and alleviating the injuries caused by these crimes and to preventing the reoccurrence of such crimes to the greatest extent possible." Id. It stated that "the parties to this *Memorandum* will continue to work together to prevent criminal activity," recognizing that "the crimes addressed in this Memorandum are serious matters that warrant a full and prompt investigation by appropriate law enforcement authorities." Id.

In accordance with the MOU, since 2002 the Diocese has reported every allegation of the abuse of a minor by diocesan priests – whether or not it was believable – to law enforcement authorities in the locales where the abuse was said to have happened. These reports have been made to county prosecutors in Atlantic, Burlington, Camden, Cape May, Cumberland, Essex, Gloucester, Mercer, Monmouth, Ocean, Salem and Union counties, the Crown Prosecution Service in London, the Director of Prosecutions in San Juan, the district attorneys in Philadelphia and Allegheny counties, and the consular representatives of Mexico, Portugal, and Spain.

Even prior to the MOU, the Diocese reported the names of 43 diocesan priests, whether living or dead, against whom an allegation of child abuse had been received to the prosecutor of each county in the Diocese in which the abuse was reported to have occurred. Where a Prosecutor requested additional information (civil complaints, correspondence, *etc.*) it was readily provided.

### ii.  Charter for the Protection of Children and Young People

In addition, the *Charter for the Protection of Children and Young People* is a comprehensive set of procedures originally established by the United States Conference of Catholic Bishops in June 2002 (and subsequently revised and expanded in 2005, 2011, and 2018) for addressing allegations of sexual abuse of minors by Catholic clergy. See Reverend Hughes' Declaration at Exhibit D. [ECF 3]. The *Charter* also includes guidelines for reconciliation, healing, accountability, and prevention of future acts of abuse, and it urges actions by Catholic dioceses in the United States for creating a safe environment for children and young people, the healing and reconciliation of victims and survivors, the establishment of methods for making prompt and effective response to allegations of abuse, the disciplining of offenders, and cooperation with civil authorities. Id.

38

The *Charter* states that "the sexual abuse of children and young people by some priests and bishops, and the ways in which we bishops addressed these crimes and sins, have caused enormous pain, anger, and confusion. Id.  Innocent victims and their families have suffered terribly."  Id. The Conference of Bishops added that "as bishops, we acknowledge our mistakes and our role in that suffering, and we apologize and take responsibility for too often failing victims and our people in the past. We also take responsibility for dealing with this problem strongly, consistently, and effectively in the future." Id.

The *Charter* requires mandatory background checks for all personnel of the Diocese who have regular contact with minors.  In this regard, Article 13 of the *Charter* provides as follows:

Dioceses/eparchies will evaluate the background of all diocesan/eparchial and parish personnel who have regular contact with minors. Specifically, they will utilize the resources of law enforcement and other community agencies. In addition, they will employ adequate screening and evaluative techniques in deciding the fitness of candidates for ordination (cf. National Conference of Catholic Bishops, *Program of Priestly Formation,* 1993, no. 513).[22] Id.

In accordance with the *Charter,* the Diocese has issued its policy with respect to employees and volunteers.  It applies to all priests, and to all adult employees and volunteers (18 years of age or older) who have regular contact with minors (under 18 years of age).  The policy requires the employee or volunteer to undergo appropriate evaluation, which must include a fingerprint-facilitated criminal history background check.  See Father Hughes' Declaration at Exhibit E.  [ECF 3].  The policy is comprehensive and mandatory.

### iii.  Other Actions Taken by the Diocese

Since 2002, the Diocese of Camden has reviewed, updated, strengthened, and enforced its safe environment protocols, including but not limited to conducting background checks of all clergy, employees, and volunteers who have regular contact with minors, and instituting, maintaining, and enhancing safe environment education and training.  In addition, the Diocese routinely updates its guidelines for reporting abuse.  See Reverend Hughes' Declaration at Exhibit F. [ECF 3].

### K.  Litigation Involving Public Nuisance Claim

On November 14, 2019, the Superior Court of New Jersey, Essex County, Civil Division, dismissed a lawsuit captioned Hanratty v. New Jersey Catholic Conference; Archdiocese of Newark; Diocese of Trenton; Diocese of Camden; Diocese of Paterson; and Diocese of Metuchen, Docket No. ESX-L-003360-19.  The Hanratty complaint alleged two counts involving public nuisance and civil conspiracy.  The Honorable Jeffrey B. Beacham, Judge of the Superior Court, issued a seventeen (17) page Opinion.  No appeal was taken.

---

[22] "Eparchies" in the churches of the Eastern rite are the functional equivalent of dioceses in the Latin (or "western") rite.

### L.  Events Precipitating the Chapter 11 Filing

The Diocese comes before this Court for the purpose of reorganizing and maximizing its assets for the benefit of all individuals presenting bona fide claims of abuse while ensuring that the critical mission of the Diocese is accomplished for its congregants and the greater community especially during the global COVID-19 pandemic.  Although there has been no claim of abuse having occurred within the past 19 years (since the 2002 *Charter for the Protection of Children and Young People*, the *Essential Norms* and the *Memorandum of Understanding*, all of which are discussed above), that does not diminish the pain of the horrific acts which occurred before then, and which have affected far too many.

Rebuilding the confidence of the Diocese's congregants and society is a paramount goal for the Diocese, and in this regard the Diocese has taken substantial steps.  In addition to what was discussed above, every adult having regular contact with minors is required to take a safe environment training program.  In July 2018, the Diocese transitioned from Child Assault Prevention (CAP) to the VIRTUS child abuse training awareness program entitled "*Protecting God's Children*."  The Diocese requires retraining every five years.  Also, the VIRTUS training program "*Empowering God's Children"* teaches such matters as "protecting our bodies," "safe adults" and "boundaries" and is presented to children in diocesan-affiliated educational programs in age-appropriate tiers.

During COVID-19, while government stay-at-home orders were in place, Diocese revenue was reduced by nearly 25%.  Moreover, collections have reduced significantly over the past two years.

### ARTICLE V.
### THE DIOCESE'S BANKRUPTCY

### A.  The Diocese's Chapter 11 Filing

The Diocese filed its voluntary Chapter 11 petition on October 1, 2020 (the "Petition Date").

#### a.  First Day Orders

Concurrently with the filing of its chapter 11 petition, the Diocese filed certain motions and proposed Orders (collectively, the "First-Day Orders").  A summary of the relief granted in the First Day Orders is set forth below:

    i.   **Complex Case Order**.  Pursuant to the *Application For Designation As Complex Chapter 11 Cases* [ECF 5], the Court entered an Order [ECF 52] designating this Chapter 11 Case as a Complex Chapter 11 Case.

    ii.   **Motion to Seal Order**.  Pursuant to *Motion to Seal Portions of Schedule F, The Master Creditor Matrix, and Other Pleadings and Documents Under Seal* [ECF 6], the Court entered an Order [ECF 54] that, among other things, sealed certain portions of Schedule F and the Master Creditor Matrix relating to Survivor Claims.

iii.   **Cash Management Order**. Pursuant to the *Motion For An Order (I) Authorizing The Debtor To Continue And Maintain Their Existing Cash Management System, Bank Accounts And Business Forms, (II) Modifying The Investment Guidelines, (III) Providing The United States Trustee With A 60-Day Objection Period, And (IV) Granting Related Relief* [ECF 7], the Court entered an Interim Order [ECF 34], a Second Interim Order [ECF 57], a Third Interim Order [ECF 199], and a Fourth Interim Order [ECF 248] that, among other things, (i) authorized the Debtor to continue to use its existing bank accounts and cash management system, and existing checks and business forms; and (ii) waived certain bank account and related requirements of the Office of the United States Trustee.  On December 16, 2020, the Court entered a final order in connection with the Cash Management Motion.  [ECF 284].

iv.   **Wages Order**.  Pursuant to the *Motion For An Order (I) Authorizing The Debtor To (A) Pay Prepetition Wages, and Related Obligations, (B) Pay And Remit Payroll Taxes And Other Deductions To Third Parties, And (C) Honor And Process Workers' Compensation And Employee Benefit Obligations, And (II) Authorizing and Directing All Banks To Honor Checks And Transfers For Payment of Prepetition Employee Obligations* [ECF 8], the Court entered an Interim Order [ECF 44] and a Final Order [ECF 130] authorizing the Debtor to, among other things, pay certain prepetition wages and other compensation, continue various benefit programs, and pay other employee-related obligations.

v.   **Self-Insurance Order**. Pursuant to the *Motion for Entry of Interim & Final Orders (i) Authorizing the Continued Maintenance of the Diocese's Self Insurance Programs; and (ii) Authorizing the Payment of Prepetition Obligations in Respect Thereof* [ECF 9], the Court entered an Interim Order [ECF 50] and a Final Order [ECF 131] authorizing the Debtor to, among other things, continue its self-insurance program and pay prepetition obligations related thereto.

vi.   **Premium Finance Order**.  Pursuant to the *Motion For Interim And Final Orders Authorizing (I) The Continuation Of The Debtor's Insurance Policies (II) The Continuation Of The Debtor's Premium Financing Agreements And (III) The Performance Of All Prepetition Obligations Related Thereto* [ECF 10], the Court entered an Interim Order [ECF 49] and a Final Order [ECF 132] authorizing the Debtor to continue to pay and perform under various prepetition insurance policies and the Debtor's premium financing agreement, and to pay all prepetition and post-petition obligations in respect thereof in the ordinary course of their business.

vii.   **Utilities Order**. Pursuant to the *Motion For Entry Of Interim And Final Orders (I) Prohibiting Utility Companies From Discontinuing, Altering Or Refusing Service On Account Of Prepetition Invoices, (II) Approving The Debtor's Proposed Form Of Adequate Assurance Of Future Payment And (III) Establishing Procedures For Resolving Requests For Additional Adequate Assurance* [ECF 14], the Court entered an Interim Order [ECF 51] and a Final Order [ECF 136] authorizing and approving the provision of adequate assurance of payment to the Debtor's utility service providers under section 366 of the Bankruptcy Code, while allowing the

41

Debtor to avoid the threat of imminent termination of their utility services from those utility companies.

viii. **Credit Card Facilities Order**.  Pursuant to the *Motion for an Order Authorizing Debtor to Continue Credit Card Facilities* [ECF 12] the Court entered an order [ECF 53] directing certain payment card processors to honor its prepetition agreement with the Debtor pending assumption or rejection.

ix. **Prime Clerk LLC Retention Order**.  Pursuant to the *Application For Entry Of An Order Authorizing The Retention And Appointment Of Prime Clerk LLC As Claims And Noticing Agent Effective As Of The Petition Date* [ECF 17], the Court entered an Order authorizing the Debtor to retain Prime Clerk LLC as claims and noticing agent for the Chapter 11 Cases. [ECF 55].

## b.  Appointment of Tort Claimants' Committee

On October 23, 2020, the Office of the United States Trustee appointed the Tort Claimants' Committee in this Chapter 11 Case.  The *Notice of Appointment of Official Committee of Tort Claimant Creditors* [ECF 111] sets forth the nine (9) appointed Tort Claimants' Committee members: (i) Dr. James Reuter; (ii) Mr. Jack Lechner; (iii) Ms. Jennifer Wydra; (iv) Mr. Paul Harrington; (v) Mr. Robert Polt; (vi) Mr. Edward Henkel; (vii) Dr. Patrick Lloyd; (viii) Mr. John Collins; and (ix) Mr. Andrew Napoli.

## c.  Appointment of Trade Creditors' Committee

On December 24, 2020, the Office of the United States Trustee appointed the Trade Creditors' Committee in this Chapter 11 Case.  The *Notice of Appointment of Official Committee of Unsecured Trade Creditors* [ECF 293] sets forth the nine (3) appointed Trade Creditors' Committee members: (i) Porter & Curtis, LLC; (ii) Seton Hall University; and  (iii) St. Mary's Villa.

## d.  Employment of Professionals and Advisors

### i.  Debtor's Professionals

On October 1, 2020, the Diocese filed an application to approve the retention of McManimon, Scotland & Baumann, LLC ("MSB") as counsel.  [ECF 15].  MSB's retention was approved on October 16, 2020.  [ECF 86].

