**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**
Caption in Compliance with D.N.J. LBR 9004-1

**LOWENSTEIN SANDLER LLP**
Jeffrey D. Prol, Esq.
Michael A. Kaplan, Esq.
Brent Weisenberg, Esq.
One Lowenstein Drive
Roseland, NJ 07068
Telephone:  (973) 597-2500
Email:  jprol@lowenstein.com
Email:  mkaplan@lowenstein.com
Email:  bweisenberg@lowenstein.com

*Counsel to the Official Committee*
*of Tort Claimant Creditors*

| | |
|---|---|
| In re:<br><br>THE DIOCESE OF CAMDEN, NEW JERSEY,<br><br>Debtor. | Chapter 11<br><br>Case No. 20-21257 (JNP) |

**DECLARATION OF MICHAEL A. KAPLAN, ESQ. IN SUPPORT OF THE REPLY**
**TO OPPOSITIONS TO THE MOTION OF THE OFFICIAL COMMITTEE OF**
**TORT CLAIMANT CREDITORS FOR ENTRY OF AN ORDER GRANTING IT**
**STANDING AND AUTHORIZING IT TO PROSECUTE AND SETTLE**
**CERTAIN CLAIMS ON BEHALF OF THE DEBTOR'S ESTATE**

      I, Michael A. Kaplan, Esq., an attorney duly admitted to practice law in the courts of the

District of New Jersey, hereby declare under penalty of perjury, pursuant to Section 1746 of title

28 of the United States Code, as follows:

      1.      I am a partner at the law firm of Lowenstein Sandler LLP, counsel to the Official

Committee of Tort Claimant Creditors (the "Committee") of The Diocese of Camden, New Jersey

(the "Debtor").

      2.      I submit this declaration in support of the Committee's reply to the objections to

the *Motion of the Official Committee of Tort Claimant Creditors for Entry of an Order Granting*

*it Standing and Authorizing it to Prosecute and Settle Certain Claims on Behalf of the Debtor's*

*Estate* (Dkt. 871).

3.      Attached hereto as **<u>Exhibit A</u>** is a true and correct copy of the Committee's First

Amended Adversary Complaint against the Diocese and the Diocese of Camden Trusts, Inc.

("<u>DOCT</u>") (the "<u>Amended DOCT Adversary Complaint</u>"), without the exhibits, as certain of those

exhibits have been filed under seal.  The publically-filed exhibits to the Complaints can be found

in Adversary Proceeding Nos. 21-01393 and 21-01394.  The sealed exhibits have been provided

to the Court and to the parties to the adversary proceedings.

4.      Attached hereto as **<u>Exhibit A-1</u>** is a true and correct copy of a redline comparing

the Amended DOCT Adversary Complaint to the original complaint (Dkt. 871-3) (the "<u>DOCT</u>

<u>Adversary Complaint</u>").

5.      Attached hereto as **<u>Exhibit B</u>** is a true and correct copy of the Committee's First

Amended Adversary Complaint against the Diocese and the Parishes, Missions, and Schools (the

"<u>Amended Parishes Adversary Complaint</u>"), without the exhibits, as certain of those exhibits have

been filed under seal.  The publically-filed exhibits to the Complaints can be found in Adversary

Proceeding Nos. 21-01393 and 21-01394.  The sealed exhibits have been provided to the Court

and to the parties to the adversary proceedings.

6.      Attached hereto as **<u>Exhibit B-1</u>** is a true and correct copy of a redline comparing

the Amended Parishes Adversary Complaint to the original complaint (Dkt. 871-4) (the "<u>Parishes</u>

<u>Adversary Complaint</u>").

7.      Attached hereto as **<u>Exhibit C</u>** is a true and correct copy of the Committee's

Amended Adversary Complaint against the Diocese, the Most Rev. Dennis J. Sullivan, in his

capacity as Bishop and President of the Diocese, the Directors & Officers, and the Parish Parties

(the "<u>Amended Directors and Officers Adversary Complaint</u>").

8.      Attached hereto as **<u>Exhibit C-1</u>** is a true and correct copy of a redline comparing

the Amended Directors and Officers Adversary Complaint to the original complaint (Dkt. 871-5)

(the "<u>Directors and Officers Adversary Complaint</u>").

I declare under penalty of perjury under the law of the United States of America that the

foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  December 3, 2021

<div style="margin-left: 50%;">

*/s/ Michael A. Kaplan, Esq.*
Michael A. Kaplan, Esq.
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2302
mkaplan@lowenstein.com

*Counsel to the Official Committee*
*of Tort Claimant Creditors*

</div>

# Exhibit A

**LOWENSTEIN SANDLER LLP**
Jeffrey D. Prol, Esq.
Michael A. Kaplan, Esq.
Colleen Maker, Esq.
One Lowenstein Drive
Roseland, NJ 07068
Telephone: (973) 597-2500
*Counsel to the Official Committee of Tort Claimant Creditors*

<div align="center">

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| In re:<br><br>THE DIOCESE OF CAMDEN, NEW JERSEY,<br><br>Debtor.<br>-------------------------------------------------------<br><br>OFFICIAL COMMITTEE OF TORT CLAIMANT CREDITORS OF THE DIOCESE OF CAMDEN, NEW JERSEY,<br><br>Plaintiff,<br><br>v.<br><br>THE DIOCESE OF CAMDEN, NEW JERSEY, THE DIOCESE OF CAMDEN TRUSTS, INC.,<br><br>Defendants. | Chapter 11<br><br>Case No. 20-21257 (JNP)<br><br><br><br><br>Adv. Pro. No. 21-01393 (JNP) |

<div align="center">

**FIRST AMENDED ADVERSARY COMPLAINT**

</div>

Plaintiff, the Official Committee of Tort Claimant Creditors (the "Committee") of the Diocese of Camden, New Jersey (the "Debtor" or "Diocese"), by way of this first amended adversary complaint (the "Complaint") against the Diocese and the Diocese of Camden Trusts,

Inc. ("DOCT" and together with the Diocese, the "Defendants"), hereby states and alleges as follows:

## PRELIMINARY STATEMENT[1]

1.      By this Complaint, the Committee seeks, *inter alia*, a determination from the Court regarding the ownership of more than $110 million in assets, as of June 30, 2021, purportedly held by DOCT.

2.      The Diocese claims to hold some portion of the DOCT Accounts in trust for the benefit of DOCT, a non-debtor.  DOCT was established to hold funds solely for the benefit of the Diocese with no other purpose than to financially support the Diocese.  This circular structure demonstrates that DOCT is not an independent entity but rather a secondary arm of the Diocese, akin to simply acting as an investment advisor for a privately managed investment account held in an account separate from the Diocese's operating accounts, established for the sole purpose of shielding assets of the Diocese from claims of creditors.  Therefore the DOCT Accounts belong to the Debtor and its estate.

3.      The Diocese claims to have transferred funds to DOCT in 2001, but also claims to hold those same funds in trust for DOCT.  Both cannot be true.

4.      The Diocese contends that the assets purportedly held in trust are not part of the Diocese's estate, and thus cannot be reached by creditors of the Diocese, including the abuse survivors comprising the Committee's constituency.

5.      The Committee respectfully requests a judgment from this Court declaring the DOCT Accounts property of the estate.

---

[1] Capitalized terms not defined in this Preliminary Statement shall have the meanings ascribed to them in this Complaint.

6.      Alternatively, the Committee seeks substantive consolidation of the Defendants and a declaratory judgment that the DOCT Accounts are so entangled with the Diocese and its estate as to require substantive consolidation.

7.      Alternatively, the Committee seeks a judgement determining that DOCT is a mere instrumentality, agent, and/or alter ego of the Diocese and that the Diocese and DOCT are a single legal entity.

8.      The Committee further contends that the Diocese failed to establish, and indeed cannot establish, that a valid trust exists with respect to the $110 million in the DOCT Accounts.

9.       The Committee further contends that the Diocese owns all legal and equitable interest in the DOCT Accounts.

10.      To the extent a valid trust exists, such trust is an avoidable self-settled trust pursuant to Section 548(e)(1) of the Bankruptcy Code and any deposits of the Diocese's assets into such trust are avoidable fraudulent transfers.

11.      The Committee further contends that a valid trust does not exist under New Jersey state law.

12.      To the extent a valid trust exists under New Jersey state law, the Committee seeks a judgment determining that the DOCT Accounts are subject to and available to pay the claims of the Diocese's creditors.

## JURISDICTION AND VENUE

13.      This Court has jurisdiction over this adversary proceeding (the "Adversary Proceeding") pursuant to 28 U.S.C. §§ 157 and 1334(b).

3

14.     Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409 as this Adversary Proceeding arises under and in connection with a case under Chapter 11 of the Bankruptcy Code that is pending in this District.

15.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

16.     The Committee has standing to pursue this Complaint pursuant to 11 U.S.C. § 1103.[2]

## **PARTIES**

17.     Plaintiff is the Official Committee of Tort Claimant Creditors in this Chapter 11 case appointed by the Office of the United States Trustee pursuant to 11 U.S.C. § 1102(a)(1).  The Committee is a party in interest in the Debtor's Chapter 11 case pursuant to 11 U.S.C. § 1109(b).

18.     The Committee is comprised of nine creditors with claims against, *inter alia*, the Diocese based upon sexual abuse by members of the clergy, workers, teachers, volunteers, or other persons or entities associated with or representing the Diocese and/or parishes, schools, or other Diocese-related institutions served by the Diocese.

19.     Defendant the Diocese of Camden, New Jersey is a New Jersey not-for-profit religious organization with its principal place of business at 631 Market Street, Camden, New Jersey 08102 and is the Chapter 11 debtor and debtor-in-possession in the underlying bankruptcy proceeding.

20.     The Diocese's governing body is comprised of six members.  The Most Reverend Dennis J. Sullivan (the current Bishop of the Diocese and hereafter the "Bishop") is the President of the Diocese.

---

[2] On October 12, 2021, the Committee filed its *Motion for Entry of an Order Granting it Standing and Authorizing it to Prosecute and Settle Certain Claims on Behalf of the Debtor's Estate* (Dkt. 871) (the "Standing Motion"), seeking an order granting standing to pursue Count Three (Alter Ego) and Count Six (Avoidance of Declaration of Trust) only. The Standing Motion remains pending.

21.     Defendant Diocese of Camden Trusts, Inc. is a New Jersey nonprofit membership corporation with its principal place of business at 631 Market Street, Camden, New Jersey 08102. DOCT assists the Diocese by providing funding for education, religious personnel development, long-term capital needs, and the maintenance of diocesan offices.  The Bishop is the sole member of DOCT.  The current trustees are Monsignor Thomas Morgan, the Honorable Joseph H. Rodriguez, U.S.D.J. (ret.), and Kenneth J. Bossong, Esq. (the "Board of DOCT").

22.     The Board of DOCT is assisted by the Diocese's Investment Committee on the investment of DOCT's assets.  All the investments of DOCT are managed based on the *Diocese of Camden Trusts, Inc. Statement of Investment Policies and Objectives*.

## FACTUAL BACKGROUND

### A.  DOCT is a sham created for the purpose of shielding assets from the Diocese's creditors

23.     In the late 1990s, an increased number of survivors of childhood sexual abuse began coming forward alleging abuse by members of the Catholic Church.  These survivors brought lawsuits against the Catholic Church which resulted in multi-million dollar jury verdicts.  *See* Don Lattin, *$30 Million Awarded Men Molested by 'Family Priest' / 3 bishops accused of Stockton coverup*, SFGate (July 17, 1998), https://www.sfgate.com/news/article/30-Million-Awarded-Men-Molested-by-Family-3001550.php.

24.     In June 2001, Cardinal Bernard Law, the Archbishop of Boston, admitted in a court pleading that when a priest was accused of sexual abuse allegations, that priest was simply re-assigned to a different parish.  *See* Jon Henley, *How the Boston Globe exposed the abuse scandal that rocked the Catholic church*, The Guardian (Apr. 21, 2010), https://www.theguardian.com/world/2010/apr/21/boston-globe-abuse-scandal-catholic.

25.     On June 22, 2001, the Certificate of Incorporation of Diocese of Camden Trusts, Inc. was executed.  The Certificate of Incorporation was filed on June 25, 2001.

26.     Pursuant to Article 5.1 of the Certificate of Incorporation, the Diocese "shall be the sole member of the Corporation."

27.     The Diocese and DOCT contend that the Diocese funded DOCT with approximately $71.9 million in 2001.

28.     On June 10, 2010, the United States Bankruptcy Court for the District of Delaware issued an opinion holding that funds held by a diocese for parish and diocese organizations in diocese pooled investment accounts pursuant to a resulting trust could not rely on the diocese's "meticulous" and "exhaustive" records to satisfy the burden of tracing, but a parish with an express written trust agreement with the diocese and whose investment was deposited directly into the pooled investment account and not into the diocese's general operating account could rely on the diocese's records. *In re Cath. Diocese of Wilmington, Inc.*, 432 B.R. 135, 162 (Bankr. D. Del. 2010).

29.     From 2010 to 2014, bills that were the precursors to the New Jersey Child Victims Act were introduced in the Senate, Senate Judiciary Committee, and Assembly Judiciary Committee, which, if approved, would subject the Diocese to liability for previously time-barred sexual abuse claims by survivors of childhood sexual abuse by members of the clergy, workers, teachers, volunteers, or other persons or entities associated with or representing the Diocese and/or the Non-Debtors, or other Diocese-related institutions served by the Diocese.

30.     In 2015, the movie "Spotlight" was released in theaters, bringing increased attention to the widespread systemic history of sexual abuse of children perpetrated by the Catholic Church.

31.     In July 2015, the Board of DOCT executed a resolution to amend its certificate of incorporation to reflect that the Bishop is the sole member of DOCT, pending the approval of the

Diocese, the sole member of DOCT at the time.  The Diocese approved the amendment in October

2015.  The Certificate of Amendment of DOCT's Certificate of Incorporation was not executed

until November 2, 2016 and not filed until November 21, 2016.

32.     Upon information and belief, this amendment was an attempt by DOCT and the

Diocese to legally distance themselves in order to shield the assets in the DOCT Accounts for

creditors of the Diocese.

33.     For example, upon information and belief, replacing the Diocese as the sole

member of DOCT with the Bishop, the President of the Diocese, was an attempt to remove the

Diocese from the legal definition of an "insider" of DOCT for the purposes of voidable fraudulent

transfers under New Jersey law.

34.     The Diocese does not have a legitimate reason for amending its certificate of

incorporation to remove the Diocese as the sole member of DOCT.

35.     Purportedly by corporate resolutions dated July 10, 2015 and October 15, 2015

respectively, the trustees of the Diocese and the Board of DOCT entered into a Declaration of

Trust and Trust Agreement (the "Declaration of Trust") in an attempt to form the Diocese of

Camden Trusts, Inc. Investment Trust (the "Alleged Trust"), while also declaring that the

Declaration of Trust applies nunc pro tunc to June 25, 2001.  (*See* Declaration of Trust, dated June

25, 2001, Ex. A.)

36.     According to the Declaration of Trust, "the Diocese has held certain assets which

are the property of the DOCT for purposes of management and investment on behalf of the DOCT"

and "the Diocese and the DOCT wish to memorialize the trustee relationship with governs the

Diocese's holding of certain funds of the DOCT in custody, which trustee relationship has existed

since the Diocese first undertook to hold such funds in custody in or about June 2001."  (*Id.* at 2.)

37.    The Declaration of Trust continues that "the Diocese does hereby publish and affirm the fact that such ~~Trust~~ [sic] Assets [the "<u>Alleged Trust Assets</u>"] of the DOCT as it holds in custody are held as a charitable trust, for the exclusive use and benefit of the said DOCT, and with the equitable ownership thereof being vested in the said DOCT, on the terms and conditions hereinafter set forth."  (*Id.*)

38.    The minutes of the July 10, 2015 Board of DOCT meeting reflect that legal counsel recommended documenting through a formal Declaration of Trust "that the Diocese holds – and always held – the Trusts' assets in a charitable trust for the benefit of [DOC Trusts, Inc]."  (DOCT Minutes of Meeting of Board of Trustees, dated July 10, 2015, Ex. B, at 2.)

39.    The July 10, 2015 Board of DOCT meeting minutes and the Declaration of Trust are inconsistent about whether the Diocese purportedly holds all of DOCT's assets in a trust or just certain of DOCT's assets.  (*Compare* DOCT Minutes of Meeting of Board of Trustees, dated July 10, 2015, Ex. B, *with* Declaration of Trust, dated June 25, 2001, Ex. A.)

40.    The Diocese has not held DOCT funds in custody pursuant to a trustee relationship since in or about June 2001.

41.    The Board of the Diocese did not approve the Declaration of Trust until November 2, 2016, more than a year after the date on the Declaration of Trust and more than fifteen years after the retroactive application of the Declaration of Trust.  (*See* DOCT Minutes of Meeting of Board of Trustees, dated November 2, 2016, Ex. C.)

42.    No consideration was provided for entry into the Declaration of Trust.

43.    The Declaration of Trust is a failed attempt at establishing an express trust in accordance with New Jersey law.

44.      The Declaration of Trust also contains provisions intended to shield the Alleged Trust Assets from the Diocese's creditors.  For example, the Declaration of Trust states that the Alleged Trust Assets shall not be subject to the claims of creditors of the Diocese.  The Declaration of Trust also states, ignoring the purpose for which Alleged Trust Assets (and all assets of DOCT) will ultimately be used, that "[u]nder no circumstances will the Diocese be, or be considered or deemed to be, a beneficiary of the trust affirmed and ratified herein and hereby."  (Declaration of Trust, dated June 25, 2001, Ex. A, at 3.)

45.      Upon information and belief, DOCT was created for the sole purpose of shielding assets from creditors of the Diocese, specifically survivors of sexual abuse.  The Declaration of Trust was entered and DOCT's certificate of incorporation was amended in furtherance of its goal of shielding assets from the reach of creditors as the number of abuse claims increased and legislation was introduced which would reopen the statute of limitations to allow those claims to be pursued.

**B.  The Diocese owns and controls all funds in the DOCT Accounts**

46.      At or around the time of DOCT's corporate formation, the Diocese funded DOCT. No additional funding has been provided to DOCT from any entity since its initial funding, including when the Declaration of Trust was executed.

47.      After the corporate formation of DOCT, the funds held by DOCT continued to be used for the same purposes that the funds were used for prior to the formation of DOCT, among other things, to fund the capital needs of the Diocese.  (*See, e.g.*, *First Amended Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code Describing Chapter 11 Plan Proposed by the Debtor-in-Possession* (the "Amended Disclosure Statement"), Dkt. 869, at Art. IV(E)(a)

("DOC Trusts is organized for the purpose of assisting the Diocese . . . by providing funding for[, *inter alia*,] . . . long-term capital needs.").)

48.     DOCT essentially functions as the Diocese's privately managed investment advisor.

49.     The Diocese, the Bishop, and DOCT have intentionally obfuscated DOCT's relationship to the Diocese.  On one hand, the Diocese insists that DOCT is not a trust.  (*See, e.g.*, Dkt. 1004 at 15 ("The DOCT is not holding funds in trust for the benefit of any beneficiary. . . . Rather, funds held by the DOCT are simply the funds of the DOCT, a nonprofit corporation."); Dkt. 1005 ¶ 119 ("Moreover, the Diocese transferred funds to establish DOCT, a corporation. DOCT is ***not*** a trust. . . .  The Diocese is not, and has never been, a beneficiary of DOCT because DOCT is not a trust.") (emphasis in original).)

50.     On the other hand, the Diocese, the Bishop, and DOCT routinely refer to DOCT as a trust.  For example, attached hereto as Exhibit D, is a letter, dated October 15, 2008 from the Bishop to Judge Joseph H. Rodriquez appointing Judge Rodriguez as "a trustee" of DOCT. ("I need not tell you that the work of this Trust is very important to the mission of the Diocese.  I am gratified that you have agree to accept this important position and share in the work of the Trust."). (*See also, e.g.*, DOCT Minutes of Meeting of Board of Trustees, dated October 14, 2010, Ex. E (referencing the "Status of Trust" and referring to DOCT's assets as "trust assets"); DOC Trusts Inc. Resolution Amending Bylaws, dated October 14, 2010, Ex. F (defining DOCT as the "Trust").)  The Board of DOCT itself recognized that DOCT's name creates confusion.  (*See* DOCT Minutes of Meeting of Board of Trustees, dated November 2, 2016, Ex. C.)

51.     When it benefits the Diocese to frame DOCT as a trust of the Diocese, the Diocese uses the ambiguity to its benefit.  (*See* Short Form Offering Template, dated August 6, 2018, Ex. G, at 11 ("The Diocese has a Trust, which houses the bulk of its unrestricted assets").)

52.     Critically, the Declaration of Trust does not clearly define what assets are subject to the purported trust.  The Declaration of Trust states: "The assets of the trust . . . consist of those investments, funds, monies and any other property, assets held for the account of the DOCT in the Diocese's custodial account with PNC Bank (the "Master Custody Account"), together with any earnings thereon," without providing sufficient information to identify what the Master Custody Account is and whether it only holds Alleged Trust Assets.

53.     The Diocese associates ten investment accounts with DOCT which are held at PNC (the "PNC DOCT Accounts").

54.     The Diocese does not have a custodial account with PNC that holds funds for DOCT.

55.     The Diocese associates five other investment accounts with DOCT which are not held at PNC (the "Non-PNC DOCT Accounts").

56.     The Non-PNC DOCT Accounts are not subject to the Declaration of Trust. Accordingly, none of the Non-PNC DOCT Accounts are Alleged Trust Assets under the terms of the Declaration of Trust.

57.     The Non-PNC DOCT Accounts are not subject to any other custodial or trust arrangement between the Diocese and DOCT.

58.     In contrast, PNC, not the Diocese, serves as custodian for certain investment accounts that the Diocese associates with DOCT pursuant to an Institutional Custody Agreement

between DOCT and PNC dated November 18, 2011.  (*See* Institutional Custody Agreement, dated June 25, 2001, Ex. H.)

59.     The Diocese is not a party to the Institutional Custody Agreement.

60.     The Diocese does not hold funds for DOCT in a custodial account with any financial institution prior to November 18, 2011.

61.     The Alleged Trust Assets, the PNC DOCT Accounts, the Non-PNC DOCT Accounts, and all other assets purportedly held or owned by DOCT, are referred to herein as the "DOCT Accounts."

62.     Documentation regarding whether the DOCT Accounts were opened by, and are in the name of, the Diocese or DOCT is inconsistent.  For example, regarding the PNC account ending in -4811, which the Diocese associates with DOCT and which appears to be subject to the Institutional Custody Agreement between DOCT and PNC, certain documents describe the Diocese as the account owner while others suggest that DOCT is the account owner.  (*See* Certification Regarding Beneficial Owners of Legal Entities, dated July 19, 2019, Ex. I (listing Diocese of Camden as Account Owner and indicating that the customer is DOCT); New Mirrored Account Information, dated December 23, 2019, Ex. J (listing Diocese of Camden as Patriot Act customer); Ex. J, at 11 (indicating that the customer is DOCT).)  This confusion further illustrates the relatedness of the Diocese and DOCT.

63.     For example, the Declaration of Trust provides that the DOCT Accounts may, at the Diocese's discretion, be commingled with the Diocese's assets, implying that the DOCT Accounts are owned by the Diocese.  Simultaneously, the Diocese claims the PNC DOCT Accounts are owned by DOCT in connection with the PNC Loan (defined and discussed below).

64.     Laura Montgomery, the Diocese's Finance Officer, is an authorized signatory on all of the PNC DOCT Accounts.  (*See* Email, dated April 18, 2019, Ex. K (indicating that Laura Montgomery should be added as an authorized signer for all 19 Diocese of Camden Accounts, including PNC DOCT Accounts); Schedule of Authorized Signers, dated March 11, 2019, Ex. L (including Laura Montgomery, for numerous purported DOCT Accounts as "Client: Diocese of Camden").)

65.     The Diocese asserts that since its inception, DOCT has distributed over $69 million to the Diocese through quarterly and annual grants independently reviewed and approved by the Board of DOCT.

66.     Except on rare occasions, the Board of DOCT always approved the Diocese's grant request in the maximum amount allowed under the Spending Policy.

67.     Additionally, the Diocese routinely received and used funds from DOCT in the form of grants before the grants and issuance of the funds were approved by the Board of DOCT. (*See, e.g.*, DOCT Minutes of Meeting of Board of Trustees dated April 4, 2013, Ex. M (grant approval for fiscal year ending 6/30/2012 was made on 4/4/2013, more than 21 months after the beginning of the fiscal year); DOCT Minutes of Meeting of Board of Trustees dated July 10, 2015, Ex. B, (grant approval FY ending 6/30/2015 was made on 7/10/2015, more than 12 months after the beginning of the fiscal year).)

68.     The Diocese declared the alleged trust on DOCT's behalf.

69.     Pursuant to the Declaration of Trust, the Diocese (not DOCT) has the unilateral power to amend the provisions governing the administration of the alleged trust.

70.     The total amount held in the DOCT Accounts exceeds $110 million.

71.     The entire balance of the DOCT Accounts is property of the Debtor's estate under Section 541(a) of the Bankruptcy Code.

## C.  The PNC Loan

72.     On December 9, 2011, the Diocese entered into a Loan Agreement (the "Loan Agreement") with PNC Bank, National Association ("PNC") for a revolving line of credit (the "PNC Loan") wherein the Diocese may borrow the lessor of (a) $25 million or (b) 90% of the margin value of "Pledged Collateral" (as defined in the Loan Agreement).

73.     Upon information and belief, PNC understood that DOCT housed the bulk of the Diocese's unrestricted assets, which information it utilized when deciding to enter into the Loan Agreement. (*See* Short Form Offering Template, dated August 6, 2018, Ex. G, at 11 ("The Diocese has a Trust, which houses the bulk of its unrestricted assets.").)

74.     In connection with the PNC Loan, DOCT entered into a Pledge Agreement with PNC.  Through the Pledge Agreement, seven accounts purportedly held by DOCT at PNC, including all assets credited to those accounts and all additions, substitutions, replacement, proceeds, income, dividends, and distributions thereon (collectively, the "Pledged Accounts"), were pledged as collateral to secure the PNC Loan.[3]

75.     As of January 31, 2021, the Pledged Accounts held more than $66.2 million.  That amount reflects an increase of more than $9.9 million in seven months (since June 30, 2020).

76.     In addition to the Pledge Agreement, DOCT entered into a Guaranty and Suretyship Agreement (the "Guaranty") with PNC, whereby DOCT unconditionally guaranteed and became the surety for prompt payment of all amounts due under the PNC Loan.

---

[3] The ten PNC DOCT Accounts include the seven Pledged Accounts.

77.     As of the Petition Date (defined below), the outstanding balance of the PNC Loan was $22,807,500.

78.     On November 17, 2020, the Board of DOCT signed a *Resolution Regarding Guaranteed Loan*, whereby DOCT agreed to assume responsibility for making interest payments on the PNC Loan.

**D.  The Chapter 11 Case**

79.     On October 10, 2020 (the "Petition Date"), the Diocese commenced a voluntary case under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in this Court.

80.     The Diocese's commencement of the above-captioned bankruptcy case as of the Petition Date created an "estate" as defined pursuant to 11 U.S.C. § 541(a).

81.     Upon information and belief, the Diocese sought relief under Chapter 11 of the Bankruptcy Code in response to multiple sexual abuse actions filed by the survivors of such abuse, in order to obtain leverage over the victims and to hide financial resources owned and controlled by the Diocese from the survivors.

82.     DOCT is not a legal entity separate from or independent from the Diocese, but rather is merely an operating division and/or a corporate formality designed to shield assets from creditors of the Diocese.  DOCT is operated for the purpose of acting as an investment account for the Diocese, *i.e.*, investing funds deposited by the Diocese and then later providing funding to the Diocese.

83.     Part 11 of the Debtor's *Voluntary Petition* (Dkt. 1, at 21) (the "Petition") lists DOCT as an asset of the Debtor's estate, specifically in the category of "trusts, equitable or future interests in property."

84. On or about October 6, 2020, the Diocese filed its *Amended Schedules of Assets and Liabilities and List of Creditors* (Dkt. 41, at 4) ("Amended Schedules"), which deleted DOCT from the list of estate assets, and instead included DOCT under the list of "property that the debtor holds or controls that another entity owns."

85. The balances in the DOCT Accounts are under the Diocese's complete control. The DOCT Accounts are property belonging to the Diocese and should be scheduled as property of the estate.

86. An actual controversy exists concerning whether the DOCT Accounts are assets of the estate.

87. On December 31, 2020, the Debtor filed a proposed *Plan of Reorganization* (Dkt. 306), and on March 6, 2021, the Debtor filed a *First Amended Plan of Reorganization* (Dkt. 498) (the "Initial Plan").

88. The Debtor classified PNC as a general unsecured creditor in Class 2 under the Initial Plan. Pursuant to the terms of the Initial Plan, PNC was impaired and would not receive a full recovery of the amount it is owed despite its security interest over the Pledged Accounts and Guaranty by DOCT.

89. Section VI.1.(b)(b)(iv) of the Initial Plan provided that the Initial Plan was to be funded, in part, by a contribution from DOCT in the amount of "$30,000 per year for ten (10) consecutive years for a total contribution of $300,000. Not less than ten (10) days prior to confirmation, the Board of [DOCT] ***shall approve*** this funding and submit proof of cash availability." (Initial Plan, Dkt. 498, at Art. VI.1(b)(b)(iv) (emphasis added).)

90. The Debtor thereby guarantied approval by the Board of DOCT and did not contemplate the impact if the Board of DOCT did not approve the contribution.

91.    On June 28, 2021, PNC filed a proof of claim (Claim No. 372) (the "PNC Claim")

in the amount of $23,007,528.96 on account of amounts due and owing under the Loan.  The PNC

Claim was filed as a secured claim, further illustrating the confusion regarding the relationship

between DOCT and the Diocese and the ownership of the Pledged Accounts.  (*See* PNC Claim ¶

10 (noting that PNC is "unaware" whether the Pledged Collateral constitutes property of the

Debtor's estate).)

92.    The PNC Claim notes "[t]he *Debtor's* obligations to the Bank under the Financing

Agreement are secured by the Pledged Collateral . . . ."  (*Id.* ¶ 8 (emphasis added).)  PNC further

indicates that its "security interest in the Pledged Collateral is perfected by control by operation of

law and as further set forth in the Control Agreement."  (*Id.* ¶ 9.)

93.    The Diocese has not objected to the PNC Claim or its current status as a secured

claim.

94.    On August 12, 2021, the Debtor filed a *Motion for Entry of an Order Approving

Settlement of Controversy by and between the Diocese and PNC Bank, National Association

Pursuant to Federal Rule of Bankruptcy 9019(a)* (Dkt. 749) (the "PNC Settlement Motion").

Pursuant to the PNC Settlement Motion, the Diocese seeks to enter a settlement with PNC which,

among other things, extends the maturity date of the PNC Loan and changes the primary obligor

under the PNC Loan from the Diocese to DOCT.

95.    On October 12, 2021, the Diocese filed its *First Amended Plan of Reorganization*

(Dkt. 870) (the "Amended Plan").

96.    The Debtor classifies PNC as a general unsecured creditor in Class 2 under the

Amended Plan.  Pursuant to the terms of the Amended Plan, "[t]he Debtor shall assume and

reaffirm all loan documents with PNC and all such loan documents and provisions shall remain in

full force and effect until all obligations of the Debtor have been indefeasibly paid in full."
(Amended Plan, Art. IV.2(b).)  The Debtor proposes to pay PNC in full under the Amended Plan,
but nonetheless asserts that PNC's claim is impaired.  (*Id.*)

97.     Article VI.1(b)(i)(2) of the Amended Plan provides that the Debtor's contribution
to funding the Trust (as defined in the Amended Plan) will be funded, in part, by "a loan of non-
restricted cash" from DOCT.  Unlike the Initial Plan, the Amended Plan does not contemplate
needing approval of the funding from DOCT *at all*.  The Debtor thereby guaranties approval by
the Board of DOCT and did not contemplate the impact if the Board of DOCT does not approve
the contribution.

**E.  The Diocese Dominates and Controls DOCT and the DOCT Accounts**

98.     The Diocese exercises complete control and domination over DOCT, such that
DOCT is a mere instrumentality, agent, and/or alter ego of the Diocese that has no legal existence
separate and distinct from the Diocese.

99.     The Diocese exercises complete day to day operational and financial control and
domination through the Bishop.

100.    Prior to the PNC Loan, DOCT provided loans to the Diocese to assist with cash
flow.

101.    The PNC Loan was initiated prior to the Declaration of Trust, when the sole
member of DOCT was the Debtor.  Currently, the Bishop is the sole member of DOCT and
concurrently serves as the President of the Diocese.

102.    As a result of the complete day-to-day operational and financial control and
domination exercised by the Diocese over DOCT, the Defendants failed to observe proper
corporate formalities and have not dealt with each other at arm's length.

103.    The Diocese and DOCT occupy the same premises and use the same business locations.

104.    For instance, DOCT entered the Pledge Agreement and Guaranty whereby the Pledged Accounts become collateral for the PNC Loan to the Diocese.  DOCT did not receive any consideration for the Guaranty and did not benefit from the PNC Loan.  The Diocese merely used the PNC Loan to repay a $10 million line of credit extended by DOCT to the Diocese.

105.    While DOCT also has a separate annual audit report, the Diocese's financial statements and consolidated audit reports have included DOCT since the fiscal year ending in June 2014.  DOCT is also included in the Diocese's accounting system.

106.    Additionally the Initial Plan and Amended Plan take it as a foregone conclusion that the Board of DOCT will approve its contribution to fund the Amended Plan.  Thus, the Diocese guaranties the Board of DOCT's approval, illustrating the control the Diocese has over DOCT.

107.    The business operations of the Diocese and DOCT are inextricably intertwined and interdependent.

108.    DOCT's sole function is to maintain investment accounts that are used to fund, among other things, the Diocese's capital needs.

109.    For example, before guarantying the PNC Loan, DOCT considered granting a loan itself to the Diocese, or borrowing money from a bank and making a loan to the Diocese afterwards.  The PNC Loan was ultimately selected because a loan from DOCT would reduce the corpus of the DOCT Accounts and therefore reduce future grants for the Diocese's operating expenses.  (*See* DOCT Minutes of Meeting of Board of Trustees, dated March 23, 2011, Ex. N.)

110.    The Diocese and DOCT hold themselves out to the public as a single, unified organization.  (*See, e.g.*, Short Form Offering Template, dated August 6, 2018, Ex. G, at 11 ("The Diocese has a Trust, which houses the bulk of its unrestricted assets.").)

## CAUSES OF ACTION

### COUNT ONE

**(Declaratory Relief: The DOCT Accounts are property of the Debtor's estate)**

111.    The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

112.    The Diocese initially listed DOCT, and therefore the DOCT Accounts, as property of the estate on its Petition.

113.    The Diocese subsequently removed DOCT from its list of assets in the Amended Schedules.

114.    The Diocese and DOCT concede that DOCT is not a trust.

115.    The Diocese operationally and financially controls DOCT and the DOCT Accounts.

116.    The funds held in the DOCT Accounts are controlled by the Diocese and used solely for the Diocese's benefit.  DOCT functions as an investment overseer of the Diocese.

117.    The DOCT Accounts are property of the Diocese's estate, subject to the rights of PNC to the Pledged Accounts under the PNC Loan.

118.    At the time of the PNC Loan, PNC believed that DOCT housed the bulk of the Diocese's unrestricted assets.

119.    A dispute exists as to whether the DOCT Accounts constitute property of the estate.

120.     Therefore, the Committee respectfully seeks an order of this Court declaring that the DOCT Accounts are property of the Debtor's estate.

## COUNT TWO

### (Declaratory Relief: Substantive Consolidation)

121.     The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

122.     Prior to the Petition Date, parties dealt with the Diocese and DOCT as a single institution.

123.     The Diocese held DOCT out as housing the bulk of the Diocese's unrestricted assets.

124.     The Defendants are mere instrumentalities of one another, and DOCT has no separate existence apart from the Diocese.  The Diocese's affairs are so entangled with those of DOCT that substantive consolidation of the Diocese and DOCT will benefit all of the Debtor's creditors including, but not limited to, the survivors of sexual abuse which are the Committee's constituents (the "Survivor Claimants").

125.     The separateness of the Defendants was disregarded so significantly prior to the Petition Date that creditors relied on the breakdown of entity borders and treated them as one legal entity.

126.     The time and expense necessary to attempt to unscramble the entanglement of the Debtor's affairs with that of DOCT is so substantial that no accurate identification and allocation of assets is possible in the absence of substantive consolidation.

127.     No harm will come to the Defendants should this Court enter an order of substantive consolidation because these entities are already so entirely entangled.

128.    Substantive consolidation will allow a truly equitable distribution of assets among the Debtor's creditors by treating DOCT as a single economic unit along with the Diocese.

129.    If the Defendants are not substantively consolidated, the Diocese will receive a windfall at the expense of creditors of the Diocese, including the Survivor Claimants.

130.    A dispute exists as to whether DOCT has an identity separate from that of the Diocese and whether the Diocese's affairs are so entangled with those of DOCT.

131.    Wherefore, the Committee respectfully seeks entry of an order of this Court ordering substantive consolidation, *nunc pro tunc*, of the Debtor's estate with DOCT effective as of October 1, 2020.

