**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>THE DIOCESE OF CAMDEN, NEW JERSEY,<br><br>Debtor. | Case No. 20-21257 (JNP)<br><br>Chapter 11 |

## MEMORANDUM DECISION

**JERROLD N. POSLUSNY, JR., U.S. Bankruptcy Judge**

The Official Committee of Tort Claimant Creditors (the "Committee") filed a Motion (the "Motion") for authority to prosecute and settle certain claims on behalf of the estate of the Diocese of Camden, New Jersey ("Debtor") against: (a) Debtor; (b) its Directors & Officers; (c) the Parishes, Missions, and Schools (collectively, the "Parishes"); (d) the Diocese of Camden Trusts, Inc. ("DOCT"); and (e) the Most Reverend Dennis J. Sullivan (the "Bishop," and together with Debtor, its Directors & Officers, the Parishes, and DOCT, the "Proposed Defendants"). Attached to the Motion are proposed adversary complaints that seek: declarations that DOCT and the Parishes are alter egos of Debtor and that property of those entities are property of Debtor's estate; an order for substantive consolidation of such entities with Debtor; and damages for breaches of fiduciary duties. The Motion seeks derivative standing to bring certain counts in two of the complaints and the entire third complaint.

Debtor, DOCT, and the Parishes all filed Objections and the Committee filed a Reply, along with an Amended Complaint related to each adversary proceeding (the "Complaints").

## BACKGROUND

Debtor filed a petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on October 1, 2020. Debtor is a New Jersey nonprofit religious corporation. Debtor's territory consists of six counties in southern New Jersey with 62 parishes that have approximately 500,000 parishioners. In December 2019, the New Jersey legislature opened a two-year "window" to allow survivors of sexual abuse to recover damages no matter when such abuse occurred. Over 300 survivor claims have been filed against Debtor. The Committee's investigation led it to conclude certain causes of action should be brought against the Proposed Defendants.

### A.    The Committee's Position

The Motion asserts that Debtor largely controls the operations of the Parishes and DOCT. Each Parish is governed by a board of trustees comprised of the Bishop, Vicar General, the pastor of the Parish, and two lay members of the Parish. The Schools are subject to the general supervision of Debtor's Superintendent of Schools and their budgets must be approved by Debtor. The Motion further asserts that Debtor, the Parishes, and DOCT hold themselves out to the public as a single, unified organization. Additionally, each Parish is a party to a Declaration of Trust with Debtor which permits Debtor, as trustee, to commingle the assets of each Parish with Debtor's own assets.

The Motion further alleges that Debtor holds significant cash and investments in two sets of bank accounts. First are accounts related to DOCT. The Motion alleges the trust received a fraudulent transfer from Debtor upon its creation. The Committee discusses the creation of DOCT, and alleges the trust was a fraudulent transfer from Debtor. Second are accounts allegedly held for the benefit of the Parishes. These accounts are commonly and interchangeably referred to as the "Deposit & Loan Fund," the "Parish Trust," and the "Revolving Fund" (the "DLF"). Debtor

maintains the DLF, through which the Parishes deposit, withdraw, or borrow funds. The Motion

states that the Parishes are required to deposit any cash beyond one month of operating expenses

into the DLF and they can borrow from the DLF to fund capital improvements or other needs.

According to the Motion, as of January 31, 2021, the DLF assets totaled $147 million, comprised

of $103.5 million in cash and investments, and $43.5 million in loans to the Parishes.

Furthermore, the Motion asserts that, as of April 30, 2021, the Parishes collectively owed

between $73.8 and $77 million to Debtor (the "Debt"). The Committee asserts that Debtor has

improperly failed to pursue repayment of the Debt. According to the Committee, the Bishop

contends that only a portion of the Debt is collectible from the Parishes and therefore reduced a

large portion of the Debt (the "Debt Cancellation"). Additionally, the Parishes pay ten percent of

their annual ordinary income (the "Parish Assessments") to Debtor in monthly installments, which

Debtor uses to fund its daily operations. However, the Bishop waived the Parish Assessments in

the second quarter of 2020 (the "Assessment Waiver"). The Committee believes that Debtor did

not receive reasonably equivalent value in exchange of the Assessment Waiver, and therefore, this

was a fraudulent transfer.

The Reply argues that the Court should grant its motion for derivative standing because the

claims asserted in the various complaints are colorable and Debtor's refusal to pursue such claims

is unjustified.

## B.    DOCT First Amended Complaint

The First Amended Complaint against DOCT (the "DOCT Complaint," Adv. No. 21-

1393), seeks a determination that Debtor is the true owner of DOCT's assets. DOCT is a New

Jersey nonprofit membership corporation established in 2001. The Committee argues that DOCT

is a sham created to shield assets from Debtor's creditors. In 2001, at or around the time of DOCT's

formation, Debtor funded DOCT with approximately $71.9 million. In July 2015, DOCT's board of directors amended its certificate of incorporation to make the Bishop the sole member. However, the amendment was not executed and filed until a year later, after receiving approval from Debtor. The Committee argues this amendment evidences an attempt by DOCT and Debtor to shield assets in the DOCT accounts.