On October 1, 2020, the Diocese filed an application to approve the retention of EisnerAmper as Financial Advisor.  [ECF 16].  EisnerAmper's retention was approved on October 16, 2020.  [ECF 87].

On October 1, 2020, the Diocese filed an application to approve the retention of Cooper Levenson, P.A. ("Cooper") as Special Counsel relating to Survivor Claims.  [ECF 18].  Cooper's retention was approved on October 16, 2020.  [ECF 88].

42

On October 1, 2020, the Diocese filed an application to approve the retention of Duane Morris LLP ("Duane") as Special Counsel relating to eminent domain litigation. [ECF 19]. Duane's retention was approved on October 16, 2020. [ECF 89].

On October 16, 2020, the Diocese filed an application to approve the retention of A. Atkins Appraisal Corp. ("Atkins") as Appraiser. [ECF 81]. Atkin's retention was approved on October 28, 2020. [ECF 133].

### ii.  Tort Claimants' Committee Professionals

On November 9, 2020, the Tort Claimants' Committee filed an application to approve the retention of Lowenstein Sandler LLP ("Lowenstein") as counsel. [ECF 182]. Lowenstein's retention was approved on November 17, 2020. [ECF 218].

It is the Diocese's understanding that the Tort Claimants' Committee has voted to retain BRG as its financial advisor. At the time of filing this Disclosure Statement, a retention application has not been filed.

### iii.  Trade Creditors' Committee Professionals

It is the Diocese's understanding that the Trade Creditors' Committee has voted to retain Porzio, Bromberg & Newman, P.C. as its counsel. At the time of filing this Disclosure Statement, a retention application has not been filed.

### e.  Claims Process and Bar Date

### i.  Schedules and Statement of Financial Affairs

On the Petition Date, the Diocese filed for protection under Chapter 11 of the Code. [ECF 1]. The Diocese's schedules and statement of financial affairs were filed simultaneously with the Chapter 11 Petition. The Debtor filed amended Schedules on October 6, 2020 [ECF 41 & 42], October 19, 2020 [ECF 92] and November 11, 2020 [ECF 198] (as amended, the "Debtor's Schedules").

### ii.  Section 341(a) Meeting of Creditors

The Debtor's Initial Debtor Interview was held on October 16, 2020. The Debtor's Section 341(a) Meeting of Creditors was held on November 13, 2020.

### f.  Other Significant Events During the Bankruptcy

On October 14, 2020, the Debtor filed a *Motion for Entry of Order Establishing a Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* (the "Bar Date Motion") [ECF 74]. Through the Bar Date Motion, the Debtor seeks to set bar dates for general, abuse and governmental unit related claims against the Debtor. At the time of filing of the Disclosure Statement, the Bar Date Motion has not been heard by the Court. The hearing on the Bar Date Motion is currently scheduled for January 27, 2021.

43

On October 19, 2020, the Debtor filed a *Motion for an Order Authorizing and Approving Sale of (i) 276 White Horse Pike, Galloway Township, New Jersey; and (ii) 1597 Almonesson Road, Deptford, New Jersey* (the "Sale Motion") [ECF 90]. Through the Sale Motion, the Debtor sought approval to sell the following real property: (i) 276 White Horse Pike, Galloway Township, New Jersey (the "Galloway Property"); and (ii) 1597 Almonesson Road, Deptford, New Jersey (the "Deptford Property"). The Galloway Property is under contract with Ark Innovations, LLC for $3.9 million. The Deptford Property is under contract with Raphael Braschoss and Melissa Fleming for $75,000. On December 23, 2020, the Court entered an order granting the Sale Motion. [ECF 290].

On October 21, 2020, the Debtor filed a *Motion of the Diocese of Camden, New Jersey, Chapter 11 Debtor and Debtor-in-Possession, for Entry of an Order: (i) Establishing Mediation Process Relating to Survivor and Tort Claims; (ii) Estimating Remaining Survivor and Tort Claims Pursuant to 11 U.S.C. § 502(c)(1) and Fed. R. Bankr. P. 3018(a) for Purpose of Voting on Plan of Reorganization and Confirmation Process; and (iii) Granting Related Relief* (the "Mediation Motion") [ECF 99]. Through the Mediation Motion, the Diocese requested that the Court establish certain mediation procedures to fix the Survivor and Tort Claims and related issues. In the alternative, the Diocese requested estimation of the Survivor and Tort Claims pursuant to 11 U.S.C. § 502(c)(1) and Fed. R. Bankr. P. 3018(a) for any claimant who is unwilling to participate in the mediation process. At the time of filing of the Disclosure Statement, the Mediation Motion has not been heard by the Court. The hearing on the Mediation Motion is currently scheduled for January 27, 2021.

On October 21, 2020, the Debtor filed a *Motion for Entry of an Order Approving Settlement and Compromise by and Between the Debtor and State of New Jersey, Department of Transportation Pursuant to Fed. R. Bankr. P. 9019* (the "Settlement Motion") [ECF 97]. Through the Settlement Motion, the Debtor seeks approval of a settlement and compromise relating to an eminent domain taking by the State of New Jersey, Department of Transportation. The anticipated net proceeds to the Diocese from the proposed settlement is $250,250. On November 13, 2020, the Court entered an Order granting the Settlement Motion. [ECF 203].

On October 30, 2020, the Debtor filed a *Motion for Entry of an Order Approving Payment of Certain De Minimis Claims, Refunds and Reimbursements* (the "De Minimis Motion") [ECF 140]. The De Minimis Motion sought payment of certain de minimis unsecured claims against the Debtor. On November 13, 2020, the Court entered an Order granting the De Minimis Motion. [ECF 202].

On October 30, 2020, the Debtor filed a *Motion for the Entry of an Order Approving and Authorizing the Diocese to Assume Contract with PerpetualCareAdequacy.com Pursuant to 11 U.S.C. §§ 105(a) and 365(a) and Approving Cure Cost* (the "Motion to Assume") [ECF 142]. The Motion to Assume sought approval from the Court to assume a contract with PerpetualCareAdequacy.com and pay all cure costs associated therewith. On November 13, 2020, the Court entered an Order granting the Motion to Assume Motion. [ECF 201].

On October 30, 2020, the Debtor filed a *Motion to Extend Time to Remove Civil Actions* (the "Removal Motion") [ECF 146]. Through the Removal Motion, the Debtor sought to extend the time that it has to remove related actions from state court to the Bankruptcy Court pursuant to

Rules 9006(b) and 9027 of the Federal Rules of Bankruptcy Procedure. On November 30, 2020, the Court entered an Order granting the Removal Motion. [ECF 251].

On November 13, 2020, the Tort Claimants' Committee filed a *Motion for the Entry of an Order Authorizing the Retention of Experts* (the "Experts Motion") [ECF 204]. The Experts Motion seeks authorization for the Tort Claimants' Committee to retain undisclosed experts in connection with the Debtor's Bar Date Motion. At the time of filing of the Disclosure Statement, the Experts Motion has not been heard by the Court. The hearing on the Experts Motion is currently scheduled for January 13, 2021.

On November 19, 2020, the Debtor filed a *Motion for a Final Order Authorizing the Diocese to (i) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105(a), 362 and 364(c) and (d), (ii) Granting Liens and Superpriority Claims to the Lender Pursuant to 11 U.S.C. § 364(c), and (iii) Modifying the Automatic Stay* (the "Premium Financing Motion") [ECF 221]. Through the Premium Financing Motion, the Debtor sought approval of its entry into a premium financing agreement with AFS/IBEX in connection with the Debtor's insurance program for 2021. On November 25, 2020, the Court entered an Order granting the Premium Financing Motion. [ECF 247].

On December 1, 2020, the Debtor filed a *Motion to Extend Exclusive Period to File a Chapter 11 Plan and Solicit Votes for Chapter 11 Plan Pursuant to 11 U.S.C. § 1121(d)* (the "Exclusivity Motion") [ECF 252]. Through the Exclusivity Motion, the Diocese sought to extend the the exclusive period for the Debtor to file a chapter 11 plan and solicit votes thereon pursuant to section 1121(d) of the Bankruptcy Code. On December 23, 2020, the Court entered an Order granting the Exclusivity Motion. [ECF 291].

On December 2, 2020, the Diocese filed a *Motion for Entry of an Order Extending the Deadline to Assume or Reject Unexpired Leases of Nonresidential Real Property Pursuant to Section 365(d)(4) of the Bankruptcy Code* (the "Extension Motion") [ECF 256]. On Decemver 23, 2020, the Court entered an Order granting the Extension Motion. [ECF 292].

## B. Adversary Proceedings

On October 1, 2020, the Debtor filed an adversary complaint, commencing Adv. Pro. No. 20-1544 against certain Survivor Claimants. Through the complaint, the Diocese sought entry of an order, pursuant to 11 U.S.C. §§ 105 and 362, enjoining the continued prosecution of certain lawsuits against the Diocese and/or non-debtor parishes, schools and other Catholic ministry entities and institutions within the geographical territory of the Diocese which assert claims arising from or related to alleged child abuse and which could negatively impact upon the Diocese's ability to successfully reorganize. In the alternative, the Diocese sought an order, pursuant to Rule 7065 of the Federal Rules of Bankruptcy Procedure enjoining or restraining the Abuse Plaintiffs from continuing their prosecution of the Abuse Cases.

On October 21, 2020, the Debtor filed an adversary complaint, commencing Adv. Pro. No. 20-1573 against Insurance Company of North America, now known as Chubb Limited, Underwriters at Lloyd's, London, National Catholic Risk Retention Group, Inc., Interstate Fire & Casualty Company d/b/a Allianz Insurance Group, Berkshire Hathaway Inc., d/b/a Resolute

Management Services Limited, Athena Assurance Co., United National Insurance Co., Hartford Fire Insurance Co., Kemper Insurance, Lexington Insurance Co., U.S. Fire Insurance Co., International Fidelity Insurance Co., North River Insurance Co., Century Indemnity Co., Granite State Insurance Co., Integrity Insurance Co., Colonial Penn Life Insurance, Northbrook Insurance Associates, Inc. and potentially other insurance companies which may have insured the Diocese during the relevant time periods described below (collectively, the "Insurance Defendants"). Through the complaint, the Diocese is seeking an order, pursuant to 11 U.S.C. § 105, for declaratory judgment regarding the rights, duties and liabilities of the Insurance Defendants regarding certain insurance policies and certificates that the Insurance Defendants sold or which the Insurance Defendants acquired responsibility for as they relate to insurance coverage for Survivor Claims against the Diocese and/or non-debtor parishes, schools, or other Catholic ministry entities and institutions within the geographical territory of the Diocese. This action also seeks declaratory relief to determine the extent of the rights of the Diocese in said Policies and Certificates to the extent they are property of the Diocese's bankruptcy estate pursuant to 11 U.S.C. § 541.

### C.  Mediation with the Tort Claimants' Committee and Insurance Carriers

In order to resolve certain issues in this case, the Debtor and the Tort Claimants' Committee agreed to engage in mediation before the Honorable Michael B. Kaplan, Chief Judge of the United States Bankruptcy Court for the District of New Jersey. Chief Judge Kaplan has held numerous mediation sessions with the Tort Claimants' Committee and the Debtor. On December 4, 2020, Chief Judge Kaplan held an in-person mediation session with the Tort Claimants' Committee and the Debtor in Sewell, New Jersey. In addition to counsel for the Diocese, the Bishop of the Diocese, the Vicar General of the Diocese and the Diocesan Finance Officer attended the in-person mediation. Counsel for the Tort Claimants' Committee and counsel for the parishes, schools and mission within the territory of the Diocese attended the mediation. No individual members of the Tort Claimants' Committee attended. The mediation session lasted approximately 8 hours. Prior to the in-person mediation session, Chief Judge Kaplan held separate Zoom meetings with the Tort Claimants' Committee and the Debtor. Chief Judge Kaplan has also fielded numerous phone calls with the parties in an attempt to resolve issues in this matter.

In addition to the mediation sessions with the Tort Claimants' Committee and the Debtor, Chief Judge Kaplan has also included the various insurance carriers in mediation sessions. To this end, Chief Judge Kaplan held virtual mediation session with counsel for the insurance carriers, the Tort Claimants' Committee and the Debtor on December 18, 2020 and December 31, 2020. In advance of these sessions, Chief Judge Kaplan also held a Zoom meeting with counsel for the insurance carriers.