<u>**COUNT THREE**</u>

**(Declaratory Relief: Alter Ego (The Diocese and DOCT constitute a single entity))**

132.    The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

133.    Through the Bishop and with the assistance of other high-level management personnel of the Diocese, the Diocese exercises such a high degree of domination and control over DOCT that DOCT has no separate existence but rather Defendants operate as a single entity and enterprise.

134.    There is a unity of interest and ownership between the Defendants that the separate personalities of the corporation and the owners no longer exist.

135.    DOCT was created and operates merely for the purpose of funding the Diocese's capital needs and shielding funds from the Diocese's creditors.

136.    DOCT solely serves as a conduit for the Diocese, and the DOCT Accounts are merely investment accounts of the Diocese.

137.    DOCT is a mere instrumentality, agent, and/or alter ego of the Diocese that has no legal existence or purpose separate and distinct from the Diocese.

138.    The Diocese is attempting to use its bankruptcy filing to obtain a litigation advantage over its abuse survivors and to place the assets it owns and controls beyond the reach of the Survivor Claimants but still within the Diocese's reach and control.

139.    Under these circumstances, it would be unfair and inequitable to treat DOCT as a separate entity from the Debtor.

140.    To adhere to the doctrine of the corporate entity would promise injustice and/or protect fraud.

141.    Wherefore, the Committee respectfully seeks entry of an order declaring that DOCT is a mere instrumentality, agent, and/or alter ego of the Diocese and that the Diocese and DOCT are a single legal entity.

## COUNT FOUR

**(Declaratory Relief: No valid trust exists with respect to any of the DOCT Accounts)**

142.    The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

143.    The Diocese contends that the funds in the DOCT Accounts are held by the Diocese for the benefit of DOCT.

144.    The Diocese and DOCT concede that DOCT is not a trust.

145.    The Diocese further contends that the funds held in the DOCT Accounts do not constitute property of the Diocese's estate.

146.    The Committee, on the other hand, contends that no valid trust exists with respect to any of the assets held by the Diocese in the DOCT Accounts.

147.    The Committee contends that neither the Diocese nor DOCT intended that any funds in the DOCT Accounts were to be held in trust by the Diocese for the benefit of DOCT but rather for the benefit of the Diocese.

148.    The Committee further contends that both the legal and beneficial interest in the DOCT Accounts, and all of the funds and assets therein, are property of the Diocese's estate, subject to the liens of PNC on the Pledged Accounts.

149.    In fact, none of the Non-PNC DOCT Accounts are Alleged Trust Assets under the terms of the Declaration of Trust.

150.    Because Section 3B:31-18 of New Jersey's Uniform Trust Code requires a trust to be in writing, no valid trust existed, at a minimum, prior to the execution of the Declaration of Trust, and no valid trust has ever existed with respect to the Non-PNC DOCT Accounts.

151.    An actual, justiciable controversy exists as to whether any of the DOCT Accounts, and the funds therein, are (as the Diocese contends) held in trust by the Diocese for the benefit of DOCT or are (as the Committee contends) owned by the Diocese and constitute property of the Diocese's estate.

152.    Wherefore, the Committee respectfully seeks entry of an order declaring that the funds in the DOCT Accounts are not held in trust by the Diocese for the benefit of DOCT, and that the DOCT Accounts, and all of the funds therein, constitute property of the Diocese's estate.

## COUNT FIVE

**(Declaratory Relief: Diocese owns all legal and equitable interest in the DOCT Accounts and therefore a valid trust does not exist)**

153.    The Committee repeats and realleges each of the allegations set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

154.    Under the doctrine of merger, a valid trust cannot exist where the legal interest in the alleged trust assets and the beneficial interest in the alleged trust assets are held by the same entity.

155.    The Diocese and DOCT concede that DOCT is not a trust.

156.    As set forth above, the Committee alleges that the Diocese and DOCT constitute a single legal entity.

157.    Therefore, the legal interest in the Alleged Trust Assets (purportedly held by the Diocese) and the beneficial interest in the alleged trust assets (purportedly held by DOCT) are identical and held by the same legal entity.

158.    As a result, no express or resulting trust as alleged by the Diocese can exist with respect to the Alleged Trust Assets or any assets in the DOCT Accounts.

159.    In fact, none of the Non-PNC DOCT Accounts are Alleged Trust Assets under the terms of the Declaration of Trust.

160.    The Diocese contends that DOCT is separate from the Diocese, and that the Diocese holds the assets in the DOCT Accounts in trust for DOCT.

161.    Because Section 3B:31-18 of New Jersey's Uniform Trust Code requires a trust to be in writing, no valid trust exists.

162.    An actual, justiciable controversy exists as to whether the legal and beneficial interest in the alleged trust is held by the same legal entity, such that the alleged trust is void.

163.    Wherefore, the Committee respectfully seeks entry of an order declaring that the assets in the DOCT Accounts are not held in trust by the Diocese for the benefit of DOCT, and that the DOCT Accounts, and all of the funds therein, constitute property of the Diocese's estate.

## COUNT SIX

**(Avoidance of Declaration of Trust, 11 U.S.C. §§ 548(e)(1), 550)**

164.    The Committee repeats and realleges each of the allegations set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

165.    The Diocese and DOCT contend that the Diocese funded DOCT with approximately $71.9 million.

166.    The initial funding of DOCT did not involve an actual transfer of assets from a Diocese account to a DOCT account.  Indeed, the Declaration of Trust asserts that the Diocese has held assets of DOCT in custody since in or about June 2001, suggesting that the Diocese simply continued to hold assets as it had before DOCT's incorporation.

167.    The Diocese or did not hold funds of DOCT in custody pursuant to a trustee relationship that existed as of June 2001 or any time prior to the execution of the Declaration of Trust.

168.    In the Declaration of Trust, the Diocese purports to affirm that the DOCT assets the Diocese holds in custody are held for the exclusive use and benefit of DOCT and with equitable ownership vested in DOCT.

169.    No trust relationship existed with respect to any DOCT asset that the Diocese held prior to the 2015 Declaration of Trust.

170.    Pursuant to the Declaration of Trust, the Debtor transferred an interest of the Debtor in property—specifically, its equitable interest in the Alleged Trust Assets—to DOCT and therefore to the Alleged Trust.

171.    The Declaration of Trust was executed and approved by the Board of DOCT within ten years before the Petition Date.

172.    The Diocese is the settlor of the Alleged Trust created under the Declaration of Trust.  The Alleged Trust, to the extent it is a valid trust, is a self-settled trust.

173.    The Declaration of Trust states that "[u]nder no circumstances will the Diocese be, or be considered or deemed to be, a beneficiary of the trust affirmed and ratified herein and hereby."

174.    It is uncontroverted that the purpose of DOCT is to assist the Diocese by providing funding.

175.    DOCT has never made any grants or disbursements to any entity other than the Diocese, which would be against DOCT's purpose.

176.    Accordingly, notwithstanding any language in the Declaration of Trust to the contrary, the Debtor is the true, ultimate, and sole beneficiary of the Alleged Trust.

177.    In the alternative, notwithstanding any language in the Declaration of Trust to the contrary, the Debtor is a de facto beneficiary of the Alleged Trust.

178.    The Debtor transferred the DOCT Accounts to the self-settled Alleged Trust with the intent to hinder, delay, or defraud current and future creditors.

179.    Entry into the Declaration of Trust is an avoidable transaction pursuant to 11 U.S.C. § 548(e)(1).  In accordance with Section 550 of the Bankruptcy Code, the Committee may recover the transfer of the DOCT Accounts to the Alleged Trust for the benefit of the estate and its creditors.

## COUNT SEVEN

### (Declaration of Trust is Invalid Pursuant to N.J.S.A. 3B:31-19)

180.    The Committee repeats and realleges each of the allegations set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

27

181.    The Debtor is the trustee of the Alleged Trust.

182.    The Debtor and DOCT concede DOCT is not a trust.

183.    The Debtor is the true, ultimate, and sole beneficiary of the Alleged Trust.

184.    The Debtor is thus the sole trustee and the sole beneficiary of all beneficial interests of the Alleged Trust.

185.    A valid trust was not created by the Declaration of Trust pursuant to N.J.S.A. 3B:31-19.

186.    Wherefore, the Committee respectfully seeks entry of an order declaring a valid trust does not exist between DOCT and the Debtor.

## COUNT EIGHT

**(Declaratory Judgment: Diocese Cannot Shield DOCT
Accounts from Creditors Pursuant to N.J.S.A. 3B:11-1(a))**

187.    The Committee repeats and realleges each of the allegations set forth in the preceding paragraphs with the same force and effect as if sully set forth herein.

188.    The Diocese created the Alleged Trust.

189.    To the extent a valid trust exists with respect to the DOCT Accounts, the income or principal of the trust is freely alienable and subject to claims of the Diocese's creditors, notwithstanding any provision to the contrary in the Declaration of Trust, pursuant to N.J.S.A. 3B:11-1(a).

190.    Wherefore, the Committee respectfully seeks entry of an order declaring the DOCT Accounts are freely alienable and subject to claims against the Diocese.

## COUNT NINE

**(Alleged Trust Assets Were Fully Revocable by the Diocese until the
Declaration of Trust was Entered in 2015 Pursuant to N.J.S.A. 3B:31-43)**

191.    The Committee repeats and realleges each of the allegations set forth in the preceding paragraphs with the same force and effect as if sully set forth herein.

192.    To the extent a valid trust was created in 2001, it was fully revocable by the Diocese until the trust relationship was memorialized in writing.

193.    The Diocese has not provided clear and convincing evidence that it intended that the trust be irrevocable in 2001.

194.    A revocable trust cannot retroactively be converted to an irrevocable trust.

195.    As the Alleged Trust was revocable by the Diocese until at least 2015, the assets in the Alleged Trust were subject to the claims of the Diocese's creditors until at least 2015, including the Survivors.

196.    Because the trust was a revocable trust until at least 2015, the execution of the Declaration of Trust constitutes an irrevocable transfer and/or a fraudulent transfer as to creditors of the Diocese prior to 2015, like the Survivors, who would have been entitled to the assets of the alleged revocable trust.

197.    Wherefore, the Committee respectfully seeks entry of an order declaring any trust existing prior to July 10, 2015 and October 15, 2015 respectively, was a revocable trust subject to the claims of then-existing creditors, including the Survivors.

## PRAYER FOR RELIEF

**WHEREFORE**, the Committee respectfully requests that this Court enter judgment in favor of the Committee as follows:

a.      Entry of a judgment declaring that the DOCT Accounts are property of the Debtor's estate;

b.      Entry of a judgment ordering substantive consolidation, *nunc pro tunc*, of the Debtor's estate with DOCT effective as of October 1, 2020;

c.      Entry of a judgment declaring that DOCT is a mere instrumentality, agent, and/or alter ego of the Diocese and that the Diocese and DOCT are a single legal entity;

d.      Entry of a judgment declaring that the funds and assets in the DOCT Accounts are not held in trust by the Diocese for the benefit of DOCT, and that the DOCT Accounts, and all of the funds therein, constitute property of the Diocese's estate;

e.      Entry of a judgment that entry into Declaration of Trust is avoidable as a fraudulent transfer pursuant to 11.S.C.C. § 548(e)(1) and 11 U.S.C. § 550;

f.      Entry of a judgment declaring a valid trust does not exist between DOCT and the Debtor;

g.      Entry of a judgment declaring the DOCT Accounts are freely alienable and subject to the claims against the Diocese;

h.      Entry of a judgment declaring any trust existing prior to July 10, 2015 and October 15, 2015 respectively, was a revocable trust subject to the claims of then-existing creditors, including the Survivors; and

i.      Such other and further relief as the Court deems just and equitable.

Dated: December 3, 2021                    **LOWENSTEIN SANDLER LLP**

                                           */s/ Jeffrey D. Prol*
                                           Jeffrey D. Prol, Esq.
                                           Michael A. Kaplan, Esq.
                                           Colleen Maker, Esq.
                                           One Lowenstein Drive
                                           Roseland, NJ 07068
                                           Telephone:  (973) 597-2500
                                           Facsimile:  (973) 597-2400
                                           Email:  jprol@lowenstein.com
                                           Email:  mkaplan@lowenstein.com
                                           Email:  cmaker@lowenstein.com

                                           *Counsel to the Official Committee of Tort*
                                           *Claimant Creditors*

# Exhibit A-1

**LOWENSTEIN SANDLER LLP**
Jeffrey D. Prol, Esq.
Michael A. Kaplan, Esq.
Colleen Maker, Esq.
One Lowenstein Drive
Roseland, NJ 07068
Telephone: (973) 597-2500
*Counsel to the Official Committee of Tort Claimant Creditors*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>THE DIOCESE OF CAMDEN, NEW JERSEY,<br><br>Debtor.<br>------------------------------------------------------<br>OFFICIAL COMMITTEE OF TORT CLAIMANT CREDITORS OF THE DIOCESE OF CAMDEN, NEW JERSEY,<br><br>Plaintiff,<br><br>v.<br><br>THE DIOCESE OF CAMDEN, NEW JERSEY, THE DIOCESE OF CAMDEN TRUSTS, INC.,<br><br>Defendants. | Chapter 11<br><br>Case No. 20-21257 (JNP)<br><br><br><br><br>Adv. Pro. No. ~~21-~~ 21-01393 (JNP) |

## **FIRST AMENDED ADVERSARY COMPLAINT**

Plaintiff, the Official Committee of Tort Claimant Creditors (the "Committee") of the

Diocese of Camden, New Jersey (the "Debtor" or "Diocese"), by way of this first amended

adversary complaint (the "Complaint") against the Diocese and the Diocese of Camden Trusts,

Inc. ("DOCT" and together with the Diocese, the "Defendants"), hereby states and alleges as follows:

## PRELIMINARY STATEMENT[1]

1.      By this Complaint, the Committee seeks, *inter alia*, a determination from the Court regarding the ownership of more than $~~100~~110 million in assets, as of ~~January 31~~June 30, 2021, purportedly held by ~~the Diocese in the~~ DOCT ~~Accounts~~.

2.      The Diocese ~~controls~~claims to hold some portion of the DOCT Accounts~~, which it claims to hold~~ in trust for the benefit of DOCT, a non-debtor.  DOCT ~~however,~~ was established to hold funds solely for the benefit of the Diocese ~~and~~ with no other purpose than to financially support the Diocese.  This circular structure demonstrates that DOCT is not an independent entity but rather a secondary arm of the Diocese, akin to simply acting as an investment advisor for a privately managed investment account held ~~at a bank~~in an account separate from the Diocese's operating accounts, established for the sole purpose of shielding assets of the Diocese from claims of creditors.  Therefore the DOCT Accounts belong to the Debtor and its estate.

3.      The Diocese claims to have transferred funds to DOCT in 2001, but also claims to hold those same funds in trust for DOCT.  Both cannot be true.

4.      ~~3.~~The Diocese contends that the ~~estimated $100 million in~~ assets purportedly held in trust are not part of the Diocese's estate, and thus cannot be reached by creditors of the Diocese, including the abuse survivors comprising the Committee's constituency.

5.      ~~4.~~The Committee respectfully requests a judgment from this Court declaring the DOCT Accounts property of the estate.

---

[1] Capitalized terms not defined in this Preliminary Statement shall have the meanings ascribed to them in this Complaint.

6.    5. Alternatively, the Committee seeks substantive consolidation of the Defendants and a declaratory judgment that the DOCT Accounts are so entangled with the Diocese and its estate as to require substantive consolidation.

7.    6. Alternatively, the Committee seeks a judgement determining that DOCT is a mere instrumentality, agent, and/or alter ego of the Diocese and that the Diocese and DOCT are a single legal entity.

8.    7. The Committee further contends that the Diocese failed to establish, and indeed cannot establish, that a valid trust exists with respect to the $100110 million in the DOCT Accounts.

9.    8.   The Committee further contends that the Diocese owns all legal and equitable interest in the DOCT Accounts.

10.    9. To the extent a valid trust exists, such trust is an avoidable self-settled trust pursuant to Section 548(e)(1) of the Bankruptcy Code and any deposits of the Diocese's assets into such trust are avoidable fraudulent transfers.

11.    10. The Committee further contends the DOCT Accounts were initially funded with comingled assets which cannot be traced that a valid trust does not exist under New Jersey state law.

12.    To the extent a valid trust exists under New Jersey state law, the Committee seeks a judgment determining that the DOCT Accounts are subject to and available to pay the claims of the Diocese's creditors.

## JURISDICTION AND VENUE

13.    11. This Court has jurisdiction over this adversary proceeding (the "Adversary Proceeding") pursuant to 28 U.S.C. §§ 157 and 1334(b).

14.    ~~12.~~ Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409 as this ~~adversary proceeding~~Adversary Proceeding arises under and in connection with a case under Chapter 11 of the Bankruptcy Code that is pending in this District.

15.    ~~13.~~ This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

16.    ~~14.~~ The Committee has standing to pursue this Complaint pursuant to 11 U.S.C. § 1103.[2]

## PARTIES

17.    ~~15.~~ Plaintiff is the Official Committee of Tort Claimant Creditors in this Chapter 11 case appointed by the Office of the United States Trustee pursuant to 11 U.S.C. § 1102(a)(1). The Committee is a party in interest in the Debtor's Chapter 11 case pursuant to 11 U.S.C. § 1109(b).

18.    ~~16.~~ The Committee is comprised of nine creditors with claims against, *inter alia*, the Diocese based upon sexual abuse by members of the clergy, workers, teachers, volunteers, or other persons or entities associated with or representing the Diocese and/or parishes, schools, or other Diocese-related institutions served by the Diocese.

19.    ~~17.~~ Defendant the Diocese of Camden, New Jersey is a New Jersey not-for-profit religious organization with its principal place of business at 631 Market Street, Camden, New Jersey 08102 and is the Chapter 11 debtor and debtor-in-possession in the underlying bankruptcy proceeding.

---

[2] ~~Simultaneously herewith~~On October 12, 2021, the Committee ~~has~~ filed ~~a motion for~~its *Motion for Entry of an Order Granting it Standing and Authorizing it to Prosecute and Settle Certain Claims on Behalf of the Debtor's Estate* (Dkt. 871) (the "Standing Motion"), seeking an order granting standing to pursue Count Three (Alter Ego) and Count Six (Avoidance of Declaration of Trust) only. The Standing Motion remains pending.

20.    18. The Diocese's governing body is comprised of six members.  The Most Reverend Dennis J. Sullivan (the current Bishop of the Diocese and hereafter the "Bishop") is the President of the Diocese.

21.    19. Defendant Diocese of Camden Trusts, Inc. is a New Jersey nonprofit membership corporation with its principal place of business at 631 Market Street, Camden, New Jersey 08102.  DOCT assists the Diocese by providing funding for education, religious personnel development, long-term capital needs, and the maintenance of diocesan offices.  The Bishop is the sole member of DOCT.  The current trustees are Monsignor Thomas Morgan, the Honorable Joseph H. Rodriguez, U.S.D.J. (ret.), and Kenneth J. Bossong, Esq. (the "Board of DOCT").

22.    20. The Board of DOCT is assisted by the Diocese's Investment Committee on the investment of DOCT's assets.  All the investments of DOCT are managed based on the *Diocese of Camden Trusts, Inc. Statement of Investment Policies and Objectives*.

## FACTUAL BACKGROUND

**A.  DOCT is a sham created for the purpose of shielding assets from the Diocese's creditors**

23.    In the late 1990s, an increased number of survivors of childhood sexual abuse began coming forward alleging abuse by members of the Catholic Church.  These survivors brought lawsuits against the Catholic Church which resulted in multi-million dollar jury verdicts.  *See* Don Lattin, *$30 Million Awarded Men Molested by 'Family Priest' / 3 bishops accused of Stockton coverup*, SFGate (July 17, 1998), https://www.sfgate.com/news/article/30-Million-Awarded-Men-Molested-by-Family-3001550.php.

24.    In June 2001, Cardinal Bernard Law, the Archbishop of Boston, admitted in a court pleading that when a priest was accused of sexual abuse allegations, that priest was simply re-assigned to a different parish.  *See* Jon Henley, *How the Boston Globe exposed the abuse scandal that rocked the Catholic church*, The Guardian (Apr. 21, 2010), https://www.theguardian.com/world/2010/apr/21/boston-globe-abuse-scandal-catholic.

25.    On June 22, 2001, the Certificate of Incorporation of Diocese of Camden Trusts, Inc. was executed.  The Certificate of Incorporation was filed on June 25, 2001.

26.    Pursuant to Article 5.1 of the Certificate of Incorporation, the Diocese "shall be the sole member of the Corporation."

27.    A. The Diocese ~~owns~~ and ~~controls all funds in the DOCT Accounts~~DOCT contend that the Diocese funded DOCT with approximately $71.9 million in 2001.

~~21. Prior to the creation of DOCT, certain funds received by the parishes within the Diocese's territory (the "Parishes") were required to be transferred to and held by the Diocese. Those funds were commingled with the assets of the Diocese and were subsequently used to fund DOCT, in part.~~

22. DOCT was initially funded with funds held by the Diocese.  Upon information and belief, no additional funding has been provided to DOCT from any entity since its initial funding.

23. After the formation of DOCT, the funds held by DOCT continue to be used for the same purposes that the funds were used for prior to the formation of DOCT, *i.e.* to fund the capital needs of the Diocese.

28.     On June 10, 2010, the United States Bankruptcy Court for the District of Delaware issued an opinion holding that funds held by a diocese for parish and diocese organizations in diocese pooled investment accounts pursuant to a resulting trust could not rely on the diocese's "meticulous" and "exhaustive" records to satisfy the burden of tracing, but a parish with an express written trust agreement with the diocese and whose investment was deposited directly into the pooled investment account and not into the diocese's general operating account could rely on the diocese's records.  *In re Cath. Diocese of Wilmington, Inc.*, 432 B.R. 135, 162 (Bankr. D. Del. 2010).

29.     From 2010 to 2014, bills that were the precursors to the New Jersey Child Victims Act were introduced in the Senate, Senate Judiciary Committee, and Assembly Judiciary Committee, which, if approved, would subject the Diocese to liability for previously time-barred sexual abuse claims by survivors of childhood sexual abuse by members of the clergy, workers, teachers, volunteers, or other persons or entities associated with or representing the Diocese and/or the Non-Debtors, or other Diocese-related institutions served by the Diocese.

30.     In 2015, the movie "Spotlight" was released in theaters, bringing increased attention to the widespread systemic history of sexual abuse of children perpetrated by the Catholic Church.

31.    In July 2015, the Board of DOCT executed a resolution to amend its certificate of incorporation to reflect that the Bishop is the sole member of DOCT, pending the approval of the Diocese, the sole member of DOCT at the time.  The Diocese approved the amendment in October 2015.  The Certificate of Amendment of DOCT's Certificate of Incorporation was not executed until November 2, 2016 and not filed until November 21, 2016.

32.    Upon information and belief, this amendment was an attempt by DOCT and the Diocese to legally distance themselves in order to shield the assets in the DOCT Accounts for creditors of the Diocese.

33.    For example, upon information and belief, replacing the Diocese as the sole member of DOCT with the Bishop, the President of the Diocese, was an attempt to remove the Diocese from the legal definition of an "insider" of DOCT for the purposes of voidable fraudulent transfers under New Jersey law.

34.    24. The Diocese ~~routinely received and used funds from DOCT in the form of grants before the grants and issuance of the funds were approved by the Board~~does not have a legitimate reason for amending its certificate of incorporation to remove the Diocese as the sole member of DOCT.

~~25. DOCT essentially functions as the Diocese's privately managed investment account.~~

35.    26. Purportedly by corporate resolutions dated July 10, 2015 and October 15, 2015 respectively, the trustees of the Diocese and the Board of DOCT entered into a Declaration of Trust and Trust Agreement (the "Declaration of Trust") in an attempt to form the Diocese of Camden Trusts, Inc. Investment Trust (the "Alleged Trust"), while also ~~requesting~~declaring that the Declaration of Trust ~~apply~~applies nunc pro tunc to June 25, 2001.  ~~However, the Board of DOCT (See Declaration of Trust, dated June 25, 2001, Ex. A.)~~

36.     According to the Declaration of Trust, "the Diocese has held certain assets which are the property of the DOCT for purposes of management and investment on behalf of the DOCT" and "the Diocese and the DOCT wish to memorialize the trustee relationship with governs the Diocese's holding of certain funds of the DOCT in custody, which trustee relationship has existed since the Diocese first undertook to hold such funds in custody in or about June 2001." (*Id.* at 2.)

37.     The Declaration of Trust continues that "the Diocese does hereby publish and affirm the fact that such ~~Trust~~ [sic] Assets [the "Alleged Trust Assets"] of the DOCT as it holds in custody are held as a charitable trust, for the exclusive use and benefit of the said DOCT, and with the equitable ownership thereof being vested in the said DOCT, on the terms and conditions hereinafter set forth." (*Id.*)

38.     The minutes of the July 10, 2015 Board of DOCT meeting reflect that legal counsel recommended documenting through a formal Declaration of Trust "that the Diocese holds – and always held – the Trusts' assets in a charitable trust for the benefit of [DOC Trusts, Inc]."  (DOCT Minutes of Meeting of Board of Trustees, dated July 10, 2015, Ex. B, at 2.)

39.     The July 10, 2015 Board of DOCT meeting minutes and the Declaration of Trust are inconsistent about whether the Diocese purportedly holds all of DOCT's assets in a trust or just certain of DOCT's assets.  (*Compare* DOCT Minutes of Meeting of Board of Trustees, dated July 10, 2015, Ex. B, *with* Declaration of Trust, dated June 25, 2001, Ex. A.)

40.     The Diocese has not held DOCT funds in custody pursuant to a trustee relationship since in or about June 2001.

41.     The Board of the Diocese did not approve the Declaration of Trust until November 2, 2016, more than a year after the date on the Declaration of Trust and more than fifteen years

after the retroactive application of the Declaration of Trust.  (*See* DOCT Minutes of Meeting of Board of Trustees, dated November 2, 2016, Ex. C.)

42.    No consideration was provided for entry into the Declaration of Trust.

43.    The Declaration of Trust is a failed attempt at establishing an express trust in accordance with New Jersey law.

44.    The Declaration of Trust also contains provisions intended to shield the Alleged Trust Assets from the Diocese's creditors.  For example, the Declaration of Trust states that the Alleged Trust Assets shall not be subject to the claims of creditors of the Diocese.  The Declaration of Trust also states, ignoring the purpose for which Alleged Trust Assets (and all assets of DOCT) will ultimately be used, that "[u]nder no circumstances will the Diocese be, or be considered or deemed to be, a beneficiary of the trust affirmed and ratified herein and hereby."  (Declaration of Trust, dated June 25, 2001, Ex. A, at 3.)

45.    Upon information and belief, DOCT was created for the sole purpose of shielding assets from creditors of the Diocese, specifically survivors of sexual abuse.  The Declaration of Trust was entered and DOCT's certificate of incorporation was amended in furtherance of its goal of shielding assets from the reach of creditors as the number of abuse claims increased and legislation was introduced which would reopen the statute of limitations to allow those claims to be pursued.

**B.** 27. **The Diocese** ~~declared the alleged trust on DOCT's behalf, and the Diocese funded DOCT by diverting certain of its assets to DOCT.~~**owns and controls all funds in the DOCT Accounts**

~~28. Pursuant to the Declaration of Trust, the Diocese (not DOCT) has the unilateral power to amend the provisions governing the administration of the alleged trust.~~

10

29.  The purpose of the formation of DOCT was to shield assets from creditors of the Diocese.

46.     At or around the time of DOCT's corporate formation, the Diocese funded DOCT. No additional funding has been provided to DOCT from any entity since its initial funding, including when the Declaration of Trust was executed.

47.     After the corporate formation of DOCT, the funds held by DOCT continued to be used for the same purposes that the funds were used for prior to the formation of DOCT, among other things, to fund the capital needs of the Diocese.  (*See, e.g.*, *First Amended Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code Describing Chapter 11 Plan Proposed by the Debtor-in-Possession* (the "Amended Disclosure Statement"), Dkt. 869, at Art. IV(E)(a) ("DOC Trusts is organized for the purpose of assisting the Diocese . . . by providing funding for[, *inter alia*,] . . . long-term capital needs.").)

48.     DOCT essentially functions as the Diocese's privately managed investment advisor.

49.     The Diocese, the Bishop, and DOCT have intentionally obfuscated DOCT's relationship to the Diocese.  On one hand, the Diocese insists that DOCT is not a trust.  (*See, e.g.*, Dkt. 1004 at 15 ("The DOCT is not holding funds in trust for the benefit of any beneficiary. . . . Rather, funds held by the DOCT are simply the funds of the DOCT, a nonprofit corporation."); Dkt. 1005 ¶ 119 ("Moreover, the Diocese transferred funds to establish DOCT, a corporation. DOCT is ***not*** a trust. . . .  The Diocese is not, and has never been, a beneficiary of DOCT because DOCT is not a trust.") (emphasis in original).)

50.     On the other hand, the Diocese, the Bishop, and DOCT routinely refer to DOCT as a trust.  For example, attached hereto as Exhibit D, is a letter, dated October 15, 2008 from the

11

Bishop to Judge Joseph H. Rodriquez appointing Judge Rodriguez as "a trustee" of DOCT. ("I need not tell you that the work of this Trust is very important to the mission of the Diocese. I am gratified that you have agree to accept this important position and share in the work of the Trust."). (*See also, e.g.*, DOCT Minutes of Meeting of Board of Trustees, dated October 14, 2010, Ex. E (referencing the "Status of Trust" and referring to DOCT's assets as "trust assets"); DOC Trusts Inc. Resolution Amending Bylaws, dated October 14, 2010, Ex. F (defining DOCT as the "Trust").) The Board of DOCT itself recognized that DOCT's name creates confusion. (*See* DOCT Minutes of Meeting of Board of Trustees, dated November 2, 2016, Ex. C.)

51.     When it benefits the Diocese to frame DOCT as a trust of the Diocese, the Diocese uses the ambiguity to its benefit. (*See* Short Form Offering Template, dated August 6, 2018, Ex. G, at 11 ("The Diocese has a Trust, which houses the bulk of its unrestricted assets").)

52.     30. TheCritically, the Declaration of Trust does not clearly define what assets are subject to the purported trust. The Declaration of Trust states: "The assets of the trust . . . consist of those investments, funds, monies and any other property, assets held for the account of the DOCT in the Diocese's custodial account with PNC Bank (the "Master Custody Account"), together with any earnings thereon," without providing sufficient information to identify what the Master Custody Account is. The Master Custody Account, and whether it only holds Alleged Trust Assets.

53.     The Diocese associates ten investment accounts with DOCT which are held at PNC (the "PNC DOCT Accounts").

54.     The Diocese does not have a custodial account with PNC that holds funds for DOCT.

55.     The Diocese associates five other investment accounts with DOCT which are not held at PNC (the "Non-PNC DOCT Accounts").

56.     The Non-PNC DOCT Accounts are not subject to the Declaration of Trust. Accordingly, none of the Non-PNC DOCT Accounts are Alleged Trust Assets under the terms of the Declaration of Trust.

57.     The Non-PNC DOCT Accounts are not subject to any other custodial or trust arrangement between the Diocese and DOCT.

58.     In contrast, PNC, not the Diocese, serves as custodian for certain investment accounts that the Diocese associates with DOCT pursuant to an Institutional Custody Agreement between DOCT and PNC dated November 18, 2011. (*See* Institutional Custody Agreement, dated June 25, 2001, Ex. H.)

59.     The Diocese is not a party to the Institutional Custody Agreement.

60.     The Diocese does not hold funds for DOCT in a custodial account with any financial institution prior to November 18, 2011.

61.     The Alleged Trust Assets, the PNC DOCT Accounts, the Non-PNC DOCT Accounts, and all other assets purportedly held or owned by DOCT, are referred to herein as the "DOCT Accounts"."

62.     Documentation regarding whether the DOCT Accounts were opened by, and are in the name of, the Diocese or DOCT is inconsistent.  For example, regarding the PNC account ending in -4811, which the Diocese associates with DOCT and which appears to be subject to the Institutional Custody Agreement between DOCT and PNC, certain documents describe the Diocese as the account owner while others suggest that DOCT is the account owner.  (*See* Certification Regarding Beneficial Owners of Legal Entities, dated July 19, 2019, Ex. I (listing

Diocese of Camden as Account Owner and indicating that the customer is DOCT); New Mirrored Account Information, dated December 23, 2019, Ex. J (listing Diocese of Camden as Patriot Act customer); Ex. J, at 11 (indicating that the customer is DOCT).)  This confusion further illustrates the relatedness of the Diocese and DOCT.

63.    ~~31.  The~~For example, the Declaration of Trust provides that the DOCT Accounts may, at the Diocese's discretion, be commingled with the Diocese's assets, implying that the DOCT Accounts are owned by the Diocese.  Simultaneously, the Diocese claims the PNC DOCT Accounts are owned by DOCT in connection with the PNC Loan (defined and discussed below).

~~32.  Upon information and belief, the funds held in the DOCT Accounts are and have been commingled at all times with non-trust funds of the Diocese.~~

64.    Laura Montgomery, the Diocese's Finance Officer, is an authorized signatory on all of the PNC DOCT Accounts.  (*See* Email, dated April 18, 2019, Ex. K (indicating that Laura Montgomery should be added as an authorized signer for all 19 Diocese of Camden Accounts, including PNC DOCT Accounts); Schedule of Authorized Signers, dated March 11, 2019, Ex. L (including Laura Montgomery, for numerous purported DOCT Accounts as "Client: Diocese of Camden").)

65.    The Diocese asserts that since its inception, DOCT has distributed over $69 million to the Diocese through quarterly and annual grants independently reviewed and approved by the Board of DOCT.

66.    Except on rare occasions, the Board of DOCT always approved the Diocese's grant request in the maximum amount allowed under the Spending Policy.

67.    Additionally, the Diocese routinely received and used funds from DOCT in the form of grants before the grants and issuance of the funds were approved by the Board of DOCT.

14

(*See, e.g.*, DOCT Minutes of Meeting of Board of Trustees dated April 4, 2013, Ex. M (grant approval for fiscal year ending 6/30/2012 was made on 4/4/2013, more than 21 months after the beginning of the fiscal year); DOCT Minutes of Meeting of Board of Trustees dated July 10, 2015, Ex. B, (grant approval FY ending 6/30/2015 was made on 7/10/2015, more than 12 months after the beginning of the fiscal year).)

68.    33. The total amount held in the DOCT Accounts exceeds $100 millionDiocese declared the alleged trust on DOCT's behalf.

69.    34. ThePursuant to the Declaration of Trust is a failed attempt at establishing an express trust in accordance with New Jersey law, the Diocese (not DOCT) has the unilateral power to amend the provisions governing the administration of the alleged trust.

70.    35. The Diocese holds legal title to the fundstotal amount held in the DOCT Accounts exceeds $110 million.

71.    36. The entire balance of the DOCT Accounts is property of the Debtor's estate under Section 541(a) of the Bankruptcy Code.

**C. B. The PNC Loan**

72.    37. On December 9, 2011, the Diocese entered into a Loan Agreement (the "Loan Agreement") with PNC Bank, National Association ("PNC") for a revolving line of credit (the "PNC Loan") wherein the Diocese may borrow the lessor of (a) $25 million or (b) 90% of the margin value of "Pledged Collateral" (as defined in the Loan Agreement).

73.    38. Upon information and belief, PNC understood that DOCT housed the bulk of the Diocese's unrestricted assets, which information it utilized when deciding to enter into the Loan Agreement.  (*See* Short Form Offering Template, dated August 6, 2018, Ex. G, at 11 ("The Diocese has a Trust, which houses the bulk of its unrestricted assets.").)

74.    39. In connection with the PNC Loan, DOCT entered into a Pledge Agreement with PNC.  Through the Pledge Agreement, seven accounts purportedly held by DOCT at PNC Investments, LLC, including all assets credited to those accounts and all additions, substitutions, replacement, proceeds, income, dividends, and distributions thereon (collectively, the "Pledged Accounts"), were pledged as collateral to secure the PNC Loan.[3]

75.    40. As of January 31, 2021, the Pledged Accounts held more than $66.2 million. That amount reflects an increase of more than $9.9 million in seven months (since June 30, 2020).

76.    41. In addition to the Pledge Agreement, DOCT entered into a Guaranty and Suretyship Agreement (the "Guaranty") with PNC, whereby DOCT unconditionally guaranteed and became the surety for prompt payment of all amounts due under the PNC Loan.

77.    42. As of the Petition Date (defined below), the outstanding balance of the PNC Loan was $22,807,500.

78.    43. On November 17, 2020, the Board of DOCT signed a *Resolution Regarding Guaranteed Loan*, whereby DOCT agreed to assume responsibility for making interest payments on the PNC Loan.

**D.** C. **The Chapter 11 Case**

79.    44. On October 10, 2020 (the "Petition Date"), the Diocese commenced a voluntary case under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in this Court.

80.    45. The Diocese's commencement of the above-captioned bankruptcy case as of the Petition Date created an "estate" as defined pursuant to 11 U.S.C. § 541(a).

81.    46. Upon information and belief, the Diocese sought relief under Chapter 11 of the Bankruptcy Code in response to multiple sexual abuse actions filed by the survivors of such abuse,

---

[3] The ten PNC DOCT Accounts include the seven Pledged Accounts.

in order to obtain leverage over the victims and to hide financial resources owned and controlled by the Diocese from the survivors.

82. 47. DOCT is not a legal entity separate from or independent from the Diocese, but rather is merely an operating division and/or a corporate formality designed to shield assets from creditors of the Diocese.  DOCT is operated for the purpose of acting as an investment account for the Diocese, *i.e.*, investing funds deposited by the Diocese and then later providing funding to the Diocese.