Later in 2015, Debtor's trustees and DOCT's board entered into a Declaration of Trust and Trust Agreement (the "Declaration of Trust"). According to the Declaration of Trust, "the Diocese has held certain assets which are the property of DOCT for the purposes of management and investment on behalf of DOCT." DOCT Compl. ¶ 36. The Committee alleges that the Declaration of Trust is intended to shield its assets from Debtor's creditors.

Based on the alleged facts above, the Committee seeks authority to bring alter ego and fraudulent transfer claims, amongst others, against DOCT and Debtor. The only counts applicable to the Motion are Count Three for alter ego and Count Six for avoidance of declaration of trust.

C.   Parishes First Amended Complaint

The First Amended Adversary Complaint against the Parishes (the "Parishes Complaint," Adv. No. 21-1394), seeks a determination that Debtor owns all of the $159.5 million of cash and investments, as of August 2021, in the DLF.

The Parishes Complaint asserts that the Parishes lack independent control over themselves. Rather, the Committee alleges, Debtor exercises complete control over the Parishes. To support this, the Committee cites to the fact that Debtor makes annual representations to the Internal Revenue Service that the Parishes are under Debtor's supervision or direct control. The Parishes Complaint includes conclusory statements that the Parishes and Debtor do not adhere to corporate formalities or separateness.

4

The Parishes Complaint refers to Debtor's maintenance of the DLF as a primary example of how Debtor exercises control over the Parishes. Parishes Compl. ¶ 135. The Committee claims that all assets of the Parishes in the DLF are commingled with Debtor's assets. Further, each Parish must request funding from Debtor to obtain money allegedly held on the Parishes' behalf, to pay for maintenance, improvements, and repairs to its real property.

Due to the nature of the relationship between the Parishes, Debtor, and the DLF, the Committee seeks authority to bring an alter ego claim, amongst others, against the Parishes. Only Count Two for alter ego is applicable to the Court's review.

> ### D.     D&O First Amended Complaint

The First Amended Adversary Complaint against the Directors & Officers (the "D&O Complaint") alleges that Debtor made fraudulent transfers in connection with the Assessment Waiver and Debt Cancellation. Further, the D&O Complaint seeks a judgment against the Bishop and the Directors & Officers for breach of fiduciary duties in connection with the same. The D&O Complaint has not been filed because all of the relief sought requires the Court to grant derivative standing.

The D&O Complaint asserts that the Bishop operationally and financially controls Debtor and the Parishes. The D&O Complaint states that, because of the Bishop's control, Debtor and the Parishes have failed to observe proper corporate formalities and have not dealt with each other at arms-length. For example, the D&O Complaint refers to the Assessment Waiver and Debt Cancellation as instances where the Bishop instructed Debtor in a way that was not in Debtor's best financial interest. As a result, the D&O Complaint alleges that the Bishop and the Directors & Officers breached their fiduciary duties of loyalty and care to Debtor.

Additionally, the D&O Complaint alleges a breach of fiduciary duty because Debtor failed to pursue insurance coverage when settling survivor claims in the Independent Victim Compensation Program (the "IVCP") in 2019. Debtor and the other dioceses in New Jersey, along with the Archdiocese of Newark, established the IVCP to settle and pay survivor claims. The IVCP is a voluntary program administered by victim's compensation experts independent of Debtor. Debtor funded its participation in the program from its operations and a line of credit with PNC Bank. The D&O Complaint asserts that Debtor was aware that it could have pursued insurance proceeds in connection with the IVCP but failed to do so, resulting the Directors   Officers breaching their fiduciary duties.

E.    Waiver of Privilege and Authority to Settle

The Committee seeks authority to waive Debtor's attorney-client privilege with regard to the Complaints, as well as sole authority to negotiate and settle the Complaints.

F.    Objections

Debtor asserts that the Committee does not meet the elements necessary for derivative standing. Debtor argues that the Committee has not asserted a colorable claim in any of the Complaints. Next, Debtor argues that it is justified in refusing to pursue the claims asserted by the Committee. As such, Debtor argues the Committee failed to meet two elements necessary for derivative standing.

The Parishes assert that the Committee failed to plead facts sufficient to state a colorable claim for alter ego. Rather, each Parish is separate and distinct, has its own assets and liabilities, parishioners, tax identification numbers, and employees. Additionally, the Parishes claim that the Committee has not plead facts sufficient to satisfy the tests for alter ego liability.

Similarly, the Parishes assert that the Committee failed to plead facts sufficient to state a colorable claim for fraudulent transfer and breach of fiduciary duty. The Parishes contend that Debtor never transferred an interest to the Parishes, and therefore there is nothing to avoid. The Parishes further contend that the Assessment Waiver and Debt Cancellation are wholly within Debtor's discretion. Additionally, the Parishes rebut the Committee's portrait of improper loan forgiveness by stating that Debtor did not loan money to the Parishes. Rather, the Parishes entrusted its funds to Debtor, from which Debtor, as trustee, sometimes loaned funds back to the Parishes.