### D.  Production of Discovery to the Tort Claimants' Committee

On October 30, 2020, the Tort Claimants' Committee served the Diocese with informal document requests (the "Requests") to the Diocese. The Diocese and the Tort Claimants' Committee agreed that responses to the Requests would be produced on a rolling basis.

The Diocese has responded to the Requests made by the Tort Claimants' Committee as follows: (i) on November 8, 2020, the Diocese responded to five of the Requests providing 568

pages of documents; (ii) on November 13, 2020, the Diocese responded to one of the Requests providing an additional 2,586 pages of documents; (iii) on November 15, 2020, the Diocese responded to one of the Requests providing an additional 504 pages of documents; (iv) on November 20, 2020, the Diocese responded to five of the Requests providing an additional 1,945 pages of documents through two separate responses; (v) on November 24, 2020, the Diocese responded to one of the Requests providing an additional 126 pages of documents; (vi) on December 14, 2020, the Diocese responded to three of the Requests and two additional requests by the Committee providing an additional 1,737 pages of documents; (vii) on December 17, 2020, the Diocese responded to thirteen of the Requests providing an additional 684 pages of documents; and (viii) on December 18, 2020, the Diocese responded to seven of the Requests (and objected to two) providing an additional 13 pages of documents.  In total, the Diocese has produced 7,640 pages in response to the Requests and has committed to making additional productions once the Diocese's staff returns after the holidays.  In addition to the documents produced in response to the Requests, on October 24, 2020 – one day after the Tort Claimants' Committee was appointed – the Diocese provided counsel for the Tort Claimants' Committee with certain insurance policies. Since then, the Diocese has provided additional insurance policies to the Committee.  In total, the Diocese has produced 2,974 pages of insurance policies, in addition to the 7,640 pages of documents produced pursuant to the Requests, totaling 10,614 pages of documents.[23]

In addition to responses to the Requests, on November 30, 2020, the Diocese's counsel and financial advisors hosted a conference call with counsel for the Tort Claimants' Committee's counsel to express and describe the dire financial straits that the Diocese is currently in.  It took weeks for counsel to the Tort Claimants' Committee to commit to such a call and the Tort Claimants' Committee has not provided any feedback or additional questions relating to the presentation made by the Diocese.

The Diocese has also repeatedly offered a virtual or in person meeting with all members of the Tort Claimants' Committee to discuss the financial condition of the Diocese and any programs recommended by the survivors.

## E.  Current and Historical Conditions

The Diocese is current on all post-petition obligations.  [ECF 265].  The Diocese intends to timely file all Monthly Operating Reports in accordance with the United States Trustee Guidelines.  [ECF 265].

---

[23] In contrast, the Diocese has repeatedly requested the following from the Tort Claimants' Committee: (i) additional programs that the Tort Claimants' Committee would like to see implemented to protect survivors; and (ii) a budget for counsel fees.  The Tort Claimants' Committee committed to providing program information by January 4, 2021 and a budget no later than December 18, 2020.  Despite these representations to the Diocese and to the Honorable Michael B. Kaplan, Chief Judge, on December 31, 2020, the Tort Claimants' Committee stated that it refused to follow through on its representations and would not provide the additional programs (which would only serve the best interests of survivors) or provide a budget.  While the Committee has not provided the budget to the Diocese, it has provided for an increase in its hourly rates to up to $1,495 per hour.  Unlike the Diocese's counsel and financial adviser, which each provided a courtesy discount of 10% from their normal rates (in recognition of the fact the Diocese is a non-profit that relies on the donations of its parishioners), the Committee has not provided any discount and continues to raise its fees to the detriment of survivors.

4817-6551-8030, v. 2

## ARTICLE VI.
## SUMMARY OF THE PLAN OF REORGANIZATION

The following is a summary of the significant elements of the Plan. This Disclosure Statement is qualified in its entirety by reference to the Plan. This summary does not describe every element of the Plan and is not a substitute for a complete review of the Plan. All parties are encouraged to review the Plan in its entirety for a full understanding of its provisions and impact on Creditors and Interest Holders. If there are any inconsistencies between the provisions of this Disclosure Statement and the provisions of the Plan, the provisions of the Plan will control.

### A.  What Creditors Will Receive Under the Proposed Plan

The Plan classifies claims in various classes.  The Plan states whether each class of claims is impaired or unimpaired.  The Plan provides the treatment each class will receive.  A copy of the Plan is annexed hereto as **Exhibit A**.

### B.  Classification of Claims and Interests

As set forth in Articles III and IV of the Plan, the Plan classifies the various Claims against, and Interests in, the Debtor and specifies their treatment pursuant to sections 1122 and 1123(a) of the Bankruptcy Code. All Claims and all Interests, as defined herein and in Section 101(5) of the Bankruptcy Code, except the Fee Claims, Administrative Expense Claims, U.S. Trustee Fees, and Priority Tax Claims, are placed into the Classes set forth below.  Pursuant to Section 1123(a)(1) of the Bankruptcy Code, Fee Claims, Administrative Expense Claims, U.S. Trustee Fees, and Priority Tax Claims, as described below, are not classified in the Plan, and the treatment of such Claims is set forth in Article III below.  A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest falls within the description of such other Classes.  A Claim or Interest is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and such Claim or Interest has not been paid, discharged, released or otherwise settled prior to the Effective Date.

### a.  Unclassified Claims

The following are the unclassified Claims: Fee Claims, Administrative Expense Claims, U.S. Trustee Fees, and Priority Tax Claims. Unclassified Claims are not Impaired by the Plan. Each Holder of an unclassified Claim is conclusively presumed to have accepted the Plan and, therefore, is not entitled to vote to accept or reject the Plan.

### b.  Unimpaired Classes of Claims

Each holder of an Allowed claim in the following class is unimpaired and deemed to have accepted the Plan and, therefore, is not entitled to vote to accept or reject the Plan: Priority Non-Tax Claims.

4817-6551-8030, v. 2

### c. Impaired Classes of Claims

Each Holder of an Allowed Claim in the following classes is impaired and entitled to vote to accept or reject the Plan:

| Class | Claims & Interest | Status | Voting Rights |
|---|---|---|---|
| 2 | Non-Abuse General Unsecured Claims | Impaired | Entitled to Vote |
| 3 | Underfunded Pension Claims | Impaired | Entitled to Vote |
| 4 | Tort Claims Other Than Unknown Tort Claims | Impaired | Entitled to Vote |
| 5 | Unknown Tort Claims | Impaired | Entitled to Vote |
| 6A | Abuse Related Contingent Claims | Impaired | Not Entitled to Vote |
| 6B | Abuse Related Contingent Claims | Impaired | Not Entitled to Vote |

## ARTICLE VII.
## TREATMENT OF UNCLASSIFIED CLAIMS

### A. Administrative Expenses Claims

Administrative Expense Claims are Claims for costs or expenses of administering the Debtor's Chapter 11 Case which are allowed under Bankruptcy Code section 503(b) or otherwise. The Bankruptcy Code requires that all administrative expenses be paid on the Effective Date of the Plan, unless a particular claimant agrees to different treatment. The Debtor or Reorganized Debtor, as appropriate, shall pay each Holder of an Allowed Administrative Expense Claim in full, in cash, on the later of (i) fifteen (15) days after the Effective Date; or (ii) fifteen (15) days after the date on which such claim becomes an Allowed Administrative Expense Claim. Notwithstanding anything in the Plan to the contrary, the Holder of an Allowed Administrative Claim may be paid on such other date and upon such other terms as may be agreed upon by the Holder of an Allowed Administrative Expense Claim and Debtor/Reorganized Debtor.

### B. Priority Tax Claims

The Debtor shall pay any Allowed Priority Tax Claims, in full, in Cash, without interest, as soon as practicable after the later of (i) fifteen (15) days after the Effective Date, (ii) fifteen (15) days after the date on which such claim becomes an Allowed Priority Tax Claim, (iii) at the option of the Debtor prior to the Effective Date in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code, in Cash, in an aggregate amount of such Allowed Priority Tax Claim payable in regular quarterly installments over a period of not more than five (5) years from the Petition Date, or (iv) such other treatment agreed to by the Debtor and the Holder of such Allowed Priority Tax Claim; *provided*, *however*, that the Holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising with respect to, or in connection with any Priority Tax Claim. Any demand for any such penalty will be deemed disallowed by Confirmation of the Plan.

4817-6551-8030, v. 2

The Debtor is unaware of any Priority Tax Claims.

### C. **U.S. Trustee Fees.**

All outstanding U.S. Trustee Fees that have not been paid as of the Effective Date shall be paid no later than fifteen (15) days after the Effective Date or when such U.S. Trustee Fees come due in the ordinary course.

The Debtor does not anticipate that there will be any outstanding U.S. Trustee Fees, except those that have not become due in the ordinary course at the time of confirmation.

### D. **Fee Claims.**

All entities seeking an award by the Bankruptcy Court of Fee Claims (i) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is 30 days after the Effective Date and (ii) shall be paid in full in such amounts as are Allowed by the Bankruptcy Court (a) on the date upon which the Order relating to any such Allowed Fee Claim is entered, or (b) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtor. The Reorganized Debtor is authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

The Debtor estimates the following Fee Claims:[24]

| Name of Professional and Role in Case | Estimated Amount of Fee Claim | Proposed Payment |
|---|---|---|
| McManimon, Scotland & Baumann, LLC<br><br>*Attorneys for Debtor* | $500,000 | Payment in full on Effective Date or as otherwise agreed upon between the Debtor and the professional |
| EisnerAmper, LLP<br><br>*Financial Advisors for Debtor* | $250,000 | Payment in full on Effective Date or as otherwise agreed upon between the Debtor and the professional |
| Cooper Levenson, P.A.<br><br>*Special Counsel for Debtor* | $100,000 | Payment in full on Effective Date or as otherwise agreed upon between the Debtor and the professional |

---

[24] The fee amounts are directly impacted by the timing of confirmation of the Debtor's plan.

| Name of Professional and Role in Case | Estimated Amount of Fee Claim | Proposed Payment |
|---|---|---|
| Duane Morris, LLC<br><br>*Special Counsel for Debtor* | $134,750 | To be satisfied from the DOT Settlement Proceeds |
| A. Atkins Appraisal Corp.<br><br>*Appraiser for Debtor* | $15,000 | Payment in full on Effective Date or as otherwise agreed upon between the Debtor and the professional |
| Lowenstein Sandler, LLP<br><br>*Counsel for the Tort Claimants' Committee* | Despite repeated requests, the Lowenstein firm has refused to provide the Debtor with any estimate of its fees. | Payment in full on Effective Date or as otherwise agreed upon between the Debtor and the professional |
| BRG<br><br>*Financial Advisor for the Tort Claimants' Committee* | The Debtor has been informed that the Tort Claimants' Committee voted to retain a financial advisor. At the time of filing this Disclosure Statement, a retention application has not been filed. | Payment in full on Effective Date or as otherwise agreed upon between the Debtor and the professional |
| Porzio, Bromberg & Newman, P.C.<br><br>*Counsel for the Trade Creditors' Committee* | $75,000 | Payment in full on Effective Date or as otherwise agreed upon between the Debtor and the professional |

## ARTICLE VIII.
## TREATMENT OF CLAIMS AND INTERESTS

### A. Estimates of Claims

The amounts listed below represent estimated Allowed Claims, and do not represent amounts actually asserted by creditors in proofs of claim or otherwise. The Debtor has not completed its analysis of Claims in the Chapter 11 Cases and objections to such Claims have not been made or fully litigated. Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time. Rather, the actual amount of the Allowed Claims may be greater or lower than estimated. The estimated percentage recovery is based upon, among other things, an estimate of the Allowed Claims in the Chapter 11 Cases. The actual amount of the Allowed Claims may be greater or lower than estimated. Thus, the actual recoveries may be higher or lower than projected depending upon, among other things, the amounts and priorities of Claims that are actually Allowed by the Bankruptcy Court.