83. 48. Part 11 of the Debtor's *Voluntary Petition* [(Dkt. 1], at 21) (the "Petition") lists DOCT as an asset of the Debtor's estate, specifically in the category of "trusts, equitable or future interests in property."

84. 49. On or about October 6, 2020, the Diocese filed its *Amended Schedules of Assets and Liabilities and List of Creditors* [(Dkt. 41], at 4) ("Amended Schedules"), which deleted DOCT from the list of estate assets, and instead included DOCT under the list of "property that the debtor holds or controls that another entity owns."

85. 50. The balances in the DOCT Accounts are under the Diocese's complete control. The DOCT Accounts are property belonging to the Diocese and should be scheduled as property of the estate.

86. 51. An actual controversy exists concerning whether the DOCT Accounts are assets of the estate.

87. 52. On December 31, 2020, the Debtor filed a proposed *Plan of Reorganization* [(Dkt. 306]), and on March 6, 2021, the Debtor filed a *First Amended Plan of Reorganization* [(Dkt. 498]) (the "ProposedInitial Plan").

88. 53. The Debtor ~~classifies~~classified PNC as a general unsecured creditor in Class 2 under the ~~Proposed~~Initial Plan. Pursuant to the terms of the ~~Proposed~~Initial Plan, PNC ~~is~~was impaired and ~~will~~would not receive a full recovery of the amount it is owed despite its security interest over the Pledged Accounts and Guaranty by DOCT.

~~54. Pursuant to the Proposed Plan, DOCT is a "Released Party," and therefore will be released from "all claims, obligations, suits, judgments, damages, demands, debts, remedies, causes of action, rights of setoff, other rights, and liabilities whatsoever."~~

~~55. Thus, even though the PNC Loan is oversecured by the Pledged Accounts, the Plan does not propose to pay PNC in full, and both the Debtor and DOCT will be released, meaning PNC will not be permitted to collect the full amount it is owed from the Pledged Accounts or based on the Guaranty.~~

89. 56. Section VI.1.(b)(b)(iv) of the ~~Proposed~~Initial Plan ~~provides~~provided that the ~~Proposed~~Initial Plan ~~is being~~was to be funded, in part, by a contribution from DOCT in the amount of "$30,000 per year for ten (10) consecutive years for a total contribution of $300,000. Not less than ten (10) days prior to confirmation, the Board of [DOCT] ***shall approve*** this funding and submit proof of cash availability." (Initial Plan, Dkt. 498, at Art. VI.1(b)(b)(iv) (emphasis added).)

90. 57. The Debtor thereby ~~guaranties~~guaranteed approval by the Board of DOCT and ~~does~~did not contemplate the impact if the Board of DOCT ~~does~~did not approve the contribution.

91. 58. On June 28, 2021, PNC filed a proof of claim ~~[~~(Claim No. 372~~]~~) (the "PNC Claim") in the amount of $23,007,528.96 on account of amounts due and owing under the Loan. The PNC Claim was filed as a secured claim, further illustrating the confusion regarding the relationship between DOCT and the Diocese and the ownership of the Pledged Accounts. (*See*

PNC Claim ¶ 10 (noting that PNC is "unaware" whether the Pledged Collateral constitutes property of the Debtor's estate).)

92.     The PNC Claim notes "[t]he *Debtor's* obligations to the Bank under the Financing Agreement are secured by the Pledged Collateral . . . ."  (*Id.* ¶ 8 (emphasis added).)  PNC further indicates that its "security interest in the Pledged Collateral is perfected by control by operation of law and as further set forth in the Control Agreement."  (*Id.* ¶ 9.)

93.     ~~59.~~ The Diocese has not objected to the PNC Claim or its current status as a secured claim.

94.     ~~60.~~ On August 12, 2021, the Debtor filed a *Motion for Entry of an Order Approving Settlement of Controversy by and between the Diocese and PNC Bank, National Association Pursuant to* ~~*Fed. R. Bankr. P.*~~ *Federal Rule of Bankruptcy* 9019 ~~(a)~~ (Dkt. 749~~)~~) (the "PNC Settlement Motion").  Pursuant to the PNC Settlement Motion, the Diocese seeks to enter a settlement with PNC which, among other things, extends the maturity date of the PNC Loan and changes the primary obligor under the PNC Loan from the Diocese to DOCT.

95.     On October 12, 2021, the Diocese filed its *First Amended Plan of Reorganization* (Dkt. 870) (the "Amended Plan").

96.     The Debtor classifies PNC as a general unsecured creditor in Class 2 under the Amended Plan.  Pursuant to the terms of the Amended Plan, "[t]he Debtor shall assume and reaffirm all loan documents with PNC and all such loan documents and provisions shall remain in full force and effect until all obligations of the Debtor have been indefeasibly paid in full." (Amended Plan, Art. IV.2(b).)  The Debtor proposes to pay PNC in full under the Amended Plan, but nonetheless asserts that PNC's claim is impaired.  (*Id.*)

97.    Article VI.1(b)(i)(2) of the Amended Plan provides that the Debtor's contribution to funding the Trust (as defined in the Amended Plan) will be funded, in part, by "a loan of non-restricted cash" from DOCT.  Unlike the Initial Plan, the Amended Plan does not contemplate needing approval of the funding from DOCT *at all*.  The Debtor thereby guaranties approval by the Board of DOCT and did not contemplate the impact if the Board of DOCT does not approve the contribution.

**E.  ~~D.~~ The Diocese Dominates and Controls DOCT and the DOCT Accounts**

98.    ~~61.~~ The Diocese exercises complete control and domination over DOCT, such that DOCT is a mere instrumentality, agent, and/or alter ego of the Diocese that has no legal existence separate and distinct from the Diocese.

99.    ~~62.~~ The Diocese exercises complete day to day operational and financial control and domination through the Bishop.

100.    ~~63. Upon information and belief, prior~~Prior to the PNC Loan, DOCT provided loans to the Diocese to assist with cash flow.

101.    ~~64. Upon information and belief, the~~The PNC Loan was initiated prior to the Declaration of Trust, when the sole member of DOCT was the Debtor.  Currently, the Bishop is the sole member of DOCT and concurrently serves as the President of the Diocese.

102.    ~~65.~~ As a result of the complete ~~day to day~~day-to-day operational and financial control and domination exercised by the Diocese over DOCT, the Defendants failed to observe proper corporate formalities and have not dealt with each other at arm's length.

103.    ~~66.~~ The Diocese and DOCT occupy the same premises and use the same business locations.

67. Upon information and belief, the financial affairs of the Diocese and DOCT are inextricably intertwined and interdependent.

104. 68. For instance, DOCT entered the Pledge Agreement and Guaranty whereby the Pledged Accounts become collateral for the PNC Loan to the Diocese.  DOCT did not receive any consideration for the Guaranty and did not benefit from the PNC Loan.  The Diocese merely used the PNC Loan to repay a $10 million line of credit extended by DOCT to the Diocese.

69. Further, upon information and belief, the funds used to fund the DOCT Accounts were commingled with non-trust funds of the Diocese.

105. 70. Further, upon information and belief While DOCT also has a separate annual audit report, the Diocese's financial statements and consolidated audit reports have included DOCT since the fiscal year ending in June 2014.  DOCT is also included in the Diocese's accounting system.

106. 71. Additionally the Proposed Initial Plan takes and Amended Plan take it as a foregone conclusion that the Board of DOCT will approve its contribution to fund the Proposed Amended Plan.  Thus, the Diocese guaranties the Board of DOCT's approval, illustrating the control the Diocese has over DOCT.

107. 72. The business operations of the Diocese and DOCT are inextricably intertwined and interdependent.

108. DOCT's sole function is to maintain investment accounts that are used to fund, among other things, the Diocese's capital needs.

109. 73. For example, upon information and belief, before guarantying the PNC Loan, DOCT considered granting a loan itself to the Diocese, or borrowing money from a bank and making a loan to the Diocese afterwards.  The PNC Loan was ultimately selected because a loan

from DOCT would reduce the corpus of the DOCT Accounts and therefore reduce future grants for the Diocese's operating expenses. *(See* DOCT Minutes of Meeting of Board of Trustees, dated March 23, 2011, Ex. N.)

110. ~~74.~~ The Diocese and DOCT hold themselves out to the public as a single, unified organization. *(See, e.g.*, Short Form Offering Template, dated August 6, 2018, Ex. G, at 11 ("The Diocese has a Trust, which houses the bulk of its unrestricted assets.").)

## **CAUSES OF ACTION**

## **COUNT ONE**

**(Declaratory Relief: The DOCT Accounts are property of the Debtor's estate)**

111. ~~75.~~ The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

112. ~~76.~~ The Diocese initially listed DOCT, and therefore the DOCT Accounts, as property of the estate on its Petition.

113. ~~77.~~ The Diocese subsequently removed DOCT from its list of assets in the Amended Schedules.

114.   The Diocese and DOCT concede that DOCT is not a trust.

115. ~~78.~~ The Diocese operationally and financially controls DOCT and the DOCT Accounts.

116. ~~79.~~ The funds held in the DOCT Accounts are controlled by the Diocese and used solely for the Diocese's benefit. ~~The~~ DOCT ~~Accounts function as~~ functions as an investment ~~accounts~~ overseer of the Diocese.

117. ~~80.~~ The DOCT Accounts are property of the Diocese's estate, subject to the rights of PNC to the Pledged Accounts under the PNC Loan.

118. 81. At the time of the PNC Loan, PNC believed that DOCT housed the bulk of the Diocese's unrestricted assets.

119. 82. A dispute exists as to whether the DOCT Accounts constitute property of the estate.

120. 83. Therefore, the Committee respectfully seeks an order of this Court declaring that the DOCT Accounts are property of the Debtor's estate.

## **COUNT TWO**

### **(Declaratory Relief: Substantive Consolidation)**

121. 84. The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

122. 85. Prior to the Petition Date, parties dealt with the Diocese and DOCT as a single institution.

123. 86. The Diocese held DOCT out as housing the bulk of the Diocese's unrestricted assets.

124. 87. The Defendants are mere instrumentalities of one another, and DOCT has no separate existence apart from the Diocese.  The Diocese's affairs are so entangled with those of DOCT that substantive consolidation of the Diocese and DOCT will benefit all of the Debtor's creditors including, but not limited to, the survivors of sexual abuse which are the Committee's constituents (the "Survivor Claimants").

125. 88. The separateness of the Defendants was disregarded so significantly prior to the Petition Date that creditors relied on the breakdown of entity borders and treated them as one legal entity.

126. ~~89.~~ The time and expense necessary to attempt to unscramble the entanglement of the Debtor's affairs with that of DOCT is so substantial that no accurate identification and allocation of assets is possible in the absence of substantive consolidation.

127. ~~90.~~ No harm will come to the Defendants should this Court enter an order of substantive consolidation because these entities are already so entirely entangled.

128. ~~91.~~ Substantive consolidation will allow a truly equitable distribution of assets among the Debtor's creditors by treating DOCT as a single economic unit along with the Diocese.

129. ~~92.~~ If the Defendants are not substantively consolidated, the Diocese will receive a windfall at the expense of creditors of the Diocese, including the Survivor Claimants.

130. ~~93.~~ A dispute exists as to whether DOCT has an identity separate from that of the Diocese and whether the Diocese's affairs are so entangled with those of DOCT.

131. ~~94.~~ Wherefore, the Committee respectfully seeks entry of an order of this Court ordering substantive consolidation, *nunc pro tunc*, of the Debtor's estate with DOCT effective as of October 1, 2020.

## COUNT THREE

**(Declaratory Relief: Alter Ego (The Diocese and DOCT constitute a single entity))**

132. ~~95.~~ The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

133. ~~96.~~ Through the Bishop and with the assistance of other high-level management personnel of the Diocese, the Diocese exercises such a high degree of domination and control over DOCT that DOCT has no separate existence but rather Defendants operate as a single entity and enterprise.

134. 97. There is a unity of interest and ownership between the Defendants that the separate personalities of the corporation and the owners no longer exist.

135. 98. DOCT was created and operates merely for the purpose of funding the Diocese's capital needs and shielding funds from the Diocese's creditors.

136. 99. DOCT solely serves as a conduit for the Diocese, and the DOCT Accounts are merely investment accounts of the Diocese.

137. 100. DOCT is a mere instrumentality, agent, and/or alter ego of the Diocese that has no legal existence or purpose separate and distinct from the Diocese.

138. 101. The Diocese is attempting to use its bankruptcy filing to obtain a litigation advantage over its abuse survivors and to place the assets it owns and controls beyond the reach of the Survivor Claimants but still within the Diocese's reach and control.

139. 102. Under these circumstances, it would be unfair and inequitable to treat DOCT as a separate entity from the Debtor.

140. 103. To adhere to the doctrine of the corporate entity would promise injustice and/or protect fraud.

141. 104. Wherefore, the Committee respectfully seeks entry of an order declaring that DOCT is a mere instrumentality, agent, and/or alter ego of the Diocese and that the Diocese and DOCT are a single legal entity.

## COUNT FOUR

**(Declaratory Relief: No valid trust exists with respect to any of the DOCT Accounts)**

142. 105. The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

143.   ~~106.~~ The Diocese contends that the funds in the DOCT Accounts are held by the Diocese for the benefit of DOCT.

144.   The Diocese and DOCT concede that DOCT is not a trust.

145.   ~~107.~~ The Diocese further contends that the funds ~~allegedly~~ held in the DOCT Accounts do not constitute property of the Diocese's estate.

146.   ~~108.~~ The Committee, on the other hand, contends that no valid trust exists with respect to any of the assets held by the Diocese in the DOCT Accounts.

147.   ~~109.~~ The Committee contends that neither the Diocese nor DOCT intended that any funds in the DOCT Accounts were to be held in trust by the Diocese for the benefit of DOCT but rather for the benefit of the Diocese.

148.   ~~110.~~ The Committee further contends that both the legal and beneficial interest in the DOCT Accounts, and all of the funds and assets therein, are property of the Diocese's estate, subject to the liens of PNC on the Pledged Accounts.

149.   In fact, none of the Non-PNC DOCT Accounts are Alleged Trust Assets under the terms of the Declaration of Trust.

150.   Because Section 3B:31-18 of New Jersey's Uniform Trust Code requires a trust to be in writing, no valid trust existed, at a minimum, prior to the execution of the Declaration of Trust, and no valid trust has ever existed with respect to the Non-PNC DOCT Accounts.

151.   ~~111.~~ An actual, justiciable controversy exists as to whether any of the DOCT Accounts, and ~~all of~~ the funds therein, are (as the Diocese contends) held in trust by the Diocese for the benefit of DOCT or are (as the Committee contends) owned by the Diocese and constitute property of the Diocese's estate.

152. 112. Wherefore, the Committee respectfully seeks entry of an order declaring that the funds in the DOCT Accounts are not held in trust by the Diocese for the benefit of DOCT, and that the DOCT Accounts, and all of the funds therein, constitute property of the Diocese's estate.

## COUNT FIVE

**(Declaratory Relief: Diocese owns all legal and equitable interest in the DOCT Accounts and therefore a valid trust does not exist)**

153. 113. The Committee repeats and realleges each of the allegations set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

154. 114. Under the doctrine of merger, a valid trust cannot exist where the legal interest in the alleged trust assets and the beneficial interest in the alleged trust assets are held by the same entity.

155.    The Diocese and DOCT concede that DOCT is not a trust.

156. 115. As set forth above, the Committee alleges that the Diocese and DOCT constitute a single legal entity.

157. 116. Therefore, the legal interest in the alleged trust assets Alleged Trust Assets (purportedly held by the Diocese) and the beneficial interest in the alleged trust assets (purportedly held by DOCT) are identical and held by the same legal entity.

158. 117. As a result, no express or resulting trust as alleged by the Diocese can exist with respect to the Alleged Trust Assets or any assets in the DOCT Accounts.

159.    In fact, none of the Non-PNC DOCT Accounts are Alleged Trust Assets under the terms of the Declaration of Trust.

160. 118. The Diocese contends that DOCT is separate from the Diocese, and that the Diocese holds the assets in the DOCT Accounts in trust for DOCT.

27

161.   Because Section 3B:31-18 of New Jersey's Uniform Trust Code requires a trust to be in writing, no valid trust exists.

162.   119. An actual, justiciable controversy exists as to whether the legal and beneficial interest in the alleged trust is held by the same legal entity, such that the alleged trust is void.

163.   120. Wherefore, the Committee respectfully seeks entry of an order declaring that the assets in the DOCT Accounts are not held in trust by the Diocese for the benefit of DOCT, and that the DOCT Accounts, and all of the funds therein, constitute property of the Diocese's estate.

## COUNT SIX

**(Avoidance of Declaration of Trust, 11 U.S.C. §§ 548(e)(1) &, 550)**

164.   121. The Committee repeats and realleges each of the allegations set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

165.   The Diocese and DOCT contend that the Diocese funded DOCT with approximately $71.9 million.

166.   The initial funding of DOCT did not involve an actual transfer of assets from a Diocese account to a DOCT account.  Indeed, the Declaration of Trust asserts that the Diocese has held assets of DOCT in custody since in or about June 2001, suggesting that the Diocese simply continued to hold assets as it had before DOCT's incorporation.

167.   The Diocese or did not hold funds of DOCT in custody pursuant to a trustee relationship that existed as of June 2001 or any time prior to the execution of the Declaration of Trust.

168.   In the Declaration of Trust, the Diocese purports to affirm that the DOCT assets the Diocese holds in custody are held for the exclusive use and benefit of DOCT and with equitable ownership vested in DOCT.

169. No trust relationship existed with respect to any DOCT asset that the Diocese held prior to the 2015 Declaration of Trust.

170. ~~122.~~ Pursuant to the Declaration of Trust, the Debtor transferred an interest of the Debtor in property~~,~~ — specifically ~~the DOCT Accounts, to a purported trust (the "~~, its equitable interest in the Alleged Trust~~")~~ Assets—to DOCT and therefore to the Alleged Trust.

171. ~~123.~~ The Declaration of Trust was executed and approved by the Board of DOCT within ten years before the Petition Date.

172. ~~124.~~ The Diocese is the settlor of the Alleged Trust created under the Declaration of Trust.  The Alleged Trust, to the extent it is a valid trust, is a self-settled trust.

173. The Declaration of Trust states that "[u]nder no circumstances will the Diocese be, or be considered or deemed to be, a beneficiary of the trust affirmed and ratified herein and hereby."

174. It is uncontroverted that the purpose of DOCT is to assist the Diocese by providing funding.

175. DOCT has never made any grants or disbursements to any entity other than the Diocese, which would be against DOCT's purpose.

176. ~~125. The~~ Accordingly, notwithstanding any language in the Declaration of Trust to the contrary, the Debtor is the true, ultimate, and sole beneficiary of the Alleged Trust.

177. In the alternative, notwithstanding any language in the Declaration of Trust to the contrary, the Debtor is a de facto beneficiary of the Alleged Trust.

178. ~~126.~~ The Debtor transferred the DOCT Accounts to the self-settled Alleged Trust with the intent to hinder, delay, or defraud current and future creditors.

179. ~~127.~~ Entry into the Declaration of Trust is an avoidable transaction pursuant to 11 U.S.C. § 548(e)(1). ~~Additionally, any subsequent transfer of the Debtor's property into the Alleged Trust constitutes a fraudulent transfer.~~ In accordance with Section 550 of the Bankruptcy Code, the Committee may recover the transfer of the DOCT Accounts to the Alleged Trust for the benefit of the estate and its creditors.

## COUNT SEVEN
### ~~Declaratory Relief: Funds deposited into the DOCT Accounts are untraceable~~
### (Declaration of Trust is Invalid Pursuant to N.J.S.A. 3B:31-19)

180. The Committee repeats and realleges each of the allegations set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

181. The Debtor is the trustee of the Alleged Trust.

182. The Debtor and DOCT concede DOCT is not a trust.

183. The Debtor is the true, ultimate, and sole beneficiary of the Alleged Trust.

184. The Debtor is thus the sole trustee and the sole beneficiary of all beneficial interests of the Alleged Trust.

185. A valid trust was not created by the Declaration of Trust pursuant to N.J.S.A. 3B:31-19.

186. Wherefore, the Committee respectfully seeks entry of an order declaring a valid trust does not exist between DOCT and the Debtor.

### COUNT EIGHT
### (Declaratory Judgment: Diocese Cannot Shield DOCT Accounts from Creditors Pursuant to N.J.S.A. 3B:11-1(a))

187. ~~128.~~ The Committee repeats and realleges each of the allegations set forth in the preceding paragraphs with the same force and effect as if ~~fully~~sully set forth herein.

188.    The Diocese created the Alleged Trust.

189.    To the extent a valid trust exists with respect to the DOCT Accounts, the income or principal of the trust is freely alienable and subject to claims of the Diocese's creditors, notwithstanding any provision to the contrary in the Declaration of Trust, pursuant to N.J.S.A. 3B:11-1(a).

190.    Wherefore, the Committee respectfully seeks entry of an order declaring the DOCT Accounts are freely alienable and subject to claims against the Diocese.

## COUNT NINE

### (Alleged Trust Assets Were Fully Revocable by the Diocese until the Declaration of Trust was Entered in 2015 Pursuant to N.J.S.A. 3B:31-43)

191.    The Committee repeats and realleges each of the allegations set forth in the preceding paragraphs with the same force and effect as if sully set forth herein.

192.    To the extent a valid trust was created in 2001, it was fully revocable by the Diocese until the trust relationship was memorialized in writing.

193.    The Diocese has not provided clear and convincing evidence that it intended that the trust be irrevocable in 2001.

194.    A revocable trust cannot retroactively be converted to an irrevocable trust.

195.    As the Alleged Trust was revocable by the Diocese until at least 2015, the assets in the Alleged Trust were subject to the claims of the Diocese's creditors until at least 2015, including the Survivors.

196.    Because the trust was a revocable trust until at least 2015, the execution of the Declaration of Trust constitutes an irrevocable transfer and/or a fraudulent transfer as to creditors of the Diocese prior to 2015, like the Survivors, who would have been entitled to the assets of the alleged revocable trust.

197. Wherefore, the Committee respectfully seeks entry of an order declaring any trust existing prior to July 10, 2015 and October 15, 2015 respectively, was a revocable trust subject to the claims of then-existing creditors, including the Survivors.

**PRAYER FOR RELIEF**

**WHEREFORE**, the Committee respectfully requests that this Court enter judgment in favor of the Committee as follows:

a.   ~~129. The Diocese contends that funds deposited into~~ Entry of a judgment declaring that the DOCT Accounts are ~~readily identifiable.~~ property of the Debtor's estate;

~~130. The Committee contends that DOCT's funds are comingled with other alleged funds of the Diocese, the Parishes, and other non-debtor affiliates and cannot be adequately traced.~~

b.   Entry of a judgment ordering substantive consolidation, *nunc pro tunc*, of the Debtor's estate with DOCT effective as of October 1, 2020;

c.   Entry of a judgment declaring that DOCT is a mere instrumentality, agent, and/or alter ego of the Diocese and that the Diocese and DOCT are a single legal entity;

~~131. Therefore, even if an express or resulting trust is found to exist,~~ d.   Entry of a judgment declaring that the funds and assets in the DOCT Accounts are not held in trust by the Diocese for the benefit of DOCT, and that the DOCT Accounts, and all of the funds therein, constitute property of the Diocese's estate~~.~~;

~~132. An actual, justiciable controversy exists as to whether the Diocese can meet its burden to prove that the funds deposited into the DOCT Accounts, and comingled with the other alleged funds of the Diocese, can be traced to the assets in the DOCT Accounts.~~

e.   Entry of a judgment that entry into Declaration of Trust is avoidable as a fraudulent transfer pursuant to 11.S.C.C. § 548(e)(1) and 11 U.S.C. § 550;

f.     Entry of a judgment declaring a valid trust does not exist between DOCT and the Debtor;

g.     Entry of a judgment declaring the DOCT Accounts are freely alienable and subject to the claims against the Diocese;

h.     Entry of a judgment declaring any trust existing prior to July 10, 2015 and October 15, 2015 respectively, was a revocable trust subject to the claims of then-existing creditors, including the Survivors; and

i.     Such other and further relief as the Court deems just and equitable.

133. Wherefore, the Committee respectfully seeks entry of an order declaring that that the DOCT Accounts, and all of the funds and assets therein, constitute property of the Diocese's estate.

Dated: October 12December 3, 2021                    **LOWENSTEIN SANDLER LLP**

*/s/ Jeffrey D. Prol*
Jeffrey D. Prol, Esq.
Michael A. Kaplan, Esq.
Colleen Maker, Esq.
One Lowenstein Drive
Roseland, NJ 07068
Telephone:  (973) 597-2500
Facsimile:  (973) 597-2400
Email:  jprol@lowenstein.com
Email:  mkaplan@lowenstein.com
Email:  cmaker@lowenstein.com

*Counsel to the Official Committee of Tort Claimant Creditors*

| Summary report: Litera® Change-Pro for Word 10.13.0.36 Document comparison done on 12/3/2021 4:32:23 PM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://ROS-IWODMSCLSTR/DBIWOV2/210399428/1 | |
| **Modified DMS:** iw://ROS-IWODMSCLSTR/DBIWOV2/210399428/4 | |
| **Changes:** | |
| Add | 415 |
| Delete | 237 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 652 |

# Exhibit B

**LOWENSTEIN SANDLER LLP**
Jeffrey D. Prol, Esq.
Michael A. Kaplan, Esq.
Colleen Maker, Esq.
One Lowenstein Drive
Roseland, NJ 07068
Telephone: (973) 597-2500
*Counsel to the Official Committee of Tort Claimant Creditors*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>THE DIOCESE OF CAMDEN, NEW JERSEY,<br><br>                        Debtor.<br>---------------------------------------------------------<br><br>OFFICIAL COMMITTEE OF TORT CLAIMANT CREDITORS OF THE DIOCESE OF CAMDEN, NEW JERSEY,<br><br>                        Plaintiff,<br><br>v.<br><br>THE DIOCESE OF CAMDEN, NEW JERSEY; CATHEDRAL OF THE IMMACULATE CONCEPTION; CATHOLIC COMMUNITY OF CHRIST OUR LIGHT; CHRIST THE GOOD SHEPHERD PARISH; CHURCH OF CHRIST THE KING; CHRIST THE REDEEMER PARISH; DIVINE MERCY PARISH; HOLY ANGELS PARISH; HOLY CHILD PARISH; PARISH OF THE HOLY CROSS; HOLY EUCHARIST PARISH; CHURCH OF THE HOLY FAMILY; CATHOLIC COMMUNITY OF THE HOLY SPIRIT; HOLY TRINITY PARISH; R.C. CHURCH OF THE INCARNATION; INFANT JESUS | Chapter 11<br><br>Case No. 20-21257 (JNP)<br><br><br><br><br>Adv. Pro. No. 21-01394 (JNP) |

PARISH; MARY, MOTHER OF MERCY
PARISH; MARY, QUEEN OF ALL
SAINTS PARISH; MOST PRECIOUS
BLOOD PARISH; NOTRE DAME DE LA
MER PARISH; OUR LADY OF THE
ANGELS; OUR LADY OF THE
BLESSED SACRAMENT; OUR LADY
OF THE LAKES; OUR LADY, STAR OF
THE SEA; OUR LADY OF GUADALUPE
PARISH; OUR LADY OF HOPE PARISH;
OUR LADY OF PEACE PARISH; OUR
LADY OF PERPETUAL HELP PARISH;
OUR LADY OF SORROWS; PARISH OF
ALL SAINTS; CHURCH OF THE
SACRED HEART; ST. ANDREW THE
APOSTLE'S R.C. CHURCH; ST.
BRENDAN THE NAVIGATOR PARISH;
ST. BRIDGET CATHOLIC CHURCH;
CHURCH OF ST. CHARLES
BORROMEO; ST. CLARE OF ASSISI
PARISH; ST. DAMIEN PARISH; ST.
ELIZABETH ANN SETON; ST.
GABRIEL THE ARCHANGEL PARISH;
ST. GIANNA BERETTA MOLLA
PARISH; ST. JOACHIM PARISH;
PARISH OF ST. JOHN NEUMANN; ST.
JOSEPH'S CATHOLIC CHURCH, SEA
ISLE; ST. JOSEPH'S CHURCH, SOMERS
POINT; ST. JOSEPH PRO-CATHEDRAL;
ST. JOSEPH THE WORKER PARISH;
CHURCH OF ST. KATHARINE
DREXEL; ST. MARY'S R.C. CHURCH;
ST. MARY'S CHURCH; ST. MARY OF
MOUNT CARMEL PARISH; PARISH OF
ST. MAXIMILIAN KOLBE; PARISH OF
ST. MICHAEL THE ARCHANGEL;
PARISH OF ST. MONICA; ST. PADRE
PIO; ST. PETER, MERCHANTVILLE,
N.J. PARISH; CHURCH OF ST. ROSE OF
LIMA; ST. SIMON STOCK PARISH; ST.
STEPHEN'S R.C. CHURCH; ST. TERESA
OF CALCUTTA PARISH; ST. THOMAS'
CATHOLIC CHURCH; CHURCH OF ST.
THOMAS MOORE; ST. VINCENT DE
PAUL PARISH; CHURCH OF SAINTS
PETER AND PAUL; MATER

ECCLESIAE CHAPEL, INC.; SAINT YI
YUN II CHERRY HILL KOREAN
CATHOLIC MISSION, INC.; SAINT
ANDREW KIM KOREAN CATHOLIC
MISSION, INC.; PADRE PIO SHRINE
BUENA BOROUGH, N.J., INC.; HOLY
SPIRIT HIGH SCHOOL; CAMDEN
CATHOLIC HIGH SCHOOL; POPE
PAUL VI HIGH SCHOOL; BISHOP
JAMES T. MCHUGH REGIONAL
SCHOOL; ST. JOSEPH CHILD
DEVELOPMENT CENTER, INC.,

Defendants.

## FIRST AMENDED ADVERSARY COMPLAINT

Plaintiff, the Official Committee of Tort Claimant Creditors (the "Committee") of the Diocese of Camden, New Jersey (the "Debtor" or "Diocese"), by way of this first amended adversary complaint (the "Complaint") against the Diocese and the Parishes, Missions, and Schools (each as defined below, together the "Non-Debtors" and with the Diocese, the "Defendants"), hereby states and alleges as follows:

## PRELIMINARY STATEMENT[1]

1.      By this Complaint, the Committee seeks, *inter alia*, a determination from the Court regarding the ownership of more than $159.5 million in assets, as of August 31, 2021, that are comprised of cash and investments held by the Diocese in five accounts at PNC Bank in the Diocese's name and loans to Non-Debtors. These assets, along with the associated Non-Debtor Deposits comprise the Deposit & Loan Fund, the Parish Trust, and the Revolving Fund (the "DLF") (as further defined below). The DLF, and various elements of the DLF, have

---

[1] Capitalized terms not defined in this Preliminary Statement shall have the meanings ascribed to them in this Complaint.

interchangeably been referred to by the Diocese during the pendency of the Chapter 11 Case as Parish Trusts, the Revolving Fund, and Parish Loans.

2.      The Defendants are inextricably intertwined both operationally and financially. The Defendants shuffle assets between each other with the goal of shielding assets from their creditors.  The Committee urges the Court to see through this façade.  At its core, the Defendants constitute a single unified entity, and Defendants present themselves to the public as such.

3.      To treat the Defendants as separate entities, particularly in light of the Debtor's Chapter 11 Case and the treatment of the Non-Debtors it seeks in the Amended Plan, would severely prejudice the Diocese's creditors, including those survivors who suffered sexual abuse by parties under the collective control of the Defendants.

4.      For example, the Diocese contends that the cash and investments portion of the DLF assets, which are shown to be $117.3 million as of August 31, 2021, are not part of the Diocese's estate, and thus cannot be reached by creditors of the Diocese, including the abuse survivors.

5.      The Committee seeks a declaratory judgment that the Non-Debtors are so entangled with the Diocese and its estate as to require substantive consolidation of each of the Defendants' assets, including each Non-Debtors' allocated share of the DLF.

6.      Alternatively, the Committee seeks a judgment determining that the Non-Debtors are mere instrumentalities, agents, and/or alter egos of the Diocese and that the Defendants are a single legal entity.

7.      The Committee further contends that the Diocese failed to establish, and indeed cannot establish, that a valid trust exists with respect to the $159.5 million of DLF assets.

8.      The Committee further contends that the Diocese owns all legal and equitable interest in the DLF.

9.      The Committee respectfully requests a judgment from this Court declaring the DLF property of the estate.

10.     Finally, the Committee further contends the DLF, and all of the funds and assets held therein on behalf of the Non-Debtors, are comingled with the other alleged funds of the Diocese, and cannot be traced to the assets of each individual Non-Debtor.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this adversary proceeding (the "Adversary Proceeding") pursuant to 28 U.S.C. §§ 157 and 1334(b).

12.     Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409 as this Adversary Proceeding arises under and in connection with a case under Chapter 11 of the Bankruptcy Code that is pending in this District.

13.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

14.     The Committee has standing to pursue this Complaint pursuant to 11 U.S.C. § 1103.[2]

## PARTIES

15.     Plaintiff is the Committee of Tort Claimant Creditors in this Chapter 11 case appointed by the Office of the United States Trustee pursuant to 11 U.S.C. § 1102(a)(1).  The Committee is a party in interest in the Debtor's Chapter 11 case pursuant to 11 U.S.C. § 1109(b).

---

[2] On October 12, 2021, the Committee filed its *Motion for Entry of an Order Granting it Standing and Authorizing it to Prosecute and Settle Certain Claims on Behalf of the Debtor's Estate* (Dkt. 871) (the "Standing Motion"), seeking an order granting standing to pursue Count Two (Alter Ego) only.

5

16.    The Committee is comprised of nine creditors with claims against, *inter alia*, the Diocese based upon sexual abuse by members of the clergy, workers, teachers, volunteers, or other persons or entities associated with or representing the Diocese and/or the Non-Debtors, or other Diocese-related institutions served by the Diocese.

17.    Defendant Diocese of Camden, New Jersey is a New Jersey not-for-profit religious corporation with its principal place of business at 631 Market Street, Camden, New Jersey 08102 and is the Chapter 11 debtor and debtor-in-possession in the underlying bankruptcy proceeding.

18.    The Diocese's governing body is comprised of six members.  The Most Rev. Dennis J. Sullivan (the current Bishop of the Diocese and hereafter the "Bishop") is the President of the Diocese.

19.    Defendant Cathedral of the Immaculate Conception is a New Jersey not-for-profit religious corporation with its principal place of business at 642 Market Street, Camden, New Jersey 08102.

20.    Defendant Catholic Community of Christ Our Light is a New Jersey not-for-profit religious corporation with its principal place of business at 402 Kings Highway North, Cherry Hill, New Jersey 08034.

21.    Defendant Christ the Good Shepherd Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 1655 Magnolia Road, Vineland, New Jersey 08361.

22.    Defendant Church of Christ the King is a New Jersey not-for-profit religious corporation with its principal place of business at 200 Windsor Avenue, Haddonfield, New Jersey 08033.

23.     Defendant Christ the Redeemer Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 318 Carl Hasselhan Drive, Atco, New Jersey 08004.

24.     Defendant Divine Mercy Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 23 West Chestnut Ave, Vineland, New Jersey 08360.

25.     Defendant Holy Angels Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 81 Cooper Street, Woodbury, New Jersey 08096.

26.     Defendant Holy Child Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 13 East Evesham Road, Runnemede, New Jersey 08078.

27.     Defendant Parish of the Holy Cross is a New Jersey not-for-profit religious corporation with its principal place of business at 46 Central Avenue, Bridgeton, New Jersey 08302.

28.     Defendant Holy Eucharist Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 344 Kresson Road, Cherry Hill, New Jersey 08034.

29.     Defendant Church of the Holy Family is a New Jersey not-for-profit religious corporation with its principal place of business at 266 Hurffville Road, Sewell, New Jersey 08080.

30.     Defendant Catholic Community of the Holy Spirit is a New Jersey not-for-profit religious corporation with its principal place of business at 17 Earlington Avenue, Mullica Hill, New Jersey 08062.

31.     Defendant Holy Trinity Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 11 North Kenyon Avenue, Margate City, New Jersey 08402.

32.    Defendant R.C. Church of the Incarnation is a New Jersey not-for-profit religious corporation with its principal place of business at 240 Main Street, Mantua, New Jersey 08051.

33.    Defendant Infant Jesus Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 334 Beach Avenue, Woodbury Heights, New Jersey 08097.

34.    Defendant Mary, Mother of Mercy Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 500 Greentree Road, Glassboro, New Jersey 08028.

35.    Defendant Mary, Queen of All Saints Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 4824 Camden Avenue, Pennsauken, New Jersey 08110.

36.    Defendant Most Precious Blood Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 445 White Horse Pike, West Collingswood, New Jersey 08107.

37.    Defendant Notre Dame de la Mer Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 1500 Central Avenue, North Wildwood, New Jersey 08260.

38.    Defendant Our Lady of the Angels is a New Jersey not-for-profit religious corporation with its principal place of business at 35 East Mechanic Street, Cape May Court House, New Jersey 08210.

39.    Defendant Our Lady of the Blessed Sacrament is a New Jersey not-for-profit religious corporation with its principal place of business at 104 Catawba Avenue, Newfield, New Jersey 08344.

40.     Defendant Our Lady of the Lakes is a New Jersey not-for-profit religious corporation with its principal place of business at 19 Malaga Road, Collings Lakes, New Jersey 08094.