DOCT argues that the Committee's fraudulent transfer and alter ego claims versus DOCT lack the substance necessary for the Court to find a colorable claim exists. DOCT argues the Committee cannot assert a colorable alter ego claim because DOCT and Debtor are each validly formed and operating New Jersey nonprofit corporations.

Furthermore, DOCT argues the Committee cannot assert a colorable claim for fraudulent transfer because the Committee cannot meet the requirements of section 548(e)(1) of the Bankruptcy Code. First, nothing was transferred when DOCT and Debtor entered the Declaration of Trust. Second, the Committee cannot identify a transfer that occurred within the ten-year lookback period of section 548(e). Lastly, even if the Committee had demonstrated the other elements, Debtor did not transfer funds into a self-settled trust or similar device through the Declaration of Trust. As a result, DOCT argues that the Committee has not plead any colorable claims against DOCT.

Debtor, DOCT, and the Parishes all oppose the Committee's request to waive the attorney-client privilege and for authority to settle the proposed claims.

## JURISDICTION

This Court has jurisdiction under 28 U.S.C. §§ 1334 and 157(a) and (b)(1). Venue is proper in this Court under 28 U.S.C. § 1408. This is a core proceeding under 28 U.S.C. § 157(b)(2).

## DISCUSSION

The Motion seeks derivative standing to bring certain claims against the Proposed Defendants. After considering the applicable standard, the Court finds the Committee is not entitled to derivative standing at this juncture, so the Motion will be Denied.

### A.     Derivative Standing

When considering whether to grant derivative standing to pursue actions on behalf of an estate, courts generally consider four elements: (1) a demand has been made upon the statutorily authorized party to take action; (2) the demand is declined; (3) a colorable claim that would benefit the estate, if successful, exists based on a cost-benefit analysis performed by the court; and (4) the inaction is an abuse of discretion (i.e., unjustified) in light of the debtor-in-possession's duties in a Chapter 11 case. In re G-I Holdings, Inc., 313 B.R. 612, 628 (Bankr. D.N.J. 2004); In re Crivaro, 2017 WL 3314232, at *5 (Bankr. D.N.J. 2017). The Committee, as the party seeking standing, bears the burden of proof. G-I Holdings, 313 B.R at 629. In certain circumstances, a formal demand is unnecessary, and a debtor's refusal may be implied. Id. at 630. Here, there is ample evidence to suggest that any formal demand made by the Committee upon Debtor would have been refused.[1] Thus, only the third and fourth elements are relevant to the Court's analysis of whether to grant the Committee derivative standing.

---

[1] Debtor maintains that the Parishes and DOCT are separate entities from Debtor, the transfers were not fraudulent, and no fiduciary duties were breached. Given the nature of the claims it is evident any demand by the Committee would have been refused.

The colorable claim prong requires the Court to decide whether the Committee has asserted "claims for relief that on appropriate proof would support a recovery." Id. at 631 (citations omitted). This inquiry is like that of a motion to dismiss for failure to state a claim, where a court must accept as true the allegations and facts pleaded in the complaint. Id. When accepting well-pleaded facts as true, "the Court is not bound to accept as true legal conclusions couched in factual allegations, and 'threadbare recitals of elements of a cause of action, supported by mere conclusory statements, will not suffice.'" In re Archdiocese of Milwaukee, 483 B.R. 693, 697 (Bankr. E.D. Wis. 2021); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Additionally, the court should examine the facts for any dispositive affirmative defenses and may deny a motion for standing when an affirmative defense appears on its face. G-I Holdings, 313 B.R. at 631. A colorable claim must also benefit the estate and be an appropriate endeavor based on a cost-benefit analysis. Id. at 629.

The fourth element considers whether a debtor's refusal to bring a claim is an abuse of discretion, or unjustifiable. Id. at 628. A debtor's refusal to bring a claim is unjustifiable when "the committee has presented a colorable claim that on appropriate proof would support recovery, and the action is likely to benefit the reorganization estate." See In re STN Enters., 779 F.2d 901, 905 (2d Cir. 1985); In re Adelphia Commc'ns Corp., 330 B.R. 364, 374 n.19 (Bankr. S.D.N.Y. 2005). Courts have considered several tests when analyzing if a debtor unjustifiably refuses to bring a particular action.

In In re Racing Servs., Inc., the court considered: "'(1) [the] probabilities of legal success and financial recovery in event of success'; (2) the creditor's proposed fee arrangement; and (3) 'the anticipated delay and expense to the bankruptcy estate that initiation and continuation of

litigation will likely produce.'" 540 F.3d 892, 901 (8th Cir. 2008) (quoting <u>STN Enters.</u>, 779 F.2d

at 905-06). Similarly, the court in <u>G-I Holdings</u>, considered:

> (1) whether conflicts of interest exist between the debtor and the parties against whom the creditors' committee's derivative action will be brought; (2) whether the creditors' interests are protected despite the debtor's refusal; (3) whether allowing the creditors' committee to pursue the action on the debtor's behalf will benefit the estate; and (4) whether appointing a trustee and allowing the trustee, as opposed to the creditors' committee, to pursue the action or converting the Chapter 11 case to a Chapter 7 case would be more beneficial to the estate.