## B.  Treatment of Class 1 (Priority Non-Tax Claims).

Class 1 consists of the Priority Non-Tax Claims which are defined by the Plan as all Claims that are entitled to priority pursuant to Section 507 of the Bankruptcy Code and that are not General Administrative Expense Claims or Priority Tax Claims. The legal and equitable rights of the Holders of Allowed Priority Non-Tax Claims are unaltered by the Plan.  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim and the Debtor shall have agreed in writing to a different treatment, each Holder of an Allowed Priority Non-Tax Claim shall receive, in full and final satisfaction of such Claim, payment in full in Cash, without interest, in an amount equal to such Allowed Priority Non-Tax Claim as soon as reasonably practicable after the later of (a) the Effective Date and (b) the date when such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim.

The Debtor estimates that there will be no Priority Non-Tax Claims.

## C.  Treatment of Class 2 (General Unsecured Claims).

General Unsecured Claims are unsecured claims not entitled to priority under Bankruptcy Code section 507(a) that are not Tort Claims.

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|---------------|----------------|-----------|
| 2 | General unsecured claims <br>• Total amount of claims = (this amount is still being determined in light of the fact that certain claims are subject to objection and reclassification, but is anticipated to be $24.8 million). <br><br>Estimated Distribution: 80.6% | N | Y | Allowed Class 2 Claims shall be paid a *pro rata* portion of a $20,000,000 distribution over ten (10) years. Payments may be made quarterly. |

As of the date of this Disclosure Statement, the estimated amount of the asserted General Unsecured Claims in Class 2 is approximately $24.8 million.  The unsecured creditors include PNC Bank, N.A., which extended Diocese a line of credit with a balance of approximately $22.8 million.  In addition, trade creditors total approximately $2,000,000.

## D.  Treatment of Class 3 (Underfunded Pension Claims)

Underfunded Pension Claims are unsecured claims that are based on the Debtor's underfunded pension plans: (i) Pension Plan for Priests of the Diocese of Camden; (ii) Pension Plan for Certain Lay Employees of the Diocese of Camden; and (iii) Post-Retirement Benefits Plan

for Priests of the Diocese of Camden.  The Debtor estimates that these claims are approximately $45,439,291.

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|---------------|----------------|-----------|
| 3 | Underfunded Pension Claims<br>• Total amount of claims = estimated at $45,439,291. | N | Y | Allowed Class 3 Claims shall be paid $2,000,000 a year for 20 years. Payments may be made quarterly. |

### E.  Treatment of Class 4 (Tort Claims Other Than Unknown Tort Claims)

A Class 4 Claim means a Tort Claim other than an Unknown Tort Claim.  The Plan creates a Trust to fund payments to Class 4 Claims entitled to such payments under the Plan and Trust Agreement.  Class 4 Claimants' share of the Trust Assets as provided by the Trust Distribution Plan is the only amount, if any, they will be entitled to receive from the Covered Parties.  Distribution from the Trust does not preclude Claims or recoveries by Tort Claimants against Persons who are not Covered Parties for the liability of such Persons not attributable to the causal fault or share of liability of Covered Parties.  Any Person that is or was alleged to be a joint tortfeasor with any of the Covered Parties in connection with the Abuse that forms the basis of a Tort Claim shall not be liable for any Covered Party's share of causal liability or fault nor have any claim against the Covered Parties.

Except with respect to the Covered Parties, nothing in the Plan is intended to affect, diminish, or impair the rights of any Tort Claimant against any Person named or that could be named as a defendant in a lawsuit based on the Abuse that forms the basis for his or her Tort Claim except that the rights of Tort Claimants against third-parties, including joint tortfeasors, does not include the right of the Tort Claimants to collect or to obtain a reallocation of the share of any judgment initially allocated to a Covered Party to any third-party based on the causal fault or share of liability of Covered Parties.  Any Person that is or was alleged to be a joint tortfeasor with any of the Covered Parties in connection with a Tort Claim shall not be liable for any Covered Party's share of liability or fault.  Under no circumstances will the reservation of such Tort Claimant's rights against any other Person impair the discharge or Channeling Injunctions with respect to any Covered Party and the Reorganized Debtor.

The Covered Parties' liability for and obligation to pay, if any, Class 4 Claims shall be assigned to and assumed by the Trust.  The Trust shall be funded as set forth in the Plan.  Each Class 4 Claim will be estimated solely for purposed of voting.  The Covered Parties shall have no further liability in connection with Class 4 Claims.

Nothing in this Article requires any Tort Claimant to release any Claims against any joint tortfeasor who is not a Covered Party, and such Claims are reserved.  But in no event may a Tort Claimant collect on that portion of any judgment or obtain any reallocation of any judgment based on the causal fault or share of liability of any Covered Parties.

4817-6551-8030, v. 2

### F. **Treatment of Class 5 (Unknown Tort Claims).**

A Class 5 Claim means an Unknown Tort Claim. The Plan requires that the Reorganized Debtor fund payments to Class 5 Claimants entitled to such payments under the Plan and Trust Distribution Plan. Class 5 Claimants will receive distributions from the Trust. Payment by the Trust does not preclude Claims or recoveries by Tort Claimants against Persons other than the Covered Parties and the Reorganized Debtor for the liability of such other Persons not attributable to the causal fault or share of liability of Covered Parties. Any Person that is or was alleged to be a joint tortfeasor with any of the Covered Parties in connection with the Abuse that forms the basis of a Tort Claim shall not be liable for any Covered Party's share of causal liability or fault.

Except with respect to the Covered Parties (other than the Reorganized Debtor), nothing in the Plan is intended to affect, diminish, or impair the rights of any Unknown Tort Claimant against any Person named or that could be named as a defendant in a lawsuit based on the Abuse that forms the basis for his or her Unknown Tort Claim except that the rights of Unknown Tort Claimants against third-parties, including joint tortfeasors, does not include the right of the Unknown Tort Claimants to collect or to obtain a reallocation of the share of any judgment initially allocated to a Covered Party to any third-party based on the causal fault or share of liability of Covered Parties. Any Person that is or was alleged to be a joint tortfeasor with any of the Covered Parties in connection with the Abuse that forms the basis of an Unknown Tort Claim shall not be liable for any Covered Party's share of liability or fault.

The Covered Parties' liability for and obligation to pay, if any, Class 5 Claims shall be assumed by the Trust. The maximum amount of the Trust's obligation to pay Class 5 Claimants shall be $250,000. The Reorganized Debtor and the Covered Parties shall have no further liability therefor. Individuals determined to hold a Class 5 Claim shall provide sufficient information to allow the Tort Claims Reviewer to make an evaluation of the Class 5 Claim pursuant to the factors in the Trust Distribution Plan, before any payment shall be made on a Class 5 Claim.

Class 5 Claims will be determined by the Tort Claims Reviewer in accordance with the Trust Distribution Plan.

Nothing in this Article requires any Unknown Tort Claimant to release any Claims against any joint tortfeasor who is not a Covered Party (excluding the Reorganized Debtor) and such Claims are reserved. But in no event may a Class 5 Claimant collect on that portion of any judgment or obtain any reallocation of any judgment based on the casual fault or share of liability of any Covered Party.

### G. **Treatment of Class 6A (Abuse Related Contingent Claims).**

A Class 6A Claim means any Claim for contribution, indemnity or reimbursement arising out of or related to the Diocese's liability to pay or defend any Class 4 Claim. Claims in Class 6A shall be allowed or disallowed in accordance with Section 502(e)(1) of the Bankruptcy Code, and Class 6A Claims will receive no distribution under the Plan. The Plan does not allow Tort Claimants to collect that portion of any judgment or obtain reallocation of any judgment based on the causal fault or share of liability of any Covered Party. Any Person that is or was alleged to be

a joint tortfeasor with any of the Covered Parties in connection with a Tort Claim shall not be liable for any Covered Party's share of liability or fault.

### H.  Treatment of Class 6B (Abuse Related Contingent Claims).

A Class 6B Claim means any Claim for contribution, indemnity or reimbursement arising out of or related to the Diocese's liability to pay or defend any Class 5 Claim. Claims in Class 6B shall be allowed or disallowed in accordance with Section 502(e)(1) of the Bankruptcy Code, and Class 6B Claims will receive no distribution under the Plan.  The Plan does not allow Tort Claimants to collect that portion of any judgment or obtain reallocation of any judgment based on the causal fault or share of liability of any Covered Party.  Any Person that is or was alleged to be a joint tortfeasor with any of the Covered Parties in connection with a Tort Claim shall not be liable for any Covered Party's share of liability or fault.

## ARTICLE IX.
## MEANS OF EFFECTUATING THE PLAN

### A.  Trust Formation and Funding.

(a)    **Purpose, Formation and Assets.**  The Trust shall be established for the purposes of assuming liability of Covered Parties for Channeled Claims and receiving, liquidating, and distribution Trust Assets in accordance with this Plan and the Trust Distribution Plan.  The proposed Trust Agreement is attached hereto as **Exhibit D**.

(b)    **Funding.**

a.    **Summary.**  This Plan will be funded from the sources and in the manner set forth in this Section.

b.    **Contributions.**  Cash and other assets with an expected value of $10,000,000 will be paid or transferred, as applicable, to the Trust Account as provided in the Plan and as described herein subject to reversion if any proceeds are not needed to fund the Trust.

i.    **Debtor Initial Cash Contribution.**  The Debtor will transfer $250,000 to the Trust Account within two (2) business days after the Confirmation Order has become a Non-Appealable Order (the "Debtor Initial Cash Contribution").  The Debtor Initial Cash Contribution will be primarily comprised of funds from the following sources:

1.    non-restricted cash accounts held by the Diocese; and

2.    an account established to hold the proceeds derived from the sale of Diocese properties during the course of this Chapter 11 case.

ii.   **Covered Party Cash Contribution**.  It is anticipated that the Covered Parties will make contributions based upon an analysis of their financial capabilities over the lifetime of the Plan (the "Substantial Contribution Amounts").

iii.   **Insurance Claims**.  The Diocese will transfer to the Trust all Claims or Causes of Action that the Diocese holds against any and all Insurers.  Any proceeds resulting from these Claims or Causes of Action shall vest in the Trust (the "Insurance Claim Amounts").

iv.   **Future Debtor Contributions**.  The Debtor will transfer Cash in the amount of $250,000 to the Trust Account in accordance with the Plan each quarter following the transfer of the Debtor Initial Cash Contribution for ten (10) years (the "Future Debtor Contributions").  Any amounts received by the Trust from the Substantial Contribution Amounts or the Insurance Claim Amounts shall offset the Future Debtor Contributions.

**(c)**      **Vesting.**  On the Effective Date, all Trust Assets shall vest in the Trust, and the Diocese and other Covered Parties shall be deemed for all purposes to have transferred all Interests in the Trust Assets to the Trust.  On the Effective Date, or as soon as practicable thereafter, the Reorganized Debtor or any other Covered Party, as applicable, shall take all actions reasonably necessary to transfer any Trust Assets to the Trust.  Upon the transfer of contract of Trust Assets in accordance with this paragraph, the Diocese and other Covered Parties shall have no further interest in or with respect to the Trust Assets.

### B.  Vesting of Assets in Reorganized Debtor.

Except as otherwise provided in the Plan or the Trust Agreement, other agreement, instrument, or other document incorporated therein, on the Effective Date, all property in the Estate, all Causes of Action, and any property acquired by the Debtor pursuant to the Plan shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances (except for Liens expressly preserved and continued under the Plan).  On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Without limiting any of the foregoing, the Reorganized Debtor may pay the charges incurred on or after the Effective Date for Professionals' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

### C.  Causes of Action.

Except as set forth otherwise herein, the Reorganized Debtor, on behalf of and for the benefit of the Debtor's estates, shall be vested with and shall retain and may enforce any and all

claims, rights, demands and Causes of Action of any kind or nature whatsoever held by, through or on behalf of the Debtor and/or its Estate against any other entity, arising before the Effective Date that have not been fully resolved or disposed of prior to the Effective Date whether or not such claims or Causes of Action are specifically identified in the Disclosure Statement accompanying this Plan and whether or not litigation with respect to same has been commenced prior to the Effective Date.