41.     Defendant Our Lady, Star of the Sea is a New Jersey not-for-profit religious corporation with its principal place of business at 520 Lafayette Street, Cape May, New Jersey 08204.

42.     Defendant Our Lady of Guadalupe Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 135 North White Horse Pike, Lindenwold, New Jersey 08021.

43.     Defendant Our Lady of Hope Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 701 Little Gloucester Road, Blackwood, New Jersey 08012.

44.     Defendant Our Lady of Peace Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 32 Carroll Avenue, Williamstown, New Jersey 08094.

45.     Defendant Our Lady of Perpetual Help Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 146 South Pitney Road, Galloway, New Jersey 08205.

46.     Defendant Our Lady of Sorrows is a New Jersey not-for-profit religious corporation with its principal place of business at 724 Maple Avenue, Linwood, New Jersey 08094.

47.     Defendant Parish of All Saints is a New Jersey not-for-profit religious corporation with its principal place of business at 621 Dock Street, Millville, New Jersey 08332.

48.     Defendant The Church of the Sacred Heart is a New Jersey not-for-profit religious corporation with its principal place of business at 1739 Ferry Avenue, Camden, New Jersey 08104.

49.     Defendant St. Andrew the Apostle's R.C. Church is a New Jersey not-for-profit religious corporation with its principal place of business at 27 Kresson-Gibbsboro Road, Gibbsboro, New Jersey 08026.

50.     Defendant St. Brendan the Navigator Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 5012 Dune Drive, Avalon, New Jersey 08202.

51.     Defendant St. Bridget Catholic Church is a New Jersey not-for-profit religious corporation with its principal place of business at 125 Church Street, Glassboro, New Jersey 08028.

52.     Defendant Church of St. Charles Borromeo is a New Jersey not-for-profit religious corporation with its principal place of business at 176 Stagecoach Road, Sicklerville, New Jersey 08081.

53.     Defendant St. Clare of Assisi Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 140 Broad Street, Swedesboro, New Jersey 08085.

54.     Defendant St. Damien Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 1337 Asbury Avenue, Ocean City, New Jersey 08081.

55.     Defendant St. Elizabeth Ann Seton is a New Jersey not-for-profit religious corporation with its principal place of business at 591 New Jersey Avenue, Absecon, New Jersey 08201.

56.     Defendant St. Gabriel the Archangel Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 369 Georgetown Road, Carneys Point, New Jersey 08069.

57.     Defendant St. Gianna Beretta Molla is a New Jersey not-for-profit religious corporation with its principal place of business at 1421 New Road, Northfield, New Jersey 08225.

58.     Defendant St. Joachim Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 601 West Browning Road, Bellmawr, New Jersey 08031.

59.     Defendant Parish of St. John Neumann is a New Jersey not-for-profit religious corporation with its principal place of business at 680 Town Bank Road, North Cape May, New Jersey 08204.

60.     Defendant St. Joseph's Catholic Church, Sea Isle is a New Jersey not-for-profit religious corporation with its principal place of business at 126 44th Street, Sea Isle City, New Jersey 08243.

61.     Defendant St. Joseph's Church, Somers Point is a New Jersey not-for-profit religious corporation with its principal place of business at 606 Shore Road, Somers Point, New Jersey 08244.

62.     Defendant St. Joseph Pro-Cathedral is a New Jersey not-for-profit religious corporation with its principal place of business at 2907 Federal Street, Camden, New Jersey 08105.

63.     Defendant St. Joseph the Worker Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 901 Hopkins Road, Haddon Township, New Jersey 08033.

64.    Defendant Church of St. Katharine Drexel is a New Jersey not-for-profit religious corporation with its principal place of business at 6075 West Jersey Avenue, Egg Harbor Township, New Jersey 08243.

65.    Defendant St. Mary's R.C. Church is a New Jersey not-for-profit religious corporation with its principal place of business at 2001 Springdale Road, Cherry Hill, New Jersey 08003.

66.    Defendant St. Mary's Church is a New Jersey not-for-profit religious corporation with its principal place of business at 426 Monmouth Street, Gloucester, New Jersey 08030.

67.    Defendant St. Mary of Mount Carmel Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 226 French Street, Hammonton, New Jersey 08037.

68.    Defendant Parish of St. Maximilian Kolbe is a New Jersey not-for-profit religious corporation with its principal place of business at 200 Tuckahoe Road, Marmora, New Jersey 08223.

69.    Defendant Parish of St. Michael the Archangel is a New Jersey not-for-profit religious corporation with its principal place of business at 49 West North Street, Clayton, New Jersey 08312.

70.    Defendant Parish of St. Monica is a New Jersey not-for-profit religious corporation with its principal place of business at 2651 Atlantic Avenue, Atlantic City, New Jersey 08401.

71.    Defendant St. Padre Pio is a New Jersey not-for-profit religious corporation with its principal place of business at 4680 Dante Avenue, Vineland, New Jersey 08360.

72.     Defendant St. Peter, Merchantville, NJ Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 43 West Maple Avenue, Merchantville, New Jersey 08109.

73.     Defendant Church of St. Rose of Lima is a New Jersey not-for-profit religious corporation with its principal place of business at 300 East Kings Highway, Haddon Heights, New Jersey 08035.

74.     Defendant St. Simon Stock Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 178 West White Horse Pike, Berlin, New Jersey 08009.

75.     Defendant St. Stephen's R.C. Church is a New Jersey not-for-profit religious corporation with its principal place of business at 6306 Browning Road, Pennsauken, New Jersey 08109.

76.     Defendant St. Teresa of Calcutta Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 809 Park Avenue, Collingswood, New Jersey 08108.

77.     Defendant St. Thomas' Catholic Church is a New Jersey not-for-profit religious corporation with its principal place of business at 331 8th Street South, Brigantine, New Jersey 08203.

78.     Defendant Church of St. Thomas Moore is a New Jersey not-for-profit religious corporation with its principal place of business at 1439 Springdale Road, Cherry Hill, New Jersey 08003.

79.     Defendant St. Vincent de Paul Parish is a New Jersey not-for-profit religious corporation within the Diocese's territory located at 5021 Harding Highway, Mays Landing, New Jersey 08330.

80.     Defendant Church of Saints Peter and Paul is a New Jersey not-for-profit religious corporation with its principal place of business at 362 Ganttown Road, Turnersville, New Jersey 08012.

81.     The entities identified in paragraphs 19–80 above are each referred to individually herein as a "Parish" or collectively as the "Parishes".

82.     Pursuant to Title 16 of New Jersey law, each Parish is governed by a Board of Trustees comprised of the Bishop, the Vicar General of the Diocese, the pastor of the Parish, and two lay members of the Parish.  Each Parish owns the real and personal property used in its ministry.

83.     Certain of the Parishes own twenty-one elementary schools and two high schools affiliated with the Diocese (the "Parish Schools").  The Parish Schools are not separately incorporated, and are part of the Parishes.

84.     Defendant Mater Ecclesiae Chapel, Inc. is a New Jersey not-for-profit corporation with its principal place of business at 261 Cross Keys Road, Berlin, New Jersey 08009.

85.     Defendant Saint Yi Yun II John Cherry Hill Korean Catholic Mission, Inc. is a New Jersey not-for-profit corporation with its principal place of business at 631 Market Street, Camden, New Jersey 08102.

86.     Defendant Saint Andrew Kim Korean Catholic Mission, Inc. is a New Jersey not-for-profit corporation with its principal place of business at 631 Market Street, Camden, New Jersey 08102.

14

87.     Defendant Padre Pio Shrine in Buena Borough, N.J., Inc. is a New Jersey non-profit membership corporation with its principal place of business at 631 Market Street, Camden, New Jersey 08102.

88.     The entities identified in paragraphs 84–87 above are each referred to individually herein as a "Mission" and collectively as the "Missions".

89.     The Missions are incorporated under Title 15A of New Jersey law.  Upon information and belief, aside from incorporation under Title 15A of New Jersey law, the respective corporate governance structures of the Missions mirrors that of the Parishes incorporated under Title 16 of New Jersey law.

90.     The Parishes and Missions are referred to herein each as a "Parish Party" and collectively as the "Parish Parties".

91.     Defendant Holy Spirit High School is a New Jersey not-for-profit corporation with its principal place of business at 500 South New Road, Absecon, New Jersey 08201.  The Bishop is the member of the corporation, and he appoints trustees and certain corporate officers and has certain reserved powers.

92.     Defendant Camden Catholic High School is a New Jersey not-for-profit corporation with its principal place of business at Cuthbert Blvd. and Route 38, Cherry Hill, New Jersey 08002. The Bishop is the member of the corporation, and he appoints trustees and certain corporate officers and has certain reserved powers.

93.     Defendant Pope Paul VI High School is a New Jersey not-for-profit corporation with its principal place of business at 901 Hopkins Road, Haddonfield, New Jersey 08033.  The Bishop is the member of the corporation, and he appoints trustees and certain corporate officers and has certain reserved powers.

15

94.    Defendant Bishop James T. McHugh Regional School is a New Jersey not-for-profit corporation with its principal place of business at 2221 NJ State Highway Route 9 North, Cape May Court House, New Jersey 08210.  The trustees of Bishop James T. McHugh Regional School are *ex officio* the pastors in Cape May County, New Jersey.

95.    Defendant St. Joseph Child Development Center, Inc. is a New Jersey not-for-profit corporation with its principal place of business at 17 Church Street, Camden, New Jersey 08105.  The pastor of St. Joseph's Pro-Cathedral is an *ex officio* trustee of St. Joseph Child Development Center, Inc.  Other trustees are appointed by the Bishop.  The current trustees are Father Jaime Hostios, Mr. James Catrambone, and Ms. Frances Montgomery.

96.    The schools identified in paragraphs 91–95 above are each referred to individually herein as an "Incorporated School" or collectively as the "Incorporated Schools".  The Incorporated Schools and the Parish Schools are each referred to individually herein as a "School" or collectively as the "Schools".

## FACTUAL BACKGROUND

**A.  The Parishes Parties and Declarations of Trust**

97.    Each Parish Party is a party to a *Declaration of Trust* (each a "Declaration of Trust" and collectively the "Declarations of Trust") with the Diocese memorializing an alleged trust under which the Diocese holds certain funds of the Parish Parties.

98.    Each Declaration of Trust is signed by the Bishop and the pastor of the relevant Parish Party.

99.    Each Declaration of Trust relating to a Mission incorrectly asserts that the Mission is incorporated under Title 16 of New Jersey Law.

100.     Each Declaration of Trust substantially mirrors the others.  Ninety-five percent of the Declarations of Trust were executed between 2010 and 2012 but purport to memorialize a pre-existing trustee relationship, at times allegedly dating back decades.

101.     Section 1.2 of each Declaration of Trust provides that the Diocese, as the trustee, may commingle the assets of each Parish Party with its own assets, with assets of the other Parish Parties, and with other assets which the Diocese allegedly holds for other entities.  However, each Declaration of Trust provides that the trustee must maintain records that make the assets held on behalf of the Parish Party "readily identifiable."

102.     Upon information and belief, each Parish Party's assets are and have been commingled at all times with assets of the other Non-Debtors and the Diocese.

103.     The Declarations of Trust are failed attempts at establishing express trusts in accordance with New Jersey law.

**B. The Parish Parties Lack Independent Corporate Control Over Their Own Administration**

104.     The Diocese exercises complete control and domination over the Parish Parties such that the Parish Parties are mere instrumentalities, agents, and/or alter egos of the Diocese that have no legal existence separate and distinct from the Diocese.

105.     The Defendants hold themselves out to the public as a single, unified organization.

106.     Defendants refer to the Parish Parties interchangeably with "The Diocese of Camden, New Jersey."

107.     For instance, on the Diocese's website at http://www.camdendiocese.org (the "Diocese Website"), the Diocese lists that "[t]here are 62 parishes in the six counties *comprising the Diocese.*" (emphasis added).

108.     The Diocese makes an annual representation to the Internal Revenue Service that the Parish Parties are under its supervision or direct control so that the Parish Parties may receive tax-exempt status through group tax-exempt provisions of the Internal Revenue Code.

109.     The Parish Parties and the Diocese do not adhere to corporate formalities or separateness.

110.     The Diocese assumes responsibilities for the Parish Parties which are ordinarily designated to a corporate board.  For example, upon information and belief, the Diocese establishes each Parish Party's mission and strategic priorities, determines criteria for Parish Party membership and to whom it will provide services, executes fiscal management policies, manages risk for the Parish Party, and decides how to use Parish Party property.

111.     The Board of each Parish is comprised of the Bishop, Vicar General, pastor of the Parish, and two lay persons of the Parish.  Vicars General are appointed and serve at the will of the Bishop.  Similarly, the Board of each Mission is comprised primarily of the Bishop and/or trustees appointed by the Bishop.  This allows the Bishop to retain complete authority and responsibility over entities and property within the Diocese, including that of the Parish Parties.

112.     The Diocese is the president of each Parish.

113.     If there is any uncertainty or disagreement between the pastor and lay members of the Board of Trustees for an individual Parish Party, the Bishop or the Vicar General will settle the matter.  Any order or act will not be deemed valid or of effect without the written approval of the Bishop or Vicar General.

114.     The Diocese, through its counsel, dictates the governance of the Parish Parties by advising them to adopt and file uniform Articles of Incorporation and Corporate Bylaws.

115.    The Bishop has the power to dissolve or merge any of the Parish Parties or establish new ones.

116.    The Bishop has the authority to "suppress" any Parish Party in the Diocese.  Upon suppression of a Parish Party, either the assets of the suppressed Parish Party are transferred to another Parish Party in the Diocese, or the Diocese itself succeeds to the assets of the suppressed Parish Party.

117.    The Diocese, through its central administrative offices, provides operational and administrative support to the Parish Parties.

118.    The Bishop appoints the pastor of each Parish Party who can be removed if the Bishop so decides.

119.    The appointment, termination, and all decisions relating to the placement and reassignment of each pastor rests exclusively with the Diocese through the Bishop.

120.    All priests within the Diocese and Parish Parties are subject to the direct control of the Bishop.

121.    The Diocese, through the Bishop, determines a priest's salary, health benefits, vacation, place of residence, and the Diocese, through the Bishop, has the sole exclusive authority over decisions regarding priest placement, discipline, removal, or transfer.

122.    The Diocese provides health insurance and workers compensation insurance for the employees of the Parish Parties through the Diocese's self-insurance program.

123.    Due to the control by the Diocese of the Parish Parties and their employees, allegations of sexual abuse by priests within the Parish Parties are properly pled jointly as against both the Diocese and the individual Parish Party.

124. The Diocese further exercises direct control over legal strategies and choices regarding legal representation in matters involving the Parish Parties.  Indeed, Parish Parties must seek the consent of the Bishop before commencing or entering into any litigation.

## C.  The Schools Lack Independent Corporate Control Over Their Own Administration

125. The Diocese exercises complete control and domination over the Schools such that the Schools are mere instrumentalities, agents, and/or alter egos of the Diocese that have no legal existence separate and distinct from the Diocese.

126. The Diocese controls the Parish Schools through its complete control over the Parishes.

127. The Schools are subject to the general supervision of the Diocese's Superintendent of Schools.

128. Schools can only close with the permission of the Bishop.

129. The Diocese, through its central administrative offices, provides operational and administrative support to the Schools.

130. The Diocese oversees aspects of job training for the Schools' employees.  (*See, e.g.*, Dkt. 3, at ¶ 7; Dkt. 869, at Art. IV(L) (explaining mandatory VIRTUS training).)

131. Due to the control by the Diocese of the Schools and their employees, allegations of sexual abuse by employees of the Schools are properly pled jointly as against both the Diocese and the individual School.

132. The Defendants hold themselves out to the public as a single, unified organization.

133. The Diocese Website contains a section dedicated to Education, and within that a link to "South Jersey Catholic Schools," among other educational avenues, which notes that the Diocese "sponsors 25 elementary schools and 5 high schools throughout Southern New Jersey."

20

134.    Further, the Diocese exercises direct control over legal strategies and choices regarding legal representation in matters involving the Schools.

**D.  The DLF**

135.    The Diocese maintains the DLF, which is a primary example of how the Diocese exercises influence and control over the Non-Debtors.  The mechanics of the DLF, and associated asset and liability balances as of January 31, 2021,[3] are as follows:

a.  Upon information and belief, the Non-Debtors, as well as other affiliates of the Diocese, are required to deposit into the DLF any cash beyond one month of operating expenses.  A schedule produced by the Diocese (the "DLF Schedule") indicates that as of January 31, 2021, the amount of deposits outstanding in the DLF totals at least $111.1 million (the "DLF Deposits").

i.  The Diocese accounting system reflects outstanding DLF deposits in the amount of $138.2 million, a discrepancy from the amount reflected in the DLF Schedule of $27.1 million.  The Committee has determined from the information provided that the full amount of the discrepancy relates to deposits attributable to the Diocesan Cemeteries, but the reason for the discrepancy remains unknown.

b.  The DLF Deposits can be segmented into two broad categories. One segment, which totals $89.1 million as of January 31, 2021, represents deposits made by the Non-Debtors into the DLF ("Non-Debtor Deposits").  The amount of Non-Debtor Deposits represents the liability portion of the DLF, and the Parish Parties earned

---

[3] January 31, 2021 is the most recent date for which the Diocese has provided information to the Committee that reflects both asset and liability balances associated with the DLF.

interest on Non-Debtor Deposits.  The other segment, which totals no less than $22.0 million as of January 31, 2021, represents funds the Diocese itself has deposited into the DLF ("Diocese Deposits").  Since Diocese Deposits represent funds internal to the Diocese, they do not represent a liability of the DLF and are not reported as such in the Diocese audited financial statements.

    i. The audited financial statements prepared by the Diocese include the consolidated financial statements of the Diocese, the Diocese of Camden Trusts, Inc. ("DOC Trusts"), and the Diocese of Camden Healthcare Foundation, Inc. ("DOC Healthcare").

c. Funds received in connection with the DLF are contained in the following six bank and investment accounts at PNC Bank:

    (i)    PNC Bank NA as Custodian under agreement dated 12/12/11 for Diocese of Camden CHFS - Revolving Fund;

    (ii)    PNC Bank NA as Custodian under agreement dated 12/12/11 for Diocese of Camden CHFS - Special Gifts / Tuition Investment;

    (iii)    PNC Bank NA as Custodian under agreement dated 12/12/11 for Diocese of Camden Stock CHFS - Investment Policy;

    (iv)    PNC Bank NA as Custodian under agreement dated 12/12/11 for Diocese of Camden CHFS - Targeted General Investment Policy;

    (v)    PNC Bank NA as Custodian under agreement dated 12/12/11 for Diocese of Camden CHFS - Treasury General; and

    (vi)    PNC Bank NA as Custodian under agreement dated 12/12/11 for Diocese of Camden CHFS – Investment Fund General.

d. The DLF has been in existence for decades, and over time, the bank and investment accounts used by the DLF have been at various financial institutions.

22

e. The Non-Debtors are able to borrow funds from the DLF in the form of unsecured loans with various repayment terms for the purpose of funding capital improvements, or for other funding needs of the Non-Debtors. Accordingly, the assets of the DLF are comprised of: (1) cash and investments, which represent deposits and investment returns on deposits that have not been used to fund loans to the Non-Debtors, and (2) outstanding loans to Non-Debtors. As of August 31, 2021, the assets of the DLF totaled $159.5 million, which are comprised of cash and investments of $117.3 million, and loans to Non-Debtors in the amount of $42.2 million.

136. Prior to the Petition Date, the Diocese's financial reports reflected all assets of the DLF, including both cash and investments and loans to Non-Debtors, as assets of the Diocese. Further, the Diocese's financial reporting prior to the Petition Date also reflected Non-Debtor Deposits as liabilities of the Diocese.

137. Just as with the audited financial statements, the Diocese's accounting data reports cash and investments and loans to Parish Parties as assets of the Debtor, and Non-Debtor Deposits as liabilities of the Debtor.

138. Since the Petition Date, the Diocese, in the financial reporting set forth in the Monthly Operating Reports, has altered the accounting treatment of the DLF by excluding both the assets and liabilities of the DLF. This has been done in an attempt to obfuscate what the DLF is and the fact that the assets and liabilities of the DLF are in fact assets and liabilities of the Debtor.

139. The Debtor concedes that, as of September 30, 2021, $7,392,637 in cash and investments the DLF are property of the estate. (Dkt. 974.)

140. Upon information and belief, that amount is understated by millions of dollars.

141.    Upon information and belief, assets attributable to the Schools are similarly commingled with the assets of other Defendants, and other entities in the DLF.

142.    The Diocese then uses certain accounts in the DLF to process payment of capital expenses for the Parish Parties, deposit loan payments for Parish Parties that have outstanding loan balances, and make various payments to the Schools.  The Parish Parties must request funding from the Diocese from the funds allegedly held on their behalf in the DLF for maintenance, improvement, and repairs on the real property owned by the Parish Parties.

143.    The Diocese asserts that it records activity related to the DLF, including activities relating to the Non-Debtors, in the Diocese's accounting system by creating accounting entries and accounting codes through which it records and prorates the commingled bank and investment accounts.

144.    The Diocese holds legal title to the funds held in the DLF.

145.    Further, upon information and belief, the funds held in the DLF are and have been commingled at all times with non-trust funds of the Diocese and/or funds from more than one Non-Debtor.

146.    The entire balance of the DLF is property of the Diocese's estate under Section 541(a) of the Bankruptcy Code.

**E. The Non-Debtors Lack Independent Financial Control Over Their Own Financial Affairs and the DLF**

147.    The Diocese exercises complete financial control and domination over the Non-Debtors and the DLF through the Bishop.

148.    The Parishes must deposit all funds above what is required for one month of operations into the DLF and must ask the Diocese for funds for capital expenses and loan payments.

24

149.    The Parish Parties own real estate valued at hundreds of millions of dollars.  The
Diocese, through the DLF, provides funding for improvements, maintenance, and repairs on that
real estate.  Such funding includes loans from the Diocese to the Parishes for Parish capital
projects.  (*See, e.g*., DOCT Minutes of Meeting of Board of Trustees, dated of March 23, 2011,
Ex. A.)  The Parish Parties must request funding for the needs of the particular real estate, and the
timing and amount of that funding is dictated and controlled by the Diocese.

150.    The Parish Parties cannot control the use of their facilities and must seek approval
from the Diocese before entering into agreements for even short term use.

151.    Upon information and belief, the Parish Parties are not permitted to approve
fundraising or donations to charity—such decisions are made by the Bishop through the Diocese.

152.    The Diocese strictly requires the Parish Parties to obtain written permission from
the Bishop and the Vicar General before any Parish Party may enter any contract, including
purchasing any interest in real property, entering into any loan, granting any mortgage, establishing
any line of credit, purchasing personal property over a certain amount, entering a lease of any kind
for a term of longer than one year, building any new structure on Parish Party property, renovating
or restoring any existing Parish Party improvements, initiating maintenance projects expected to
cost over a certain amount, or initiating a capital fund campaign in which the total projected annual
expenses exceed a certain amount. Without the Bishop's signature, any contract entered by a Parish
Party is invalid and ineffectual.

153.    Any of the following acts by a Parish Party require approval of the Bishop:

- Election of the secretary/treasurer,
- Opening a bank account,
- Authorizing the treasurer of the corporation to sign checks to withdraw funds from the bank account,
- Authorizing the transfer to have a safe-deposit box,
- Concluding a contract of rental of grand or of buildings, or of purchase or sale of the

25

same, or of securities, or signing a promissory note,

- Borrowing money,
- Constructing a building, and
- Hiring an architect.

154.    Similarly, the budgets of the Schools must be approved by the Diocese.

155.    Upon information and belief, the Diocese requires that it be named as a secondary insured whenever Parish Parties' facilities are used by others.

156.    Upon information and belief, the Non-Debtors are required to follow accounting procedures promulgated by the Diocese and to file budgets and annual reports with the Diocese.

157.    Upon information and belief, the Diocese dictates the Non-Debtors' accounting practices, and even manages, pays for, and oversees implementing the accounting programs used by the Non-Debtors.

158.    The Diocese makes an annual representation to the Internal Revenue Service that the Parish Parties are under its supervision or direct control so that the Parish Parties may receive tax-exempt status through group tax-exempt provisions of the Internal Revenue Code.

159.    The business operations of the Defendants are inextricably intertwined and interdependent, such that the Non-Debtors would not be able to survive as separate entities.

160.    The Diocese raises money through an annual appeal and uses the funds raised to support the Non-Debtors.

161.    Upon information and belief, the Diocese funds all or most of the Non-Debtors' operations either through direct contributions to their budgets or through fundraising programs.

162.    Upon information and belief, the Schools' financial assistance programs are materially subsidized with Diocesan funds.

163.    The Parishes also provide funding to the Diocese through parish assessments, which are used to fund the general operations of the Diocese.  The Diocese assesses the Parishes

ten percent of their annual ordinary income.  Assessments are due on a monthly basis and provide financial support for the Diocese's pastoral, education, religious personnel development (education and care of priest and seminarians), youth, and administrative program areas.

**F. Defendants Routinely Transact with Each Other in a Manner Contrary to Their Individual Best Interests**

164.    The Diocese operationally and financially controls the Non-Debtors.

165.    As a result of the complete day-to-day operational and financial control and domination exercised by the Diocese over the Non-Debtors, the Defendants have failed to observe proper corporate formalities and have not dealt with each other at arm's length.

166.     Upon information and belief, the Non-Debtors frequently follow the Diocese's instructions, even if doing so is not in the best financial interest of the individual Non-Debtor.

167.    For example, upon information and belief, the Diocese has caused the Parish Parties to transfer property to the Diocese and each other for either no or only nominal consideration.

168.    Upon information and belief, the Diocese enters into lease agreements with the Non-Debtors for the use of the Diocese's real property in exchange for little to no consideration.

169.    Upon information and belief, the Parish Parties also provide services and beneficial property rights or property use to other Non-Debtors or other Diocese affiliates without receiving equivalent consideration in exchange.

170.    Upon information and belief, the Diocese holds and sells real property to the Non-Debtors for significantly below fair market value.

171.    The Diocese subsidizes the Non-Debtors without receiving adequate consideration in exchange.

172.    The Diocese also provides loans to the Non-Debtors.

173.    As of April 30, 2021, the Non-Debtors collectively owed between $73.8 million and $77 million in accounts and loans receivable to the Diocese.  Of those amounts, the Diocese has asserted $52.3 million to $53.7 million is uncollectible.

174.    The Diocese alleges that only between $21.5 million and $23.3 million is collectible despite the fact that the assets of the Non-Debtors far exceed the amounts owed and in fact, their cash balance alone in the DLF can satisfy their debt.

**G.  The Chapter 11 Case**

175.    On October 10, 2020 (the "Petition Date"), the Diocese commenced a voluntary case under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in this Court.

176.    The Diocese's commencement of the above-captioned bankruptcy case as of the Petition Date created an "estate" as defined pursuant to 11 U.S.C. § 541(a).

177.    Upon information and belief, the Diocese sought relief under Chapter 11 of the Bankruptcy Code in response to multiple sexual abuse actions filed by the survivors of such abuse, in order to obtain leverage over the victims and to hide financial resources owned and controlled by the Diocese from the survivors.

178.    The Non-Debtors are not legal entities separate from or independent from the Diocese, but rather are merely operating divisions and/or corporate formalities designed to shield assets from creditors of the Diocese.

179.    The balance in the DLF is under the Diocese's complete control.  The DLF is property belonging to the Diocese and should be scheduled as property of the estate.

180.    An actual controversy exists concerning whether the DLF is an asset of the estate.

181.    On October 12, 2021, the Diocese filed its *First Amended Plan of Reorganization* (Dkt. 870) (the "Amended Plan").

182.    Pursuant to the Amended Plan, each of the Non-Debtors are a "Released Party," and therefore will be released from "all claims, obligations, suits, judgments, damages, demands, debts, remedies, causes of action, rights of setoff, other rights, and liabilities whatsoever."

183.    Pursuant to the Amended Plan, the Non-Debtors are each a "Covered Party," and therefore any "Channeled Claim" will be subject to the "Channeling Injunction," (each as defined in the Amended Plan) to permanently enjoin, among other things, abuse survivors from bringing claims against the Non-Debtors.

184.    As "Released Parties" and "Covered Parties" all claims and causes of action against any of the Non-Debtors, including those relating to sexual abuse allegations, will be forever released and enjoined, regardless of whether that Non-Debtor specifically made any contribution to the Plan.

## CAUSES OF ACTION

## COUNT ONE

### (Declaratory Relief: Substantive Consolidation)

185.    The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

186.    Prior to the Petition Date, parties dealt with the Defendants as a single institution.

187.    The Defendants are mere instrumentalities of one another, and the Non-Debtors have no separate existence apart from the Diocese.  The Diocese's affairs are so entangled with those of the Non-Debtors that substantive consolidation of the Diocese and Non-Debtors will benefit all of the Debtor's creditors including, but not limited to, the survivors of sexual abuse which are the Committee's constituents (the "Survivor Claimants").

188.   The separateness of the Defendants was disregarded so significantly prior to the Petition Date that creditors relied on the breakdown of entity borders and treated them as one legal entity.

189.   The time and expense necessary to attempt to unscramble the entanglement of the Debtor's affairs with that of the Non-Debtors is so substantial that no accurate identification and allocation of assets is possible in the absence of substantive consolidation.

190.   No harm will come to the Defendants should this Court enter an order of substantive consolidation because these entities are already so entirely entangled.

191.   Substantive consolidation will allow a truly equitable distribution of assets among the Debtor's creditors by treating the Non-Debtors and the Diocese as a single economic unit.

192.   If the Defendants are not substantively consolidated, the Diocese and Non-Debtors will each receive a windfall at the expense of creditors of the Diocese, including the Survivor Claimants.

193.   A dispute exists as to whether the Non-Debtors have identities separate from that of the Diocese and whether the Diocese's affairs are so entangled with those of the Non-Debtors.

194.   Wherefore, the Committee respectfully seeks entry of an order of this Court ordering substantive consolidation, *nunc pro tunc*, of the Debtor's estate with the Non-Debtors effective as of October 1, 2020.

## COUNT TWO

### (Declaratory Relief: Alter Ego (the Defendants constitute a single entity))

195.   The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

196.    Through the Bishop and with the assistance of other high-level management personnel of the Diocese, the Diocese exercised such a high degree of domination and control over the Non-Debtors that the Non-Debtors have no separate existence but rather operate as a single entity and enterprise.

197.    There is a unity of interest and ownership between the Defendants such that the separate personalities of the corporations and the owners no longer exist.

198.    The Non-Debtors are mere instrumentalities, agents, and/or alter egos of the Diocese that have no legal existence or purpose separate and distinct from the Diocese.

199.    The Diocese is attempting to use its bankruptcy filing to obtain a litigation advantage over its abuse survivors and to place assets it owns and controls beyond the reach of the abuse survivors but still within the Diocese's reach and control.

200.    Under these circumstances, it would be unfair and inequitable to treat the Non-Debtors as separate entities from the Debtor.

201.    To adhere to the doctrine of the corporate entity would promise injustice and/or protect fraud.

202.    Wherefore, the Committee respectfully seeks entry of an order declaring that the Non-Debtors are mere instrumentalities, agents, and/or alter egos of the Diocese and that the Defendants are a single legal entity.

## **COUNT THREE**

### **(Declaratory Relief: No valid trust exists with respect to the DLF)**

203.    The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

204.    The Diocese contends that the funds in the DLF are held by the Diocese for the benefit of the Non-Debtors.

205.    The Diocese further contends that the funds allegedly held in the DLF do not constitute property of the Diocese's estate.

206.    The Committee, on the other hand, contends that no valid trust exists with respect to any of the assets held by the Diocese in the DLF.

207.    The Committee contends that neither the Diocese nor the Non-Debtors intended that any funds in the DLF were to be held in trust by the Diocese for the benefit of the Non-Debtors but rather for the benefit of the Diocese.

208.    The Committee further contends that both the legal and beneficial interest in the DLF, and all of the funds and assets therein, are property of the Diocese's estate, free and clear of the interests of any other person or entity.

209.    An actual, justiciable controversy exists as to whether the DLF, and all of the funds therein, are (as the Diocese contends) held in trust by the Diocese for the benefit of the Non-Debtors or are (as the Committee contends) owned by the Diocese and constitute property of the Diocese's estate.

210.    Wherefore, the Committee respectfully seeks entry of an order declaring that the funds in the DLF are not held in trust by the Diocese for the benefit of the Non-Debtors, and that the DLF, and all of the funds therein, constitute property of the Diocese's estate.

## **COUNT FOUR**

**(Declaratory Relief: Diocese owns all legal and equitable interest in the DLF)**

211.    The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

212.    Under the doctrine of merger, a valid trust cannot exist where the legal interest in the alleged trust assets and the beneficial interest in the alleged trust assets are held by the same entity.

213.    As set forth above, the Committee alleges that the Diocese and the Non-Debtors constitute a single legal entity.

214.    Therefore, the legal interest in the alleged trust assets (purportedly held by the Diocese) and the beneficial interest in the alleged trust assets (purportedly held by the Non-Debtors) are identical and held by the same legal entity.

215.    As a result, no express or resulting trust as alleged by the Diocese can exist with respect to the assets in the DLF.

216.    The Diocese contends that the Non-Debtors are separate from the Diocese, and that the Diocese holds the assets in the DLF in trust for the Non-Debtors.

217.    An actual, justiciable controversy exists as to whether the legal and beneficial interest in the alleged trust is held by the same legal entity, such that the alleged trust is void.

218.    Wherefore, the Committee respectfully seeks entry of an order declaring that the assets in the DLF are not held in trust by the Diocese for the benefit of the Non-Debtors, and that the DLF, and all of the funds therein, constitute property of the Diocese's estate.

## <u>COUNT FIVE</u>

**(Declaratory Relief: The DLF is property of the Debtor's estate)**

219.    The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

220.    The Diocese operationally and financially controls the Non-Debtors.

221.    The funds held in the DLF are controlled by Diocese and used solely for the Diocese's benefit.

222.    The DLF is property of the Diocese's estate, free and clear of all liens, claims, and encumbrances.

223.    A dispute exists as to whether the DLF constitutes property of the estate.

224.    Therefore, the Committee respectfully seeks an order of this Court declaring that the DLF is property of the Debtor's estate.

## COUNT SIX

### (Declaratory Relief: Funds deposited into the DLF are untraceable)

225.    The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

226.    The Diocese contends that funds deposited into the DLF are readily identifiable.

227.    The Committee contends that the Non-Debtors' funds are comingled with other alleged funds of the Diocese, the other Non-Debtors, and other non-debtor affiliates of the Diocese and cannot be adequately traced.

228.    Therefore, even if an express or resulting trust is found to exist, the DLF, and all of the funds therein, constitute property of the Diocese's estate.

229.    An actual, justiciable controversy exists as to whether the Diocese can meet its burden to prove that the funds deposited into the DLF, and comingled with the other alleged funds of the Diocese, can be traced to the assets of the individual Non-Debtors.

230.    Wherefore, the Committee respectfully seeks entry of an order declaring that that the DLF, and all of the funds and assets therein, constitutes property of the Diocese's estate.

34

## PRAYER FOR RELIEF

**WHEREFORE**, the Committee respectfully requests that this Court enter judgment in favor of the Committee as follows:

a.    Entry of a judgment ordering substantive consolidation, *nunc pro tunc*, of the Debtor's estate with the Non-Debtors effective as of October 1, 2020.

b.    Entry of a judgment declaring that the Non-Debtors are mere instrumentalities, agents, and/or alter egos of the Diocese and that the Defendants are a single legal entity;

c.    Entry of a judgment declaring that the funds and assets in the DLF are not held in trust by the Diocese for the benefit of the Non-Debtors, and that the DLF, and all of the funds therein, constitute property of the Diocese's estate;

d.    Entry of a judgment declaring that the DLF is property of the estate;

e.    Entry of a judgment declaring that the DLF, and all funds and assets therein, constitutes property of the Diocese's estate; and

j.    Such other and further relief as the Court deems just and equitable.