313 B.R. at 643. Ultimately, in determining whether a debtor unjustifiably refuses to bring

proposed claims, the court must perform a cost-benefit analysis with the aforementioned factors

in mind. <u>See</u> <u>Racing Servs.</u>, 540 F.3d at 901.

After such consideration, the Court concludes the Committee failed to demonstrate a

colorable claim for portions of the DOCT Complaint and Parishes Complaint. Additionally, the

Committee has not met its burden of proof that Debtor has unjustifiably refused to bring the claims.

In particular, the Committee has not shown that these claims would provide a benefit to the estate

after considering the risks and costs.

### *1.    Colorable Claim*

The standard for assessing whether a claim is colorable, as set forth above, is like that of a

motion to dismiss, and requires the Court to accept well-pleaded facts as true. <u>G-I Holdings</u>, 313

B.R. at 631. Additionally, the well-pleaded facts must support a recovery. <u>Id.</u> However, the Court

will not accept legal conclusions couched in factual allegations. <u>See</u> <u>Iqbal</u>, 556 U.S. at 678 (citing

<u>Twombly</u>, 550 U.S. at 555). Regarding the alter ego counts, the Court finds the Committee failed

to allege facts that would support a recovery, and therefore failed to state a colorable claim.

a.  The Committee Has Not Alleged a Colorable Alter Ego Claim

The Motion fails to allege a colorable claim for alter ego in the Parishes Complaint or

DOCT Complaint. To state a claim for alter ego in New Jersey, "a plaintiff must show that: (1)

one corporation is organized and operated as to make it a mere instrumentality of another

corporation, and (2) the dominant corporation is using the subservient corporation to perpetuate

fraud, to accomplish injustice, or to circumvent the law." Bd. of Trustees of Teamsters Loc. 863

Pension Fund v. Foodtown, Inc., 296 F.3d 164, 171 (3d Cir. 2002). As to the first element, the

Third Circuit considers eight nonconjunctive and nonexclusive factors:

> (1) failure to observe corporate formalities; (2) nonpayment of
> dividends; (3) insolvency of the debtor corporation; (4) siphoning of
> funds from the corporation by dominant shareholders; (5)
> nonfunctioning of their officers and directors; (6) absence of
> corporate records; (7) the corporation is a mere façade for the
> operation of a dominant shareholder or shareholders; and (8) gross
> undercapitalization.

U.S. v. Pisani, 646 F.2d 83, 88 (3d Cir. 1981). As to the second element, the Third Circuit

explained that the situation must present an element of injustice or fundamental unfairness and a

number of the factors above can be sufficient. Id. at 87. However, under New Jersey law, courts

generally will not pierce the corporate veil in the absence of extraordinary circumstances, such as

fraud or injustice, see Linus Holding Corp. v. Mark Line Indus., LLC, 376 F. Supp. 3d 417, 425

(D.N.J. 2019); Lyon v. Barret, 89 N.J. 294, 300 (1982), and such burden is difficult to meet. See

Pearson v. Component Tech. Corp., 247 F.3d 471, 485 (3d Cir. 2001).

In its Reply, the Committee argues it has alleged at least four of the factors above in the

Parishes Complaint, "numerous facts" in support of alter ego in the DOCT Complaint, and submits

it has alleged facts demonstrating an element of injustice or fundamental unfairness. After

reviewing the Parishes Complaint, the Court concludes only two alter ego factors fall in favor of

the Committee. Similarly, the DOCT Complaint alleges only three of the alter ego factors.

i.      *Failure to Observe Corporate Formalities*

In the Parishes Complaint, the Committee alleges that the Parishes and Debtor do not adhere to corporate formalities or separateness (Parishes Compl. ¶ 109) and have not dealt with each other at arm's length. Id. ¶ 165. These are nothing more than bald allegations. At the hearing, counsel directed the Court to paragraph 17 of its Reply as support for its alter ego claim. Paragraph 17 is a list of allegations from the Parishes Complaint the Committee asserts as support for its alter ego claim.

The Parishes Complaint alleges facts, accepted as true, which indicate that the Parishes and Debtor engaged in questionable behavior concerning their observation of corporate formalities. For example, allegations that Debtor "oversees aspects of job training for the School's employees" and "the budgets of the schools must be approved by [Debtor]" raise concern. Parishes Compl. ¶¶ 130, 154. However, other allegations contradict the Committee's position and indicate that corporate formalities have been properly observed. For example, the Parishes own real estate and operate from different addresses. Parishes Compl. ¶¶ 19-95, 149. The Parishes each have separate bank accounts. Id. ¶ 153. These facts suggest the parties do observe corporate formalities.