### D.  Post-Confirmation Conversion/Dismissal.

A creditor or party in interest may bring a motion to convert or dismiss the case under § 1112(b), after the Plan is confirmed, if there is a default in performing under the Plan.  If the Court orders the case converted to chapter 7 after the Plan is confirmed, then all property that had been property of the chapter 11 estate, and that has not been disbursed pursuant to the Plan, will revest in the chapter 7 estate, and the automatic stay will be reimposed upon the revested property only to the extent that relief from the stay was not previously granted by the Court during this case.

## ARTICLE X.
## THE TRUST

### A.  Establishment of Trust.

On or before the Confirmation Date, the Trust shall be established in accordance with the Trust Documents.  The Trust is intended to qualify as a "Designated" or "Qualified Settlement Fund" pursuant to Section 468B of the Internal Revenue Code and the Treasury Regulations promulgated thereunder.  The Debtor is the "transferor" within the meaning of Treasury Regulation Section 1.468B-1(d)(1).  The Trust Administrator shall be classified as the "administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3).  The Trust Documents, including the Trust Agreement, are incorporated herein by reference.

### B.  Allocations Within and Distribution and Payments from the Trust.

(a)    **General Corpus.**  The following distributions and payments will be made from the general corpus of the Trust.

a.    **Distributions.**  Distributions on Class 4 Claims as determined by the Tort Claims Reviewer in accordance with this Plan, the Trust Agreement, and the Trust Distribution Plan.

b.    **Tort Claims Reviewer.**  The Trust Administrator shall retain the Tort Claims Reviewer.  Fees payable to the Tort Claims Reviewer for review of Class 4 Claims shall be paid from the Trust.  Fees payable to the Tort Claims Reviewer for review of Class 4 Claims shall be paid by the Trust.

c.    **Trust Administrative Fees.**  All fees, costs, and expenses of administering the Trust as provided in the Plan and the Trust Agreement shall be paid by the Trust, including:  (i) as reasonably necessary to meet current liabilities and to maintain the value of the respective Assets of the

57

Trust; (ii) to pay reasonable administrative expenses (including any taxes imposed on the Trust and any professional fees); and (iii) to satisfy other liabilities incurred by the Trust in accordance with the Plan or the Trust Agreement.

d. **Indemnity.**  The Trust's obligations, if any, to defend, indemnify, or hold harmless any Person expressly set out in the Plan shall be made from the corpus of the Trust.

**(b)  Unknown Tort Claim Reserve Fund.**  The Reorganized Debtor shall establish the Unknown Tort Claim Reserve Fund in the amount of $250,000, which shall be funded with $25,000 per year over ten (10) years.  The Reorganized Debtor shall maintain the Unknown Tort Claim Reserve Fund until the later of (i) fifteen (15) days after the Reorganized Debtor provides written notice to the Trust Administrator that the Unknown Tort Claim Reserve Fund has been exhausted or (ii) the occurrence of the eleventh (11th) anniversary of the Effective Date.

## C. <u>Tax Matters.</u>

The Trust shall not be deemed to be the same legal entity as the Diocese but only the assignee of certain assets of the Diocese and a representative of the Estate for delineated purposes within the meaning of Section 1123(b)(3) of the Bankruptcy Code.  The Trust is expected to be tax exempt.  The Trust Administrator shall file such income tax and other returns and documents as are required to comply with the applicable provisions of the Internal Revenue Code of 1986, 26 U.S.C. §§ 1 et seq., as may be amended, and the regulations promulgated thereunder, 31 C.F.R. §§ 900 et seq., and New Jersey law and the regulations promulgated thereunder, and shall pay from the Trust all taxes, assessments, and levies upon the Trust, if any.

## D. <u>Appointment of the Trust Administrator.</u>

The initial Trust Administrator will be identified ten (10) days before the Confirmation Date.  The Trust Administrator shall commence serving as the Trust Administrator on the Confirmation Date; *provided, however*, that the Trust Administrator shall be permitted to act in accordance with the terms of the Trust Agreement from such earlier date, as authorized by the Diocese, and shall be entitled to seek compensation in accordance with the terms of the Trust Agreement and the Plan.

## E. <u>Rights and Responsibilities of Trust Administrator.</u>

**(a)**  The Trust Administrator shall be deemed the Estate's representative in accordance with Section 1123 of the Bankruptcy Code and shall have all rights, powers, authority, responsibilities, and benefits specified in the Plan and the Trust Agreement, including the powers of a trust administrator under Sections 704, 108 and 1106 of the Bankruptcy Code and Bankruptcy Rule 2004 (including commencing, prosecuting or settling Causes of Action enforcing contracts, and asserting Claims, defenses, offsets and privileges).  If there is any inconsistency or ambiguity between the Confirmation Order and the Trust Agreement with respect to Trust Administrator's authority to act, the

4817-6551-8030, v. 2

provisions of the Trust Agreement shall control.   Among other things, the Trust Administrator: (1) shall liquidate and convert to case the Trust Assets, make timely distributions and not unduly prolong the duration of the Trust; (2) may request an expedited determination of taxes of the Trust under Section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Trust for all taxable periods through the dissolution of the Trust; and (3) may retain professionals, including legal counsel, accountants, financial advisors, auditors, and other agents on behalf of the Trust, and at the Trust's sole expense, as reasonably necessary and to carry out the obligations of the Trust Administrator hereunder and under the Trust Agreement.

(b)   Notwithstanding the foregoing, the Diocese, the Reorganized Debtor, and the Trust acting for itself and on behalf of the Estate, shall be deemed to have waived, effective upon the Effective Date:

a.   Any and all Claims under Sections 547, 548, 549, and 550 of the Bankruptcy Code for the recovery of any sums paid to any Person who provided goods and services to the Diocese in the ordinary course of business prior to the Effective Date;

b.   Any and all Claims and Causes of Action: (i) seeking the substantive consolidation of the Diocese and any other Person or an order deeming any such Person and the Diocese to be an "alter-ego" of the other or any other similar Claim or Cause of Action; (ii) to avoid, set aside or recover any payment or other transfer made to any Person under Sections 547, 548, 549, and 550 of the Bankruptcy Code; and (iii) any proceeding to avoid or set aside any interest of a Person in property under Section 544 of the Bankruptcy Code.

c.   The Confirmation Order shall state that, absent permission of the Bankruptcy Court, no judicial, administrative, arbitral, or other action or proceeding shall be commenced in any forum other than the Bankruptcy Court against the Trust Administrator in its official capacity, with respect to its status, duties, powers, acts, or omissions as Trust Administrator.

### F.   <u>Investment Powers; Permitted Cash Expenditures.</u>

All funds held by the Trust shall be invested in cash or short-term highly liquid investments that are readily convertible to known amounts of cash as more particularly described in the Trust Agreement.   The Trust Administrator may expend the cash of the Trust.

### G.   <u>Registry of Beneficial Interests.</u>

To evidence the beneficial interest in the Trust of each holder of such an interest, the Trust Administrator shall maintain a registry of beneficiaries.

### H. **Non-Transferability of Interests.**

Any transfer of an interest in the Trust shall not be effective until and unless the Trust Administrator receives written notice of such transfer.

### I. **Termination.**

The Trust shall terminate after its liquidation, administration, and distribution of the Trust Assets in accordance with the Plan and its full performance of all other duties and functions set forth herein or in the Trust Agreement.  The Trust shall terminate no later than the tenth (10th) anniversary of the Effective Date.

### J. **Immunity; Liability; Indemnification.**

(a)    Neither the Reorganized Debtor nor its respective members, designees, or professionals, nor the Trust Administrator or any duly designated agent or representative of the Trust Administrator, nor their respective employees, shall be liable for the acts or omissions of any other member, designee, agent, or representative of such Trust Administrator, except that the Trust Administrator shall be liable for its specific acts or omissions resulting from such Trust Administrator's misconduct, gross negligence, fraud, or breach of the fiduciary duty of loyalty.  The Trust Administrator may, in connection with the performance of its functions and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors, and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Persons.  Notwithstanding such authority, the Trust Administrator shall not be under any obligation to consult with its attorneys, accountants, financial advisors, or agents, and its determination not to do so shall not result in the imposition of liability on the Trust Administrator unless such determination is based on the Trust Administrator's recklessness, gross negligence, willful misconduct, or fraud.

(b)    No recourse shall ever be had, directly or indirectly, against the Trust Administrator personally, or against any employee, contractor, agent, attorney, accountant, or other professional retained in accordance with the terms of the Trust Agreement or the Plan by the Trust Administrator, by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking, obligation, covenant or Trust Agreement whatsoever executed by the Trust Administrator in implementation of this Trust Agreement or the Plan, or by reason of the creation of any indebtedness by the Trust Administrator under the Plan for any purpose authorized by the Trust Agreement or the Plan, it being expressly understood and agreed that all such liabilities, covenants, and Trust Agreements of the Trust whether in writing or otherwise, shall be enforceable only against and be satisfied only out of the Trust Assets or such part thereof as shall under the term of any such Trust Agreement be liable therefore or shall be evidence only of a right of payment out of the Trust Assets.  Notwithstanding the foregoing, the Trust Administrator may be held liable for its recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud; and if liability on such grounds is established, recourse may be had directly against the Trust Administrator.  The Trust shall not be covered by a bond.

4817-6551-8030, v. 2

(**c**)    The Trust shall defend, indemnify, and hold the Trust Administrator, its officers, directors, agents, representatives, and employees to the fullest extent that a corporation or trust organized under the laws of New Jersey entitled to indemnify and defend its directors, trustees, officers, and employees against any and all liabilities, expenses, Claims, damages or losses incurred by them in the performance of their duties hereunder.

a.    Additionally, the Reorganized Debtor and the Covered Parties, and each of their respective agents, who was or is a party, or is threatened to be made a party to any threatened or pending judicial, administrative, or arbitrative action, by reason of any act or  omission of the Trust or Trust Administrator or respective agents, with respect to: (i) the Chapter 11 case and any act or omission undertaken by them prior to the commencement thereof; (ii) the assessment or liquidation of any Class 4 and Class 5 Claims; (iii) the administration of the Trust and the implementation of the Trust Distribution Plan; or (iv) any and all activities in connection with the rust Agreement, shall be indemnified and defended by the Trust, to the fullest extent that a corporation or trust organized under the laws of New Jersey is from time to time entitled to indemnify and defend its officers, directors, trustees, and employees, against reasonable expenses, costs and fees (including attorneys' fees and costs), judgments, awards, amounts paid in settlement and liabilities of all kinds incurred by the Debtor, Reorganized Debtor or Covered Party, and their respective professionals, officers and directors, in connection with or resulting from such action, suit, or proceeding, provided such expenditures have been approved by the Trust in advance such approval not be unreasonably withheld.

b.    Reasonable expenses, costs, and fees (including attorneys' fees and costs) incurred by or on behalf of a Trust Administrator, the Debtor, the Reorganized Debtor, and their respective agents in connection with any action, suit, or proceeding, whether civil, administrative, or arbitrative, from which they are entitled to be indemnified by the Trust, shall be paid by the Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of such Trust Administrator, the Debtor, the Reorganized Debtor, and their respective agents, to repay such amount in the event that it shall be determine ultimate by Non-Appealable Order that such Trust Administrator, the Debtor, the Reorganized Debtor, and their respective professionals, officers, and directors is not entitled to be indemnified by the Trust.

**K.  Treatment of Tort Claims.**

(**a**)    **Trust Liability.**  On the Effective Date, the Trust shall automatically and without further act or deed assume:  (i) all liability, if any, of the Covered Parties in respect of Channeled Claims; and (ii) the responsibility for preserving and managing Trust Assets and distributing Trust Assets.

4817-6551-8030, v. 2

**(b)** **Assessment.**

a.      Each Tort Claim will be assessed by the Tort Claims Reviewer in accordance with the Trust Distribution Plan to determine whether the Tort Claimant is entitled to a distribution under the Trust.  The Diocese or the Reorganized Debtor shall reasonably cooperate with the Tort Claims Reviewer and the Trust Administrator as requested by the Tort Claims Reviewer or the Trust Administrator in connection with any inquiries by either in the administration of the Trust Distribution Plan.

b.      Each Tort Claimant may elect, in lieu of assessment by the Tort Claims Reviewer, to have his Tort Claim treated pursuant to the convenience Claim process provided by the Trust Distribution Plan ("Convenience Claim").