Dated: December 3, 2021                    **LOWENSTEIN SANDLER LLP**

*/s/ Jeffrey D. Prol*
Jeffrey D. Prol, Esq.
Michael A. Kaplan, Esq.
Colleen Maker, Esq.
One Lowenstein Drive
Roseland, NJ 07068
Telephone:  (973) 597-2500
Facsimile:  (973) 597-2400
Email:  jprol@lowenstein.com
Email:  mkaplan@lowenstein.com
Email:  cmaker@lowenstein.com

*Counsel to the Official Committee of Tort
Claimant Creditors*

# Exhibit B-1

**LOWENSTEIN SANDLER LLP**
Jeffrey D. Prol, Esq.
Michael A. Kaplan, Esq.
Colleen Maker, Esq.
One Lowenstein Drive
Roseland, NJ 07068
Telephone: (973) 597-2500
*Counsel to the Official Committee of Tort Claimant Creditors*

<div align="center">

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| In re:<br><br>THE DIOCESE OF CAMDEN, NEW JERSEY,<br><br>            Debtor.<br>-------------------------------------------------------<br><br>OFFICIAL COMMITTEE OF TORT CLAIMANT CREDITORS OF THE DIOCESE OF CAMDEN, NEW JERSEY,<br><br>            Plaintiff,<br><br>v.<br><br>THE DIOCESE OF CAMDEN, NEW JERSEY; CATHEDRAL OF THE IMMACULATE CONCEPTION; CATHOLIC COMMUNITY OF CHRIST OUR LIGHT; CHRIST THE GOOD SHEPHERD PARISH; CHURCH OF CHRIST THE KING; CHRIST THE REDEEMER PARISH; DIVINE MERCY PARISH; HOLY ANGELS PARISH; HOLY CHILD PARISH; PARISH OF THE HOLY CROSS; HOLY EUCHARIST PARISH; CHURCH OF THE HOLY FAMILY; CATHOLIC COMMUNITY OF THE HOLY SPIRIT; HOLY TRINITY PARISH; R.C. CHURCH OF THE INCARNATION; INFANT JESUS | Chapter 11<br><br>Case No. 20-21257 (JNP)<br><br><br><br><br><br>Adv. Pro. No. ~~21-~~21-01394 (JNP) |

PARISH; MARY, MOTHER OF MERCY
PARISH; MARY, QUEEN OF ALL
SAINTS PARISH; MOST PRECIOUS
BLOOD PARISH; NOTRE DAME DE LA
MER PARISH; OUR LADY OF THE
ANGELS; OUR LADY OF THE
BLESSED SACRAMENT; OUR LADY
OF THE LAKES; OUR LADY, STAR OF
THE SEA; OUR LADY OF GUADALUPE
PARISH; OUR LADY OF HOPE PARISH;
OUR LADY OF PEACE PARISH; OUR
LADY OF PERPETUAL HELP PARISH;
OUR LADY OF SORROWS; PARISH OF
ALL SAINTS; CHURCH OF THE
SACRED HEART; ST. ANDREW THE
APOSTLE'S R.C. CHURCH; ST.
BRENDAN THE NAVIGATOR PARISH;
ST. BRIDGET CATHOLIC CHURCH;
CHURCH OF ST. CHARLES
BORROMEO; ST. CLARE OF ASSISI
PARISH; ST. DAMIEN PARISH; ST.
ELIZABETH ANN SETON; ST.
GABRIEL THE ARCHANGEL PARISH;
ST. GIANNA BERETTA MOLLA
PARISH; ST. JOACHIM PARISH;
PARISH OF ST. JOHN NEUMANN; ST.
JOSEPH'S CATHOLIC CHURCH, SEA
ISLE; ST. JOSEPH'S CHURCH, SOMERS
POINT; ST. JOSEPH PRO-CATHEDRAL;
ST. JOSEPH THE WORKER PARISH;
CHURCH OF ST. KATHARINE
DREXEL; ST. MARY'S R.C. CHURCH;
ST. MARY'S CHURCH; ST. MARY OF
MOUNT CARMEL PARISH; PARISH OF
ST. MAXIMILIAN KOLBE; PARISH OF
ST. MICHAEL THE ARCHANGEL;
PARISH OF ST. MONICA; ST. PADRE
PIO; ST. PETER, MERCHANTVILLE,
N.J. PARISH; CHURCH OF ST. ROSE OF
LIMA; ST. SIMON STOCK PARISH; ST.
STEPHEN'S R.C. CHURCH; ST. TERESA
OF CALCUTTA PARISH; ST. THOMAS'
CATHOLIC CHURCH; CHURCH OF ST.
THOMAS MOORE; ST. VINCENT DE
PAUL PARISH; CHURCH OF SAINTS
PETER AND PAUL; MATER

2

ECCLESIAE CHAPEL, INC.; SAINT YI
YUN II CHERRY HILL KOREAN
CATHOLIC MISSION, INC.; SAINT
ANDREW KIM KOREAN CATHOLIC
MISSION, INC.; PADRE PIO SHRINE
BUENA BOROUGH, N.J., INC.; HOLY
SPIRIT HIGH SCHOOL; CAMDEN
CATHOLIC HIGH SCHOOL; POPE
PAUL VI HIGH SCHOOL; BISHOP
JAMES T. MCHUGH REGIONAL
SCHOOL; ST. JOSEPH CHILD
DEVELOPMENT CENTER, INC.,

Defendants.

## **FIRST AMENDED ADVERSARY COMPLAINT**

Plaintiff, the Official Committee of Tort Claimant Creditors (the "Committee") of the
Diocese of Camden, New Jersey (the "Debtor" or "Diocese"), by way of this first amended
adversary complaint (the "Complaint") against the Diocese and the Parishes, Missions, and
Schools (each as defined below, together the "Non-Debtors" and with the Diocese, the
"Defendants"), hereby states and alleges as follows:

### **PRELIMINARY STATEMENT[1]**

1.      By this Complaint, the Committee seeks, *inter alia*, a determination from the Court
regarding the ownership of more than $~~147~~159.5 million in assets, as of ~~January~~August 31, 2021,
that are comprised of cash and investments held by the Diocese in five accounts at PNC Bank in
the Diocese's name and loans to Non-Debtors.  These assets, along with the associated Non-Debtor
Deposits comprise the Deposit & Loan Fund, the Parish Trust, and the Revolving Fund (the
"DLF") (as further defined below).   The DLF, and various elements of the DLF, have

---

[1] Capitalized terms not defined in this Preliminary Statement shall have the meanings ascribed to them in this
Complaint.

interchangeably been referred to by the Diocese during the pendency of the Chapter 11 Case as Parish Trusts, the Revolving Fund, and Parish Loans.

2.    The Defendants are inextricably intertwined both operationally and financially. The Defendants shuffle assets between each other with the goal of shielding assets from their creditors.  The Committee urges the Court to see through this façade.  At its core, the Defendants constitute a single unified entity, and Defendants present themselves to the public as such.

3.    To treat the Defendants as separate entities, particularly in light of the Debtor's Chapter 11 Case and the treatment of the Non-Debtors it ~~intends to seek in a plan of reorganization~~seeks in the Amended Plan, would severely prejudice the Diocese's creditors, including those survivors who suffered sexual abuse by parties under the collective control of the Defendants.

4.    For example, the Diocese contends that the cash and investments portion of the DLF assets, which are shown to be $~~103.5~~117.3 million as of ~~January~~August 31, 2021, are not part of the Diocese's estate, and thus cannot be reached by creditors of the Diocese, including the abuse survivors.

5.    The Committee seeks a declaratory judgment that the Non-Debtors are so entangled with the Diocese and its estate as to require substantive consolidation of each of the Defendants' assets, including each Non-Debtors' allocated share of the DLF.

6.    Alternatively, the Committee seeks a judgment determining that the Non-Debtors are mere instrumentalities, agents, and/or alter egos of the Diocese and that the Defendants are a single legal entity.

7.    The Committee further contends that the Diocese failed to establish, and indeed cannot establish, that a valid trust exists with respect to the $~~147~~159.5 million of DLF assets.

8.      The Committee further contends that the Diocese owns all legal and equitable interest in the DLF.

9.      The Committee respectfully requests a judgment from this Court declaring the DLF property of the estate.

10.      Finally, the Committee further contends the DLF, and all of the funds and assets held therein on behalf of the Non-Debtors, are comingled with the other alleged funds of the Diocese, and cannot be traced to the assets of each individual Non-Debtor.

## JURISDICTION AND VENUE

11.      This Court has jurisdiction over this adversary proceeding (the "Adversary Proceeding") pursuant to 28 U.S.C. §§ 157 and 1334(b).

12.      Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409 as this adversary proceedingAdversary Proceeding arises under and in connection with a case under Chapter 11 of the Bankruptcy Code that is pending in this District.

13.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

14.      The Committee has standing to pursue this Complaint pursuant to 11 U.S.C. § 1103.[2]

## PARTIES

15.      Plaintiff is the Committee of Tort Claimant Creditors in this Chapter 11 case appointed by the Office of the United States Trustee pursuant to 11 U.S.C. § 1102(a)(1).  The Committee is a party in interest in the Debtor's Chapter 11 case pursuant to 11 U.S.C. § 1109(b).

---

[2] Simultaneously herewithOn October 12, 2021, the Committee has filed a motion forits *Motion for Entry of an Order Granting it Standing and Authorizing it to Prosecute and Settle Certain Claims on Behalf of the Debtor's Estate* (Dkt. 871) (the "Standing Motion"), seeking an order granting standing to pursue Count Two (Alter Ego) only.

16.     The Committee is comprised of nine creditors with claims against, *inter alia*, the Diocese based upon sexual abuse by members of the clergy, workers, teachers, volunteers, or other persons or entities associated with or representing the Diocese and/or the Non-Debtors, or other Diocese-related institutions served by the Diocese.

17.     Defendant Diocese of Camden, New Jersey is a New Jersey not-for-profit religious corporation with its principal place of business at 631 Market Street, Camden, New Jersey 08102 and is the Chapter 11 debtor and debtor-in-possession in the underlying bankruptcy proceeding.

18.     The Diocese's governing body is comprised of six members.  The Most Rev. Dennis J. Sullivan (the current Bishop of the Diocese and hereafter the "Bishop") is the President of the Diocese.

19.     Defendant Cathedral of the Immaculate Conception is a New Jersey not-for-profit religious corporation with its principal place of business at 642 Market Street, Camden, New Jersey 08102.

20.     Defendant Catholic Community of Christ Our Light is a New Jersey not-for-profit religious corporation with its principal place of business at 402 Kings Highway North, Cherry Hill, New Jersey 08034.

21.     Defendant Christ the Good Shepherd Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 1655 Magnolia Road, Vineland, New Jersey 08361.

22.     Defendant Church of Christ the King is a New Jersey not-for-profit religious corporation with its principal place of business at 200 Windsor Avenue, Haddonfield, New Jersey 08033.

23.     Defendant Christ the Redeemer Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 318 Carl Hasselhan Drive, Atco, New Jersey 08004.

24.     Defendant Divine Mercy Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 23 West Chestnut Ave, Vineland, New Jersey 08360.

25.     Defendant Holy Angels Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 81 Cooper Street, Woodbury, New Jersey 08096.

26.     Defendant Holy Child Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 13 East Evesham Road, Runnemede, New Jersey 08078.

27.     Defendant Parish of the Holy Cross is a New Jersey not-for-profit religious corporation with its principal place of business at 46 Central Avenue, Bridgeton, New Jersey 08302.

28.     Defendant Holy Eucharist Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 344 Kresson Road, Cherry Hill, New Jersey 08034.

29.     Defendant Church of the Holy Family is a New Jersey not-for-profit religious corporation with its principal place of business at 266 Hurffville Road, Sewell, New Jersey 08080.

30.     Defendant Catholic Community of the Holy Spirit is a New Jersey not-for-profit religious corporation with its principal place of business at 17 Earlington Avenue, Mullica Hill, New Jersey 08062.

31.     Defendant Holy Trinity Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 11 North Kenyon Avenue, Margate City, New Jersey 08402.

32.     Defendant R.C. Church of the Incarnation is a New Jersey not-for-profit religious corporation with its principal place of business at 240 Main Street, Mantua, New Jersey 08051.

33.     Defendant Infant Jesus Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 334 Beach Avenue, Woodbury Heights, New Jersey 08097.

34.     Defendant Mary, Mother of Mercy Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 500 Greentree Road, Glassboro, New Jersey 08028.

35.     Defendant Mary, Queen of All Saints Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 4824 Camden Avenue, Pennsauken, New Jersey 08110.

36.     Defendant Most Precious Blood Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 445 White Horse Pike, West Collingswood, New Jersey 08107.

37.     Defendant Notre Dame de la Mer Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 1500 Central Avenue, North Wildwood, New Jersey 08260.

38.     Defendant Our Lady of the Angels is a New Jersey not-for-profit religious corporation with its principal place of business at 35 East Mechanic Street, Cape May Court House, New Jersey 08210.

39.     Defendant Our Lady of the Blessed Sacrament is a New Jersey not-for-profit religious corporation with its principal place of business at 104 Catawba Avenue, Newfield, New Jersey 08344.

40.    Defendant Our Lady of the Lakes is a New Jersey not-for-profit religious corporation with its principal place of business at 19 Malaga Road, Collings Lakes, New Jersey 08094.

41.    Defendant Our Lady, Star of the Sea is a New Jersey not-for-profit religious corporation with its principal place of business at 520 Lafayette Street, Cape May, New Jersey 08204.

42.    Defendant Our Lady of Guadalupe Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 135 North White Horse Pike, Lindenwold, New Jersey 08021.

43.    Defendant Our Lady of Hope Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 701 Little Gloucester Road, Blackwood, New Jersey 08012.

44.    Defendant Our Lady of Peace Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 32 Carroll Avenue, Williamstown, New Jersey 08094.

45.    Defendant Our Lady of Perpetual Help Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 146 South Pitney Road, Galloway, New Jersey 08205.

46.    Defendant Our Lady of Sorrows is a New Jersey not-for-profit religious corporation with its principal place of business at 724 Maple Avenue, Linwood, New Jersey 08094.

47.    Defendant Parish of All Saints is a New Jersey not-for-profit religious corporation with its principal place of business at 621 Dock Street, Millville, New Jersey 08332.

48.     Defendant The Church of the Sacred Heart is a New Jersey not-for-profit religious corporation with its principal place of business at 1739 Ferry Avenue, Camden, New Jersey 08104.

49.     Defendant St. Andrew the Apostle's R.C. Church is a New Jersey not-for-profit religious corporation with its principal place of business at 27 Kresson-Gibbsboro Road, Gibbsboro, New Jersey 08026.

50.     Defendant St. Brendan the Navigator Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 5012 Dune Drive, Avalon, New Jersey 08202.

51.     Defendant St. Bridget Catholic Church is a New Jersey not-for-profit religious corporation with its principal place of business at 125 Church Street, Glassboro, New Jersey 08028.

52.     Defendant Church of St. Charles Borromeo is a New Jersey not-for-profit religious corporation with its principal place of business at 176 Stagecoach Road, Sicklerville, New Jersey 08081.

53.     Defendant St. Clare of Assisi Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 140 Broad Street, Swedesboro, New Jersey 08085.

54.     Defendant St. Damien Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 1337 Asbury Avenue, Ocean City, New Jersey 08081.

55.      Defendant St. Elizabeth Ann Seton is a New Jersey not-for-profit religious corporation with its principal place of business at 591 New Jersey Avenue, Absecon, New Jersey 08201.

56.     Defendant St. Gabriel the Archangel Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 369 Georgetown Road, Carneys Point, New Jersey 08069.

57.     Defendant St. Gianna Beretta Molla is a New Jersey not-for-profit religious corporation with its principal place of business at 1421 New Road, Northfield, New Jersey 08225.

58.     Defendant St. Joachim Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 601 West Browning Road, Bellmawr, New Jersey 08031.

59.     Defendant Parish of St. John Neumann is a New Jersey not-for-profit religious corporation with its principal place of business at 680 Town Bank Road, North Cape May, New Jersey 08204.

60.     Defendant St. Joseph's Catholic Church, Sea Isle is a New Jersey not-for-profit religious corporation with its principal place of business at 126 44th Street, Sea Isle City, New Jersey 08243.

61.     Defendant St. Joseph's Church, Somers Point is a New Jersey not-for-profit religious corporation with its principal place of business at 606 Shore Road, Somers Point, New Jersey 08244.

62.     Defendant St. Joseph Pro-Cathedral is a New Jersey not-for-profit religious corporation with its principal place of business at 2907 Federal Street, Camden, New Jersey 08105.

63.     Defendant St. Joseph the Worker Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 901 Hopkins Road, Haddon Township, New Jersey 08033.

64.     Defendant Church of St. Katharine Drexel is a New Jersey not-for-profit religious corporation with its principal place of business at 6075 West Jersey Avenue, Egg Harbor Township, New Jersey 08243.

65.     Defendant St. Mary's R.C. Church is a New Jersey not-for-profit religious corporation with its principal place of business at 2001 Springdale Road, Cherry Hill, New Jersey 08003.

66.     Defendant St. Mary's Church is a New Jersey not-for-profit religious corporation with its principal place of business at 426 Monmouth Street, Gloucester, New Jersey 08030.

67.     Defendant St. Mary of Mount Carmel Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 226 French Street, Hammonton, New Jersey 08037.

68.     Defendant Parish of St. Maximilian Kolbe is a New Jersey not-for-profit religious corporation with its principal place of business at 200 Tuckahoe Road, Marmora, New Jersey 08223.

69.     Defendant Parish of St. Michael the Archangel is a New Jersey not-for-profit religious corporation with its principal place of business at 49 West North Street, Clayton, New Jersey 08312.

70.     Defendant Parish of St. Monica is a New Jersey not-for-profit religious corporation with its principal place of business at 2651 Atlantic Avenue, Atlantic City, New Jersey 08401.

71.     Defendant St. Padre Pio is a New Jersey not-for-profit religious corporation with its principal place of business at 4680 Dante Avenue, Vineland, New Jersey 08360.

72.    Defendant St. Peter, Merchantville, NJ Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 43 West Maple Avenue, Merchantville, New Jersey 08109.

73.    Defendant Church of St. Rose of Lima is a New Jersey not-for-profit religious corporation with its principal place of business at 300 East Kings Highway, Haddon Heights, New Jersey 08035.

74.    Defendant St. Simon Stock Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 178 West White Horse Pike, Berlin, New Jersey 08009.

75.    Defendant St. Stephen's R.C. Church is a New Jersey not-for-profit religious corporation with its principal place of business at 6306 Browning Road, Pennsauken, New Jersey 08109.

76.    Defendant St. Teresa of Calcutta Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 809 Park Avenue, Collingswood, New Jersey 08108.

77.    Defendant St. Thomas' Catholic Church is a New Jersey not-for-profit religious corporation with its principal place of business at 331 8th Street South, Brigantine, New Jersey 08203.

78.    Defendant Church of St. Thomas Moore is a New Jersey not-for-profit religious corporation with its principal place of business at 1439 Springdale Road, Cherry Hill, New Jersey 08003.

79.     Defendant St. Vincent de Paul Parish is a New Jersey not-for-profit religious corporation within the Diocese's territory located at 5021 Harding Highway, Mays Landing, New Jersey 08330.

80.     Defendant Church of Saints Peter and Paul is a New Jersey not-for-profit religious corporation with its principal place of business at 362 Ganttown Road, Turnersville, New Jersey 08012.

81.     The entities identified in paragraphs 19–80 above are each referred to individually herein as a "Parish" or collectively as the "Parishes".

82.     Pursuant to Title 16 of New Jersey law, each Parish is governed by a Board of Trustees comprised of the Bishop, the Vicar General of the Diocese, the pastor of the Parish, and two lay members of the Parish.  Each Parish owns the real and personal property used in its ministry.

83.     Certain of the Parishes own twenty-one elementary schools and two high schools affiliated with the Diocese (the "Parish Schools").  The Parish Schools are not separately incorporated, and are part of the Parishes.

84.     Defendant Mater Ecclesiae Chapel, Inc. is a New Jersey not-for-profit corporation with its principal place of business at 261 Cross Keys Road, Berlin, New Jersey 08009.

85.     Defendant Saint Yi Yun IlII John Cherry Hill Korean Catholic Mission, Inc. is a New Jersey not-for-profit corporation with its principal place of business at 631 Market Street, Camden, New Jersey 08102.

86.     Defendant Saint Andrew Kim Korean Catholic Mission, Inc. is a New Jersey not-for-profit corporation with its principal place of business at 631 Market Street, Camden, New Jersey 08102.

14

87.    Defendant Padre Pio Shrine in Buena Borough, N.J., Inc. is a New Jersey non-profit membership corporation with its principal place of business at 631 Market Street, Camden, New Jersey 08102.

88.    The entities identified in paragraphs 84–87 above are each referred to individually herein as a "Mission" and collectively as the "Missions".

89.    The Missions are incorporated under Title 15A of New Jersey law.    Upon information and belief, aside from incorporation under Title 15A of New Jersey law, the respective corporate governance structures of the Missions mirrors that of the Parishes incorporated under Title 16 of New Jersey law.

90.    The Parishes and Missions are referred to herein each as a "Parish Party" and collectively as the "Parish Parties".

91.    Defendant Holy Spirit High School is a New Jersey not-for-profit corporation with its principal place of business at 500 South New Road, Absecon, New Jersey 08201.  The Bishop is the member of the corporation, and he appoints trustees and certain corporate officers and has certain reserved powers.

92.    Defendant Camden Catholic High School is a New Jersey not-for-profit corporation with its principal place of business at Cuthbert Blvd. and Route 38, Cherry Hill, New Jersey 08002. The Bishop is the member of the corporation, and he appoints trustees and certain corporate officers and has certain reserved powers.

93.    Defendant Pope Paul VI High School is a New Jersey not-for-profit corporation with its principal place of business at 901 Hopkins Road, Haddonfield, New Jersey 08033.  The Bishop is the member of the corporation, and he appoints trustees and certain corporate officers and has certain reserved powers.

94.     Defendant Bishop James T. McHugh Regional School is a New Jersey not-for-profit corporation with its principal place of business at 2221 NJ State Highway Route 9 North, Cape May Court House, New Jersey 08210.  The trustees of Bishop James T. McHugh Regional School are *ex officio* the pastors in Cape May County, New Jersey.

95.     Defendant St. Joseph Child Development Center, Inc. is a New Jersey not-for-profit corporation with its principal place of business at 17 Church Street, Camden, New Jersey 08105. The pastor of St. Joseph's Pro-Cathedral is an *ex officio* trustee of St. Joseph Child Development Center, Inc.  Other trustees are appointed by the Bishop.  The current trustees are Father Jaime Hostios, Mr. James Catrambone, and Ms. Frances Montgomery.

96.     The schools identified in paragraphs 91–95 above are each referred to individually herein as an "Incorporated School" or collectively as the "Incorporated Schools".  The Incorporated Schools and the Parish Schools are each referred to individually herein as a "School" or collectively as the "Schools".

## FACTUAL BACKGROUND

**A.  The Parishes Parties and Declarations of Trust**

97.     ~~Upon information and belief, each~~Each Parish Party is a party to a *Declaration of Trust* (each a "Declaration of Trust" and collectively the "Declarations of Trust") with the Diocese memorializing an alleged trust under which the Diocese holds certain funds of the Parish Parties.

98.     ~~Upon information and belief, each~~Each Declaration of Trust is signed by the Bishop and the pastor of the relevant Parish Party.

99.     ~~Upon information and belief, each~~Each Declaration of Trust relating to a Mission incorrectly asserts that the Mission is incorporated under Title 16 of New Jersey Law.

100.    Each Declaration of Trust substantially mirrors the others.  Ninety-five percent of the Declarations of Trust were executed between 2010 and 2012 but purport to memorialize a pre-existing trustee relationship, at times allegedly dating back decades.

101.    Section 1.2 of each Declaration of Trust provides that the Diocese, as the trustee, may commingle the assets of each Parish Party with its own assets, with assets of the other Parish Parties, and with other assets which the Diocese allegedly holds for other entities.  However, each Declaration of Trust provides that the trustee must maintain records that make the assets held on behalf of the Parish Party "readily identifiable."

102.    Upon information and belief, each Parish Party's assets are and have been commingled at all times with assets of the other Non-Debtors and the Diocese.

103.    The Declarations of Trust are failed attempts at establishing express trusts in accordance with New Jersey law.

## B. The Parish Parties Lack Independent Corporate Control Over Their Own Administration

104.    The Diocese exercises complete control and domination over the Parish Parties such that the Parish Parties are mere instrumentalities, agents, and/or alter egos of the Diocese that have no legal existence separate and distinct from the Diocese.

105.    The Defendants hold themselves out to the public as a single, unified organization.

106.    Defendants ~~use the Diocese's name to~~ refer to the Parish Parties~~.~~ interchangeably with "The Diocese of Camden, New Jersey."

107.    For instance, on the Diocese's website at http://www.camdendiocese.org (the "Diocese Website"), the Diocese lists that "[t]here are 62 parishes in the six counties *comprising the Diocese.*" (emphasis added).

17

108.    ~~Upon information and belief, the~~The Diocese makes an annual representation to the Internal Revenue Service that the Parish Parties are under its supervision or direct control so that the Parish Parties may receive tax-exempt status through group tax-exempt provisions of the Internal Revenue Code.

109.    The Parish Parties and the Diocese do not adhere to corporate formalities or separateness.

110.    ~~For example, upon information and belief, the~~The Diocese assumes responsibilities for the Parish Parties which are ordinarily designated to a corporate board ~~such as establishing~~, For example, upon information and belief, the Diocese establishes each Parish Party's mission and strategic priorities, ~~determining~~determines criteria for Parish Party membership and to whom it will provide services, ~~executing~~executes fiscal management policies, ~~managing~~manages risk for the Parish Party, and ~~deciding~~decides how to use Parish Party property.

111.    ~~Upon information and belief, the~~The Board of each Parish is comprised of the Bishop, Vicar General, pastor of the Parish, and two lay persons of the Parish.  Vicars General are appointed and serve at the will of the Bishop.  Similarly, the Board of each Mission is comprised primarily of the Bishop and/or trustees appointed by the Bishop.  This allows the Bishop to retain complete authority and responsibility over entities and property within the Diocese, including that of the Parish Parties.

112.    The Diocese is the president of each Parish.

113.    If there is any uncertainty or disagreement between the pastor and lay members of the Board of Trustees for an individual Parish Party, the Bishop or the Vicar General will settle the matter.  Any order or act will not be deemed valid or of effect without the written approval of the Bishop or Vicar General.

114. ~~112. Upon information and belief, the Bishop~~The Diocese, through its counsel, dictates the governance of the Parish Parties by ~~requiring~~advising them to adopt and file uniform Articles of Incorporation and Corporate Bylaws.

115. ~~113. Upon information and belief, the~~The Bishop has the ~~unilateral~~ power to dissolve or merge any of the Parish Parties or establish new ones.

116. ~~114. Upon information and belief, the~~The Bishop has the authority to "suppress" any Parish Party in the Diocese.  Upon suppression of a Parish Party, either the assets of the suppressed Parish Party are transferred to another Parish Party in the Diocese, or the Diocese itself succeeds to the assets of the suppressed Parish Party.

117. ~~115.~~ The Diocese, through its central administrative offices, provides operational and administrative support to the Parish Parties.

~~116. The Diocese oversees and controls the employees of the Parish Parties, including many aspects of job training and employees' compensation.~~

118. ~~117.~~ The Bishop appoints the pastor of each Parish Party who can be removed ~~at the will of~~if the Bishop so decides.

119. ~~118. Upon information and belief, the~~The appointment, termination, and all decisions relating to the placement and reassignment of each pastor rests exclusively with the Diocese through the Bishop.

120. ~~119. Upon information and belief, all~~All priests within the Diocese and Parish Parties are subject to the direct control of the Bishop.

121. ~~120. Upon information and belief, the~~The Diocese, through the Bishop, determines a priest's salary, health benefits, vacation, place of residence, and the Diocese, through the Bishop,

has the sole exclusive authority over decisions regarding priest placement, discipline, removal, or transfer.

121. The Diocese provides payroll processing services for the Parish Parties. Upon information and belief, all employees of the Parish Parties are paid from a payroll account owned and maintained by the Diocese.

122. The Diocese provides health insurance and workers compensation insurance for the employees of the Parish Parties through the Diocese's self-insurance program.

123. Due to the control by the Diocese of the Parish Parties and their employees, allegations of sexual abuse by priests within the Parish Parties are properly pled jointly as against both the Diocese and the individual Parish Party.

124. The Diocese further exercises direct control over legal strategies and choices regarding legal representation in matters involving the Parish Parties. Indeed, Parish Parties must seek the consent of the Bishop before commencing or entering into any litigation.

**C. The Schools Lack Independent Corporate Control Over Their Own Administration**

125. The Diocese exercises complete control and domination over the Schools such that the Schools are mere instrumentalities, agents, and/or alter egos of the Diocese that have no legal existence separate and distinct from the Diocese.

126. The Diocese controls the Parish Schools through its complete control over the Parishes.

127. The Schools are subject to the general supervision of the Diocese's Superintendent of Schools.

128. The Diocese conducts School operations and provides comprehensive risk management services to the Schools can only close with the permission of the Bishop.

129. Upon information and belief, the Diocese routinely makes unilateral decisions regarding whether the Schools will remain open or will close.

129.    130. The Diocese, through its central administrative offices, provides operational and administrative support to the Schools.

130.    The Diocese oversees aspects of job training for the Schools' employees. (*See, e.g.*, Dkt. 3, at ¶ 7; Dkt. 869, at Art. IV(L) (explaining mandatory VIRTUS training).)

131. The Diocese oversees and controls the employees of the Schools and the employees' compensation.

132. Upon information and belief, the Diocese oversees many aspects of job training for the Schools' employees.

131.    133. Due to the control by the Diocese of the Schools and their employees, allegations of sexual abuse by employees of the Schools are properly pled jointly as against both the Diocese and the individual School.

132.    134. The Defendants hold themselves out to the public as a single, unified organization.

133.    135. The Diocese Website contains a section dedicated to Education, and within that, a link to "South Jersey Catholic Schools," among other educational avenues, which notes that the Diocese "sponsors 25 elementary schools and 5 high schools throughout Southern New Jersey."

134.    136. Further, the Diocese exercises direct control over legal strategies and choices regarding legal representation in matters involving the Schools.

**D. The DLF**

135. ~~137.~~ The Diocese maintains the DLF, which is a primary example of how the Diocese exercises influence and control over the Non-Debtors. The mechanics of the DLF, and associated asset and liability balances as of January 31, 2021,[3] are as follows:

    a. Upon information and belief, the Non-Debtors, as well as other affiliates of the Diocese, are required to deposit into the DLF any cash beyond one month of operating expenses. A schedule produced by the Diocese (the "DLF Schedule") indicates that as of January 31, 2021, the amount of deposits outstanding in the DLF totals at least $111.1 million (the "DLF Deposits").[4]

        i. The Diocese accounting system reflects outstanding DLF deposits in the amount of $138.2 million, a discrepancy from the amount reflected in the DLF Schedule of $27.1 million. The Committee has determined from the information provided that the full amount of the discrepancy relates to deposits attributable to the Diocesan Cemeteries, but the reason for the discrepancy remains unknown.

    b. The DLF Deposits can be segmented into two broad categories. One segment, which totals $89.1 million as of January 31, 2021, represents deposits made by the Non-Debtors into the DLF ("Non-Debtor Deposits"). The amount of Non-Debtor Deposits represents the liability portion of the DLF, and the Parish Parties earned interest on Non-Debtor Deposits. The other segment, which totals no less than

---

[3] January 31, 2021 is the most recent date for which the Diocese has provided information to the Committee that reflects both asset and liability balances associated with the DLF.

[4] ~~The Diocese accounting system reflects outstanding DLF deposits in the amount of $138.2 million, a discrepancy from the amount reflected in the DLF Schedule of $27.1 million. The Committee has determined from the information provided that the full amount of the discrepancy relates to deposits attributable to the Diocesan Cemeteries, but the reason for the discrepancy remains unknown by the Committee. On several occasions, the Committee has sought an explanation of the discrepancy. Notwithstanding the Committee's requests, no explanation has been provided by the Debtor.~~

$22.0 million as of January 31, 2021, represents funds the Diocese itself has deposited into the DLF ("Diocese Deposits").  Since Diocese Deposits represent funds internal to the Diocese, they do not represent a liability of the DLF and are not reported as such in the Diocese audited financial statements.[5]

    i.   The audited financial statements prepared by the Diocese include the consolidated financial statements of the Diocese, the Diocese of Camden Trusts, Inc. ("DOC Trusts"), and the Diocese of Camden Healthcare Foundation, Inc. ("DOC Healthcare").

c. b. Funds received in connection with the DLF are contained in the following five six bank and investment accounts at PNC Bank:[6]

(i)     PNC Bank NA as Custodian under agreement dated 12/12/11 for Diocese of Camden CHFS - Revolving Fund;

(ii)    PNC Bank NA as Custodian under agreement dated 12/12/11 for Diocese of Camden CHFS - Special Gifts / Tuition Investment;

(iii)   PNC Bank NA as Custodian under agreement dated 12/12/11 for Diocese of Camden Stock CHFS - Investment Policy;

(iv)   PNC Bank NA as Custodian under agreement dated 12/12/11 for Diocese of Camden CHFS - Targeted General Investment Policy; and

(v)    PNC Bank NA as Custodian under agreement dated 12/12/11 for Diocese of Camden CHFS - Treasury General.; and

(vi)   PNC Bank NA as Custodian under agreement dated 12/12/11 for Diocese of Camden CHFS – Investment Fund General.

---

[5]  The audited financial statements prepared by the Diocese include the consolidated financial statements of the Diocese, the Diocese of Camden Trusts, Inc. ("DOC Trusts"), and the Diocese of Camden Healthcare Foundation, Inc. ("DOC Healthcare").

[6] The DLF has been in existence for decades, and over time, the bank and investment accounts used by the DLF have been at various financial institutions.

    d.   The DLF has been in existence for decades, and over time, the bank and investment accounts used by the DLF have been at various financial institutions.

    e.   ~~c.~~The Non-Debtors are able to borrow funds from the DLF in the form of unsecured loans with various repayment terms for the purpose of funding capital improvements, or for other funding needs of the Non-Debtors. Accordingly, the assets of the DLF are comprised of: (1) cash and investments, which represent deposits and investment returns on deposits that have not been used to fund loans to the Non-Debtors, and (2) outstanding loans to Non-Debtors.  As of ~~January~~August 31, 2021, the assets of the DLF totaled $~~147~~159.5 million, which are comprised of cash and investments of $~~103.5~~117.3 million, and loans to Non-Debtors in the amount of $~~43.5~~42.2 million.

136.    ~~138. The Committee's investigation of the Diocese's financial reporting shows that~~ ~~prior~~Prior to the Petition Date, the Diocese's financial reports reflected all assets of the DLF, including both cash and investments and loans to Non-Debtors, as assets of the Diocese.  Further, the Diocese's financial reporting prior to the Petition Date also reflected Non-Debtor Deposits as liabilities of the Diocese.

137.    ~~139. Further, in the context of the bankruptcy, the Diocese produced an export of its accounting system data.  The Committee has extracted and evaluated accounting data that the Debtor has represented relates solely to the Diocese.~~ Just as with the audited financial statements, the Diocese's accounting data reports cash and investments and loans to Parish Parties as assets of the Debtor, and Non-Debtor Deposits as liabilities of the Debtor.

138.    ~~140.~~Since the Petition Date, the Diocese, in the financial reporting set forth in the Monthly Operating Reports, has altered the accounting treatment of the DLF by excluding both

the assets and liabilities of the DLF.  This has been done in an attempt to obfuscate what the DLF

is and the fact that the assets and liabilities of the DLF are in fact assets and liabilities of the Debtor.

139.    The Debtor concedes that, as of September 30, 2021, $7,392,637 in cash and

investments the DLF are property of the estate.  (Dkt. 974.)

140.    Upon information and belief, that amount is understated by millions of dollars.

141.    Upon information and belief, assets attributable to the Schools are similarly

commingled with the assets of other Defendants, and other entities in the DLF.

142.    The Diocese then uses certain accounts in the DLF to process payment of capital

expenses for the Parish Parties, deposit loan payments for Parish Parties that have outstanding loan

balances, and make various payments to the Schools.  The Parish Parties must request funding

from the Diocese from the funds allegedly held on their behalf in the DLF for maintenance,

improvement, and repairs on the real property owned by the Parish Parties.

143.    The Diocese asserts that it records activity related to the DLF, including activities

relating to the Non-Debtors, in the Diocese's accounting system by creating accounting entries

and accounting codes through which it records and prorates the commingled bank and investment

accounts.

144.    The Diocese holds legal title to the funds held in the DLF.

145.    Further, upon information and belief, the funds held in the DLF are and have been

commingled at all times with non-trust funds of the Diocese and/or funds from more than one Non-

Debtor.

146.    The entire balance of the DLF is property of the Diocese's estate under Section

541(a) of the Bankruptcy Code.

**E. The Non-Debtors Lack Independent Financial Control Over Their Own Financial
   Affairs and the DLF**

147.    The Diocese exercises complete financial control and domination over the Non-Debtors and the DLF through the Bishop.

148.    ~~Upon information and belief, the Non-Debtors~~The Parishes must deposit all funds above what is required for one month of operations into the DLF and must ask the Diocese for funds for capital expenses and loan payments.

149.    ~~For example, the~~The Parish Parties own real estate valued at hundreds of millions of dollars.  The Diocese, through the DLF, provides funding for improvements, maintenance, and repairs on that real estate.  Such funding includes loans from the Diocese to the Parishes for Parish capital projects.  (*See, e.g*., DOCT Minutes of Meeting of Board of Trustees, dated of March 23, 2011, Ex. A.)  The Parish Parties must request funding for the needs of the particular real estate, and the timing and amount of that funding is dictated and controlled by the Diocese.

150.    ~~Upon information and belief, the~~The Parish Parties cannot control the use of their facilities and must seek approval from the Diocese before entering into agreements for even short term use.

151.    Upon information and belief, the Parish Parties are not permitted to approve fundraising or donations to charity——such decisions are made by the Bishop through the Diocese.

152.    ~~Upon information and belief, the~~The Diocese strictly requires the Parish Parties to obtain written permission ~~(in the form of a proxy vote)~~ from the Bishop and the Vicar General before any Parish Party may ~~take~~enter any ~~number of actions~~contract, including purchasing any interest in real property, entering into any loan, granting any mortgage, establishing any line of credit, purchasing personal property ~~of $25,000 or more,~~over a certain amount, entering a lease of any kind for a term of longer than one year, building any new structure on Parish Party property, renovating or restoring any existing Parish Party improvements, initiating maintenance projects ~~of~~

~~$25,000 or more~~expected to cost over a certain amount, or initiating a capital fund campaign in which the total projected annual expenses exceed ~~$25,000.~~a certain amount. Without the Bishop's signature, any contract entered by a Parish Party is invalid and ineffectual.