Additionally, some of the allegations the Committee believes support its alter ego claim comply with New Jersey law. See N.J.S.A. 16:15-1, et. seq. For example, the Committee alleges that the Bishop and Vicar General sit on the board of each Parish (Parishes Compl. ¶ 82), but this is required by New Jersey law. See N.J.S.A. 16:15-3. The Committee also alleges that the Parishes must obtain permission from the Bishop "before entering into any contract or completing a multitude of ordinary business-related tasks." Parishes Compl. ¶ 152. However, N.J.S.A. 16:15-5 requires such approval. Complying with statutory requirements cannot be a basis to demonstrate

failure to comply with corporate formalities, but instead indicates that Debtor and the Parishes observe formalities.

Given the conflicting allegations, the Court finds this factor does not weigh in favor of granting the Motion.

However, the Committee has alleged sufficient facts to satisfy this factor in the DOCT Complaint. For example, the DOCT Complaint alleges: Debtor and DOCT share the same address (DOCT Compl. ¶ 103); the Bishop controls Debtor and is the sole member of DOCT (id. ¶ 101); and that Debtor often receives funds from DOCT prior to DOCT's board approving the request. Id. ¶ 167.

### ii.    Siphoning of Funds

The Parishes Complaint alleges: the Parishes are required to deposit into the DLF any cash beyond one month operating expenses (Parishes Compl. ¶ 135); Debtor's financial reports reflected all assets of the DLF, including cash, investments, and loans to Parishes, as assets of Debtor (id. ¶ 136); and the Parishes must request funding from Debtor from the funds allegedly held on their behalf in the DLF for maintenance, improvement, and repairs on the real property owned by the Parishes. Id. ¶ 142. Viewing these allegations in the light most favorable to the Committee, the Court finds that the Committee has alleged facts, which on appropriate proof, suggest that Debtor has siphoned funds from the Parishes; therefore, this factor supports granting the Motion.

The Committee's allegations related to siphoning of funds is not as strong in the DOCT Complaint. The strongest argument the Committee makes related to this factor is that Debtor often receives funds prior to the request being formally approved by DOCT's board. However, the

board's approval suggest that Debtor's use of the funds was legitimate and therefore this factor

falls against granting the Motion.

### iii.    Nonfunctioning of Directors and Officers

The Committee claims this is one of the four factors it has sufficiently alleged in the

Parishes Complaint. However, after reviewing the Parishes Complaint the Court finds no well-

plead allegations suggesting the nonfunctioning of directors and officers. Likewise, there are no

such allegations in the DOCT Complaint. Therefore, this factor falls against granting the Motion.

### iv.    The Corporation is a Mere Façade for the Operation of the Dominant Shareholder(s)

The Parishes Complaint alleges that Debtor dictates the governance of the Parishes and

assumes responsibilities for the Parishes which are ordinarily designated to the corporate board.

Parishes Compl. ¶¶ 110, 114. An example the Committee provides is that Debtor advises the

Parishes to file uniform Articles of Incorporation and Bylaws and establishes the mission and

strategic priorities of the Parishes. Id. The Committee also alleges that the Parishes' funds are

commingled with funds of Debtor and the Parishes must request funding from Debtor, from funds

allegedly held on their behalf, for the maintenance and improvement of real property owned by

the Parishes. Id. ¶¶ 142, 145. Furthermore, the Committee alleges that Debtor enters into lease

agreements with the Parishes for the use of Debtor's real property in exchange for little to no

consideration. Id. ¶¶ 168-69.

These are well-plead allegations that may show, on appropriate proof, that the Parishes are

a mere façade of Debtor; therefore, this factor supports granting the Motion.

Likewise, the DOCT Complaint properly alleges that DOCT is a mere façade of Debtor.

For example, Debtor is authorized to commingle assets with DOCT (DOCT Compl. ¶ 63); and

Debtor often receives funds from DOCT before DOCT's board approval. Id. ¶ 67.

v.    *Alter Ego Summary*

Neither the Parishes Complaint nor the DOCT Complaint allege sufficient facts to support a recovery under the alter ego standard, and therefore the Committee has not demonstrated a colorable claim. In considering the eight factors of an alter ego claim, the Parishes Complaint fails to make any allegations as to the second, third, fifth, sixth, and eighth factors. Viewing the Complaint in the most favorable light, the Committee has alleged facts, which, assuming they were proven, would show that only two of the eight factors – siphoning of funds and mere façade – weigh in favor of a finding that the Parishes are the alter ego of Debtor.[2] Similarly, the DOCT Complaint only alleged three of the factors – failure to adhere to corporate formalities, siphoning of funds, and mere façade. As noted, under New Jersey law, courts should not pierce the corporate veil in the absence of extraordinary circumstances, and in this case there are no allegations as to over half of the factors the Court is to consider, and the few factors that are discussed contain minimal allegations at best. Thus, the Committee has not alleged sufficient facts to establish a colorable claim for alter ego regarding the Parishes. See In re LocalBizUSA, Inc., 2018 WL 2569989 (Bankr. D.N.J. May 31, 2018) (alleging three alter ego factors is not sufficient).

b.  The Committee Has Not Alleged a Colorable
Fraudulent Transfer Claim Against DOCT

The DOCT Complaint seeks a judgment avoiding Debtor's and DOCT's formation of the Declaration of Trust as a fraudulent transfer under section 548(e)(1) of the Bankruptcy Code. But the fraudulent transfer claim asserted by the Committee is not colorable.