**(c)** **Distributions to Tort Claimants.**  A Tort Claimant electing to be treated as a Distribution Plan Claimant, and whom the Tort Claims Reviewer determines to be entitled to a distribution, will receive a distribution from the Trust in the amount(s) and at the time(s) provided for in the Trust Distribution Plan.  Any payment on a Tort Claim constitutes payments for damages on account of personal physical injuries or sickness arising from an occurrence, within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended.  For the avoidance of doubt, Tort Claimants' recovery on their Class 4 Claims shall be limited to the distributions they are entitled to, if any, from the Trust under the Trust Distribution Plan, and they shall not be entitled to collect personally or otherwise any additional amounts whatsoever on their Tort Claims from any Covered Party or any Covered Party's assets, even if they are denied a distribution pursuant to the Trust Distribution Plan.  For the avoidance of doubt, the Unknown Tort Claims Reserve Fund established and maintained by the Trust shall be the sole source of payment to Class 4 Claimants on account of Class 4 Claims.  Tort Claimants' recovery on their Class 4 Claims shall be limited to the distributions they are entitled to, if any, from the Trust determined under the Trust Distribution Plan, and they shall not be entitled to collect personally or otherwise any additional amounts whatsoever on their Tort Claims from the Reorganized Debtor, any Covered Party, or any Covered Party's assets, even if they are denied a distribution pursuant to the Trust Distribution Plan.

**(d)** **Dismissal of Pending Litigation.**  Within twenty (21) days after the Effective Date, all Claims arising out of, or related to, Tort Claims asserted in any lawsuit against any Covered Party currently pending in state court shall be dismissed with prejudice and without fees and costs being recoverable against any Covered Party or by any Covered Party against the Tort Claimant.

**(e)** **Objections and Litigation After the Effective Date.**  As of the Effective Date, the Trust Administrator shall have the sole and exclusive right to object to Class 4 Claims.  The Reorganized Debtor shall have no right to object to any Class 4 Claims after confirmation of the Plan.  The Trust and the Reorganized Debtor shall each have the right to object to any Class 5 Claims after confirmation of the Plan.

**(f)      Claim Withdrawal.**  A Tort Claimant may withdraw his or her Tort Claim at any time on written notice to the Trust Administrator.  If withdrawn, (a) the Tort Claim will be withdrawn with prejudice and may not be reasserted, and such Tort Claimant shall still be subject to the Discharge Injunction, the Channeling Injunctions, and the Supplemental Insurer Injunction as provided by this Plan; and (b) any reserve maintained by the Trust on account of such Tort Claim shall revert to the Trust as a Trust Asset for distribution in accordance with the Plan and Trust Distribution Plan.

## ARTICLE XI.
## EFFECT OF PLAN ON CLAIMS AND INTERESTS

### A.  General Injunction.

Except as otherwise provided in the Plan, the Confirmation Order will provide that all persons and entities who have held, hold, or may hold Claims against the Debtor are permanently enjoined, on and after the Confirmation Date, from (A) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or taking any act to recover such Claim outside of the claims allowance procedure discussed in the Plan and the Bankruptcy Code and Bankruptcy Rules, (B) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or Order against the Debtor on account of any such Claim, (C) creating, perfecting or enforcing any encumbrance of any kind against the Debtor or against the property or interests in property of the Debtor on account of any such Claim and (D) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtor or against the property or interests in property of the Debtor on account of any such Claim.

### B.  Channeling Injunction.

Channeling Injunction preventing prosecution of Channeled claims against Covered Parties.

(a)      In consideration of the undertakings of the Covered Parties under the Plan, their contributions to the Trust, and other consideration, and pursuant to their respective settlements with the Debtor and to further preserve and promote the agreements between and among the Covered Parties and pursuant to Section 105 of the Bankruptcy Code:

a.      any and all Channeled Claims are channeled into the Trust and shall be treated, administered, determined, and resolved under the procedures and protocols and in the amounts as established under the Plan and the Trust Agreement as the sole and exclusive remedy for all holders of Channeled Claims; and

b.      all Persons who have held or asserted, hold or assert, or may in the future hold or assert any Channeled Claims are hereby permanently stayed, enjoined, barred and restrained from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce any Channeled Claim against the Covered Parties, including:

      i.   commencing or continuing in any manner any action or other proceeding of any kind with respect to any Channeled Claim against any of the Covered Parties or against the property of any of the Covered Parties;

     ii.   enforcing, attaching, collecting or recovering, by any manner or means, from any of the Covered Parties or the property of any of the Covered Parties, any judgment, award, decree, or order with respect to any Channeled Claim against any of the Covered Parties;

    iii.   creating, perfecting or enforcing any lien of any kind relating to any Channeled Claim against any of the Covered Parties or the property of the Covered Parties;

    iv.   asserting, implementing or effectuating any Channeled Claim of any kind against:

        1.   any obligation due any of the Covered Parties;

        2.   any of the Covered Parties; or

        3.   the property of any of the Covered Parties.

     v.   taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan; and

    vi.   asserting or accomplishing any setoff, right of indemnity, subrogation, contribution or recoupment of any kind against any obligation due to any of the Covered Parties.

(b)    The Channeling Injunction is an integral part of the Plan and is essential to the Plan's consummation and implementation. It is intended that the channeling of the Channeled Claims as provided in this Section shall inure to the benefit of the Covered Parties. In a successful action to enforce the injunctive provisions of this Section in response to a willful violation thereof, the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

### C.  **Exculpation; Limitation of Liability.**

From and after the Effective Date, none of the Exculpated Parties shall have or incur any liability for, and each Exculpated Party shall be released from, any Claim, Cause of Action or liability to any other Exculpated Party, to any holder of a Claim, or to any other party in interest, for any act or omission that occurred during and in connection with this Chapter 11 case or in connection with the preparation and filing of this Chapter 11 case, the formulation, negotiation, or pursuit of confirmation of a Plan, the consummation of the Plan, and the administration of the Plan or the property to be distributed under the Plan, except for Claims, Causes of Action or liabilities arising from the gross negligence, willful misconduct, fraud, or breach of the fiduciary duty of loyalty of

4817-6551-8030, v. 2

any Exculpated Party, in each case subject to determination of such by Non-Appealable Order of a court of competent jurisdiction and provided that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan. Without limiting the generality of the foregoing, the Committee and the Diocese and their respective officers, board and committee members, employees, attorneys, financial advisors, and other Professionals shall be entitled to and granted benefits of Section 1125(e) of the Bankruptcy Code and the Channeling Injunction.

### D. **Disclosure**

In exchange for the Substantial Contribution Amount and agreement to be bound to meet all Plan requirements, the release relating to the Parishes and OCE (collectively, the "Releasing Parties") and the corresponding injunctions are critically important to the success of the Debtor's Plan and implements the concessions, compromises and commitments therein.

The Parishes and OCE, whether directly or indirectly through the concessions, compromises and commitments, afforded value to the Debtor and has aided in the Debtor's reorganization process. The Parishes and OCE have played an integral role in the formulation of the Plan, has expended and will continue to expend significant time and resources analyzing and negotiating the issues presented by the Plan and, in exchange for receiving the releases and injunctions set forth in the Plan, is making critical financial contributions to Plan, that are necessary to make the Plan feasible, including, but not limited to the Substanive Contribution.

In addition, the Parishes and OCE made significant concessions and compromises that provide a material benefit to the Releasing Parties. For example, the Parishes will waive any claims agains the Diocese. The Debtor submits that it will be able to demonstrate at confirmation that the release is proper under *In re Continental Airlines,* 203 F.3d 203 (3rd Cir. 2000).

Further, the Parishes and OCE will not make any of the concessions, compromises and commitments outlined in the Plan unless the releases are approved. Accordingly, the releases and related injunctions are an integral part of the consideration to be provided in exchange for the concessions, compromises and commitments embodied in the Plan that the Debtor believes maximizes recoveries to the Debtor's creditors. Absent the expeditious implementation of the Plan, the Debtor could face a longer, costlier and uncertain Chapter 11 process mired with contentious litigation, which could materially delay and reduce distributions to creditors.

The Debtor believes that the "Channeling Injunction" to the Parishes and OCE is a sound exercise of its business judgment is appropriate and reasonable under the circumstances, particularly where, as here, the relative strength of the claims being released are more than offset by the significant benefits the Debtor is receiving under the Plan from the Parishes and OCE. In light of the foregoing, the Debtor believes, in its sound business judgment, that the "Debtor Release" falls well within the range of reasonableness and, thus, satisfies the applicable provisions of the Bankruptcy Code and Bankruptcy Rules relating to the approval of settlements.

4817-6551-8030, v. 2

## ARTICLE XII.
## <u>PROVISIONS GOVERNING DISTRIBUTIONS GENERALLY</u>

### A. <u>Disbursing Agent.</u>

The Reorganized Debtor shall be the Disbursing Agent (and Trust Administrator) and shall be responsible for all distributions required under the Plan.

### B. <u>Payments and Distributions.</u>

Any payment of Cash under the Plan may be made either by check drawn or by wire transfer from a domestic bank, at the option of the respective Disbursing Agent.

As and when authorized by a Final Order, Disputed Claims that become Allowed Claims shall be paid from the Disputed Claim Reserve. No distribution shall be made on a Claim where only a portion of such Claim is disputed until such dispute is resolved by settlement or Final Order.

To the extent that a disbursing agent makes a distribution hereunder to a Class prior to the resolution of all Disputed Claims of such Class, the respective disbursing agent shall reserve an amount for any Disputed Claims in such Class equal to the amount that such Holders of Disputed Claims in such Class would be entitled to receive under the Plan if such Disputed Claims were Allowed in the asserted amount of the Claim.

All distributions by check shall be deemed made at the time such check is deposited in the United States mail, postage prepaid. Any distributions by wire transfer shall be deemed made as of the date of the wire transfer is made. Except as otherwise agreed with the Holder of an Allowed Claim in respect thereof or provided in the Plan, any distribution required under the Plan on account of an Allowed Claim, shall be mailed to (i) the latest mailing address filed for the Holder of an Allowed Claim entitled to a distribution, (ii) the latest mailing address filed for a Holder of a filed power of attorney designated by the Holder of such Claim to receive distributions, (iii) the latest mailing address filed for the Holder's transferee as identified in a filed notice served on the Debtor pursuant to Bankruptcy Rule 3001(e), or (iv) if no such mailing address has been filed, the mailing address reflected on the Schedules or in the Debtor's books and records. The Holder of a Claim shall be required to promptly notify the Reorganized Debtor and the Bankruptcy Court of any change in its mailing address.

Except as otherwise provided in the Plan, any distribution under the Plan which is unclaimed after three (3) months following any Distribution Date shall be forfeited, and such distribution, together with any interest earned thereon, and shall return to and revest in the Reorganized Debtor.

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the following Business Day, but shall be deemed to have been completed as of the required date.

Subject to the terms of the Plan and pursuant to Section 553 of the Bankruptcy Code or applicable non-bankruptcy law, the Debtor or Reorganized Debtor, as appropriate, may but shall

not be required to, setoff against or recoup from any Claim on which payments are to be made pursuant to the Plan, any Claims of any nature whatsoever the Debtor may have against the Holder of such Claim.

Notwithstanding any other provisions of the Plan to the contrary, no payment of fractional cents will be made under the Plan. Cash will be issued to Holders entitled to receive a distribution of Cash in whole cents (rounded to the nearest whole cent when and as necessary). Any distribution of less than $25.00 will be considered *de minimis,* and Holders of Allowed Claims that are entitled to an interim or final distribution of less than $25.00 will not receive any distribution. Such funds will remain with and revest in the Reorganized Debtor.

Except as otherwise provided herein or the Confirmation Order, the Plan Administrator shall have the right to prepay, without penalty, all or any portion of an Allowed Claim.