153.    Any of the following acts by a Parish Party require approval of the Bishop:

- Election of the secretary/treasurer,
- Opening a bank account,
- Authorizing the treasurer of the corporation to sign checks to withdraw funds from the bank account,
- Authorizing the transfer to have a safe-deposit box,
- Concluding a contract of rental of grand or of buildings, or of purchase or sale of the same, or of securities, or signing a promissory note,
- Borrowing money,
- Constructing a building, and
- Hiring an architect.

154.    ~~153.~~Similarly, the budgets of the Schools must be approved by the Diocese.

155.    ~~154.~~Upon information and belief, the Diocese requires that it be named as a secondary insured whenever Parish Parties' facilities are used by others.

156.    ~~155.~~Upon information and belief, the Non-Debtors are required to follow accounting procedures promulgated by the Diocese and to file budgets and annual reports with the Diocese.

157.    ~~156.~~Upon information and belief, the Diocese dictates the Non-Debtors' accounting practices, and even manages, pays for, and oversees implementing the accounting programs used by the Non-Debtors.

158.    ~~157. Upon information and belief, the~~The Diocese makes an annual representation to the Internal Revenue Service that the Parish Parties are under its supervision or direct control so that the Parish Parties may receive tax-exempt status through group tax-exempt provisions of the Internal Revenue Code.

159. 158. The business operations of the Defendants are inextricably intertwined and interdependent, such that the Non-Debtors would not be able to survive as separate entities.

160. 159. The Diocese raises money through an annual appeal and uses the funds raised to support the Non-Debtors.

161. 160. Upon information and belief, the Diocese funds all or most of the Non-Debtors' operations either through direct contributions to their budgets or through fundraising programs.

162. 161. Upon information and belief, the Schools' financial assistance programs are materially subsidized with Diocesan funds.

163. 162. Upon information and belief, the Parish Parties The Parishes also provide funding to the Diocese through parish assessments, which are used to fund the general operations of the Diocese.  The Diocese assesses the Non-Debtors Parishes ten percent of their annual ordinary income.  Assessments are due on a monthly basis and provide financial support for the Diocese's pastoral, education, religious personnel development (education and care of priest and seminarians), youth, and administrative program areas.

**F. Defendants Routinely Transact with Each Other in a Manner Contrary to Their Individual Best Interests**

164. 163. The Diocese operationally and financially controls the Non-Debtors.

165. 164. As a result of the complete day-to-day operational and financial control and domination exercised by the Diocese over the Non-Debtors, the Defendants have failed to observe proper corporate formalities and have not dealt with each other at arm's length.

166. 165.  Upon information and belief, the Non-Debtors frequently follow the Diocese's instructions, even if doing so is not in the best financial interest of the individual Non-Debtor.

28

167. 166. For example, upon information and belief, the Diocese has caused the Parish Parties to transfer property to the Diocese and each other for either no or only nominal consideration.

168. 167. Upon information and belief, the Diocese enters into lease agreements with the Non-Debtors for the use of the Diocese's real property in exchange for little to no consideration.

169. 168. Upon information and belief, the Parish Parties also provide services and beneficial property rights or property use to other Non-Debtors or other Diocese affiliates without receiving equivalent consideration in exchange.

170. 169. Upon information and belief, the Diocese holds and sells real property to the Non-Debtors for significantly below fair market value.

171. 170. The Diocese subsidizes the Non-Debtors without receiving adequate consideration in exchange.

172. 171. The Diocese also provides loans and grants to the Non-Debtors.

173. 172. As of April 30, 2021, the Non-Debtors collectively owed between $73.8 million and $77 million in accounts and loans receivable to the Diocese.  Of those amounts, the Diocese has asserted an allowance, or reduction, of $52.3 million to $53.7 million is uncollectible.

174. 173. Upon information and belief, the The Diocese alleges that only between $21.5 million and $23.3 million is collectible despite the fact that the assets of the Non-Debtors far exceed the amounts owed and in fact, their cash balance alone in the DLF can satisfy their debt.

**G.  The Chapter 11 Case**

175. 174. On October 10, 2020 (the "Petition Date"), the Diocese commenced a voluntary case under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in this Court.

176. 175. The Diocese's commencement of the above-captioned bankruptcy case as of the Petition Date created an "estate" as defined pursuant to 11 U.S.C. § 541(a).

177. 176. Upon information and belief, the Diocese sought relief under Chapter 11 of the Bankruptcy Code in response to multiple sexual abuse actions filed by the survivors of such abuse, in order to obtain leverage over the victims and to hide financial resources owned and controlled by the Diocese from the survivors.

178. 177. The Non-Debtors are not legal entities separate from or independent from the Diocese, but rather are merely operating divisions and/or corporate formalities designed to shield assets from creditors of the Diocese.

179. 178. The balance in the DLF is under the Diocese's complete control.  The DLF is property belonging to the Diocese and should be scheduled as property of the estate.

180. 179. An actual controversy exists concerning whether the DLF is an asset of the estate.

181. 180. On December 31, 2020, the Debtor filed a proposed *Plan of Reorganization* [Dkt. 306], and on March 6October 12, 2021, the DebtorDiocese filed aits *First Amended Plan of Reorganization* [(Dkt. 498]870) (the "ProposedAmended Plan").

182. Pursuant to the Amended Plan, each of the Non-Debtors are a "Released Party," and therefore will be released from "all claims, obligations, suits, judgments, damages, demands, debts, remedies, causes of action, rights of setoff, other rights, and liabilities whatsoever."

183. 181. Pursuant to the ProposedAmended Plan, the Non-Debtors are each a "Covered Party," and therefore any "Channeled Claim" will be subject to the "Channeling Injunction," (each as defined in the Amended Plan) to permanently enjoin, among other things, abuse survivors from bringing claims against the Non-Debtors.

184. As "Released Parties" and "Covered Parties" all claims and causes of action against any of the Non-Debtors, including those relating to sexual abuse allegations, will be forever released and enjoined, regardless of whether that Non-Debtor specifically made any contribution to the Plan.

## CAUSES OF ACTION

## COUNT ONE

### (Declaratory Relief: Substantive Consolidation)

185. 182. The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

186. 183. Prior to the Petition Date, parties dealt with the Defendants as a single institution.

187. 184. The Defendants are mere instrumentalities of one another, and the Non-Debtors have no separate existence apart from the Diocese.  The Diocese's affairs are so entangled with those of the Non-Debtors that substantive consolidation of the Diocese and Non-Debtors will benefit all of the Debtor's creditors including, but not limited to, the survivors of sexual abuse which are the Committee's constituents (the "Survivor Claimants").

188. 185. The separateness of the Defendants was disregarded so significantly prior to the Petition Date that creditors relied on the breakdown of entity borders and treated them as one legal entity.

189. ~~186.~~ The time and expense necessary to attempt to unscramble the entanglement of the Debtor's affairs with that of the Non-Debtors is so substantial that no accurate identification and allocation of assets is possible in the absence of substantive consolidation.

190. ~~187.~~ No harm will come to the Defendants should this Court enter an order of substantive consolidation because these entities are already so entirely entangled.

191. ~~188.~~ Substantive consolidation will allow a truly equitable distribution of assets among the Debtor's creditors by treating the Non-Debtors and the Diocese as a single economic unit.

192. ~~189.~~ If the Defendants are not substantively consolidated, the Diocese and Non-Debtors will each receive a windfall at the expense of creditors of the Diocese, including the Survivor Claimants.

193. ~~190.~~ A dispute exists as to whether the Non-Debtors have identities separate from that of the Diocese and whether the Diocese's affairs are so entangled with those of the Non-Debtors.

194. ~~191.~~ Wherefore, the Committee respectfully seeks entry of an order of this Court ordering substantive consolidation, *nunc pro tunc*, of the Debtor's estate with the Non-Debtors effective as of October 1, 2020.

## COUNT TWO

### (Declaratory Relief: Alter Ego (the Defendants constitute a single entity))

195. ~~192.~~ The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

196. ~~193.~~ Through the Bishop and with the assistance of other high-level management personnel of the Diocese, the Diocese exercised such a high degree of domination and control over

the Non-Debtors that the Non-Debtors have no separate existence but rather operate as a single entity and enterprise.

197. 194. There is a unity of interest and ownership between the Defendants such that the separate personalities of the corporations and the owners no longer exist.

198. 195. The Non-Debtors are mere instrumentalities, agents, and/or alter egos of the Diocese that have no legal existence or purpose separate and distinct from the Diocese.

199. 196. The Diocese is attempting to use its bankruptcy filing to obtain a litigation advantage over its abuse survivors and to place assets it owns and controls beyond the reach of the abuse survivors but still within the Diocese's reach and control.

200. 197. Under these circumstances, it would be unfair and inequitable to treat the Non-Debtors as separate entities from the Debtor.

201. 198. To adhere to the doctrine of the corporate entity would promise injustice and/or protect fraud.

202. 199. Wherefore, the Committee respectfully seeks entry of an order declaring that the Non-Debtors are mere instrumentalities, agents, and/or alter egos of the Diocese and that the Defendants are a single legal entity.

## COUNT THREE

### (Declaratory Relief: No valid trust exists with respect to the DLF)

203. 200. The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

204. 201. The Diocese contends that the funds in the DLF are held by the Diocese for the benefit of the Non-Debtors.

205. 202. The Diocese further contends that the funds allegedly held in the DLF do not constitute property of the Diocese's estate.

206. 203. The Committee, on the other hand, contends that no valid trust exists with respect to any of the assets held by the Diocese in the DLF.

207. 204. The Committee contends that neither the Diocese nor the Non-Debtors intended that any funds in the DLF were to be held in trust by the Diocese for the benefit of the Non-Debtors but rather for the benefit of the Diocese.

208. 205. The Committee further contends that both the legal and beneficial interest in the DLF, and all of the funds and assets therein, are property of the Diocese's estate, free and clear of the interests of any other person or entity.

209. 206. An actual, justiciable controversy exists as to whether the DLF, and all of the funds therein, are (as the Diocese contends) held in trust by the Diocese for the benefit of the Non-Debtors or are (as the Committee contends) owned by the Diocese and constitute property of the Diocese's estate.

210. 207. Wherefore, the Committee respectfully seeks entry of an order declaring that the funds in the DLF are not held in trust by the Diocese for the benefit of the Non-Debtors, and that the DLF, and all of the funds therein, constitute property of the Diocese's estate.

## COUNT FOUR

**(Declaratory Relief: Diocese owns all legal and equitable interest in the DLF)**

211. 208. The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

212. 209. Under the doctrine of merger, a valid trust cannot exist where the legal interest in the alleged trust assets and the beneficial interest in the alleged trust assets are held by the same entity.

213. 210. As set forth above, the Committee alleges that the Diocese and the Non-Debtors constitute a single legal entity.

214. 211. Therefore, the legal interest in the alleged trust assets (purportedly held by the Diocese) and the beneficial interest in the alleged trust assets (purportedly held by the Non-Debtors) are identical and held by the same legal entity.

215. 212. As a result, no express or resulting trust as alleged by the Diocese can exist with respect to the assets in the DLF.

216. 213. The Diocese contends that the Non-Debtors are separate from the Diocese, and that the Diocese holds the assets in the DLF in trust for the Non-Debtors.

217. 214. An actual, justiciable controversy exists as to whether the legal and beneficial interest in the alleged trust is held by the same legal entity, such that the alleged trust is void.

218. 215. Wherefore, the Committee respectfully seeks entry of an order declaring that the assets in the DLF are not held in trust by the Diocese for the benefit of the Non-Debtors, and that the DLF, and all of the funds therein, constitute property of the Diocese's estate.

## COUNT FIVE

### (Declaratory Relief: The DLF is property of the Debtor's estate)

219. 216. The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

220. 217. The Diocese operationally and financially controls the Non-Debtors.

221. 218. The funds held in the DLF are controlled by Diocese and used solely for the Diocese's benefit.

222. 219. The DLF is property of the Diocese's estate, free and clear of all liens, claims, and encumbrances.

223. 220. A dispute exists as to whether the DLF constitutes property of the estate.

224. 221. Therefore, the Committee respectfully seeks an order of this Court declaring that the DLF is property of the Debtor's estate.

## COUNT SIX

**(Declaratory Relief: Funds deposited into the DLF are untraceable)**

225. 222. The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

226. 223. The Diocese contends that funds deposited into the DLF are readily identifiable.

227. 224. The Committee contends that the Non-Debtors' funds are comingled with other alleged funds of the Diocese, the other Non-Debtors, and other non-debtor affiliates of the Diocese and cannot be adequately traced.

228. 225. Therefore, even if an express or resulting trust is found to exist, the DLF, and all of the funds therein, constitute property of the Diocese's estate.

229. 226. An actual, justiciable controversy exists as to whether the Diocese can meet its burden to prove that the funds deposited into the DLF, and comingled with the other alleged funds of the Diocese, can be traced to the assets of the individual Non-Debtors.

230. 227. Wherefore, the Committee respectfully seeks entry of an order declaring that that the DLF, and all of the funds and assets therein, constitutes property of the Diocese's estate.

36

## PRAYER FOR RELIEF

**WHEREFORE**, the Committee respectfully requests that this Court enter judgment in favor of the Committee as follows:

a.  Entry of a judgment ordering substantive consolidation, *nunc pro tunc*, of the Debtor's estate with the Non-Debtors effective as of October 1, 2020.

b.  Entry of a judgment declaring that the Non-Debtors are mere instrumentalities, agents, and/or alter egos of the Diocese and that the Defendants are a single legal entity;

c.  Entry of a judgment declaring that the funds and assets in the DLF are not held in trust by the Diocese for the benefit of the Non-Debtors, and that the DLF, and all of the funds therein, constitute property of the Diocese's estate;

d.  Entry of a judgment declaring that the DLF is property of the estate;

e.  Entry of a judgment declaring that the DLF, and all funds and assets therein, constitutes property of the Diocese's estate; and

j.  Such other and further relief as the Court deems just and equitable.


Dated: ~~October 12~~December 3, 2021                    **LOWENSTEIN SANDLER LLP**

                                        */s/ Jeffrey D. Prol*
                                        Jeffrey D. Prol, Esq.
                                        Michael A. Kaplan, Esq.
                                        Colleen Maker, Esq.
                                        One Lowenstein Drive
                                        Roseland, NJ 07068
                                        Telephone:  (973) 597-2500
                                        Facsimile:  (973) 597-2400
                                        Email:  jprol@lowenstein.com
                                        Email:  mkaplan@lowenstein.com
                                        Email:  cmaker@lowenstein.com

                                        *Counsel to the Official Committee of Tort
                                        Claimant Creditors*

| **Summary report:** | |
|---|---|
| **Litera® Change-Pro for Word 10.13.0.36 Document comparison done on 12/3/2021 3:30:57 PM** | |
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://ROS-IWODMSCLSTR/DBIWOV2/210399427/1 | |
| **Modified DMS:** iw://ROS-IWODMSCLSTR/DBIWOV2/210399427/2 | |
| **Changes:** | |
| Add | 237 |
| Delete | 182 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 419 |

# Exhibit C

**LOWENSTEIN SANDLER LLP**
Jeffrey D. Prol, Esq.
Michael A. Kaplan, Esq.
Colleen Maker, Esq.
One Lowenstein Drive
Roseland, NJ 07068
Telephone: (973) 597-2500
*Counsel to the Official Committee of Tort Claimant Creditors*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| THE DIOCESE OF CAMDEN, NEW JERSEY, | Case No. 20-21257 (JNP) |
| Debtor. | |
| ------------------------------------------------------ | |
| OFFICIAL COMMITTEE OF TORT CLAIMANT CREDITORS OF THE DIOCESE OF CAMDEN, NEW JERSEY, | Adv. Pro. No. 21-_____(JNP) |
| Plaintiff, | |
| v. | |
| THE DIOCESE OF CAMDEN, NEW JERSEY, THE MOST REV. DENNIS J. SULLIVAN, IN HIS CAPACITY AS BISHOP AND PRESIDENT OF THE DIOCESE OF CAMDEN, NEW JERSEY, REVEREND ROBERT E. HUGHES, IN HIS CAPACITY AS VICAR GENERAL AND VICE PRESIDENT OF THE DIOCESE OF CAMDEN, NEW JERSEY, REVEREND MONSIGNOR JOHN H. BURTON, IN HIS CAPACITY AS VICAR GENERAL AND VICE PRESIDENT OF THE DIOCESE OF CAMDEN, NEW JERSEY, REVEREND JOSEPH SZOLACK, IN HIS CAPACITY AS TRUSTEE OF THE DIOCESE OF | |

CAMDEN, NEW JERSEY, REVEREND
JASON T. ROCKS, IN HIS CAPACITY
AS CHANCELLOR AND SECRETARY
OF THE DIOCESE OF CAMDEN, NEW
JERSEY, LAURA MONTGOMERY, IN
HER CAPACITY AS DIOCESAN
FINANCE OFFICER AND CHIEF
FINANCIAL OFFICER OF THE
DIOCESE OF CAMDEN, NEW JERSEY,
REVEREND JAMES L. BARTOLOMA,
IN HIS CAPACITY AS FORMER
TRUSTEE/CHANCELLOR OF THE
DIOCESE OF CAMDEN, NEW JERSEY,
CATHEDRAL OF THE IMMACULATE
CONCEPTION; CATHOLIC
COMMUNITY OF CHRIST OUR LIGHT;
CHRIST THE GOOD SHEPHERD
PARISH; CHURCH OF CHRIST THE
KING; CHRIST THE REDEEMER
PARISH; DIVINE MERCY PARISH;
HOLY ANGELS PARISH; HOLY CHILD
PARISH; PARISH OF THE HOLY
CROSS; HOLY EUCHARIST PARISH;
CHURCH OF THE HOLY FAMILY;
CATHOLIC COMMUNITY OF THE
HOLY SPIRIT; HOLY TRINITY PARISH;
R.C. CHURCH OF THE INCARNATION;
INFANT JESUS PARISH; MARY,
MOTHER OF MERCY PARISH; MARY,
QUEEN OF ALL SAINTS PARISH;
MOST PRECIOUS BLOOD PARISH;
NOTRE DAME DE LA MER PARISH;
OUR LADY OF THE ANGELS; OUR
LADY OF THE BLESSED SACRAMENT;
OUR LADY OF THE LAKES; OUR
LADY, STAR OF THE SEA; OUR LADY
OF GUADALUPE PARISH; OUR LADY
OF HOPE PARISH; OUR LADY OF
PEACE PARISH; OUR LADY OF
PERPETUAL HELP PARISH; OUR
LADY OF SORROWS; PARISH OF ALL
SAINTS; CHURCH OF THE SACRED
HEART; ST. ANDREW THE APOSTLE'S
R.C. CHURCH; ST. BRENDAN THE
NAVIGATOR PARISH; ST. BRIDGET
CATHOLIC CHURCH; CHURCH OF ST.

2

CHARLES BORROMEO; ST. CLARE OF
ASSISI PARISH; ST. DAMIEN PARISH;
ST. ELIZABETH ANN SETON; ST.
GABRIEL THE ARCHANGEL PARISH;
ST. GIANNA BERETTA MOLLA
PARISH; ST. JOACHIM PARISH;
PARISH OF ST. JOHN NEUMANN; ST.
JOSEPH'S CATHOLIC CHURCH, SEA
ISLE; ST. JOSEPH'S CHURCH, SOMERS
POINT; ST. JOSEPH PRO-CATHEDRAL;
ST. JOSEPH THE WORKER PARISH;
CHURCH OF ST. KATHARINE
DREXEL; ST. MARY'S R.C. CHURCH;
ST. MARY'S CHURCH; ST. MARY OF
MOUNT CARMEL PARISH; PARISH OF
ST. MAXIMILIAN KOLBE; PARISH OF
ST. MICHAEL THE ARCHANGEL;
PARISH OF ST. MONICA; ST. PADRE
PIO; ST. PETER, MERCHANTVILLE,
N.J. PARISH; CHURCH OF ST. ROSE OF
LIMA; ST. SIMON STOCK PARISH; ST.
STEPHEN'S R.C. CHURCH; ST. TERESA
OF CALCUTTA PARISH; ST. THOMAS'
CATHOLIC CHURCH; CHURCH OF ST.
THOMAS MOORE; ST. VINCENT DE
PAUL PARISH; CHURCH OF SAINTS
PETER AND PAUL; MATER
ECCLESIAE CHAPEL, INC.; SAINT YI
YUN II CHERRY HILL KOREAN
CATHOLIC MISSION, INC.; SAINT
ANDREW KIM KOREAN CATHOLIC
MISSION, INC.; PADRE PIO SHRINE
BUENA BOROUGH, N.J., INC.; HOLY
SPIRIT HIGH SCHOOL; CAMDEN
CATHOLIC HIGH SCHOOL; POPE
PAUL VI HIGH SCHOOL; BISHOP
JAMES T. MCHUGH REGIONAL
SCHOOL; ST. JOSEPH CHILD
DEVELOPMENT CENTER, INC.,

Defendants.

## ADVERSARY COMPLAINT

Plaintiff, the Official Committee of Tort Claimant Creditors (the "Committee") of the Diocese of Camden, New Jersey (the "Debtor" or "Diocese"), by way of this adversary complaint (the "Complaint") against the Diocese, the Most Rev. Dennis J. Sullivan, in his capacity as Bishop and President of the Diocese (the "Bishop"), the Directors & Officers (as defined below), and the Parish Parties (as defined below) hereby states and alleges as follows:

## PRELIMINARY STATEMENT[1]

1.      This Complaint arises out of the voluntary depletion of the Diocese's estate by the Bishop, the Diocese, and its Directors & Officers for the benefit of non-debtor affiliated entities to the detriment of the Debtor and, in turn, its creditors.

2.      First, the Debtor alleges that the primary source of funding for its day-to-day operations is through Parish Assessments.  During the COVID-19 pandemic, the Bishop, on behalf of the Diocese, elected to waive certain Parish Assessments despite the solvency and indisputable ability of the Parishes to pay the Parish Assessments as they came due.

3.      The Assessment Waiver resulted in insufficient funding to pay creditors of the Debtor, including sexual abuse survivors, insolvency, and ultimately the filing of the Debtor's Chapter 11 Case.  Thus, the Assessment Waiver constituted an avoidable fraudulent transfer under both the Bankruptcy Code and state law.

4.      Second, the Bishop, on behalf of the Diocese, elected to reduce or cancel $52.3 million to $53.7 million of debt owed by the Parish Parties to the Diocese, despite the solvency and ability of those parties to pay the Debt in full while the Debtor claims insolvency.

---

[1] Capitalized terms not defined in this Preliminary Statement shall have the meanings ascribed to them in this Complaint.

5.      The Debt Cancellation benefitted the Parish Parties and offered no value, let alone reasonably equivalent value, in exchange to the Debtor.  Thus, the Debt Cancellation constituted an avoidable fraudulent transfer under both the Bankruptcy Code and state law.

6.      The Bishop's decision to favor the Parish Parties over the Diocese, and his actions which benefitted the Parish Parties to the detriment of the Debtor and its creditors, constitute a breach of the Bishop's fiduciary duties of care and loyalty to the Diocese.

7.      In addition, the Directors & Officers failed to pursue insurance coverage to pay previous survivor claims, which improperly depleted the Diocese's assets by (a) using Diocese funds to resolve prior claims, and (b) foreclosing the Diocese's ability to access prior "claims made" policies on the basis of "interrelated wrongful acts" and "interrelated claims."

8.      Had the Directors & Officers pursued insurance coverage to pay prior survivor claims, such as those paid through the IVCP, significant assets would have been preserved and would be available to respond to the Survivor Claims in this case.  Failing to pursue insurance was thus a breach of the Directors & Officers' fiduciary duty of care.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this adversary proceeding (the "Adversary Proceeding") pursuant to 28 U.S.C. §§ 157 and 1334(b).

10.      Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409 as this Adversary Proceeding arises under and in connection with a case under Chapter 11 of the Bankruptcy Code that is pending in this District.

11.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

12.     To the extent the Committee does not have standing pursuant to 11 U.S.C. § 1103 to bring any cause of action pled herein, the Committee has requested standing to assert such cause of action through a motion filed simultaneously herewith.

## PARTIES

13.     Plaintiff is the Committee of Tort Claimant Creditors in this Chapter 11 case appointed by the Office of the United States Trustee pursuant to 11 U.S.C. § 1102(a)(1).  The Committee is a party in interest in the Debtor's Chapter 11 case pursuant to 11 U.S.C. § 1109(b).

14.     The Committee is comprised of nine creditors with claims against, *inter alia*, the Diocese based upon sexual abuse by members of the clergy, workers, teachers, volunteers, or other persons or entities associated with or representing the Diocese and/or Parish Parties, Schools, or other Diocese-related institutions served by the Diocese.

15.     Defendant Diocese of Camden, New Jersey is a New Jersey not-for-profit religious organization with its principal place of business at 631 Market Street, Camden, New Jersey 08102 and is the Chapter 11 debtor and debtor-in-possession in the underlying bankruptcy proceeding.

16.     Defendant the Most Reverend Dennis J. Sullivan (the "Bishop") is the current Bishop of the Diocese and the President of the Diocese.  Upon information and belief, the Bishop is a citizen and resident of the State of New Jersey.  The Bishop's principal place of business is 631 Market Street, Camden, New Jersey 08102.

17.     Defendant Reverend Robert E. Hughes ("Hughes") is the Vicar General and Vice President of the Diocese. Upon information and belief, Hughes is a citizen and resident of the State of New Jersey.  Hughes' principal place of business is 631 Market Street, Camden, New Jersey 08102.

6

18.     Defendant Reverend Monsignor John H. Burton ("Burton") is the Vicar General and Vice President of the Diocese.  Upon information and belief, Burton is a citizen and resident of the State of New Jersey.  Burton's principal place of business is 631 Market Street, Camden, New Jersey 08102.

19.     Defendant Reverend Joseph Szolack ("Szolack") is a Trustee of the Diocese.  Upon information and belief, Szolack is a citizen and resident of the State of New Jersey.  Szolack's principal place of business is 631 Market Street, Camden, New Jersey 08102.

20.     Defendant Reverend Jason T. Rocks ("Rocks") is the Chancellor and Secretary of the Diocese.  Upon information and belief, Rocks is a citizen and resident of the State of New Jersey.  Rocks' principal place of business is 631 Market Street, Camden, New Jersey 08102.

21.     Defendant Laura Montgomery ("Montgomery") is the Diocesan Finance Officer and Chief Financial Officer of the Diocese.  Upon information and belief, Montgomery is a citizen and resident of the State of New Jersey.  Montgomery's principal place of business is 631 Market Street, Camden, New Jersey 08102.

22.     Defendant Reverend James L. Bartoloma ("Bartoloma" and together with the Bishop, Hughes, Burton, Szolack, Rocks, and Montgomery, the "Directors & Officers") is the former Trustee/Chancellor of the Diocese.  Upon information and belief, Bartoloma is a citizen and resident of the State of New Jersey.  Bartoloma's principal place of business is 226 Hurffsville Road, Sewell, NJ 08080.

23.     Defendant Cathedral of the Immaculate Conception is a New Jersey not-for-profit religious corporation with its principal place of business at 642 Market Street, Camden, New Jersey 08102.

7

24.     Defendant Catholic Community of Christ Our Light is a New Jersey not-for-profit religious corporation with its principal place of business at 402 Kings Highway North, Cherry Hill, New Jersey 08034.

25.     Defendant Christ the Good Shepherd Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 1655 Magnolia Road, Vineland, New Jersey 08361.

26.     Defendant Church of Christ the King is a New Jersey not-for-profit religious corporation with its principal place of business at 200 Windsor Avenue, Haddonfield, New Jersey 08033.

27.     Defendant Christ the Redeemer Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 318 Carl Hasselhan Drive, Atco, New Jersey 08004.

28.     Defendant Divine Mercy Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 23 West Chestnut Ave, Vineland, New Jersey 08360.

29.     Defendant Holy Angels Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 81 Cooper Street, Woodbury, New Jersey 08096.

30.     Defendant Holy Child Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 13 East Evesham Road, Runnemede, New Jersey 08078.

31.     Defendant Parish of the Holy Cross is a New Jersey not-for-profit religious corporation with its principal place of business at 46 Central Avenue, Bridgeton, New Jersey 08302.

32.     Defendant Holy Eucharist Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 344 Kresson Road, Cherry Hill, New Jersey 08034.

33.     Defendant Church of the Holy Family is a New Jersey not-for-profit religious corporation with its principal place of business at 266 Hurffville Road, Sewell, New Jersey 08080.

34.     Defendant Catholic Community of the Holy Spirit is a New Jersey not-for-profit religious corporation with its principal place of business at 17 Earlington Avenue, Mullica Hill, New Jersey 08062.

35.     Defendant Holy Trinity Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 11 North Kenyon Avenue, Margate City, New Jersey 08402.

36.     Defendant R.C. Church of the Incarnation is a New Jersey not-for-profit religious corporation with its principal place of business at 240 Main Street, Mantua, New Jersey 08051.

37.     Defendant Infant Jesus Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 334 Beach Avenue, Woodbury Heights, New Jersey 08097.

38.     Defendant Mary, Mother of Mercy Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 500 Greentree Road, Glassboro, New Jersey 08028.

39.     Defendant Mary, Queen of All Saints Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 4824 Camden Avenue, Pennsauken, New Jersey 08110.

40.     Defendant Most Precious Blood Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 445 White Horse Pike, West Collingswood, New Jersey 08107.

41.    Defendant Notre Dame de la Mer Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 1500 Central Avenue, North Wildwood, New Jersey 08260.

42.    Defendant Our Lady of the Angels is a New Jersey not-for-profit religious corporation with its principal place of business at 35 East Mechanic Street, Cape May Court House, New Jersey 08210.

43.    Defendant Our Lady of the Blessed Sacrament is a New Jersey not-for-profit religious corporation with its principal place of business at 104 Catawba Avenue, Newfield, New Jersey 08344.

44.    Defendant Our Lady of the Lakes is a New Jersey not-for-profit religious corporation with its principal place of business at 19 Malaga Road, Collings Lakes, New Jersey 08094.

45.    Defendant Our Lady, Star of the Sea is a New Jersey not-for-profit religious corporation with its principal place of business at 520 Lafayette Street, Cape May, New Jersey 08204.

46.    Defendant Our Lady of Guadalupe Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 135 North White Horse Pike, Lindenwold, New Jersey 08021.

47.    Defendant Our Lady of Hope Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 701 Little Gloucester Road, Blackwood, New Jersey 08012.

48.     Defendant Our Lady of Peace Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 32 Carroll Avenue, Williamstown, New Jersey 08094.

49.     Defendant Our Lady of Perpetual Help Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 146 South Pitney Road, Galloway, New Jersey 08205.

50.     Defendant Our Lady of Sorrows is a New Jersey not-for-profit religious corporation with its principal place of business at 724 Maple Avenue, Linwood, New Jersey 08094.

51.     Defendant Parish of All Saints is a New Jersey not-for-profit religious corporation with its principal place of business at 621 Dock Street, Millville, New Jersey 08332.

52.     Defendant The Church of the Sacred Heart is a New Jersey not-for-profit religious corporation with its principal place of business at 1739 Ferry Avenue, Camden, New Jersey 08104.

53.     Defendant St. Andrew the Apostle's R.C. Church is a New Jersey not-for-profit religious corporation with its principal place of business at 27 Kresson-Gibbsboro Road, Gibbsboro, New Jersey 08026.

54.     Defendant St. Brendan the Navigator Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 5012 Dune Drive, Avalon, New Jersey 08202.

55.     Defendant St. Bridget Catholic Church is a New Jersey not-for-profit religious corporation with its principal place of business at 125 Church Street, Glassboro, New Jersey 08028.

56.     Defendant Church of St. Charles Borromeo is a New Jersey not-for-profit religious corporation with its principal place of business at 176 Stagecoach Road, Sicklerville, New Jersey 08081.

11

57.    Defendant St. Clare of Assisi Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 140 Broad Street, Swedesboro, New Jersey 08085.

58.    Defendant St. Damien Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 1337 Asbury Avenue, Ocean City, New Jersey 08081.

59.     Defendant St. Elizabeth Ann Seton is a New Jersey not-for-profit religious corporation with its principal place of business at 591 New Jersey Avenue, Absecon, New Jersey 08201.

60.    Defendant St. Gabriel the Archangel Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 369 Georgetown Road, Carneys Point, New Jersey 08069.

61.    Defendant St. Gianna Beretta Molla is a New Jersey not-for-profit religious corporation with its principal place of business at 1421 New Road, Northfield, New Jersey 08225.

62.    Defendant St. Joachim Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 601 West Browning Road, Bellmawr, New Jersey 08031.

63.    Defendant Parish of St. John Neumann is a New Jersey not-for-profit religious corporation with its principal place of business at 680 Town Bank Road, North Cape May, New Jersey 08204.

64.    Defendant St. Joseph's Catholic Church, Sea Isle is a New Jersey not-for-profit religious corporation with its principal place of business at 126 44th Street, Sea Isle City, New Jersey 08243.

65.     Defendant St. Joseph's Church, Somers Point is a New Jersey not-for-profit religious corporation with its principal place of business at 606 Shore Road, Somers Point, New Jersey 08244.

66.     Defendant St. Joseph Pro-Cathedral is a New Jersey not-for-profit religious corporation with its principal place of business at 2907 Federal Street, Camden, New Jersey 08105.

67.     Defendant St. Joseph the Worker Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 901 Hopkins Road, Haddon Township, New Jersey 08033.

68.     Defendant Church of St. Katharine Drexel is a New Jersey not-for-profit religious corporation with its principal place of business at 6075 West Jersey Avenue, Egg Harbor Township, New Jersey 08243.

69.     Defendant St. Mary's R.C. Church is a New Jersey not-for-profit religious corporation with its principal place of business at 2001 Springdale Road, Cherry Hill, New Jersey 08003.

70.     Defendant St. Mary's Church is a New Jersey not-for-profit religious corporation with its principal place of business at 426 Monmouth Street, Gloucester, New Jersey 08030.

71.     Defendant St. Mary of Mount Carmel Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 226 French Street, Hammonton, New Jersey 08037.

72.     Defendant Parish of St. Maximilian Kolbe is a New Jersey not-for-profit religious corporation with its principal place of business at 200 Tuckahoe Road, Marmora, New Jersey 08223.

73.     Defendant Parish of St. Michael the Archangel is a New Jersey not-for-profit religious corporation with its principal place of business at 49 West North Street, Clayton, New Jersey 08312.

74.     Defendant Parish of St. Monica is a New Jersey not-for-profit religious corporation with its principal place of business at 2651 Atlantic Avenue, Atlantic City, New Jersey 08401.

75.     Defendant St. Padre Pio is a New Jersey not-for-profit religious corporation with its principal place of business at 4680 Dante Avenue, Vineland, New Jersey 08360.

76.     Defendant St. Peter, Merchantville, NJ Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 43 West Maple Avenue, Merchantville, New Jersey 08109.

77.     Defendant Church of St. Rose of Lima is a New Jersey not-for-profit religious corporation with its principal place of business at 300 East Kings Highway, Haddon Heights, New Jersey 08035.

78.     Defendant St. Simon Stock Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 178 West White Horse Pike, Berlin, New Jersey 08009.

79.     Defendant St. Stephen's R.C. Church is a New Jersey not-for-profit religious corporation with its principal place of business at 6306 Browning Road, Pennsauken, New Jersey 08109.

80.     Defendant St. Teresa of Calcutta Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 809 Park Avenue, Collingswood, New Jersey 08108.

81.      Defendant St. Thomas' Catholic Church is a New Jersey not-for-profit religious corporation with its principal place of business at 331 8th Street South, Brigantine, New Jersey 08203.

82.      Defendant Church of St. Thomas Moore is a New Jersey not-for-profit religious corporation with its principal place of business at 1439 Springdale Road, Cherry Hill, New Jersey 08003.

83.      Defendant St. Vincent de Paul Parish is a New Jersey not-for-profit religious corporation within the Diocese's territory located at 5021 Harding Highway, Mays Landing, New Jersey 08330.

84.      Defendant Church of Saints Peter and Paul is a New Jersey not-for-profit religious corporation with its principal place of business at 362 Ganttown Road, Turnersville, New Jersey 08012.

85.      The entities identified in paragraphs 23–84 above are each referred to individually herein as a "Parish" or collectively as the "Parishes".

86.      Certain of the Parishes own twenty-one elementary schools and two high schools affiliated with the Diocese (the "Parish Schools").  The Parish Schools are not separately incorporated, and are part of the Parishes.

87.      Defendant Mater Ecclesiae Chapel, Inc. is a New Jersey not-for-profit corporation with its principal place of business at 261 Cross Keys Road, Berlin, New Jersey 08009.

88.      Defendant Saint Yi Yun II John Cherry Hill Korean Catholic Mission, Inc. is a New Jersey not-for-profit corporation with its principal place of business at 631 Market Street, Camden, New Jersey 08102.

89.     Defendant Saint Andrew Kim Korean Catholic Mission, Inc. is a New Jersey not-for-profit corporation with its principal place of business at 631 Market Street, Camden, New Jersey 08102.

90.     Defendant Padre Pio Shrine in Buena Borough, N.J., Inc. is a New Jersey not-for-profit membership corporation with its principal place of business at 631 Market Street, Camden, New Jersey 08102.

91.     The entities identified in paragraphs 87–90 above are each referred to individually herein as a "Mission" and collectively as the "Missions".

92.     The Missions are incorporated under Title 15A of New Jersey law.  Upon information and belief, aside from incorporation under Title 15A of New Jersey law, the respective corporate governance structures of the Missions mirrors that of the Parishes incorporated under Title 16 of New Jersey law.