---

[2] Although the Parishes Complaint alleges commingling of funds in the DLF, there are no allegations that Debtor has siphoned those funds for its own use.

Section 548 provides in relevant part:

> (e)(1) [t]he trustee may avoid any transfer of an interest of the debtor in property that was made on or within 10 years before the date of the filing of the petition, if—
>
> > (A) such transfer was made to a self-settled trust or similar device;
> >
> > (B) such transfer was by the debtor;
> >
> > (C) the debtor is a beneficiary of such trust or similar device; and
> >
> > (D) the debtor made such transfer with actual intent to hinder, delay, or defraud an entity to which the debtor was or became, on or after the date that such transfer was made, indebted.

11 U.S.C. § 548(e). To establish a colorable claim for fraudulent transfer under section 548(e), the Committee must assert claims for relief that on appropriate proof would support a recovery. G-I Holdings, 313 B.R. at 631.

The Committee's allegations fail to meet the requirements of section 548(e). First, DOCT, is the settlor of the trust. For this reason alone, the Committee fails to establish a colorable claim because any transfer that may have occurred was not made by Debtor, as required by the Code. Furthermore, Debtor is not the beneficiary of the trust, but rather the trustee. Despite recognizing the plain language of the Declaration of Trust, which states Debtor is not a beneficiary, the Committee subsequently asserts "[i]t is uncontroverted that the purpose of DOCT is to assist the Diocese in providing funding," and therefore Debtor is the true beneficiary. DOCT Compl. ¶¶ 173-76. The mere fact that DOCT, an independent corporation, chooses to assist Debtor does not make Debtor the ultimate beneficiary of the trust. For the Committee to prevail on this count, the Court would have to set aside that Debtor and DOCT are separate entities, which the Committee was not able to properly allege as part of its alter ego claim.

Accordingly, the Committee failed to plead the elements of a section 548(e) claim and

therefore it has failed to state a colorable claim for fraudulent transfer in relation to the Declaration

of Trust.

c.  The D&O Complaint Asserts A Colorable Claim

The Committee asserts numerous breach of fiduciary duty claims in its D&O Complaint.

Although they appear to be colorable claims, as discussed below, the Committee has not shown

that Debtor is unjustified in not pursuing the claims.

2.    *Justifiability*

The Committee has not shown that Debtor's refusal to bring the proposed claims is

unjustified. A debtor's refusal to bring a claim is unjustifiable when the committee asserts a

colorable claim and demonstrates such claim is likely to benefit the estate. STN Enters., 779 F.2d

at 905. While a mini-trial is not necessary, the court "should assure itself that there is a likelihood

of success [for the claims] to justify the anticipated delay and expense to the bankruptcy estate that

the initiation and continuation of litigation will likely produce." Id. at 906. As previously

discussed, this is ultimately a cost-benefit analysis. See G-I Holdings, 313 B.R. at 643; Racing

Servs., 540 F.3d at 901. Because the Court finds that the Committee failed to assert a colorable

claim in the Parishes Complaint and DOCT Complaint, it need not analyze whether Debtor's

refusal to pursue the claims therein was unjustifiable. However, because some of those claims

overlap with the claims asserted in the D&O Complaint, this Court reviews the Complaints and

concludes that the Committee has not shown that Debtor's refusal was unjustifiable.

a.    Conducting a Cost-Benefit Analysis is Appropriate

Relying on In re One2One Commc'ns., LLC, 2014 WL 3882467, at *3 (Bankr. D.N.J.

2014), the Committee argues that conducting a cost-benefit analysis is not required in the Third

Circuit. The Committee based this argument on the One2One court's review of a Third Circuit case, Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548 (3d Cir. 2003). A close read of One2One shows that the court in Cybergenics did not set out criteria for determining an unjustifiability analysis "presumably because the issue was not before the [Third Circuit]." One2One, 2014 WL 3882467, at *3. After noting this distinction, the One2One court ultimately decided a cost-benefit analysis was appropriate. Id.; see also G-I Holdings, 313 B.R. at 643 (finding debtor's inaction in instituting an adversary proceeding unjustified after considering cost-benefit factors). Furthermore, numerous circuit courts have adopted this standard. See, e.g., STN Enters., 779 F.2d at 905; Racing Servs., 540 F.3d at 901. Without performing a cost-benefit analysis, a court could allow standing without any assurance that doing so would likely lead to a net recovery for the estate. Therefore, it is appropriate to perform a cost-benefit analysis.