### C.  <u>Allowance and Disallowance of Claims.</u>

(a)  **Allowance of Claims.** Except as expressly provided in the Plan, no Claims shall be deemed Allowed by virtue of the Plan or the Confirmation Order unless and until such Claim is deemed Allowed under the Bankruptcy Code, or the Bankruptcy Court enters a Final Order in the Chapter 11 Cases allowing such Claim.  Notwithstanding the foregoing, any Claim included in the Debtor's Schedules that is not listed as contingent, unliquidated, and/or disputed shall be an Allowed Claim.  Any Proof of Claim Filed in an unliquidated amount shall be deemed Allowed in the amount listed in the Debtor's Schedules as liquidated, not contingent and not disputed. The Allowance and disallowance of Claims shall be in all respects subject to the provisions of Section 502 of the Bankruptcy Code.

(b)  **Disallowance of Claims.** All Claims held by Persons against whom the Debtor or Reorganized Debtor, as appropriate, have filed or commenced or may in the future file or commence a Claim or Cause of Action under Sections 522(f), 522(h), 542, 543, 544, 547, 548, 549, 550, 551, 553 or 724(a) of the Bankruptcy Code shall be deemed disallowed pursuant to Section 502(d) of the Bankruptcy Code.  The Holders of any and all Claims Filed with the Bankruptcy Court after the relevant Bar Date shall be deemed disallowed without further action by the Debtor or Reorganized Debtor and without any further notice to or action, order, or approval of the Bankruptcy Court. The Holders of any and all Claims Filed with the Bankruptcy Court after the relevant bar date shall not be entitled to a distribution, unless otherwise allowed by Final Order of the Bankruptcy Court.

### D.  <u>Resolution of Disputed Administrative Expense Claims and Disputed Claims.</u>

(a)  **Prosecution of Objections to Claims.** Prior to the Effective Date, the Debtor shall have standing and the right to commence and pursue objections to Claims, and the Reorganized Debtor shall have such standing after the Effective Date. All objections to Claims shall be Filed with the Bankruptcy Court by the Claims Objection Deadline and served upon the Holders of each of the Claims to which objections are made. The Debtor or Reorganized Debtor shall have the right, after notice and a hearing, to seek

an extension of the Claim Objection Deadline and such an extension shall not be deemed a material modification of the Plan.

(b)    **Objections to Claims.** An objection to the allowance of a Claim shall be in writing and shall be Filed with the Bankruptcy Court by the Debtor or Reorganized Debtor. Except as expressly set forth herein, nothing herein, in the Confirmation Order or in any Order in aid of Confirmation, shall constitute, or be deemed to constitute, a waiver or release of any Claim, Cause of Action, Avoidance Action, right of setoff or recoupment or other legal or equitable defense which the Debtor had immediately prior to the commencement of the Chapter 11 Cases against or with respect to any Claim. Except as set forth herein, upon Confirmation, the Debtor and Reorganized Debtor shall have, retain, reserve and be entitled to assert all such Claims, Causes of Action, rights of setoff and recoupment and other legal or equitable defenses that the Debtor had immediately prior to the commencement of the Chapter 11 Cases against or with respect to any Claim.

If a controversy arises as to whether any Claims or any Class of Claims or Interests are Impaired under the Plan, the Bankruptcy Court, after notice and a hearing, shall determine such controversy before approving the Disclosure Statement.

## ARTICLE XIII.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A. Executory Contracts and Unexpired Leases.

On the Effective Date, all Executory Contracts and unexpired leases not rejected on or before the Confirmation Date will be deemed assumed. The Confirmation Order shall constitute an order approving such assumption as of the Effective Date. No cure payments on adequate assurance of future performance shall be due.

### B. Bar to Rejection Damages.

All proofs of claim with respect to claims arising from said rejection must be filed with the Bankruptcy Court within the earlier of (i) the date set forth for filing claims in any order of the Bankruptcy Court approving such rejection or (ii) thirty (30) days after the Confirmation Date. Any such claims, proofs of which are not filed timely, will be barred forever from assertion.

## ARTICLE XIV.
## EFFECTS OF CONFIRMATION

### A. Authority to Effectuate Plan.

Upon the Effective Date, all matters provided under the Plan shall be deemed to be authorized and approved without the requirement of further approval from the Bankruptcy Court or the Debtor. The Debtor and/or Reorganized Debtor shall be authorized, without further application to or order of the Bankruptcy Court, to take whatever action necessary to achieve consummation and carry out the Plan and to effectuate the transactions provided for thereunder.

**B.  Binding Effect.**

Except as otherwise expressly provided in the Plan, on and after the Effective Date, the Plan shall bind all Holders of Claims and Interests. Subject to the terms of the Plan, upon the Effective Date, every Holder of a Claim or Interest shall be precluded and permanently enjoined from asserting against the Debtor and/or Reorganized Debtor any Claim based on any document, instrument, judgment, award, order, act, omission, transaction or other activity of any kind or nature that occurred before the Petition Date.

**C.  Discharge of the Debtor.**

Upon the Effective Date, the Debtor shall be deemed discharged and released under Section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in Section 502 of the Bankruptcy Code, whether or not (i) a proof of claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code, (ii) a Claim based upon such debt is Allowed under Section 502 of the Bankruptcy Code, (iii) a Claim based upon such debt is or has been disallowed by order of the Bankruptcy Court, or (iv) the Holder of a Claim based upon such debt accepted the Plan.

As of the Effective Date, except as provided in the Plan or the Confirmation Order, all Persons shall be precluded from asserting against the Debtor, the Reorganized Debtor and their respective members, shareholders, officers, directors, partners, attorneys or advisors, any other or further Claims, debts, rights, Causes of Action, claims for relief, liabilities, or equity interests relating to the Debtor based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date.  In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtor, pursuant to Sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtor and/or Reorganized Debtor at any time, to the extent that such judgment relates to a discharged Claim.

**D.  Release and Discharge of the Committee.**

Effective on the Effective Date, the Tort Claimants' Committee and the Trade Creditors' Committee, and their respective professionals shall be deemed disbanded and released from their duties and obligations.

**E.  Continued Corporate Existence**

The Debtor will, as the Reorganized Debtor, continue to exist after the Effective Date as a separate entity in accordance with the applicable laws of the State of New Jersey, with all the powers of a not-for-profit, non-stock member corporation having tax-exempt status under 26 U.S.C. § 501(c)(3) under applicable law and without prejudice to any right to alter or terminate such existence under applicable state law, except as such rights may be limited and conditioned by the Plan and the documents and instruments executed and delivered in connection therewith.

On and after the Effective Date, the Reorganized Debtor may operate and manage its affairs and may use, acquire, and dispose of property without notice to any Person, and without supervision or approval by the Bankruptcy Court and free of any restrictions imposed by the Bankruptcy Code, Bankruptcy Rules, or the Bankruptcy Court, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

## ARTICLE XV.
## RETENTION OF JURISDICTION

The Court shall retain jurisdiction of this case pursuant to the provisions of chapter 11 of the Bankruptcy Code, pending the final allowance or disallowance of all Claims affected by the Plan, to make such orders as are necessary or appropriate to carry out the provisions of this Plan, and with respect to the following matters:

(a)     To enable the Plan Proponent to consummate the Plan and to resolve any disputes arising therefrom;

(b)     To adjudicate all controversies concerning the classification, estimation or allowance of any Claim herein;

(c)     To make such Orders as are necessary or appropriate to implement the provisions of this Plan;

(d)     To determine the classification, estimation and priority of all claims against the Debtor and to re-examine any Claims which may have been allowed;

(e)     To determine applications for the rejection or assumption of executory contracts or unexpired leases pursuant to the provisions of this Plan which are not determined prior to the Confirmation date and to determine allowance of Claims for damages with respect to rejection of any such executory contracts or unexpired leases within such time as the Court may direct;

(f)     To oversee and issue further appropriate orders respecting disbursement of amounts deposited as may be required by this Plan;

(g)     To conduct hearings on valuation, as necessary, and to determine whether any party in interest is entitled to recover against any Person any Claim, whether arising under section 506(c) of the Bankruptcy Code, or arising out of a voidable preference, a fraudulent transfer, or otherwise;

(h)     To hear and determine all applications for compensation and other Administrative Expenses;

(i)     To hear and determine any and all pending adversary proceedings or contested matters;

4817-6551-8030, v. 2

(j)     To determine all causes of action which may exist in favor of the Debtor;

(k)     To determine any modification of the Plan after confirmation pursuant to section 1127 of the Bankruptcy Code;

(l)     To enter any order, including injunctions, necessary to establish and enforce the rights and powers of the Debtor under the Plan;

(m)     To enter a final decree pursuant to Rule 3022 of the Bankruptcy Rules.

(n)     To hear and determine all controversies, suits and disputes, if any, as may arise in connection with the interpretation or enforcement of the Plan;

(o)     To hear and determine all controversies, suits and disputes, if any, as may arise with regard to orders of Bankruptcy Court in the Chapter 11 Case entered on or before the Confirmation Date;

(p)     To hear and determine any and all controversies and disputes arising under, or in connection with, the Plan;

(q)     To hear and determine any and all objections to payments under the Plan;

(r)     To liquidate damages in connection with any disputed, contingent or unliquidated Claims;

(s)     To adjudicate all Claims to a security or ownership interest in any property of the Debtor or in any proceeds thereof;

(t)     To adjudicate all causes of action to recover all assets and properties of the Debtor wherever located;

(u)     To enter any order, including injunctions necessary to enforce the title, rights and powers of the Debtor, and to impose such limitations, restrictions, terms and conditions on such title rights and powers as the Bankruptcy Court may deem necessary or appropriate; and

(v)     To make such orders as are necessary or appropriate to carry out the provisions of the Plan, including but not limited to orders interpreting, or enforcing the provisions thereof.

In addition, this Court shall retain jurisdiction to implement the provisions of the Plan in the manner as provided under section 1142, sub-paragraphs (a) and (b) of the Bankruptcy Code.  If the Court abstains from exercising, or declines to exercise jurisdiction, or is otherwise without jurisdiction over any matter set forth in this Section, or if the Debtor elects to bring an action or proceeding in any other forum, then this section shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court, public authority or commission having competent jurisdiction over such matters.

## ARTICLE XVI.
## MISCELLANEOUS PROVISIONS OF THE PLAN

### A.  Amendment or Modification of this Plan.

On or before the Effective Date, this Plan or any exhibits hereto may be amended, modified, or supplemented by the Debtor in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code.  In addition, after the Confirmation Date, the Debtor or Trust Administrator, as applicable, may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of this Plan.  The Debtor may make appropriate technical adjustments and modifications to this Plan prior to the Effective Date without further order or approval of the Bankruptcy Court.

### B.  Revocation or Withdrawal of this Plan.

The Debtor reserves the right to revoke or withdraw this Plan before the Confirmation Date.  If the Debtor revokes or withdraws this Plan before the Confirmation Date, then this Plan shall be deemed null and void.  In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against the Debtor or the Trust Administrator or to prejudice in any manner the rights of the Debtor or the Trust Administrator in any further proceedings.

### C.  Reports.

Until a Final Decree is entered, the Debtor shall submit all post-Confirmation quarterly reports to the U.S. Trustee as required by the U.S. Trustee guidelines (with a copy served on the Office of the U.S. Trustee) setting forth all receipts and disbursements of the Debtor. The first report shall be filed within thirty (30) days after the end of the quarter in which the Effective Date occurs. The Debtor shall be responsible to request that a Final Decree be entered in this Bankruptcy Cases. The Debtor shall also be responsible for any quarterly fees due to the U.S. Trustee from and after the Effective Date until the Bankruptcy Cases are closed.

### D.  Severability of Plan Provisions.

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtor or Reorganized Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may be altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### E.  **No Interest.**

Except as expressly stated in the Plan, no interest, penalty or late charge is allowed or shall be paid on any Claim.

### F.  **Allocation of Distributions Between Principal and Interest.**

To the extent that any Allowed Claim entitled to a Distribution under this Plan comprises indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid prepetition interest.

### G.  **Notices.**

All notices, requests or demands with respect to this Plan shall be in writing and shall be deemed to have been received within five (5) days of the date of mailing, provided they are sent by registered mail or certified mail, postage prepaid, return receipt requested, and if sent to the Proponent, addressed to Richard D. Trenk, Esq. and Robert S. Roglieri, Esq., McManimon, Scotland & Baumann, LLC, 75 Livingston Avenue, Roseland, New Jersey 07068.