93.     Defendant Holy Spirit High School is a New Jersey not-for-profit corporation with its principal place of business at 500 South New Road, Absecon, New Jersey 08201.  The Bishop is the member of the corporation, and he appoints trustees and certain corporate officers and has certain reserved powers.

94.     Defendant Camden Catholic High School is a New Jersey not-for-profit corporation with its principal place of business at Cuthbert Blvd. and Route 38, Cherry Hill, New Jersey 08002.  The Bishop is the member of the corporation, and he appoints trustees and certain corporate officers and has certain reserved powers.

95.     Defendant Pope Paul VI High School is a New Jersey not-for-profit corporation with its principal place of business at 901 Hopkins Road, Haddonfield, New Jersey 08033.  The

Bishop is the member of the corporation, and he appoints trustees and certain corporate officers and has certain reserved powers.

96.     Defendant Bishop James T. McHugh Regional School is a New Jersey not-for-profit corporation with its principal place of business at 2221 NJ State Highway Route 9 North, Cape May Court House, New Jersey 08210.  The trustees of Bishop James T. McHugh Regional School are *ex officio* the pastors in Cape May County, New Jersey.

97.     Defendant St. Joseph Child Development Center, Inc. is a New Jersey not-for-profit corporation with its principal place of business at 17 Church Street, Camden, New Jersey 08105.  The pastor of St. Joseph's Pro-Cathedral is an *ex officio* trustee of St. Joseph Child Development Center, Inc.  Other trustees are appointed by the Bishop.  The current trustees are Father Jaime Hostios, Mr. James Catrambone, and Ms. Frances Montgomery.

98.     The schools identified in paragraphs 93–97 above are each referred to individually herein as an "Incorporated School" or collectively as the "Incorporated Schools".  The Incorporated Schools and the Parish Schools are each referred to individually herein as a "School" and collectively as the "Schools".

99.     The Parishes, Missions, and Schools are each referred to herein as a "Parish Party" and collectively as the "Parish Parties".

## FACTUAL BACKGROUND

### A.  The Diocese's Connection to the Parish Parties

100.     The Diocese serves a six-county region in Southern New Jersey.  The Bishop holds all power over the operation and finances of the Diocese and its related entities.

101.     Each Parish is governed by a Board of Trustees comprised of the Bishop, Vicar General, the Pastor of the Parish, and two lay members of the Parish.  The Vicar General, Pastor,

and lay members are either directly or partially appointed by the Bishop and can be removed by the Bishop at any time.

102.    Upon information and belief, the corporate governance structures of the Missions mirror that of the Parishes.

103.    Accordingly, upon information and belief, the Bishop controls the Missions.

104.    The Bishop controls the Parish Schools through his complete control over the Diocese and Parishes.

105.    The Incorporated Schools are separately incorporated in accordance with Title 15A of New Jersey Law.  The Bishop of the Diocese is the member of each corporation; he appoints the trustees and certain corporate officers, and has certain reserved powers.

106.    The Bishop, directly and through the Diocese, maintains complete operational and financial control over the Parish Parties.

**B.  The Bishop's Financial Control Over the Diocese and Parish Parties**

107.    The Bishop operationally and financially controls the Diocese and Parish Parties.

108.    As a result of the complete day-to-day operational and financial control and domination exercised by the Bishop over the Diocese and Parish Parties, the Diocese and Parish Parties have failed to observe proper corporate formalities and have not dealt with each other at arm's length.

109.    Upon information and belief, the Diocese and Parish Parties adhere to the Bishop's instructions even if doing so is not in the best financial interest of the Diocese or individual Parish Party.

110.    The Bishop, through the Diocese, assesses the Parishes ten percent of their annual ordinary income (the "Parish Assessments").  The Parish Assessments are due to the Diocese on a monthly basis and are a primary source of funds used by the Diocese to support its daily operations.

111.    The Diocese, at the direction of the Bishop, waived the Parishes' obligation to pay Parish Assessments during the second quarter of 2020 (the "Assessment Waiver").

112.    Upon information and belief, the Diocese did not receive reasonably equivalent value in exchange for the Assessment Waiver.

113.    The Diocese, at the direction of the Bishop, provides loans to the Parish Parties.

114.    Throughout this Chapter 11 Case, the Diocese has taken the position that the loans to the Parish Parties are made from the Diocese's funds. (*See, e.g.*, Dkt. 1022, at ¶ 37.)

115.    In contradiction to the Diocese's prior statements, and when favorable to the Diocese and Parishes, the Diocese and the Parishes assert that loans to the Parish Parties are made from Parish funds *only*.  (*See, e.g.*, Dkt. 1002, at § IV.)

116.    As of April 30, 2021, the Parish Parties owed between $73.8 million and $77 million in accounts and loans receivable to the Diocese (the "Debt").

117.    Upon information and belief, the Bishop failed to pursue repayment of the Debt.

118.    The Bishop, through the Diocese, has deemed $52.3 million to $53.7 million of the Debt as "uncollectible" and does not intend to pursue or receive any repayment of that portion of the Debt (the "Debt Cancellation").

119.    Even if the Debt has not been formally written off by the Debtor, the Debtor expressed it has always intended to confirm the Debt Cancellation by, if necessary, granting the Parishes releases pursuant to any plan of reorganization in this Chapter 11 Case, including in the Amended Plan.

120.    The majority of the Debt which the Diocese has asserted as uncollectible breaks down neatly into percentages, 0%, 25%, 35%, 50%, 60%, 75%, and 100% of the principal loan amounts.

121.    Upon information and belief, the Diocese did not receive reasonably equivalent value in exchange for the Debt Cancellation.

122.    The Bishop, through the Diocese, alleges that only between $21.5 million and $23.3 million is collectible from the Parish Parties in connection with the Debt despite the fact that the assets of the Parish Parties far exceed the amount owed.

123.    The Diocese further alleges that in the event of a liquidation, the Debt is valued at $0.

124.    Upon information and belief, at approximately the time of the Assessment Waiver and Debt Cancellation, the Diocese was or became insolvent.

125.    Prior to the Assessment Waiver and Debt Cancellation, the Diocese was aware that survivors of sexual abuse would bring claims and causes of action against the Diocese and that the Diocese's exposure on account of such claims was greater than it had cash on hand to pay.

**C. The IVCP**

126.    In 2019, the Diocese set up a fund, the Independent Victim Compensation Program (the "IVCP"), to pay survivor claims that arose prior to the commencement of this bankruptcy case.

127.    The IVCP paid out approximately $8.1 million to sexual abuse survivors (the "IVCP Payments").

128.    The Diocese was aware that insurance proceeds could have been pursued and utilized in connection with the IVCP Payments.

129.    The Diocese was aware that insurance proceeds could have been pursued even after IVCP Payments were made to survivors.

130.    The Directors & Officers never pursued insurance coverage to fund the IVCP Payments.

**D. The Chapter 11 Case**

131.    On October 10, 2020 (the "Petition Date"), the Diocese commenced a voluntary case under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in this Court.

132.    The Diocese's commencement of the above-captioned bankruptcy case as of the Petition Date created an "estate" as defined pursuant to 11 U.S.C. § 541(a).

133.    Upon information and belief, the Diocese sought relief under Chapter 11 of the Bankruptcy Code in response to multiple sexual abuse actions filed by the survivors of such abuse, in order to obtain leverage over the victims and to hide financial resources owned and controlled by the Diocese from the survivors.

134.    On October 12, 2021, the Diocese filed its *First Amended Plan of Reorganization* (Dkt. 870) (the "Amended Plan").

135.    The Debtor claims it cannot pay creditors in full under the Amended Plan.  For example, holders of non-abuse general unsecured claims (Class 3) (the "Trade Creditors") will not be paid in full under the Amended Plan.

136.    Pursuant to the Amended Plan, the Directors & Officers are each a "Released Party," and therefore will be released from "all claims, obligations, suits, judgments, damages, demands, debts, remedies, causes of action, rights of setoff, other rights, and liabilities whatsoever."

137.    Pursuant to the Amended Plan, the Directors & Officers are also each a "Covered Party" and therefore benefit from the Channeling Injunction, as defined in the Amended Plan.

138.    Upon information and belief, the Diocese intends to seek a release of any claims and causes of action against the Directors & Officers, whether arising pursuant the Directors & Officers' role in connection with the Diocese or any of the Parish Parties.

## CAUSES OF ACTION

### COUNT ONE

**(Avoidance of Assessment Waiver as Constructive
Fraudulent Transfer Under 11 U.S.C. §§ 548 & 550)**

139.    The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

140.    The Assessment Waiver constitutes a constructive fraudulent transfer within the meaning of 11 U.S.C. § 548(a)(1)(B) that can be avoided and recovered for the benefit of general unsecured creditors.

141.    The Assessment Waiver was effected within two years of the Petition Date.

142.    The Debtor received less than reasonably equivalent value for the Assessment Waiver.

143.    At the time the Assessment Waiver occurred, the Debtor was insolvent.

144.    To the extent the Debtor was not already insolvent, the Debtor became insolvent as a result of the Assessment Waiver.

145.    The Assessment Waiver benefited the Parishes, who are insiders of the Debtor.

146.    The Assessment Waiver is avoidable to the extent necessary to satisfy the claims of creditors pursuant to 11 U.S.C. § 548(a)(1)(B).  In accordance with 11 U.S.C. § 550, the

Committee may recover the value of the Assessment Waiver for the benefit of the general unsecured creditors.

## <u>COUNT TWO</u>

**(Avoidance of Assessment Waiver as Actual Fraudulent
Transfer Under 11 U.S.C. §§ 548 & 550)**

147.    The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

148.    The Assessment Waiver constitutes an actual fraudulent transfer within the meaning of 11 U.S.C. § 548(a)(1)(A) that can be avoided and recovered for the benefit of general unsecured creditors.

149.    The Assessment Waiver was effected within two years of the Petition Date.

150.    The Assessment Waiver was made with actual intent to hinder, delay, or defraud the Debtor's creditors.

151.    The Debtor received less than reasonably equivalent value in exchange for the Assessment Waiver.

152.    At the time the Assessment Waiver occurred, the Debtor was insolvent.

153.    To the extent the Debtor was not already insolvent, the Debtor became insolvent as a result of the Assessment Waiver.

154.    The Assessment Waiver benefited the Parishes, who are insiders of the Debtor.

155.    The Assessment Waiver was intentionally for less than reasonably equivalent value while the Debtor was insolvent.

156.    The Assessment Waiver is avoidable to the extent necessary to satisfy claims of creditors under 11 U.S.C. § 548(a)(1)(A).  In accordance with 11 U.S.C. § 550, the Committee may recover the value of the Assessment Waiver for the benefit of the general unsecured creditors.

## COUNT THREE

### (Avoidance of Assessment Waiver as Constructive
### Fraudulent Transfer Under Applicable State Law)

157.    The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

158.    The Assessment Waiver was a constructive fraudulent transfer within the meaning of N.J.S.A. 25:2-25(b).

159.    The Assessment Waiver was a transfer made by the Debtor.

160.    The Debtor did not receive reasonably equivalent value in exchange for the Assessment Waiver.

161.    The Parish Assessments are a primary source of funds used by the Diocese to support its daily operations.

162.    Prior to the Assessment Waiver, the Debtor was aware that survivors of sexual abuse would bring claims against it and that the Diocese's exposure on account of such claims was greater than it had cash on hand to pay.

163.    At the time of the Assessment Waiver, the Debtor intended, believed, or reasonably should have believed that it would incur debts beyond the Debtor's ability to pay as they become due.

164.    Accordingly, the Assessment Waiver is avoidable to the extent necessary to satisfy claims of creditors pursuant to applicable state law.

165.    Pursuant to 11 U.S.C. § 544, the Committee may avoid any transfer of property of the Debtor that may be avoided by an actual or hypothetical lien creditor under state law.

166.    In accordance with 11 U.S.C. §§ 544 and 550, the Committee may avoid and recover the value of the Assessment Waiver from the Debtor.

24

## COUNT FOUR

**(Avoidance of Assessment Waiver as Actual Fraudulent
Transfer Under Applicable State Law)**

167.    The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

168.    The Assessment Waiver was an actual fraudulent transfer within the meaning of N.J.S.A. 25:2-27(a).

169.    The Assessment Waiver was a transfer made by the Debtor.

170.    The Assessment Waiver was made with actual intent to hinder, delay, or defraud one or more creditors of the Debtor.

171.    Pursuant to 11 U.S.C. § 544, the Committee may avoid any transfer of property of the Debtor that may be avoided by an actual or hypothetical lien creditor under state law.

172.    In accordance with 11 U.S.C. §§ 544 and 550, the Committee may avoid and recover the value of the Assessment Waiver from the Debtor.

## COUNT FIVE

**(Avoidance of Debt Cancellation as Constructive
Fraudulent Transfer Under 11 U.S.C. §§ 548 & 550)**

173.    The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

174.    The Debt Cancellation constitutes a constructive fraudulent transfer within the meaning of 11 U.S.C. § 548(a)(1)(B) that can be avoided and recovered for the benefit of general unsecured creditors.

175.    The Debt Cancellation was effected within two years of the Petition Date.

176.    The Debtor received less than reasonably equivalent value for the Debt Cancellation.

177.    At the time the Debt Cancellation occurred, the Debtor was insolvent.

178.    To the extent the Debtor was not already insolvent, the Debtor became insolvent as a result of the Debt Cancellation.

179.    The Debt Cancellation benefited the Parish Parties, who are insiders of the Debtor.

180.    The Debt Cancellation is avoidable to the extent necessary to satisfy the claims of creditors pursuant to 11 U.S.C. § 548(a)(1)(B).  In accordance with 11 U.S.C. § 550, the Committee may recover the value of the Debt Cancellation for the benefit of the general unsecured creditors.

## COUNT SIX

**(Avoidance of Debt Cancellation as Actual Fraudulent
Transfer Under 11 U.S.C. §§ 548 & 550)**

181.    The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

182.    The Debt Cancellation constitutes an actual fraudulent transfer within the meaning of 11 U.S.C. § 548(a)(1)(A) that can be avoided and recovered for the benefit of general unsecured creditors.

183.    The Debt Cancellation was effected within two years of the Petition Date.

184.    The Debt Cancellation was made with actual intent to hinder, delay, or defraud the Debtor's creditors.

185.    The Debtor received less than reasonably equivalent value in exchange for the Debt Cancellation.

186.    At the time the Debt Cancellation occurred, the Debtor was insolvent.

187.    To the extent the Debtor was not already insolvent, the Debtor became insolvent as a result of the Debt Cancellation.

188.    The Debt Cancellation benefited the Parish Parties, who are insiders of the Debtor.

189.    The Debt Cancellation was intentionally for less than reasonably equivalent value while the Debtor was insolvent.

190.    The Debt Cancellation is avoidable to the extent necessary to satisfy claims of creditors under 11 U.S.C. § 548(a)(1)(A).  In accordance with 11 U.S.C. § 550, the Committee may recover the value of the Debt Cancellation for the benefit of the general unsecured creditors.

## **COUNT SEVEN**

### **(Avoidance of the Debt Cancellation as Constructive Fraudulent Transfer Under Applicable State Law)**

191.    The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

192.    The Debt Cancellation was a constructive fraudulent transfer within the meaning of N.J.S.A. 25:2-25(b).

193.    The Debt Cancellation was a transfer made by the Debtor.

194.    The Debtor did not receive reasonably equivalent value in exchange for the Debt Cancellation.

195.    Prior to the Debt Cancellation, the Debtor was aware that survivors of sexual abuse would bring claims against it and that the Diocese's exposure on account of such claims was greater than it had cash on hand to pay.

196.    At the time of the Debt Cancellation, the Debtor intended, believed, or reasonably should have believed that it would incur debts beyond the Debtor's ability to pay as they become due.

197.    Accordingly, the Debt Cancellation is avoidable to the extent necessary to satisfy claims of creditors pursuant to applicable state law.

198.    Pursuant to 11 U.S.C. § 544, the Committee may avoid any transfer of property of the Debtor that may be avoided by an actual or hypothetical lien creditors under state law.

199.    In accordance with 11 U.S.C. §§ 544 and 550, the Committee may avoid and recover the value of the Debt Cancellation from the Debtor.

## COUNT EIGHT

### (Avoidance of Debt Cancellation as Actual Fraudulent Transfer Under Applicable State Law)

200.    The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

201.    The Debt Cancellation was an actual fraudulent transfer within the meaning of N.J.S.A. 25:2-27(a).

202.    The Debt Cancellation was a transfer made by the Debtor.

203.    The Debt Cancellation was made with actual intent to hinder, delay, or defraud one or more creditors of the Debtor.

204.    Pursuant to 11 U.S.C. § 544, the Committee may avoid any transfer of property of the Debtor that may be avoided by an actual or hypothetical lien creditor under state law.

205.    In accordance with 11 U.S.C. §§ 544 and 550, the Committee may avoid and recover the value of the Debt Cancellation from the Debtor.

## COUNT NINE

### (Breach of Duty of Care: Assessment Waiver)

206.    The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

28

207.    The Bishop, as President of the Diocese, owes a fiduciary duty of care to the Diocese.

208.    The Assessment Waiver was not in the best interest of the Debtor because it resulted in the loss of a primary source of funds for the Debtor's operations.

209.    The Bishop breached his duty of care by authorizing the Assessment Waiver.

210.    Because of the Assessment Waiver, the Debtor did not receive a primary source of funds for the Debtor's operations and became insolvent.

211.    The Debtor asserts that it does not have adequate assets to pay the claims of its creditors in full.

212.    As a result of the Assessment Waiver, creditors of the Debtor were harmed.

## COUNT TEN

### (Breach of Duty of Loyalty: Assessment Waiver)

213.    The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

214.    The Bishop, as President of the Diocese, owes a fiduciary duty of loyalty to the Diocese.

215.    The Assessment Waiver was not in the best interest of the Debtor because it resulted in the loss of a primary source of funds for the Debtor's operations.

216.    The Bishop is simultaneously an officer, director, and/or trustee of each of the Parish Parties.

217.    The Assessment Waiver benefited other entities to which the Bishop owes a fiduciary duty, specifically the Parishes.

218. The Bishop breached his duty of loyalty by authorizing the Assessment Waiver to the detriment of the Debtor and for the benefit of the Parishes.

219. Because of the Assessment Waiver, the Debtor did not receive a primary source of funds for the Debtor's operations and became insolvent.

220. The Debtor asserts that it does not have adequate assets to pay the claims of its creditors in full.

221. As a result of the Assessment Waiver, creditors of the Debtor were harmed.

## COUNT ELEVEN

### (Breach of Duty of Care: Failure to Pursue Payment of the Debt and Authorization of Debt Cancellation)

222. The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

223. The Bishop, as President of the Diocese, owes a fiduciary duty of care to the Diocese.

224. Upon information and belief, the Bishop did not pursue collection of the Debt.

225. The Bishop's failure to pursue collection of the Debt was a breach of his fiduciary duty owed to the Diocese.

226. The Debt Cancellation was not in the best interest of the Debtor because it resulted in a pecuniary loss to the Debtor.

227. The Bishop breached his duty of care by authorizing the Debt Cancellation.

228. Pursuant to the Debt Cancellation, the Debtor suffered a pecuniary loss and became insolvent.

229. The Debtor asserts that it does not have adequate assets to pay the claims of its creditors in full.

230.    As a result of the Debt Cancellation, creditors of the Debtor were harmed.

## COUNT TWELVE

### (Breach of Duty of Loyalty: Failure to Pursue Payment of the Debt and Authorization of Debt Cancellation)

231.    The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

232.    The Bishop, as President of the Diocese, owes a fiduciary duty of loyalty to the Diocese.

233.    The failure of the Diocese to pursue repayment of the Debt was not in the best interest of the Debtor.

234.    The Debt Cancellation was not in the best interest of the Debtor because it resulted in a pecuniary loss by the Debtor.

235.    The Bishop is simultaneously an officer, director, and/or trustee of and has control over each of the Parish Parties.

236.    The failure to pursue repayment of the Debt and authorization of the Debt Cancellation benefited other entities to which the Bishop owes a fiduciary duty, specifically the Parish Parties.

237.    The Bishop breached his duty of loyalty by failing to pursue repayment of the Debt and by authorizing the Debt Cancellation to the detriment of the Debtor and for the benefit of the Parish Parties.

238.    Because of the failure to pursue repayment of the Debt and authorization of the Debt Cancellation, the Debtor suffered a pecuniary loss and became insolvent.

239.    The Debtor asserts that it does not have adequate assets to pay the claims of its creditors in full.

240.    As a result of the failure to pursue repayment of the Debt and authorization of the Debt Cancellation, creditors of the Debtor were harmed.

## COUNT THIRTEEN

**(Breach of Duty of Care: Failure to Pursue Insurance Proceeds for the IVCP Payments)**

241.    The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

242.    The Directors & Officers owe a fiduciary duty of care to the Diocese.

243.    The Directors & Officers failed to take any steps to pursue insurance coverage to make the IVCP Payments.

244.    Pursuit of insurance proceeds for the IVCP Payments would have resulted in more available insurance proceeds to fund payment of Survivor Claims in this case.

245.    The Directors & Officers' failure to pursue insurance proceeds was a breach of their fiduciary duty owed to the Diocese.

246.    The failure to pursue insurance proceeds for the IVCP Payments was not in the best interest of the Debtor because it resulted in a pecuniary loss to the Debtor.

247.    The Directors & Officers breached their duty of care by failing to pursue insurance proceeds in connection with the IVCP Payments.

248.    Pursuant to the failure to pursue insurance proceeds in connection with the IVCP Payments, the Debtor suffered a pecuniary loss and became insolvent.

249.    The Debtor asserts that it does not have adequate assets to pay the claims of its creditors in full.

250.    As a result of the failure to pursue insurance, creditors of the Debtor were harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, the Committee respectfully requests that this Court enter judgment in favor of the Committee as follows:

a.      Entry of a judgment that the Assessment Waiver is avoidable as a fraudulent transfer pursuant to 11 U.S.C. § 548 and 11 U.S.C. § 550;

b.      Entry of a judgment that the Assessment waiver is avoidable as a fraudulent transfer pursuant to applicable state law;

c.      Entry of a judgment that the Debt Cancellation is avoidable as a fraudulent transfer pursuant to 11 U.S.C. § 548 and 11 U.S.C. § 550;

d.      Entry of a judgment that the Debt Cancellation is avoidable as a fraudulent transfer pursuant to applicable state law;

e.      Entry of a judgment that the Bishop breached his duty of care to the Debtor in connection with the Assessment Waiver;

f.      Entry of a judgment that the Bishop breached his duty of loyalty to the Debtor in connection with the Assessment Waiver;

g.      Entry of a judgment that the Bishop breached his duty of care to the Debtor by not pursuing collection of the Debt and authorizing the Debt Cancellation;

h.      Entry of a judgment that the Bishop breached his duty of loyalty to the Debtor by not pursuing the collection of the Debt and authorizing the Debt Cancellation;

i.      Entry of a judgment that the Directors & Officers breached their duty of care to the Debtor by not pursuing insurance coverage in connection with the IVCP Payments; and

j.      Such other and further relief as the Court deems just and equitable.

Dated: December 3, 2021

**LOWENSTEIN SANDLER LLP**

*/s/ Jeffrey D. Prol*

Jeffrey D. Prol, Esq.
Michael A. Kaplan, Esq.
Colleen Maker, Esq.
One Lowenstein Drive
Roseland, NJ 07068
Telephone:  (973) 597-2500
Facsimile:  (973) 597-2400
Email:  jprol@lowenstein.com
Email:  mkaplan@lowenstein.com
Email:  cmaker@lowenstein.com

*Counsel to the Official Committee of Tort Claimant Creditors*

# Exhibit C-1

**LOWENSTEIN SANDLER LLP**
Jeffrey D. Prol, Esq.
Michael A. Kaplan, Esq.
Colleen Maker, Esq.
One Lowenstein Drive
Roseland, NJ 07068
Telephone: (973) 597-2500
*Counsel to the Official Committee of Tort Claimant Creditors*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>THE DIOCESE OF CAMDEN, NEW JERSEY,<br><br>Debtor.<br>------------------------------------------------------- | Chapter 11<br><br>Case No. 20-21257 (JNP) |
| OFFICIAL COMMITTEE OF TORT CLAIMANT CREDITORS OF THE DIOCESE OF CAMDEN, NEW JERSEY,<br><br>Plaintiff,<br><br>v.<br><br>THE DIOCESE OF CAMDEN, NEW JERSEY, THE MOST REV. DENNIS J. SULLIVAN, IN HIS CAPACITY AS BISHOP AND PRESIDENT OF THE DIOCESE OF CAMDEN, NEW JERSEY, REVEREND ROBERT E. HUGHES, IN HIS CAPACITY AS VICAR GENERAL AND VICE PRESIDENT OF THE DIOCESE OF CAMDEN, NEW JERSEY, REVEREND MONSIGNOR JOHN H. BURTON, IN HIS CAPACITY AS VICAR GENERAL AND VICE PRESIDENT OF THE DIOCESE OF CAMDEN, NEW JERSEY, REVEREND JOSEPH SZOLACK, IN HIS CAPACITY AS TRUSTEE OF THE DIOCESE OF | Adv. Pro. No. 21-_____(JNP) |

CAMDEN, NEW JERSEY, REVEREND
JASON T. ROCKS, IN HIS CAPACITY
AS CHANCELLOR AND SECRETARY
OF THE DIOCESE OF CAMDEN, NEW
JERSEY, LAURA MONTGOMERY, IN
HER CAPACITY AS DIOCESAN
FINANCE OFFICER AND CHIEF
FINANCIAL OFFICER OF THE
DIOCESE OF CAMDEN, NEW JERSEY,
REVEREND JAMES L. BARTOLOMA,
IN HIS CAPACITY AS FORMER
TRUSTEE/CHANCELLOR OF THE
DIOCESE OF CAMDEN, NEW JERSEY, CATHEDRAL OF THE IMMACULATE
CONCEPTION; CATHOLIC
COMMUNITY OF CHRIST OUR LIGHT;
CHRIST THE GOOD SHEPHERD
PARISH; CHURCH OF CHRIST THE
KING; CHRIST THE REDEEMER
PARISH; DIVINE MERCY PARISH;
HOLY ANGELS PARISH; HOLY CHILD
PARISH; PARISH OF THE HOLY
CROSS; HOLY EUCHARIST PARISH;
CHURCH OF THE HOLY FAMILY;
CATHOLIC COMMUNITY OF THE
HOLY SPIRIT; HOLY TRINITY PARISH;
R.C. CHURCH OF THE INCARNATION;
INFANT JESUS PARISH; MARY,
MOTHER OF MERCY PARISH; MARY,
QUEEN OF ALL SAINTS PARISH;
MOST PRECIOUS BLOOD PARISH;
NOTRE DAME DE LA MER PARISH;
OUR LADY OF THE ANGELS; OUR
LADY OF THE BLESSED SACRAMENT;
OUR LADY OF THE LAKES; OUR
LADY, STAR OF THE SEA; OUR LADY
OF GUADALUPE PARISH; OUR LADY
OF HOPE PARISH; OUR LADY OF
PEACE PARISH; OUR LADY OF
PERPETUAL HELP PARISH; OUR
LADY OF SORROWS; PARISH OF ALL
SAINTS; CHURCH OF THE SACRED
HEART; ST. ANDREW THE APOSTLE'S
R.C. CHURCH; ST. BRENDAN THE
NAVIGATOR PARISH; ST. BRIDGET
CATHOLIC CHURCH; CHURCH OF ST.

CHARLES BORROMEO; ST. CLARE OF ASSISI PARISH; ST. DAMIEN PARISH; ST. ELIZABETH ANN SETON; ST. GABRIEL THE ARCHANGEL PARISH; ST. GIANNA BERETTA MOLLA PARISH; ST. JOACHIM PARISH; PARISH OF ST. JOHN NEUMANN; ST. JOSEPH'S CATHOLIC CHURCH, SEA ISLE; ST. JOSEPH'S CHURCH, SOMERS POINT; ST. JOSEPH PRO-CATHEDRAL; ST. JOSEPH THE WORKER PARISH; CHURCH OF ST. KATHARINE DREXEL; ST. MARY'S R.C. CHURCH; ST. MARY'S CHURCH; ST. MARY OF MOUNT CARMEL PARISH; PARISH OF ST. MAXIMILIAN KOLBE; PARISH OF ST. MICHAEL THE ARCHANGEL; PARISH OF ST. MONICA; ST. PADRE PIO; ST. PETER, MERCHANTVILLE, N.J. PARISH; CHURCH OF ST. ROSE OF LIMA; ST. SIMON STOCK PARISH; ST. STEPHEN'S R.C. CHURCH; ST. TERESA OF CALCUTTA PARISH; ST. THOMAS' CATHOLIC CHURCH; CHURCH OF ST. THOMAS MOORE; ST. VINCENT DE PAUL PARISH; CHURCH OF SAINTS PETER AND PAUL; MATER ECCLESIAE CHAPEL, INC.; SAINT YI YUN II CHERRY HILL KOREAN CATHOLIC MISSION, INC.; SAINT ANDREW KIM KOREAN CATHOLIC MISSION, INC.; PADRE PIO SHRINE BUENA BOROUGH, N.J., INC.; HOLY SPIRIT HIGH SCHOOL; CAMDEN CATHOLIC HIGH SCHOOL; POPE PAUL VI HIGH SCHOOL; BISHOP JAMES T. MCHUGH REGIONAL SCHOOL; ST. JOSEPH CHILD DEVELOPMENT CENTER, INC.,

Defendants.

**ADVERSARY COMPLAINT**

Plaintiff, the Official Committee of Tort Claimant Creditors (the "Committee") of the Diocese of Camden, New Jersey (the "Debtor" or "Diocese"), by way of this adversary complaint (the "Complaint") against the Diocese and, the Most Rev. Dennis J. Sullivan, in his capacity as Bishop and President of the Diocese, Reverend Robert E. Hughes, in his capacity as Vicar General and Vice President of the Diocese, Reverend Monsignor John H. Burton, in his capacity as Vicar General and Vice President of the Diocese, Reverence Joseph Szolack, in his capacity as Trustee of the Diocese, Reverend Jason R. Rocks, in his capacity as Chancellor and Secretary of the Diocese, Laura Montgomery, in her capacity as Diocesan Finance Officer and Chief Financial Officer of the Diocese, and Reverend James L. Bartoloma in his capacity as former Trustee/Chancellor of the Diocese (the "Bishop"), the Directors & Officers (as defined below), and the Parish Parties (as defined below) hereby states and alleges as follows:

**PRELIMINARY STATEMENT[1]**

1. This Complaint arises out of the voluntary depletion of the Diocese's estate by the Bishop, the Diocese, and its Directors & Officers for the benefit of non-debtor affiliated entities to the detriment of the Debtor and, in turn, its creditors.

2. First, the Debtor alleges that a the primary source of funding for its day-to-day operations is through Parish Assessments. During the COVID-19 pandemic, the Bishop, on behalf of the Diocese, elected to waive certain of the Parish Assessments despite the solvency and indisputable ability of the Parish Parties Parishes to pay the Parish Assessments as they came due.

3. The Assessment Waiver resulted in insufficient funding to pay creditors of the Debtor, including sexual abuse survivors, insolvency, and ultimately the filing of the Debtor's

---

[1] Capitalized terms not defined in this Preliminary Statement shall have the meanings ascribed to them in this Complaint.

Chapter 11 Case.  Thus, the Assessment Waiver constituted an avoidable fraudulent transfer under both the Bankruptcy Code and state law.

4.      Second, the Bishop, on behalf of the Diocese, elected to reduce or cancel $52.3 million to $53.7 million of debt owed by the Parish Parties ~~and Schools~~ to the Diocese, despite the solvency and ability of those parties to pay the Debt in full while the Debtor claims insolvency.

5.      The Debt Cancellation benefitted the Parish Parties and ~~Schools and~~ offered no value, let alone reasonably equivalent value, in exchange to the Debtor.  Thus, the Debt Cancellation constituted an avoidable fraudulent transfer under both the Bankruptcy Code and state law.

6.      The Bishop's decision to favor the Parish Parties ~~and Schools~~ over the Diocese, and his actions which benefitted the Parish Parties ~~and Schools~~ to the detriment of the Debtor and its creditors, constitute a breach of the Bishop's fiduciary duties of care and loyalty to the Diocese.

7.      In addition, the Directors & Officers failed to pursue insurance coverage to pay previous survivor claims, which improperly depleted the Diocese's assets by (a) using Diocese funds to resolve prior claims, and (b) foreclosing the Diocese's ability to access prior "claims made" policies on the basis of "interrelated wrongful acts" and "interrelated claims."

8.      Had the Directors & Officers pursued insurance coverage to pay prior survivor claims, such as those paid through the IVCP, significant assets would have been preserved and would be available to respond to the Survivor Claims in this case.  Failing to pursue insurance was thus a breach of the Directors & Officers' fiduciary duty of care.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this adversary proceeding (the "Adversary Proceeding") pursuant to 28 U.S.C. §§ 157 and 1334(b).

10.     Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409 as this ~~adversary proceeding~~Adversary Proceeding arises under and in connection with a case under Chapter 11 of the Bankruptcy Code that is pending in this District.

11.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

12.     To the extent the Committee does not have standing pursuant to 11 U.S.C. § 1103 to bring any cause of action pled herein, the Committee has requested standing to assert such cause of action through a motion filed simultaneously herewith.

<u>**PARTIES**</u>

13.     Plaintiff is the Committee of Tort Claimant Creditors in this Chapter 11 case appointed by the Office of the United States Trustee pursuant to 11 U.S.C. § 1102(a)(1).  The Committee is a party in interest in the Debtor's Chapter 11 case pursuant to 11 U.S.C. § 1109(b).

14.     The Committee is comprised of nine creditors with claims against, *inter alia*, the Diocese based upon sexual abuse by members of the clergy, workers, teachers, volunteers, or other persons or entities associated with or representing the Diocese and/or Parish Parties, Schools, or other Diocese-related institutions served by the Diocese.

15.     Defendant Diocese of Camden, New Jersey is a New Jersey not-for-profit religious organization with its principal place of business at 631 Market Street, Camden, New Jersey 08102 and is the Chapter 11 debtor and debtor-in-possession in the underlying bankruptcy proceeding.

16.     Defendant the Most Reverend Dennis J. Sullivan (the "<u>Bishop</u>") is the current Bishop of the Diocese and the President of the Diocese.  Upon information and belief, the Bishop is a citizen and resident of the State of New Jersey.  The Bishop's principal place of business is 631 Market Street, Camden, New Jersey 08102.

17.     Defendant Reverend Robert E. Hughes ("Hughes") is the Vicar General and Vice President of the Diocese. Upon information and belief, Hughes is a citizen and resident of the State of New Jersey.  Hughes' principal place of business is 631 Market Street, Camden, New Jersey 08102.

18.     Defendant Reverend Monsignor John H. Burton ("Burton") is the Vicar General and Vice President of the Diocese.  Upon information and belief, Burton is a citizen and resident of the State of New Jersey.  Burton's principal place of business is 631 Market Street, Camden, New Jersey 08102.

19.     Defendant Reverend Joseph Szolack ("Szolack") is a Trustee of the Diocese.  Upon information and belief, Szolack is a citizen and resident of the State of New Jersey.  Szolack's principal place of business is 631 Market Street, Camden, New Jersey 08102.

20.     Defendant Reverend Jason T. Rocks ("Rocks") is the Chancellor and Secretary of the Diocese.  Upon information and belief, Rocks is a citizen and resident of the State of New Jersey.  Rocks' principal place of business is 631 Market Street, Camden, New Jersey 08102.

21.     Defendant Laura Montgomery ("Montgomery") is the Diocesan Finance Officer and Chief Financial Officer of the Diocese.  Upon information and belief, Montgomery is a citizen and resident of the State of New Jersey.  Montgomery's principal place of business is 631 Market Street, Camden, New Jersey 08102.

22.     Defendant Reverend James L. Bartoloma ("Bartoloma" and together with the Bishop, Hughes, Burton, Szolack, Rocks, and Montgomery, the "Directors & Officers") is the former Trustee/Chancellor of the Diocese.  Upon information and belief, Bartoloma is a citizen and resident of the State of New Jersey.  Bartoloma's principal place of business is 226 Hurffsville Road, Sewell, NJ 08080.

23.    Defendant Cathedral of the Immaculate Conception is a New Jersey not-for-profit religious corporation with its principal place of business at 642 Market Street, Camden, New Jersey 08102.

24.    Defendant Catholic Community of Christ Our Light is a New Jersey not-for-profit religious corporation with its principal place of business at 402 Kings Highway North, Cherry Hill, New Jersey 08034.

25.    Defendant Christ the Good Shepherd Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 1655 Magnolia Road, Vineland, New Jersey 08361.

26.    Defendant Church of Christ the King is a New Jersey not-for-profit religious corporation with its principal place of business at 200 Windsor Avenue, Haddonfield, New Jersey 08033.

27.    Defendant Christ the Redeemer Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 318 Carl Hasselhan Drive, Atco, New Jersey 08004.

28.    Defendant Divine Mercy Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 23 West Chestnut Ave, Vineland, New Jersey 08360.

29.    Defendant Holy Angels Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 81 Cooper Street, Woodbury, New Jersey 08096.

30.    Defendant Holy Child Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 13 East Evesham Road, Runnemede, New Jersey 08078.

31.     Defendant Parish of the Holy Cross is a New Jersey not-for-profit religious corporation with its principal place of business at 46 Central Avenue, Bridgeton, New Jersey 08302.