The Committee next argues, if the Court conducts a cost-benefit analysis, it should conclude the benefit in pursuing the claims far outweighs the cost or delay. But the Committee provided minimal, at best, support for this argument. Rather, counsel only stated that its proposed claims against DOCT and the Parishes could result in a judgment of approximately $250 million, and its proposed claims against the Directors & Officers could result in an additional judgment of another $200 million. The Committee also stated without support that the cost of litigating will be insignificant. While a potential recovery of $450 million is substantial, the Committee did not adequately analyze the costs and risks of such litigation, and therefore, failed to provide a cost-benefit analysis that meets its burden of proof.

b.    Likelihood of Success on the Proposed Claims

The Committee offers nothing regarding the likelihood of success other than blind confidence. At the hearing, counsel for the Committee stated, "maybe we will be able to prove our

case and maybe we won't." Feb. 9, 2022, Hearing at 4:40:46 p.m. The Reply states that "allowing the Committee to pursue the Derivative Claims will clearly benefit the Debtor's estate" without any analysis of why the benefit is "clear." Reply ¶ 46.

Initially, the Motion does not allege sufficient facts to show that the benefit in pursuing the claims would outweigh the costs. The benefit alleged by the Committee assumes it will obtain a judgment in the full amount stated in the Complaints and does not account for any litigation risks, which are material to the Court's consideration of the Motion. See Racing Servs., 540 F.3d at 901 (court should consider the probability of legal success and financial recovery). Rather, the Committee would face many hurdles in pursuing the claims which affect its likelihood of success.

The Committee alleges the Assessment Waiver of approximately $1 million is a fraudulent transfer and Debtor's refusal to pursue it is a breach of the Directors' & Officers' fiduciary duties. But the Assessment Waiver occurred at the onset of the COVID-19 pandemic. During this time of uncertainty, when churches were shuttered due to a state of emergency throughout the country, it is entirely possible that the Parishes were largely unable to collect funds from parishioners to fund their operations and the Parish Assessments. As a result, it may have been reasonable for Debtor to authorize the Assessment Waiver and, to lessen its burden of doing so, reduce the guaranteed rate of return for Parishes' funds in the DLF from 3 percent to 1.5 percent, saving Debtor approximately $500,000. See Certification of Reverend Robert E. Hughes in Opposition to the Motion ¶ 16. The Court has concerns whether the Assessment Waiver was a breach of fiduciary duty in light of COVID and the steps Debtor took offset those losses.

Additionally, although $1 million is a substantial amount, after considering the likelihood of success on this proposed claim, the Committee did not show that Debtor is unjustified in not pursuing the Parishes. The Committee alleges a fraudulent transfer regarding the Assessment

Waiver as a single cause of action. But the Committee would have to pursue each Parish separately, adding layers of costs and delay, while also facing the burden of analyzing which of the 62 Parishes have any ability to pay a judgment. The Motion provides no analysis of the benefit each Parish received, and as a result, no analysis of which Parishes should be pursued. Assuming each Parish "received" an equal amount, it amounts to a benefit of approximately $17,000 per Parish. And, after considering savings from the interest reduction, the average benefit to each parish was approximately $8,500 – hardly a sum worth pursuing when considering the likely costs of litigation. The Committee would have to prove the elements of a fraudulent transfer as to each Parish. The costs associated with such an in-depth analysis and litigation would be substantial and the Committee failed to provide any such information in the Motion, despite these issues adding risk to the likelihood of success. Moreover, the Committee provided no analysis of whether the fraudulent transfer claims related to the Assessment Waiver are collectible.

As discussed below, there are also issues with pursuing the IVCP claims. Regardless, at the hearing the Committee suggested a potential judgment of $200 million for these claims but provided no analysis why this amount is accurate or reliable. Nor did the Committee discuss the litigation risks. The Court has concerns as to the Committee's chance to prevail on these claims, let alone whether the Committee would be able to realize a material benefit to the estate.

Regarding the IVCP claims, Debtor states it considered pursuing insurance but given the insurers' numerous defenses Debtor decided not to pursue recovery for the IVCP settlements. While the Court need not determine whether such actions were in Debtor's business judgment, it recognizes the negative impact this potential defense has on the Committee's likelihood of success in pursuing these claims, especially when the Committee would have to reach the high burden of showing a breach of business judgment. See In re Teleservices Grp., Inc., 2009 WL 838157

(Bankr. D.N.J. 2009) (the business judgment rule shields directors' corporate decisions except in instances of fraud, self-dealing or unconscionable conduct).

The Committee also would likely have difficulty with the Debt Cancellation because the Committee has not shown that Debtor waived these claims. Rather, the purported cancelled debt remains on Debtor's books and records and Debtor asserts it maintains the ability to collect if circumstances change in the future. Similarly, Debtor and the Parishes argue the loans came from the DLF, which if true, would negate the Committee's claims. Even if the purported claims are valid, and such claims are released in Debtor's plan, as the Committee asserts (D&O Compl. ¶ 119), any release would be part of Debtor's settlement with the Parishes and therefore the analysis discussed below applies. These factual issues add significant litigation risk for the Committee's likelihood of success, but the Committee never discussed these risks.