### H.  **Plan Controls Disclosure Statement.**

Notwithstanding anything to the contrary contained herein or in the Disclosure Statement, in the event and to the extent that any provision of the Plan is inconsistent with any provision of the Disclosure Statement, the provisions of the Plan shall control and take precedence.

### I.  **Filing of Additional Documents.**

Prior to the Effective Date, the Debtor may File with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan that are not inconsistent with the terms of the Plan. On or after the Effective Date, the Debtor and/or the Reorganized Debtor may file with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate to effectuate the terms and conditions of the Plan.

### J.  **Reservation of Rights.**

If the Plan is not confirmed by the Bankruptcy Court or any other Court of competent jurisdiction for any reason, the rights of the Debtor and all parties in interest in the Bankruptcy Cases shall and will be reserved in full.  Statements and provisions made in the Plan or in the Disclosure Statement are made only for the purpose(s) of the Plan.  If the Plan is withdrawn, the Confirmation Order is not entered, or if the Effective Date does not occur, no Person shall be bound by or deemed prejudiced by any such statement or provision.

### K.  **Rules of Interpretation; Computation of Time.**

For purposes of the Plan, (a) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document as being in a particular form or containing particular

4817-6551-8030, v. 2

terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, (b) any reference in the Plan to an existing document, schedule or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented, (c) unless otherwise specified, all references in the Plan to Sections, Articles, Schedules and Exhibits, if any, are references to Sections, Articles, Schedules and Exhibits of or to the Plan, (d) the words "herein" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan, (e) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan, and (f) the rules of construction set forth in Section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply. In computing any period of time prescribed or allowed by the Plan, unless otherwise specifically designated herein, the provisions of Bankruptcy Rule 9006(a) shall apply.

## L.  Successors and Assigns.

The rights, duties and obligations of any Person named or referred to in the Plan, including all Creditors, shall be binding on, and shall inure to the benefit of, the successors and assigns of such Person.

## M.  Waiver of Subordination.

Notwithstanding any provision of the Plan to the contrary, all holders of Claims shall be deemed to have waived any and all contractual subordination rights to which they may have with respect to the distributions made pursuant to the Plan, and the Confirmation Order shall permanently enjoin, effective as of the Effective Date, all holders of Claims from enforcing or attempting to enforce any such rights against any Person receiving distributions under the Plan.

## N.  Post-Effective Date Professional Fees.

The reasonable fees and actual and necessary expenses incurred after the Effective Date by professionals for the Debtor shall be paid by the Debtor or Reorganized Debtor upon the submission of an invoice to the Debtor or Reorganized Debtor without the need for further notice to any Person or approval by the Bankruptcy Court.

## O.  Governing Law.

Unless a rule of law or procedure is supplied by federal law, including the Bankruptcy Code and Bankruptcy Rules, (a) the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, and (b) governance matters shall be governed by the laws of the State of New Jersey, without giving effect to the principles of conflict of law thereof.

## P.  Headings.

Headings are used in this Plan for convenience and reference only, and shall not constitute a part of this Plan for any other purpose.

**Q. No Admissions.**

Notwithstanding anything herein to the contrary, nothing contained in this Plan shall be deemed as an admission by any Entity with respect to any matter set forth herein.

## ARTICLE XVII.
## RISK FACTORS/TAX CONSEQUENCES

Holders of Claims and Interests should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together herewith, referred to or incorporated by reference herein, before voting to accept or reject the Plan. These risk factors should not be regarded as constituting the only risks present in connection with the Debtor's mission or the Plan and their implementation.

**A. Tax Consequences of Plan**

---

**CIRCULAR 230 DISCLAIMER**

**To ensure compliance with requirements imposed by the Internal Revenue Service (the "IRS"), the Debtor inform all creditors that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or tax-related matter(s) addressed herein**

---

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS.  The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers to possible tax issues this Plan may present to Debtor. The Debtor CANNOT and DOES NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Tax Code embodies many complicated rules which make it difficult to state completely and accurately all the tax implications of any action.

Confirmation may have federal income tax consequences for the Debtor and Holders of Claims or Equity Interests. The Debtor has not obtained and do not intend to request a ruling from the Internal Revenue Service, nor has the Debtor obtained an opinion of counsel with respect to any tax matters. Any federal income tax matters raised by Confirmation of the Plan are governed by the Internal Revenue Code and the regulations promulgated thereunder. The following is intended to be a summary only and not a substitute for careful tax planning with a tax professional. The federal, state and local tax consequences of the Plan may be complex in some circumstances and, in some cases, uncertain. Accordingly, each Holder of a Claim or Interest is strongly urged to consult with his or her own tax advisor regarding the federal, state, local and foreign tax consequences of the Plan.

The confirmation and consummation of the Plan may have tax consequences to Holders of Claims and Interests. The Debtor does not offer an opinion as to any federal, state, local or other

tax consequences to Holders of Claims and Interests as a result of the confirmation of the Plan. All Holders of Claims and Interests are urged to consult with their own tax advisors to ascertain the federal, state, local and foreign tax consequences of the Plan. The Plan is not intended, and should not be construed, as legal or tax advice to any Creditor, Interest Holder, or any other party in interest.

## B.  Risk Factors

The following discussion is intended to be a non-exclusive summary of certain risks attendant upon the consummation of the Plan. You are encouraged to supplement this summary with your own analysis and evaluation of the Plan and Disclosure Statement, in their entirety, and in consultation with your own advisors. Based on the analysis of the risks summarized below, the Debtor believe that the Plan is viable and will meet all requirements of confirmation.

Any company emerging from Chapter 11 faces risks. In particular, the Debtor herein faces the following risks: (i) the Diocese will need its parishioners to continue to support its mission and programs; and (ii) the general economic conditions of the Diocse territory may have a financial and service impact on its revenues and program needs.

### a.  Risk of Non-Confirmation of the Plan

Although the Debtor believes that the Plan satisfies all legal requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will confirm the Plan as proposed. There can also be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate a solicitation of votes to accept or reject the Plan. If the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Case will continue rather than be dismissed. The Bankruptcy Court, which sits as a court of equity, may exercise substantial discretion with respect to the affairs of the Debtor during the Chapter 11 Case. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a plan and requires, among other things, that the value of distributions to dissenting creditors not be less than the value of distributions such creditors and shareholders would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. Although the Debtor believes that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The Debtor could experience material adverse changes in its liquidity as a result of such delay.

### b.  The Debtor May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtor reserves the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive their expected share of the estimated distributions described in this Disclosure Statement.

### c.   **Risk of Additional or Larger Claims**

The Disclosure Statement and its attached exhibits necessarily include estimates, including estimates of future events.  These estimates include, but are not limited to, estimates of future income and expenses, estimates as to the total amount of Claims that will be asserted against the Debtor and the outcome of Disputed Claims.  The Debtor believes that the estimates presented are reasonable and appropriate under the circumstances.  Nevertheless, there is a risk that unforeseen future events may cause one or more of these estimates to be materially inaccurate.  Among the potential risks is that additional Administrative Expense Claims may be asserted, that Disputed Claims may be resolved at higher amounts than expected or that the resolution of such Claims may require the expenditure of unanticipated professional fees. If one or more of these estimates proves to be inaccurate, the amount of funds available for Distribution pursuant to the Plan may be reduced.

### d.   **Historical Financial Information of the Debtor**

As a result of the consummation of the Plan and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtor from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtor's historical financial statements.

## ARTICLE XVIII.
## FEASIBILITY OF THE PLAN

As a condition to Confirmation, section 1129(a)(11) of the Bankruptcy Code involves the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of Debtor or any successor to Debtor under the Plan.

There are at least two important aspects of a feasibility analysis.  The first aspect considers whether Debtor will have enough cash on hand on the Effective Date of the Plan to pay all the claims and expenses that are entitled to be paid on such date.  The Debtor maintains that this aspect of feasibility is satisfied as illustrated here, based upon the value of the Debtor's assets.

The second aspect considers whether the Debtor will have enough cash over the life of the Plan to make the required Plan payments.  The Debtor believes that this second aspect of the feasibility requirement is met based on the work in progress and historical performance.  A copy of the Debtor's projections is annexed hereto as **Exhibit B**.  Accordingly, the Debtor believes, on the basis of the foregoing, that the Plan is feasible.

ALTHOUGH EVERY EFFORT WAS MADE TO BE ACCURATE, THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTS OR IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPALS IN THE UNITED STATES, THE FINANCIAL ACCOUNTING STANDARDS BOARD, OR THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION REGARDING PROJECTIONS. FURTHERMORE, NEITHER THE DEBTOR'S ACCOUNTANTS, NOR ANY OTHER ACCOUNTANTS, HAVE

COMPILED, EXAMINED, OR PERFORMED ANY PROCEDURES WITH RESPECT TO THE PROJECTIONS CONTAINED HEREIN, NOR HAVE THEY EXPRESSED ANY OPINION OR ANY OTHER FORM OF ASSURANCE ON SUCH INFORMATION OR ITS ACHIEVABILITY, AND ASSUME NO RESPONSIBILITY FOR, AND DISCLAIM ANY ASSOCIATION WITH, THE PROSPECTIVE FINANCIAL INFORMATION. WHILE PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED ON A VARIETY OF ASSUMPTIONS, WHICH MAY NOT BE REALIZED, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, WHICH ARE BEYOND THE CONTROL OF THE DEBTOR. CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTOR, OR ANY OTHER PERSON, THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS. HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATION AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS IN REACHING THEIR DETERMINATIONS OF WHETHER TO ACCEPT OR REJECT THE PLAN. THE DEBTOR'S FINANCIAL ADVISORS HAVE NOT EXPRESSED AN OPINION ON OR MADE A REPRESENTATION REGARDING THE ACHIEVABILITY OF THE FINANCIAL PROJECTIONS.

## ARTICLE XIX.
## BEST INTERESTS TEST

Another confirmation requirement is the "Best Interest Test," which requires a liquidation analysis.  Under the Best Interest Test, if a claimant is in an impaired class and that claimant does not vote to accept the Plan, then that claimant must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if the Debtor's assets were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, the Debtor's assets are usually sold by a Chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien.  Administrative claims are paid next.  Next, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claims.

In order for the Court to be able to confirm this Plan, the Court must find that all creditors who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a Chapter 7 liquidation. The Debtor maintains that this requirement is met here for the following reasons:

Conversion of the case to Chapter 7 is not available because the Diocese is a nonprofit religious corporation.  Therefore, the only remedy available would be dismissal under 11 U.S.C. § 1112.  If dismissal occurred, the "race to the courthouse" would ensue.  In such event, it is highly likely that many creditors would be treated unfairly and inequitably because the first creditor(s) to obtain judgments would likely substantially deplete the available assets.  In addition, the resources needed to adjudicate the claims would be substantial.

As such, the Debtor believes that secured, priority unsecured, and general unsecured creditors are better off by implementation of the Chapter 11 Plan of Reorganization, as opposed to dismissal of the case.  A copy of the Debtor's liquidation analysis is annexed hereto as **Exhibit E**.

## ARTICLE XX.
## RECOMMENDATION

**THE DEBTOR RECOMMENDS THAT CREDITORS VOTE TO "ACCEPT" THE PLAN. THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS PREFERABLE TO ANY OF THE ALTERNATIVES DESCRIBED ABOVE AND THAT THE PLAN IS DESIGNED TO PROVIDE GREATER RECOVERIES THAN THOSE AVAILABLE IN ANY OTHER FORM OF LIQUIDATION. ANY OTHER ALTERNATIVE WOULD CAUSE SIGNIFICANT DELAY AND UNCERTAINTY, AS WELL AS ADDITIONAL ADMINISTRATIVE COSTS.**

Dated:  December 31, 2021                    **THE DIOCESE OF CAMDEN, NEW JERSEY**


By: */s/ Reverend Robert E. Hughes*
    Reverend Robert E. Hughes,
    Vicar General


    -  and  -

**McMANIMON, SCOTLAND
& BAUMANN, LLC**
*Counsel for The Diocese of Camden, New Jersey, Debtor and Debtor-in-Possession*


By:   */s/ Richard D. Trenk*
    Richard D. Trenk


79