32.     Defendant Holy Eucharist Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 344 Kresson Road, Cherry Hill, New Jersey 08034.

33.     Defendant Church of the Holy Family is a New Jersey not-for-profit religious corporation with its principal place of business at 266 Hurffville Road, Sewell, New Jersey 08080.

34.     Defendant Catholic Community of the Holy Spirit is a New Jersey not-for-profit religious corporation with its principal place of business at 17 Earlington Avenue, Mullica Hill, New Jersey 08062.

35.     Defendant Holy Trinity Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 11 North Kenyon Avenue, Margate City, New Jersey 08402.

36.     Defendant R.C. Church of the Incarnation is a New Jersey not-for-profit religious corporation with its principal place of business at 240 Main Street, Mantua, New Jersey 08051.

37.     Defendant Infant Jesus Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 334 Beach Avenue, Woodbury Heights, New Jersey 08097.

38.     Defendant Mary, Mother of Mercy Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 500 Greentree Road, Glassboro, New Jersey 08028.

39.     Defendant Mary, Queen of All Saints Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 4824 Camden Avenue, Pennsauken, New Jersey 08110.

40.     Defendant Most Precious Blood Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 445 White Horse Pike, West Collingswood, New Jersey 08107.

41.     Defendant Notre Dame de la Mer Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 1500 Central Avenue, North Wildwood, New Jersey 08260.

42.     Defendant Our Lady of the Angels is a New Jersey not-for-profit religious corporation with its principal place of business at 35 East Mechanic Street, Cape May Court House, New Jersey 08210.

43.     Defendant Our Lady of the Blessed Sacrament is a New Jersey not-for-profit religious corporation with its principal place of business at 104 Catawba Avenue, Newfield, New Jersey 08344.

44.     Defendant Our Lady of the Lakes is a New Jersey not-for-profit religious corporation with its principal place of business at 19 Malaga Road, Collings Lakes, New Jersey 08094.

45.     Defendant Our Lady, Star of the Sea is a New Jersey not-for-profit religious corporation with its principal place of business at 520 Lafayette Street, Cape May, New Jersey 08204.

46.     Defendant Our Lady of Guadalupe Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 135 North White Horse Pike, Lindenwold, New Jersey 08021.

10

47.     Defendant Our Lady of Hope Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 701 Little Gloucester Road, Blackwood, New Jersey 08012.

48.     Defendant Our Lady of Peace Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 32 Carroll Avenue, Williamstown, New Jersey 08094.

49.     Defendant Our Lady of Perpetual Help Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 146 South Pitney Road, Galloway, New Jersey 08205.

50.     Defendant Our Lady of Sorrows is a New Jersey not-for-profit religious corporation with its principal place of business at 724 Maple Avenue, Linwood, New Jersey 08094.

51.     Defendant Parish of All Saints is a New Jersey not-for-profit religious corporation with its principal place of business at 621 Dock Street, Millville, New Jersey 08332.

52.     Defendant The Church of the Sacred Heart is a New Jersey not-for-profit religious corporation with its principal place of business at 1739 Ferry Avenue, Camden, New Jersey 08104.

53.     Defendant St. Andrew the Apostle's R.C. Church is a New Jersey not-for-profit religious corporation with its principal place of business at 27 Kresson-Gibbsboro Road, Gibbsboro, New Jersey 08026.

54.     Defendant St. Brendan the Navigator Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 5012 Dune Drive, Avalon, New Jersey 08202.

55.     Defendant St. Bridget Catholic Church is a New Jersey not-for-profit religious corporation with its principal place of business at 125 Church Street, Glassboro, New Jersey 08028.

56.    Defendant Church of St. Charles Borromeo is a New Jersey not-for-profit religious corporation with its principal place of business at 176 Stagecoach Road, Sicklerville, New Jersey 08081.

57.    Defendant St. Clare of Assisi Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 140 Broad Street, Swedesboro, New Jersey 08085.

58.    Defendant St. Damien Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 1337 Asbury Avenue, Ocean City, New Jersey 08081.

59.    Defendant St. Elizabeth Ann Seton is a New Jersey not-for-profit religious corporation with its principal place of business at 591 New Jersey Avenue, Absecon, New Jersey 08201.

60.    Defendant St. Gabriel the Archangel Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 369 Georgetown Road, Carneys Point, New Jersey 08069.

61.    Defendant St. Gianna Beretta Molla is a New Jersey not-for-profit religious corporation with its principal place of business at 1421 New Road, Northfield, New Jersey 08225.

62.    Defendant St. Joachim Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 601 West Browning Road, Bellmawr, New Jersey 08031.

63.    Defendant Parish of St. John Neumann is a New Jersey not-for-profit religious corporation with its principal place of business at 680 Town Bank Road, North Cape May, New Jersey 08204.

64.     Defendant St. Joseph's Catholic Church, Sea Isle is a New Jersey not-for-profit religious corporation with its principal place of business at 126 44th Street, Sea Isle City, New Jersey 08243.

65.     Defendant St. Joseph's Church, Somers Point is a New Jersey not-for-profit religious corporation with its principal place of business at 606 Shore Road, Somers Point, New Jersey 08244.

66.     Defendant St. Joseph Pro-Cathedral is a New Jersey not-for-profit religious corporation with its principal place of business at 2907 Federal Street, Camden, New Jersey 08105.

67.     Defendant St. Joseph the Worker Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 901 Hopkins Road, Haddon Township, New Jersey 08033.

68.     Defendant Church of St. Katharine Drexel is a New Jersey not-for-profit religious corporation with its principal place of business at 6075 West Jersey Avenue, Egg Harbor Township, New Jersey 08243.

69.     Defendant St. Mary's R.C. Church is a New Jersey not-for-profit religious corporation with its principal place of business at 2001 Springdale Road, Cherry Hill, New Jersey 08003.

70.     Defendant St. Mary's Church is a New Jersey not-for-profit religious corporation with its principal place of business at 426 Monmouth Street, Gloucester, New Jersey 08030.

71.     Defendant St. Mary of Mount Carmel Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 226 French Street, Hammonton, New Jersey 08037.

72.     Defendant Parish of St. Maximilian Kolbe is a New Jersey not-for-profit religious corporation with its principal place of business at 200 Tuckahoe Road, Marmora, New Jersey 08223.

73.     Defendant Parish of St. Michael the Archangel is a New Jersey not-for-profit religious corporation with its principal place of business at 49 West North Street, Clayton, New Jersey 08312.

74.     Defendant Parish of St. Monica is a New Jersey not-for-profit religious corporation with its principal place of business at 2651 Atlantic Avenue, Atlantic City, New Jersey 08401.

75.     Defendant St. Padre Pio is a New Jersey not-for-profit religious corporation with its principal place of business at 4680 Dante Avenue, Vineland, New Jersey 08360.

76.     Defendant St. Peter, Merchantville, NJ Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 43 West Maple Avenue, Merchantville, New Jersey 08109.

77.     Defendant Church of St. Rose of Lima is a New Jersey not-for-profit religious corporation with its principal place of business at 300 East Kings Highway, Haddon Heights, New Jersey 08035.

78.     Defendant St. Simon Stock Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 178 West White Horse Pike, Berlin, New Jersey 08009.

79.     Defendant St. Stephen's R.C. Church is a New Jersey not-for-profit religious corporation with its principal place of business at 6306 Browning Road, Pennsauken, New Jersey 08109.

14

80.      Defendant St. Teresa of Calcutta Parish is a New Jersey not-for-profit religious corporation with its principal place of business at 809 Park Avenue, Collingswood, New Jersey 08108.

81.      Defendant St. Thomas' Catholic Church is a New Jersey not-for-profit religious corporation with its principal place of business at 331 8th Street South, Brigantine, New Jersey 08203.

82.      Defendant Church of St. Thomas Moore is a New Jersey not-for-profit religious corporation with its principal place of business at 1439 Springdale Road, Cherry Hill, New Jersey 08003.

83.      Defendant St. Vincent de Paul Parish is a New Jersey not-for-profit religious corporation within the Diocese's territory located at 5021 Harding Highway, Mays Landing, New Jersey 08330.

84.      Defendant Church of Saints Peter and Paul is a New Jersey not-for-profit religious corporation with its principal place of business at 362 Ganttown Road, Turnersville, New Jersey 08012.

85.      The entities identified in paragraphs 23–84 above are each referred to individually herein as a "Parish" or collectively as the "Parishes".

86.      Certain of the Parishes own twenty-one elementary schools and two high schools affiliated with the Diocese (the "Parish Schools").  The Parish Schools are not separately incorporated, and are part of the Parishes.

87.      Defendant Mater Ecclesiae Chapel, Inc. is a New Jersey not-for-profit corporation with its principal place of business at 261 Cross Keys Road, Berlin, New Jersey 08009.

88.　　Defendant Saint Yi Yun II John Cherry Hill Korean Catholic Mission, Inc. is a New Jersey not-for-profit corporation with its principal place of business at 631 Market Street, Camden, New Jersey 08102.

89.　　Defendant Saint Andrew Kim Korean Catholic Mission, Inc. is a New Jersey not-for-profit corporation with its principal place of business at 631 Market Street, Camden, New Jersey 08102.

90.　　Defendant Padre Pio Shrine in Buena Borough, N.J., Inc. is a New Jersey not-for-profit membership corporation with its principal place of business at 631 Market Street, Camden, New Jersey 08102.

91.　　The entities identified in paragraphs 87–90 above are each referred to individually herein as a "Mission" and collectively as the "Missions".

92.　　The Missions are incorporated under Title 15A of New Jersey law.  Upon information and belief, aside from incorporation under Title 15A of New Jersey law, the respective corporate governance structures of the Missions mirrors that of the Parishes incorporated under Title 16 of New Jersey law.

93.　　Defendant Holy Spirit High School is a New Jersey not-for-profit corporation with its principal place of business at 500 South New Road, Absecon, New Jersey 08201.  The Bishop is the member of the corporation, and he appoints trustees and certain corporate officers and has certain reserved powers.

94.　　Defendant Camden Catholic High School is a New Jersey not-for-profit corporation with its principal place of business at Cuthbert Blvd. and Route 38, Cherry Hill, New Jersey 08002.  The Bishop is the member of the corporation, and he appoints trustees and certain corporate officers and has certain reserved powers.

95.     Defendant Pope Paul VI High School is a New Jersey not-for-profit corporation with its principal place of business at 901 Hopkins Road, Haddonfield, New Jersey 08033.  The Bishop is the member of the corporation, and he appoints trustees and certain corporate officers and has certain reserved powers.

96.     Defendant Bishop James T. McHugh Regional School is a New Jersey not-for-profit corporation with its principal place of business at 2221 NJ State Highway Route 9 North, Cape May Court House, New Jersey 08210.  The trustees of Bishop James T. McHugh Regional School are *ex officio* the pastors in Cape May County, New Jersey.

97.     Defendant St. Joseph Child Development Center, Inc. is a New Jersey not-for-profit corporation with its principal place of business at 17 Church Street, Camden, New Jersey 08105.  The pastor of St. Joseph's Pro-Cathedral is an *ex officio* trustee of St. Joseph Child Development Center, Inc.  Other trustees are appointed by the Bishop.  The current trustees are Father Jaime Hostios, Mr. James Catrambone, and Ms. Frances Montgomery.

98.     The schools identified in paragraphs 93–97 above are each referred to individually herein as an "Incorporated School" or collectively as the "Incorporated Schools".  The Incorporated Schools and the Parish Schools are each referred to individually herein as a "School" and collectively as the "Schools".

99.     The Parishes, Missions, and Schools are each referred to herein as a "Parish Party" and collectively as the "Parish Parties".

## FACTUAL BACKGROUND

**A.  The Diocese's Connection to the ~~Parishes, Missions, and Schools~~Parish Parties**

100.    ~~23.~~ The Diocese serves a six-county region in Southern New Jersey.  The Bishop holds all power over the operation and finances of the Diocese and its related entities.

17

24. The Diocese operates sixty-two parishes (each a "Parish" and collectively, the "Parishes") within the Diocese as interdependent departments. The Parishes are incorporated under N.J.S.A. 16:15-1 to 16:15-8.

101. 25. Each Parish is governed by a Board of Trustees comprised of the Bishop, Vicar General, the Pastor of the Parish, and two lay members of the Parish. The Vicar General, Pastor, and lay members are either directly or partially appointed by the Bishop and can be removed by the Bishop at any time.

26. In addition, there are four "missions" within the Diocese (each a "Mission" and collectively the "Missions").

27. The Parishes and Missions are referred to herein each as a "Parish Party" and collectively as the "Parish Parties".

28. Three of the Missions are organized and operated as non-profit corporations in accordance with Title 15A of New Jersey Law. The Missions are not considered "parishes" under Canon Law since they serve specific communities that cross Parish boundaries, and therefore cannot be incorporated under Title 16 of New Jersey Law, which only provides for the incorporation of Catholic parishes.

29. The fourth Mission is a non-profit membership corporation of which the Diocese is the member.

102. 30. Upon information and belief, the corporate governance structures of the Missions mirror that of the Parishes.

103. 31. Accordingly, upon information and belief, the Bishop controls the Missions.

104. 32. The Parishes own twenty-one elementary schools and two high schools (the "Parish Schools").  The Parish Schools are not separately incorporated.  The Bishop controls the Parish Schools through his complete control over the Diocese and Parishes.

105. 33. The Diocese additionally operates one elementary school and three high schools (the "Incorporated Schools" and together with the Parish Schools, the "Schools") which are separately incorporated in accordance with Title 15A of New Jersey Law.  The Bishop of the Diocese is the member of each corporation; he appoints the trustees and certain corporate officers, and has certain reserved powers.

106. 34. The Bishop, directly and through the Diocese, maintains complete operational and financial control over the Parish Parties and Schools.

**B.  The Bishop's Financial Control Over the Diocese, and Parish Parties, and Schools**

107. 35. The Bishop operationally and financially controls the Diocese, and Parish Parties, and Schools.

108. 36. As a result of the complete day-to-day operational and financial control and domination exercised by the Bishop over the Diocese, and Parish Parties, and Schools, the Diocese, and Parish Parties, and Schools have failed to observe proper corporate formalities and have not dealt with each other at arm's length.

109. 37. Upon information and belief, the Diocese, and Parish Parties, and Schools adhere to the Bishop's instructions even if doing so is not in the best financial interest of the Diocese or individual Parish Party or School.

110. 38. Upon information and belief, the The Bishop, through the Diocese, assesses the Parish Parties Parishes ten percent of their annual ordinary income (the "Parish Assessments").

The Parish Assessments are due to the Diocese on a monthly basis and are a primary source of funds used by the Diocese to support its daily operations.

111.    ~~39. Upon information and belief, the~~The Diocese, at the direction of the Bishop, waived the ~~Parish Parties~~Parishes' obligation to pay Parish Assessments during the second quarter of 2020 (the "Assessment Waiver").

112.    ~~40.~~ Upon information and belief, the Diocese did not receive reasonably equivalent value in exchange for the Assessment Waiver.

113.    ~~41.~~ The Diocese, at the direction of the Bishop, provides loans ~~and grants~~ to the Parish Parties ~~and Schools~~.

114.    Throughout this Chapter 11 Case, the Diocese has taken the position that the loans to the Parish Parties are made from the Diocese's funds. (*See, e.g.*, Dkt. 1022, at ¶ 37.)

115.    In contradiction to the Diocese's prior statements, and when favorable to the Diocese and Parishes, the Diocese and the Parishes assert that loans to the Parish Parties are made from Parish funds *only.*  (*See, e.g.*, Dkt. 1002, at § IV.)

116.    ~~42. Upon information and belief, as~~As of April 30, 2021, the Parish Parties ~~and Schools~~ owed between $73.8 million and $77 million in accounts and loans receivable to the Diocese (the "Debt").

117.    ~~43.~~ Upon information and belief, the Bishop failed to pursue repayment of the Debt.

118.    ~~44. Upon information and belief, the~~The Bishop, through the Diocese, has ~~asserted an allowance, or reduction, of the Debt of~~deemed $52.3 million to $53.7 million of the Debt as "uncollectible" and does not intend to pursue or receive any repayment of that portion of the Debt (the "Debt Cancellation").

119.    Even if the Debt has not been formally written off by the Debtor, the Debtor expressed it has always intended to confirm the Debt Cancellation by, if necessary, granting the Parishes releases pursuant to any plan of reorganization in this Chapter 11 Case, including in the Amended Plan.

120.    45. Curiously, theThe majority of the Debt which the Diocese has asserted as uncollectible breaks down neatly into percentages, 0%, 25%, 35%, 50%, 60%, 75%, and 100% of the principal loan amounts.

121.    46. Upon information and belief, the Diocese did not receive reasonably equivalent value in exchange for the Debt Cancellation.

122.    47. Upon information and belief, theThe Bishop, through the Diocese, alleges that only between $21.5 million and $23.3 million is collectible from the Parish Parties and Schools in connection with the Debt despite the fact that the assets of the Parish Parties and Schools far exceed the amount owed.

123.    The Diocese further alleges that in the event of a liquidation, the Debt is valued at $0.

124.    48. Upon information and belief, at approximately the time of the Assessment Waiver and Debt Cancellation, the Diocese was or became insolvent.

125.    49. Upon information and belief, priorPrior to the Assessment Waiver and Debt Cancellation, the Diocese was aware that survivors of sexual abuse would bring claims and causes of action against the Diocese and that the Diocese's exposure on account of such claims was greater than it had cash on hand to pay.

**C. The IVCP**

126. ~~50.~~ In 2019, the Diocese set up a fund, the Independent Victim Compensation ~~Fund~~Program (the "IVCP"), to pay survivor claims that arose prior to the commencement of this bankruptcy case.

127. ~~51. Upon information and belief, the~~The IVCP paid out approximately $8.1 million to sexual abuse survivors (the "IVCP Payments").

128. ~~52.~~ The Diocese was aware that insurance proceeds could have been pursued and utilized in connection with the IVCP Payments.

129. The Diocese was aware that insurance proceeds could have been pursued even after IVCP Payments were made to survivors.

130. ~~53. Upon information and belief, the~~The Directors & Officers never pursued insurance coverage to fund the IVCP Payments.

**D. The Chapter 11 Case**

131. ~~54.~~ On October 10, 2020 (the "Petition Date"), the Diocese commenced a voluntary case under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in this Court.

132. ~~55.~~ The Diocese's commencement of the above-captioned bankruptcy case as of the Petition Date created an "estate" as defined pursuant to 11 U.S.C. § 541(a).

133. ~~56.~~ Upon information and belief, the Diocese sought relief under Chapter 11 of the Bankruptcy Code in response to multiple sexual abuse actions filed by the survivors of such abuse, in order to obtain leverage over the victims and to hide financial resources owned and controlled by the Diocese from the survivors.

134. ~~57.~~ On ~~December 31, 2020, the Debtor filed a proposed *Plan of Reorganization* [Dkt. 306], and on March 6~~October 12, 2021, the ~~Debtor~~Diocese filed ~~a~~its *First Amended Plan of Reorganization* ~~[~~(Dkt. ~~498]~~870) (the "~~Proposed~~Amended Plan").

135.   The Debtor claims it cannot pay creditors in full under the Amended Plan.  For example, holders of non-abuse general unsecured claims (Class 3) (the "Trade Creditors") will not be paid in full under the Amended Plan.

136.   58. Pursuant to the ~~Proposed~~Amended Plan, the ~~Bishop is~~Directors & Officers are each a "Released Party," and therefore will be released from "all claims, obligations, suits, judgments, damages, demands, debts, remedies, causes of action, rights of setoff, other rights, and liabilities whatsoever."

137.   Pursuant to the Amended Plan, the Directors & Officers are also each a "Covered Party" and therefore benefit from the Channeling Injunction, as defined in the Amended Plan.

138.   59. Upon information and belief, the Diocese intends to seek a release of any claims and causes of action against the ~~Bishop~~Directors & Officers, whether arising pursuant the ~~Bishop's~~Directors & Officers' role in connection with the Diocese or any of the Parish Parties ~~or Schools~~.

## **CAUSES OF ACTION**

## **COUNT ONE**

### **(Avoidance of Assessment Waiver as Constructive Fraudulent Transfer Under 11 U.S.C. §§ 548 & 550)**

139.   60. The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

140.   61. The Assessment Waiver constitutes a constructive fraudulent transfer within the meaning of 11 U.S.C. § 548(a)(1)(B) that can be avoided and recovered for the benefit of general unsecured creditors.

141.   62. The Assessment Waiver was effected within two years of the Petition Date.

142. 63. The Debtor received less than reasonably equivalent value for the Assessment Waiver.

143. 64. At the time the Assessment Waiver occurred, the Debtor was insolvent.

144. 65. To the extent the Debtor was not already insolvent, the Debtor became insolvent as a result of the Assessment Waiver.

145. 66. The Assessment Waiver benefited the Parish Parties Parishes, who are insiders of the Debtor.

146. 67. The Assessment Waiver is avoidable to the extent necessary to satisfy the claims of creditors pursuant to 11 U.S.C. § 548(a)(1)(B). In accordance with 11 U.S.C. § 550, the Committee may recover the value of the Assessment Waiver for the benefit of the general unsecured creditors.

## COUNT TWO

### (Avoidance of Assessment Waiver as Actual Fraudulent Transfer Under 11 U.S.C. §§ 548 & 550)

147. 68. The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

148. 69. The Assessment Waiver constitutes an actual fraudulent transfer within the meaning of 11 U.S.C. § 548(a)(1)(A) that can be avoided and recovered for the benefit of general unsecured creditors.

149. 70. The Assessment Waiver was effected within two years of the Petition Date.

150. 71. The Assessment Waiver was made with actual intent to hinder, delay, or defraud the Debtor's creditors.

151. 72. The Debtor received less than reasonably equivalent value in exchange for the Assessment Waiver.

24

152. ~~73.~~ At the time the Assessment Waiver occurred, the Debtor was insolvent.

153. ~~74.~~ To the extent the Debtor was not already insolvent, the Debtor became insolvent as a result of the Assessment Waiver.

154. ~~75.~~ The Assessment Waiver benefited the ~~Parish Parties~~Parishes, who are insiders of the Debtor.

155. ~~76.~~ The Assessment Waiver was intentionally for less than reasonably equivalent value while the Debtor was insolvent.

156. ~~77.~~ The Assessment Waiver is avoidable to the extent necessary to satisfy claims of creditors under 11 U.S.C. § 548(a)(1)(A).  In accordance with 11 U.S.C. § 550, the Committee may recover the value of the Assessment Waiver for the benefit of the general unsecured creditors.

## COUNT THREE

### (Avoidance of Assessment Waiver as Constructive Fraudulent Transfer Under Applicable State Law)

157. ~~78.~~ The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

158. ~~79.~~ The Assessment Waiver was a constructive fraudulent transfer within the meaning of N.J. ~~Rev~~S. ~~Stat §~~A. 25:2-25(b).

159. ~~80.~~ The Assessment Waiver was a transfer made by the Debtor.

160. ~~81.~~ The Debtor did not receive reasonably equivalent value in exchange for the Assessment Waiver.

161. ~~82.~~ The Parish Assessments are a primary source of funds used by the Diocese to support its daily operations.

162. 83. Prior to the Assessment Waiver, the Debtor was aware that survivors of sexual abuse would bring claims against it and that the Diocese's exposure on account of such claims was greater than it had cash on hand to pay.

163. 84. At the time of the Assessment Waiver, the Debtor intended, believed, or reasonably should have believed that it would incur debts beyond the Debtor's ability to pay as they become due.

164. 85. Accordingly, the Assessment Waiver is avoidable to the extent necessary to satisfy claims of creditors pursuant to applicable state law.

165. 86. Pursuant to 11 U.S.C. § 544, the Committee may avoid any transfer of property of the Debtor that may be avoided by an actual or hypothetical lien creditor under state law.

166. 87. In accordance with 11 U.S.C. §§ 544 and 550, the Committee may avoid and recover the value of the Assessment Waiver from the Debtor.

## COUNT FOUR

### (Avoidance of Assessment Waiver as Actual Fraudulent Transfer Under Applicable State Law)

167. 88. The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

168. 89. The Assessment Waiver was an actual fraudulent transfer within the meaning of N.J. Rev S. Stat §A. 25:2-25 2-27(a).

169. 90. The Assessment Waiver was a transfer made by the Debtor.

170. 91. The Assessment Waiver was made with actual intent to hinder, delay, or defraud one or more creditors of the Debtor.

171. 92. Pursuant to 11 U.S.C. § 544, the Committee may avoid any transfer of property of the Debtor that may be avoided by an actual or hypothetical lien creditor under state law.

172. 93. In accordance with 11 U.S.C. §§ 544 and 550, the Committee may avoid and recover the value of the Assessment Waiver from the Debtor.

## COUNT FIVE

### (Avoidance of Debt Cancellation as Constructive
### Fraudulent Transfer Under 11 U.S.C. §§ 548 & 550)

173. 94. The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

174. 95. The Debt Cancellation constitutes a constructive fraudulent transfer within the meaning of 11 U.S.C. § 548(a)(1)(B) that can be avoided and recovered for the benefit of general unsecured creditors.

175. 96. The Debt Cancellation was effected within two years of the Petition Date.

176. 97. The Debtor received less than reasonably equivalent value for the Debt Cancellation.

177. 98. At the time the Debt Cancellation occurred, the Debtor was insolvent.

178. 99. To the extent the Debtor was not already insolvent, the Debtor became insolvent as a result of the Debt Cancellation.

179. 100. The Debt Cancellation benefited the Parish Parties and Schools, who are insiders of the Debtor.

180. 101. The Debt Cancellation is avoidable to the extent necessary to satisfy the claims of creditors pursuant to 11 U.S.C. § 548(a)(1)(B).  In accordance with 11 U.S.C. § 550, the Committee may recover the value of the Debt Cancellation for the benefit of the general unsecured creditors.

## COUNT SIX

### (Avoidance of Debt Cancellation as Actual Fraudulent
### Transfer Under 11 U.S.C. §§ 548 & 550)

181.    102. The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

182.    103. The Debt Cancellation constitutes an actual fraudulent transfer within the meaning of 11 U.S.C. § 548(a)(1)(A) that can be avoided and recovered for the benefit of general unsecured creditors.

183.    104. The Debt Cancellation was effected within two years of the Petition Date.

184.    105. The Debt Cancellation was made with actual intent to hinder, delay, or defraud the Debtor's creditors.

185.    106. The Debtor received less than reasonably equivalent value in exchange for the Debt Cancellation.

186.    107. At the time the Debt Cancellation occurred, the Debtor was insolvent.

187.    108. To the extent the Debtor was not already insolvent, the Debtor became insolvent as a result of the Debt Cancellation.

188.    109. The Debt Cancellation benefited the Parish Parties and Schools, who are insiders of the Debtor.

189.    110. The Debt Cancellation was intentionally for less than reasonably equivalent value while the Debtor was insolvent.

190.    111. The Debt Cancellation is avoidable to the extent necessary to satisfy claims of creditors under 11 U.S.C. § 548(a)(1)(A).  In accordance with 11 U.S.C. § 550, the Committee may recover the value of the Debt Cancellation for the benefit of the general unsecured creditors.

## COUNT SEVEN

### (Avoidance of the Debt Cancellation as Constructive Fraudulent Transfer Under Applicable State Law)

191. ~~112.~~ The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

192. ~~113.~~ The Debt Cancellation was a constructive fraudulent transfer within the meaning of N.J. ~~Rev~~S. ~~Stat §~~A. 25:2-25(b).

193. ~~114.~~ The Debt Cancellation was a transfer made by the Debtor.

194. ~~115.~~ The Debtor did not receive reasonably equivalent value in exchange for the Debt Cancellation.

195. ~~116.~~ Prior to the Debt Cancellation, the Debtor was aware that survivors of sexual abuse would bring claims against it and that the Diocese's exposure on account of such claims was greater than it had cash on hand to pay.

196. ~~117.~~ At the time of the Debt Cancellation, the Debtor intended, believed, or reasonably should have believed that it would incur debts beyond the Debtor's ability to pay as they become due.

197. ~~118.~~ Accordingly, the Debt Cancellation is avoidable to the extent necessary to satisfy claims of creditors pursuant to applicable state law.

198. ~~119.~~ Pursuant to 11 U.S.C. § 544, the Committee may avoid any transfer of property of the Debtor that may be avoided by an actual or hypothetical lien creditors under state law.

199. ~~120.~~ In accordance with 11 U.S.C. §§ 544 and 550, the Committee may avoid and recover the value of the Debt Cancellation from the Debtor.

## COUNT EIGHT

### (Avoidance of Debt Cancellation as Actual Fraudulent
### Transfer Under Applicable State Law)

200.    121. The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

201.    122. The Debt Cancellation was an actual fraudulent transfer within the meaning of N.J. Rev S. Stat §A. 25:2-25 2-27(a).

202.    123. The Debt Cancellation was a transfer made by the Debtor.

203.    124. The Debt Cancellation was made with actual intent to hinder, delay, or defraud one or more creditors of the Debtor.

204.    125. Pursuant to 11 U.S.C. § 544, the Committee may avoid any transfer of property of the Debtor that may be avoided by an actual or hypothetical lien creditor under state law.

205.    126. In accordance with 11 U.S.C. §§ 544 and 550, the Committee may avoid and recover the value of the Debt Cancellation from the Debtor.

## COUNT NINE

### (Breach of Duty of Care: Assessment Waiver)

206.    127. The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

207.    128. The Bishop, as President of the Diocese, owes a fiduciary duty of care to the Diocese.

208.    129. The Assessment Waiver was not in the best interest of the Debtor because it resulted in the loss of a primary source of funds for the Debtor's operations.

209.    130. The Bishop breached his duty of care by authorizing the Assessment Waiver.

30

210. ~~131.~~ Because of the Assessment Waiver, the Debtor did not receive a primary source of funds for the Debtor's operations and became insolvent.

211. ~~132.~~ The Debtor asserts that it does not have adequate assets to pay the claims of its creditors in full.

212. ~~133.~~ As a result of the Assessment Waiver, creditors of the Debtor were harmed.

## COUNT TEN

### (Breach of Duty of Loyalty: Assessment Waiver)

213. ~~134.~~ The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

214. ~~135.~~ The Bishop, as President of the Diocese, owes a fiduciary duty of loyalty to the Diocese.

215. ~~136.~~ The Assessment Waiver was not in the best interest of the Debtor because it resulted in the loss of a primary source of funds for the Debtor's operations.

216. ~~137.~~ The Bishop is simultaneously an officer, director, and/or trustee of each of the Parish Parties.

217. ~~138.~~ The Assessment Waiver benefited other entities to which the Bishop owes a fiduciary duty, specifically the ~~Parish Parties~~ Parishes.

218. ~~139.~~ The Bishop breached his duty of loyalty by authorizing the Assessment Waiver to the detriment of the Debtor and for the benefit of the ~~Parish Parties~~ Parishes.

219. ~~140.~~ Because of the Assessment Waiver, the Debtor did not receive a primary source of funds for the Debtor's operations and became insolvent.

220. ~~141.~~ The Debtor asserts that it does not have adequate assets to pay the claims of its creditors in full.

221. ~~142.~~ As a result of the Assessment Waiver, creditors of the Debtor were harmed.

## COUNT ELEVEN

**(Breach of Duty of Care: Failure to Pursue Payment
of the Debt and Authorization of Debt Cancellation)**

222. ~~143.~~ The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

223. ~~144.~~ The Bishop, as President of the Diocese, owes a fiduciary duty of care to the Diocese.

224. ~~145.~~ Upon information and belief, the Bishop did not pursue collection of the Debt.

225. ~~146.~~ The Bishop's failure to pursue collection of the Debt was a breach of his fiduciary duty owed to the Diocese.

226. ~~147.~~ The Debt Cancellation was not in the best interest of the Debtor because it resulted in a pecuniary loss to the Debtor.

227. ~~148.~~ The Bishop breached his duty of care by authorizing the Debt Cancellation.

228. ~~149.~~ Pursuant to the Debt Cancellation, the Debtor suffered a pecuniary loss and became insolvent.

229. ~~150.~~ The Debtor asserts that it does not have adequate assets to pay the claims of its creditors in full.

230. ~~151.~~ As a result of the Debt Cancellation, creditors of the Debtor were harmed.

## COUNT TWELVE

**(Breach of Duty of Loyalty: Failure to Pursue Payment
of the Debt and Authorization of Debt Cancellation)**

231. ~~152.~~ The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

232. ~~153.~~ The Bishop, as President of the Diocese, owes a fiduciary duty of loyalty to the Diocese.

233. ~~154.~~ The failure of the Diocese to pursue repayment of the Debt was not in the best interest of the Debtor.

234. ~~155.~~ The Debt Cancellation was not in the best interest of the Debtor because it resulted in a pecuniary loss by the Debtor.

235. ~~156.~~ The Bishop is simultaneously an officer, director, and/or trustee of and has control over each of the Parish Parties ~~and Schools~~.

236. ~~157.~~ The failure to pursue repayment of the Debt and authorization of the Debt Cancellation benefited other entities to which the Bishop owes a fiduciary duty, specifically the Parish Parties.

237. ~~158.~~ The Bishop breached his duty of loyalty by failing to pursue repayment of the Debt and by authorizing the Debt Cancellation to the detriment of the Debtor and for the benefit of the Parish Parties ~~and Schools~~.

238. ~~159.~~ Because of the failure to pursue repayment of the Debt and authorization of the Debt Cancellation, the Debtor suffered a pecuniary loss and became insolvent.

239. ~~160.~~ The Debtor asserts that it does not have adequate assets to pay the claims of its creditors in full.

240. ~~161.~~ As a result of the failure to pursue repayment of the Debt and authorization of the Debt Cancellation, creditors of the Debtor were harmed.

## COUNT THIRTEEN

**(Breach of Duty of Care: Failure to Pursue Insurance Proceeds for the IVCP Payments)**

241. ~~162.~~ The Committee repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

242. ~~163.~~ The Directors & Officers owe a fiduciary duty of care to the Diocese.

243. ~~164. Upon information and belief, the~~ The Directors & Officers failed to take any steps to pursue insurance coverage to make the IVCP Payments.

244. ~~165.~~ Pursuit of insurance proceeds for the IVCP Payments would have resulted in more available insurance proceeds to fund payment of Survivor Claims in this case.

245. ~~166.~~ The Directors & Officers' failure to pursue insurance proceeds was a breach of their fiduciary duty owed to the Diocese.

246. ~~167.~~ The failure to pursue insurance proceeds for the IVCP Payments was not in the best interest of the Debtor because it resulted in a pecuniary loss to the Debtor.

247. ~~168.~~ The Directors & Officers breached their duty of care by failing to pursue insurance proceeds in connection with the IVCP Payments.

248. ~~169.~~ Pursuant to the failure to pursue insurance proceeds in connection with the IVCP Payments, the Debtor suffered a pecuniary loss and became insolvent.

249. ~~170.~~ The Debtor asserts that it does not have adequate assets to pay the claims of its creditors in full.

250. ~~171.~~ As a result of the failure to pursue insurance, creditors of the Debtor were harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, the Committee respectfully requests that this Court enter judgment in favor of the Committee as follows:

a.      Entry of a judgment that the Assessment Waiver is avoidable as a fraudulent transfer pursuant to 11 U.S.C. § 548 and 11 U.S.C. § 550;

b.      Entry of a judgment that the Assessment waiver is avoidable as a fraudulent transfer pursuant to applicable state law;

c.      Entry of a judgment that the Debt Cancellation is avoidable as a fraudulent transfer pursuant to 11 U.S.C. § 548 and 11 U.S.C. § 550;

d.      Entry of a judgment that the Debt Cancellation is avoidable as a fraudulent transfer pursuant to applicable state law;

e.      Entry of a judgment that the Bishop breached his duty of care to the Debtor in connection with the Assessment Waiver;

f.      Entry of a judgment that the Bishop breached his duty of loyalty to the Debtor in connection with the Assessment Waiver;

g.      Entry of a judgment that the Bishop breached his duty of care to the Debtor by not pursuing collection of the Debt and authorizing the Debt Cancellation;

h.      Entry of a judgment that the Bishop breached his duty of loyalty to the Debtor by not pursuing the collection of the Debt and authorizing the Debt Cancellation;

i.      Entry of a judgment that the Directors & Officers breached their duty of care to the Debtor by not pursuing insurance coverage in connection with the IVCP Payments; and

j.      Such other and further relief as the Court deems just and equitable.

Dated: ~~October 12~~December 3, 2021               **LOWENSTEIN SANDLER LLP**

                                                     */s/ Jeffrey D. Prol*
                                                     Jeffrey D. Prol, Esq.
                                                     Michael A. Kaplan, Esq.
                                                     Colleen Maker, Esq.
                                                     One Lowenstein Drive
                                                     Roseland, NJ 07068
                                                     Telephone:  (973) 597-2500
                                                     Facsimile:  (973) 597-2400
                                                     Email:  jprol@lowenstein.com
                                                     Email:  mkaplan@lowenstein.com
                                                     Email:  cmaker@lowenstein.com

                                                     *Counsel to the Official Committee of Tort*
                                                     *Claimant Creditors*

| **Summary report:** | |
| :---: | :---: |
| **Litera® Change-Pro for Word 10.13.0.36 Document comparison done on 12/3/2021 4:05:45 PM** | |
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://ROS-IWODMSCLSTR/DBIWOV2/210399429/1 | |
| **Modified DMS:** iw://ROS-IWODMSCLSTR/DBIWOV2/210399429/2 | |
| **Changes:** | |
| Add | 400 |
| Delete | 229 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 629 |