In addition, the plan is effectively a settlement between Debtor and DOCT and the Parishes. The Committee cannot obtain derivative standing simply because it does not believe the terms of those settlements are not favorable. See In re Manley Toys Ltd., 2020 WL 1580244, *8 (Bankr. D.N.J. Mar. 31, 2020) (citing In re Caesars Entm't Operating Co., Inc., 561 B.R. 457, 468 (Bankr. N.D. Ill. 2016); In re Milazzo, 450 B.R. 363, 371 (Bankr. D. Conn. 2011)). In each of these cases, when discussing whether derivative standing was appropriate, the court held that a trustee pursuing settlement of a potential claim was sufficient to deem the trustee had not unjustifiably refused to pursue it. This reality further reduces the Committee's likelihood of success.

Again, litigating these claims would include considerable risk. With these complications in mind, it is quite possible the purported $200 million claim would be dramatically reduced, but the Committee did not provide any analysis of those litigation risks or make any showing that the

potential benefit outweighs the risks. Therefore, the Court cannot conclude the likelihood of success outweighs the cost of bringing the claims.

### b. Costs of Litigating the Proposed Complaints

The Committee also failed to provide a meaningful analysis of the costs.[3] When discussing the cost-benefit analysis at the hearing, counsel stated, "we don't know . . . how these cases are going to be pursued – whether on a contingency or other basis. We also don't know the timing . . . but what we do know is the magnitude of the claims in which we might recover . . . in excess of $400 million" Feb. 9, 2022, Hearing at 4:35:58 p.m. Despite the Committee's optimism, it has not provided sufficient information for a cost-benefit analysis to satisfy its burden of proof.

The Committee has not provided any analysis of the risk of delaying the case beyond its suggestion that the claims could be assigned to a litigation trust and that they would otherwise proceed quickly because the issues are not complex. Reply ¶¶ 51, 52. However, the Committee provided little explanation to support this conclusion beyond its bald suggestion that a litigation trust would resolve the issue. Reply ¶ 51. As the Committee notes, litigation or liquidation trusts are typical in complex Chapter 11 cases, but this avenue is not practicable in this case because DOCT and the Parishes play a significant role in funding the plan. Dkt. 1142.[4]

DOCT proposes to provide a loan of up to $50 million and the Parishes are providing $10 million to help fund the plan. DOCT and the Parishes will also waive any claims against Debtor.

---

[3] Despite nineteen attorneys working on this case for the Committee, the Committee did not provide a proposed litigation budget for any of the Complaints but offers to retain an expert to provide such information, if needed. It is difficult to imagine that the Committee's counsel is not able to prepare a litigation budget to include with the Motion. Nevertheless, the time to provide such an estimate has passed.

[4] On March 23 the Court issued an oral decision related to Debtor's third amended disclosure statement (the "Disclosure Statement"). The Court approved the Disclosure Statement subject to minor modifications, and expects that revised version to be filed by March 25.

They will not fund a plan if the Committee obtains derivative standing to bring its proposed claims – counsel for the Parishes stated as much at the hearing – because that would effectively result in DOCT and the Parishes funding litigation against themselves. The Committee did not explain how this issue could be resolved, or if DOCT and Parishes do not fund a trust, how a trust with little or no liquid assets would be able to fund what would likely be protracted, expensive litigation.

Additionally, the Committee provides little indication of how it intends to fund litigation of these claims. Unlike the committee in <u>STN Enters.</u> that agreed to bear the cost of litigation, the Committee here makes little reference to the costs or a proposed fee arrangement in bringing the Complaints or how the litigation would be funded. The Committee's only reference to the cost of litigating the claims is its suggestion that it will be "minimal." Reply ¶ 46. Based upon the Court's experience, it is more likely that the cost of litigating these claims will be substantial. Lastly, the litigation would include complex factual and legal issues. Such litigation would take a substantial amount of time, perhaps five years when considering discovery, trial, and appeals.

For these reasons, the Committee has not shown that granting it derivative standing will likely result in a benefit to the estate, let alone that the benefit would outweigh the costs and risks. Thus, the Committee has failed to meet its burden of showing that Debtor's refusal is unjustified, and therefore the Motion for derivative standing is denied.

B.      <u>Attorney-Client Privilege and Authority to Settle</u>

Because the Committee will not be granted derivative standing, there is no basis for the Court to waive attorney-client privilege or to grant the Committee authority to settle any of the proposed claims. Therefore, this request is also denied.

## CONCLUSION

Because the Committee has not shown that Debtor is unjustified in refusing to pursue the claims asserted by the Committee, the Committee has failed to meet the standard for derivative standing. Thus, the Motion is denied.

Dated: March 24, 2022

JERROLD N. POSLUSNY, JR.
U.S. BANKRUPTCY COURT JUDGE