~~TRENK ISABEL SIDDIQI~~
~~& SHAHDANIAN P.C.~~
~~Richard D. Trenk, Esq.~~
~~Robert S. Roglieri, Esq.~~
~~290 W. Mt. Pleasant Ave., Suite 2350~~
~~Livingston, New Jersey 07039~~
~~Telephone: (973) 533-1000~~
~~Email: rtrenk@trenkisabel.law~~
~~Email: rroglieri@trenkisabel.law~~

~~*Counsel to The Diocese of Camden, New Jersey,*~~
~~*Chapter 11 Debtor and Debtor-in-Possession*~~

**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| THE DIOCESE OF CAMDEN, NEW JERSEY, | Case No. 20-21257 (JNP) |
| Debtor. | |

~~SEVENTH~~EIGHTH **AMENDED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE DESCRIBING** ~~SEVENTH~~EIGHTH **AMENDED CHAPTER 11 PLAN ─── OF REORGANIZATION** ~~OF THE DIOCESE OF CAMDEN, NEW JERSEY~~

**TRENK ISABEL SIDDIQI**
**& SHAHDANIAN P.C.**
Richard D. Trenk, Esq.
Robert S. Roglieri, Esq.
290 W. Mt. Pleasant Ave., Suite 2350
Livingston, NJ 07039
Telephone: (973) 533-1000
Email: rtrenk@trenkisabel.law
Email: rroglieri@trenkisabel.law

*Counsel to The Diocese of Camden, New Jersey*

**LOWENSTEIN SANDLER LLP**
Jeffrey D. Prol, Esq.
Michael A. Kaplan, Esq.
Brent Weisenberg, Esq.
One Lowenstein Drive
Roseland, NJ 07068
Telephone: (973) 597-2500
Email: jprol@lowenstein.com
Email: mkaplan@lowenstein.com
Email: bweisenberg@lowenstein.com

*Counsel to the Official Committee of Tort Claimant Creditors*

Dated:  June 1, 2022

ii

PLEASE READ THIS ~~SEVENTH~~EIGHTH AMENDED DISCLOSURE STATEMENT (THIS "DISCLOSURE STATEMENT") CAREFULLY.  THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR ON YOUR DECISION TO ACCEPT OR REJECT THE ~~SEVENTH~~EIGHTH AMENDED PLAN OF REORGANIZATION (THE "PLAN"), WHICH IS ANNEXED HERETO AS **EXHIBIT A**, BEING PROPOSED BY THE DIOCESE OF CAMDEN, NEW JERSEY (THE "DIOCESE" OR THE "DEBTOR") AND ITS OFFICIAL COMMITTEE OF TORT CLAIMANT CREDITORS (THE "TORT COMMITTEE," AND COLLECTIVELY WITH THE DIOCESE, THE "PLAN PROPONENTS").

THE DIOCESE ~~AND THE TORT COMMITTEE BELIEVE~~BELIEVES THAT THIS PLAN IS IN THE BEST INTERESTS OF ALL CREDITORS AND THAT THE PLAN IS FAIR AND EQUITABLE.  THE DIOCESE ~~AND THE TORT COMMITTEE URGE~~URGES THAT CREDITORS ENTITLED TO VOTE ACCEPT THE PLAN.

FOR REASONS MORE FULLY SET FORTH HEREIN AND IN THE TORT COMMITTEE STATEMENT (DEFINED BELOW), THE TORT COMMITTEE URGES CLASS 5 CREDITORS TO ACCEPT THE PLAN BECAUSE THE TORT COMMITTEE BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF CLASS 5 CREDITORS.

FOR REASONS MORE FULLY SET FORTH HEREIN AND IN THE TRADE COMMITTEE STATEMENT (DEFINED BELOW), THE TRADE COMMITTEE URGES CLASS 3 CREDITORS TO ACCEPT THE PLAN BECAUSE THE TRADE COMMITTEE ASSERTS THAT THE PLAN IS IN THE BEST INTERESTS OF CLASS 3 CREDITORS.

## TABLE OF CONTENTS

PAGE

DISCLAIMER ................................................................................................................. 1

ARTICLE I. ..................................................................................................................... 2

INTRODUCTION ........................................................................................................... 2

ARTICLE II. .................................................................................................................... 2

PURPOSE OF THIS DISCLOSURE STATEMENT ...................................................... 2

ARTICLE III. ................................................................................................................... 3

OVERVIEW OF PROPOSED TREATMENT OF ABUSE CLAIMS ........................... 3

ARTICLE IV. ................................................................................................................... 4

CONFIRMATION PROCEDURES ................................................................................ 4

ARTICLE V. .................................................................................................................... 9

BACKGROUND AND SUMMARY OF CHAPTER 11 CASE .................................... 9

ARTICLE VI. ................................................................................................................... 40

THE DIOCESE'S BANKRUPTCY ................................................................................ 40

ARTICLE VII. ................................................................................................................. 53

ASSETS OF THE DIOCESE .......................................................................................... 53

ARTICLE VIII. ................................................................................................................ 78

VALUATION OF ABUSE CLAIMS .............................................................................. 78

ARTICLE IX. ................................................................................................................... 79

ii

SUMMARY OF THE PLAN OF REORGANIZATION ............................................................ 79

ARTICLE X. ..................................................................................................................... 80

TREATMENT OF UNCLASSIFIED CLAIMS ................................................................ 80

ARTICLE XI. .................................................................................................................... 84

TREATMENT OF CLAIMS .......................................................................................... 84

ARTICLE XII. THE TRUST ............................................................................................. 88

ARTICLE XIII. .................................................................................................................. 98

TRUST DISTRIBUTION PLAN AND RELATED PROVISIONS ......................................... 98

ARTICLE XIV. ................................................................................................................ 105

SETTLING INSURERS ............................................................................................... 105

ARTICLE XV. ................................................................................................................. 106

NON-SETTLING INSURERS ...................................................................................... 106

ARTICLE XVI. ................................................................................................................ 109

PROVISIONS GOVERNING DISTRIBUTIONS GENERALLY ......................................... 109

ARTICLE XVII. ............................................................................................................... 113

TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................... 113

ARTICLE XVIII. .............................................................................................................. 113

CONFIRMATION AND CONSUMMATION OF THE PLAN .............................................. 113

ARTICLE XIX. ................................................................................................................ 116

EFFECTS OF CONFIRMATION ........................................................................................ 116

ARTICLE XX. .................................................................................................................... 117

EFFECT OF PLAN ON CLAIMS AND INTERESTS .......................................................... 117

ARTICLE XXI. ................................................................................................................... 127

RETENTION OF JURISDICTION ..................................................................................... 127

ARTICLE XXII. .................................................................................................................. 129

BANKRUPTCY RULE 9019 REQUEST .............................................................................. 129

ARTICLE XXIII. ................................................................................................................. 129

INCORPORATION OF CHILD PROTECTION PROTOCOLS. ........................................... 129

ARTICLE XXIV. ................................................................................................................. 129

MISCELLANEOUS PROVISIONS OF THE PLAN ............................................................ 129

ARTICLE XXV. .................................................................................................................. 132

RISK FACTORS/TAX CONSEQUENCES........................................................................... 132

ARTICLE XXVI. ................................................................................................................. 142

FEASIBILITY OF THE PLAN ........................................................................................... 142

ARTICLE XXVII. ............................................................................................................... 143

BEST INTERESTS TEST .................................................................................................... 143

ARTICLE XXVIII. .............................................................................................................. 143

PLAN PROPONENTS' RECOMMENDATION.................................................................... 143

4870-2885-4563, v. 2

## DISCLAIMER

THIS DISCLOSURE STATEMENT FOR THE PLAN ~~OF THE DIOCESE~~ AND RELATED MATERIALS DELIVERED HEREWITH ARE BEING PROVIDED BY THE ~~DEBTOR~~PLAN PROPONENTS TO KNOWN HOLDERS OF CLAIMS PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE.[1]

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT EXCEPT AS EXPRESSLY INDICATED HEREIN.  THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION AND BELIEF.  NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN.  IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.  NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, NOR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTOR OR HOLDERS OF CLAIMS.   CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

---

[1] Capitalized terms used but not defined herein shall have the same meaning ascribed to such term in the Plan.

## ARTICLE I.
### <u>INTRODUCTION</u>

On the Petition Date, the Diocese commenced its bankruptcy case by filing a voluntary petition pursuant to Chapter 11 of the Bankruptcy Code in the Bankruptcy Court. Chapter 11 of the Bankruptcy Code allows the Debtor to propose a plan of reorganization. Since the Petition Date, the Diocese has remained in possession of its assets and management of its mission as debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The document you are reading is the Disclosure Statement for the Plan which is annexed hereto as **<u>Exhibit A</u>**. The Plan constitutes a Chapter 11 plan of reorganization. Except as set forth in the Plan or otherwise provided by order of the Bankruptcy Court, Distributions will occur on the Effective Date or as soon thereafter as is practicable and at various intervals thereafter. In the Plan Proponents' opinions, the treatment of Claims under the Plan provides a greater recovery for Creditors than that which is likely to be achieved under other alternatives.

**Accordingly, the Plan Proponents believe that Confirmation of the Plan is in the best interests of all Creditors and, therefore, urge all Creditors to vote to accept the Plan.**

## ARTICLE II.
### <u>PURPOSE OF THIS DISCLOSURE STATEMENT</u>

This Disclosure Statement summarizes what is in the Plan and tells you certain information relating to the Plan and the process the Bankruptcy Court follows in determining whether or not to confirm the Plan. This Disclosure Statement contains the following exhibits: (i) the Plan (**<u>Exhibit A</u>**); (ii) Financial Projections (**<u>Exhibit B</u>**); (iii) Order Approving the Disclosure Statement (**<u>Exhibit C</u>**); (iv) the Debtor's liquidation analysis (**<u>Exhibit D</u>**); (v) the analysis performed by the Debtor's financial advisers of the value of IVCP claims (**<u>Exhibit E</u>**); and (vi) the Debtor's analysis of the valuation of Abuse Claims (**<u>Exhibit F</u>**).

READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:

(1)    WHO CAN VOTE OR OBJECT,

(2)    THE PROPOSED TREATMENT OF YOUR CLAIM (I.E., WHAT YOUR CLAIM WILL RECEIVE IF THE PLAN IS CONFIRMED), AND HOW THIS TREATMENT COMPARES TO WHAT YOU WOULD RECEIVE IN A CHAPTER 7 LIQUIDATION,

(3)    THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY,

(4)    WHAT THE BANKRUPTCY COURT WILL CONSIDER WHEN DECIDING WHETHER TO CONFIRM THE PLAN,

(5)    THE EFFECT OF CONFIRMATION, AND

2

(6)    THE FEASIBILITY OF THE PLAN.

This Disclosure Statement cannot tell you everything about your rights.  You should consider consulting your own lawyer to obtain more specific advice on how the Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as the Disclosure Statement.  If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

Section 1125 of the Bankruptcy Code requires a Disclosure Statement to contain "adequate information" concerning the Plan.  The term "adequate information" is defined in section 1125(a) of the Bankruptcy Code as "information of a kind, and in sufficient detail," about the Debtor and its operations "that would enable a hypothetical reasonable investor typical of holders of claims or interests" of the Debtor to make an informed judgment about accepting or rejecting the Plan.  The Bankruptcy Court determined that the information contained in this Disclosure Statement is adequate, and it has approved this document in accordance with section 1125 of the Bankruptcy Code.

This Disclosure Statement is provided to each Creditor whose Claim has been scheduled by the Debtor or who has filed a proof of claim against the Debtor as of the date of approval of this Disclosure Statement.  Under the Bankruptcy Code, your acceptance of the Plan may not be solicited unless you receive a copy of this Disclosure Statement prior to or concurrently with such solicitation.

## ARTICLE III.
## OVERVIEW OF PROPOSED TREATMENT OF ABUSE CLAIMS

The Plan classifies Claims in various Classes, and proposes specific treatment to be provided to all Holders of Claims in that class.  This Section is meant only to provide a summary overview of the treatment of Abuse Claims for purposes of convenience.  Claimants should read the entirety of this Disclosure Statement and the Plan before making a determination on how to vote on the Plan.

The Plan classifies Abuse Claims into two classes: Class 5 Abuse Claims Other Than Unknown Abuse Claims, and Class 6 Unknown Abuse Claims.  All Abuse Claims are classified into Class 5 unless the claim was not filed by the Bar Date (defined herein) and is held by an individual meeting certain criteria such that the individual was not required to file a claim prior to the Bar Date.

The Plan proposes to create a Trust to fund payments for Class 5 and Class 6 Claims pursuant to the guidelines in the Plan and Trust Agreement.  The Trust will be funded by $87,500,000 in cash from the Debtor and Other Catholic Entities.  As of the date of this Disclosure Statement, 324 non-duplicative Class 5 Claims have been filed, which will share collectively in the funds contributed to the Trust in accordance with the Trust Distribution Protocols.  In exchange for this contribution, the Plan proposes that the Abuse Claims against the Diocese and the Other Catholic Entities, other than accused perpetrators of Abuse, will be channeled to the Trust and released in accordance with the terms of the Plan and the Trust Distribution Protocols, and all

3

currently pending and future causes of action against these parties will be forever barred. Notwithstanding the foregoing, Abuse Claims will not be released or enjoined against the Covered Parties for any Abuse that may be covered under Non-Settling Insurer Policies until such claims are settled with the Covered Parties and their Non-Settling Insurers, or are fully adjudicated, resolved, and subject to Final Order.

In addition to the Diocese and Other Catholic Entity contribution, the Plan provides that the proceeds of the Diocese's insurance policies shall be assigned to the Trust for the benefit of Holders of Class 5 and Class 6 Claims. The Trust will then have the responsibility for litigating the claims against the Non-Settling Insurers at its sole cost and expense. There is no guarantee that the Trust will be successful in this litigation in light of the defenses that the insurance companies assert they have to these claims. **The Diocese makes no representations or warranties regarding the value of the Insurance Policies whatsoever, including, but not limited to, any defenses the Non-Settling Insurers may have.**

**NEW JERSEY STATE LAW LIMITS THE AMOUNT OF FEES AN ATTOREY MAY CHARGE UNDER A CONTINGENT FEE ARRANGEMENT. THE PLAN PROPONENTS RECOMMEND THAT EACH HOLDER OF A CLASS 5 AND CLASS 6 CLAIM REVIEW NEW JERSEY COURT RULE 1:21-7 (https://www.njcourts.gov/attorneys/assets/rules/r1-21.pdf) TO MAKE CERTAIN THEIR RETENTION AGREEMENT WITH THEIR ATTORNEY, IF ANY, IS CONSISTENT THEREWITH. ANY HOLDER OF A CLASS 5 OR CLASS 6 CLAIM WITH QUESTIONS ABOUT NEW JERSEY COURT RULE 1:21-7 SHOULD CONTACT COUNSEL FOR THE TORT COMMITTEE FOR ADDITIONAL INFORMATION.**

The Tort Committee believes that treatment of Abuse Claims under the Plan is fair and equitable and that the Plan should be approved. As a result, the Tort Committee recommends that Abuse Claimants vote to accept the Plan.

**ARTICLE IV.**
**CONFIRMATION PROCEDURES**

**THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. IF THE BANKRUPTCY COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL HOLDERS OF CLAIMS IN THE CHAPTER 11 CASE.**

If the Plan is confirmed, the Distributions provided for in the Plan will be in exchange for, and in complete satisfaction, discharge and release of, all Claims against the Debtor or any of its assets or properties, including any Claim accruing after the Petition Date and before the Effective Date, and of currently unknown Abuse Claims. ~~As~~Except as set forth otherwise in the Plan or Trust Distribution Procedures, as of the Effective Date of the Plan, all Holders of Claims will be precluded from asserting any Claim against the Debtor, the Reorganized Debtor or their assets, or other interests in the Debtor or the Reorganized Debtor based on any transaction or other activity of any kind that occurred before the Effective Date ~~except as otherwise provided in the Plan~~. In addition, the Plan provides for a release and channeling injunction based on a contribution to the

4

4870-2885-4563, v. 2

Plan by the Covered Parties and the Settling Insurers, which release shall be provided for solely as set forth in the Plan and Trust Distribution Procedures. Notwithstanding the foregoing, Abuse Claims will not be released or enjoined against the Covered Parties for any Abuse that may be covered under Non-Settling Insurer Policies until such claims are settled with the Covered Parties and their Non-Settling Insurers, or are fully adjudicated, resolved, and subject to Final Order.

**A.  Requirements for Confirmation**

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THIS PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.   The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing claims.  The Debtor CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code. Among the requirements for confirmation in this Chapter 11 Case are that the Plan (a) is accepted by Impaired Classes that have the right to vote; and (b) the Plan is feasible. The Bankruptcy Court must also find that:

1.  the Plan has classified Claims in a permissible manner;

2.  the Plan complies with the technical requirements of Chapter 11 of this Bankruptcy Code; and

3.  the Plan has been proposed in good faith. See 11 U.S.C. §§ 1123, 1129.

**B.  Persons Potentially Eligible to Vote on the Plan**

In determining acceptance of the Plan, votes will only be counted if submitted by a Creditor whose claim is duly scheduled by the Debtor as undisputed, non-contingent and unliquidated, or who, prior to the hearing on Confirmation of the Plan, has filed with the Bankruptcy Court a proof of claim which has not been disallowed or suspended prior to computation of the votes on the Plan. The Ballot Form that you received does not constitute a proof of claim.  If you are uncertain whether your Claim has been correctly scheduled, you should check the Debtor's Schedules, which are on file at the office of the Clerk of the Bankruptcy Court located at: United States Bankruptcy Court, Mitchell H. Cohen U.S. Courthouse, 400 Cooper Street, Fourth Floor, Camden, New Jersey 08101.  The Clerk of the Bankruptcy Court will not provide this information by telephone.  The Debtor's Schedules are also available at https://cases.primeclerk.com/camdendiocese.

The following are the unclassified Claims: Fee Claims, Administrative Expense Claims, U.S. Trustee Fees, and Priority Tax Claims. Unclassified Claims are not Impaired by the Plan. Each Holder of an unclassified Claim is conclusively presumed to have accepted the Plan and, therefore, is not entitled to vote to accept or reject the Plan.

Classes 7A and 7B are fully Impaired and are not receiving any Distributions under the Plan and, pursuant to section 1126(g) of the Bankruptcy Code, are conclusively presumed to have

4870-2885-4563, v. 2

rejected the Plan.  Classes 2, 3, 4, 5, 6, and 8 are Impaired under the Plan and are entitled to vote on the Plan.

### C.  Solicitation and Confirmation Hearing Notice

All Holders of Claims in Classes 2, 3, 4, 5, 6, and 8 will receive (i) notice of the Confirmation Hearing (defined below) (the "Confirmation Hearing Notice") and (ii) a Ballot.  All other creditors and parties in interest not entitled to vote on the Plan will receive a copy of the Confirmation Hearing Notice and a Notice of Non-Voting Status (as defined in the Disclosure Statement Order).  Because of the significant cost of printing and mailing the Disclosure Statement and Plan, copies of the Disclosure Statement and Plan will be available in electronic format online at https://cases.primeclerk.com/camdendiocese.

The Debtor's counsel will provide a hard copy of the Disclosure Statement and Plan at the request of any party in interest.  Parties may request a hard copy of the Disclosure Statement and Plan by contacting the Debtor's counsel, Richard D. Trenk or Robert S. Roglieri at 973-533-1000 or by emailing them at rroglieri@trenkisabel.law.

### D.  Plan Voting Procedures

The Ballots received by Holders of Impaired Claims do not constitute a proof of claim.  If a creditor is uncertain whether its claim has been correctly scheduled, the creditor should check the Debtor's Schedules, which are on file at the Office of the Clerk of the Bankruptcy Court located at: United States Bankruptcy Court for the District of New Jersey, U.S. Post Office and Courthouse, 401 Market Street, Camden, New Jersey 08101. The Clerk of the Bankruptcy Court will not provide this information by telephone.

Alternatively, a creditor may obtain copies of the Debtor's schedules on the website of Prime ClerkKroll, LLC, the Debtor's Claims and Noticing Agent (the "Claims and Noticing Agent"), at https://cases.primeclerk.com/camdendiocese.

#### a.  Deadline For Voting For or Against the Plan

In order for a Ballot to count, the creditor must (1) complete, date and properly execute the Ballot and (2) properly deliver the Ballot to the Claims and Noticing Agent by: (a) the E-Balloting Portal; or (b) mail or overnight courier to the Claims and Noticing Agent at the following address:

> The Diocese of Camden, New Jersey Ballot Processing Center
> c/o Kroll Restructuring Administration LLC (f/k/a Prime Clerk LLC)
> 830 3rd850 Third Avenue, 9th FloorSuite 412
> New York, New York 10022
> Brooklyn, NY 11232

**Formatted:** No widow/orphan control

The Claims and Noticing Agent must **ACTUALLY RECEIVE** original ballots on or before _____ ___, **2022 at 5:00 p.m.** (prevailing Eastern Time) in accordance with the solicitation procedures approved by the Bankruptcy Court (the "Voting Deadline").  Except as otherwise provided, you may not change your vote once the Claims and Noticing Agent receives your ballot.

6

4870-2885-4563, v. 2

Any ballot that is timely received, that contains sufficient information to permit the identification of the claimant and that is cast as an acceptance or rejection of the Plan will be counted and will be deemed to be cast as an acceptance or rejection, as the case may be, of the Plan.

The following ballots will not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected:

1.    any ballot received after the Voting Deadline, unless the Debtor, with the consent of the Tort Committee, grants an extension of the Voting Deadline with respect to such ballot or the Bankruptcy Court grants such an extension;

2.    any ballot that is illegible or contains insufficient information to permit the identification of the claimant after the Debtor reaches out to the person or entity that submitted such Ballot for clarification;

3.    any ballot cast by a person or entity that does not hold a Claim in a class that is entitled to vote to accept or reject the Plan;

4.    any ballot cast for a Claim designated as unliquidated, contingent or disputed or as zero or unknown in amount and for which no Rule 3018(a) motion has been filed by the Rule 3018(a) motion deadline;

5.    any ballot timely received that is cast in a manner that indicates neither acceptance nor rejection of the Plan or that indicates both acceptance and rejection of the Plan;

6.    any unsigned ballot; or

7.    any ballot that is electronically submitted other than through the E-Balloting Portal.

**Voting Questions.** If there are any questions regarding the provisions or requirements for voting to accept the Plan or require assistance in completing a Ballot, creditors may contact counsel to the Debtor, Richard D. Trenk or Robert S. Roglieri at 973-533-1000 or by emailing them at rtrenk@trenkisabel.law or rroglieri@trenkisabel.law. Class 3 Claimants may contact counsel for the Trade Committee, John S. Mairo or Rachel A. Parisi at (973) 538-4006 or by emailing them at jsmairo@pbnlaw.com or raparisi@pbnlaw.com. Abuse Claimants holding Claims classified in Class 5 or Class 6 may contact counsel for the Tort Committee, Jeffrey D. Prol or Brent Weisenberg at 973-597-2500 or by emailing them at jprol@lowenstein.com or bweisenberg@lowenstein.com.

b.    <u>**Acceptance of Plan**</u>

The acceptance of the Plan by Impaired Creditors is important. In order for the Plan to be accepted by Impaired Creditors, a majority in number (*i.e.*, more than half) and two-thirds in dollar amount of the Impaired Classes that vote must vote to accept the Plan. The Debtor urges that Creditors vote to accept the Plan. **CREDITORS ARE URGED TO COMPLETE, DATE,**

7

4870-2885-4563, v. 2

**SIGN AND PROMPTLY RETURN THEIR BALLOT.   PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY IDENTIFY THE EXACT AMOUNT OF THE CREDITOR'S CLAIM AND THE NAME OF THE CREDITOR.**

> ### E.  Time and Place of the Confirmation Hearing

The hearing at which the Bankruptcy Court will determine whether to confirm the Plan will take place on _____ ___, **2022 at __:00 __.m. (prevailing Eastern Time)**   in Courtroom 4C of the United States Bankruptcy Court for the District of New Jersey, Mitchell H. Cohen U.S. Courthouse, 400 Cooper Street, 4th Floor, Camden, New Jersey, 08101.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the hearing.

> ### F.  Procedure for Objections to Confirmation of the Plan

Any objection to Confirmation of the Plan must (a) be in writing; (b) state the name and address of the objecting party and the amount of the Claim of such party; and (c) state with particularity the grounds for the objection.  Any objection must be filed with the Bankruptcy Court and served so as to be actually received on or before _____ ___, **2022 at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline") by:

| | |
|---|---|
| *The Debtor and Reorganized Debtor* | Richard D. Trenk, Esq.<br>Robert S. Roglieri, Esq.<br>Trenk Isabel Siddiqi & Shahdanian P.C.<br>290 W. Mt. Pleasant Ave., Suite 2350<br>Livingston, New Jersey 07039<br>rtrenk@trenkisabel.law<br>rroglieri@trenkisabel.law |
| *The Official Committee of Tort Claimant Creditors (the "Tort Committee")* | Jeffrey Prol, Esq.<br>Brent Weisenberg, Esq.<br>Lowenstein Sandler LLP<br>One Lowenstein Drive<br>Roseland, New Jersey 07068<br>JProl@lowenstein.com<br>BWeisenberg@lowenstein.com |
| *The Official Committee of Trade Creditors (the "Trade Committee")* | John S. Mairo, Esq.<br>Rachel A. Parisi, Esq.<br>Porzio, Bromberg & Newman, P.C.<br>100 Southgate Parkway, P.O. Box 1997<br>Morristown, NJ 07962-1997<br>jsmairo@pbnlaw.com<br>raparisi@pbnlaw.com |

8

| | |
|---|---|
| *The Office of the United States Trustee* | Jeffrey M. Sponder, Esq. |
| | Lauren Bielskie, Esq. |
| | Office of the United States Trustee |
| | for the District of New Jersey |
| | One Newark Center |
| | 1085 Raymond Boulevard, Suite 2100 |
| | Newark, New Jersey 07102 |
| | Jeffrey.M.Sponder@usdoj.gov |
| | Lauren.Bielskie@usdoj.gov |
| | |
| *The Unknown Claims Representative* | Judge Michael Hogan (Ret.) |
| | PO Box 1375 |
| | Eugene, OR 97440 |
| | judge@hoganmediation.net |

**Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court.**

Formatted: No widow/orphan control

**G.  Identity of Person to Contact for More Information Regarding the Plan**

Any interested party desiring further information about the Plan should contact Debtor's counsel, Richard D. Trenk, Esq. or Robert S. Roglieri, Esq. at Trenk Isabel Siddiqi & Shahdanian P.C., 290 W. Mt. Pleasant Ave., Suite 2350, Livingston, New Jersey 07039, telephone (973) 533-1000 or by emailing rroglieri@trenkisabel.law.  Class 3 Claimants may contact counsel to the Trade Committee, John S. Mairo, Esq. or Rachel A. Parisi, Esq., at Porzio Bromberg & Newman, P.C., 100 Southgate Parkway, P.O. Box 1997, Morristown, New Jersey 07962, telephone (973) 538-4006 or by emailing them at jsmairo@pbnlaw.com or raparisi@pbnlaw.com.  Class 5 or 6 Claimants may contact counsel to the Tort Committee, Jeffrey D. Prol, Esq. or Brent Weisenberg, Esq., at Lowenstein Sandler LLP, One Lowenstein Drive, Roseland, New Jersey 07068, telephone (973) 597-2500 or by emailing them at jprol@lowenstein.com or bweisenberg@lowenstein.com.

**ARTICLE V.**
**BACKGROUND AND SUMMARY OF CHAPTER 11 CASE**

**A.  Background of Debtor**

**a.  The Roman Catholic Church**

It is a matter of faith that the Catholic Church (the "Church")[2] was founded by Jesus Christ to carry out the mission to teach, sanctify and serve the needs of others.  The Church is a worldwide community with over 1.2 billion members who adhere to a common creed.  The *Code of Canon*

---

[2] As used herein, "Church" means the universal Catholic Church (*i.e.,* the "one, holy, catholic and apostolic church" of Catholic belief, seated in the Vatican and headed by Pope Francis).  For the avoidance of doubt, particular places of worship are referred to herein as "churches" without capitalization.

4870-2885-4563, v. 2

*Law[3]* establishes the internal organizational structure and procedures to be followed within the Church.  Canon Law also identifies property rights and agency relationships among the various structures within the community of the Church.

While the Church is organized in a hierarchical structure, it is not a monolithic corporate entity.  A variety of organizations operate in ecclesiastical harmony to carry out the mission of the Church.  The Church is organized by territorial districts, the most common of which is a diocese.[4]  A diocese usually is defined by a geographic area and is created to serve the community of Latin Rite Catholics present in that area.  The bishop of a diocese is appointed by the Pope.[5]

Within the territory of a diocese are separately constituted parishes.[6]  Like a diocese, a parish usually is defined territorially.[7]

"Juridic persons" are constituted pursuant to Canon Law or by a special grant of competent authority given through a decree, and they have perpetual existence unless extinguished in accordance with Canon Law.  Juridic persons within the Church are either aggregates of persons or things, ordered for a purpose which is in keeping with the mission of the Church.  Similar to the civil law concept of a corporation, a juridic person is distinct and separate from any natural person, and from other juridic persons.  A public juridic person is a type of juridic person that fulfills its purposes in the name of the Church.  Dioceses and parishes are separate public juridic persons in Canon Law.[8]

Each public juridic person owns all the property it has acquired.  A juridic person possesses property in order to carry out its mission to teach, sanctify and serve.  These purposes are broadly defined as the conduct of worship, the support of employees and ministers, and the works of the apostolate.[9]  Canon Law requires the ownership of property to be protected by valid means under secular civil law, and permits the formation of secular legal entities, like the Diocese and parishes located within its ecclesiastical boundaries to hold property and conduct the business of a public

---

[3] Canon Law comes from several sources of Church law that together establish the internal organizational structure and relationships among the entities and organizations that comprise the Church.  Canon Law was originally codified in 1917, and revised by Pope John Paul II on January 25, 1983.  See 1983 Code of Canon Law c. 1-1752 (1983) ("Canon Law").

[4] Canon Law, c. 369.

[5] Id. at c. 377 § 1.

[6] Id. at c. 374.

[7] Id. at c. 515.

[8] Juridic personality is articulated in 1983 Code in canons 113-123.

[9] 1983 Code c. 1254.  The works of the apostolate include activities associated with easing human suffering, promoting the general welfare, and advancing the social mission of the Church: feeding the hungry, clothing the poor, welcoming the stranger, caring for the sick and offering education - and any other activity that can promote the good of an individual and society.

10

4870-2885-4563, v. 2

juridic person.

The administration of property is the responsibility of a public juridic person's administrator,[10] such as a diocesan bishop over the property of a diocese or a pastor over the property of a parish. The administrator of the property of a public juridic person must exercise this responsibility in concert with a Finance Council.[11] It is a fundamental canonical understanding that property owned by one public juridic person cannot be simultaneously owned or controlled by another.

The persons who populate a diocese or a parish are first of all those who are baptized and live in communion with the successor of St. Peter (the Pope, otherwise known as the Supreme Pontiff of the Roman Catholic Church) and those in communion with him.[12] Among the baptized are laypersons and clerics.[13] Clerics are also called sacred ministers and perform many of the liturgical services within the worship of the Church. Clerics are deacons, priests or bishops. There are other individuals, called "Religious," who contribute to the mission of the Church by joining together through common life and the profession of the evangelical counsels of poverty, chastity, and obedience.[14] Religious may be either laypersons or clerics. If a Religious is not a cleric, that person is referred to as a sister or brother.

In the Diocese, there are 4 communities of Religious men, and 15 communities of Religious women.

b. **The Diocese of Camden**

Catholics who lived in New Jersey were initially the responsibility of the Diocese of Baltimore until 1808, when South New Jersey passed under the authority of the Diocese of Philadelphia. On August 15, 1830, Bishop Francis Kenrick dedicated the St. Mary's Church in Pleasant Mills, New Jersey. St. Mary's Church was the fourth Catholic church in New Jersey and the first in the area that makes up present-day Diocese of Camden. The first parish and school were established at St. Mary's, Gloucester in 1849 and 1859, respectively.

In 1853, the Diocese of Newark was created and South New Jersey passed under the authority of the Diocese of Newark. Catholics in the area remained under the care of the Diocese of Newark until 1881 when the Diocese of Trenton was established.

With continued growth in the Catholic population during the first decades of the twentieth century, Pope Pius XI on December 9, 1937 established the Diocese of Camden. This also marked the time that New Jersey, previously part of the ecclesiastical province of New York, became a

---

[10] Id. at c. 1279 § 1.

[11] Id. at c. 1280.

[12] Id. at c. 204.

[13] Id. at c. 207 § 1.

[14] Id. at c. 207 § 2.

11

separate province, with the metropolitan see at Newark, which established it as an archdiocese.

Under New Jersey Law, the Diocese is an incorporated legal entity formed pursuant to New Jersey's Religious Corporations Law, Title 16 of the *Revised Statutes of New Jersey*, with its own corporate structure and governance, separate from the Parishes, Missions, Schools, and Catholic Ministry Entities which are other Catholic entities within its territory. The Other Catholic Entities are separate civil corporations, several of which predate the establishment of the Diocese, with their own employees and which maintain their own books, records, bank accounts and employee payrolls. These Other Catholic Entities are not debtors in this chapter 11 proceeding and have not otherwise sought relief under the Bankruptcy Code. ~~The~~These Other Catholic Entities ~~listed on Exhibits G and H~~ are seeking releases under the Plan and for claims against them to be channeled pursuant to the Channeling Injunction.

The juridic person of the Diocese of Camden was canonically established on December 9, 1937. Thereafter, on June 17, 1938, a corporation was formed to constitute the Diocese of Camden under N.J.S.A. 16:15-9 to 16:15-17. By statute, N.J.S.A. 16:15-10, the five trustees of the Diocese are the Bishop, the Vicar General and the Chancellor and two priests of the Diocese whom they elect.

The Diocese serves a 6-county region in Southern New Jersey and serves 486,368 Catholic individuals within its territory.

**B.   Other Catholic Entities Located Within the Territory of the Diocese**

**a.   The Parishes**

The secular legal embodiments of the Parishes extant within the Diocese are incorporated, and function pursuant to, separate provisions of the Religious Corporation Law that provide for the incorporation and operations of Dioceses. There are currently 62 Parishes. The Parishes are incorporated under N.J.S.A. 16:15-1 to 16:15-8. Pursuant to N.J.S.A. 16:15-1 and 15-3. Pursuant to New Jersey law, each of the Parish corporations is governed by a Board of Trustees comprised of the Bishop, the Vicar General of the Diocese, the Pastor of the Parish and two lay members of the Parish.

Each Parish corporation owns the real and personal property that is used in its ministry. Each Parish pays its own employees, has its own taxpayer/employer identification number, holds its own meetings, and appoints its own councils and committees.

As of the Petition Date, the Parishes were served by 124 active Diocesan priests, 88 retired Diocesan priests, 31 Religious priests that reside in the Diocese, 15 extern priests[15], 66 active permanent deacons serving in the Diocese, 38 retired permanent deacons living in the Diocese,

---

[15] An extern priest is a priest incardinated in another diocese or institute of consecrated life who comes with the permission of the diocesan bishop to exercise ministry in the territory of the Diocese. Incardination is the bond that exists between a cleric and a diocese or institute of consecrated life.

12

4870-2885-4563, v. 2

and 15 permanent deacons serving outside the Diocese.[16]  Deacons are men ordained for the ministry of the word (catechetics and preaching), service to the poor, and liturgical assistance. Deacons may preside at baptisms, officiate at marriages, and provide for the funeral rites apart from the celebration of the Eucharist.

b.  **The Missions**

In addition, there are four "missions" within the Diocese.  Three of them, Mater Ecclesiae Chapel, Inc., Saint Yi Yun Il John Cherry Hill Korean Catholic Mission, Inc., and Saint Andrew Kim Korean Catholic Mission, Inc. are organized and operated as nonprofit corporations in accordance with Title 15A of New Jersey Law.  These Missions are not considered to be "parishes" under Canon Law since they serve specific communities that cross Parish boundaries.  They cannot be incorporated under N.J.S.A. 16:15-1, *et seq*., which only provides for the incorporation of Catholic parishes, although their respective corporate governance structures mirror that of a Title 16 parish.  The fourth mission is Padre Pio Shrine in Buena Borough, N.J., Inc., which is a non-profit membership corporation of which the Diocese is the member.

c.  **Independent Catholic Schools (Elementary and Secondary)**

There are twenty-two (22) elementary schools operated in conjunction with the Diocese. With the exception of the Bishop McHugh Regional School in Dennis Township in Cape May County, each elementary school is owned by the respective parish where it is located, although most are regional schools that serve multiple parishes. The Bishop James T. McHugh Regional School, Inc. (Pre-K through 8th Grade), located in Cape May County, is a separate nonprofit corporation whose trustees are *ex officio* the pastors of parishes in that County. Additionally, the junior high school (7th and 8th grades) affiliated with Gloucester Catholic High School in Gloucester City in Camden County is owned by St. Mary's Church, Gloucester, and the pre-K-12th grade Wildwood Catholic Academy in Wildwood, in Cape May County, is owned by Notre Dame de la Mer Parish, Wildwood, N.J. Additionally, there are four elementary schools (three of which are in Camden, and one of which is in Pennsauken), which are owned by Parishes but operated by Catholic Partnership Schools, Camden, N.J., Inc.

St. Joseph Child Development Center, Inc., which was incorporated in 2003, operates a pre-school daycare program and facilitates early childhood education in Camden, New Jersey for approximately 120 children ages 2½ through 6.  The pastor of St. Joseph's Pro-Cathedral is an *ex officio* trustee, and the other trustees are appointed by the Bishop.  The current trustees are the pastor, Reverend Jaime Hostios, and the lay trustees: Mr. James Catrambone and Ms. Frances Montgomery.

There are five high schools affiliated with the Diocese.  Three of these high schools are Title 15A nonprofit corporations: (i) Camden Catholic High School located in Cherry Hill, New Jersey (incorporated as Camden Catholic High School, Cherry Hill, N.J.); (ii) Holy Spirit High School located in Absecon, New Jersey (incorporated as Holy Spirit High School, Absecon, N.J.); and (iii) Pope Paul VI High School located in Haddon Township, New Jersey (incorporated as Pope Paul VI High School, Haddon Township, N.J.).  The Bishop of the Diocese is the member

---

[16] The statistics cited in this paragraph are as of December 31, 2019.

4870-2885-4563, v. 2

of the corporation, and he appoints the trustees and certain corporate officers and has certain reserved powers.  Gloucester Catholic High School is located in Gloucester City, New Jersey; it is part of St. Mary's Church, Gloucester and is not separately incorporated.  Wildwood Catholic Academy (pre-kindergarten through 12th grade) is located in Wildwood, New Jersey; it is part of Notre Dame de la Mer Parish in Wildwood and is not separately incorporated.

While each of the Schools set forth herein are independently owned by the Parishes, except as otherwise noted herein, these schools are subject to the general supervision of the Diocese's Superintendent of Schools, their budgets must be approved by the Diocese or the Bishop, and they must comply with the Diocese's child protection policies.

Based on a projected census of 5,016 grammar school students for 2020-2021 and the sending municipality's per pupil expenditure to educate these students, a financial burden of over $108 million would be incurred if these students were educated in public schools.  These figures do not include the students in the three grammar schools in Camden City and the one grammar school in Pennsauken Township, which are administered by Catholic Partnership Schools.

With respect to the high schools, based on a projected census of 2,446 high school students for 2020-2021, and the sending municipality's per pupil expenditure to educate these students, a financial burden of $51.2 million would be incurred if these students were educated in public schools.  These figures do not include the students enrolled in the three private Catholic high schools (Bishop Eustace Preparatory School in Pennsauken, Our Lady of Mercy Academy in Newfield, and St. Augustine's Preparatory School in Richland).

d.  **Catholic Ministry Entities**

There are several nonprofit corporations that work to carry out various ministries of the Church within the territory of the Diocese.  All the Catholic Ministry Entities were created under the New Jersey Nonprofit Corporation law or other New Jersey organizational statutes to carry out a variety of works of the apostolate.

The Catholic Ministry Entities include the following:

i.  **Catholic Charities, Diocese of Camden, Inc.**

Catholic Charities, Diocese of Camden, Inc. ("Catholic Charities") was incorporated in 2000 and assumed the operations of Catholic Social Services, Diocese of Camden.  Catholic Social Services, Diocese of Camden had been established in 1971 through the merger of Catholic Charities of the Diocese of Camden, N.J. and Catholic Aid Society of the Diocese of Camden, New Jersey.

Catholic Charities is a nonprofit New Jersey corporation governed by its trustees.  The trustees include (all serving *ex officio*): the Bishop of the Diocese, the Vicar General of the Diocese, and the Chancellor of the Diocese.  In addition, these three trustees elect an additional two trustees for Catholic Charities.  The current *ex officio* trustees are Bishop Dennis Sullivan, Reverend Robert Hughes and Reverend Jason Rocks, and the elected trustees are Sister Helen Cole and Mr. Robert DiStanislao.  The affairs, property, business, and policies of Catholic Charities are under the charge, control and direction of the trustees.

14

Catholic Charities participates in the Church's social mission by recognizing the inherent dignity and worth of all people and responding with sincere Christian compassion to the corporeal needs of the poor and marginalized.  The purpose of Catholic Charities is to aid, support, advise, and conduct, by itself or in cooperation with any religious, charitable, benevolent or education corporation, a wide variety of human services for the benefit of all people in need within the Diocese without regard to religious, racial, ethnic or economic background.  In accordance with Catholic Social Teaching, Catholic Charities creates programs designed to serve the most vulnerable populations, while also guiding them towards a life of self-sufficiency.  These populations include: (i) those affected by housing and financial crises or disasters; (ii) refugees, immigrants, and asylees; (iii) veterans and their families; (iv) those struggling with mental health or addiction who are in need of counseling; (v) individuals looking for employment; (vi) the incarcerated; and (vii) families considering adoption.

Catholic Charities' headquarters is located at 1845 Haddon Avenue, Camden, New Jersey. In addition to its headquarters, Catholic Charities has a Family and Community Services Center in each of the New Jersey counties within the territory of the Diocese.  These are located in Westville (Gloucester County), Atlantic City (Atlantic County), Rio Grande (Cape May County), Vineland (Cumberland County), Bridgeton (Cumberland County), Salem City (Salem County), and Penns Grove (Salem County).  The headquarters is the Family and Community Services Center in Camden County.  Through the Family and Community Services Centers, those in need have access to a wide array of services including food pantries, housing counseling, rental assistance, nutrition education, thrift stores, utilities assistance, SNAP (food stamps) enrollment, and a community resource warehouse.

Catholic Charities employs approximately eighty (80) people and has a budget of approximately $8 million per year.  Over half of Catholic Charities' budget is obtained from grants from government entities.  In addition, the Diocese provides approximately $3 million per year, mainly through an annual fund-raising appeal.

Specifically, with respect to veterans, the Catholic Charities' Veteran Services Program is designed to assist homeless veterans in leaving homelessness through meaningful, competitive employment and permanent housing.  The Veteran Services Program focuses a significant portion of its time on preventing homelessness within the veteran community.  Through a $1.6 million grant from the United States Department of Veterans Affairs, Catholic Charities provides various assistance to veterans.  Catholic Charities assists homeless veterans in finding and procuring safe and secure places to live.  Approximately $500,000 of the grant from Veterans Affairs is specifically designated for rental assistance.  Catholic Charities provides up to four months of rental assistance to qualifying veterans.  These services can be provided to veterans and their families who live at 35% of the area median income.

Catholic Charities also receives approximately $1 million in grants from the New Jersey Department of Community Affairs.  These grants support the following homeless programs:

    a.    Homeless Prevention and Rapid Rehousing Program, which provides up to six months of rental assistance;

    b.    Supportive Services for Homeless People, which provides up to one month

of rental assistance; and

c. The Homeless Prevention Program, which also provides rental assistance to struggling families.

In 2019, Catholic Charities served 17,143 people within the Diocese's territory.  The 2019 Annual Report is annexed to the Reverend Hughes' Declaration at Exhibit I.  [ECF 3].

The following entities also fall under the responsibility of Catholic Charities.

4870-2885-4563, v. 2

**ii.  The Diocesan Housing Services Corporation of the Diocese of Camden, Incorporated**

The Diocesan Housing Services Corporation of the Diocese of Camden, Incorporated ("Diocesan Housing Services") is a nonprofit membership corporation, which was incorporated in 2000.  Diocesan Housing Services provides housing services to persons in need, including low- and moderate-income families, the disabled, and senior citizens.

Catholic Charities is the member of Diocesan Housing Services.  The trustees of Diocesan Housing Services are Peter O'Connor, Esq. (President), Ms. Alma Johnson (Vice President), Mrs. Laura J. Montgomery (Secretary/Treasurer), Monsignor John Burton, Reverend Thomas Newton, Mr. Joseph Fahy, Mr. William Murray and Reverend Walter Norris, Esq.

In total, Diocesan Housing Services serves approximately 1,100 residents in 847 units across 9 locations in Southern New Jersey.

**1.  Senior Housing Services**

The Diocese is the sponsor of Shepherd's Farm, a senior housing development located in West Deptford in Gloucester County.  The development is owned by Shepherd's Farm Senior Housing at West Deptford, Inc., a nonprofit corporation, a majority of whose trustees are appointed by the Diocese.

Diocesan Housing Services is a sponsor or developer and the manager of the following affordable senior housing developments:

a.  **Stonegate at St. Stephen** is located in Pennsauken in Camden County. Stonegate at St. Stephen, Inc., a nonprofit corporation, owns the development.  Diocesan Housing Services appoints a majority of the trustees.

b.  **Haven House** is located in North Cape May in Cape May County.  Haven House at St. John of God, Inc., a nonprofit corporation, owns the development.  Diocesan Housing Services appoints a majority of the trustees.

c.  **Village at St. Peter's** is located in Pleasantville in Atlantic County.  Village at St. Peter's, Inc., a nonprofit corporation, is the General Partner in the partnership which owns the development.  Diocesan Housing Services appoints a majority of the trustees.

d.  **Benedict's Place** is located in Cherry Hill in Camden County.  Benedict's Place, Inc., a nonprofit corporation, is the General Partner in the partnership which owns the development.  Diocesan Housing Services appoints the trustees.

e.  **Stonegate II** is located in Pennsauken in Camden County.  Diocesan Housing Services is the sole member of SG II MM, LLC, which is the Managing Member of the limited liability company which owns the development.

f.  **Victorian Towers** is located in Cape May in Cape May County.  Diocesan Housing Services is the sole member of DHSC Cape May LLC, which has a 50% interest

17

in the Managing Member of the limited liability company that owns the development.

## 2. Other Housing Services

**Village Apartments of Cherry Hill, N.J., Inc.** is a nonprofit corporation, which was incorporated in 1981, and owns an affordable housing development for seniors and disabled individuals located in Cherry Hill in Camden County. The trustees are the trustees of the Diocese or individuals approved by the Diocese. The current trustees are Bishop Dennis Sullivan, Reverend Jason Rocks, Monsignor John Burton and Reverend Joseph Szolack and Reverend Robert E. Hughes. Diocesan Housing Services manages the property.

Diocesan Housing Services manages **Davenport Village**, an affordable family housing development located in Hainesport in Burlington County, and controls the partnership which owns the development. The General Partner of the partnership is Domicilium Corporation, a nonprofit corporation, which was incorporated in 2000 and whose trustees are elected by Diocesan Housing Services. The current trustees are Reverend Walter Norris, Esq., Mr. Felix Torres-Colon, and Mr. George Tutwiler.

**Bishop Guilfoyle Housing Fund, Inc.** is a nonprofit membership corporation, which was incorporated in 2017 and supports the work of Diocesan Housing Services. Diocesan Housing Services is its sole member and appoints its trustees. The current trustees are Monsignor John Burton, Monsignor Thomas Morgan, and Reverend Joseph Perreault.

**DHS Communities, Inc.** is a nonprofit membership corporation, which was incorporated in 2019 and provides housing to people with autism spectrum disorder and similar disabilities. Diocesan Housing Services is the sole member and appoints the trustees. The current trustees are Mr. James Reynolds, Mr. Robert Waite, and Mr. Stephen Schoch.

The **Mews at St. Mary's LLC** is currently a single-member LLC formed to develop an affordable housing development for seniors in Monroe Township in Glocester County. Diocesan Housing Services is the member.

### iii. St. Mary's Catholic Home, Delaware Township, NJ

St. Mary's Catholic Home, Delaware Township, NJ is a nonprofit membership corporation that formerly operated a nursing home and residential health care facility in Cherry Hill, New Jersey (formerly known as "Delaware Township"). The nursing home and care facility was sold in 2015.[17] Catholic Charities is the member.

---

[17] On December 14, 2015, the Healthcare Foundation entered into a Guaranty and Suretyship Agreement (the "Agreement") with Center Management Group, LLC and its affiliates (collectively, "CMG"), as the buyers of (i) St. Mary's Catholic Home, (ii) Bishop McCarthy Residence, and (iii) Our Lady's Residence (collectively, the "Nursing Homes"). Pursuant to the Agreement, the Healthcare Foundation unconditionally guaranteed and became the surety for certain claims that may arise between CMG and the former owners of the Nursing Homes. In connection with the Agreement, the Healthcare Foundation pledged an investment account it owns that is held at PNC Bank. The maximum amount of the guaranty under the Agreement is $8,000,000 for years 2-8 of the Agreement. On December 14, 2023, the Agreement will expire by its own terms.

4870-2885-4563, v. 2

The entity continues to own land in Cherry Hill, portions of which were conveyed for Village Apartments in 1981 and for Benedicts Place in 2012. In addition, other facilities have been constructed on this property (Sacred Heart Residence for Priests, its ancillary residences, and a convent).[18]

### iv. Bishop McCarthy Residence, Vineland, NJ

Bishop McCarthy Residence, Vineland, NJ is a nonprofit membership corporation that formerly operated a nursing home and residential health care facility in Vineland, New Jersey.[19] Bishop McCarthy Residence was sold in 2015. The member is Catholic Charities.

### v. Our Lady's Residence, Pleasantville, NJ

Our Lady's Residence, Pleasantville, NJ is a nonprofit membership corporation that formerly operated a nursing home and residential health care facility in Pleasantville, New Jersey, which was sold in 2015.[20] The member is Catholic Charities.

### vi. VITALity Catholic Healthcare Services

VITALity Catholic Healthcare Services ("VITALity") is a department of the Diocese and provides various healthcare services within the Diocese. VITALity began in 2015 with funding from the Healthcare Foundation. VITALity employs approximately 30 people, including registered nurses, social workers, chaplains and associate chaplains. VITALity is funded through the Diocese and grants from the Healthcare Foundation. In 2019, VITALITY had annual funding of $2,383,964, which came from the House of Charity/Bishop's Annual Appeal ($916,105), the Healthcare Foundation ($1,347,856), and a grant through Diocesan Housing Services ($120,000). A copy of the 2019 Annual Report is annexed to the Reverend Hughes' Declaration at Exhibit J. [ECF 3]. VITALity is a department of the Diocese and is funded by the Diocese. It has no assets other than its yearly funding by the Diocese and other grants set forth herein.

VITALity provides the following programs and missions, amongst others:

a.      Staffed by registered nurses and social workers, VITALity Care Coordination provides assistance to individuals and families to navigate healthcare options and support services available. VITALity gives guidance and assistance to help access medical services that are needed, as well as monitor and oversee those services to evaluate their quality and effectiveness. The most used services through VITALity's Care Coordination Programs are home health aides, insurance assistance, housing/assisted living, nutritional services/Meals on Wheels, utility assistance, Catholic Charities referrals, prescription assistance, mental health counseling, transportation and in-home medical care. VITALity provides assistance to individuals in completing Medicaid applications for

---

[18] The net proceeds from this sale were used to fund The Diocese of Camden Healthcare Foundation, Inc.

[19] The net proceeds from this sale were used to fund The Diocese of Camden Healthcare Foundation, Inc.

[20] The net proceeds from this sale were used to fund The Diocese of Camden Healthcare Foundation, Inc.

4870-2885-4563, v. 2

expanded Medicaid in New Jersey.  This is a long, complicated, and detailed process.

      b.     Through the Hospital Chaplaincy Program, VITALity ensures that all parishioners have timely access to Catholic Chaplains when hospitalized. Priest chaplains are partnered with deacons, religious sisters or lay ministers, as associate chaplains to administer pastoral care to patients, families and hospital staff. The chaplaincy team helps in coordinating the visits of parish Extraordinary Ministers of the Eucharist; maintaining communication with the local parishes and pastors to inform them of parishioners that are hospitalized; and assisting patients being discharged to access other health-related services. Through the Hospital Chaplaincy Program, VITALity gave the following care in 2019:

        1.   Pastoral care visits with patients: 128,863

        2.   Pastoral care visits with staff and families: 14,276

        3.   Holy Communion distributed: 68,625

        4.   Sacrament of the Sick administered: 4,563

        5.   Pastoral care hours by chaplains and associate chaplains:  25,116

      c.     Ministry to Persons with Disabilities, which facilitates access to spiritual development for persons with disabilities.  The Ministry works to evangelize and serve persons with disabilities in the Diocese, so that they may be affirmed in all aspects of their faith life and reach their full potential as baptized members of the Church.  In this regard, VITALity assists families in finding transitional care after persons with disabilities age out of the education system and assist families in applying for state aid and grants.

      d.     Ministry of the Deaf, which facilitates access to spiritual development for the deaf.  The Ministry works to evangelize and serve the deaf in the Diocese of Camden, so that they may be affirmed in all aspects of their faith life and reach their full potential as baptized members of the Church.  VITALity provides for a special mass each Sunday for deaf individuals.  In addition, VITALity establishes programs in the Parishes to provide opportunity for deaf individuals to gather in social environments.

      e.     Parish Nurses Program, which provides parishioners ongoing access to trained registered nurses at their parish. These nurses can screen, educate, and coordinate care needs, all with an added spiritual dimension, allowing seniors and those dealing with health challenges, to stay healthy and more effectively deal with chronic medical conditions in order to remain safe and independent at home, while continuing to be a vital part of their community.  The parish nurse ministries sponsor programs such as "Opioid Prevention and Awareness", "Alzheimer's Awareness", and "The Dangers of Vaping".  In addition, VITALity works to ensure that each Parish has an AED in all facilities for emergencies.

      f.     The Resource and Referral Help Line (1-888-26VITAL) is available 24/7 and provides information on programs and services within the parish or community to address pertinent issues related to aging and disability.  Callers are connected to the

4870-2885-4563, v. 2

resource they need to provide appropriate care and support.  Live email chats also provide
additional access and a means to connect with VITALity staff.

g.      With the support of VITALity, three Parishes provide daily programs for
physical activity, nutritious meals, social interaction and recreation, spiritual exercises
along with health screening and monitoring for the elderly.  VITALity currently supports
the three Senior Social Day Centers: (i) "The Renaissance Center Senior Ministry" at St.
Andrew the Apostle in Gibbsboro, New Jersey; (ii) "Prime Timers" at Church of the
Incarnation in Mantua, New Jersey; and (iii) "Golden Slippers Senior Ministry at St. Simon
Stock in Berlin, New Jersey.  VITALity assists the Parishes in organizing senior day
centers, including providing grants for renovations to Senior Day Centers areas of the
Parish and ensuring there is appropriate programming and activities.  VITALity also
provides a grant for 50% of the salary of the director for each Senior Day Centers up to
$16,000 per year.  While the Senior Day Centers were closed due to COVID-19, isolation
for seniors was even more pronounced, with individuals confined to their own homes and
separated from their loved ones.  As a result, VITALity continued to ensure that seniors
were provided with social activities and, in this regard, supported the Renaissance Center
in having weekly Zoom meetings for its seniors.  The weekly sessions lasted approximately
two hours, with the first hour devoted to Bible study or a fun activity like trivia, while the
second half of the meetings are time to chat amongst themselves.  Prior to COVID-19, the
Senior Day Centers served approximately 60-100 seniors each.

h.      The Stephen Ministry is a program through which selected parishioners of
a parish are trained and organized to help provide one on one confidential Christian care to
parishioners of parishes and communities.  Trained Stephen Ministers are paired with
individuals in order to help them through any crisis, including the loss of a loved one,
divorce, grief, terminal illness, loss of job, hospitalization, loneliness, being a caregiver to
a loved one, and other stresses and challenges.  Stephen Ministers receive at least 50 hours
or training through the Stephen Ministry International Christian program or from "Stephen
Leaders" within the Parish.  Currently, there are 15 Stephen Ministry Parishes with 36
trained "Stephen Leaders" and 295 trained "Stephen Ministers," all of whom are
volunteers.

Even during COVID-19 and the subsequent lockdown orders, VITALity has continued to
provide assistance to the community.  From January 1 through July 31, 2020, VITALity provided
for: (i) 613 intakes, compared to 585 during the same time period in 2019; (ii) 486 in person visits
by a nurse or social worker, compared to 705 during the same time period in 2019; and (iii) 1,124
phone consultations by a nurse or social worker, compared to 425 during the same time period in
2019.  In total, VITALity has served approximately 4,000 persons from January 1, 2020 through
July 31, 2020.

In addition, VITALity has approximately 2,000 participants in its "Life to the Fullest"
program, which is a health and well-being membership program.  "Life to the Fullest" is a free
program available to all residents 65 and older.  As a member, participants receive quarterly
newsletters with upcoming events, health topics and information about VITALity programs.

### vii.  Other Ministry Entities

21

4870-2885-4563, v. 2

The Diocese is also affiliated with the following entities.  To the extent that they have or are the beneficiaries of any assets, the Diocese asserts that such assets belong to or are solely to the benefit of a separately incorporated entity, in which entity the Diocese has no legal interest, are not assets of the estate, and are not available for distribution under a plan of reorganization.

        **a.**      **Sacred Heart Residence for Priests, Inc.:** Sacred Heart Residence for Priests, Inc. is a nonprofit corporation that was incorporated in 1996 to provide accommodations for retired priests.  The three trustees are, *ex officio*, the Bishop for the Diocese, the Vicar General of the Diocese, and the Vicar for Priests. The current trustees are Bishop Dennis Sullivan, Reverend Robert Hughes, and Reverend Nicholas Dudo.

        **b.**      **Catholic Business Network of South Jersey, Inc.:** Catholic Business Network of South Jersey Inc. is a nonprofit membership corporation that was incorporated in 2016 and is intended to strengthen and support the application of faith and charity in the marketplace.  The Bishop of the Diocese is the member.

        **c.**      **The Catholic-Jewish Commission of Southern N.J., Incorporated:** The Catholic Jewish Commission of Southern N.J., Incorporated is a nonprofit membership corporation that was incorporated in 2002 and is intended to promote communication between the Jewish and the Catholic communities.  The members are the Jewish Federation of Southern New Jersey and the Diocese.

        **d.**      **The Catholic Star Herald:** The *Catholic Star Herald* is a nonprofit corporation that was incorporated in 1951 to publish newspapers, journals, magazines and books.  It publishes thirty-six issues per year.  The Bishop, the Vicar General, and the Chancellor are *ex officio* trustees and they elect two priests as the other trustees.  The *ex officio* trustees are Bishop Dennis Sullivan, Reverend Robert Hughes, and Reverend Jason Rocks.  The elected trustees are Reverend Monsignor John Burton and Reverend Joseph Szolack.

        **e.**      **The Collegium Center for Faith and Culture:** The Collegium Center for Faith and Culture is a nonprofit membership corporation that was incorporated in 1994 to engage in evangelization, and spiritual and moral formation.  Since 2003, the Diocese has been the member.

        **f.**      **The Camden Center for Law and Social Justice:** The Camden Center for Law and Social Justice (i) provides direct legal services to poor or moderate-income individuals and families in the City of Camden and its environs; (ii) promotes justice for all under the law through education, cooperation with other legal service providers, and litigation of wide impact; and (iii) brings together individuals and agencies to advocate for social justice and the vindication of individual rights through the law.

4870-2885-4563, v. 2

The Diocese supports approximately 9-12% of its budget each year with the remainder of its income is obtained from government grants, direct donations, and fees.

       **g.** **Guadalupe Family Services, Inc.:** Guadalupe Family Services, Inc. ("GFS") was incorporated in 1995 with the belief that the complex needs of urban family life in North Camden must be better served. From its offices in North Camden, GFS offers clinical counseling and direct social services focusing on families in distress. These services are offered with particular sensitivity to the cultural needs of the community. GFS directly serves one thousand persons annually.

**C.** **Diocese of Camden Trusts, Inc.**

Diocese of Camden Trusts, Inc. ("DOC Trusts") is a separately incorporated non-profit corporation, formed in 2001, and is more fully described in Reverend Hughes' Declaration. DOC Trusts is organized for the purpose of assisting the Diocese in fulfilling its religious, charitable and educational mission by providing funding for education, religious personnel development, health care needs, canonically required offices and long-term capital needs.

At the time of its formation, the Debtor was the sole member of DOC Trusts. Currently, the Bishop of the Diocese is the member. The current trustees of DOC Trusts are Monsignor Thomas Morgan, Judge Joseph Rodriguez, and Kenneth J. Bossong, Esq. The Board of Trustee of DOC Trusts is responsible for the overall governance of DOC Trusts. The Board of Trustees of DOC Trusts are fiduciaries to DOC Trusts. When the Diocese seeks funds from DOC Trusts, such requests are required to be reviewed and approved by the Board of DOC Trusts before any disbursement can be made.

The Board of Trustees of DOC Trusts is assisted by the Diocese's Investment Committee with respect to the investment of the DOC Trusts' assets. All of the investments are managed based on the Diocese of Camden, Inc. Statement of Investment Policies and Objectives.

The investments of DOC Trusts are administered by Cobble Hill Financial Services, Inc. ("Cobble Hill"), which acts as the investment consultant and advisor for the Diocese and DOC Trusts.

As set forth below, DOC Trusts has pledged certain of its investment accounts as collateral for the Diocese's line of credit with PNC Bank, National Association ("PNC"). The value of DOC Trusts was $110,025,286 as of September 30, 2021. These assets are subject to market fluctuations.

**D.** **The Revolving Fund**

The Diocese holds cash and investments in the following accounts (collectively, the "Revolving Fund"):

       a.     PNC Bank NA as Custodian under agreement dated 12/12/11 for Diocese of Camden CHFS – Revolving Fund;

23

b.    PNC Bank NA as Custodian under agreement dated 12/12/11 for Diocese of Camden Stock CHFS;

c.    PNC Bank NA as Custodian under agreement dated 12/12/11 for Diocese of Camden CHFS - Targeted General;

d.    PNC Bank NA as Custodian under agreement dated 12/12/11 for Diocese of Camden CHFS - Treasury General; and

e.    PNC Bank NA as Custodian under agreement dated 12/12/11 for Diocese of Camden CHFS – Investment Fund General.

The Diocese, as trustee, holds and invests certain funds for the Other Catholic Entities in the Revolving Fund.  The Diocese holds these cash and investments in the Revolving Fund for the Parishes pursuant to trust agreements (collectively, the "Parish Trusts").  As set forth above, each Parish is separately formed and incorporated under civil law, and holds a significant portion of its cash and investments in the Revolving Fund.

Each of the parish trust agreements (collectively, the "Parish Trust Agreements") are identical. The Diocese has operated in conformance with the Parish Trust Agreements.  All Parish assets are separate and distinct from the Diocese assets and fully accounted for in such a manner. These accounts are managed by Cobble Hill and are in the custody of PNC.

**E.  Other Foundations and Investments**

a.  **The Diocese of Camden Healthcare Foundation**

The Diocese of Camden Healthcare Foundation, Inc. (the "Healthcare Foundation") is a separate legal entity from the Diocese, formed in 2015, and is more fully described in Reverend Hughes' Declaration. [ECF 3, ¶ 101].  The Healthcare Foundation assists in funding the development, implementation and ongoing support of healthcare programs.

The Bishop of the Diocese is its member.  The current trustees are Mary Bettina Kemps, R.N., Judge Donald Smith, and Reverend Monsignor Peter M. Joyce.

The Board of Trustees of the Healthcare Foundation is responsible for the overall governance of the Healthcare Foundation.  All of the investments are managed based on the Diocese of Camden Healthcare Foundation, Inc. Statement of Investment Policies and Objectives and are managed by the Investment Committee.

The investments of the Healthcare Foundation are administered by Cobble Hill, which acts as the investment consultant and advisor for the Healthcare Foundation.

The Foundation's assets are the result of an assignment of the net proceeds of the purchase price of the sale of the Nursing Homes in 2015 pursuant to the Order and Opinion of the Honorable Deborah Silverman Katz, Assignment Judge.  The Nursing Homes were sold by the following entities: (i) St. Mary's Catholic Home, Delaware Township, N.J., Inc.; (ii) Bishop McCarthy Residence, Inc.; and (iii) Our Lady's Residence, Pleasantville, N.J., Inc. (collectively, the "Nursing

24

Home Entities"). As part of the transaction, $10 million must remain in an account with PNC (the "Control Account") until December 14, 2023 as a guarantee of certain covenants in the transaction.

Prior to the sale of the Nursing Homes, Catholic Charities was the sole member of each of the Nursing Home Entities. At the time of the sale, the Diocese had no legal interest in those entities. This is confirmed by the *cy pres* order entered by Judge Katz, which states that "Catholic Charities . . . is the sole member and owner of the three (3) nursing home facilities . . . ." See In the Matter of Approval of the Sale of the Assets of St. Mary's Catholic Home Delaware Township, New Jersey, our Lady's Residence, Pleasantville, N.J. d/b/a Our Lady's Multi-Care Center, Inc. and Bishop McCarthy Residence to Center Management Group, LLC, Docket No. CAM-L-4377-15 (N.J. Super. Ct. Law Div. Camden Cty. Dec. 3, 2015) (the "*Cy Pres* Action").

The Superior Court of New Jersey found in the *Cy Pres* Action that the continued operation of the Nursing Homes was financially unsustainable due to the decreased occupancy and the negative financial impact from the reduced per diem levels currently provided by Medicaid. *Id.* at 9. The Court further found that "Petitioner's request to deposit net consideration from the sale of the facilities to the Camden Diocese Healthcare Foundation is appropriate, as its overriding purpose is to remain 'responsible to the needs of God's most vulnerable people and their families, by delivering care where people are most comfortable and best able to receive it – at home and within their community.'" *Id.* at 15.

As described below, two of the three facilities were owned by the Diocese at some point; however, much like the DOC Trusts, all such transfers are beyond that statute of repose set forth in N.J.S.A. 25:2-31 and the only possible way that such transfers could be avoided would be through an actual fraudulent transfer articulated in N.J.S.A. 25:2-25(a), which is impossible as described below.

Saint Mary's Catholic Home was transferred from the Diocese to Catholic Charities of the Diocese of Camden, Inc. in 1940. Given the fact that such transfer is greater than 80 years old and Saint Mary's Catholic Home continued its charitable mission for more than 75 years following the transfer from the Diocese, the Diocese believes that it is extremely unlikely that any fraudulent transfer claim exists regarding the transfer of Saint Mary's Catholic Home. Our Lady's Residence was never owned by the Diocese. It was originally acquired in 1966 by Catholic Charities of the Diocese of Camden, a nonprofit corporation. Accordingly, the Diocese has no grounds to avoid any transfer not related to the Diocese.

The Diocese transferred Bishop McCarthy Residence to a newly formed Bishop McCarthy Residence, Inc. on May 21, 2015. Such transfer was recorded in the Cumberland County Clerk's Office on May 29, 2015. The transfer was completed in order to effectuate the ultimate transfer of the Nursing Homes to Center Management Group, LLC as described in the *Cy Pres* Action. The Diocese does not believe that it would be successful in any cause of action related to the 2015 transfer of Bishop McCarthy Residence for many of the reasons set forth with respect to the DOC Trusts. Additionally, it is important to consider that through the sale of the Nursing Homes, the Diocese received repayment of $8,653,326.00 in debt due from the Nursing Home Entities to the Diocese. This repayment was likely impossible without the sale of the Nursing Homes when considering the Nursing Homes' financial difficulties.

25

4870-2885-4563, v. 2

The value of the Healthcare Foundation's assets was $46,452,908 as of September 30, 2021. The Diocese contends the assets of the Healthcare Foundation are protected trust funds, assets of a separately incorporated entity of which the Diocese has no legal interest, not assets of the Diocese, and not available for distributions under a plan of reorganization.

### b.  Special Gifts Account

In addition to the Revolving Fund accounts set forth above, the Diocese holds certain investments in an account titled "PNC Bank NA as Custodian under agreement dated 12/12/11 for Diocese of Camden CHFS - Special Gifts" (the "Special Gifts Account"). The Special Gifts Account holds certain donor restricted funds. In addition, the Special Gifts Account holds funds on behalf of certain foundations and entities that support the mission of the Diocese. These foundations include, but are not limited to, the following:

### i.  The Frank J. and Rosina W. Suttill Catholic Foundation

The Frank J. and Rosina W. Suttill Catholic Foundation (the "Suttill Foundation") is a nonprofit membership corporation and was incorporated in 1972. The principal purpose of the Suttill Foundation is to provide a scholarship program for students from Camden to attend college.

The members are the Bishop of the Diocese, the Vice President of the Diocesan Corporation, and an individual selected by the Diocese. The current members are Bishop Dennis Sullivan, Reverend Robert Hughes, and Reverend Joseph Szolack. There are two Priest Directors (trustees) and one Lay Director (trustee) who are appointed by the Bishop. The current directors are Reverend Joseph Szolack, Reverend Robert Hughes, and Mrs. Laura J. Montgomery.

The value of the Suttill Foundation's assets was $2,660,321 as of September 30, 2021. The Diocese asserts the assets of the Sutill Foundation are protected trust funds, assets of a separately incorporated entity of which the Diocese has no legal interest, not assets of the Diocese, and not available for distribution under a plan of reorganization.

4870-2885-4563, v. 2

c.  **Other Investment Accounts**

The Diocese holds certain funds on behalf of other separately incorporated entities in investment accounts with PNC Bank.  These are:

### i.  The Tuition Assistance Fund, Inc.

The account is titled "DOC Tuition Assistance Fund" and held at PNC Bank as custodian.  The Tuition Assistance Fund, Inc. (the "Tuition Fund") is a nonprofit membership corporation that was incorporated in 1980.  The Tuition Fund provides tuition assistance to needy families whose children attend schools affiliated with the Diocese.  The members are, ex officio, the Bishop of the Diocese, the Vicar for Administration, and the Chancellor of the Diocese.  The current members are Bishop Dennis Sullivan, Reverend Robert Hughes and Reverend Jason Rocks.  In addition, there are five trustees:  (i) the Bishop or his designee; (ii) the Superintendent of Catholic Schools or his/her designee; and (iii) three trustees elected by the members.

The value of the Tuition Fund's assets was $1,376,681 as of December 31, 2021.  The Diocese asserts the assets of the Tuition Fund are protected trust funds, assets of a separately incorporated entity of which the Diocese has no legal interest, not assets of the Diocese, and not available for distribution under a plan of reorganization.

### ii.  The Sharkey Family Charitable Trust

The account is titled "DOC CHFS Sharkey Trust" and held at PNC Bank as custodian.  The Sharkey Family Charitable Trust" (the "Sharkey Family Trust") was established in 1988 to contribute to Catholic organizations and engage in activities supported by the Church.

The Sharkey Family Trust regularly provides scholarships for students in Catholic secondary schools.  There are three trustees, two of whom are appointed by the Bishop of the Diocese, and the third of whom is elected by the two appointed trustees.  The current trustees are Reverend Robert Hughes, Reverend Jason Rocks, and Mrs. Laura J. Montgomery.

The value of the Sharkey Family Trust's assets was $2,692,240 as of December 31, 2021.  The Diocese asserts the assets of the Sharkey Family Trust are protected trust funds, assets of a separately incorporated entity of which the Diocese has no legal interest, not assets of the Diocese, and not available for distribution under a plan of reorganization.

### iii.  James and Johanna Guilfoyle Trust

The James and Johanna Guilfoyle Trust was established under the November 16, 1990 Last Will and Testament of Bishop Guilfoyle.  Bishop Guilfoyle died on June 11, 1991.  The account is titled "DOC CHFS Guilfoyle Trust" and held at PNC Bank as custodian.

The value of the Guilfoyle Trust's assets was $1,517,094 as of December 31, 2021.  The Diocese asserts the assets of the James and Johanna Guilfoyle Trust are protected trust funds, assets of a separately incorporated entity of which the Diocese has no legal interest, not assets of the Diocese, and not available for distribution under a plan of reorganization.

4870-2885-4563, v. 2

F. **The Debtor's Management**

    a. <u>**Background of the Most Reverend Dennis J. Sullivan**</u>

The Most Reverend Dennis J. Sullivan, D.D. was appointed as the eighth Bishop of the Diocese by Pope Benedict XVI on January 8, 2013 and was installed as Bishop on February 12, 2013.

Bishop Sullivan was born in the Bronx on March 17, 1945. He was educated at St. Anthony Parish Elementary School and Mount St. Michael Academy in the Bronx. Thereafter, Bishop Sullivan attended Iona College in New Rochelle, New York, but left after his second year to enter St. Joseph's Seminary in Yonkers, New York. There, Bishop Sullivan earned a bachelor's degree in 1967 and a Master of Divinity in 1970.

Bishop Sullivan was ordained a priest for the Archdiocese of New York in 1971. From 1971 to 1981, he served as assistant pastor at the Parish of St. Elizabeth's Church in Manhattan, the Church of the Ascension in Manhattan, and Saints Philip and James Church in the Bronx. From 1982 to 2002, he was assigned to St. Teresa's Church in Manhattan, and from 2002 to 2004 he was assigned to Saints John and Paul Church in Larchmont, New York.

Bishop Sullivan also was ordained as an Auxiliary Bishop for the Archdiocese of New York in 2004 and served eight years as Vicar General of the Archdiocese under Cardinal Timothy Dolan, and the late Cardinal Edward Egan.

In 1999, the Bishop was named a Prelate of Honor to His Holiness (with the title "Monsignor"). Throughout his ministry, Bishop Sullivan has served on a variety of boards and committees, including:

    a.    The Presbyteral Council of the Archdiocese of New York as representative of South Manhattan priests;

    b.    The Lower East Side Catholic Area Conference, a pastoral agency;

    c.    The Inter Parish Finance Committee, which assists poor parishes;

    d.    Cabrini Immigrant Services;

    e.    Immigrant Social Service, Inc., an agency that provides services for Asian-American youth;

    f.    Two Bridges Neighborhood Association, which built 2,200 moderate income apartments;

    g.    The Catholic Campaign for Human Development Committee, which is part of the United States Conference of Catholic Bishops for a two-year term; and

    h.    At the United States Catholic Conference of Bishops, as the representative of Region II to the Committee for the Protection of Children and Young People.

28

In March 2020, pursuant to Canon Law, when Bishop Sullivan became 75 years old, he submitted his resignation to the Vatican. No action has been taken and Bishop Sullivan continues to serve.

b. **Background of Reverend Robert E. Hughes**

The Reverend Robert E. Hughes is the Vicar General of the Roman Catholic Diocese of Camden and the Vice President of the civil corporation, The Diocese of Camden, New Jersey. He has served in such capacity since December 3, 2013.

He was raised within the territory[21] of the Diocese, having lived in West Berlin, New Jersey and Voorhees, New Jersey. In 1981, he graduated from Paul VI High School in Haddonfield, New Jersey, one of the high schools affiliated with the Diocese.

Following high school, he attended La Salle University in Philadelphia, PA for two years to study pre-med before entering the seminary. He was assigned to St. Pius X Seminary in Dalton, Pennsylvania. He graduated from the University of Scranton in 1985 with a Bachelor of Arts in Philosophy.

Thereafter, he attended the Pontifical North American College in Rome, Italy, where he studied for five years, receiving the equivalent of a Master's Degree in Sacred Theology from the Pontifical University of St. Thomas in Rome in 1988. In 2001, he also received a Master's Degree in Education from Seton Hall University.

On August 4, 1990, he was ordained by the Most Reverend James T. McHugh at the Cathedral of the Immaculate Conception in Camden, New Jersey. On that same date, he was assigned to Holy Saviour Church in Westmont, New Jersey by Bishop McHugh as an assistant pastor. He served in that capacity until July 2, 1996, when he was assigned to St. Francis de Sales Church in Barrington, New Jersey. From August 14, 1999 to June 20, 2000, he was assigned to St. Mary's Church in Gloucester City, New Jersey. From June 20, 2000 through June 17, 2002, he was assigned to Mary, Mother of the Church in Bellmawr, New Jersey. Thereafter, from June 17, 2002 through July 5, 2003, he served as the Parochial Vicar in Residence for St. Thomas More Church in Cherry Hill, New Jersey. From July 5, 2003 through February 1, 2014, he served as Pastor of the Church of the Holy Family in Washington Township, Gloucester County.

In addition, from July 2, 1996 through 1999, he served as a Religion and Latin teacher and the chairperson of the Religion Department at Paul VI High School. Thereafter, on August 26, 1999, he was appointed the Vice Principal of Gloucester Catholic High School.

On October 10, 2001, he was appointed the President of Paul VI High School. In that capacity, he administered the School in conjunction with the Principal until 2003. In 2005, he was again appointed as the President of Paul VI High School and served in that capacity for two three-year terms.

In addition to his roles as a Pastor and school administrator during this time period,

---

[21] The territory of the Diocese is coextensive with the following six (6) counties: Atlantic, Camden, Cape May, Cumberland, Gloucester, and Salem.

29

4870-2885-4563, v. 2

Reverend Hughes served as the Vicar for Pastoral Life for the Diocese from January of 2003 through January of 2006 and as a Consultant to the College of Consultors from September of 2009 through November of 2011. He also served on the Diocesan Liturgical Commission, the Continuing Education & Spiritual Formation of Priests Committee, the Liturgical Art & Architecture Committee, the Priest Personnel Board and the Presbyteral Council.

On August 16, 2011, Reverend Hughes was appointed as the Chancellor of the Diocese. Reverend Hughes was appointed as the Vicar General on December 3, 2013. The Vicar General is essentially the chief operations officer of the Diocese. All departments within the Diocese report to him. On a regular basis, he oversees the Diocesan operations, the cemeteries, housing, charitable activities of the Diocese, and relationships with the parishes, schools, housing operations and Catholic Charities. As Vicar General, he serves these various ministries and programs within the Diocese in any way possible as the need arises.

c.  **Professional Background of Laura J. Montgomery**

Laura J. Montgomery is the Diocesan Finance Officer and the Bishop's Delegate for Temporalities for the Diocese.

In 1985, Ms. Montgomery graduated from Drexel University with a Bachelor of Science in Business Administration focused on accounting. In 1998, she successfully completed the Uniform Certified Public Accountant Examination.

Ms. Montgomery has nearly 30 years of experience working in finance and accounting roles for non-profit organizations. From June 1996 to August 2001, she was the Director of Accounting Services for the Archdiocese of Philadelphia after having worked as Assistant Treasurer and in other financial positions beginning in November 1990. From August 2001 through January 2004, she was the Controller for Project H.O.M.E., a non-profit organization that focuses on breaking the cycle of homelessness and poverty and alleviating the underlying causes of poverty.

In January 2004, Ms. Montgomery became the Controller for Catholic Charities, Diocese of Camden, Inc. and The Diocesan Housing Services Corporation of the Diocese of Camden, Incorporated and later added four nursing homes associated with the Diocese. In 2015, she became the Director of Finance for the Diocese of Camden. In 2018, she became the Chief Financial Officer and Diocesan Finance Officer and Bishop's Delegate for Temporalities of the Diocese. The position of Finance Officer is established under Can. 494 §1 of Canon Law, which requires: "every diocese, after having heard the College of Consultors and the Finance Council, the Bishop is to appoint a Finance Officer who is truly expert in Financial affairs and absolutely distinguished for honesty."

G.  **Retirement Programs**

The Diocese administers several retirement programs for the priests and lay employees of the Diocese.

4870-2885-4563, v. 2

a. **Pension Plan for Priests of the Diocese of Camden**

As part of its retirement programs, the Diocese has a Pension Plan for Priests of the Diocese of Camden (the "Priest Pension Plan").  The Priest Pension Plan is a non-contributory defined benefit plan covering all incardinated priests in good standing of the Diocese. The Priest Pension Plan qualifies as a church institution under the Internal Revenue Code and is, therefore, not subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), nor are the Priest Pension Plan's benefits guaranteed by the Pension Benefit Guarantee Corporation.  The Priest Pension Plan is exempt from federal income tax under provisions of Section 501(c)(3) of the Internal Revenue Code.  The Priest Pension Plan is covered under Code Section 414(e) - Church Plans.

Priests who serve in a Diocesan assignment for at least 25 years begin receiving benefits upon retirement with approval from the Ordinary of the Roman Catholic Diocese of Camden. Priests with less than 25 years, but at least 10 years of service receive a reduced benefit upon retirement. Under the Priest Pension Plan, normal retirement age is 70 with mandatory retirement at age 75.  The Priest Pension Plan permits early retirement at age 65 due to permanent mental or physical disability, or with the approval of the Bishop.

Retired priests received $2,340 per month for the years ended June 30, 2021and 2020 if they live outside a rectory or Diocesan facility.  If the priest lives in a rectory or a Diocesan facility, the monthly benefit to the participant was $1,408 for the years ended June 30, 2021 and 2020, respectively, with the difference being paid each month to the parish or Diocesan facility providing residence.  If a priest receives a pension benefit from another source, the monthly benefit is reduced by the amount of the outside benefit.

Contributions to the Priest Pension Plan are assessed by the Diocese to the Parishes and affiliated organizations being served by priests in a Diocesan assignment.  For the years ended June 30, 2021 and 2020, the amount assessed on behalf of each priest was $7,350.  As of the filing date, this plan was not fully funded.

The value of the Priest Pension Plan and the Priest Post-Retirement Plan (defined below) was $ 28,794,406.73 as of June 30, 2021.  This amount is subject to fluctuation.  The Priest Pension Plan and the Priest Post-Retirement Plan are combined investments.  The Diocese asserts that these assets are protected pension trust funds, not assets of the Diocese, and not available for distributions under a plan of reorganization.

b. **Pension Plan for Certain Lay Employees of the Diocese of Camden**

As part of its retirement programs, the Diocese has a Pension Plan for Certain Lay Employees of the Diocese of Camden (the "Lay Pension Plan").  The Lay Pension Plan is a non-contributory defined benefit plan covering certain employees of the Diocese and affiliated organizations designated by the Diocese as entitled to adopt the Lay Pension Plan. The Lay Pension Plan qualifies as a church institution under the Internal Revenue Code and is, therefore, not subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), nor are the Lay Pension Plan's benefits guaranteed by the Pension Benefit Guarantee Corporation.  The Lay Pension Plan is exempt from federal income tax under provisions of Section 501(c)(3) of the

31

Case 20-21257-JNP    Doc 1726    Filed 06/01/22    Entered 06/01/22 20:52:45    Desc Main
Document      Page 38 of 151

Internal Revenue Code.  The Plan is covered under Code Section 414(e) - Church Plans.

An employee became eligible to participate in the Lay Pension Plan after age 21 and completing one full year of service to the Diocese or other affiliated organization. An employee received a 100% vested benefit after ten years of credited service.  Effective July 1, 2009, participation in the Lay Pension Plan was frozen for employees hired on or after such date.  Current Lay Pension Plan participants continue to participate in the Lay Pension Plan with no change. Any former participant who vested and left the Diocese can re-enter the Plan upon rehire. Non-vested former employees can re-enter the Lay Pension Plan within two years from the date of separation unless such participant was separated as part of a merger or closure in which case the participant may re-enter within four years of separation.  Additionally, a participant is enrolled in the Lay Pension Plan as of his or her date of eligibility, and the participating organization is billed for his or her contribution.

The Lay Pension Plan provides for normal retirement on the last day of the month coinciding with or next following the later of the date the participant attains age 65 or the tenth anniversary of the date he or she becomes a plan participant.  The Lay Pension Plan permits early retirement for participants on the last day of the month in which a participant attains age 62, or the tenth anniversary of the date he or she becomes a plan participant, if later.  Benefits under early retirement are reduced by 1/2 of 1% for each month prior to normal retirement date.

A participant who retires on or after his or her normal retirement date is entitled to an annual pension benefit equal to 1.4% of annual earnings for the first ten years of credited service plus 1.8% of annual earnings for the next fifteen years of credited service plus 2.2% of annual earnings for the remaining years of credited service.  In no event does a participant receive less than $100 per month in full retirement.

In the event of the death of a vested active or vested terminated participant, a death benefit is paid to the employee's eligible spouse beginning when the deceased participant would have reached the age of 65.  The benefit is equal to one-half of the amount the eligible employee would have received had the employee retired the day before the employee's death and elected a 50% contingent annuitant option.

Contributions to the Lay Pension Plan are assessed by the Diocese to each participating organization.  For each of the years ended June 30, 2021 and 2020, these assessments were made based upon 14.5% and 14% of participating employees' W-2 salaries for the years ended December 31, 2020 and 2019, respectively.  As of the filing date, this plan was also underfunded.

The value of the Lay Pension Plan was $126,765,229 as of September 30, 2021.  The Diocese asserts that these assets are protected pension trust funds, not assets of the Diocese, and not available for distributions under a plan of reorganization.

c.  **Post-Retirement Benefits Plan for Priests of the Diocese of Camden**

As part of its retirement programs, the Diocese has a Post-Retirement Benefits Plan for Priests of the Diocese of Camden (the "Priest Post-Retirement Plan").  The Priest Post-Retirement Plan is a non-contributory defined benefit plan that provides health benefits and automobile insurance for all incardinated priests in good standing of the Diocese. The Priest Post-Retirement

32

4870-2885-4563, v. 2

Plan qualifies as a church institution under the Internal Revenue Code and is, therefore, not subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), as amended. The Priest Post-Retirement Plan is exempt from federal income tax under provisions of Section 501(c)(3) of the Internal Revenue Code. The Priest Post-Retirement Plan is covered under Code Section 414(e) - Church Plans.

Under the Priest Post-Retirement Plan, participants who have served in a Diocesan assignment for at least 25 years receive health benefits (medical, dental, vision and prescription) upon retirement with approval from the Ordinary of the Roman Catholic Diocese of Camden. Normal retirement age is 70 with mandatory retirement at age 75. The Priest Post-Retirement Plan permits early retirement at age 65 due to permanent mental or physical disability, or with approval of the Bishop. Participants who retire at age 70 and have at least 10 years of service in a Diocesan assignment also receive full health benefits upon retirement. Automobile insurance premiums are also paid by the Priest Post-Retirement Plan for certain priests.

The Diocese assesses the parishes and affiliated organizations in which priests are serving for the Priests Post-Retirement Plan. For the years ended June 30, 2021 and 2020, the amount contributed on behalf of each priest was $3,650 and $3,150, respectively. As of the filing date, this plan was also underfunded.

The value of the Priest Post-Retirement Plan is set forth above. The Diocese asserts that these assets are protected pension trust funds, not assets of the Diocese, and not available for distributions under a plan of reorganization.

> d. **The Diocese of Camden Retirement Plan**

As part of its retirement programs, the Diocese has established The Diocese of Camden Retirement Plan (the "Lay Retirement Plan"). The Lay Retirement Plan is a non-contributory defined contribution "profit sharing" plan covering certain employees of the Diocese and affiliated organizations designated by the Diocese as entitled to adopt the Lay Retirement Plan. The Lay Retirement Plan qualifies as a church institution under the Internal Revenue Code and is, therefore, not subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA). The Lay Retirement Plan is exempt from federal income tax under provisions of Section 501(c)(3) of the Internal Revenue Code. The Plan is covered under Code Section 414(e) - Church Plans.

An employee becomes eligible to participate in the Lay Retirement Plan after age 21 and completing one full year of service. An employee has a 100% vested benefit after ten years of credited service.

Employer discretionary contributions are allocated to a participant's account as a uniform percentage of the employee's annual earnings. Each participant's account is credited with contributions, allocated forfeitures and earnings thereon. The benefit to which a participant is entitled is the benefit that can be provided by the participant's vested balance.

The Lay Retirement Plan provides for normal retirement on the first day of the calendar year month immediately following the date the participant attains age 65 with ten years of credited service. A participant's normal form of distribution is a single lump sum cash distribution. A participant who has not terminated employment and has attained age 59-1/2 may elect a

4870-2885-4563, v. 2

withdrawal of all, or any portion of, his/her vested account benefit.

A person who terminates employment is entitled to elect to receive a distribution of all or any portion of his/her vested account benefit as soon as reasonably possible following the termination date. The participant may elect to receive a distribution of any deferred amount at any time.

The Diocese assesses participating organizations to the Plan. For each of the years ended June 30, 2021 and 2020, assessments were made based upon 3% of participating employees' W-2 wages for each of the years ended December 31, 2020 and 2019.

The benefit of a participant who is not vested is retained by the Diocese, as the Trustee of the Lay Retirement Plan, and deposited into the forfeiture account after that participant has incurred two consecutive one-year breaks in service and is applied to reduce employer contributions under the Lay Retirement Plan or to pay Lay Retirement Plan expenses. At June 30, 2021 and 2020, the forfeiture balance was $233,901 and $132,747, respectively. As of the filing date, this plan was also underfunded.

These assets are protected pension trust funds, not assets of the Diocese, and not available for distributions under a plan of reorganization.

### H.  Catholic Cemeteries

The Diocese administers several Catholic Cemeteries within its territory. The Diocese has been serving Catholic families in this capacity since before the establishment of the Diocese of Camden in 1937. There are fifteen Diocesan cemeteries throughout the six counties in southern New Jersey. The fifteen locations are as follows: (i) Calvary Cemetery and Mausoleum in Cherry Hill, NJ; (ii) New St. Mary Cemetery and Mausoleum in Bellmawr, NJ; (iii) Gate of Heaven Cemetery in Berlin, NJ; (iv) St. Joseph Cemetery in Swedesboro, NJ; (v) St. Mary's Cemetery in Williamstown, NJ; (vi) All Saints Cemetery and Mausoleum in Newfield, NJ; (vii) Our Lady of Assumption Cemetery in Pleasant Mills, NJ; (viii) Our Lady of Victories in Landisville, NJ; (ix) Holy Cross Cemetery and Mausoleum in Mays Landing, NJ; (x) Sacred Heart Cemetery and Mausoleum in Vineland, NJ; (xi) St. Casimir's Cemetery in Woodbine, NJ; (xii) St. Bernard Cemetery in Dorothy, NJ; (xiii) St. Elizabeth's Cemetery in Goshen, NJ; (xiv) Resurrection Cemetery in Clermont, NJ; and (xv) St. Mary's Cemetery and Mausoleum in Cape May, NJ.

The Catholic Cemeteries offer in-ground and above-ground burial options such as cemetery plots, cremation graves, chapel and garden mausoleums, and cremation niches.

The cemeteries are not separately incorporated. Except as set forth herein, the above-referenced cemeteries are owned by parishes, but administered and operated by the Diocese. The Diocese owns the land for All Saints Cemetery and Mausoleum in Newfield, New Jersey and Resurrection Cemetery in Clermont, New Jersey.

The employees of the cemeteries are members of Teamsters Local Union No. 676 (the "Union"). The Union is the sole and exclusive representative for all full-time cemetery field workers/foremen employed by the Diocese. The Diocese is current on all its obligations to the Union.

34

4870-2885-4563, v. 2

The Diocese asserts that it has a fiduciary responsibility to ensure that its cemeteries are maintained in perpetuity with adequate funding. As of the Petition Date, no reserves existed. The Diocese has been advised by its financial advisers that, as part of its reorganization, it must establish reserves for the care and maintenance of the cemeteries and mausoleums. Pursuant to Court Order, the Debtor assumed a contract with Perpetualcareadequacy.com for the purpose of conducting a perpetual care analysis to fulfill the above noted needs of the cemeteries. [ECF 201]. The Diocese filed the actuarial report on July 28, 2021. [ECF 731]. The actuarial report demonstrated that the Diocese needed to invest $2,305,000 immediately in a perpetual care fund plus additional money annually in order to provide for the perpetual care of the cemeteries. Id.

## I. **The Debtor's Prepetition Capital Structure**

### a. **Revolving Line of Credit**

On December 9, 2011, the Diocese entered into a Loan Agreement with PNC Bank for a revolving line of credit (the "Loan") wherein the Diocese may borrow the lesser of (a) $25 million dollars or (b) 90% of the margin value of the "Pledged Collateral" (as defined in the Loan Agreement).

In addition to the Loan Agreement, the Diocese and PNC Bank entered into a Committed Line of Credit Note (the "Note"). Pursuant to the Note, the Loan carries a rate of interest equal to (a) the Daily LIBOR Rate plus (b) the "Applicable Margin" (as that term is defined in the Note). The current "Applicable Margin" is .55%. Interest payments are due monthly, and the entire principal balance of the Loan is due upon expiration of the Loan. The original expiration date of the Loan was December 9, 2014, which was extended to December 9, 2017, and further extended to December 9, 2020.

In connection with, and as security for, the Loan, DOC Trusts entered into a Pledge Agreement with PNC Bank. Through the Pledge Agreement, DOC Trusts pledged the following collateral as security for the Loan: all investment property held in security account nos. xx-xx-xxx-xxx7115; xx-xx-xxx-xxx7123; xx-xx-xxx-xxx7131; xx-xx-xxx-xxx7149; xx-xx-xxx-xxx7157; xx-xx-xxx-xxx7165; and xx-xx-xxx-xxx7173 maintained with PNC Investments, LLC in its capacity as custodian (collectively, the "Pledged Accounts"), all assets credited to the Accounts and all additions, substitutions, replacements, proceeds, income, dividends and distributions thereon.

In addition to the Pledge Agreement, DOC Trusts entered into a Guaranty and Suretyship Agreement (the "Guaranty") with PNC, whereby DOC Trusts unconditionally guaranteed and became the surety for, the prompt payment of all amounts due under the Loan.

On December 11, 2017, the Diocese entered into an Amendment with PNC Bank. Pursuant to the Amendment, the expiration date of the Loan was extended to December 9, 2020.

As of September 30, 2020, the outstanding balance of the Loan is $22,807,500. The value of the Pledged Accounts as of September 30, 2021 was $100.2 million. The existing Loan expired on December 9, 2020.

On August 12, 2021, the Diocese filed a motion for approval from the Bankruptcy Court

35

4870-2885-4563, v. 2

to enter a settlement with PNC regarding the Loan.  If approved, the Diocese and PNC have agreed, in part, to amend the Loan documents to extend the expiration of the Loan.

      b.  **Other Unsecured Debt**

The Diocese owed its vendors approximately $1,500,000 as of the Petition Date.  These claims are for the delivery of goods and services to the Diocese, which are used in the operation of the Diocese's business, including providing support for its ministries and other outreach programs.

    **J.**  **Abuse Claims Against the Diocese**

The Diocese publicly released the names of fifty-six (56) priests (which was reduced to fifty-five (55) after further review) and one (1) deacon of the Diocese who have been credibly accused of abuse of minors.  These fifty-five (55) priests are a small percentage of the more than 800 priests who have faithfully served the people of South Jersey since the Diocese was founded in 1937.

From 1990 to 2019, the Diocese paid 99 settlements to abuse victims totaling approximately $10,120,000 (approximately $102,222 per claim).  In addition, the Diocese has expended approximately $945,000 to provide therapeutic assistance to victims.

On December 1, 2019, amendments to New Jersey's statute of limitations went into effect allowing individuals to assert claims of child abuse regardless of when it is reported to have occurred, and to file claims against institutions and individuals, even if those claims had already expired and/or were dismissed because they were filed late.  Additionally, the new law also expands the statute of limitations for victims to bring claims of child sexual abuse to age 55 or until seven years from the time that an alleged victim became aware of his/her injury, whichever comes later.

From December 1, 2019 through the Petition Date, fifty-five (55) lawsuits were filed against the Diocese by plaintiffs who are seeking damages as a result of alleged abuse, three (3) of which have been voluntarily withdrawn.  In addition, demand letters and or notices have been received from other claimants who have not commenced lawsuits against the Diocese.

The Diocese does not believe it has insurance coverage for any claims that occurred before November 27, 1969 because it has not been able to locate insurance policies or evidence of insurance policies issued to the Diocese prior to that date.  The Diocese and the Tort Committee have jointly retained an insurance archeologist to determine if there are any insurance policies available to the Diocese or its parishes for the pre-1969 period.

a.  **New Jersey Independent Victim Compensation Program**

Beginning on June 15, 2019, the Roman Catholic Archdiocese of Newark and the dioceses of Camden, Metuchen, Paterson and Trenton established the Independent Victim Compensation Program ("IVCP") to begin accepting claims related to the abuse of minors by priests of these dioceses.  The Diocese paid over $842,000 for the IVCP administration.

The IVCP is administered by Kenneth R. Feinberg and Camille S. Biros (collectively, the "IVCP Administrators"), two noted victims' compensation experts who have designed and administered similar compensation programs for the Catholic Dioceses in New York and Pennsylvania.  They also have administered similar programs for the September 11th Victim Compensation Fund, the Hokie Spirit Memorial Fund (Virginia Tech shootings), Deepwater Horizon/BP oil spill fund, the Penn State abuse claims, Aurora, Colorado shooting victim relief fund, The Newtown-Sandy Hook Community Foundation, the One Fund (2013 Boston Marathon bombings), and the Archdiocese of New York Independent Reconciliation and Compensation Program.  The IVCP Administrators act independently in evaluating and compensating individual claims.

The IVCP provided for:

a.  The complete independence of the IVCP Administrators in determining eligibility and the amount of compensation.

b.  The program was completely voluntary; no individual claimant was required to participate.

c.  All payments authorized by the IVCP Administrators came from funds which the Diocese borrowed; no public money was used to compensate victims.

d.  A signed release was only required if the individual victim accepted the amount offered by the IVCP Administrators, in which the victim agreed not to engage in any further litigation against the particular diocese.

e.  The program gave first priority to claimants who previously filed a claim directly with diocesan officials about abuse, prior to the establishment of the IVCP.

The Diocese did not fund IVCP payments by using money: (i) donated by the people of the Diocese to support parishes, schools, and charitable works; (ii) given to the *House of Charity-Bishop's Annual Appeal* or the *Catholic Strong* campaigns; or (iii) given by a donor for a specific ministry or apostolate.  The funding of IVCP payments came from diocesan operations or the Diocese's line of credit from PNC.

Through the IVCP Administrators, seventy-one (71) claims were resolved with payments totaling $8,102,500 (average claim settled for approximately $114,000).  Effective July 31, 2020, the Diocese suspended its participation in the operation of the IVCP due to its fiscal realities, which were worsened by the COVID-19 pandemic.

37

4870-2885-4563, v. 2

b. **Steps Taken by the Diocese to Protect Children**

In 2002, there was widespread recognition on the part of both civil and church authorities that the abuse and exploitation of minor children by Catholic priests was a serious problem that needed to be urgently and comprehensively addressed. The Catholic dioceses in New Jersey, including the Diocese of Camden, responded by entering into a *Memorandum of Understanding* with the New Jersey Division of Law and Public Safety and the twenty-one prosecutors of the counties in which each diocese is located. In addition, the United States Conference of Catholic Bishops addressed this issue by adopting the *Charter for the Protection of Children and Young People* and, at the request of the Conference of Bishops, the Holy See approved the *Essential Norms for Diocesan/Eparchial Policies Dealing with Allegations of Sexual Abuse of Minors by Priests or Deacons.*

i. **Memorandum of Understanding**

In the December 2002 *Memorandum of Understanding* (the "MOU"), the Attorney General of New Jersey, the twenty-one county prosecutors of New Jersey, and New Jersey's Catholic bishops, including the Bishop of Camden, pledged "their continuing commitment to work together to protect victims of crimes," acknowledging "the value of cooperation and communication and the need to have in place clearly defined policies and procedures so that all employees" of Catholic dioceses and parishes "know what they are expected to do" when they have cause to believe that criminal activity – primarily the exploitation or abuse of children – has been committed. See Reverend Hughes' Declaration at Exhibit C. [ECF 3]. The MOU added that the parties "are committed to addressing and alleviating the injuries caused by these crimes and to preventing the reoccurrence of such crimes to the greatest extent possible." Id. It stated that "the parties to this *Memorandum* will continue to work together to prevent criminal activity," recognizing that "the crimes addressed in this Memorandum are serious matters that warrant a full and prompt investigation by appropriate law enforcement authorities." Id.

In accordance with the MOU, since 2002 the Diocese has reported every allegation of the abuse of a minor by diocesan priests – whether or not it was believable – to law enforcement authorities in the locales where the abuse was said to have happened. These reports have been made to county prosecutors in Atlantic, Burlington, Camden, Cape May, Cumberland, Essex, Gloucester, Mercer, Monmouth, Ocean, Salem and Union counties, the Crown Prosecution Service in London, the Director of Prosecutions in San Juan, the district attorneys in Philadelphia and Allegheny counties, and the consular representatives of Mexico, Portugal, and Spain.

Even prior to the MOU, the Diocese reported the names of 43 diocesan priests, whether living or dead, against whom an allegation of child abuse had been received to the prosecutor of each county in the Diocese in which the abuse was reported to have occurred. Where a Prosecutor requested additional information (civil complaints, correspondence, *etc.*) it was readily provided.

ii. **Charter for the Protection of Children and Young People**

In addition, the *Charter for the Protection of Children and Young People* is a comprehensive set of procedures originally established by the United States Conference of Catholic Bishops in June 2002 (and subsequently revised and expanded in 2005, 2011, and 2018)

38

4870-2885-4563, v. 2

for addressing allegations of sexual abuse of minors by Catholic clergy.  See Reverend Hughes' Declaration at Exhibit D.  [ECF 3].  The *Charter* also includes guidelines for reconciliation, healing, accountability, and prevention of future acts of abuse, and it urges actions by Catholic dioceses in the United States for creating a safe environment for children and young people, the healing and reconciliation of victims and survivors, the establishment of methods for making prompt and effective response to allegations of abuse, the disciplining of offenders, and cooperation with civil authorities.  Id.

The *Charter* states that "the sexual abuse of children and young people by some priests and bishops, and the ways in which we bishops addressed these crimes and sins, have caused enormous pain, anger, and confusion.  Id.  Innocent victims and their families have suffered terribly."  Id. The Conference of Bishops added that "as bishops, we acknowledge our mistakes and our role in that suffering, and we apologize and take responsibility for too often failing victims and our people in the past. We also take responsibility for dealing with this problem strongly, consistently, and effectively in the future."  Id.

The *Charter* requires mandatory background checks for all personnel of the Diocese who have regular contact with minors.  In this regard, Article 13 of the *Charter* provides as follows:

Dioceses/eparchies will evaluate the background of all diocesan/eparchial and parish personnel who have regular contact with minors. Specifically, they will utilize the resources of law enforcement and other community agencies. In addition, they will employ adequate screening and evaluative techniques in deciding the fitness of candidates for ordination (cf. National Conference of Catholic Bishops, *Program of Priestly Formation,* 1993, no. 513).[22]  Id.

In accordance with the *Charter,* the Diocese has issued its policy with respect to employees and volunteers.  It applies to all priests, and to all adult employees and volunteers (18 years of age or older) who have regular contact with minors (under 18 years of age).  The policy requires the employee or volunteer to undergo appropriate evaluation, which must include a fingerprint-facilitated criminal history background check.  See Father Hughes' Declaration at Exhibit E.  [ECF 3].  The policy is comprehensive and mandatory.

### iii.  Other Actions Taken by the Diocese

Since 2002, the Diocese of Camden has reviewed, updated, strengthened, and enforced its safe environment protocols, including but not limited to conducting criminal history background checks of all clergy, employees, and volunteers who have regular contact with minors, and instituting, maintaining, and enhancing safe environment education and training.  In addition, the Diocese routinely updates its guidelines for reporting abuse.  See id.

Rebuilding the confidence of the Diocese's congregants and society is a paramount goal for the Diocese, and in this regard the Diocese has taken substantial steps.  In addition to what was discussed above, every adult having regular contact with minors is required to take a safe environment training program.  In July 2018, the Diocese transitioned from Child Assault Prevention (CAP) to the VIRTUS child abuse training awareness program entitled "*Protecting*

---

[22] "Eparchies" in the churches of the Eastern rite are the functional equivalent of dioceses in the Latin (or "western") rite.

*God's Children*." The Diocese requires retraining every five years. Also, the VIRTUS training program "*Empowering God's Children*" teaches such matters as "protecting our bodies," "safe adults" and "boundaries" and is presented to children in diocesan-affiliated educational programs in age-appropriate tiers.

### K. <u>Litigation Involving Public Nuisance Claim</u>

On November 14, 2019, the Superior Court of New Jersey, Essex County, Civil Division, dismissed a lawsuit captioned <u>Hanratty v. New Jersey Catholic Conference; Archdiocese of Newark; Diocese of Trenton; Diocese of Camden; Diocese of Paterson; and Diocese of Metuchen</u>, Docket No. ESX-L-003360-19. This complaint alleged two counts involving public nuisance and civil conspiracy. The Honorable Jeffrey B. Beacham, Judge of the Superior Court, issued a seventeen (17) page Opinion. No appeal was taken.

### L. <u>Events Precipitating the Chapter 11 Filing</u>

New Jersey Senate Bill No. 477 ("<u>S477</u>") was introduced to the New Jersey Senate on January 9, 2018, and ultimately approved on May 13, 2019. S477 reopened the statute of limitations in civil actions for certain sexual abuse claims, expanded categories of potential defendants in civil actions, and created a two-year window for parties to bring previously time-barred actions based on sexual abuse ("<u>Revived Claims</u>"). The two-year window became effective December 1, 2019, and ultimately expired on November 30, 2021 ("<u>Renewed Deadline</u>").

The Diocese filed this Chapter 11 Case for the purpose of reorganizing and maximizing its assets for the benefit of all individuals presenting bona fide claims of abuse while ensuring that the critical mission of the Diocese is accomplished for its congregants and the greater community especially during the global COVID-19 pandemic. Although there has been no claim of abuse having occurred within the past 19 years (since the 2002 *Charter for the Protection of Children and Young People*, the *Essential Norms* and the *Memorandum of Understanding*, all of which are discussed above), that does not diminish the pain of the horrific acts which occurred before then, and which have affected far too many.

During COVID-19, while government stay-at-home orders were in place, Diocese revenue was reduced by nearly 25%. Moreover, collections have reduced significantly over the past two years.

### ARTICLE VI.
### THE DIOCESE'S BANKRUPTCY

### A. <u>The Diocese's Chapter 11 Filing</u>

The Diocese filed its voluntary Chapter 11 petition on October 1, 2020.

40

a. **First Day Orders**

Concurrently with the filing of its chapter 11 petition, the Diocese filed certain motions and proposed Orders (collectively, the "First-Day Orders").  A summary of the relief granted in the First Day Orders is set forth below:

i.    **Complex Case Order**.  Pursuant to the *Application for Designation As Complex Chapter 11 Cases* [ECF 5], the Bankruptcy Court entered an Order [ECF 52] designating this Chapter 11 Case as a Complex Chapter 11 Case.

ii.   **Motion to Seal Order**.  Pursuant to *Motion to Seal Portions of Schedule F, The Master Creditor Matrix, and Other Pleadings and Documents Under Seal* [ECF 6], the Bankruptcy Court entered an Order [ECF 54] that, among other things, sealed certain portions of Schedule F and the Master Creditor Matrix relating to Abuse Claims.

iii.  **Cash Management Order**. Pursuant to the *Motion For An Order (I) Authorizing The Debtor To Continue And Maintain Their Existing Cash Management System, Bank Accounts And Business Forms, (II) Modifying The Investment Guidelines, (III) Providing The United States Trustee With A 60-Day Objection Period, And (IV) Granting Related Relief* [ECF 7], the Bankruptcy Court entered an Interim Order [ECF 34], a Second Interim Order [ECF 57], a Third Interim Order [ECF 199], and a Fourth Interim Order [ECF 248] that, among other things, (i) authorized the Debtor to continue to use its existing bank accounts and cash management system, and existing checks and business forms; and (ii) waived certain bank account and related requirements of the Office of the United States Trustee.  On December 16, 2020, the Bankruptcy Court entered a final order in connection with the Cash Management Motion.  [ECF 284].

iv.   **Wages Order**.  Pursuant to the *Motion For An Order (I) Authorizing The Debtor To (A) Pay Prepetition Wages, and Related Obligations, (B) Pay And Remit Payroll Taxes And Other Deductions To Third Parties, And (C) Honor And Process Workers' Compensation And Employee Benefit Obligations, And (II) Authorizing and Directing All Banks To Honor Checks And Transfers For Payment of Pre-petition Employee Obligations* [ECF 8], the Bankruptcy Court entered an Interim Order [ECF 44] and a Final Order [ECF 130] authorizing the Debtor to, among other things, pay certain prepetition wages and other compensation, continue various benefit programs, and pay other employee-related obligations.

v.    **Self-Insurance Order**. Pursuant to the *Motion for Entry of Interim & Final Orders (i) Authorizing the Continued Maintenance of the Diocese's Self Insurance Programs; and (ii) Authorizing the Payment of Prepetition Obligations in Respect Thereof* [ECF 9], the Bankruptcy Court entered an Interim Order [ECF 50] and a Final Order [ECF 131] authorizing the Debtor to, among other things, continue its self-insurance program and pay prepetition obligations related thereto.

vi.   **Premium Finance Order**.  Pursuant to the *Motion For Interim And Final Orders*

41

*Authorizing (I) The Continuation Of The Debtor's Insurance Policies (II) The Continuation Of The Debtor's Premium Financing Agreements And (III) The Performance Of All Prepetition Obligations Related Thereto* [ECF 10], the Bankruptcy Court entered an Interim Order [ECF 49] and a Final Order [ECF 132] authorizing the Debtor to continue to pay and perform under various prepetition insurance policies and the Debtor's premium financing agreement, and to pay all prepetition and post-petition obligations in respect thereof in the ordinary course of their business.

vii.    **Utilities Order**. Pursuant to the *Motion For Entry Of Interim And Final Orders (I) Prohibiting Utility Companies From Discontinuing, Altering Or Refusing Service On Account Of Prepetition Invoices, (II) Approving The Debtor's Proposed Form Of Adequate Assurance Of Future Payment And (III) Establishing Procedures For Resolving Requests For Additional Adequate Assurance* [ECF 14], the Bankruptcy Court entered an Interim Order [ECF 51] and a Final Order [ECF 136] authorizing and approving the provision of adequate assurance of payment to the Debtor's utility service providers under section 366 of the Bankruptcy Code, while allowing the Debtor to avoid the threat of imminent termination of their utility services from those utility companies.

viii.    **Credit Card Facilities Order**.  Pursuant to the *Motion for an Order Authorizing Debtor to Continue Credit Card Facilities* [ECF 12] the Bankruptcy Court entered an order [ECF 53] directing certain payment card processors to honor its prepetition agreement with the Debtor pending assumption or rejection.

ix.    **Prime Clerk LLC Retention Order**.  Pursuant to the *Application for Entry Of An Order Authorizing The Retention And Appointment Of Prime Clerk LLC As Claims And Noticing Agent Effective As Of The Petition Date* [ECF 17], the Bankruptcy Court entered an Order authorizing the Debtor to retain Prime Clerk LLC as claims and noticing agent for the Chapter 11 Cases. [ECF 55].

b.    **Appointment of Tort Committee**

On October 23, 2020, the Office of the United States Trustee appointed the Tort Committee in this Chapter 11 Case.  The *Notice of Appointment of Official Committee of Tort Claimant Creditors* [ECF 111] sets forth the nine (9) appointed Tort Committee members: (i) Dr. James Reuter; (ii) Mr. Jack Lechner; (iii) Ms. Jennifer Wydra; (iv) Mr. Paul Harrington; (v) Mr. Robert Polt; (vi) Mr. Edward Henkel; (vii) Dr. Patrick Lloyd; (viii) Mr. John Collins; and (ix) Mr. Andrew Napoli.

c.    **Appointment of Trade Committee**

On December 24, 2020, the Office of the United States Trustee appointed the Trade Committee in this Chapter 11 Case.  The *Notice of Appointment of Official Committee of Unsecured Trade Creditors* [ECF 293] sets forth the three (3) appointed Trade Committee members: (i) Porter & Curtis, LLC; (ii) Seton Hall University; and (iii) St. Mary's Villa.

42

4870-2885-4563, v. 2

### d. __Appointment of the Unknown Claims Representative__

On February 18, 2022, the Diocese filed an *Application for Entry of an Order Approving the Employment and Retention of Judge Michael R. Hogan (Ret.) as Unknown Claims Representative* seeking to retain Judge Michael R. Hogan (Ret.) as Unknown Claims Representative to represent the interests of Class 6 Claimants (the "UCR"). [ECF 1182]. The Bankruptcy Court approved retention of the UCR on February 28, 2022. [ECF 1237].

Pursuant to the Order approving retention of the UCR, the UCR is responsible for the following duties with respect to Class 6 Claimants:

> (i)    Undertaking an investigation and analysis regarding the estimated number of unknown Abuse claimants and the estimated value of unknown Abuse claims;

> (ii)    Filing proofs of claim on behalf of all unknown Abuse claimants within 60 days of entry of the order retaining the UCR, subject to extension as set forth in the Order;

> (iii)    Negotiating treatment of unknown Abuse claims in a plan of reorganization with the appropriate parties;

> (iv)    Advocating unknown Abuse claimants' legal positions before the Bankruptcy Court and, if necessary, filing pleadings and presenting evidence on any issue affecting such claimants;

> (v)    Taking all other legal actions reasonably necessary to represent the interests of unknown Abuse claimants; and

> (vi)    Serving as an independent fiduciary acting on behalf of all unknown Abuse claimants.

### e. __Employment of Professionals and Advisors__

#### i. __Debtor's Professionals__

On October 1, 2020, the Diocese filed an application to approve the retention of McManimon, Scotland & Baumann, LLC ("MSB") as counsel. [ECF 15]. MSB's retention was approved on October 16, 2020. [ECF 86].

On October 1, 2020, the Diocese filed an application to approve the retention of EisnerAmper as Financial Advisor. [ECF 16]. EisnerAmper's retention was approved on October 16, 2020. [ECF 87].

On October 1, 2020, the Diocese filed an application to approve the retention of Cooper Levenson, P.A. ("Cooper") as Special Counsel relating to Abuse Claims. [ECF 18]. Cooper's retention was approved on October 16, 2020. [ECF 88].

4870-2885-4563, v. 2

On October 1, 2020, the Diocese filed an application to approve the retention of Duane Morris LLP ("Duane") as Special Counsel relating to eminent domain litigation.  [ECF 19]. Duane's retention was approved on October 16, 2020.  [ECF 89].

On October 16, 2020, the Diocese filed an application to approve the retention of A. Atkins Appraisal Corp. ("Atkins") as Appraiser.  [ECF 81].  Atkin's retention was approved on October 28, 2020.  [ECF 133].

On March 15, 2021, the Diocese filed an application to approve the retention of Binswanger Company ("Binswanger") as Appraiser in order to appraise certain real property owned by the Diocese. [ECF 496]. Binswanger's retention was approved on March 23, 2021. [ECF 523].

On April 27, 2021, the Diocese filed an application to approve the retention of Trenk Isabel, P.C. ("Trenk Isabel") as counsel.  [ECF 598].  Trenk Isabel's retention was approved on May 5, 2021.  [ECF 616].

On September 20, 2021, the Diocese and the Tort Committee jointed filed an application to approve the retention of Insurance Archeology Group ("IAG") as Insurance Archeologist.  [ECF 824].  IAG's retention was approved on September 28, 2021.  [ECF 832].

On November 16, 2021, the Diocese filed an application to approve the retention of Roux Associates ("Roux") as a consultant and expert witness with respect to evaluation of abuse claims. [ECF 968].  Roux's retention was approved by the Bankruptcy Court on January 5, 2022. [ECF 1084].

### ii.  Tort Committee Professionals

On November 9, 2020, the Tort Committee filed an application to approve the retention of Lowenstein Sandler LLP ("Lowenstein") as counsel.  [ECF 182].  Lowenstein's retention was approved on November 17, 2020.  [ECF 218].

On November 13, 2020, the Tort Committee filed an application to approve the retention of undisclosed experts in connection with this matter.  [ECF 204].  Following various objections, the Tort Committee sought approval to retain Dr. Jennifer Hasselberger and Marci Hamilton as experts.  The Bankruptcy Court entered an order approving such retention on February 3, 2021. [ECF 392].

On January 5, 2021, the Tort Committee filed an application to approve the retention of Berkeley Research Group, LLC ("BRG") as financial advisor.  [ECF 309].  BRG's retention was approved on February 5, 2021. [ECF 400].

On March 3, 2021, the Tort Committee filed an application to approve the retention of Finance Scholars Group, Inc. ("FSG") as a consultant on the valuation of abuse claims and expert witness.  [ECF 455].  FSG's retention was approved on April 28, 2021.  [ECF 604].

On November 16, 2021, the Tort Committee filed an application to approve the retention of The Claro Group LLC (the "Claro Group") as an expert consultant and expert witness with

4870-2885-4563, v. 2

respect to estimation of abuse claims. [ECF 963]. The Claro Group's retention was approved on December 10, 2021. [ECF 1043].

On February 22, 2022, the Tort Committee filed an application to approve the retention of Tom Baker as an expert consultant and witness on the valuation of Debtor's insurance policies. [ECF 1198]. Mr. Baker's retention was approved on March 2, 2022. [ECF 1254].

### iii. Trade Committee Professionals

On January 15, 2021, the Trade Committee filed an application to approve the retention of Porzio, Bromberg & Newman, P.C. ("Porzio") as counsel. [ECF 347]. Porzio's retention was approved on February 1, 2021. [ECF 388].

### f. Claims Process and Bar Date

### i. Schedules and Statement of Financial Affairs

On the Petition Date, the Diocese filed for protection under Chapter 11 of the Bankruptcy Code. [ECF 1]. The Diocese's schedules and statement of financial affairs were filed simultaneously with the Chapter 11 Petition. The Debtor filed amended Schedules on October 6, 2020 [ECF 41 & 42], October 19, 2020 [ECF 92] and November 11, 2020 [ECF 198] (as amended, the "Debtor's Schedules").

### ii. Section 341(a) Meeting of Creditors

The Debtor's Initial Debtor Interview was held on October 16, 2020. The Debtor's Section 341(a) Meeting of Creditors was held on November 13, 2020.

### iii. Bar Date

Pursuant to an order of the Bankruptcy Court dated February 11, 2021 [ECF 409] (the "Bar Date Order"), June 30, 2021 at 11:59 p.m. (prevailing Eastern Time) (the "Bar Date") was established as the deadline for Creditors, including Governmental Units and Abuse Claimants, to file proofs of Claim in this Chapter 11 Case. Notice of this deadline was served on all potential creditors of the Debtor's Estate and published in various newspapers as required by the Bar Date Order.

### g. Other Significant Events During the Bankruptcy

On October 14, 2020, the Debtor filed a *Motion for Entry of Order Establishing a Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* (the "Bar Date Motion") [ECF 74]. Through the Bar Date Motion, the Debtor seeks to set bar dates for general, abuse and governmental unit related claims against the Debtor. On February 11, 2021, the Bankruptcy Court entered the Bar Date Order, as set forth above.

On October 19, 2020, the Debtor filed a *Motion for an Order Authorizing and Approving Sale of (i) 276 White Horse Pike, Galloway Township, New Jersey; and (ii) 1597 Almonesson Road, Deptford, New Jersey* (the "Sale Motion") [ECF 90]. Through the Sale Motion, the Debtor

45

4870-2885-4563, v. 2

sought approval to sell the following real property: (i) 276 White Horse Pike, Galloway Township, New Jersey (the "Galloway Property"); and (ii) 1597 Almonesson Road, Deptford, New Jersey (the "Deptford Property"). The Galloway Property is under contract with Ark Innovations, LLC for $3.9 million. The Deptford Property is under contract with Raphael Braschoss and Melissa Fleming for $75,000. On December 23, 2020, the Bankruptcy Court entered an order granting the Sale Motion. [ECF 290].

On October 21, 2020, the Debtor filed a *Motion of the Diocese of Camden, New Jersey, Chapter 11 Debtor and Debtor-in-Possession, for Entry of an Order: (i) Establishing Mediation Process Relating to Survivor and Tort Claims; (ii) Estimating Remaining Survivor and Tort Claims Pursuant to 11 U.S.C. § 502(c)(1) and Fed. R. Bankr. P. 3018(a) for Purpose of Voting on Plan of Reorganization and Confirmation Process; and (iii) Granting Related Relief* (the "Mediation Motion") [ECF 99]. Through the Mediation Motion, the Diocese requested that the Bankruptcy Court establish certain mediation procedures to fix the Abuse Claims and related issues. In the alternative, the Diocese requested estimation of the Abuse Claims pursuant to 11 U.S.C. § 502(c)(1) and Fed. R. Bankr. P. 3018(a) for any claimant who is unwilling to participate in the mediation process. The Bankruptcy Court denied the Mediation Motion.

On October 21, 2020, the Debtor filed a *Motion for Entry of an Order Approving Settlement and Compromise by and Between the Debtor and State of New Jersey, Department of Transportation Pursuant to Fed. R. Bankr. P. 9019* (the "Dept. of Transportation Settlement Motion") [ECF 97]. Through the Dept. of Transportation Settlement Motion, the Debtor seeks approval of a settlement and compromise relating to an eminent domain taking by the State of New Jersey, Department of Transportation. The anticipated net proceeds to the Diocese from the proposed settlement is $250,250. On November 13, 2020, the Bankruptcy Court entered an Order granting the Dept. of Transportation Settlement Motion. [ECF 203].

On October 30, 2020, the Debtor filed a *Motion for Entry of an Order Approving Payment of Certain De Minimis Claims, Refunds and Reimbursements* (the "De Minimis Motion") [ECF 140]. The De Minimis Motion sought payment of certain de minimis unsecured claims against the Debtor. On November 13, 2020, the Bankruptcy Court entered an Order granting the De Minimis Motion. [ECF 202].

On October 30, 2020, the Debtor filed a *Motion for the Entry of an Order Approving and Authorizing the Diocese to Assume Contract with PerpetualCareAdequacy.com Pursuant to 11 U.S.C. §§ 105(a) and 365(a) and Approving Cure Cost* (the "Motion to Assume") [ECF 142]. The Motion to Assume sought approval from the Bankruptcy Court to assume a contract with PerpetualCareAdequacy.com and pay all cure costs associated therewith. On November 13, 2020, the Bankruptcy Court entered an Order granting the Motion to Assume Motion. [ECF 201].

On October 30, 2020, the Debtor filed a *Motion to Extend Time to Remove Civil Actions* (the "Removal Motion") [ECF 146]. Through the Removal Motion, the Debtor sought to extend the time that it has to remove related actions from state court to the Bankruptcy Court pursuant to Rules 9006(b) and 9027 of the Federal Rules of Bankruptcy Procedure. On November 30, 2020, the Bankruptcy Court entered an Order granting the Removal Motion. [ECF 251].

On November 19, 2020, the Debtor filed a *Motion for a Final Order Authorizing the*

46

*Diocese to (i) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105(a), 362 and 364(c) and (d), (ii) Granting Liens and Superpriority Claims to the Lender Pursuant to 11 U.S.C. § 364(c), and (iii) Modifying the Automatic Stay* (the "Premium Financing Motion") [ECF 221]. Through the Premium Financing Motion, the Diocese sought approval of its entry into a premium financing agreement with AFS/IBEX in connection with the Debtor's insurance program for 2021. On November 25, 2020, the Bankruptcy Court entered an Order granting the Premium Financing Motion. [ECF 247].

On December 1, 2020, the Debtor filed a *Motion to Extend Exclusive Period to File a Chapter 11 Plan and Solicit Votes for Chapter 11 Plan Pursuant to 11 U.S.C. § 1121(d)* (the "Exclusivity Motion") [ECF 252]. Through the Exclusivity Motion, the Diocese sought to extend the exclusive period for the Debtor to file a chapter 11 plan and solicit votes thereon pursuant to section 1121(d) of the Bankruptcy Code. On December 23, 2020, the Bankruptcy Court entered an Order granting the Exclusivity Motion. [ECF 291].

On December 2, 2020, the Diocese filed a *Motion for Entry of an Order Extending the Deadline to Assume or Reject Unexpired Leases of Nonresidential Real Property Pursuant to Section 365(d)(4) of the Bankruptcy Code* (the "Extension Motion") [ECF 256]. On December 23, 2020, the Bankruptcy Court entered an Order granting the Extension Motion. [ECF 292].

On December 31, 2020, the Diocese filed its first Plan and Disclosure Statement. Various parties filed objections to the Disclosure Statement. The Bankruptcy Court denied approval of the Disclosure Statement.

On February 25, 2021, Century Indemnity Company filed a Notice of Appeal of the Bar Date order. [ECF 446]. This appeal is fully briefed but has not been decided by the District Bankruptcy Court.

On March 17, 2021, the Debtor filed a *Motion of The Diocese of Camden, New Jersey, Chapter 11 Debtor and Debtor-In-Possession, for Entry of an Order Further Extending Time to File Notices of Removal of Civil Actions* seeking to extend the deadline to remove civil actions. [ECF 502]. The Bankruptcy Court granted the Motion on April 14, 2021. [ECF 574].

On December 1, 2020, the Debtor filed a *Second Motion to Extend Exclusive Period to File a Chapter 11 Plan and Solicit Votes for Chapter 11 Plan Pursuant to 11 U.S.C. § 1121(d)* (the "Second Exclusivity Motion") [ECF 541]. Through the Second Exclusivity Motion, the Diocese sought to extend the exclusive period for the Debtor to file a chapter 11 plan and solicit votes thereon pursuant to section 1121(d) of the Bankruptcy Code. On May 12, 2021, the Bankruptcy Court entered an Order granting the Second Exclusivity Motion. [ECF 628].

On April 7, 2021, the Debtor and the Tort Committee filed a *Joint Motion of the Diocese and the Official Committee of Tort Claimant Creditors for Entry of an Order (i) Appointing a Mediator, (ii) Referring Matters to Mandatory Global Mediation, and (iii) Granting Related Relief* (the "Joint Mediation Motion"). [ECF 562]. On May 20, 2021, the Bankruptcy Court entered an order granting the Joint Mediation Motion and appointed the Honorable Jose L. Linares (ret.). [ECF 640]. The parties remain in active mediation.

On June 23, 2021, the Debtor filed a *Third Motion to Extend Exclusive Period to File a*

47

4870-2885-4563, v. 2

*Chapter 11 Plan and Solicit Votes for Chapter 11 Plan Pursuant to 11 U.S.C. § 1121(d)* (the "Third Exclusivity Motion") [ECF 678]. Through the Third Exclusivity Motion, the Diocese sought to extend the exclusive period for the Debtor to file a chapter 11 plan and solicit votes thereon pursuant to section 1121(d) of the Bankruptcy Code. On July 14, 2021, the Bankruptcy Court entered an Order granting the Second Exclusivity Motion. [ECF 703].

On June 23, 2021, the Debtor filed a *Second Motion of The Diocese of Camden, New Jersey, Chapter 11 Debtor and Debtor-in-Possession, for Entry of an Order Further Extending Time to File Notices of Removal of Civil Actions* seeking to extend the deadline to remove civil actions. [ECF 679]. The Bankruptcy Court granted the Motion on July 16, 2021. [ECF 706].

On June 25, 2021, the Debtor filed a *Motion for Entry of an Order to Approve Settlement of Controversy by and Among the Diocese and the RH Claimants Pursuant to Federal Rule of Bankruptcy 9019(a)* (the "RH Settlement Motion"). [ECF 682]. The RH Settlement Motion sought approval of settlements with the RH Claimants, providing them with payment on their claim over ten years in equal annual installments. Id. On October 15, 2021, the Bankruptcy Court entered an order granting the RH Settlement Motion. [ECF 884].

On August 12, 2021, the Diocese filed a *Motion for Entry of an Order Approving Settlement of Controversy by and Between the Diocese and PNC Bank, National Association Pursuant to Federal Rule of Bankruptcy 9019(a)* (the "PNC Settlement Motion"). [ECF 749]. The PNC Settlement Motion was heard by the Bankruptcy Court on September 9, 2021. On October 5, 2021, the Bankruptcy Court ruled that an evidentiary hearing would be held on the PNC Settlement Motion.

On October 12, 2021, the Tort Committee filed the Tort Committee Standing Motion [ECF 871]. The Diocese, DOC Trusts, and the Parishes, Missions, and Schools have objected to the Tort Committee Standing Motion. On March 24, 2022, the Bankruptcy Court entered an Order and Opinion denying the Standing Motion. The Tort Committee has filed an appeal of this order. [ECF 1469]. The terms of the Plan and the settlement between the Diocese and Tort Committee would resolve this appeal.

On November 2, 2021, the Debtor filed a *Fourth Motion to Extend Exclusive Period to File a Chapter 11 Plan and Solicit Votes for Chapter 11 Plan Pursuant to 11 U.S.C. § 1121(d)* (the "Fourth Exclusivity Motion") [ECF 932]. Through the Fourth Exclusivity Motion, the Diocese sought to extend the exclusive period for the Debtor to file a chapter 11 plan and solicit votes thereon pursuant to section 1121(d) of the Bankruptcy Code. On November 24, 2021, the Bankruptcy Court entered an Order granting the Fourth Exclusivity Motion. [ECF 996].

On November 16, 2021, the Tort Committee filed a *Motion (I) Compelling the Debtor to File Amended Schedules, Statements of Financial Affairs and Monthly Operating Reports and (II) Holding the Debtor in Contempt of Court* (the "Motion to Compel") [ECF 964]. On February 17, 2022, the Bankruptcy Court entered an oral opinion on the Motion to Compel. On March 23, 2022, the Bankruptcy Court entered an order granting the Motion to Compel in part, and denying the Motion to Compel in part. [ECF 1357].

On November 16, 2021, the Tort Committee filed a *Motion for Entry of an Order, Under*

48

*Sections 105(a) and 502(c) of the Bankruptcy Code, Establishing Procedures and Scheduling a Hearing for Estimation of Survivor Claims for Voting and Confirmation Purposes* [ECF 962] seeking a procedure to estimate the value of all Abuse Claims.  On February 25, 2022, the Bankruptcy Court entered an Order denying the Estimation Motion.  [ECF 1225].

On November 17, 2021, the Debtor filed a *Motion for Entry of an Order (a) Approving First Amended Disclosure Statement; (b) Establishing Plan Solicitation, Voting, and Tabulation Procedures; (c) Scheduling a Confirmation Hearing and Deadline for Filing Objections to Plan Confirmation; and (d) Granting Related Relief* (the "Solicitation Motion") [ECF 973].  The Court granted the relief sought in the Solicitation Motion.

On November 18, 2021, the Debtor filed a *Motion for an Order Authorizing the Diocese to (I) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105(a), 362 and 364(c) and (d), (Ii) Granting Liens and Superpriority Claims to the Lender Pursuant to 11 U.S.C. § 364(C), and (Iii) Modifying the Automatic Stay* (the "Motion to Obtain Premium Financing") [ECF 975] seeking approval of a premium financing agreement.  On November 24, 2021, the Bankruptcy Court entered an Order granting the Motion to Obtain Premium Financing. [ECF 998].

On December 22, 2021, the Debtor file a *Motion for the Entry of an Order Authorizing and Approving the Sale of 1000 Williamstown Road, Sicklerville, New Jersey 08081* (the "Sale Motion") [ECF 1063].  On January 12, 2022, the Bankruptcy Court entered an Order granting the Sale Motion. [ECF 1099].

On January 5, 2022, the Debtor filed a *Motion for Entry of an Order to Approve Settlement of Controversary By and Among the Diocese and Certain Settling Insurers Pursuant to Federal Rule of Bankruptcy 9019(a)* (the "Insurance Settlement Motion") [ECF 1087].  On February 25, 2022, the Bankruptcy Court entered an *Order (I) Scheduling Motion for Entry of an Order to Approve Settlement of Controversy By and Among the Diocese and Certain Settling Insurers Pursuant to Federal Rule of Bankruptcy 9019(a) and (II) Approving Notice Thereof.* [ECF 1219].  ~~This order provides for the scheduling of certain discovery and other deadlines associated with the Insurance Settlement Motion.  As set forth herein, the terms of the settlement between the Diocese and the Tort Committee requires this motion to be withdrawn~~<u>As of the date of filing this Disclosure Statement, the Insurance Settlement Motion remains pending before the Court.  As set forth herein, the Diocese no longer believes the Proposed Insurance Settlement (defined below), is in the estate's best interest.  Thus, at the appropriate time, the Plan Proponents intend to set forth why the Bankruptcy Court should not approve the Insurance Settlement Agreement.  The London Market Insurers have filed a motion seeking for the Bankruptcy Court to enter an order scheduling a hearing on the Insurance Settlement Motion.  [ECF 1615].  At the time of filing this Disclosure Statement, the Court has not entered an order on that motion</u>.

On February 2, 2022, the Diocese filed a *Second Amended Disclosure Statement* [ECF 1142] describing its *Second Amended Plan of Reorganization* [ECF 1143].  On February 23, 2022, the Bankruptcy Court held a hearing on the adequacy of the *Second Amended Disclosure Statement*.  Thereafter, the Bankruptcy Court entered an oral opinion, requiring the Diocese to make certain amendments to the *Second Amended Disclosure Statement*.

On February 24, 2022, the Diocese filed a *Fifth Motion for Entry of an Order Extending*

4870-2885-4563, v. 2

*Time to File Notices of Removal of Civil Actions* seeking to further extend the time period under the Bankruptcy Code for removing civil actions. On March 23, 2022, the Bankruptcy Court entered an order granting this motion. [ECF 1355].

On February 25, 2022, the Bankruptcy Court entered an *Order Extending the Diocese's Exclusive Period to File a Chapter 11 Plan and Solicit Votes for a Chapter 11 Plan Pursuant to 11 U.S.C. § 1121(d)* extending the exclusive periods to file a disclosure statement and plan and seek solicitation of same to April 1, 2022 and June 1, 2022, respectively.

On March 7, 2022, the Tort Committee filed a *Motion to Disallow Proofs of Claim filed by the Other Catholic Entities* [ECF 1288], seeking to disallow certain claims filed by the Other Catholic Entities. At the time of filing this Disclosure Statement, this motion remains pending. The relief sought therein would be resolved based on the settlement between the Diocese and the Tort Committee.

On March 10, 2022, the Diocese filed a *Third Amended Disclosure Statement* [ECF 1305] describing its *Third Amended Plan of Reorganization* [ECF 1307]. On March 23, 2022, the Bankruptcy Court held a hearing on the adequacy of the *Third Amended Disclosure Statement*. Thereafter, the Bankruptcy Court requiring the Diocese to make certain amendments to the *Third Amended Disclosure Statement*.

On March 14, 2022, certain insurance companies filed a *Joint Motion to Compel the Claimants' Attorneys to Submit the Disclosures Required by Federal Rule of Bankruptcy Procedure 2019* [ECF 1311] seeking for certain representatives of Abuse Claimants to file disclosures pursuant to the Bankruptcy Code. Following a hearing on this motion, the Court granted the relief sought therein.

On March 24, 2022, the Diocese filed a *Fourth Amended Disclosure Statement* [ECF 1361] describing its *Fourth Amended Plan of Reorganization* [ECF 1363].

On March 24, 2022, the Diocese filed a *Fifth Amended Disclosure Statement* [ECF 1393] describing its *Fifth Amended Plan of Reorganization* [ECF 1394]. On April 6, 2022, the Bankruptcy Court entered an order approving the Fifth Amended Disclosure Statement for solicitation. [ECF 1447].

In connection with the Insurance Settlement Motion, the Diocese, the Tort Committee and certain Insurers filed various motions *in limine*. [ECF 1446, 1449, 1453, 1455, 1457, 1458, 1460, 1462] In addition, the Tort Committee filed a motion for summary judgment. [ECF 1451]. All of these motions remain pending as of the filing of this Disclosure Statement.

## B. **Adversary Proceedings**

### (i) **The Injunction Adversary Proceeding**

On October 1, 2020, the Debtor filed an adversary complaint, commencing Adv. Pro. No. 20-1544 against certain Abuse Claimants. Through the complaint, the Diocese sought entry of an order, pursuant to 11 U.S.C. §§ 105 and 362, enjoining the continued prosecution of certain lawsuits against the Diocese and/or non-debtor parishes, schools and other Catholic ministry

50

entities and institutions within the geographical territory of the Diocese which assert claims arising from or related to alleged child abuse and which could negatively impact upon the Diocese's ability to successfully reorganize.  In the alternative, the Diocese sought an order, pursuant to Rule 7065 of the Federal Rules of Bankruptcy Procedure enjoining or restraining the Abuse Plaintiffs from continuing their prosecution of the Abuse Cases.

### (ii)  The Insurance Adversary Proceeding

On October 21, 2020, the Debtor filed an adversary complaint, commencing Adv. Pro. No. 20-1573 against Insurance Company of North America, now known as Chubb Limited, Underwriters at Lloyd's, London, National Catholic Risk Retention Group, Inc., Interstate Fire & Casualty Company d/b/a Allianz Insurance Group, Berkshire Hathaway Inc., d/b/a Resolute Management Services Limited, Athena Assurance Co., United National Insurance Co., Hartford Fire Insurance Co., Kemper Insurance, Lexington Insurance Co., U.S. Fire Insurance Co., International Fidelity Insurance Co., North River Insurance Co., Century Indemnity Co., Granite State Insurance Co., Integrity Insurance Co., Colonial Penn Life Insurance, Northbrook Insurance Associates, Inc. and potentially other insurance companies which may have insured the Diocese during the relevant time periods described below (collectively, the "Insurance Defendants"). Through the complaint, the Diocese is seeking an order, pursuant to 11 U.S.C. § 105, for declaratory judgment regarding the rights, duties and liabilities of the Insurance Defendants regarding certain insurance policies and certificates that the Insurance Defendants sold or which the Insurance Defendants acquired responsibility for as they relate to insurance coverage for Abuse Claims against the Diocese and/or non-debtor parishes, schools, or other Catholic ministry entities and institutions within the geographical territory of the Diocese.  This action also seeks declaratory relief to determine the extent of the rights of the Diocese in said Policies and Certificates to the extent they are property of the Diocese's bankruptcy estate pursuant to 11 U.S.C. § 541.  This action is temporarily stayed. IAG's insurance archeology works remains active despite the stay.

### (iii)  The DOC Trusts Adversary Proceeding

On October 12, 2021, the Tort Committee filed an adversary complaint, commencing Adv. Pro. No. 21-01393 (JNP), against the Diocese, and DOC Trusts.  Through the complaint, the Tort Committee seeks entry of an order (i) declaring that DOC Trusts' accounts are property of the Debtor's Estate; (ii) ordering substantive consolidation of the Debtor's Estate with DOC Trusts effective as of October 1, 2020; (iii) declaring that the funds in DOC Trusts's accounts are not held in trust by the Diocese for the benefit of DOC Trusts, and all the funds therein constitute property of the Debtor's Estate; (iv) declaring a valid trust does not exist between DOC Trusts and the Debtor; (vi) declaring the DOC Trusts accounts are freely alienable and subject to the claims against the Diocese; and (vi) declaring that any trust existing prior to July 10, 2015 and October 15, 2015 respectively was a revocable trust subject to the claims of then-existing creditors, including the Abuse Claimants.  The Tort Committee filed a first amended adversary complaint on December 3, 2021.

The Diocese disputes all of these claims and does not believe the Tort Committee has any basis for seeking such relief against the parties named.  As part of the Diocese and Tort Committee's settlement, the Tort Committee will dismiss this action with prejudice on

51

the Effective Date of the Plan.

### (iv) The Parishes Adversary Proceeding

On October 12, 2021, the Tort Committee filed an adversary complaint, commencing Adv. Pro. No. 21-01394 (JNP), against the Diocese, Parishes, Missions, and Schools.  Through the complaint, the Tort Committee seeks entry of an order (i) ordering substantive consolidation of the Debtor's estate with the Parishes, Missions, and Schools effective as of October 1, 2020; (ii) declaring the funds and assets in the Revolving Fund are not held in the trust by the Diocese for the benefit of the Parishes, Missions, and Schools; and (iii) that the Revolving Fund, and all of the funds contained herein, constitute property of the Debtor's estate.  The Tort Committee filed a first amended adversary complaint on December 3, 2021.

The Diocese disputes all of these claims and does not believe the Tort Committee has any basis for seeking such relief against the parties named.  The Bankruptcy Court entered an order denying the Tort Committee standing to bring certain counts of this action.  As part of the Diocese and Tort Committee's settlement, the Tort Committee will dismiss this action with prejudice on the Effective Date of the Plan.

### (v) The Restricted Assets Adversary Proceeding

On December 3, 2021, the Tort Committee filed an adversary complaint, commencing Adv. Pro. No. 21-01493 (JNP), against the Diocese and certain Parishes and Missions.  Through the complaint, the Tort Committee seeks entry of an order finding that the Diocese's assets, as more fully described in the complaint, are unrestricted and available to pay claims of the Diocese's creditors.

The Diocese disputes all of these claims and does not believe the Tort Committee has any basis for seeking such relief against the parties named.  As part of the Diocese and Tort Committee's settlement, the Tort Committee will dismiss this action with prejudice on the Effective Date of the Plan.

### C.  Current and Historical Conditions

The Diocese is current on all post-petition obligations.  [ECF 856].  The Diocese asserts it has filed all Monthly Operating Reports in accordance with the United States Trustee Guidelines, as such Monthly Operating Reports have been amended in accordance with the Bankruptcy Court's order.  [ECF 265, 297, 373, 461, 544, 597, 655, 676, 736, 802, 856, 974, 1135, 1136, 1162, 1300, 1406, 1407, 1408, 1409, 1411, 1412, 1413, 1414, 1415, 1428, 1429, 1430, 1433, 1434, 1435, 1436, 1456].

### ARTICLE VII.
### ASSETS OF THE DIOCESE

### A.  The Debtor's Assets

This section contains a discussion of the Diocese's potential assets available for distribution to creditors.  Earlier sections of the Disclosure Statement discuss entities located within the territory of the Diocese, which are all separately incorporated and, are, therefore, not included in the Diocese's analysis of its assets.

a. **Gross Revenue and Support**

Under New Jersey law, the Diocese is an incorporated legal entity formed pursuant to Article 2 of Chapter 15 of Title 16 of the Revised Statutes of New Jersey (N.J.S.A. 16:15-9 to 15-17) with its own corporate structure and governance separate and distinct from the other Catholic entities located within the geographic area of the Diocese.

Gross revenue and support ("Gross Revenue") for the recently ended fiscal year (July 1, 2020 through June 30, 2021) is approximately $43.0 million. Gross Revenue for the fiscal year ending on June 30, 2020 was approximately $49.5 million while expenses were approximately $58.2 million. Gross Revenue for the fiscal year ending on June 30, 2019 was approximately $50.7 million and expenses were approximately $64.8 million. Expenses include non-cash items including depreciation and reserves.

The primary source of funds used by the Diocese to support its daily operations comes from parish assessments, which in turn are funded primarily by contributions from parishioners. The Diocese assesses parishes ten percent of their annual Ordinary Income. Assessments are due on a monthly basis and provide financial support for pastoral, education, religious personnel development (education and care of priest and seminarians), youth and administrative program areas.

The Diocese's Gross Revenue is derived substantially from voluntary contributions of its congregants and is wholly reliant on the continuing support of the faithful.

Additional sources of operating funds include: (i) revenue from the share of the *House of Charity – Bishop's Annual Appeal* designated for Diocesan activities and the Diocesan share (30%) of the *Catholic Strong* appeal; (ii) contributions and bequests from the faithful and grants from the Diocese of Camden Trusts, Inc. and the Diocese of Camden Healthcare Foundation, Inc.; and (iii) realized investment gains.

The House of Charity – Bishop's Annual Appeal is an annual campaign undertaken early in the calendar year, proceeds of which are used to support various charitable, pastoral, educational, and human service activities. As of June 30, 2021, pledges for the House of Charity – Bishop's Annual Appeal were over $942,000 to be collected through June 30, 2022. The House of Charity provides the day-to-day operational income that supports ministries of the Diocese, including support for seminarian education and housing for retired priests, support for VITALity Catholic Healthcare Services, support for Catholic education, as well as support for our various pastoral ministries. Monies that are raised in this fiscal year are expended next fiscal year. Without the House of Charity, the Diocese could not fulfill its mission. These funds are restricted as they are collected through a solicitation that describes how the funds will be used. Accordingly, the Debtor asserts that the House of Charity Funds are not property of the estate.

The Catholic Strong Campaign ("CSC") was a capital campaign that sought to raise $40 million to primarily benefit the Parishes. Of the funds raised through the CSC, 70% was designated solely for the Parishes. Their needs include updates to physical plant, new or expanded youth and pastoral ministries, and the hiring of staff to support parish programs. Thirty (30%) percent of the funds raised are designated for the Diocese for supporting stronger faith, stronger service and

54

4870-2885-4563, v. 2

stronger Catholic schools.  The Debtor asserts that these funds are restricted funds and, therefore, are not assets of the estate.  These funds are restricted because they were donated for a specific purpose and the Diocese cannot use such funds outside of the donor's intent.  As of June 30, 2021, the CSC had $40.1 million in pledges, of which $24.6 million has been collected and $17.2 million has been distributed, or deposited to the credit of the parishes' accounts in the Revolving Fund.

The Tort Committee disagrees with certain assertions made by the Diocese in this section. The settlement between the Diocese and the Tort Committee resolves all such claims.

### b.  Cash and Investments

The Diocese has cash and investments totaling $29,724,540 as of January 31, 2022. This includes $14,277,857 in cash accounts and $7,091,760 in the Revolving Fund.  The Diocese asserts that $2,063,882 of this amount is restricted based on the donor's intent when donating such funds to the Diocese.  The restricted funds are as follows:

| Description | Amount |
|---|---|
| Funds Donated through Catholic Strong Campaign | $195,067 |
| Vitality Home & Parish Catholic Healthcare | $344,770 |
| Vitality Catholic Healthcare – Parish Nursing | $32,719 |
| Vitality – Deaf Ministry | $47,696 |
| Nursing Home Sale Proceeds pursuant to Cy Pres Order | $339,722 |
| St. Mary Cemetery Rt. 42 Bridge Escrow | $162,849 |
| St. Mary Cemetery Bridge Legal Fees Escrow | $17,185 |
| Vitality – SJCMA | $6,151 |
| Special Gifts | $917,723 |

The Tort Committee disagrees with certain assertions made by the Diocese in this section. The settlement between the Diocese and the Tort Committee resolves all such claims.

### c.  Furniture, Fixtures and Equipment

The Diocese owns certain personal property, including, but not limited to office equipment, furniture, fixtures, vehicles, and religious accessories (collectively, the "FF&E").  The details of FF&E are set forth in the Appraisal Report prepared by A. Atkins Appraisal Corporation (the "FF&E Appraisal").  Pursuant to that appraisal, the FF&E is valued at $192,620.  A copy of each appraisal is available on the docket at ECF 301.  The FF&E Appraisal appraised the FF&E of the Diocese at the following locations: (i) 631 Market Street, Camden, New Jersey; and (ii) 1845 Haddon Avenue, Camden, New Jersey.

The Diocese also has FF&E located at the following addresses: (i) 510 Cooper Street, Woodbury, New Jersey; (ii) the various cemeteries operated by the Diocese (Cemetery Administration, All Saints Cemetery & Mausoleum, Calvary Cemetery, Gate of Heaven Cemetery, Holy Cross Cemetery, Resurrection Cemetery, St. Mary Cemetery, Sacred Heart Cemetery); (iii) Newman Catholic Campus Ministry Center, 235 S. Pomona Road, Pomona, NJ; (iv) Pastoral Center, 15 N. 7th Street, Camden, NJ; (v) Camden Center for Law & Social Justice, 128 Broadway

55

Street, Camden, NJ; (vi) Sacred Heart North, Convent & Residence, 200/250 Saint Mary's Drive, Cherry Hill, NJ; (vii) New St. Mary, 515 W. Browning Road, Bellmawr, NJ; (viii) Carlo Acutis Center, 500 S. New Rd., Absecon, NJ; and (ix) Newman Center (Rowan), 1 Redmond Avenue, Glassboro, NJ.  The Diocese values the FF&E at these locations at $186,267.

On its Petition, the Diocese listed Personal Property with a value of $53,575,365.98.  This figure includes FF&E, but also includes assets listed elsewhere in this Disclosure Statement, including: (i) cash of $8,401,409.12 on the Petition Date (Article VII.A.c); (ii) accounts receivable of $26,300,951.00 on the Petition Date (Article VII.A.e); (iii) notes receivable of $18,798,059.86 on the Petition Date (Article VII.A.e).

    d.  **Real Estate**

The Diocese owns 52 pieces of real property. On June 3, 2021, the Diocese filed a copy of the Appraisal Report dated May 25, 2021, prepared by Binswanger Company for the real property of the Diocese.  [ECF 657].  Binswanger determined that the value of the 33 parcels it appraised as follows:

| Property Address | Block | Lot | Value |
|---|---|---|---|
| 631-637 Market Street, Camden, NJ | 125 | 57 | $3,300,000 |
|  | 125 | 24 |  |
|  | 125 | 21 |  |
|  | 125 | 12 |  |
|  | 125 | 8 |  |
| 1845 Haddon Avenue, Camden, NJ | 1279.02 | 17 | $2,050,000 |
| 901 Hopkins Road, Haddon Township, NJ | 13.03 | 2 | $2,170,000 |
| 1000 Williamstown Road, Gloucester Township, NJ | 18302 | 1 | $1,400,000 |
| SEC Cross Keys Road at Kearsley Road, Winslow Township, NJ | 302 | 1.01 | $900,000 |
| 2209 & 2221 Route 9, Dennis Township, NJ | 256.05 | 43 | $1,090,000 |
|  | 256.05 | 44 |  |
| 510 Cooper Street, Woodbury, NJ | 161 | 2 | $635,000 |
| 1145 Delsea Drive, Deptford, NJ | 4 | 5 | $770,000 |
| 52-90 Blackwood-Barnsboro Road, Deptford, NJ | 417 | 8 | $2,800,000 |
|  | 418 | 1 |  |
|  | 418 | 2 |  |
|  | 418 | 3 |  |
|  | 418 | 4 |  |
|  | 418 | 5 |  |
|  | 418 | 6 |  |
| S/S Center Street, Mantua Township, NJ | 199 | 6 | $430,000 |
|  | 199 | 7 |  |
| SEC Route 45 & Harrisonville Road, South Harrison Township, NJ | 28 | 9 | $820,000 |
| N/S Ferell Road, South Harrison Township, NJ | 15 | 4 | $400,000 |
| 641 Bridgeton Pike, Elk Township, NJ | 7 | 1 | $750,000 |

| Property Address | Block | Lot | Value |
|---|---|---|---|
| 440 Whig Lane, Elk Township, NJ | 172 | 7 | $1,440,000 |
| 248 Clayton-Aura Road, Clayton Borough, NJ | 502 | 4 | |
| 730 N. Delsea Drive, Clayton Borough, NJ | 1902 | 31 | $200,000 |
| N/S East Washington Avenue, Franklinville, NJ | 103 | 59 | $260,000 |
| E/S Tuckahoe Rd. & Victoria Ave., Newfield, NJ | 6001 | 1 | $870,000 |
| | 6503 | 7 | |
| | 6702 | 39 | |
| | 6702 | 40 | |
| 1139 Delsea Drive, Deptford, NJ | 4 | 25 | $185,000 |
| **TOTAL** | | | **$20,470,000** |

In addition to the 33 parcels appraised by Binswanger, the remaining properties are valued as follows:

| Basis | Property Address | Block | Lot | Value |
|---|---|---|---|---|
| ECF 1299 | 419 George Street, Galloway, NJ | 527 | 7 | $250,000 |
| ECF 1299 | 430 S. Pomona Road, Galloway, NJ | 527 | 1 | $113,000 |
| ECF 1299 | 700 College Drive, Gloucester, NJ | 14003 | 2.01 | $10,000 |
| ECF 1299 | 6075 West Jersey Ave, Egg Harbor Township, NJ | 2610 | 14 | $300,000 |
| ECF 1299 | Piney Lane, Franklin, NJ | 6702 | 43 | $322,000 |
| | Tuckahoe Road, Franklin, NJ | 6702 | 40 | |
| | Tuckahoe Road, Franklin, NJ | 6503 | 1 | |
| | 1300 Tuckahoe Road, Franklin, NJ | 6503 | 1 | |
| | 1300 Tuckahoe Road, Franklin, NJ (Back) | 6503 | 2 | |
| | 1300 Tuckahoe Road, Franklin, NJ (Back) | 6503 | 2 | |
| ECF 1299 | Weatherby Road, Maurice River, NJ | 248 | 3 | $37,850 |
| ECF 1299 | 235 South Pomona Road, Galloway Township, NJ | 648 | 10 | $385,000 |
| ECF 1299 | 336 Kings Highway, Dennis Township, NJ | 256.05 | 13 | <$100 |
| ECF 1299 | 261-263 Cross Keys Road, Berlin, NJ | 118 | 2 & 3 | <$100 |
| ECF 1299 | 1 Redmond Avenue, Glassboro, NJ | 21 | 7.01 | $205,000 |
| ECF 1299 | 312 Cumberland Street, Gloucester City, NJ | 60 | 10 | <$100 |
| ECF 1299 | Pitney Rd, Galloway, NJ | 988.01 | 26 | <$100 |
| ECF 290 | 1597 Almonesson Road, Deptford, New Jersey | 226 | 3 | $75,000 |
| | **TOTAL** | | | **$1,698,250** |

Accordingly, the total value of the Diocese's real property is: $22,168,250.

    e.   **Parish Loans and Accounts Receivable**

In the ordinary course of its business, the Diocese made various unsecured loans from the Revolving Fund to the Parishes and Schools located within the territory of the Diocese. The following chart details the loans as of the Petition Date:

57

| Loan No. | Description | Principal Balance | Doubtful or Uncollectible Amount |
|---|---|---|---|
| L-2003-228 | Memorandum of Indebtedness (Amended) entered into January 1, 2013 between the Debtor and Camden Catholic High School, Cherry Hill, N.J. for outstanding payables. **This MOI was superseded.** | $757,300.35 | $189,325.09 |
| L-2003-227 | Memorandum of Indebtedness (Amended) entered into October 21, 2015 between the Debtor and Camden Catholic High School, Cherry Hill, N.J. for various capital improvements. (Consolidated Loan) **This MOI replaces and supersedes the MOI dated January 1, 2013.** | $786,285.15 | $196,571.29 |
| L-1418-102 | Memorandum of Indebtedness entered into on October 8, 2015 between the Debtor and The Parish of the Holy Cross, Bridgeton, NJ, for outstanding payables. | $49,513.72 | $0.00 |
| L-2001-221 | Memorandum of Indebtedness entered into on October 13, 2017 between the Debtor and Holy Spirit High School, Absecon, NJ for payroll and outstanding accounts payable. | $546,279.81 | $409,709.86 |
| L-1435-007 | Memorandum of Advances entered into on March 20, 2007 between the Debtor and St. Vincent Pallotti Parish, Haddon Township, NJ, for the purpose of rectory renovations (St. Joseph the Worker Rectory/Meeting Room). | $256,875.51 | $192,656.63 |
| L-1428-006 | Memorandum of Indebtedness entered into July 1, 2005 between the Debtor and Resurrection (St. Maximilian Kolbe Deferred Bishop McHugh Regional School Loan). | $247,955.54 | $123,977.77 |
| L-1428-007 | Memorandum of Indebtedness entered into July 1, 2005 between the Debtor and Resurrection (St. Maximilian Kolbe Deferred Bishop McHugh Regional School Loan). | $561,000.00 | $280,500.00 |
| L-1104-002 | Memorandum of Indebtedness entered into September 1, 2012 between the Debtor and St. Joseph's Catholic Church, Sea Isle City, NJ, for the construction of a new church | $4,847,715.17 | $0.00 |
| L-1113-006 | Memorandum of Indebtedness entered into on October 1, 2016 between the Debtor and St. Padre Pio Parish, Vineland, NJ, for the building of a gymnasium (St. Mary's Regional School renovation). | $677,624.52 | $169,406.13 |

58

| Loan No. | Description | Principal Balance | Doubtful or Uncollectible Amount |
|---|---|---|---|
| L-1113-007 | Memorandum of Indebtedness entered into October 1, 2016 between the Debtor and St. Padre Pio Parish, Vineland, NJ, for the building of a gymnasium | $267,355.22 | $66,838.81 |
| L-1113-008 | Memorandum of Indebtedness entered into October 1, 2016 between the Debtor and St. Padre Pio Parish, Vineland, NJ, for parish and school expenses | $407,780.19 | $101,945.05 |
| L-1119-006 | Memorandum of Advances and Indebtedness No. 2 entered into July 1, 2009 between the Debtor and St. Agnes' Church, Blackwood Terrace, N.J.; The Roman Catholic Church of St. Jude, Gloucester Township, N.J.; The Church of St. Charles Borromeo, Washington Township, N.J.; The Church of Saints Peter and Paul, Washington Township, N.J.; and the Church of the Holy Family, Washington Township, N.J., for renovations of, and the addition of, a gymnasium to Our Lady of Hope Regional School building. **(This Memorandum was replaced by Memorandum of Advances and Indebtedness No. 2A.)** | $52,228.48 | $0.00 |
| L-1120-006 | Memorandum of Advances and Indebtedness No. 2A entered into March 1, 2011 between the Debtor and Our Lady of Hope Parish, Blackwood, N.J. (formerly St. Agnes' Church, Blackwood Terrace, N.J.); The R.C. Church of St. Jude, Gloucester, Township, N.J. (Our Lady of Hope); The Church of St. Charles Borromeo, Washington Township, N.J.; The Church of Saints Peter and Paul, Washington Township, N.J.; and The Church of the Holy Family, Washington Township, N.J., for renovation and expansion of Our Lady of Hope Regional School and Our Lady of Hope Parish, Blackwood, N.J. (St Charles – Our Lady of Hope School Renovation Loan). | $196,472.36 | $0.00 |

59

| Loan No. | Description | Principal Balance | Doubtful or Uncollectible Amount |
|---|---|---|---|
| L-1417-006 | Memorandum of Advances and Indebtedness No. 2A entered into March 1, 2011 between the Debtor and Our Lady of Hope Parish, Blackwood, N.J. (formerly St. Agnes' Church, Blackwood Terrace, N.J.); The R.C. Church of St. Jude, Gloucester, Township, N.J. (Our Lady of Hope); The Church of St. Charles Borromeo, Washington Township, N.J.; The Church of Saints Peter and Paul, Washington Township, N.J.; and The Church of the Holy Family, Washington Township, N.J., for renovation and expansion of Our Lady of Hope Regional School and Our Lady of Hope Parish, Blackwood, N.J. | $628,133.40 | $0.00 |
| L-1137-001 | Memorandum of Indebtedness entered into December 12, 2003 between the Debtor and Mater Ecclesiae Chapel. | $118,112.51 | $0.00 |
| L-1401-001 | Memorandum of Indebtedness entered into December 31, 2006 between the Debtor and Our Lady of Mt. Carmel/Fatima for Cathedral Immaculate Conception. | $507,065.04 | $507,065.04 |
| L-1416-001 | Memorandum of Indebtedness entered into December 31, 2006 between the Debtor and Church of St. Edward. | $335,743.10 | $167,871.55 |
| L-1417-222 | Memorandum of Indebtedness No. 1A entered into January 31, 2012 between the Debtor and Our Lady of Hope Parish, Blackwood, N.J. for the renovation and expansion of Our Lady of Hope Regional School (facility loan). (*This Memorandum, together with Memorandum of Indebtedness No. 1B, replace Memorandum of Advances and Indebtedness No. 1.) | $100,263.89 | $25,065.97 |
| L-1417-223 | Memorandum of Indebtedness No. 1B entered into January 31, 2012 between the Debtor and Our Lady of Hope Parish, Blackwood, N.J. for the renovation and expansion of Our Lady of Hope Regional School. | $428,542.55 | $107,135.64 |
| L-1419-018 | Memorandum of Indebtedness entered into July 10, 2015 between the Debtor and Saint Gabriel the Archangel Parish, Carneys Point, N.J. for prior year DSIP, pension and health insurance premiums owed to the Diocese. | $149,967.98 | $0.00 |

60

| Loan No. | Description | Principal Balance | Doubtful or Uncollectible Amount |
|---|---|---|---|
| L-1419-019 | Memorandum of Indebtedness entered into between the Debtor and Saint Gabriel the Archangel Parish (debt forgiveness loan). | $25,885.90 | $0.00 |
| L-1420-002 | Memorandum of Advances entered into April 21, 2016 between the Debtor and The Catholic Community of Christ Our Light for the purpose of constructing a parish center/gym. | $1,584,918.24 | $0.00 |
| L-1422-001 | Memorandum of Advances entered into January 28, 2011 between the Debtor and Blessed Teresa of Calcutta for the purpose of replacing a heating and air conditioning system at St. John Church ($85,000—partial of total loan). | $425,610.27 | $319,207.70 |
| L-1438-226 | Memorandum of Indebtedness entered into March 31, 2012 between the Debtor and The Church of the Assumption at Pomona for the construction of Assumption Regional Catholic School. | $2,890,348.65 | $2,890,348.65 |
| L-1441-003 | Memorandum of Indebtedness entered into July 22, 2011 between the Debtor and Divine Mercy Parish to pay school subsidy to Bishop Shad Regional School. | $78,102.72 | $78,102.72 |
| L-1442-022 | Memorandum of Indebtedness entered into June 26, 2012 between the Debtor and Sacred Heart High School, Vineland, N.J. for operational expenses for the 2011-2012 school year. | $308,000.00 | $308,000.00 |
| L-1445-221 | Memorandum of Advances entered into August 30, 2018 between the Debtor and Holy Angels Elementary School for the purpose of providing cash to pay outstanding accounts payable owed to outside parties. | $428,329.00 | $107,082.00 |
| L-1447-006 | Memorandum of Indebtedness entered into September 1, 2012 between the Debtor and St. Vincent de Paul Catholic Church, Mays Landing, N.J. for the construction of a new church. | $2,036,202.52 | $0.00 |
| L-2006-227 | Memorandum of Advances entered into June 7, 2019 between the Debtor and St. Joseph High School, Hammonton, N.J. for the purpose of providing cash to pay the outstanding invoices owed to Northeast Mechanical Services and to provide cash for operations in June 2019. | $242,000.00 | $242,000.00 |

61

| Loan No. | Description | Principal Balance | Doubtful or Uncollectible Amount |
|---|---|---|---|
| L-6133-661 | Memorandum of Indebtedness entered into October 20, 2017 between the Debtor and John Wasilewski for federal tax liability and penalties. | $8,319.43 | $0.00 |
| L-1029-001 | St. Joseph Pro. Cathedral Loan (No Loan Agreement) | $948,570.05 | $948,570.05 |
| L-1029-101 | St. Joseph's SAP Ch. Loan (No Loan Agreement) | $284,463.09 | $284,463.09 |
| L-1029-102 | St. Joseph's SAP Sch. Loan (No Loan Agreement) | $5,000.00 | $5,000.00 |
| L-1031-006 | Our Lady of the Angels Bishop Mc Hugh Regional School Loan (No Loan Agreement) | $397,215.33 | $238,329.20 |
| L-1031-007 | Our Lady of the Angels – Property Loan – Steel Road Properties (No Loan Agreement) | 369,604.74 | $221,762.84 |
| L-1401-006 | Cathedral Immaculate Conception Loan (cathedral preservation) (No Loan Agreement) | $3,481,397.95 | $3,481,397.95 |
| L-1401-021 | Holy Name Grade School Loan (No Loan Agreement) | $64,072.00 | $64,072.00 |
| L-1401-022 | Holy Name School Operating Loan (No Loan Agreement) | $199,737.00 | $199,737.00 |
| L-1426-001 | Our Lady of Guadalupe Loan (No Loan Agreement) | $1,125,115.46 | $843,836.60 |
| L-1426-221 | Our Lady of Guadalupe – JP II School Renovation Loan (No Loan Agreement) | $2,698,807.82 | $2,698,807.82 |
| L-1426-222 | St. JP II Regional Elementary School Loan (No Loan Agreement) | $363,238.00 | $363,238.00 |
| L-1438-010 | Loan to Our Lady of Perpetual Help, 146 S. Pitney Road, Galloway, NJ 08205 (No Loan Agreement) | $3,648,310.93 | $3,648,310.93 |
| L-1442-001 | Loan to Christ the Good Shepherd, 1655 Magnolia Road, Vineland, NJ 08361 (Sacred Heart Church) (No Loan Agreement) | $2,238,571.26 | $2,238,571.26 |
| L-1442-006 | Loan to Christ the Good Shepherd, 1655 Magnolia Road, Vineland, NJ 08361 (Sacred Heart Prop. Loan) (No Loan Agreement) | $61,234.02 | $61,234.02 |
| L-1442-011 | Loan to Christ the Good Shepherd, 1655 Magnolia Road, Vineland, NJ 08361 (St. Isadore) (No Loan Agreement) | $169,320.63 | $169,320.63 |
| L-1442-012 | Loan to Christ the Good Shepherd, 1655 Magnolia Road, Vineland, NJ 08361 (Pension Loan) (No Loan Agreement) | $243,320.00 | $243,320.00 |

62

| Loan No. | Description | Principal Balance | Doubtful or Uncollectible Amount |
|---|---|---|---|
| L-1442-021 | Loan to Christ the Good Shepherd, 1655 Magnolia Road, Vineland, NJ 08361 (Sacred Heart High School Loan) (No Loan Agreement) | $379,820.00 | $379,820.00 |
| L-1442-023 | Loan to Christ the Good Shepherd, 1655 Magnolia Road, Vineland, NJ 08361 (Sacred Heart High School Expansion Loan) (No Loan Agreement) | $235,000.00 | $235,000.00 |
| L-2006-221 | Loan to St. Joseph's High School, 328 Vine Street, Hammonton, NJ 08037 (No Loan Agreement) | $1,133,706.63 | $1,133,706.63 |
| L-2006-225 | Loan to St. Joseph's High School, 328 Vine Street, Hammonton, NJ 08037 (Building Loan) (No Loan Agreement) | $3,857,727.79 | $3,857,727.79 |
| L-2006-226 | Loan to St. Joseph High School, 328 Vine Street Hammonton, NJ 08037 (Payables Loan) (No Loan Agreement) | $436,906.96 | $436,906.96 |
| L-4042-441 | Loan to Village Apartments, 1845 Haddon Avenue, Camden, NJ 08103 (Escrow Loan) (No Loan Agreement) | $10,000.00 | $0.00 |
| L1065-001 | Loan to Our Lady of Sorrows Parish 724 Maple Avenue, Linwood, NJ 08221 | $71,655.00 | $17,913.75 |
| | TOTAL: | 42,372,725.88 | $28,253,856.66 |

All of the Loans were listed in the Diocese's petition. The allowance for doubtful accounts reflects collection experience and risk. This analysis is required under United States Generally Accepted Accounting Principles ("GAAP"). The Diocese conducts its analysis annually to comply with GAAP. The Diocese has not written off or waived any of its rights to collect on all loans and accounts receivable. The doubtful or uncollectible accounts are based on an analysis of the collectability of these accounts. Annually, the Finance Office of the Diocese meets and analyzes the loans and accounts receivable outstanding from each parish and other Catholic entity. The analysis includes, but is not limited to: (i) payment history for the last year of current and past debt; (ii) availability of funds in the Parish trust; (iii) finances of the Parishes and Schools (i.e. enrollment, ordinary income, etc.); and (iv) other circumstances of the individual parish or entity that may affect the ability to repay debt.

As a result of the pandemic, the Diocese waived, during the third and fourth quarter of 2020: (i) assessments on the Parishes; and (ii) interest on all loans. Insofar as assessments are based upon prior year income, the assessment collections for fiscal year 2021 were impacted.

Many of the outstanding loans and receivables are legacy debt resulting from the merger or consolidation of two or more parishes into a single parish. These mergers and consolidations were completed for financial reasons after significant analysis by the Diocese, the respective parish(es), and the congregants. Since 2009, forty-one (41) mergers or consolidations have

4870-2885-4563, v. 2

occurred – resulting in the current sixty-two (62) parishes within the territory of the Diocese.  For example, Loan No. L1401-001 is the result of certain mergers in 2010 of *The Church of the Immaculate Conception, Camden*; *The Church of the Holy Name, Camden, N.J.*; and the *Church of Our Lady of Mount Carmel and Fatima, Camden, N.J.*  These parishes merged into *The Parish of the Cathedral of the Immaculate Conception*, whose current address is 642 Market Street, Camden, New Jersey 08102.  As a result, *The Church of the Holy Name* loan for repairs, and the loans for operations and repairs for the *Church of Our Lady Mount Carmel and Fatima, Camden, N.J.* became the debt of *The Parish of the Cathedral of the Immaculate Conception*.

A full analysis of the loans and the doubtful/uncollectible amounts was provided by the Diocese to the Tort Committee.  This information included whether the loan was a performing or unperforming loan.  The Diocese asserts it has no basis to accelerate performing loans.  In addition, the Parishes assert that the loans are owed to the Revolving Fund and, therefore, are not property of the estate.

The Liquidation Analysis provides a $0.00 value for these loans and any outstanding accounts receivable owed by the parishes.  This is the result of an analysis performed by the Diocese and the causes of action that would exist if the Diocese was liquidated.  The Parishes would have substantial claims and offsets against the Diocese for the following non-exhaustive services: (i) the Diocese's self-insurance program (DSIP); (ii) the health insurance program (CHIP-DOC); and (iii) accounting and operational support.  Due to the above claims, the Diocese asserts there does not appear to be any significant value from these loans and receivables in a liquidation scenario. The Tort Committee does not agree with the Debtor's analysis.  Rather, it believes a substantial amount of the loans are collectible and therefore should be reflected in the Debtor's liquidation analysis.

In addition, each Parish has filed a proof of claim against the Diocese asserting various set offs and causes of action.  [See Claim Nos. 287-366).  These claims include, but are not limited to: (i) indemnification, reimbursement and contribution claims; (ii) collateral and setoff rights; and (iii) claims related to the Parish Trusts.  Id.

The Tort Committee disagrees with certain assertions made by the Diocese in this section. The settlement between the Diocese and the Tort Committee resolves all such claims.

4870-2885-4563, v. 2

#### f.  <u>Litigation Claims Against The Diocese of Camden Trusts, Inc.</u>

**Formatted:** No widow/orphan control

##### i.  <u>Alleged Fraudulent Transfer Claims</u>

The Tort Committee asserts that the Declaration of Trust between the Diocese and DOC Trusts is a fraudulent transfer pursuant to section 548(e)(1) of the Bankruptcy Code.  Section 548(e)(1) provides:

> In addition to any transfer that the trustee may otherwise avoid, the trustee may avoid any transfer of an interest of the debtor in property that was made on or within 10 years before the date of filing of the petition if –
> (A) Such transfer was made to a self-settled trust or similar device;
> (B) Such transfer was by the debtor;
> (C) The debtor is a beneficiary of such trust of similar device; and
> (D) The debtor made such transfer with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made, indebted.

This claim fails because no transfer was made from the Diocese to DOCT within ten years before the Petition Date.  11 U.S.C. § 548(e)(1) ("the trustee may avoid any transfer of an interest of the debtor in property that was **made on or within 10 years before the date of the filing of the petition** . . . .") (emphasis added).  The Tort Committee's complaint states that: "DOCT was initially funded with funds held by the Diocese. Upon information and belief, *no additional funding has been provided to DOCT from any entity since its initial funding*."  [ECF 871-3 at ¶22 (emphasis added)].  DOC Trust was formed and funded in 2001 – 20 years prior to the Diocese's chapter 11 filing.  Accordingly, this claim is frivolous.

Second, the Diocese is not a beneficiary of the "alleged trust" as required by Section 548(e)(1)(C).  In this regard, the terms of the Declaration of Trust explicitly state that the Diocese is not a beneficiary of any DOCT funds: "Under no circumstances will the Diocese be, or be considered or deemed to be, a beneficiary of any trust affirmed and ratified herein and hereby in any way whatsoever, or to have any right or claim of any type, kind, nature or description to the Assets of the DOCT."  Moreover, the Diocese transferred funds to establish DOCT, a corporation.  DOC Ttust is *not* a trust.  The trust described by the Declaration of Trust is not DOC Trust.  The Declaration of Trust concerns the trust, in which the Diocese is the trustee and DOC Trust is the beneficiary.  The Diocese, as trustee, may invest and manage DOC Trust's funds for the benefit of DOC Trust.  Therefore, the section 548 claim must fail as the debtor must also be the beneficiary of the trust in question.  The Diocese is not, and has never been, a beneficiary of DOC Trust because DOC Trust is not a trust.  This is fatal to the Tort Committee's claims.

Finally, even ignoring the utter failure of the Tort Committee to establish the first two elements of a section 548 claim, the Tort Committee is unable to establish actual fraud in connection with the alleged transfer.  The only statement made by the Tort Committee relating to fraud is that "The Debtor transferred the DOCT Accounts to the self-settled Alleged Trust with the intent to hinder, delay, or defraud current and future creditors."  [ECF 871-3 at ¶126].  As an initial matter, as expressed above, DOCT is not a trust.  Additionally, this is wholly insufficient to demonstrate a colorable claim for fraud.  Not only is it a legal conclusion, it has none of the facts

required to withstand a motion to dismiss. Accordingly, the Tort Committee has failed to demonstrate a colorable claim for actual intent to defraud creditors.

Further, as a practical matter, the Diocese believes the pursuit of DOC Trusts will be time consuming and expensive. While the Debtor asserts likelihood of success is remote, no doubt exists that any such claim will involve substantial discovery and a lengthy trial, most likely before the United States District Court. Any final judgment will lead to an appeal to the Third Circuit Court of Appeals. The likely timeframe to resolve any contested claim will be at least five (5) years and cost in excess of $1 million in fees and expenses.

Through the Standing Motion, the Tort Committee sought the right to bring these claims against DOC Trusts. On March 24, 2022, the Court entered an order denying the Standing Motion. The Tort Committee filed an appeal of this order to the District Court. The settlement between the Diocese and the Tort Committee resolves all of these claims.

### ii.  Alleged Substantive Consolidation/Alter-Ego Claims

The Tort Committee has asserted that the assets of DOC Trusts should be treated as property of the Diocese's estate through substantive contribution and alter ego claims.

Substantive consolidation allows a court to treat "'separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased).'" In re Owens Corning, 419 F.3d 195, 205 (3d Cir. 2005) (quoting Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.), 402 F.3d 416, 423 (3d Cir. 2005)). "'The result is that claims of creditors against separate debtors morph to claims against the consolidated debtor.'" Id. Substantive consolidation is "a construct of federal common law" that "emanates from equity." Id.

In Owens Corning, the Third Circuit held that a proponent of substantive consolidation must demonstrate the following with regard to the entities for which consolidation is sought: "(i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." Id. at 211 (emphasis added).

First, with respect to whether "postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors", the Diocese asserts there is no evidence that the assets of the Diocese and DOC Trusts were combined pre- or post-petition. Accordingly, there can be no claim that the assets are "scrambled."

Second, the Diocese asserts there is no evidence that the Diocese and DOC Trusts disregarded separateness or that any of its creditors treated them as one legal entity. As set forth above, the Diocese and DOC Trusts have separate Boards of Trustees, are separately incorporated, and run independently of each other. The books and records of the Diocese and DOC Trusts are maintained independently of each other. Accordingly, the Diocese does not believe that a claim exists relating to disregarding the separateness of the two entities. Moreover, the only common creditor of the Diocese and DOC Trusts – PNC Bank – clearly did not treat the Diocese and DOC

4870-2885-4563, v. 2

Trusts as one legal entity. In this regard, the PNC required that DOC Trusts guarantee the Loan and enter into a Pledge Agreement relating to DOC Trusts' assets. The Diocese asserts that PNC's course of dealing with DOC Trusts and the Diocese confirms their separateness.

Third, courts have prohibited the substantive consolidation of a debtor with a non-profit non-debtor entity. Off. Comm. of Unsecured Creditors v. The Archdiocese of Saint Paul and Minneapolis (In re The Archdiocese of Saint Paul and Minneapolis), 888 F.3d 944 (8th Cir. 2018) ("No appellate court has recognized the substantive consolidation of a debtor and a *non-profit* nondebtor, let alone a debtor and *over 200* non-profit non-debtors."); see also 11 U.S.C. § 303(a) ("[a]n involuntary case may be commenced only under chapter 7 or 11 of this title, and only against a person, except a farmer, family farmer, or a corporation that is not a moneyed, business, or commercial corporation, that may be a debtor under the chapter under which such case is commenced."). On this basis alone, such claims are futile. DOC Trusts is a non-profit entity formed under New Jersey law and, pursuant to the case law set forth herein, cannot be substantively consolidated with the Diocese.

The Diocese believes the Tort Committee's alter ego claims will similarly fail. In order to warrant piercing the corporate veil of a parent corporation, a party must establish two elements: 1) that the subsidiary was dominated by the parent corporation, and 2) that adherence to the fiction of separate corporate existence would perpetuate a fraud or injustice, or otherwise circumvent the law. State, Department of Environmental Protection v. Ventron, 94 N.J. 473, 500-01 (1983). In determining whether the first element has been satisfied, courts consider whether "the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent." Id. at 501; Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 215 F.Supp.2d 482, 497 (D.N.J. 2002) ("veil-piercing is proper when a subsidiary is an alter ego or instrumentality of the parent corporation"). In determining corporate dominance, courts engage in a fact-specific inquiry considering whether the subsidiary was grossly undercapitalized, the day-to-day involvement of the parent's directors, officers and personnel, and whether the subsidiary fails to observe corporate formalities, pays no dividends, is insolvent, lacks corporate records, or is merely a facade. Bd. of Trs. v. Foodtown, Inc., 296 F.3d 164, 172 (3d Cir. 2002); Pearson v. Component Tech. Corp., 247 F.3d 471, 484 (3d Cir.), cert. denied, 534 U.S. 950 (2001); Marzano v. Computer Sci. Corp., 91 F.3d 497, 513 (3d Cir. 1996); Solomon v. Klein, 770 F.2d 352, 353–54 (3d Cir. 1985); Seltzer v. I.C. Optics, Ltd., 339 F.Supp.2d 601, 610 (D.N.J. 2004).

Here, the Diocese and DOC Trusts do not have a parent/subsidiary relationship. First, the Diocese asserts there is no evidence that supports that the Diocese dominates DOC Trusts such that DOC Trusts has no separate existence. As set forth previously, the Diocese and DOC Trusts have separate boards and are separately incorporated. DOC Trusts makes funding decisions independently of the Diocese and has denied funding in the past. Thus, the Diocese asserts that DOC Trusts has not been a mere conduit for the Diocese. Second, the Diocese asserts that DOC Trusts is not grossly undercapitalized or insolvent, the Diocese is not involved in the day-to-day operations of DOC Trusts, all corporate formalities are observed and DOC Trusts has corporate records. Finally, the Diocese asserts that DOC Trusts was not separately incorporated to perpetuate a fraud. Accordingly, the Diocese believes this claim is futile.

Finally, as a practical matter, the Diocese believes the pursuit of DOC Trusts will be time consuming and expensive. While the likelihood of success is remote, no doubt exists that any such

4870-2885-4563, v. 2

claim will involve substantial discovery and a lengthy trial, most likely before the United States District Court.  Any final judgment will lead to an appeal to the Third Circuit Court of Appeals. The likely timeframe to resolve any contested claim will be at least five (5) years and cost in excess of $5 million in fees and expenses.

Through the Standing Motion, the Tort Committee sought the right to bring these claims against DOC Trusts.  On March 24, 2022, the Court entered an order denying the Standing Motion. The Tort Committee has appealed this order to the District Court.  The settlement between the Diocese and the Tort Committee resolves all of these claims.

### iii.  Validity of Trust/Property of the Estate Claims

The Tort Committee has asserted that a valid trust does not exist between the Diocese and DOC Trusts pursuant to New Jersey law, that the Diocese cannot shield DOC Trusts assets from creditors under New Jersey law, and that the assets of DOC Trusts are property of the Debtor's Estate.

The Diocese does not believe that the Tort Committee has made any supportable arguments with respect to any of these claims.  First, as set forth previously, the Tort Committee fundamentally misunderstands the corporate form of DOC Trusts, which is not a trust, but rather a separately incorporated entity.  Second, the Tort Committee fails to recognize that DOC Trust is a separately incorporated entity, is not a debtor, and owns its owns assets.  Accordingly, these claims have no merit.

Further, as a practical matter, the Diocese believes the pursuit of DOC Trusts will be time consuming and expensive.  While the Debtor asserts likelihood of success is remote, no doubt exists that any such claim will involve substantial discovery and a lengthy trial, most likely before the United States District Court.  Any final judgment will lead to an appeal to the Third Circuit Court of Appeals.  The likely timeframe to resolve any contested claim will be at least five (5) years and cost in excess of $1 million in fees and expenses.

The settlement between the Diocese and the Tort Committee resolves all of these claims.

### g.  Litigation Claims Against the Other Catholic Entities.

The Tort Committee has asserted that the Parishes, Missions, and Schools should be substantively consolidated with the Diocese.  Through this allegation, the Tort Committee asserts that the Other Catholic Entities' assets (and liabilities) should be combined with the Diocese.  The case law associated with substantive consolidation is set forth above.  The Diocese does not believe that there is any basis for consolidation of the Other Catholic Entities and the Diocese.

As set forth above, the Third Circuit held that a proponent of substantive consolidation must demonstrate the following with regard to the entities for which consolidation is sought: "(i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors."  Id. at 211 (emphasis added).

4870-2885-4563, v. 2

First, similar to the claims made against DOC Trusts, the Diocese asserts no evidence exists that the assets of the Diocese and the Parishes are "so scrambled that separating them is prohibitive and hurts all creditors." While the Parish Trusts are held in a joint investment vehicle with investments by the Diocese and other Catholic entities, the Diocese asserts all Parish funds are traceable. For example, the Diocese has produced ten years of statements to the Tort Committee demonstrating that all funds are traceable. Thus, any allegation that the assets are "scrambled" has no weight. Besides the Parish Trusts, all other assets of the Parishes are held and maintained by the individual Parishes. Each Parish holds title to its own real estate, has its own operating and other bank accounts, and its own employees and payroll. Thus, the Diocese does not believe that there is any basis for asserting substantive consolidation under this theory of <u>Owens Corning</u>.

Second, the Diocese asserts there is no evidence that the Diocese and the Parishes disregarded separateness or that any of its creditors treated them as one legal entity. Each Parish is a separate legal entity formed properly under New Jersey law. Each parish has its own board of trustees, which is also formed in accordance with New Jersey law. The books and records of the Diocese and each Parish are maintained independently of each other. Accordingly, the Diocese asserts no claim exists relating to disregarding the separateness of the Parishes.

Finally, as set forth above, courts have prohibited the substantive consolidation of a debtor with a non-profit non-debtor entity. The Parishes are each a non-profit entity formed under New Jersey law and, pursuant to the case law set forth herein, cannot be substantively consolidated with the Diocese. Thus, the Diocese does not believe that it has a claim against the Parishes for substantive consolidation.

The Tort Committee also asserts the Diocese and the Other Catholic Entities are alter egos. As set forth above, in order to assert this claim, a party must establish two elements: 1) that the subsidiary was dominated by the parent corporation, and 2) that adherence to the fiction of separate corporate existence would perpetuate a fraud or injustice, or otherwise circumvent the law. <u>State, Department of Environmental Protection v. Ventron</u>, 94 N.J. 473, 500-01 (1983). The analysis, here, is similar to that of DOC Trusts. First, the Diocese and the Other Catholic Entities do not have a parent/subsidiary relationship. Second, the Diocese asserts there is no evidence that supports that the Diocese dominates Other Catholic Entities such that the Other Catholic Entities have no separate existence. As set forth previously, the Diocese and Other Catholic Entities have separate boards and are separately incorporated. The Other Catholic Entities function independently of the Diocese. Thus, the Diocese asserts the Other Catholic Entities have not been a mere conduit for the Diocese. Indeed, several of the Parishes existed prior to the creation of the Diocese. Second, the Diocese asserts the Other Catholic Entities are not grossly undercapitalized or insolvent, the Diocese is not involved in the day-to-day operations of the Other Catholic Entities, all corporate formalities are observed and the Other Catholic Entities have separate corporate records. Finally, the Diocese asserts the Other Catholic Entities were not separately incorporated to perpetrate a fraud. Accordingly, the Diocese believes this claim is futile.

The Tort Committee has further asserted that the Declarations of Trust are invalid, that the funds in the Revolving Fund are not traceable, and that the Revolving Fund and the assets therein are property of the Debtor's Estate. The Diocese and the Parishes dispute this, and contend that the trust funds are identifiable and/or traceable under applicable law and that, in addition a portion of these funds are "restricted funds" protected from claims of creditors. Further, to the extent any

4870-2885-4563, v. 2

Parish funds held in the Revolving Fund accounts are deemed to be not held in trust, the Parishes have asserted a claim against the Diocese which would be a dollar for dollar claim for any reduction in the trust, thereby diluting any recovery for all creditors

Finally, as set forth above, the pursuit of claims against the Other Catholic Entities will be time consuming and expensive. While the likelihood of success is remote, no doubt exists that any such claim will involve substantial discovery and a lengthy trial, most likely before the United States District Court. Any final judgment will lead to an appeal to the Third Circuit Court of Appeals. The likely timeframe to resolve any contested claim will be at least five (5) years and cost in excess of $5 million in fees and expenses.

Through the Standing Motion, the Tort Committee sought the right to bring these claims against DOC Trusts. On March 24, 2022, the Court entered an order denying the Standing Motion. The Tort Committee has appealed this order to the District Court. The settlement between the Diocese and the Tort Committee resolves all of these claims.

#### h. <u>Litigation Claims against the Diocese's Directors and Officers</u>

The Tort Committee has asserted that the Diocese, the Bishop, and the Diocese's Directors and Officers (collectively, the "<u>D&Os</u>") breached their fiduciary duty by (i) waiving certain Parish Assessments in 2020; (ii) wrote off, canceled, and/or failed to collect the outstanding loans and accounts receivable from the Parishes, Missions, and Schools, and (iii) failing to pursuant insurance proceeds in connection with the IVCP. Further, the Tort Committee asserts that the waiver of the Parish Assessments and any cancellation of debt owed by the Parishes, Missions, and Schools constitute voidable fraudulent transfers.

First, this complaint will fail because the Diocese has not written off or cancelled any debt of the Parishes. In this regard, the Diocese is required under United States Generally Accepted Accounting Principles (U.S. GAAP) to provide for doubtful or uncollectible accounts in order to accurately reflect its financial statements. The Diocese does this annually in conformance with U.S. GAAP. The doubtful or uncollectible accounts are **not** written off. Indeed, the Diocese has collected on accounts that it deemed doubtful and/or uncollectible during the course of this bankruptcy proceeding following the sale of certain real property by a Parish. Accordingly, because the accounts are not written off or cancelled, there cannot be a transfer pursuant to fraudulent transfer law. Further, following U.S. GAAP is not a breach of fiduciary duty.

Second, any waiver of Parish Assessments during the first three months of the COVID-19 pandemic, when churches were shuttered and the Diocese's services to Parishes were limited, was a proper use of the D&Os business judgment. The Diocese simultaneously cut the interest rate it provides to the Parishes in the Revolving Fund, which reduced the impact of the waiver of Parish Assessments. <u>Cts. at Beachgate v. Bird</u>, 226 N.J. Super. 631, 641 (NJ Ch. Div. 1988) ("The [business judgment] rule requires that there be a showing of fraud or lack of good faith in the conduct of the affairs of a corporation in order to question decisions of its board of directors. If the directors' actions are authorized, fraud, self-dealing or unconscionable conduct must be shown to justify judicial action. Courts will not second-guess the actions of directors unless it appears that they are the result of fraud, dishonesty or incompetence.").

4870-2885-4563, v. 2

Third, the Diocese asserts that it was proper business judgment for the Diocese to resolve Abuse Claims through the IVCP without seeking insurance for those claims. The Diocese determined, in its business judgment, that pursuing the insurance coverage would have: (i) required the Diocese to delay payment to the victims of abuse while fighting with insurance companies, (ii) subjected the Abuse Claimants that settled to discovery requests that would have delayed settlements, (iii) cost the Diocese in excess of the return to negotiate and procure the insurance amounts in light of the various defenses asserted by the insurance companies. Thus, the D&Os, in conjunction with the advice of counsel, determined, in their reasonable business judgment, that it was more important to settle with the Abuse Claimants, get the Abuse Claimants fair and equitable payments, obtain releases for those claims, and not engage in the years-long litigation that would be required to resolve the claims with insurance carriers.

Finally, as set forth above, the pursuit of claims against the D&Os will be time consuming and expensive. While the likelihood of success is remote, no doubt exists that any such claim will involve substantial discovery and a lengthy trial, most likely before the United States District Court. Any final judgment will lead to an appeal to the Third Circuit Court of Appeals. The likely timeframe to resolve any contested claim will be at least five (5) years and cost in excess of $5 million in fees and expenses. The Diocese's insurer has denied coverage for these claims.

Through the Standing Motion, the Tort Committee sought the right to bring these claims against the D&Os. On March 24, 2022, the Court entered an order denying the Standing Motion. The Tort Committee has appealed this order to the District Court. The settlement between the Diocese and the Tort Committee resolves all of these claims.

i.  **The Diocese's Insurance Program**

From 1969 through the present, the Diocese has maintained an insurance program for itself and certain Catholic organizations located within the territory of the Diocese. These insurance policies (collectively, the "**Insurance Policies**") are property of the Diocese's estate.

TheWhile the Diocese is unaware of any insurance programs prior to 1969. As set forth above, however, the Diocese and the Tort Committee have jointly retained IAG as an insurance archeologist to search for information regarding pre-1969 insurance policies of the Diocese and the Other Catholic Entities. At the time of the filing of the Disclosure Statement, suchIAG'S search is still in progressongoing.

With respect to the post-1969 insurance programInsurance Policies, the Diocese is aware of the following insurance providers per year:(collectively, the "**Insurers**"):

4870-2885-4563, v. 2

| Year | Insurance Company |
|------|-------------------|
| 1969 | Insurance Company of North America |
| 1970 | Insurance Company of North America |
| 1971 | Insurance Company of North America |
| 1972 | Insurance Company of North America<br>Lexington Insurance Co.<br>London Market Insurers |
| 1973 | Lexington Insurance Co.<br>London Market Insurers |
| 1974 | Lexington Insurance Co.<br>London Market Insurers |
| 1975 | Lexington Insurance Co.<br>London Market Insurers |
| 1976 | London Market Insurers |
| 1977 | London Market Insurers |
| 1978 | London Market Insurers<br>Interstate Fire & Casualty Co. |
| 1979 | London Market Insurers<br>Interstate Fire & Casualty Co. |
| 1980 | London Market Insurers<br>Interstate Fire & Casualty Co. |
| 1981 | London Market Insurers<br>Interstate Fire & Casualty Co. |
| 1982 | London Market Insurers<br>Interstate Fire & Casualty Co. |
| 1983 | London Market Insurers<br>Interstate Fire & Casualty Co.<br>Century Indemnity Co. |
| 1984 | London Market Insurers<br>Century Indemnity Co.<br>Interstate Fire & Casualty Co. |
| 1985 | London Market Insurers<br>Century Indemnity Co.<br>Interstate Fire & Casualty Co.<br>Granite State Ins. Co. |
| 1986 | London Market Insurers<br>Interstate Fire & Casualty Co. |
| 1987 | London Market Insurers<br>Lexington Insurance Co. |
| 1988 | Lexington Insurance Co.<br>TNCRRG |
| 1989 | Lexington Insurance Co.<br>TNCRRG |

Formatted Table

72

| Year | Insurance Company |
|------|-------------------|
| 1990 | Lexington Insurance Co.<br>TNCRRG<br>United National Ins. Co.[23] |
| 1991 | TNCRRG<br>United National Ins. Co. |
| 1992 | TNCRRG<br>United National Ins. Co.<br>Federal Insurance Co. |
| 1993 | Federal Insurance Co.<br>TNCRRG<br>United National Ins. Co.<br>Insurance Company of North America |
| 1994 | Federal Insurance Co.<br>TNCRRG<br>United National Ins. Co.<br>Insurance Company of North America |
| 1995 | Federal Insurance Co.<br>TNCRRG<br>United National Ins. Co.<br>Insurance Company of North America |
| 1996 | Federal Insurance Co.<br>TNCRRG<br>United National Ins. Co. |
| 1997 | TNCRRG<br>United National Ins. Co.<br>Federal Insurance Co.<br>National Union |
| 1998 | TNCRRG<br>United National Ins. Co.<br>Federal Insurance Co.<br>National Union |
| 1999 | National Union<br>TNCRRG<br>United National Ins. Co.<br>Federal Insurance Co.<br>AESLIC |

**Formatted Table**

---

[23] The Diocese and the Tort Committee filed a Stipulation to Dismiss United National from the Adversary Proceeding Without Prejudice (Adv. Pro. No. 20-01573-JNP; ECF 120).

4870-2885-4563, v. 2

| Year | Insurance Company |
|------|-------------------|
| 2000 | TNCRRG<br>United National Ins. Co.<br>Federal Insurance Co.<br>Underwriters at Lloyd's[24] |
| 2001 | TNCRRG<br>Underwriters at Lloyd's<br>United National Ins. Co.<br>Lexington Insurance Co. |
| 2002 | TNCRRG<br>United National Ins. Co.<br>Lexington Insurance Co. |
| 2003 | TNCRRG |
| 2004 | TNCRRG |
| 2005 | TNCRRG |
| 2006 | TNCRRG |
| 2007 | TNCRRG |
| 2008 | No claims filed in this period. |
| 2009 | No claims filed in this period. |
| 2010 | TNCRRG<br>Illinois Union Insurance Co. |
| 2011 | No claims filed in this period.<br>Illinois Union Insurance Co. |
| 2012 | No claims filed in this period.<br>Illinois Union Insurance Co. |
| 2013 | No claims filed in this period. |
| 2014 | No claims filed in this period. |
| 2015 | TNCRRG |
| 2016 | TNCRRG |
| 2017 | No claims filed in this period. |
| 2018 | TNCRRG |
| 2019 | TNCRRG |
| 2020 | TNCRRG |
| 2021 | No claims filed in this period. |

The Insurers identified above issued primary and/or excess insurance policies in the years reflected.  Certain, but not all, of these policies have a self-insured retention amounts attributable to the Diocese.

The Insurers have asserted various several defenses in the Insurance Action, including, but not limited to, the following defenses:

> a.  Certain policies attach, if at all, only after certain self-insured retentions

---

[24] Any Underwriters at Lloyd's subscribing to policies after 2000 are not LMI.

4870-2885-4563, v. 2

have been exhausted and/or after the limits of liability of any applicable underlying insurance and/or any applicable underlying limits have been exhausted regardless of the exhaustion or unavailability of such underlying insurance and/or underlying limits.

b.  Certain ~~insurers~~Insurers do not have a duty to defend or settle, only to indemnify covered ultimate net loss. There is no obligation to reimburse defenses expenses or a loss payment until after the underlying claim is resolved and coverage for that claim has been determined.

c.  There is no coverage for any entity or person that does not qualify as an assured under the respective policies.

d.  Notice of the claims by the Diocese was untimely.

e.  The Diocese breached its duty of cooperation under certain policies.

f.  There is no coverage if a claimant alleges, or a determination is made, that the Diocese (or any other Assured), was aware of the alleged perpetrator's deviant propensities or history of molesting children prior to or during the alleged abuse.

g.  There is no coverage for volitional acts.

h.  There is no coverage arising from underlying actions and underlying claims which involve claimants who previously asserted claims that were litigated to conclusion, settled, or otherwise resolved by the Diocese.

i.  There is no coverage for any claim known to be false or fraudulent, and coverage under the ~~insurance policies~~Insurance Policies shall become void, and all claims thereunder shall be forfeited, if any such claim is made.

j.  Punitive damages may be excluded from coverage under the definition of ~~"~~"occurrence~~"~~" and under the applicable law and public policy.

k.  The claims may not be covered under any policy issued or allegedly issued to the Diocese by an Insurer, in whole or in part, to the extent that any bodily injury or event resulting in such injury or damage arises from deliberate, willful and/or intentional conduct substantially certain to result in injury.

l.  Certain claims are not covered due to application of sexual abuse or molestation exclusions.

m.  For claims-made policies, there were no claims timely made or reported, which are conditions precedent to coverage.

~~Despite~~Notwithstanding these defenses, the Plan Proponents believe that ~~these insurance policies~~ the Insurance Policies are a valuable asset of the estate. and, are intended to, and will

75

inure to, the benefit of Survivors.

As part of the mediation sessions held before the Honorable Jose L. Linares, Chief Judge (ret.), the Diocese and the Insurers reached a resolution of these resolved the claims. the Diocese held against the Insurers, which settlement was, and remains, subject to approval of the Bankruptcy Court (the "**Proposed Insurance Settlement**"). The Tort Committee rejected this settlement as it opposed the Proposed Insurance Settlement because, among other reasons, the Committee ascribes significantly more value to the Insurance Policies than $30 million.

In an effort to resolve the Abuse Claimsdisputes between the Tort Committee and the Diocese, the Diocese and the Tort Committee continued to mediate. On after entry of the Diocese and the Insurers into the Proposed Insurance Settlement and on April 11, 2022, the Diocese and the Tort Committee reached the settlement described in, and embodied by, the Plan.

The terms of the settlement with the Tort Committee requiresrequire the Diocese to assign its interestthe Transferred Insurance Interests (as defined in any policy (but not the policy itself), including the net proceeds;the Plan) to the Trust. These changed circumstances compel the Diocese to withdraw from the insurance settlement as part of Confirmation. Unless ordered by the Bankruptcy Court, at the hearing to confirm the Plan, the Diocese intends to inform the Bankruptcy Court why the relief sought under the Insurance Settlement Motion is no longer in the Debtor's estate's best interests but rather, the Plan is and the relief it provides is the most efficient, cost effective and value maximizing manner in which the Diocese should exit bankruptcy.

Formatted: No widow/orphan control

The Insurers have raised raise various defenses to the Plan and assertedassert as follows:

1. That theThe Plan cannot be confirmed because it is not insurance neutral;

2. The Diocese is not authorized under the Bankruptcy Code to withdraw fromits support for the settlementProposed Insurance Settlement and the insurersInsurers seek to enforce the settlementProposed Insurance Settlement;

3. The Diocese's withdrawal from the settlement viciatesProposed Insurance Settlement vitiates coverage by the Insurers;

4. The Diocese's alleged withdrawal from the settlementProposed Insurance Settlement is a breach of the duty of good faith, a breach of the duty of coorperation and is a failure to vigorously defend claims, all of which may void coverage;

5. The insurance policies Diocese acted in bad faith by proposing a plan that does not include the terms of the Proposed Insurance Settlement;

6. The Insurance Policies are executory contracts which cannot be assumed by the Diocese or assigned to the Trust without providing for adequate assurance of future performance;

7. The Diocese is not permitted under New Jersey law to assign the defense of claims to the Trust;

76

4870-2885-4563, v. 2

8. The Trust Distribution Procedures create a disabling conflict between the Diocese and the Trust Administrator in carrying out the Diocese's duties under certain Insurance Policies, which also inhibits the Diocese's ability to assign such policies to the Trust;

9. The Insurers are materially prejudiced by the terms of the Trust Distribution Procedures;

10.    The Plan and Trust Distribution Procedures improperly give the Trust Administrator the sole right to object to Class 5 Claims;

11. The Trust Distribution Procedures do not contain a clear explanation of the standards for valuation and evaluation of Abuse Claims;

12.    The Diocese's withdrawal from the settlement results in administrative claims for the Insurers that must be satisfied; and

13. The Insurers claim that the Disclosure Statement fails to disclose that Insurers' obligations under the Insurance Policies are subject to the terms and conditions of the Insurance Policies, and that the Diocese's failure to satisfy any of the terms and conditions could vitiate coverage.

The Plan Proponents dispute these allegations, each of which will be addressed at the hearing to confirm the Plan.  As will be established at such hearing, the expected realization to Survivors from the Transferred Insurance Interests will far exceed any costs associated with litigating the forgoing claims and causes of action plus the $30 million that the Insurers had agreed to pay the Debtor's estate under the Proposed Insurance Settlement.

**The Diocese makes no representations or warranties regarding the validity of the claims against the Insurers, the Insurance Policies, or the defenses that the Insurers may have in connection with these claims.**

4870-2885-4563, v. 2

# ARTICLE VIII.
## VALUATION OF ABUSE CLAIMS

As set forth above, the Diocese, along with the Archdiocese of Newark and Dioceses of Trenton, Paterson, and Metuchen, engaged the IVCP to consensually resolve claims prior to its bankruptcy proceedings.  The IVCP Administrators determined the following values when fixing claims in the IVCP:

| IVCP SETTLEMENT COMPENSATION SUMMARY | | |
|---|---|---|
| **Category** | **Description of Abuse** | **Range of Compensation** |
| CATEGORY I | Sex talk, no physical touching | $0- $25,000 |
| CATEGORY II | Nudity/Pornography - no physical touching | $25,000 - $50,000 |
| CATEGORY III | Fondling over clothing | $50,000 - $100,000 |
| CATEGORY IV | Fondling under clothing | $100,000 - $150,000 |
| CATEGORY V | Masturbation | $150,000 - $200,000 |
| CATEGORY VI | Oral sex | $200,000 - $350,000 |
| CATEGORY VII | Penetration | $350,000 - $500,000 |

Using the above values, EisnerAmper, the Diocese's Financial Advisors, analyzed each of the IVCP claims, including the determinations issued by the IVCP Administrators following their independent review of each claim.  Through this process, EisnerAmper was able to determine the average award in each category, including the impact of the step downs per the IVCP.  A chart of this analysis is attached to the Disclosure Statement as **Exhibit I**.

Prior to the Bar Date, a total of 345 Abuse Claim proofs of claim were filed against the Diocese.  Upon review, the Diocese determined that several of the claims were duplicates.  Accordingly, the total number of Abuse Claim proofs of claim is 324.  Subsequently, 19 late claims were filed, which have not been deemed allowable by the Bankruptcy Court.  Nor has any party sought to deem such claims Allowed.

The Diocese, along with EisnerAmper, then reviewed each of the claims filed in this case and assigned each claim to one of the IVCP categories.  Classifications were made based on the highest level of abuse alleged in the proof of claim.  EisnerAmper then applied the Average Award Paid to the claims in each category for each proof of claim.

The Diocese valued 224 claims based on this IVCP analysis.  These 224 claims aggregate to $32,683,744 of the total amount of the valued claims.  An additional 67 claims were valued at lower amounts, due to the fact that the proofs of claim allege inconsistent details or the allegations are not consistent with background facts.  These claims include, but are not limited to, claims that: (i) do not allege any connection to the Diocese or the Parishes; (ii) claims against priests who have no other claims made against them and no evidence of misconduct has ever been reported against the priest; (iii) the claim is insufficiently detailed to determine who the alleged abuser is; or (iv) the victim of abuse was an adult at the time of the alleged abuse.  As a result, these claims have a total adjusted value of $1,715,000.  The remaining 33 claims were given a value of $0.00.  These claims include, but are not limited to, the following: (i) claims of abuse made against Boy Scouts of America leaders with no connection to the Diocese or a Parish; (ii) claims made against priests

that were not part of the Diocese; (iii) previously settled claims; and (iv) claims with no details.

Thus, based on this analysis, EisnerAmper arrived at a total valuation for the claims of $34,398,744. A chart of this analysis is attached to the Disclosure Statement as <u>Exhibit J</u>.

The Tort Committee retained Claro Group to provide an expert report regarding its contentions on the value of the Abuse Claims. In this regard, Claro Group determined that a reasonable range of claim value for post-1969 Abuse Claims in the aggregate ranges from $326.0 million to $737.3 million

Following Eisner Amper's analysis, the Diocese retained Roux to provide a rebuttal expert report in connection with the insurance settlement. Roux determined that a reasonable estimate of the Diocese's Abuse Claim liability should range from approximately $71 million to $86 million.

The Diocese reserves all of its rights with respect to the claims and valuations including, but not limited to, its right to: (i) dispute the validity of each claim; (ii) dispute the allegations or facts in each claim; and/or (iii) alter the value assigned to any claim as provided for in the Plan and Trust Distribution Procedures.

**ARTICLE IX.**
**SUMMARY OF THE PLAN OF REORGANIZATION**

The following is a summary of the significant elements of the Plan. This Disclosure Statement is qualified in its entirety by reference to the Plan. This summary does not describe every element of the Plan and is not a substitute for a complete review of the Plan. All parties are encouraged to review the Plan in its entirety for a full understanding of its provisions and impact on Creditors and Interest Holders. If there are any inconsistencies between the provisions of this Disclosure Statement and the provisions of the Plan, the provisions of the Plan will control.

**A.** **What Creditors Will Receive Under the Proposed Plan**

The Plan classifies claims in various classes. The Plan states whether each class of claims is impaired or unimpaired. The Plan provides the treatment each class will receive. A copy of the Plan is annexed hereto as **Exhibit A**.

**B.** **Classification of Claims**

As set forth in Articles III and IV of the Plan, the Plan classifies the various Claims against the Debtor and specifies their treatment pursuant to sections 1122 and 1123(a) of the Bankruptcy Code. All Claims, as defined herein and in section 101(5) of the Bankruptcy Code, except the Fee Claims, Administrative Expense Claims, U.S. Trustee Fees, and Priority Tax Claims, are placed into the Classes set forth below. Pursuant to section 1123(a)(1) of the Bankruptcy Code, Fee Claims, Administrative Expense Claims, U.S. Trustee Fees, and Priority Tax Claims, as described below, are not classified in the Plan, and the treatment of such Claims is set forth in Article III below. A Claim is placed in a particular Class only to the extent that the Claim falls within the description of that Class and is classified in other Classes to the extent that any portion of such Claim falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such

4870-2885-4563, v. 2

Claim is an Allowed Claim in that Class and such Claim has not been paid, discharged, released or otherwise settled prior to the Effective Date.

    a.   **Unclassified Claims**

The following are the unclassified Claims: Fee Claims, Administrative Expense Claims, U.S. Trustee Fees, and Priority Tax Claims. Unclassified Claims are not Impaired by the Plan. Each Holder of an unclassified Claim is conclusively presumed to have accepted the Plan and, therefore, is not entitled to vote to accept or reject the Plan.

    b.   **Unimpaired Classes of Claims**

Each holder of an Allowed claim in the following class is unimpaired and deemed to have accepted the Plan and, therefore, is not entitled to vote to accept or reject the Plan: Priority Non-Tax Claims.

    c.   **Impaired Classes of Claims**

Each Holder of an Allowed Claim in the following classes is impaired and entitled to vote to accept or reject the Plan:

| Class | Claims & Interest | Status | Voting Rights |
|---|---|---|---|
| 2 | PNC Bank Claim | Impaired | Entitled to Vote |
| 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Pension Claims | Impaired | Entitled to Vote |
| 5 | Abuse Claims Other Than Unknown Abuse Claims | Impaired | Entitled to Vote |
| 6 | Unknown Abuse Claims | Impaired | Entitled to Vote |
| 7A | Abuse Related Contingent Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7B | Abuse Related Contingent Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Non-Abuse Litigation Claims | Impaired | Entitled to Vote |

## ARTICLE X.
## TREATMENT OF UNCLASSIFIED CLAIMS

    C.   **Administrative Expenses Claims**

Administrative Expense Claims are Claims for costs or expenses of administering the Debtor's Chapter 11 Case, which are Allowed under Bankruptcy Code section 503(b) or otherwise. The Bankruptcy Code requires that all administrative expenses be paid on the Effective Date, unless a particular Claimant agrees to different treatment. The Debtor or Reorganized Debtor, as appropriate, shall pay each Holder of an Allowed Administrative Expense Claim in full, in Cash, on the later of (i) fifteen (15) days after the Effective Date; or (ii) fifteen (15) days after the date on which such Claim becomes an Allowed Administrative Expense Claim. Notwithstanding

80

anything in the Plan to the contrary, the Holder of an Allowed Administrative Claim may be paid on such other date and upon such other terms as may be agreed upon by the Holder of an Allowed Administrative Expense Claim and Debtor/Reorganized Debtor.

Certain Insurers assert that they are entitled to Administrative Expense Claims as a result of the Debtor allegedly withdrawing from a proposed settlement with the Insurers. The Diocese rejects this assertionPlan Proponents reject the assertions that (i) the Debtor withdrew from the proposed settlement with the Insurers and (ii) that the Insurers are entitled to Administrative Expense Claims.

**D.   Priority Tax Claims**

The Reorganized Debtor shall pay any Allowed Priority Tax Claims, in full, in Cash, without interest, as soon as practicable after the later of (i) fifteen (15) days after the Effective Date, (ii) fifteen (15) days after the date on which such Claim becomes an Allowed Priority Tax Claim, (iii) at the option of the Debtor prior to the Effective Date in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, in Cash, in an aggregate amount of such Allowed Priority Tax Claim payable in regular quarterly installments over a period of not more than five (5) years from the Petition Date, or (iv) such other treatment agreed to by the Debtor and the Holder of such Allowed Priority Tax Claim; *provided, however,* that the Holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising with respect to, or in connection with any Priority Tax Claim. Any demand for any such penalty will be deemed disallowed by Confirmation of the Plan. The Debtor is unaware of any Priority Tax Claims.

The Debtor is unaware of any Priority Tax Claims.

**E.   U.S. Trustee Fees.**

All outstanding U.S. Trustee Fees that the Debtor has not paid as of the Effective Date shall be paid by the Reorganized Debtor no later than fifteen (15) days after the Effective Date or when such U.S. Trustee Fees come due in the ordinary course.

All U.S. Trustee Fees due and payable prior to the Effective Date shall be paid by the Debtor on the Effective Date. After the Effective Date, the Reorganized Debtor shall pay any and all U.S. Trustee when due and payable. The Debtor shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Reorganized Debtor shall File with the Bankruptcy Court quarterly reports when they become due using UST Form 11-PCR. The Debtor and the Reorganized Debtor shall remain obligated to pay U.S. Trustee Fees to the United States Trustee until the earliest of the Chapter 11 Case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code. The United States Trustee shall not be required to File any Administrative Expense Claim in the Chapter 11 Case and shall not be treated as providing any release under this Plan.

The Debtor does not anticipate that there will be any outstanding U.S. Trustee Fees, except those that have not become due in the ordinary course at the time of confirmation.

**F.   Fee Claims.**

Formatted: No widow/orphan control

81

4870-2885-4563, v. 2

All Persons seeking an award by the Bankruptcy Court of Fee Claims (i) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is 45 days after the Effective Date and (ii) shall be paid in full in such amounts as are Allowed by the Bankruptcy Court (a) on the date upon which the Order relating to any such Allowed Fee Claim is entered, or (b) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtor or Reorganized Debtor, as applicable.  The Reorganized Debtor is authorized to pay compensation for services rendered or reimbursement of expenses incurred after Confirmation in the ordinary course and without the need for Bankruptcy Court approval.

The Debtor estimates the following Fee Claims:

| Name of Professional and Role in Case | Estimated Amount of Fee Claim | Proposed Payment |
|---|---|---|
| Trenk Isabel Siddiqi & Shahdanian P.C.<br><br>*Current Attorneys for Debtor* | $1,~~000~~250,000 | Payment in full on Effective Date or as otherwise agreed upon between the Debtor and the professional. |
| McManimon, Scotland & Baumann, LLC<br><br>*Initial Attorneys for Debtor* | $645,722.52 | Paid in full in accordance Order Granting Second and Final Application for Compensation. [ECF 820]. |
| EisnerAmper, LLP<br><br>*Financial Advisors for Debtor* | $~~750~~850,000 | Payment in full on Effective Date or as otherwise agreed upon between the Debtor and the professional. |
| Cooper Levenson, P.A.<br><br>*Special Counsel for Debtor* | $450,000 | Payment in full on Effective Date or as otherwise agreed upon between the Debtor and the professional. |
| Duane Morris, LLC<br><br>*Special Counsel for Debtor* | $134,750 | Paid in full from settlement proceeds in accordance with the Order Granting First and Final Application for Compensation. [ECF 223]. |
| A. Atkins Appraisal Corp.<br><br>*Appraiser for Debtor* | $13,292.70 | Paid in full in accordance with Order Granting First and Final Application for Compensation. [ECF 431]. |

82

| Name of Professional and Role in Case | Estimated Amount of Fee Claim | Proposed Payment |
|---|---|---|
| Binswanger Company<br><br>*Real Estate Appraiser for Debtor* | $64,000 | Paid in full in accordance with the Order Granting First and Final Application for Compensation. |
| Insurance Archeology Group<br><br>*Insurance Archeologist to the Debtor and Tort Committee* | $15,000 | Payment in full on Effective Date or as otherwise agreed upon between the Debtor and the professional. |
| Lowenstein Sandler LLP<br><br>*Counsel for the Tort Committee* | $~~9,000~~10,500,000 | Payment in full on Effective Date or as otherwise agreed upon between the Debtor and the professional. |
| Berkeley Research Group<br><br>*Financial Advisor for the Tort Claimants' Committee* | $1,~~500~~700,000 | Payment in full on Effective Date or as otherwise agreed upon between the Debtor and the professional. |
| Finance Scholars Group<br><br>*Expert Witness and Claims Evaluator to the Tort Committee* | $50,000 | Payment in full on Effective Date or as otherwise agreed upon between the Debtor and the professional. |
| Porzio, Bromberg & Newman, P.C.<br><br>*Counsel for the Trade Committee* | $1,000,000 | Payment in full on Effective Date or as otherwise agreed upon between the Debtor and the professional. |
| Roux Associates<br><br>*Expert to the Diocese* | $~~40~~175,000 | Payment in full on Effective Date or as otherwise agreed upon between the Debtor and the professional. |
| McCarter & English<br><br>*Mediator* | $600,000 | Payment in full on Effective Date or as otherwise agreed upon between the Debtor and the professional. |

4870-2885-4563, v. 2

| Name of Professional and Role in Case | Estimated Amount of Fee Claim | Proposed Payment |
|---|---|---|
| Claro Group<br><br>*Expert to the Tort Committee* | $~~500~~560,000 | Payment in full on Effective Date or as otherwise agreed upon between the Debtor and the professional. |
| Tom Baker<br><br>*Expert to the Tort Committee* | $78,000 | Payment in full on Effective Date or as otherwise agreed upon between the Debtor and the professional. |

**ARTICLE XI.**
**TREATMENT OF CLAIMS**

**A.  Estimates of Claims.**

The amounts listed below represent estimated Allowed Claims, and do not represent amounts actually asserted by creditors in proofs of claim or otherwise. The Debtor has not completed its analysis of Claims in the Chapter 11 Cases and objections to such Claims have not been made or fully litigated. Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time. Rather, the actual amount of the Allowed Claims may be greater or lower than estimated. The estimated percentage recovery is based upon, among other things, an estimate of the Allowed Claims in the Chapter 11 Cases. The actual amount of the Allowed Claims may be greater or lower than estimated. Thus, the actual recoveries may be higher or lower than projected depending upon, among other things, the amounts and priorities of Claims that are actually Allowed by the Bankruptcy Court.

**B.  Treatment of Class 1 (Priority Non-Tax Claims).**

Class 1 consists of the Priority Non-Tax Claims which are defined by the Plan as all Claims that are entitled to priority pursuant to Section 507 of the Bankruptcy Code and that are not General Administrative Expense Claims or Priority Tax Claims. The legal and equitable rights of the Holders of Allowed Priority Non-Tax Claims are unaltered by the Plan.  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim and the Debtor shall have agreed in writing to a different treatment, each Holder of an Allowed Priority Non-Tax Claim shall receive, in full and final satisfaction of such Claim, payment in full in Cash, without interest, in an amount equal to such Allowed Priority Non-Tax Claim as soon as reasonably practicable after the later of (a) the Effective Date and (b) the date when such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim.

The Debtor estimates that there will be no Priority Non-Tax Claims.

**C.  Treatment of Class 2 (PNC Bank Claim).**

PNC Bank is an unsecured creditor of the Diocese but is secured, *inter alia,* by a Pledge

84

Agreement and Guaranty by DOC Trusts. Accordingly, PNC Bank is entitled to separate treatment under the Plan. PNC Bank's Claim is approximately $22.8 million. Class 2 is Impaired and the Holder of the Class 2 Claim is entitled to vote to accept or reject the Plan.

On the Effective Date, the Diocese and DOC Trusts shall ~~assume and reaffirm all~~execute and deliver to PNC Bank amended and restated loan documents with PNC Bank and all such loan documents and provisions shall remain in full force and effect until all obligations of the Debtor have been indefeasibly paid in full ~~conditioned on the following terms~~and which shall include the material followingterms:

1. Confirmation of the Plan no later than June 30, 2022;

2. The Diocese shall continue to make interest only payments through the date of Confirmation;

3. 5-year term of repayment as follows: (i) first two years interest only payments; (ii) following three years with payments based on an amortization of 15 years until ~~May 31, 2027~~[two-years from the Effective Date] and (iii) a balloon payment of the balance of the loan on ~~May 31, 2027;~~[five-years from the Effective Date];

4. The Diocese maintains the right to repay the balance of the loan at any time without penalty or premium;

5. Interest rate at BSBY plus 100 (1%) basis points; and

6. The Diocese (including its pension funds) and Other Catholic Entities shall keep total assets under management (AUM) at PNC at no less than $250 million. If AUM falls below that level, the interest rate increases to BSBY plus 400 basis points (4%).

The Diocese does not believe that AUM will fall below $250 million as a result of the payments required under the Plan. The pension plans (which are not assets of the estate and cannot be used for plan payments) are approximately $160 million. The Diocese believes that the Diocese, DOC Trusts, and the Other Catholic Entities will have sufficient AUM to meet the $250 million requirement. Regardless, the Diocese does not believe, based on the projections attached to this Disclosure Statement, that an increase in its interest rate would inhibit its abilitiy to make the payments required under the Plan. See Exhibit B attached hereto.

**D. Treatment of Class 3 (General Unsecured Claims).**

General Unsecured Claims are unsecured Claims not entitled to priority under Bankruptcy Code section 507(a), which are not Abuse Claims, Unknown Abuse Claims or Non-Abuse Litigation Claims. The unsecured Creditors include trade Creditors and total approximately $1,500,000. Class 3 is Impaired, and each holder of a Class 3 Claim is entitled to vote to accept or reject the Plan.

The Diocese shall pay Allowed Class 3 Claims a 75% dividend ~~over~~within 5-years~~.~~, payable as follows:

4870-2885-4563, v. 2

- A 15% payment shall be made upon the later of: (i) 60 days of the Effective Date; or (ii) 15 days of the determination of a Claim being an Allowed Claim, as applicable;
- On the first anniversary of the Effective Date, a 15% payment shall be made;
- On the second anniversary of the Effective Date, a 15% payment shall be made;
- On the third anniversary of the Effective Date, a 15% payment shall be made;
- On the fourth anniversary of the Effective Date, a final 15% payment shall be made.

Notwithstanding the above, Allowed Class 3 Claimants shall have the option to forego the 75% payment within 5-years and instead elect to receive a payment of 50% of their ~~claim within~~ Allowed Claim in full satisfaction of their Allowed Claim upon the later of: (i) 60 days after the Effective Date ~~in full satisfaction of their respective Claims; or (ii) 5 business days after the Claim is deemed Allowed~~, as applicable. Such election may be made through the Ballot or otherwise in writing to Debtor's counsel within 20 days of Confirmation.

### E. Treatment of Class 4 (Pension Claims).

Pension Claims are unsecured Claims that are based on the Debtor's underfunded Pensions. The Debtor estimates that these claims are approximately $45,439,291. Class 4 is Impaired and the fiduciary charged with administering each of the Pensions is entitled to vote to accept or reject the Plan.

The Reorganized Debtor shall pay into the Pensions their *pro rata* share of a maximum of a $40 million distribution paid in equal annual installments over 20 years. Payments may be made quarterly.

### F. Treatment of Class 5 (Abuse Claims Other Than Unknown Abuse Claims).

A Class 5 Claim means an Abuse Claim other than an Unknown Abuse Claim. Class 5 is Impaired and each holder of a Class 5 Claim is entitled to vote to accept or reject the Plan.

This Plan creates a Trust to fund payments to Class 5 Claimants entitled to such payments under the Plan, the Trust Agreement and the Trust Distribution Plan. Class 5 Claimants shall receive their allocable share of Trust Assets at the time and in the manner set forth in the Trust Distribution Plan. It is intended that any payment on an Abuse Claim will constitute payment for damages on account of personal physical injuries or sickness arising from an occurrence, within the meaning of section 104(a)(2) of the Tax Code.

As set forth herein, the Trust will be funded with $87,500,000 in cash from the Debtor and Other Catholic Entities. In addition, the Debtor will transfer the Transferred Insurance Interests to the Trust, which may provide more value to the Trust. **The Diocese makes no representations or warranties regarding the value of the Insurance Policies or the Transferred Insurance Interests, including, but not limited to, any defenses the Non-Settling Insurers may have.** As of the date of this Disclosure Statement, 324 non-duplicative Class 5 Claims have been timely filed, which will share collectively in the funds contributed to the Trust in accordance with the Trust Distribution Plan.

The settlement set forth in the *Order Approving Settlement of Controversy by and Among*

*the Diocese and the RH Claimants Pursuant to Fed. R. Bankr. P. 9019(A)* entered on October 15, 2021 has expired by the terms of such order and is null and void. The claimants set forth therein shall be treated as Class 5 Claimants in accordance with the Plan.

### G.  Treatment of Class 6 (Unknown Abuse Claims).

A Class 6 Claim means an Unknown Abuse Claim. Class 6 is Impaired and the Unknown Claims Representative shall submit a single ballot on behalf of Class 6 Claimants.

Class 6 Claimants shall receive their allocable share of the Unknown Abuse Claims Reserve at the time and in the manner set forth in the Trust Distribution Plan. It is intended that any payment on an Abuse Claim will constitute payment for damages on account of personal physical injuries or sickness arising from an occurrence, within the meaning of section 104(a)(2) of the Tax Code.

### H.  Treatment of Class 7A (Class 5 Abuse Related Contingent Claims).

A Class 7A Claim means any Claim for contribution, indemnity or reimbursement arising out of or related to the Diocese's liability to pay or defend any Class 5 Claim. Class 7A is Impaired. Class 7A is not receiving a distribution under the Plan, provided that the Other Catholic Entities receive the benefits of the Channeling Injunction, and, therefore, is deemed to reject the Plan.

Class 7A Claims shall be disallowed and extinguished as a result of the terms of the Plan by the waiver of such claims by the Other Catholic Entities in exchange for the release and Channeling Injunction provided in the Plan and Trust Distribution Procedures. Class 7A Claims will receive no distribution under the Plan.

### I.  Treatment of Class 7B (Class 6 Abuse Related Contingent Claims).

A Class 7B Claim means any Claim for contribution, indemnity or reimbursement arising out of or related to the Diocese's liability to pay or defend any Class 6 Claim. Class 7B is Impaired by the Plan. Class 7B is not receiving a distribution under the Plan provided that the Other Catholic Entities receive the benefits of the Channeling Injunction and, therefore, is deemed to reject the Plan.

Class 7B Claims shall be disallowed and extinguished as a result of the terms of the Plan by the waiver of such claims by the Other Catholic Entities in exchange for the release and Channeling Injunction provided in the Plan and Trust Distribution Procedures. Class 7B Claims will receive no distribution under the Plan.

### J.  Treatment of Class 8 (Non-Abuse Tort Claims).

Non-Abuse Litigation Claims are litigation Claims against the Diocese that are not Abuse Claims. Class 8 is Impaired and each holder of a Class 8 Claim is entitled to vote to accept or reject the Plan.

Allowed Class 8 Claims shall be paid a *pro rata* portion of a $100,000 distribution. The Diocese shall contribute $50,000 to be designated for Class 8 Claims. Catholic Charities, Diocese

87

of Camden, Inc. shall transfer $50,000 to the Diocese to be designated for Class 8 Claimants within two (2) business days after the Confirmation Order has become a Non-Appealable Order in exchange for a release of all Class 8 Claims against it. This contribution amount is contingent upon the receipt by Catholic Charities of releases from third party claims.

Without waiving any rights to assert that additional claims fall within Class 8, the Diocese believes that the following claims are Class 8 Claims:

| Claim Number | Name of Claimant | Amount Asserted in Proof of Claim |
|---|---|---|
| 71 | Adam Fishman | $150,000 |
| 83/387 | Vincent Ajuk | $500,000 |
| 108 | Crystal Martrell Gibbs | $2,000,000 |
| 284 | Irene Haber | $150,000 |
| 399 | Tricia Vekenman Guardian ad litem for N.B., a minor | $150,000 |
| 522 | Patricia Muttalib | $100,000 |

The Diocese does not admit that the amounts asserted above are the value of such claims and is providing the amounts in the proof of claims for informational purposes only for the purpose of this Disclosure Statement. The Diocese reserves all rights with respect to all claims, including, but not limited to, the right to object to such claims.

## ARTICLE XII.
## THE TRUST

**A. Establishment of Trust.**

Effective as of the date the Confirmation Order is entered, the Trust shall be established in accordance with the Trust Documents for the purposes of assuming liability of Covered Parties and Settling Insurers for Channeled Claims and receiving, liquidating and distributing Trust Assets in accordance with the Plan and the Trust Distribution Plan.

As of the Effective Date, the liability of Covered Parties and Settling Insurers for all Channeled Claims shall be assumed fully by the Trust, without further act, deed or Bankruptcy Court order, and, pursuant to the Channeling Injunction provided for herein, the liability of Covered Parties and Settling Insurers for all Channeled Claims shall be satisfied solely from Trust Assets.

The Trust is intended to qualify as a "qualified settlement fund" pursuant to section 468B of the Tax Code and the regulations promulgated thereunder (the "**Treasury Regulations**"). The Debtor is the "transferor" within the meaning of Treasury Regulation Section 1.468B-1(d)(1). The Trust Administrator shall be classified as the "administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3). The Trust Documents, including the Trust Agreement, are incorporated herein by reference.

**B. Funding of Trust.**

Notwithstanding anything to the contrary in this Section, the Disclosure Statement or Plan, the Diocese and Other Catholic Entities **shall not** use "Restricted Funds" for any payments they make under the Plan, including, but not limited to, the payments to be made to the Trust.

a. ***Contributions to the Trust.***

The Trust shall be funded with: (i) $87.5 million by the Debtor and the Other Catholic Entities; (ii) any proceeds held by the Debtor or the Reorganized Debtor on account of Insurance Settlement Agreements as set forth in this Section 7.2; and (iii) the Transferred Insurance Interests.

i. **Debtor Cash Contribution and OCE Cash Contributions**

On the Effective Date, the Debtor shall transfer $29.75 million in good funds to the Trust using wiring instructions provided by the Trust Administrator (the "**Initial Debtor Contribution**"). The Initial Debtor Contribution will be primarily comprised of funds from the following sources: (i) $14.75 million in non-restricted cash accounts held by the Diocese; and (ii) $15 million in the form of a loan of non-restricted cash from DOC Trusts (the "**DOCT Loan**").

The Trust shall also be funded by the Debtor as set forth below (collectively, the "**Additional Debtor Contributions**" and together with the Initial Debtor Contribution, the "**Debtor Cash Contribution**"):

(a)a)    No later than one year after the Effective Date, the Debtor shall transfer $10 million in good funds to the Trust using wiring instructions provided by the Trust Administrator.

1.1.1.2.b)    No later than two years after the Effective Date, the Debtor shall transfer an additional $10 million in good funds to the Trust using wiring instructions provided by the Trust Administrator.

1.1.1.3.c)    No later than three years after the Effective Date, the Debtor shall transfer an additional $10 million in good funds to the Trust using wiring instructions provided by the Trust Administrator.

1.1.1.4.d)    No later than four years after the Effective Date, the Debtor shall transfer an additional $7.5 million in good funds to the Trust using wiring instructions provided by the Trust Administrator.

To secure the Additional Debtor Contributions, the Diocese shall grant the Trust a Lien and security interest on certain bank accounts, investment accounts and receivables to set forth in a Security Agreement to be executed and delivered on the Effective Date (such agreement being the "**Additional Debtor Contributions Security Agreement**"). The holders of any interest, whether such interest be equitable or legal in nature, in the funds identified in the Additional Debtor Contributions Security Agreement, including the Diocese and Other Catholic Entities, hereby consent to the granting of such Lien and security interests as provided for therein to secure the Additional Debtor Contributions and the Diocese is deemed to have all requisite authority to enter into the Additional Debtor Contributions Security Agreement upon entry of the Confirmation Order.

89

4870-2885-4563, v. 2

On the Effective Date, the Parishes, Schools and Missions shall transfer $10 million in good funds to the Diocese, which shall be transferred by the Diocese together with the Initial Debtor Contribution to the Trust on the Effective Date using wiring instructions provided by the Trust Administrator (the "**Parish Cash Contribution**").  On the Effective Date, DOC Trusts shall transfer $10 million in good funds to the Diocese, which shall be transferred by the Diocese together with the Initial Debtor Contribution to the Trust on the Effective Date using wiring instructions provided by the Trust Administrator (the "**DOCT Cash Contribution**").  On the Effective Date, the Catholic Ministry Entities other than DOC Trusts shall transfer $250,000 in good funds to the Diocese, which shall be transferred by the Diocese together with the Initial Debtor Contribution to the Trust on the Effective Date using wiring instructions provided by the Trust Administrator (the "**Catholic Ministry Cash Contribution**," and collectively with the Parish Cash Contribution and DOCT Cash Contribution, the "**OCE Cash Contributions**").  In addition to the OCE Cash Contributions, in consideration for the Channeling Injunction and the release provided for ~~herein~~in the Plan and the Trust Distribution Procedures, the Other Catholic Entities shall: (i) waive all Claims against the Diocese and its Estate asserted in the Chapter 11 Case, including any rights to distributions under their Class 7A and 7B Claims; (ii) be deemed to have consented to the Diocese entering into the Additional Debtor Contributions Security Agreement to secure the Additional Debtor Contributions upon entry of the Confirmation Order; and (iii) consent to the transfer of the Transferred Insurance Interests to the Trust.

As additional consideration for the Channeling Injunction and release provided ~~herein~~in the Plan and the Trust Distribution Procedures, DOC Trusts shall provide the DOCT Loan.

The Debtor Cash Contribution and the OCE Cash Contributions are being made in respect of the uninsured exposure of the Debtor and the Other Catholic Entities for Abuse Claims, including, but not limited to, years in which no Non-Settling Insurer Policies are available and, to the extent required under applicable law, when a self-insured retention or deductible must be satisfied to access coverage under Non-Settling Insurer Policies.  The Debtor Cash Contribution and the OCE Cash Contributions are not, and shall not be construed as, a discharge and/or release of any Abuse Claim covered or alleged to be covered under Non-Settling Insurer Policies.  Notwithstanding the forgoing, the Debtor and the Other Catholic Entities shall have no further financial obligations under the Plan or the Plan Documents other than the obligations required to be paid to the Trust in Section 7.2.2 of the Plan.

ii.   **Additional Trust Assets:  the Transferred Insurance Interests**

In addition to the Debtor Cash Contribution and the OCE Cash Contributions being paid to the Trust, the Transferred Insurance Interests of the Diocese are automatically and without further act or deed assigned and transferred to the Trust on the Effective Date.  In addition, the Interests of the other Covered Parties in the Transferred Insurance Interests are automatically and without further act or deed assigned and transferred to the Trust on the Effective Date.  The foregoing assignment and transfer shall not be construed as an assignment and transfer of the Non-Settling Insurer Policies but rather constitute an assignment of the right to receive insurance proceeds available under the Non-Settling Insurer Policies.

b.   *Unknown Claims Reserve.*

90

For a period of seven years after the Effective Date (the "**Unknown Claims Reserve Establishment Period**"), the Trust Administrator shall be obligated to maintain the Unknown Abuse Claim Reserve for the benefit of Unknown Abuse Claimants.  The Unknown Abuse Claims Reserve shall be administered as provided in the Trust Agreement and Trust Distribution Plan.  At the expiration of the Unknown Claims Reserve Establishment Period, neither the Debtor, Reorganized Debtor, Trust, nor any other Covered Party or Settling Insurer shall have any liability for Unknown Abuse Claims.

**C.    Vesting**.

On the Effective Date, all Trust Assets shall vest in the Trust,  and the Diocese and other Covered Parties shall be deemed for all purposes to have transferred all of their respective Interests in the Trust Assets to the Trust.  On the Effective Date, or as soon as practicable thereafter, the Reorganized Debtor, any other Covered Party, and Settling Insurers, as applicable, shall take all actions reasonably necessary to transfer any Trust Assets to the Trust.  Upon the transfer of control of Trust Assets in accordance with this paragraph, the Diocese, the other Covered Parties and the Settling Insurers shall have no further interest in or with respect to the Trust Assets except as otherwise explicitly provided in the Plan.

**D.    Appointment of the Trust Administrator**.

The ~~initial~~Initial Trust Administrator will be identified in a Plan Supplement, which shall be filed ~~no later than 10 days~~ on or before 21 days prior to the deadline ~~established~~to object to confirmation of the plan, unless otherwise ordered by the ~~Bankruptcy~~ Court ~~to object to the Plan~~.  The Trust Administrator shall commence serving as the Trust Administrator as of the date set forth in the Trust Agreement and be permitted to act in accordance with the terms of the Trust Agreement from such date, as authorized jointly by the Plan Proponents.  Such actions may include opening bank accounts and taking all further actions necessary to establish the Trust prior to the Effective Date in accordance with his or her duties under the Trust Agreement, for which the Trust Administrator shall be entitled to seek compensation in accordance with the terms of the Trust Agreement and the Plan.

**E.    Rights and Responsibilities of Trust Administrator**.

The Trust Administrator shall be deemed the Estate's representative  in accordance with section 1123 of the Bankruptcy Code and shall have all the rights, powers, authority, responsibilities, and benefits specified in the Plan and the Trust Agreement, including (to the extent necessary to enforce those rights, powers, authority, responsibilities, and benefits only) the powers of a trustee under sections 704, 108 and 1106 of the Bankruptcy Code and Bankruptcy Rule 2004 (including commencing, prosecuting or settling Causes of Action, enforcing contracts, and asserting Claims, defenses, offsets and privileges).  If there is any inconsistency or ambiguity between the Plan and Confirmation Order, on the one hand, and the Trust Agreement, on the other hand, with respect to the Trust Administrator's authority to act, the provisions of the Plan and Confirmation Order shall control.  Among other things, as more fully set forth in the Trust Agreement, the Trust Administrator:  (1) shall liquidate and convert to Cash the Trust Assets, make timely distributions and not unduly prolong the duration of the Trust; (2) may request an expedited determination of taxes of the Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Trust for all taxable periods through the dissolution of the

91

Trust; (3) may retain professionals, including legal counsel, accountants, financial advisors, auditors and other agents on behalf of the Trust to carry out the obligations of the Trust Administrator hereunder and under the Trust Agreement, with payment to such professionals to be made solely from Trust Assets; (4) pursue Coverage Claims against any Non-Settling Insurers in respect of the Transferred Insurance Interests; (5) defend and indemnify the Covered Parties against Abuse Claims as provided in the Trust Distribution Plan; (6) may take any action required to enforce the Insurance Settlement Agreements and (7) shall have all rights and powers vested in the Trust Administrator provided for in the Trust Distribution Plan.

Notwithstanding the foregoing, the Diocese, the Reorganized Debtor, and the Trust acting for itself and on behalf of the Estate, shall be deemed to have waived, effective upon the Effective Date:

(a)    Any and all Claims under sections 547, 548, 549, and 550 of the Bankruptcy Code for the recovery of any sums paid to any Person who provided goods and services to the Diocese in the ordinary course of business, including Creditors in Class 3, prior to the Effective Date.

(b)    Any and all Claims:  (i) seeking the substantive consolidation of the Diocese and any other Person or an order deeming any such Person and the Diocese to be an "alter-ego" of the other or any other similar Claim; (ii) to avoid, set aside or recover any payment or other transfer made to any Person under sections 547, 548, 549, and 550 of the Bankruptcy Code; and (iii) any proceeding to avoid or set aside any interest of a Person in property under section 544 of the Bankruptcy Code.

**F.  Appointment of Trust Advisory Committee.**

On the Effective Date, the Trust Advisory Committee shall be established pursuant to the terms of the Trust Agreement.  The Trust Advisory Committee shall have the functions, duties and rights provided in the Trust Agreement.  Upon termination of the Trust, or as otherwise provided in the Trust Agreement, the Trust Advisory Committee shall be deemed dissolved and discharged of and from  all further authority, duties,  responsibilities, and obligations with respect to or  in connection with the Trust and the Chapter 11 Case.

Except for the reimbursement of reasonable actual costs and expenses incurred in connection with their duties as members of the Trust Advisory Committee, the members of the Trust Advisory Committee shall serve without compensation.  Reasonable expenses incurred by members of the Trust Advisory Committee may be solely paid by the Trust without need for approval of the Bankruptcy Court.  For the avoidance of doubt, the Diocese and Other Catholic Entities shall not be responsible for any fees, costs, and/or expenses associated with the Trust Advisory Committee.

**G.  Transferred Insurance Interests**.

a.  *Assignment of Insurance Interests.*

Effective as of the Effective Date, the Transferred Insurance Interests are assigned and transferred to the Trust.

92

(a)     The Trust shall be entitled to (i) all recoveries on account of Transferred Insurance Interests as set forth in the Plan, the Trust Distribution Plan and the Confirmation Order and to (ii) assert and/or assign to any Abuse Claimant all Claims that currently exist or may arise in the future against Non-Settling Insurers.

(b)     The Trust shall also have the right to pursue Claims against Non-Settling Insurers to determine Coverage Claims and other Claims relating to the Covered Parties' liability for Abuse Claims or the Non-Settling Insurers' obligations in respect of such Claims as set forth in the Trust Distribution Plan.  The foregoing transfer shall not be construed to entitle any Person to insurance coverage other than those Persons entitled to such coverage from Non-Settling Insurers.

(c)     The Trust may act in its own name, or in the name of any Abuse Claimant or Covered Party, to enforce any right, title, or interest of any Covered Party in the Transferred Insurance Interests.

(d)     No limitations on recovery from Non-Settling Insurers shall be imposed by virtue of the fact the Debtor is in bankruptcy or by any distribution from the Trust to an Abuse Claimant.

(e)     The Insurance Assignment shall not affect any Non-Settling Insurer's duty to defend, but to the extent that a failure to defend or a separate agreement between a Covered Party and any Non-Settling Insurer gives rise to a monetary obligation to reimburse defense costs in lieu of a duty to defend, the Trust shall be entitled to the benefit of such monetary obligation or policy proceeds.

(f)     Any recovery by the Trust on Coverage Claims relating to the Covered Parties' liability for Abuse Claims shall become a Trust Asset and shall be distributed as provided in the Plan, the Trust Agreement and the Trust Distribution Plan.

(g)     The Trust's recourse to the Covered Parties shall be limited to the Transferred Insurance Interests and any other rights or interests expressly granted to the Trust under the Plan.

The Trust shall have full access to coverage under the Non-Settling Insurer Policies to the greatest extent permitted by applicable non-bankruptcy law, in the same manner and to the same extent as the Covered Parties prior to the confirmation of the Plan and the Insurance Assignment. The Non-Settling Insurers shall retain any and all coverage defenses, except any defense regarding or arising from the Insurance Assignment, but confirmation or effectuation of the Plan shall not trigger any coverage defense, or give rise to any additional coverage defense, that did not exist prior to the Debtor's filing for bankruptcy or Plan Confirmation, and no coverage defenses are created by the Debtor's bankruptcy or the negotiation, solicitation, or confirmation of the Plan, or the terms thereof, including any treatment of, or protections afforded to, any Covered Party or

93

Settling Insurer under the Plan.

The Insurance Assignment does not affect any Covered Party's or any Non-Settling Insurer's right to contest any Covered Party's liability or the amount of damages in respect of any Abuse Claims.

94

b. ***Determination of Validity of Insurance Assignment***

The Bankruptcy Court shall determine at the Confirmation Hearing (a) whether the Insurance Assignment is valid and (b) whether Insurance Assignment or the discharge and injunctions set forth in the Plan, void, defeat, or impair the insurance coverage under the Non-Settling Insurer Policies.  If any Person fails to timely file an objection to the proposed Insurance Assignment or other Plan terms related to the Non-Settling Insurer Policies, that Person shall be deemed to have irrevocably consented to the Insurance Assignment and such Plan terms and will be forever barred from asserting that the Insurance Assignment or other Plan terms affect the ability of the Trust or Abuse Claimants to pursue the Non-Settling Insurers, or any of them, for Coverage Claims.

If the Bankruptcy Court enters a Final Order determining that the Insurance Assignment is valid, following the Effective Date, the Trust shall assume responsibility for, and be bound by, only such obligations of the Covered Parties under the Non-Settling Insurer Policies as are necessary to enforce the Transferred Insurance Interests.

If the Bankruptcy Court does not enter a Final Order approving the Insurance Assignment, then the Insurance Assignment shall not occur and, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, the Trust Administrator shall be appointed as the representative of the Estate for the purpose of retaining and enforcing all of the Debtor's and the Estate's Interests and Claims against the Non-Settling Insurers with respect to Abuse Claims.  Any recoveries on such Interests and Claims by the Trust Administrator will be paid to the Trust.  The determination of whether the appointment of the Trust Administrator as the Debtor's and the Estate's representative provided for in this Section is valid shall be made by the Bankruptcy Court at the Confirmation Hearing.  If any Person fails to timely file an objection to the proposed appointment, that Person shall be deemed to have irrevocably consented to the appointment and will be forever barred from asserting that the appointment in any way affects the ability of the Trust Administrator to pursue any Non-Settling Insurers for insurance coverage.  If the Bankruptcy Court determines that the appointment is valid, then, following the Effective Date, the Trust Administrator shall assume responsibility for, and be bound by, only such obligations of the Covered Parties under the Non-Settling Insurer Policies as are necessary to act as the representative of the Debtor and the Estate for the purpose of retaining and enforcing their Interests and Claims, if any, against the Non-Settling Insurers; provided, however, the Trust Administrator's appointment shall not relieve the Covered Parties from any obligation that such entities may have under the Non-Settling Insurer Policies.  Nothing contained in this Section shall affect the rights and remedies of a Person who is not a Covered Party but is an insured or additional insured with the Debtor or is asserting rights under a Non-Settling Insurer Policy.

If a Final Order is entered holding that (a) the Insurance Assignment or (b) the appointment of the Trust Administrator as the Debtor's and the Estate's representative are invalid then the assignment and/or appointment, as the case may be, will be deemed not to have been made, and each of the Covered Parties will retain their Interests under each Non-Settling Insurer Policy and:

    a.    at the request of the Trust, the Covered Parties will assert their Interests and Claims against a Non-Settling Insurer, including by filing an Action for recovery of policy proceeds;

95

b.    the Covered Parties will select and retain counsel to pursue their Interests and Claims against Non-Settling Insurers, subject to the Trust Administrator's approval, which approval shall not be unreasonably withheld;

c.    the Trust shall pay the reasonable attorneys' fees, costs and expenses that are incurred by the Covered Parties in pursuing their Interests and Claims against Non-Settling Insurers;

d.    the Trust shall, in addition to reasonable attorneys' fees, costs and expenses provided for in this Section, reimburse Covered Parties for any reasonable out of pocket costs and expenses incurred as a direct consequence of pursuing their Interests and Claims against Non-Settling Insurers; *provided, however* no compensation shall be paid to any Covered Party for any time any of its employees expended; and

e.    upon receipt by a Covered Party, all recoveries received from Non-Settling Insurers shall be remitted to the Trust as soon as practicable.

**H.  Investment Powers; Permitted Cash Expenditures.**

All funds held by the Trust shall be invested in Cash or short-term highly liquid investments that are readily convertible to known amounts of Cash as more particularly described in the Trust Agreement.  The Trust Administrator may expend the Cash of the Trust.

**I.  Registry of Beneficial Interests.**

To evidence the beneficial interest in the Trust of each holder of such an interest, the Trust Administrator shall maintain a registry of beneficiaries as provided for in the Trust Agreement.

**J.  Non-Transferability of Interests.**

Any transfer of an interest in the Trust shall not be effective until and unless the Trust Administrator receives written notice of such transfer.

**K.  Tax Matters.**

The Trust shall not be deemed to be the same legal entity as the Diocese but only the assignee of certain assets of the Diocese and a representative of the Estate for delineated purposes within the meaning of section 1123(b)(3) of the Bankruptcy Code.  The Trust Administrator shall file such income tax and other returns and documents as are required to comply with the applicable provisions of the Tax Code, the Treasury Regulations, and New Jersey law and the regulations promulgated thereunder, and shall pay from the Trust all taxes, assessments, and levies upon the Trust, if any.

**L.  Termination.**

The Trust shall terminate after (i) its liquidation, administration, and distribution of the

96

Trust Assets and (ii) its full performance of all other duties and functions set forth in the Plan, the Trust Agreement and the Trust Distribution Procedures.

### M. **Immunity; Liability; Indemnification**.

    a.   ***No Liability for Reorganized Debtor or Trust Administrator.***

        Neither (i) the Reorganized Debtor nor its Agents or (ii) the Trust Administrator nor its Agents, nor their respective employees, shall be liable for the acts or omissions of any other Agents of such Trust Administrator, except that the Trust Administrator shall be liable for its specific acts or omissions resulting from such Trust Administrator's gross negligence, fraud, or breach of the fiduciary duty of loyalty.  The Trust Administrator may, in connection with the performance of its functions and in its sole and absolute discretion, consult with its Agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Persons.  Notwithstanding such authority, the Trust Administrator shall not be under any obligation to consult with its Agents, and its determination not to do so shall not result in the imposition of liability on the Trust Administrator unless such determination is based on the Trust Administrator's recklessness, gross negligence, willful misconduct or fraud.

    b.   ***No Recourse Against Trust Administrator.***

        No recourse shall ever be had, directly or indirectly, against the Trust Administrator personally, or against any Agent retained in accordance with the terms of the Trust Agreement or the Plan by the Trust Administrator, by legal or equitable proceedings or by virtue of any statute or otherwise, or upon any promise, contract, instrument, undertaking, obligation, covenant or Trust Agreement whatsoever executed by the Trust Administrator in implementation of the Trust Agreement or the Plan, or by reason of the creation of any indebtedness by the Trust Administrator under the Plan for any purpose authorized by the Trust Agreement or the Plan, it being expressly understood and agreed that all such Claims shall be enforceable only against and be satisfied only out of the Trust Assets.  Notwithstanding the foregoing, the Trust Administrator may be held liable for its recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud; and if liability on such grounds is established, recourse may be had directly against the Trust Administrator.  The Trust shall not be covered by a bond.

        The Confirmation Order shall provide that, absent permission of the Bankruptcy Court, no Cause of Action may be commenced in any forum, other than the Bankruptcy Court, against the Trust Administrator in its official capacity, with respect to its status, duties, powers, acts, or omissions as Trust Administrator.

    c.   ***Indemnification by Trust.***

        The Trust shall defend, indemnify, and hold harmless the Trust Administrator and its Agents to the fullest extent permitted under the laws of New Jersey in the performance of their duties under the Plan and under the Trust Agreement.

        If the Debtor or the Other Catholic Entities are named as a defendant in an Action by an Abuse Claimant which is enjoined by the terms of the Plan and channeled to the Trust by the Channeling Injunction, the Debtor or the Other Catholic Entities shall tender the defense of such

Action to the Trust and the Trust shall be responsible for all actions required to defend the Debtor or the Other Catholic Entities in such Action.

The Trust will fund all reasonable and necessary out of pocket attorneys' fees, costs and other expenses of the Debtor and the Other Catholic Entities in connection with their participation in the Trust Distribution Procedures ("**Defense Costs**"); *provided, however*, that if a Non-Settling Insurer defends the Debtor or the Other Catholic Entities in connection with their participation in the Trust Distribution Procedures, the Trust shall be relieved of its obligation to pay any Defense Costs; *provided, further, however*, that if a Non-Settling Insurer has a duty to defend, or has a duty to reimburse the defense costs of, the Debtor or the Other Catholic Entities but fails to honor that obligation, the Trust will advance or reimburse the Debtor or the Other Catholic Entities for reasonable and necessary Defense Costs. The Debtor and the Other Catholic Entities' selection of legal counsel shall be consistent with the Debtor and the Other Catholic Entities' historical retention and use of such counsel, who shall exercise his or her professional judgment in accordance with the Rules of Professional Conduct and any other relevant rules governing the duties and obligations of attorneys to their clients. For the purposes of clarify and avoidance of doubt: (i) the Debtor and the Other Catholic Entities shall be made whole from the Trust for any actually expended or incurred Defense Costs for their participation in the Trust Distribution Procedures and (ii) any Defense Costs previously paid by the Trust to the Debtor and the Other Catholic Entities shall be reimbursed to the Trust upon the Non-Settling Insurer's satisfaction of any such amounts.

## ARTICLE XIII.
## TRUST DISTRIBUTION PLAN AND RELATED PROVISIONS

**A. Distributions and Payments from the Trust.**

The following distributions and payments will be made from the Trust.

a) **Distributions**. Distributions on Class 5 and 6 Claims in accordance with the Plan, the Trust Agreement, and the Trust Distribution Plan.

b) **Abuse Claims Reviewer Fees**. Fees payable to the Abuse Claims Reviewer for review of Class 5 and Class 6 Claims.

c) **Trust Administrative Fees**. All fees, costs, and expenses of administering the Trust as provided in the Plan and the Trust Agreement, including: (i) as reasonably necessary to meet current liabilities and to maintain the value of the respective Assets of the Trust; (ii) to pay reasonable administrative expenses (including any taxes imposed on the Trust and any professional fees); and (iii) to satisfy other liabilities incurred by the Trust in accordance with the Plan or the Trust Agreement.

d) **Indemnity**. The Trust's obligations, if any, to defend, indemnify, or hold harmless any Person expressly set out in the Plan.

**B. Trust Distribution Procedures.**

Each Abuse Claim will be assessed by the Abuse Claims Reviewer in accordance with the

98

Trust Distribution Plan.  For the avoidance of doubt, under no circumstance shall the Abuse Claims Reviewer's review of an Abuse Claim or a determination regarding a Trust distribution thereon have any effect on the rights of a Non-Settling Insurer.

As more fully set forth in the Trust Distribution Procedures, the Covered Parties will have an obligation to respond to reasonable requests for factual information in their possession, custody or control, including, but not limited to, providing documents (subject to all applicable privileges) and reasonable access to witnesses within the Covered Parties' control in connection with any inquiries it may have in connection with the Trust Distribution Plan.

**C.  Expedited Distributions.**

An Abuse Claimant who meets the following criteria may elect to resolve his or her Abuse Claim for an expedited distribution of $2,500.00 (the "**Expedited Distribution**"):  (i) the Abuse Claimant properly and substantially completed and Filed a Proof of Claim; (ii) the Abuse Claimant has personally signed his or her Proof of Claim attesting to the truth of its contents under penalty of perjury, or supplements his or her Proof of Claim to so provide such verification and (iii) the Abuse Claimant elects to resolve his or her Abuse Claim for the Expedited Distribution in accordance with the Ballot (the "**Expedited Distribution Election**").  Abuse Claimants who make the Expedited Distribution Election will not be eligible to receive any further distribution on account of their Abuse Claim.

Abuse Claimants who are eligible for and select the Expedited Distribution Election will not have to comply with the Trust Distribution Procedures to receive payment of the Expedited Distribution from the Trust; *provided, however*, that Abuse Claimants who are eligible for and select the Expedited Distribution Election will be entitled to receive their Expedited Distribution only upon executing and delivering to the Trust Administrator the release in the form to be provided in a Plan Supplement.

An Abuse Claimant who does not make the Expedited Distribution Election in accordance with the deadlines and procedures established herein may not later elect to receive the Expedited Distribution.

Abuse Claimants that make the Expedited Distribution Election will not be eligible to receive any further distribution on account of their Abuse Claim pursuant to the Trust Distribution Procedures.

**D.  Distributions to Abuse Claimants Who Do Not Elect the Expedited Distribution.**

An Abuse Claimant whom the Abuse Claims Reviewer determines to be entitled to a distribution in accordance with the Trust Distribution Plan will receive a distribution from the Trust in the amount(s) and at the time(s) provided for in the Trust Distribution Plan; *provided, however,* that the Unknown Abuse Claims Reserve Fund established and maintained by the Trust shall be the sole source of payment to Class 6 Claimants on account of Class 6 Claims.

99

### E.  Dismissal of Pending Litigation.

Within 21 days after the Effective Date, all Channeled Claims asserted by an Abuse Claimant in any lawsuit against any Covered Party currently pending in any state or federal or territorial court whether in the United States of America or in any other country or jurisdiction shall be dismissed without prejudice.  Such Abuse Claims shall be released and dismissed with prejudice in accordance with the terms of the Plan and Trust Distribution Procedures.  Such dismissals are not, and shall not be construed as, a discharge and/or release of any Abuse Claims that are subject to coverage under Non-Settling Insurer Policies.

### F.  Objections and Litigation After the Effective Date.

As of the Effective Date, the Trust Administrator, through the Abuse Claims Reviewer, shall have the exclusive right to object to Channeled Claims; *provided, however*, that the Diocese, the Reorganized Debtor, other Covered Parties and Non-Settling Insurers shall have the right to participate in such objections as provided in the Trust Distribution Procedures.

### G.  Legal Effect of Estimation of Claims and Distributions Under Trust Distribution Plan.

The Abuse Claims Reviewer's determinations are for estimation purposes only and shall not be a finding or fixing of the fact or liability or the amount payable for any Abuse Claim with any binding legal effect, other than for distribution purposes by the Trust pursuant to the Trust Distribution Plan.  The determination of qualification, estimation of Claims, and payment of Trust distributions is not an admission of liability by any Covered Party or the Trust with respect to any Abuse Claims and has no *res judicata* or collateral estoppel effect on any Covered Party, the Trust, any Non-Settling Insurer or Settling Insurer.  Trust distributions do not release the Debtor nor are Trust Distributions an accord or novation of the Debtor's liability on account of the Abuse Claims.  The Trust's act of making a distribution is immaterial to, and shall not be construed as, a determination or admission of any Covered Party's liability for, or damages with respect to, any Abuse Claim.  The determination of qualification, estimation of Claims, and payment of distributions is not a settlement, release, accord, or novation of any Abuse Claims and cannot be used by any Joint Tortfeasor as a defense to any alleged joint liability.  The determination of qualification, estimation of claims, and payment of partial distributions does not impair an Abuse Claimant's rights to obtain a judgment, including a judgment based on joint and several liability, against a Covered Party or any Non-Settling Insurer, for purposes of establishing the Covered Party's liability on the Abuse Claim, but any such judgment awarded to an Abuse Claimant will be reduced by the amount of Trust distributions already paid by the Trust to such Abuse Claimant on his or her Abuse Claim(s).

Abuse Claimants expressly reserve their rights against Non-Covered Parties, including, but not limited to, Joint Tortfeasors, co-defendants with the Diocese or an Other Catholic Entity in their state or federal court lawsuits, and Religious Institutes of Men or Woman, who will remain severally liable on any Claims for Abuse.  Any Person alleged to be a Joint Tortfeasor shall not be liable for any Covered Party's share of causal liability or fault.

Distribution from the Trust does not preclude Claims or recoveries by Abuse Claimants

4870-2885-4563, v. 2

against Persons who are not Covered Parties or Settling Insurers for the liability of such Persons not attributable to the causal fault or share of liability of Covered Parties, including, but not limited to, Non-Settling Insurers.

**H. Release of Abuse Claim Required for a Distribution.**

No Abuse Claimant may receive a distribution under the Plan on its Allowed Claim until such Abuse Claimant has executed a release agreement in favor of the Diocese, the Reorganized Debtor, the other Covered Parties and any Settling Insurers in a form agreeable to the Plan Proponents, the other Covered Parties and any Settling Insurers; provided, that nothing herein requires any Class 5 and 6 Claimant to release any Claim(s) that is not a Channeled Claim but such release will expressly reserve an Abuse Claimant's rights against other Persons (other than a Covered Party), including Joint Tortfeasors, who will remain severally liable on any Claims for Abuse. Any Person (other than a Covered Party) that is, or was alleged to be a Joint Tortfeasor with any of the Covered Parties in connection with the Abuse that forms the basis of an Abuse Claim shall not be liable for any Covered Party's share of causal liability or fault.

Notwithstanding the forgoing or anything herein to the contrary, Abuse Claims will not be released or enjoined against the Covered Parties for any Abuse that may be covered under Non-Settling Insurer Policies until such claims are settled with the Covered Parties and their Non-Settling Insurers, or are fully adjudicated, resolved, and subject to Final Order.

**I. Claim Withdrawal.**

An Abuse Claimant may withdraw his or her Abuse Claim at any time on written notice to the Trust Administrator. If withdrawn, (a) the Abuse Claim will be withdrawn with prejudice and may not be reasserted, and such Abuse Claimant shall still be subject to the Channeling Injunction and the Supplemental Settling Insurer Injunction, as provided by the Plan; and (b) any reserve maintained by the Trust on account of such Abuse Claim shall revert to the Trust as a Trust Asset for distribution in accordance with the Plan and Trust Distribution Plan.

**Formatted:** No widow/orphan control

4870-2885-4563, v. 2

**J. Medicare Procedures.**

With respect to all Abuse Claims, the Trust shall maintain sufficient funds to pay any Medicare Claims and to perform the following duties:

a) It is the position of the Debtor that none of the Diocese, the Other Catholic Entities, the Trust, or the Settling Insurers will have any reporting obligations in respect of their contributions to the Trust, or in respect of any payments, settlements, resolutions, awards, or other Claim liquidations by the Trust, under the reporting provisions of MSP or MMSEA. Prior to making any payments to any claimants, the Trust shall seek a statement or ruling from the United States Department of Health and Human Services that none of the Trust, the Diocese, the Other Catholic Entities, or Settling Insurers has any reporting obligations under MMSEA with respect to payments to the Trust by the Diocese, the Other Catholic Entities, or Settling Insurers or payments by the Trust to Claimants. Unless and until there is definitive regulatory, legislative, or judicial authority (as embodied in a final non-appealable decision from the United States Court of Appeals for the Third Circuit or the United States Supreme Court), or written confirmation from the United States Department of Health and Human Services that none of the Diocese, the Other Catholic Entities, or the Settling Insurers has any reporting obligations under MMSEA with respect to any settlements, payments, or other awards made by the Trust or with respect to the contributions the Diocese, the Other Catholic Entities, and the Settling Insurers have made or will make to the Trust, the Trust shall, at its sole expense, in connection with the implementation of the Plan, act as a reporting agent for the Diocese, the Other Catholic Entities, and Settling Insurers, and shall timely submit all reports that would be required to be made by the Diocese or the Other Catholic Entities or Settling Insurer under MMSEA on account of any Claims settled, resolved, paid, or otherwise liquidated by the Trust or with respect to contributions to the Trust, including reports that would be required if the payments to the Trust by the Diocese or the Other Catholic Entities or Settling Insurer were determined to be made pursuant to "applicable plans" for purposes of MMSEA, or by the Diocese or the Other Catholic Entities or Settling Insurer were otherwise found to have MMSEA reporting requirements. The Trust, in its role as reporting agent for the Diocese, the Other Catholic Entities, and Settling Insurers, shall follow all applicable guidance published by CMS to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

b) If the Trust is required to act as a reporting agent for the Diocese or the Other Catholic Entities or Settling Insurer, the Trust shall provide a written certification to the Diocese and the Other Catholic Entities and Settling Insurers within twenty-one (21) days following the end of each calendar quarter, confirming that all reports to CMS have been submitted in a timely fashion, and identifying (a) any reports that were rejected or otherwise identified as noncompliant by CMS, along with the basis for such rejection or noncompliance; and (b) any payments to Medicare Beneficiaries that the Trust did not report to CMS.

c) With respect to any reports rejected or otherwise identified as noncompliant by CMS, the Trust shall, upon request by the Diocese or any of the Other Catholic Entities or Settling Insurers, promptly provide copies of the original reports submitted to CMS, as

102

well as any response received from CMS with respect to such reports; *provided, however*, that the Trust may redact from such copies any information deemed confidential by the Trust Administrator.  With respect to any such reports, the Trust shall reasonably undertake to remedy any issues of noncompliance identified by CMS, resubmit such reports to CMS, and, upon request by the Diocese or the Other Catholic Entities or Settling Insurers, provide each of the Diocese or the Other Catholic Entities and Settling Insurers copies of such resubmissions; *provided, however*, that the Trust may redact any information deemed confidential by the Trust Administrator.  If the Trust is unable to remedy its noncompliance, the provisions of Section 8.11.7 of the Plan shall apply.

d)    If the Trust is required to act as a reporting agent for the Diocese or the Other Catholic Entities or Settling Insurers pursuant to the provisions of Section 8.11.1 of the Plan, with respect to each Channeled Claim of a Medicare Beneficiary paid by the Trust and not disclosed to CMS, the Trust shall, upon request by the Diocese or the Other Catholic Entities or Settling Insurer, promptly provide the last four digits of the claimant's Social Security number, the year of the claimant's birth and any other information in the possession or control of the Trust that may be necessary in the reasonable judgment of the Diocese or the Other Catholic Entities or Settling Insurer to satisfy their obligations, if any, under MMSEA, as well as the basis for the Trust's failure to report the payment.  In the event the Diocese or the Other Catholic Entities or Settling Insurer informs the Trust that it disagrees with the Trust's decision not to report a Claim paid by the Trust, the Trust shall promptly report the payment to CMS.  All documentation relied upon by the Trust in making a determination that a payment did not have to be reported to CMS shall be maintained for a minimum of six (6) years following such determination.

e)    If the Trust is required to act as a reporting agent for the Diocese or any Other Catholic Entity or any Settling Insurer pursuant to the provisions of Section 8.11.1 of the Plan, the Trust shall make the reports and provide the certifications required by Section 8.11 until such time as such of the Diocese or the Other Catholic Entities or Settling Insurer determines, in its reasonable judgment, that it has no further legal obligation under MMSEA or otherwise to report any settlements, resolutions, payments, or liquidation determinations made by the Trust or contributions to the Trust.  Furthermore, following any permitted cessation of reporting, or if reporting has not previously commenced due to the satisfaction of one or more of the conditions set forth in Section 8.11.1 of the Plan, and if the Diocese or the Other Catholic Entities or Settling Insurer reasonably determines, based on subsequent legislative, administrative, regulatory, or judicial developments, that reporting is required, then the Trust shall promptly perform its obligations under Section 8.10 of the Plan.

f)    Section 8.11 of the Plan is intended to be purely prophylactic in nature, and does not imply, and shall not constitute an admission, that the Diocese, the Other Catholic Entities, and/or Settling Insurers have made payments pursuant to "applicable plans" within the meaning of MMSEA, or that they have any legal obligation to report any acts undertaken by the Trust or contributions to the Trust under MMSEA or any other statute or regulation.

g)    If CMS concludes that reporting done by the Trust in accordance with

103

Section 8.11 of the Plan is or may be deficient in any way, and has not been corrected to the satisfaction of CMS in a timely manner, or if CMS communicates to the Trust, the Diocese or the Other Catholic Entities or Settling Insurer a concern with respect to the sufficiency or timeliness of such reporting, or there appears to the Diocese or the Other Catholic Entities or Settling Insurer a reasonable basis for a concern with respect to the sufficiency or timeliness of such reporting or non-reporting based upon the information received pursuant to Section 8.11 of the Plan, or other credible information, then each of the Diocese or the Other Catholic Entities and Settling Insurer shall have the right to submit its own reports to CMS under MMSEA, and the Trust shall provide to any Entity that elects to file its own reports such information in its possession or control as the electing party may reasonably require in order to comply with MMSEA, including the full reports filed by the Trust pursuant to Section 8.11 of the Plan, without any redactions. The Diocese, the Other Catholic Entities, and Settling Insurers shall keep any information they receive from the Trust pursuant to this Section 8.11 of the Plan confidential and shall not use such information for any purpose other than meeting obligations under MMSEA.

h)    Notwithstanding any other provisions hereof, the Trust shall not be required to report as required by Section 8.11 of the Plan until the Person on whose behalf the Trust is required to report shall have provided its Medicare Reporting Number, if one exists. Moreover, the Trust shall have no indemnification obligation under Section 8.11 of the Plan to such Person for any penalty, interest, or sanction with respect to a Claim that may arise on account of such Person's failure timely to provide its Medicare Reporting Number, if one exists, to the Trust in response to a timely request by the Trust for such Medicare Reporting Number. However, nothing relieves the Trust from its reporting obligations with respect to each Person who provides the Trust with its Medicare Reporting Number. The Trust shall indemnify each of the Diocese or the Other Catholic Entities and Settling Insurer for any failure to report payments to Medicare eligible Abuse Claimants on behalf of Persons who have timely supplied Medicare Reporting Numbers, if any exists.

i)    Prior to remittance of funds to any Channeled Claimant or counsel therefor, the Trust Administrator shall obtain in respect of any Channeled Claim a certification from the Claimant that said Claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under MSP relating to such Channeled Claim. If the Trust receives no such certification, the Trust may withhold payment from any Claimant the funds sufficient to assure that all obligations owing or potentially owing under MSP relating to such Abuse Claim are paid to CMS. The Trust shall provide a quarterly certification of its compliance with Section 8.11.9 of the Plan to each of the Diocese or the Other Catholic Entities and Settling Insurer, and permit reasonable audits by such Persons, no more often than annually, to confirm the Trust's compliance with Section 8.11.9 of the Plan. For the avoidance of doubt, the Trust shall be obligated to comply with the requirements of Section 8.11.9 of the Plan regardless of whether the Diocese or the Other Catholic Entities or Settling Insurer elects to file its own reports under MMSEA pursuant to Section 8.11.7 of the Plan.

j)    Compliance with the provisions of this Section 8.11 of the Plan shall be a material obligation of the Trust under the Plan, in favor of the Diocese, the Other Catholic Entities, and Settling Insurers under the Plan.

104

k)      The Trust shall defend, indemnify, and hold harmless the Diocese, the Other Catholic Entities, and Settling Insurers from any Medicare Claims reporting and payment obligations relating to its payment of Channeled Claims, including any obligations owing or potentially owing under MMSEA or MSP, and any Claims related to the Trust's obligations under Section 8.4 of the Plan.

l)      The Social Security Administration may change (or may have already changed) its processes and/or procedures in a manner that is inconsistent with the foregoing.  The Trust Administrator shall make best efforts to comply meaningfully with the foregoing while adhering to the Social Security Administration's most recent processes, procedures, and requirements.

### K.  Medicare Claims Indemnity.

The Trust shall defend, indemnify, and hold harmless the Covered Parties and the Settling Insurers from any Medicare Claims and any Claims related to the Trust's obligations under the Plan.

## ARTICLE XIV.
## SETTLING INSURERS

### A.  Settling Insurers.

If, prior to ~~the~~ Confirmation ~~Date~~, an Insurer enters into an Insurance Settlement Agreement with the Debtor, who shall be required to obtain the written consent of the Tort Committee before entering into and executing such agreement, under which the Insurer would become a Settling Insurer under the Plan upon entry of the Confirmation Order, the Plan Proponents shall file a Plan Supplement providing for any provisions required by the proposed Settling Insurer, and agreed to by the Plan Proponents, to be made a part of the Plan.  Any such provisions set forth in the Plan Supplement shall be included in this Section as part of the Plan attached to the Confirmation Order.

Any Insurer that becomes a Settling Insurer prior to the Effective Date shall receive the treatment as may be provided in any Insurer Settlement Agreement approved by a Final Order.

### B.  Contribution Claims.

Each Settling Insurer agrees that it will not pursue any contribution claim that it might have against any other Insurer (a) whose Contribution Claim against Settling Insurers is satisfied and extinguished entirely; or (b) that does not make a Contribution Claim against the Settling Insurers, or any of them.  If, in the future, a Non-Settling Insurer releases its Contribution Claims, if any such exist, that it may have against the Settling Insurers, then such released Settling Insurer shall release its Contribution Claims against such releasing Insurer.

If any Insurer asserts a Claim directly against the Trust arising from or concerning the Settling Insurer Policies, any Contribution Claim of the Settling Insurers shall be transferred to the Trust, and the Trust shall be authorized to assert the Contribution Claims of such Settling Insurer against such other Insurer.

105

4870-2885-4563, v. 2

**C.  Judgment Reduction**

In any Action, including the Insurance Coverage Adversary Proceeding, involving the Diocese, an Other Catholic Entity, the Reorganized Debtor, or the Trust (collectively, "**Alleged Insured**") or an Abuse Claimant, as applicable, and one or more Non-Settling Insurers, where a Non-Settling Insurer has asserted, asserts, or could assert any Contribution Claim against a Settling Insurer, then any judgment or award obtained by such Alleged Insured or Abuse Claimant against such Non-Settling Insurer shall be automatically reduced by the amount, if any, that such settling entity is liable to pay such Non-Settling Insurer as a result of its Contribution Claim, so that the Contribution Claim is thereby satisfied and extinguished entirely ("**Reduction Amount**").  In any Action involving an Alleged Insured or Abuse Claimant against a Non-Settling Insurer, where such a Settling Insurer is not a party, such Alleged Insured or Abuse Claimant shall obtain a finding from that court or arbitrator(s), as applicable, of the Reduction Amount before entry of judgment against such Non-Settling Insurer.  In the event that such a reduction is not made as described above, then any Contribution Claim by any Non-Settling Insurer against any Settling Insurer Entity shall be reduced by the Reduction Amount, as determined by the court or arbitrator(s) in which such Contribution Claim is filed.  The Settling Insurers shall be required to cooperate in good faith with the Diocese and/or the Trust to take commercially reasonable steps to defend against any Contribution Claim.

If an Alleged Insured or Abuse Claimant and a Non-Settling Insurer enter into an agreement settling one or more Claims relating to Abuse, such agreement shall include a provision whereby such Non-Settling Insurer releases Contribution Claims against the Settling Insurers.

**ARTICLE XV.**
**NON-SETTLING INSURERS**

**A.  Preservation of Rights and Obligations.**

If an Abuse Claim is liquidated through the Initial Review Determination (as defined in the Trust Distribution Plan), the Verdict Value Assessment Determination (as defined in the Trust Distribution Plan) or in any state or federal court as may be permitted by the Plan or Trust Distribution Plan, then the Covered Parties, the Trust, and each Non-Settling Insurer shall retain any and all legal and factual defenses that may exist in respect to such Abuse Claim and, except as set forth in this Section, all coverage defenses.  The rights, duties, and obligations of each Non-Settling Insurer under the Non-Settling Insurer Policies with respect to Abuse Claims are not affected in any way by:  (a) the discharge in bankruptcy of the Debtor; (b) any Trust distribution or (c) the Insurance Assignment.  Non-Settling Insurers retain any defenses that they would be able to raise if the Claim for coverage for an Abuse Claim were brought by any Covered Party, except any defense arising from the Insurance Assignment.

The rights and obligations of the Covered Parties and every Non-Settling Insurer under the terms of the Non-Settling Insurer Policies and at law shall not be affected by the Initial Review Determination and shall be treated as if the Initial Review Determination had never occurred.  Each Non-Settling Insurer shall be entitled to all rights as are provided under the terms of its Non-Settling Insurer Policies as if the Initial Review Determination had never occurred.

106

4870-2885-4563, v. 2

Nothing in the Plan, Confirmation Order, or any Plan Document shall impose any obligation on any Non-Settling Insurer to provide a defense for, settle, or pay any judgment with respect to, any Abuse Claim, or grant to any Person any right to sue any Non-Settling Insurer directly, relating to an Abuse Claim. All such obligations with respect to Non-Settling Insurers shall be determined by and in accordance with the terms of the Non-Settling Insurer Policies and with applicable non-bankruptcy law.

**B.  Estimations/Assessments of Abuse Claims Are Not Binding.**

Estimations of Abuse Claims for purposes of determination, qualification, assignment of points, and payment of Trust distributions:

   a)  shall not (i) constitute an admission of liability by any Person with respect to such Abuse Claims; (ii) have any *res judicata* or collateral estoppel effect on any Person; (iii) constitute a settlement, release, accord, satisfaction, or novation of such Abuse Claims; (iv) be used by any third-party as a defense to any alleged joint liability; or (v) otherwise prejudice any rights of the Trust, Covered Parties, Settling Insurers, Non-Settling Insurers, or Abuse Claimants in all other contexts or forums;

   b)  shall be without prejudice to any and all rights of the Trust, the Non-Settling Insurers, and Abuse Claimants in all other contexts and forums; and

   c)  shall not be deemed to be a determination of liability of any Covered Party or a determination of whether, or the extent to which, such Abuse Claim is covered under any Non-Settling Insurer Policy.

The fact that a Claim has been estimated for distribution purposes has no *res judicata* or collateral estoppel effect and is not a binding determination on any issue. Assessments by the Abuse Claims Reviewer under the Trust Distribution Plan shall have no effect upon any "no action" provisions contained in any Non-Settling Insurer Policy to the extent any such provision remains enforceable by a Non-Settling Insurer under applicable law. The liability of the Covered Parties and the amount owed by the Covered Parties, and any Non-Settling Insurer on any Abuse Claim, shall be determined by: (y) the amount of any court judgment obtained by, or on behalf of, the Abuse Claimant; or (z) through either (1) a settlement agreement pursuant to which such Non-Settling Insurer has consented; or (2) if such Non-Settling Insurer has not consented, a settlement agreement which does not breach any duty of the Trust, Trust Administrator, or any Covered Party to the Non-Settling Insurer under the respective Non-Settling Insurer Policy or applicable law.

4870-2885-4563, v. 2

### C.  **The Debtor's and Other Catholic Entities' Obligations Survive the Insurance Assignment.**

Notwithstanding the Insurance Assignment, the Debtor, the Reorganized Debtor and the Other Catholic Entities shall not be relieved of their duties or obligations under any Non-Settling Insurer Policies (except as to the contrary in any subsequent Insurance Settlement Agreement) and shall continue to perform such duties as required by such Non-Settling Insurer Policies and applicable law.  If the Trust asserts any Claim that the Debtor, the Reorganized Debtor or the Other Catholic Entities has breached such duties or obligations under the Non-Settling Insurer Policies resulting in a loss of coverage, it shall give such party notice and an opportunity to cure any alleged breach, and in any event, the Debtor, the Reorganized Debtor or the Other Catholic Entities shall not be liable for any alleged breach resulting in a loss of coverage except to the extent that (a) the breach relates to post-Effective Date conduct of the Debtor, the Reorganized Debtor or the Other Catholic Entities and (b) the Debtor, the Reorganized Debtor or the Other Catholic Entities willfully or intentionally fails to comply with its continuing obligations under the Non-Settling Insurer Policies.  In addition, any such Claim will not be automatically allowed; the Debtor, the Reorganized Debtor or the Other Catholic Entities will have the right to defend against such claim.

### D.  **Trust Powers With Respect to Abuse Claims and Non-Settling Insurers.**

Solely as set forth in the Trust Distribution Procedures in the Trust Distribution Plan, any Abuse Claimant or the Trust, as applicable, may enter into a settlement of an Abuse Claim allowed by applicable non-bankruptcy law, and may enter into an arrangement with the Abuse Claimant's counsel providing such counsel will receive reasonable compensation from any recovery from a Non-Settling Insurer.

The Trust Administrator may use the Trust assets to prosecute litigation against the Non-Settling Insurers.

If the Trust successfully resolves a Coverage Claim or otherwise receives a recovery of insurance proceeds relating to any Abuse Claim from a Non-Settling Insurer, such proceeds shall become Trust Assets available to pay, and shall increase the amount available to pay, Abuse Claims, pursuant to the Trust Distribution Plan.

Upon the due execution and delivery of an Insurance Settlement Agreement, entry of the Insurance Settlement Agreement Approval Order and the payment to the Trust of the settlement amount due thereunder, a Non-Settling Insurer shall become a Settling Insurer protected by the Channeling Injunction and Supplemental Settling Insurer Injunction and become entitled to benefit from all releases executed by Claimants and the other rights and protections of a Settling Insurer under the Plan, the Trust Documents, and the Insurance Settlement Approval Orders.

With respect to any Stipulation of Judgment entered pursuant to the Trust Distribution Plan, the Trust will pursue the full amount of any such Stipulation of Judgment against the relevant Non-Settling Insurer on behalf of the Abuse Claimant and the Abuse Claimant shall be deemed to have assigned the full amount of such Stipulation of Judgment to the Trust.

4870-2885-4563, v. 2

**E.  Insurance Coverage Adversary Proceeding.**

As of the Effective Date, the Trust shall be substituted as the named plaintiff in the Insurance Coverage Adversary Proceeding and have all rights of the Diocese and the Other Catholic Entities to pursue recoveries against any Non-Settling Insurers.

### ARTICLE XVI.
### PROVISIONS GOVERNING DISTRIBUTIONS GENERALLY

The following provisions of the Plan shall not apply to the distributions to be made to Class 5 and Class 6 Claims under the Trust.

**A.  Disbursing Agent.**

The Reorganized Debtor shall be the "**Disbursing Agent**" for all payments to be made under the Plan except for payments made to Class 5 and Class 6 Claims under the Trust.  With respect to the Trust, the Trust Administrator shall be responsible for all distributions made under the Trust.

**B.  Manner of Payment.**

Any payment of Cash under the Plan may be made either by check drawn or by wire transfer from a domestic bank, at the option of the Disbursing Agent.

**C.  Payments and Distributions on Disputed Claims.**

As and when authorized by a Final Order, Disputed Claims that become Allowed Claims shall be paid from the Disputed Claim Reserve established under Section 12.4 of the Plan.  No distribution shall be made on a Claim where only a portion of such Claim is disputed until such dispute is resolved by settlement or Final Order.

**D.  Disputed Claim Reserve.**

To the extent that the Disbursing Agent makes a distribution hereunder to a Class prior to the resolution of all Disputed Claims of such Class, the Disbursing Agent shall reserve an amount for any Disputed Claims in such Class equal to the amount that such Holders of Disputed Claims in such Class would be entitled to receive under the Plan if such Disputed Claims were Allowed in the asserted amount of the Claim.

**E.  Transmittal of Distributions to Parties Entitled Thereto.**

All distributions by check shall be deemed made at the time such check is deposited in the United States mail, postage prepaid.  Any distributions by wire transfer shall be deemed made as of the date of the wire transfer is made.  Except as otherwise agreed with the Holder of an Allowed Claim in respect thereof or provided in the Plan, any distribution required under the Plan on account of an Allowed Claim, shall be mailed to (i) the latest mailing address filed for the Holder of an Allowed Claim entitled to a distribution, (ii) the latest mailing address filed for a Holder of a filed power of attorney designated by the Holder of such Claim to receive distributions, (iii) the

109

latest mailing address filed for the Holder's transferee as identified in a filed notice served on the Debtor pursuant to Bankruptcy Rule 3001(e), or (iv) if no such mailing address has been filed, the mailing address reflected on the Schedules or in the Debtor's books and records.  The Holder of a Claim shall be required to promptly notify the Reorganized Debtor and the Bankruptcy Court of any change in its mailing address.

### F.  **Distribution of Unclaimed Property**.

Except as otherwise provided in the Plan, any distribution under the Plan which is unclaimed after three (3) months following any Distribution Date shall be forfeited, and such distribution, together with any interest earned thereon, and shall return to and revest in the Reorganized Debtor.

### G.  **Saturday, Sunday or Legal Holiday**.

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the following Business Day but shall be deemed to have been completed as of the required date.

### H.  **Setoffs and Recoupment**.

Subject to the terms of the Plan and pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, the Debtor or Reorganized Debtor, as appropriate, may but shall not be required to, setoff against or recoup from any Claim on which payments are to be made pursuant to the Plan, any Claims of any nature whatsoever the Debtor may have against the Holder of such Claim.

4870-2885-4563, v. 2

**I.**   **Fractional Cents and *De Minimis* Distributions.**

Notwithstanding any other provisions of the Plan to the contrary, no payment of fractional cents will be made under the Plan. Cash will be issued to Holders entitled to receive a distribution of Cash in whole cents (rounded to the nearest whole cent when and as necessary). Any distribution of less than $25.00 will be considered *de minimis,* and Holders of Allowed Claims that are entitled to an interim or final distribution of less than $25.00 will not receive any distribution. Such funds will remain with and revest in the Reorganized Debtor.

**J.**   **Prepayment.**

Except as otherwise provided herein or the Confirmation Order, the Disbursing Agent shall have the right to prepay, without penalty, all or any portion of an Allowed Claim.

**K.**   **Allowance and Disallowance of Claims.**

(a)   **Allowance of Claims.**  Except as expressly provided in the Plan, no Claims shall be deemed Allowed by virtue of the Plan or the Confirmation Order unless and until such Claim is deemed Allowed under the Bankruptcy Code, or the Bankruptcy Court enters a Final Order in the Chapter 11 Case allowing such Claim.  Notwithstanding the foregoing, any Claim included in the Debtor's Schedules that is not listed as contingent, unliquidated, and/or disputed shall be an Allowed Claim.  Any Proof of Claim Filed in an unliquidated amount shall be deemed Allowed in the amount listed in the Debtor's Schedules as liquidated, not contingent and not disputed.  The Allowance and disallowance of Claims shall be in all respects subject to the provisions of section 502 of the Bankruptcy Code.

(b)   **Disallowance of Claims.**  Except as expressly provided in the Plan, all Claims held by Persons against whom the Debtor or Reorganized Debtor, as appropriate, have filed or commenced or may in the future file or commence a Claim under sections 542, 543, 544, 547, 548, 549, 550, 551, 553 or 724(a) of the Bankruptcy Code shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code.  The Holders of any and all Claims filed with the Bankruptcy Court after the Bar Date shall be deemed disallowed without further action by the Debtor or Reorganized Debtor and without any further notice to or action, order, or approval of the Bankruptcy Court.  The Holders of any and all Claims Filed with the Bankruptcy Court after the relevant Bar Date shall not be entitled to a distribution, unless otherwise allowed by Final Order of the Bankruptcy Court.

**L.**   **Resolution of Disputed Administrative Expense Claims and Disputed Claims.**

(a)   **Prosecution of Objections to Claims.**  Except as otherwise set forth herein, prior to the Effective Date, the Debtor shall have standing and the right to commence and pursue objections to Claims, and the Reorganized Debtor shall have such standing after the Effective Date. All objections to Claims shall be Filed with the Bankruptcy Court and served upon the Holders of each of the Claims to which objections are made. Any objection to a Class 3 Claim must be made pursuant to D.N.J. LBR 3007-1(b), such that it must be filed by the later of: (1) 60 days after the entry of the order confirming plan; or (2) 60 days after the claim is filed or amended. If no objection is filed pursuant to D.N.J. LBR 3007-1, a Class 3 Claim shall be deemed an Allowed Claim.  The Diocese reserves the right to seek an extension of such date in accordance with D.N.J. LBR 3007-

111

1(c), *provided, however,* that such right shall be limited to two (2) extensions of ninety (90) days from the date provided for in D.N.J. LBR 3007-1(b).

(b)     **Objections to Claims**.  An objection to the allowance of a Claim shall be in writing and shall be Filed with the Bankruptcy Court by the Debtor or Reorganized Debtor, as applicable. Except as expressly set forth herein, nothing herein, in the Confirmation Order or in any Order in aid of Confirmation, shall constitute, or be deemed to constitute, a waiver or release of any Claim, including any Avoidance Action, right of setoff or recoupment or other legal or equitable defense which the Debtor had immediately prior to the commencement of the Chapter 11 Case against or with respect to any Claim.  Except as set forth herein, upon Confirmation, the Debtor or Reorganized Debtor shall have, retain, reserve and be entitled to assert all such Claims, rights of setoff and recoupment and other legal or equitable defenses that the Debtor had immediately prior to the commencement of the Chapter 11 Case against or with respect to any Claim.

**M. Controversy Concerning Impairment**.

If a controversy arises as to whether any Claims or any Class of Claims or Interests are Impaired under the Plan, the Bankruptcy Court, after notice and a hearing, shall determine such controversy before approving the Disclosure Statement.

4870-2885-4563, v. 2

## ARTICLE XVII.
### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.  Executory Contracts and Unexpired Leases.**

On the Effective Date, all Executory Contracts and unexpired leases not rejected on or before ~~the~~ Confirmation ~~Date~~ will be deemed assumed.  The Confirmation Order shall constitute an order approving such assumption as of the Effective Date.  No cure payments or adequate assurance of future performance shall be due.

**B.  Bar to Rejection Damages.**

All Proofs of Claim for Claims arising from a rejection of a Executory Contract or unexpired leases must be filed with the Bankruptcy Court within the earlier of (i) the date set forth for filing claims in any order of the Bankruptcy Court approving such rejection; (ii) the date set forth in D.N.J. LBR 3003-1(b) or (ii) thirty (30) days after ~~the~~ Confirmation ~~Date~~.  Any Proofs of Claim that are not filed timely shall be barred forever from assertion.

## ARTICLE XVIII.
### CONFIRMATION AND CONSUMMATION OF THE PLAN

**A.  Conditions Precedent to Confirmation.**

Confirmation of the Plan shall not occur unless all of the following conditions precedent have been satisfied:

a)      the Plan Documents shall be in form and substance acceptable to the Debtor, the Other Catholic Entities, the Tort Committee and any Settling Insurers; and

b)      the Confirmation Order is in form and substance acceptable to the Debtor, the Other Catholic Entities, the Tort Committee and any Settling Insurers and in all events provides for the following:

i.      confirmation of the Plan;

ii.      specifically, and individually, ordering all Persons, as set forth in the Plan, to act or refrain from acting as specified in the Plan;

iii.      incorporating the terms and provisions of an Insurance Settlement Approval Order (if any) as though fully set forth therein;

iv.      ordering the Trust Administrator to perform the obligations, if any, imposed upon the Trust Administrator by the Plan;

v.      approving and implementing the Channeling Injunction and Supplemental Settling Insurer Injunction;

vi.      discharging DOC Trusts from all Claims;

113

vii.        ordering all Channeled Claimants with pending state court Actions against any Covered Party to dismiss Channeled Claims and assert them against the Trust for resolution pursuant to the Trust Agreement; and,

viii.       incorporating the following factual findings and legal conclusions:

1. The release granted to the Other Catholic Entities is fair and necessary to the Debtor's reorganization.

2. There is a sufficient identity of interest between the Debtor and the Other Catholic Entities such that a suit against the Other Catholic Entities is, in essence, a suit against the Debtor or will deplete assets of the Estate.

3. The cash contribution by the Other Catholic Entities, waiver of claims by the Other Catholic Entities and grant of the Lien on assets of the Parishes provides significant and critical funding for the Plan constituting a substantial contribution to the success of the Plan.

4. The Other Catholic Entities would not make a substantial contribution unless they obtained the benefits of the Channeling Injunction.

5. The release granted to the Other Catholic Entities is necessary to the Debtor's reorganization and without it there is little likelihood of reorganization.

114

**B.  Conditions Precedent to the Effective Date.**

The Effective Date shall not occur, and the Plan shall not be consummated, unless and until each of the following conditions have been satisfied:

(a) the Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Debtor, the Tort Committee and any Settling Insurers;

(b) the Confirmation Order shall be a Final Order and no stay of the Confirmation Order shall then be in effect;

(c) the Trust Administrator and the Debtor shall have executed the Trust Agreement and the Debtor shall have delivered to the Trust Administrator the Trust Agreement;

(d) the Debtor shall have executed and delivered to the Trust Administrator the Additional Debtor Contributions Security Agreement;

(e) the Other Catholic Entities shall have executed and delivered to the Trust Administrator the Other Catholic Entities Insurance Assignment Agreement;

(f) the payments required to be made by or on the Effective Date under the Plan shall have been received in good funds by the Trust, including, but not limited to, the Initial Debtor Contribution, the OCE Cash Contribution and all proceeds held by the Debtor or the Reorganized Debtor on account of Insurance Settlement Agreements; and

(g) the Plan has not been materially amended, altered, or modified as confirmed by the Confirmation Order, unless such material amendment, alteration, or modification has been made with consent of the Plan Proponents.

**C.  Notice of Effective Date.**

The Debtor shall file and serve on all Holders of Claims a Notice of Effective Date with the Bankruptcy Court within three (3) days after the occurrence of the Effective Date.  Such notice will include all relevant deadlines put into effect by the occurrence of the Effective Date.

**D.  Waiver of Conditions Precedent to the Effective Date.**

Each of the conditions precedent to the occurrence of the Effective Date set forth in Section 14 may only be waived in whole or in part by the Plan Proponents and any Settling Insurer without notice to or leave or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

**E.  Effect of Non-Occurrence of Conditions.**

If Substantial Consummation of the Plan does not occur, the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will: (a) constitute a waiver or release of any Claims by or against the Covered Parties or Settling Insurers; (b) prejudice

4870-2885-4563, v. 2

in any manner the rights of the Covered Parties, the Trust, or Settling Insurers; (c) constitute an admission, acknowledgement, offer, or undertaking by the Covered Parties or Settling Insurers in any respect, including but not limited to, in any proceeding or case against the Debtor; or (d) be admissible in any action, proceeding, or case against the Covered Parties or Settling Insurers in any Bankruptcy Court or other forum.

## ARTICLE XIX.
## EFFECTS OF CONFIRMATION

### A. **Authority to Effectuate Plan**.

Upon the Effective Date, all matters provided under the Plan shall be deemed to be authorized and approved without the requirement of further approval from the Bankruptcy Court or the Plan Proponents. The Plan Proponents shall be authorized, without further application to or order of the Bankruptcy Court, to take whatever action necessary to achieve consummation and carry out the Plan and to effectuate the transactions provided for thereunder.

### B. **Binding Effect**.

Except as otherwise expressly provided in the Plan, on and after the Effective Date, the Plan shall bind all Holders of Claims. Subject to the terms of the Plan, upon the Effective Date, every Holder of a Claim shall be precluded and permanently enjoined from asserting against the Debtor and/or Reorganized Debtor any Claim based on any document, instrument, judgment, award, order, act, omission, transaction or other activity of any kind or nature that occurred before the Petition Date.

### C. **Discharge of the Debtor**.

(a)    Except as provided in the Plan, the Trust Distribution Plan or the Confirmation Order, upon the Effective Date, the Debtor shall be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in section 502 of the Bankruptcy Code, whether or not (i) a Proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code, (iii) a Claim based upon such debt is or has been disallowed by order of the Bankruptcy Court, or (iv) the Holder of a Claim based upon such debt accepted the Plan.

(b)    Except as provided in the Plan, the Trust Distribution Plan or the Confirmation Order, upon the Effective Date, all Persons shall be precluded from asserting against the Debtor, the Reorganized Debtor and their respective members, shareholders, officers, directors, partners, attorneys or advisors, any other or further Claims relating to the Debtor based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as provided in the Plan, the Trust Distribution Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all Claims against the Debtor, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim.

116

(c)    Notwithstanding anything herein to the contrary, to preserve coverage under Non-Settling Insurer Policies, Class 5 and 6 Claimants specifically reserve, and do not release, any and all claims that they may have against the Diocese, the Reorganized Debtor and any other Covered Party that implicate coverage under Non-Settling Insurer Policies but recourse is limited to the proceeds of Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages, and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Abuse Claim, and any such judgments or awards will be handled in accordance with the Plan.  Class 5 and 6 Claims will not be released or enjoined as against the Diocese, the Reorganized Debtor and any other Covered Party for any Abuse that may be covered under Non-Settling Insurer Policies until such claims are settled with the Diocese, the Reorganized Debtor, any other Covered Party and such Non-Settling Insurer or are fully adjudicated, resolved, and subject to Final Order, but recourse is limited as described above.  Nothing herein requires any Class 5 and 6 Claimant to release any Claim(s) that is not a Channeled Claim.

(d)    Under no circumstances will the reservation of an Abuse Claimant's rights against any Person impair the discharge, Channeling Injunction, or Supplemental Settling Insurer Injunction with respect to any Covered Party or Settling Insurer to the extent provided in the Plan.

### D.  Release and Discharge of the Trade Committee.

Effective on the Effective Date, the Trade Committee shall be disbanded and it and its professionals released from their duties and obligations.

### E.  Release and Discharge of the Tort Committee.

Effective on the Effective Date, the Tort Committee and its professionals shall be disbanded and it and its professionals released from their duties and obligations.

### ARTICLE XX.
### EFFECT OF PLAN ON CLAIMS AND INTERESTS

#### A.  Disclosure Regarding Injunctions and Releases.

##### a.  Third Party Releases.

**The Plan Proponents seek approval of releases of claims and causes of action against every "Released Party" which is defined in the Plan to mean collectively and in each case in their capacity as such: (i) the Debtor and Reorganized Debtor; and (ii) all Persons listed on Exhibits 2.2.20, 2.2.72, 2.2.83 and 2.2.100 of the Plan as may be amended prior to Confirmation; and (iii) except as otherwise provided for by the Plan, with respect to each of the foregoing Persons in clauses (i) through (ii), such Persons' successors and assigns, Affiliates, and its and their current and former officers, directors, trustees, principals, shareholders and their Affiliates, and Agents, in their capacities of such.**

The Plan Proponents believes that the release of the Released Parties by the Debtor and each Holder of a Claim that is entitled to receive a distribution pursuant to the Plan (collectively,

117

the "Releasing Parties") and the corresponding injunctions are critically important to the success of the Plan and implements the concessions, compromises and commitments made by the Released Parties.

Each of the Released Parties, whether directly or indirectly through the concessions, compromises and commitments made by such Released Parties, afforded value to the Debtor and has aided in the Debtor's reorganization process. The Released Parties have played an integral role in the formulation of the Plan, have expended and will continue to expend significant time and resources analyzing the issues presented by the Plan and, in exchange for receiving the releases and injunctions set forth in the Plan, are making critical financial contributions to Plan that are necessary to make the Plan feasible, including, but not limited to contribution to Plan payments.

Further, the Released Parties will not make any of the concessions, compromises and commitments outlined in the Plan unless the releases, including those that are required from the Holders of Claims are approved. Accordingly, the releases and related injunctions are an integral part of the consideration to be provided in exchange for the concessions, compromises and commitments embodied in the Plan that the Debtor believes maximizes recoveries to the Debtor's creditors. Absent the expeditious implementation of the Plan, the Debtor could face a longer, costlier and uncertain Chapter 11 process mired with contentious litigation, which could materially delay and reduce distributions to creditors.

The Plan Proponents believe that the release to the Released Parties is a sound exercise of its business judgment and that the Debtor's release of third parties pursuant to the Plan is appropriate and reasonable under the circumstances, particularly where, as here, the relative strength of the claims being released are more than offset by the significant benefits the Debtor is receiving under the Plan from the Released Parties. In light of the foregoing, the Plan Proponents believe, in their sound business judgment, that the release falls well within the range of reasonableness and, thus, satisfies the applicable provisions of the Bankruptcy Code and Bankruptcy Rules relating to the approval of settlements.

The "Third-Party Release" provides for the release by consenting Holders of Claims against the Released Parties. The Debtor believes the Third-Party Release is fair and necessary to confirm the Plan. The Released Parties are contributing significant, new consideration in the form of cash and other concessions. The Third-Party Release is essential because without it, there would be no contribution by the Released Parties, and thus, no ability to propose and consummate the Plan, which provides for a recovery to Holders of Claims. Quite simply, without the Third-Party Release, there would be no contribution; and, without contribution, there would be no Plan. Accordingly, the Debtor has demonstrated that there is a relationship between the Debtor's successful confirmation and the Third-Party Release and that the Released Parties have provided a critical financial contribution to the Debtor's plan that is necessary to make the plan feasible in exchange for receiving a release of liability.

The Plan provides that entry of the Confirmation Order shall constitute the Court's approval, pursuant to Bankruptcy Rule 9019 and Section 105 of the Bankruptcy Code, of the releases, which includes by reference each of the related provisions and definitions contained in the Plan, and related injunctions and further, shall constitute the Bankruptcy Court's finding that

118

the releases are: (i) in exchange for the good and valuable consideration provided by the Released Parties, (ii) a good faith settlement and compromise of the claims released by the Released Parties; (iii) in the best interests of the Debtor and all Holders of Claims; (iv) fair, equitable, reasonable and necessary for the Debtor's reorganization as, among other things, the concessions, compromises and commitments provided by or on behalf of the Released Parties constitute critical financial contributions to Plan that are necessary to make the Plan feasible; (v) given and made after notice and opportunity for hearing; and (vi) a bar to the Releasing Parties, the Debtor or any party on its behalf asserting any claim released by the Releasing Parties against any of the Released Parties.

The Plan Proponents submit that the concessions made by the Released Parties are the "lynch-pin" of the Plan. In addition, the released parties are critical to the Diocese's mission and future operations. Therefore, the Plan Proponents submit the releases are appropriate under the circumstances.

   b. **Channeling Injunction**.

**The Plan Proponents further seek approval of a Channeling Injunction to prevent claims against "Covered Parties" which is defined to mean any (i) the Debtor and Reorganized Debtor, as applicable; (ii) the parties listed on** Exhibits 2.2.20, 2.2.72, 2.2.83 and 2.2.100 **of the Plan; (iii) each of the foregoing Persons' respective past, present, and future Affiliates, related companies, divisions, and acquired companies; (iv) each of the foregoing Persons' respective predecessors, successors and assigns; and (v) solely to the extent of and in their capacity as such, any and all of the foregoing Persons' respective Agents. Nothing in the foregoing is intended to suggest that such Persons are "employees" or agents of the Debtor or subject to its control. For the avoidance of doubt, "Covered Parties" does not include: (i) an individual who perpetrated an act of Abuse that forms the basis of an Abuse Claim; (ii) a religious order, other diocese or archdiocese (other than the Diocese); (iii) Non-Settling Insurers; and (iv) Joint Tortfeasors.**

**Further, a "Channeled Claim" subject to the Channeling Injunction means the Claims channeled to the Trust by the Channeling Injunction, including all (a) Abuse Claims and Indirect Claims, except for any portion of such Claims that are Non-Settling Insurer Policy Claims; (b) Contribution Claims; (c) Medicare Claims; and (d) Extra-Contractual Claims relating to the Claims listed in subsections (a)–(c) of above, and for which the Trust assumes liability, pursuant to the Plan,** *provided, however*, **that "Channeled Claims" shall not include any Claim against: (i) an individual who perpetrated an act of Abuse that forms the basis of an Abuse Claim; (ii) a religious order, other diocese or archdiocese (other than the Diocese); (iii) Non-Settling Insurers; and (iv) Joint Tortfeasors.**

The Covered Parties made significant concessions and compromises that provide a material benefit to the Plan. The Plan Proponents submit that they will be able to demonstrate at confirmation that the Channeling Injunction is proper under In re Continental Airlines, 203 F.3d 203 (3rd Cir. 2000).

Further, the Covered Parties will not make any of the concessions, compromises and commitments outlined in the Plan unless the Channeling Injunction is approved. Accordingly, the

119

releases and related injunctions are an integral part of the consideration to be provided in exchange for the concessions, compromises and commitments embodied in the Plan that the Plan Proponents believe maximizes recoveries to the Debtor's creditors. Absent the expeditious implementation of the Plan, the Debtor could face a longer, costlier and uncertain Chapter 11 process mired with contentious litigation, which could materially delay and reduce distributions to creditors.

The Plan Proponents believe that the "Channeling Injunction" to the Covered Parties is a sound exercise of its business judgment is appropriate and reasonable under the circumstances, particularly where, as here, the relative strength of the claims being released are more than offset by the significant benefits the Debtor is receiving under the Plan from the Covered Parties. In light of the foregoing, the Debtor believes, in its sound business judgment, that the "Channeling Injunction" falls well within the range of reasonableness and, thus, satisfies the applicable provisions of the Bankruptcy Code and Bankruptcy Rules relating to the approval of settlements.

**B. General Injunction.**

**EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, THE CONFIRMATION ORDER WILL PROVIDE THAT ALL PERSONS AND ENTITIES WHO HELD, HOLD, OR MAY HOLD CLAIMS AGAINST THE DEBTOR ARE PERMANENTLY ENJOINED, ON AND AFTER ~~THE~~ CONFIRMATION ~~DATE~~, FROM (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY SUCH CLAIM OR TAKING ANY ACT TO RECOVER SUCH CLAIM OUTSIDE OF THE TRUST DISTRIBUTION PROCEDURES DISCUSSED IN THE PLAN AND THE BANKRUPTCY CODE AND BANKRUPTCY RULES, (B) THE ENFORCEMENT, ATTACHMENT, COLLECTION OR RECOVERY BY ANY MANNER OR MEANS OF ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST THE DEBTOR ON ACCOUNT OF ANY SUCH CLAIM, (C) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST THE DEBTOR OR AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE DEBTOR ON ACCOUNT OF ANY SUCH CLAIM AND (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTOR OR AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE DEBTOR ON ACCOUNT OF ANY SUCH CLAIM.**

**C. Channeling Injunction.**

**(a)    IN CONSIDERATION OF THE UNDERTAKINGS UNDER THE PLAN BY THE COVERED PARTIES AND SETTLING INSURERS (IF ANY), THEIR CONTRIBUTIONS TO THE TRUST, AND OTHER CONSIDERATION AND TO FURTHER PRESERVE AND PROMOTE THE AGREEMENTS AMONG THE COVERED PARTIES AND THE SETTLING INSURERS AND TO SUPPLEMENT WHERE NECESSARY THE INJUNCTIVE EFFECT OF THE DISCHARGE AS PROVIDED IN SECTIONS 524 AND 1141 OF THE BANKRUPTCY CODE, AND PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE:**

**a.    ANY AND ALL CHANNELED CLAIMS ARE CHANNELED INTO THE TRUST AND SHALL BE TREATED, ADMINISTERED, DETERMINED,**

4870-2885-4563, v. 2

**Formatted:** No widow/orphan control

**Formatted:** No widow/orphan control, Don't keep with next

**Formatted:** No widow/orphan control, Don't keep with next

RESOLVED AND PAID IN THE AMOUNTS AS PROVIDED BY THE TRUST DISTRUBTION PLAN AND PROCEDURES ESTABLISHED UNDER THE PLAN AND THE TRUST AGREEMENT AS THE SOLE AND EXCLUSIVE REMEDY FOR ALL HOLDERS OF CHANNELED CLAIMS; AND

b.  ALL PERSONS WHO HELD OR ASSERTED, HOLD OR ASSERT, OR MAY IN THE FUTURE HOLD OR ASSERT ANY CHANNELED CLAIMS ARE HEREBY PERMANENTLY STAYED, ENJOINED, BARRED AND RESTRAINED FROM TAKING ANY ACTION, DIRECTLY OR INDIRECTLY, FOR THE PURPOSES OF ASSERTING, ENFORCING, OR ATTEMPTING TO ASSERT OR ENFORCE ANY CHANNELED CLAIM AGAINST THE COVERED PARTIES AND THE SETTLING INSURERS, INCLUDING:

    i.  COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY CHANNELED CLAIM AGAINST ANY OF THE COVERED PARTIES OR THE SETTLING INSURERS OR AGAINST THE PROPERTY OF ANY OF THE COVERED PARTIES OR THE SETTLING INSURERS;

    ii.  ENFORCING, ATTACHING, COLLECTING OR RECOVERING, BY ANY MANNER OR MEANS, FROM ANY OF THE COVERED PARTIES OR THE SETTLING INSURERS OR THE PROPERTY OF ANY OF THE COVERED PARTIES OR THE SETTLING INSURERS, ANY JUDGMENT, AWARD, DECREE, OR ORDER WITH RESPECT TO ANY CHANNELED CLAIM AGAINST ANY OF THE COVERED PARTIES OR THE SETTLING INSURERS;

    iii.  CREATING, PERFECTING OR ENFORCING ANY LIEN OF ANY KIND RELATING TO ANY CHANNELED CLAIM AGAINST ANY OF THE COVERED PARTIES OR THE SETTLING INSURERS OR THE PROPERTY OF THE COVERED PARTIES OR THE SETTLING INSURERS;

    iv.  ASSERTING, IMPLEMENTING OR EFFECTUATING ANY CHANNELED CLAIM OF ANY KIND AGAINST:

        1.  ANY OBLIGATION DUE ANY OF THE COVERED PARTIES OR THE SETTLING INSURERS;

        2.  ANY OF THE COVERED PARTIES OR THE SETTLING INSURERS; OR

        3.  THE PROPERTY OF ANY OF THE COVERED PARTIES OR THE SETTLING INSURERS.

4870-2885-4563, v. 2

**v.** TAKING ANY ACT, IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO, OR COMPLY WITH, THE PROVISIONS OF THE PLAN OR THE TRUST DISTRIBUTION PLAN; AND

**vi.** ASSERTING OR ACCOMPLISHING ANY SETOFF, RIGHT OF INDEMNITY, SUBROGATION, CONTRIBUTION OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE TO ANY OF THE COVERED PARTIES OR THE SETTLING INSURERS.

**(b)** THE CHANNELING INJUNCTION IS AN INTEGRAL PART OF THE PLAN AND IS ESSENTIAL TO THE PLAN'S CONSUMMATION AND IMPLEMENTATION. IT IS INTENDED THAT THE CHANNELING OF THE CHANNELED CLAIMS AS PROVIDED IN THIS SECTION SHALL INURE TO THE BENEFIT OF THE COVERED PARTIES AND THE SETTLING INSURERS. IN ANY ACTION TO ENFORCE THE INJUNCTIVE PROVISIONS OF THIS SECTION AGAINST A CLAIMANT WHEREBY IT IS HELD BY A FINAL ORDER THAT THAT THE CLAIMANT WILLFULLY VIOLATED THE TERMS HEREOF, THE MOVING PARTY MAY SEEK AN AWARD OF COSTS (INCLUDING REASONABLE ATTORNEYS' FEES) AGAINST THE CLAIMANT, AND SUCH OTHER LEGAL OR EQUITABLE REMEDIES AS ARE JUST AND PROPER, AFTER NOTICE AND A HEARING.

**(c)** FOR THE AVOIDANCE OF DOUBT, THE CHANNELING INJUNCTION WILL NOT BE FOR THE BENEFIT OF ANY NON-SETTLING INSURER, EXCEPT TO THE EXTENT NON-SETTLING INSURER BECOME A SETTLING INSURER.

**D.** <u>Supplemental Settling Insurer Injunction</u>.

PURSUANT TO SECTIONS 105(A) AND 363 OF THE BANKRUPTCY CODE, AND IN CONSIDERATION OF THE UNDERTAKINGS OF THE SETTLING INSURERS PURSUANT TO THE INSURANCE SETTLEMENT AGREEMENTS, INCLUDING ANY SETTLING INSURERS' PURCHASE OF THE APPLICABLE SETTLING INSURER POLICIES FREE AND CLEAR OF ALL CLAIMS AND INTERESTS PURSUANT TO SECTION 363(F) OF THE BANKRUPTCY CODE, ANY AND ALL PERSONS WHO HAVE HELD, NOW HOLD, OR WHO MAY IN THE FUTURE HOLD ANY CLAIMS OR INTERESTS (INCLUDING ALL DEBT HOLDERS, ALL PERSONS HOLDING A CLAIM, GOVERNMENTAL, TAX AND REGULATORY AUTHORITIES, LENDERS, TRADE AND OTHER CREDITORS, ABUSE CLAIMANTS, NON-SETTLING INSURERS, PERPETRATORS AND ALL OTHERS HOLDING INTERESTS OF ANY KIND OR NATURE WHATSOEVER, INCLUDING THOSE CLAIMS RELEASED OR TO BE RELEASED PURSUANT TO AN INSURANCE SETTLEMENT AGREEMENT) AGAINST ANY OF THE COVERED PARTIES OR THE SETTLING INSURERS, WHICH, DIRECTLY OR INDIRECTLY, ARISE FROM, RELATE TO, OR ARE IN CONNECTION WITH ANY ABUSE CLAIMS THAT ARE COVERED OR ALLEGED TO BE COVERED UNDER THE SETTLING INSURER POLICIES, OR ANY

122

CONTRIBUTION CLAIMS, ARE HEREBY PERMANENTLY STAYED, ENJOINED, BARRED, AND RESTRAINED FROM TAKING ANY ACTION, DIRECTLY OR INDIRECTLY, TO ASSERT, ENFORCE OR ATTEMPT TO ASSERT OR ENFORCE ANY SUCH CLAIM OR INTEREST AGAINST THE SETTLING INSURERS OR THE SETTLING INSURER POLICIES INCLUDING:

1. COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING, WHETHER LEGAL, EQUITABLE OR OTHERWISE, AGAINST THE SETTLING INSURERS OR THE PROPERTY OF THE SETTLING INSURERS;

2. ENFORCING, ATTACHING, COLLECTING, OR RECOVERING, OR SEEKING TO DO ANY OF THE PRECEDING, BY ANY MANNER OR MEANS, ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST THE SETTLING INSURERS OR THE PROPERTY OF THE SETTLING INSURERS;

3. CREATING, PERFECTING, OR ENFORCING, OR SEEKING TO DO ANY OF THE PRECEDING, ANY LIEN OF ANY KIND AGAINST THE SETTLING INSURERS OR THE PROPERTY OF THE SETTLING INSURERS;

4. ASSERTING OR ACCOMPLISHING ANY SETOFF, RIGHT OF INDEMNITY, SUBROGATION, CONTRIBUTION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE TO THE SETTLING INSURERS OR THE PROPERTY OF THE SETTLING INSURERS; AND

5. TAKING ANY ACT, IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO, OR COMPLY WITH, THE PROVISIONS OF THE PLAN.

THE SUPPLEMENTAL SETTLING INSURER INJUNCTION WILL BE EFFECTIVE WITH RESPECT TO A SETTLING INSURER ONLY AS OF THE DATE THAT THE TRUST RECEIVES THE SETTLEMENT AMOUNT AS DEFINED IN THE INSURANCE SETTLEMENT AGREEMENT FOR SUCH SETTLING INSURER. THE FOREGOING INJUNCTIVE PROVISIONS ARE AN INTEGRAL PART OF THE PLAN AND ARE ESSENTIAL TO ITS IMPLEMENTATION.

FOR THE AVOIDANCE OF DOUBT, THE SUPPLEMENTAL SETTLING INSURER INJUNCTION WILL NOT BE FOR THE BENEFIT OF THE NON-SETTLING INSURERS, EXCEPT TO THE EXTENT A NON-SETTLING INSURER BECOMES A SETTLING INSURER.

E. **Release by Debtor**.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, FOR GOOD AND VALUABLE CONSIDERATION, THE

4870-2885-4563, v. 2

**ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE RELEASED PARTIES AND THE SETTLING INSURERS ARE DEEMED RELEASED AND DISCHARGED BY THE DEBTOR, ITS ESTATE AND ANY PERSON SEEKING TO EXERCISE THE RIGHTS OF THE DEBTOR OR ITS ESTATE AND ITS PROPERTY (AND EACH SUCH RELEASED PARTY SHALL BE DEEMED RELEASED BY THE DEBTOR AND ITS ESTATE AND ITS RESPECTIVE PROPERTY) FROM ANY AND ALL CLAIMS RELATING TO THE DEBTOR, ITS ESTATE OR ITS AFFILIATES, THE CONDUCT OF THE DEBTOR'S BUSINESS, THE FORMULATION, PREPARATION, SOLICITATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE DISCLOSURE STATEMENT OR PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH OR PURSUANT TO THE DISCLOSURE STATEMENT, THE PLAN, THE FILING AND PROSECUTION OF THE CHAPTER 11 CASE, THE PURSUIT OF CONSUMMATION OF THE PLAN, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTOR, ITS ESTATE OR ITS AFFILIATES, ON THE ONE HAND, AND ANY RELEASED PARTY, ON THE OTHER HAND, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE BEFORE THE EFFECTIVE DATE; *PROVIDED* THAT, TO THE EXTENT THAT A CLAIM IS DETERMINED BY A FINAL ORDER TO HAVE RESULTED FROM FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT OF A RELEASED PARTY, SUCH CLAIM SHALL NOT BE SO RELEASED AGAINST SUCH RELEASED PARTY; *PROVIDED FURTHER* THAT, THE FOREGOING "DEBTOR RELEASE" SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS OF THE DEBTOR OR ITS CHAPTER 11 ESTATE AGAINST A RELEASED PARTY (OR OF A RELEASED PARTY AGAINST THE DEBTOR AND ITS CHAPTER 11 ESTATE) ARISING UNDER ANY CONTRACTUAL OBLIGATION OWED TO THE DEBTOR THAT IS ENTERED INTO OR ASSUMED PURSUANT TO THE PLAN.**

**THE DEBTOR SHALL RELEASE ALL OF SETTLING INSURERS RESPECTIVE CURRENT AND FORMER OFFICERS, DIRECTORS, PRINCIPALS, STOCKHOLDERS (AND ANY FUND MANAGERS, FIDUCIARIES OR OTHER AGENTS OF STOCKHOLDERS WITH ANY INVOLVEMENT WITH THE DEBTOR), MEMBERS, PARTNERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, MANAGEMENT COMPANIES, FUND ADVISORS AND OTHER PROFESSIONALS, SOLELY TO THE EXTENT SUCH PERSONS AND ENTITIES ACTED ON THE BEHALF OF THE RELEASED PARTIES IN CONNECTION WITH THE MATTERS AS TO WHICH EXCULPATION OR RELEASES ARE PROVIDED IN THE PLAN.**

**F.  <u>Release by Holders of Claims</u>.**

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, AND TO THE FULLEST EXTENT AUTHORIZED BY**

4870-2885-4563, v. 2

APPLICABLE LAW, THE RELEASING PARTIES SHALL BE DEEMED TO PROVIDE A FULL RELEASE TO THE RELEASED PARTIES AND THE SETTLING INSURERS AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS RELATING TO THE DEBTOR, ITS ESTATE OR ITS AFFILIATES, THE CONDUCT OF THE DEBTOR'S BUSINESS, THE FORMULATION, PREPARATION, SOLICITATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE DISCLOSURE STATEMENT OR PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH OR PURSUANT TO THE DISCLOSURE STATEMENT, THE PLAN, THE FILING AND PROSECUTION OF THE CHAPTER 11 CASE, THE PURSUIT OF CONSUMMATION OF THE PLAN, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS AMONG THE RELEASING PARTIES AND ANY RELEASED PARTY, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE BEFORE THE EFFECTIVE DATE; *PROVIDED* THAT, TO THE EXTENT THAT A CLAIM IS DETERMINED BY A FINAL ORDER TO HAVE RESULTED FROM FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT OF A RELEASED PARTY, SUCH CLAIM SHALL NOT BE SO RELEASED AGAINST SUCH RELEASED PARTY.

HOLDERS OF CLAIMS SHALL RELEASE ALL OF SETTLING INSURERS' RESPECTIVE CURRENT AND FORMER OFFICERS, DIRECTORS, PRINCIPALS, STOCKHOLDERS (AND ANY FUND MANAGERS, FIDUCIARIES OR OTHER AGENTS OF STOCKHOLDERS WITH ANY INVOLVEMENT WITH THE DEBTOR), MEMBERS, PARTNERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, MANAGEMENT COMPANIES, FUND ADVISORS AND OTHER PROFESSIONALS, SOLELY TO THE EXTENT SUCH PERSONS AND ENTITIES ACTED ON THE BEHALF OF THE RELEASED PARTIES IN CONNECTION WITH THE MATTERS AS TO WHICH EXCULPATION OR RELEASES ARE PROVIDED IN THE PLAN.

G. Exculpation; Limitation of Liability.

FROM AND AFTER THE EFFECTIVE DATE, NONE OF THE EXCULPATED PARTIES SHALL HAVE OR INCUR ANY LIABILITY FOR, AND EACH EXCULPATED PARTY SHALL BE RELEASED FROM, ANY CLAIM TO ANY OTHER EXCULPATED PARTY, TO ANY HOLDER OF A CLAIM, OR TO ANY OTHER PARTY IN INTEREST, FOR ANY ACT OR OMISSION THAT OCCURRED DURING AND IN CONNECTION WITH THIS CHAPTER 11 CASE OR IN CONNECTION WITH THE PREPARATION AND FILING OF THIS CHAPTER 11 CASE, THE FORMULATION, NEGOTIATION, OR PURSUIT OF CONFIRMATION OF A PLAN, THE CONSUMMATION OF THE PLAN, AND THE ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN, EXCEPT FOR CLAIMS ARISING FROM THE GROSS NEGLIGENCE, WILLFUL MISCONDUCT, FRAUD, OR BREACH OF THE FIDUCIARY DUTY OF LOYALTY OF ANY EXCULPATED PARTY,

IN EACH CASE SUBJECT TO DETERMINATION OF SUCH BY FINAL ORDER OF A BANKRUPTCY COURT OF COMPETENT JURISDICTION AND PROVIDED THAT ANY EXCULPATED PARTY SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL TO ITS DUTIES AND RESPONSIBILITIES (IF ANY) UNDER THE PLAN. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE TORT COMMITTEE AND THE TRADE COMMITTEE AND THE DIOCESE AND THEIR RESPECTIVE OFFICERS, BOARD AND RESPECTIVE COMMITTEE MEMBERS, EMPLOYEES, ATTORNEYS, FINANCIAL ADVISORS, AND OTHER PROFESSIONALS SHALL BE ENTITLED TO AND GRANTED BENEFITS OF SECTION 1125(E) OF THE BANKRUPTCY CODE AND THE CHANNELING INJUNCTION.

### H. Vesting of Assets in Reorganized Debtor.

Except as otherwise provided in the Plan Documents or the Trust Documents Plan, on the Effective Date, all property in the Estate, all Causes of Action, and any property acquired by the Debtor pursuant to the Plan shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances (except for Liens expressly preserved and continued under the Plan). On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its businesses and may use, acquire or dispose of property and compromise or settle any Claims or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Without limiting any of the foregoing, the Reorganized Debtor may pay the charges incurred on or after the Effective Date for Professionals' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

### I. Causes of Action.

Except as set forth otherwise herein, the Reorganized Debtor, on behalf of and for the benefit of the Debtor's estate, shall be vested with and shall retain and may enforce any and all Claims of any kind or nature whatsoever held by, through or on behalf of the Debtor and/or its Estate against any other Person, arising before the Effective Date that have not been fully resolved or disposed of prior to the Effective Date whether or not such Claims and Interests are specifically identified in the Disclosure Statement accompanying the Plan and whether or not litigation with respect to same has been commenced prior to the Effective Date.

### J. Dismissal of Adversary Proceedings and Appeal.

On the Effective Date, the Tort Committee shall dismiss with prejudice all adversary proceedings filed by the Tort Committee in the Debtor's bankruptcy case, including, but not limited to, Adv. Pro Nos. 21-01393 (JNP), 21-01394 (JNP), and 21-01493 (JNP). For the avoidance of doubt, this section 11.9 does not pertain to the Insurance Coverage Adversary Proceeding. In addition, on the Effective Date, the Tort Committee shall dismiss the appeal of the *Order Denying Motion for Derivative Standing* with prejudice.

4870-2885-4563, v. 2

# ARTICLE XXI.
## RETENTION OF JURISDICTION

Until such time as a Final Decree is entered by the Bankruptcy Court, the Bankruptcy Court shall retain jurisdiction of this Chapter 11 Case pursuant to the provisions of chapter 11 of the Bankruptcy Code to make such orders as are necessary or appropriate to carry out the provisions of the Plan, and with respect to the following matters:

(a) To enable the Plan Proponents to consummate the Plan and to resolve any disputes arising therefrom;

(b) To adjudicate all controversies concerning the classification, estimation or allowance of any Claim herein (other than Class 5 and Class 6 Claims);

(c) To determine the classification, estimation and priority of all claims against the Debtor and to re-examine any Claims (other than Class 5 and Class 6 Claims) which may have been allowed;

(d) To determine applications for the rejection or assumption of Executory Contracts or unexpired leases pursuant to the provisions of the Plan which are not determined prior to Confirmation and to determine allowance of Claims for damages with respect to rejection of any such Executory Contracts or unexpired leases within such time as the Bankruptcy Court may direct;

(e) To oversee and issue further appropriate orders respecting disbursement of amounts deposited as may be required by the Plan;

(f) To conduct hearings on valuation, as necessary, and to determine whether any party in interest is entitled to recover against any Person any Claim, whether arising under section 506(c) of the Bankruptcy Code, or arising out of a voidable preference, a fraudulent transfer, or otherwise;

(g) To hear and determine all applications for compensation and other Administrative Expense Claims;

(h) To hear and determine any and all pending adversary proceedings or contested matters, including but not limited to, the Insurance Coverage Adversary Proceeding and all claims or causes of action related thereto or arising therefrom, whether or not presently asserted in the operative complaint therein;

(i) To hear and determine any and all Claims and causes of action that belong to the Debtor or its Estate on or prior to the Effective Date, including but not limited to, such Claims and causes of action that vest in the Trust on the Effective Date pursuant to the Plan, whether or not asserted prior to the occurrence of the Effective Date, including but not limited to, all Claims and causes of action presently asserted in, or that could be asserted in, the Insurance Coverage Adversary Proceeding;

(j) To determine all causes of action which may exist in favor of the Debtor or

127

the Trust;

(k)    To determine any modification of the Plan after confirmation pursuant to section 1127 of the Bankruptcy Code;

(l)    To enter any order, including injunctions, necessary to establish and enforce the rights and powers of the Debtor, or the Trust, under the Plan;

(m)    To enter the Final Decree pursuant to Rule 3022 of the Bankruptcy Rules;

(n)    To hear and determine all controversies, suits and disputes, if any, as may arise in connection with the interpretation or enforcement of the Plan;

(o)    To hear and determine all controversies, suits and disputes, if any, as may arise with regard to orders of the Bankruptcy Court in the Chapter 11 Case entered on or before Confirmation;

(p)    To hear and determine any and all objections to payments to be made under the Plan;

(q)    To liquidate damages in connection with any disputed, contingent or unliquidated Claims;

(r)    To adjudicate all Claims to a security or ownership interest in any property of the Debtor or in any proceeds thereof;

(s)    To adjudicate all causes of action to recover all assets and properties of the Debtor or the Trust wherever located;

(t)    To enter any order, including injunctions, necessary to enforce the title, rights and powers of the Debtor and the Trust, and to impose such limitations, restrictions, terms and conditions on such title rights and powers as the Bankruptcy Court may deem necessary or appropriate;

(u)    Over matters related to the assets of the Estate or of the Trust, including the terms of the Trust, or the recovery, liquidation, or abandonment of Trust Assets;

(v)    Over conflicts and disputes among the Trust, the Reorganized Debtor and holders of Claims; and

(w)    To make such orders as are necessary or appropriate to carry out the provisions of the Plan, including but not limited to orders interpreting, or enforcing the provisions thereof.

In addition, the Bankruptcy Court shall retain jurisdiction to implement the provisions of the Plan in the manner as provided under section 1142, sub-paragraphs (a) and (b) of the Bankruptcy Code.  If the Bankruptcy Court abstains from exercising, or declines to exercise jurisdiction, or is otherwise without jurisdiction over any matter set forth in this Section, or if the

128

Plan Proponents, or their successors, elects to bring an action or proceeding in any other forum, then this Section shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court, public authority or commission having competent jurisdiction over such matters.

## ARTICLE XXII.
## BANKRUPTCY RULE 9019 REQUEST

Pursuant to Bankruptcy Rule 9019 and through the Plan, the Plan Proponents request approval of all compromises and settlements included in the Plan.

## ARTICLE XXIII.
## INCORPORATION OF CHILD PROTECTION PROTOCOLS.

The Child Protection Protocols are incorporated into and made a part of the Plan as if fully set forth herein.

## ARTICLE XXIV.
## MISCELLANEOUS PROVISIONS OF THE PLAN

### A. Amendment or Modification of the Plan.

On or before the Effective Date, the Plan or any exhibits hereto may be amended, modified, or supplemented by the Plan Proponents in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code. In addition, after the Confirmation Date, the Reorganized Debtor or Trust Administrator, as applicable, may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of the Plan. The Plan Proponents may make appropriate technical adjustments and modifications to the Plan prior to the Effective Date without further order or approval of the Bankruptcy Court.

### B. Revocation or Withdrawal of the Plan.

The Plan Proponents reserve the right to revoke or withdraw the Plan before the Confirmation Date. If the Plan Proponents revoke or withdraw the Plan before the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against the Debtor or the Trust Administrator or to prejudice in any manner the rights of the Plan Proponents or the Trust Administrator in any further proceedings.

### C. Reports.

Until a Final Decree is entered, the Debtor or the Reorganized Debtor, as the case may be, shall submit all post-Confirmation quarterly reports to the U.S. Trustee as required by the U.S. Trustee guidelines (with a copy served on the Office of the U.S. Trustee) setting forth all receipts and disbursements of the Debtor. The first report shall be filed within thirty (30) days after the end of the quarter in which the Effective Date occurs. The Reorganized Debtor shall be responsible

129

4870-2885-4563, v. 2

to request that a Final Decree be entered in this Chapter 11 Case. The Reorganized Debtor shall also be responsible for any quarterly fees due to the U.S. Trustee from and after the Effective Date until the Chapter 11 Case is closed.

### D. Severability of Plan Provisions.

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Plan Proponents, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may be altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### E. No Interest.

Except as expressly stated in the Plan, no interest, penalty or late charge is allowed or shall be paid on any Claim.

### F. Allocation of Distributions Between Principal and Interest.

To the extent that any Allowed Claim entitled to a Distribution under the Plan comprises indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid prepetition interest.

### G. Notices.

Any notices or requests by parties in interest under or in connection with the Plan shall be in writing and served either by: (i) certified mail, return receipt requested, postage prepaid, (ii) hand delivery, or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the following parties:

| IF TO THE DEBTOR: | IF TO THE TORT COMMITTEE: |
|---|---|
| TRENK ISABEL SIDDIQI & SHAHDANIAN P.C. | LOWENSTEIN SANDLER LLP |
| Richard D. Trenk, Esq. | Jeffrey D. Prol, Esq. |
| Robert S. Roglieri, Esq. | Michael A. Kaplan, Esq. |
| 290 Mt. Pleasant Avenue, Suite 2350, | Brent Weisenberg, Esq. |
| Livingston, New Jersey 07037 | One Lowenstein Drive |
| Email: rtrenk@trenkisabel.law | Roseland, NJ 07068 |
| Email: rroglieri@trenkisabel.law | Email: jprol@lowenstein.com |
| | Email: mkaplan@lowenstein.com |
| | Email: bweisenberg@lowenstein.com |

4870-2885-4563, v. 2

Formatted: No widow/orphan control

### H. **Controlling Documents.**

Notwithstanding anything to the contrary contained herein or in the Disclosure Statement, in the event and to the extent that any provision of the Plan is inconsistent with any provision of the Disclosure Statement, the provisions of the Plan shall control and take precedence. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control. In the event of any inconsistency among the Plan Documents, the Confirmation Order and any Insurance Settlement Agreement, the Insurance Settlement Agreement shall control.

### I. **Filing of Additional Documents.**

Prior to the Effective Date, the Plan Proponents may File with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan that are not inconsistent with the terms of the Plan. On or after the Effective Date, the Reorganized Debtor or the Trust Administrator may file with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate to effectuate the terms and conditions of the Plan.

### J. **Reservation of Rights.**

If the Plan is not confirmed by the Bankruptcy Court for any reason, the rights of the Debtor, the Tort Committee and all parties in interest in the Bankruptcy Case shall and will be reserved in full. Statements and provisions made in the Plan or in the Disclosure Statement are made only for the purpose(s) of the Plan. If the Plan is withdrawn, the Confirmation Order is not entered, or if the Effective Date does not occur, no Person shall be bound by or deemed prejudiced by any such statement or provision.

### K. **Computation of Time.**

In computing any period of time prescribed or allowed by the Plan, unless otherwise specifically designated herein, the provisions of Bankruptcy Rule 9006(a) shall apply.

### L. **Successors and Assigns.**

The rights, duties and obligations of any Person named or referred to in the Plan, including all Creditors, shall be binding on, and shall inure to the benefit of, the successors and assigns of such Person.

### M. **Waiver of Subordination.**

Notwithstanding any provision of the Plan to the contrary, all holders of Claims shall be deemed to have waived any and all contractual subordination rights to which they may have with respect to the distributions made pursuant to the Plan and the Confirmation Order shall permanently enjoin, effective as of the Effective Date, all holders of Claims from enforcing or attempting to enforce any such rights against any Person receiving distributions under the Plan.

4870-2885-4563, v. 2

**N.  Post-Effective Date Professional Fees.**

The reasonable fees and actual and necessary expenses incurred after the Effective Date by professionals for the Reorganized Debtor shall be paid by the Reorganized Debtor upon the submission of an invoice to the Reorganized Debtor without the need for further notice to any Person or approval by the Bankruptcy Court.

**O.  Governing Law.**

Unless a rule of law or procedure is supplied by federal law, including the Bankruptcy Code and Bankruptcy Rules, (a) the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan and (b) governance matters shall be governed by the laws of the State of New Jersey, without giving effect to the principles of conflict of law thereof.

**P.  Headings.**

Headings are used in the Plan for convenience and reference only and shall not constitute a part of the Plan for any other purpose.

**Q.  No Admissions.**

Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed an admission by any entity with respect to any matter set forth herein.

**ARTICLE XXV.**
**RISK FACTORS/TAX CONSEQUENCES**

**HOLDERS OF CLAIMS AGAINST THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR INCORPORATED BY REFERENCE, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTOR'S ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE MATERIALLY DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTOR UNDERTAKES NO OBLIGATION TO UPDATE ANY SUCH STATEMENT.**

**A.  Tax Consequences of Plan**

| CIRCULAR 230 DISCLAIMER |
| --- |
| **To ensure compliance with requirements imposed by the Internal Revenue Service (the "IRS"), the Debtor informs all creditors that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and** |

4870-2885-4563, v. 2

cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or tax-related matter(s) addressed herein.

**CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS**. The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers to possible tax issues the Plan may present to Debtor. The Plan Proponents CANNOT and DO NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Tax Code embodies many complicated rules which make it difficult to state completely and accurately all the tax implications of any action.

Confirmation may have federal income tax consequences for the Debtor and Holders of Claims. The Plan Proponents have not obtained and do not intend to request a ruling from the Internal Revenue Service, nor have the Plan Proponents obtained an opinion of counsel with respect to any tax matters. Any federal income tax matters raised by Confirmation of the Plan are governed by the Internal Revenue Code and the regulations promulgated thereunder. The following is intended to be a summary only and not a substitute for careful tax planning with a tax professional. The federal, state and local tax consequences of the Plan may be complex in some circumstances and, in some cases, uncertain. Accordingly, each Holder of a Claim is strongly urged to consult with his or her own tax advisor regarding the federal, state, local and foreign tax consequences of the Plan.

B. **Bankruptcy Risk Factors**

The following discussion is intended to be a non-exclusive summary of certain risks attendant upon the consummation of the Plan. You are encouraged to supplement this summary with your own analysis and evaluation of the Plan and Disclosure Statement, in their entirety, and in consultation with your own advisors. Based on the analysis of the risks summarized below, the Debtor believes that the Plan is viable and will meet all requirements of confirmation.

Any entity emerging from Chapter 11 faces risks. In particular, the Debtor herein faces the following risks: (i) the Diocese will need its parishioners and others to continue to support its mission and programs; and (ii) the general economic conditions of the Diocese territory may have a financial and service impact on its revenues and program needs.

a. **Risk of Non-Confirmation of the Plan**

Although the Plan Proponents believe that the Plan satisfies all legal requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will confirm the Plan as proposed. There can also be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate a solicitation of votes to accept or reject the Plan. If the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Case will continue rather than be dismissed. The Bankruptcy Court, which sits as a court of equity, may exercise substantial discretion with respect to the affairs of the Debtor during the Chapter 11 Case. Section 1129 of the Bankruptcy Code sets

forth the requirements for confirmation of a plan and requires, among other things, that the value of distributions to dissenting creditors not be less than the value of distributions such creditors and shareholders would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. Although the Plan Proponents believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The Debtor could experience material adverse changes in its liquidity as a result of such delay and increased administrative fees and expenses. Further, since Chapter 7 is not an option, a dismissal will restart the "race to the courthouse" for Abuse Claimants. In addition, the Diocese reserves the right to dismiss its Chapter 11 case. Such dismissal will jeopardize recoveries by many claimants.

b. **The Debtor May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, the Plan Proponents reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive their expected share of the estimated distributions described in this Disclosure Statement.

c. **Risk of Additional or Larger Claims**

The Disclosure Statement and its attached exhibits necessarily include estimates, including estimates of future events. These estimates include, but are not limited to, estimates of future income and expenses, estimates as to the total amount of Claims that will be asserted against the Debtor and the outcome of Disputed Claims. The Plan Proponents believe that the estimates presented are reasonable and appropriate under the circumstances. Nevertheless, there is a risk that unforeseen future events may cause one or more of these estimates to be materially inaccurate. Among the potential risks is that additional Administrative Expense Claims may be asserted, that Disputed Claims may be resolved at higher amounts than expected or that the resolution of such Claims may require the expenditure of unanticipated professional fees. If one or more of these estimates proves to be inaccurate, the amount of funds available for Distribution pursuant to the Plan may be reduced.

d. **Other Parties in Interest Might be Permitted to Propose Alternative Plans of Reorganization**

Under the Bankruptcy Code, a debtor in possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization. However, such exclusivity period can be reduced or terminated upon order of the Bankruptcy Court, or it may expire under the applicable provisions of the Bankruptcy Code. If such an order were to be entered or such expiration were to occur, other parties in interest would then have the opportunity to propose alternative plans of reorganization.

If other parties in interest were to propose an alternative plan of reorganization following expiration or termination of the Debtor's exclusivity period, such a plan may be less favorable to the Debtor, its Estate, and its stakeholders. In addition, if there were competing plans of reorganization, the Chapter 11 Cases would likely become longer, more complicated, and more

134

expensive, thereby reducing recoveries to holders of Claims.

e. **Non-Consensual Confirmation**

If any Impaired Class of Claims does not accept or is deemed not to accept a plan of reorganization, a Bankruptcy Court may nevertheless confirm such plan at the proponent's request if at least one Impaired Class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. If any Class votes to reject or is deemed to reject the Plan, then these requirements must be satisfied with respect to such rejecting Class. The Debtor believes that the Plan satisfies these requirements.

f. **Parties in Interest May Object to the Debtor's Classification of Claims**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if the claim or interest is substantially similar to the other claims or interests in that class. Parties in interest may object to the classification of certain claims and interests both on the grounds that certain claims and interests have been improperly placed in the same Class and/or that certain claims have been improperly placed in different Classes. The Plan Proponents believe that the classification of Claims under the Plan complies with the requirements of the Bankruptcy Code because the Classes established under the Plan each encompass Claims that are substantially similar to similarly classified Claims. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Parties in interest may object to the classification of certain Claims both on grounds that certain Claims have been improperly placed in the same Class and/or that certain Claims and Interests have been improperly placed in different Classes.

g. **The Recovery to Holders of Allowed Claims and Abuse Claims Cannot be Provided with Absolute Certainty**

Due to the inherent uncertainties associated with projecting financial results, litigation outcomes, and the projected of number and amount of Abuse Claims that will be liquidated pursuant to the Trust Distribution Procedures, the projections contained in this Disclosure Statement should not be considered assurances or guarantees of the amount of Claims that may be allowed in the various Classes or amounts that will be paid by the Trust on account of Abuse Claims. While the Debtor believes that the projections and estimates contained in this Disclosure Statement are reasonable, including with respect to the number and valuation range related to Abuse Claims, certain parties, such as the Tort Committee, have indicated that they believe that the projected number and value of the Abuse Claims is much higher than the Debtor has projected. To the extent that Claims, including Abuse Claims, are allowed at numbers or amounts that are higher than the total projected number or valuation ranges for each Class, distributions/recoveries to holders of Claims, including Abuse Claim may be lower, and there can be no assurance that the distributions/recoveries set forth in the projections in the Disclosure Statement will be realized. Also, because the Liquidation Analysis, distribution projections, and other information contained herein and attached hereto are estimates only, the timing and amount of actual distributions to holders of Allowed Claims and Abuse Claims satisfied by the Trust in accordance with the Trust

135

4870-2885-4563, v. 2

Distribution Procedures, if applicable, may be affected by many factors that cannot be predicted.

### h.  **Distributions Under the Trust Distribution Procedures**

Abuse Claims, including Unknown Abuse Claims, will be resolved pursuant to the Trust Agreement, and their treatment will be based upon, among other things, estimates of the number, types, and amount of Abuse Claims, the value of the assets of the Trust, the liquidity of the Trust, the Trust's expected future income and expenses, and other matters. There can be no certainty as to the precise amounts that will be distributed by the Trust in any particular time period or when Abuse Claims will be resolved by the Trust. In addition, the Plan Proponents believe that the insurance assignment provided for in the Plan represents a valuable asset of the Trust. The Plan Proponents cannot, at this time, predict the value of the insurance assignment. The Trust is being assigned the insurance proceeds of the Debtor. The sole cost of litigating these claims will be borne by the Trust. This may affect the timing and value of the distributions made from the Trust to Abuse Claims.

### i.  **Amendment of Plan Prior to Confirmation by the Debtor**

The Plan Proponents, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan or waive any conditions thereto if and to the extent necessary or desirable for confirmation. The potential impact of any such amendment or waiver on holders of Claims cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.

### j.  **Financial Projections**

The Debtor has prepared financial projections based on certain assumptions, as set forth herein. The projections have not been compiled, audited, or examined by independent accountants, and neither the Debtor nor its advisors make any representations or warranties regarding the accuracy of the projections or the ability to achieve forecasted results.

Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Debtor, including the timing, Confirmation, and consummation of the Plan. Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results. Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant economic, and operational risks, and the assumptions underlying the projections may be inaccurate in material respects. In addition, unanticipated events and circumstances occurring after the approval of this Disclosure Statement by the Bankruptcy Court including any natural disasters, terrorist attacks, or health epidemics may affect the actual financial results achieved. Such results may vary significantly from the forecasts and such variations may be material. The Debtor's projections reflect expectations of continued donor support. However, the Debtor cannot state with certainty that such donation programs will achieve their targeted results.

### k.  **Potential Settlements**

The Plan Proponents have been in negotiations with certain mediation parties in hopes of

4870-2885-4563, v. 2

resolving certain controversies related to the structure of the Plan and the level of contribution by the Insurers, which may result in additional settlements pursuant to Bankruptcy Rule 9019 and may be included in the Plan. If a Settlement Agreement is reached, the Plan may be modified prior to the Confirmation Hearing to incorporate any number of resolutions. The potential impact of any such settlements or resolutions on holders of Claims cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.

However, certain parties may object to such settlements, including with respect to the contribution amounts in such settlements. Additionally, there can be no assurance the Bankruptcy Court will approve the Plan, including such settlements over objections. If the settlements are not approved, the amounts will not be contributed to the Trust.

Moreover, if the Plan Proponents reach settlements with Insurers, such insurers will provide contributions to the Trust in order to be treated as a "Settling Insurer" under the Plan. It is likely that such settlements may involve the sale of insurance policies issued by such insurance company back to such insurance company in exchange for a contribution to the Trust.

### l.    **Insurance Contributions**

If the Plan Proponents are unable to reach a settlement with the Insurers, there is a risk that the Trust may not realize contributions from Insurers, or that the Trust's efforts to realize recoveries on account of the insurance coverage will be the subject of litigation that is expensive and time consuming and in which Insurers could raise meritorious coverage defenses that may reduce the amount of coverage available under the respective insurance policy.

### m.    **Insurance Coverage Actions**

In accordance with the Plan, the Debtor will contribute to the Trust, among other things, rights to its insurance policies (but not the policies themselves), which includes the pending Insurance Coverage Adversary Proceeding. It is not currently known whether the Insurance Coverage Adversary Proceeding will result in a favorable outcome for the Trust. Even if a favorable outcome is realized, the amounts awarded and the costs associated with pursuing such litigation cannot be determined at this time. Therefore, the ultimate value of the Insurance Action being contributed to the Trust is unknown.

### n.    **Insurance Coverage Risks**

The Insurers have reserved rights to contest various Abuse Claims tendered to them based on various coverage defenses. While the Plan Proponents believe these defenses have no merit and are working to resolve these disputes, to the extent any of these defenses prevail, rights to payment with respect to such insurance policies related to Abuse Claims could be reduced or barred entirely.

Additionally, the obligation to pay certain deductibles or self-insured retentions under certain insurance policies is disputed.  The Debtor may not be able to pay the deductibles or self-insured retentions.  This could affect payments from the Insurers and whether the Debtor can access excess policy limits.

4870-2885-4563, v. 2

Any of the forgoing disputes could potentially reduce or eliminate the right to payment under certain insurance policies. Moreover, defenses, disputes, and other relevant circumstances could arise that could potentially reduce or eliminate the right to payment under certain insurance policies.

o.    **Insurance Assignment Risks**

Pursuant to the Plan, the insurance rights of the Debtor, including the Other Catholic Entities, under their insurance policies will be assigned and transferred to the Trust to be used to satisfy Abuse Claims in accordance with the Trust Distribution Procedures. Certain parties in interest, including certain of the Insurers, contest the ability of the Debtor to assign those rights under these insurance policies to the Trust without insurer consent. To the extent that such assignment is not allowed, the assets contributed to the Trust to satisfy Abuse Claims will be reduced or insurance coverage may be voided by the assignment.

p.    **Failure to Obtain Approval of Releases, Injunctions, and Exculpation, Including the Channeling Injunction**

The Plan provides for certain Releases, Injunctions (including the Channeling Injunction), and exculpations, including third-party releases that may otherwise be asserted against the Debtor, the Reorganized Debtor, the Released Parties and their respective related parties, or Covered Parties, as applicable. The Releases, Injunctions, and exculpations (including, the Channeling Injunction) provided in the Plan are subject to objection by parties in interest and may not be approved.

In the Third Circuit, non-consensual third-party releases are permissible if they satisfy the Continental hallmarks of "fairness and necessity to the reorganization," which must be supported by specific factual findings. In re Millennium Lab Holdings II, LLC, 575 B.R. 252, 272 (Bankr. D. Del. 2017) (citing Gillman v. Cont'l Airlines (In re Cont'l Airlines), 203 F.3d 203, 214 (3d Cir. 2000)). In determining whether such a release satisfies this standard, courts apply the Master Mortgage factors: (1) an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (2) substantial contribution by the non-debtor of assets to the reorganization; (3) the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success; (4) an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes 'overwhelmingly' votes to accept the plan; and (5) provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction. Id. (quoting In re Zenith Elecs. Corp., 241 B.R. 92, 110 (Bankr. D. Del. 1999)). "These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the Bankruptcy Court's determination of fairness." In re Washington Mut. Inc., 442 B.R. 314, 346 (Bankr. D. Del. 2011).

If the Releases are not approved, including the non-consensual third-party releases, certain parties may not be considered Released Parties or Covered Parties, and certain of these parties could withdraw their support for the Plan and/or contributions to the Trust based on the Plan's failure, absent such releases, to release and enjoin claims against such parties.

138

q.  **The Channeling Injunction**

The Channeling Injunction, which, among other things, bars the assertion of any Abuse Claims against the Covered Parties, is a necessary element of the Plan. Although the Plan, the Trust Agreement, and the Trust Distribution Procedures all have been drafted with the intention of complying with the Bankruptcy Code, there is no guarantee that the validity and enforceability of the Channeling Injunction or the application of the Channeling Injunction to Abuse Claims will not be challenged, either before or after Confirmation of the Plan. While the Plan Proponents believe that the Plan satisfies the requirements of the Bankruptcy Code, certain objections might be lodged on grounds that the requirements of the Bankruptcy Code cannot be met given the unique facts of the Chapter 11 Cases. At this juncture, the Plan Proponents believe that the Plan provides a sufficient basis for the issuance of the Channeling Injunction under section 105(a) of the Bankruptcy Code.

r.  **Voting Requirements**

If sufficient votes are not received, the Plan Proponents may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims and Abuse Claims satisfied by the Trust in accordance with the Trust Distribution Procedures as those proposed in the Plan.

s.  **Time Risk**

There is a material risk that failure to emerge from the Chapter 11 Case in a timely manner could endanger the future of the Diocese. In order to rebuild trust of its congregants, the Debtor must emerge from the cloud of this Chapter 11 Case. If the support of the Diocese's community is substantially reduced from projections, the Diocese could lack the means to meet their operational needs or otherwise emerge from bankruptcy. Timely emergence from Chapter 11 is essential to the Debtor's ability to maintain its operations and mission.

Substantial professional fees will continue to accrue until a plan is confirmed and becomes effective. At this time, the Debtor's bankruptcy estate bears the burden for the fees of the professionals and advisors to the Debtor, the Tort Committee, and the Trade Committee.  In addition, the Debtor is required to pay the fees of its lender, PNC Bank.  The length of the case also requires continued fees for the United States Trustee.  Such fees are substantial. To date the Debtor has incurred more than $7 million in professional fees related to this restructuring. By the end of December 2021, the Debtor estimates the professional fees in the Chapter 11 Cases will equal or exceed $10 million. Each successive month costs the estate approximately $1 million or more. The Debtor believes this is wholly inappropriate for a non-profit chapter 11 proceeding and seeks to emerge from bankruptcy as soon as possible to stop the accrual of additional professional fees. The potential for protracted litigation with insurance companies is great and will cause increased costs and expenses to the Debtor, including with respect to professional fees. If such litigation ensues, there is a material risk that professional fees could be much higher than the Debtor anticipates or is able to pay.

139

**t.    Parties in Interest May Object to the Plan Based on Section 1129(a)(7) of the Bankruptcy Code**

The Debtor may need to satisfy the "best interests of creditors" test, embodied in section 1129(a)(7) of the Bankruptcy Code. As a threshold matter, the Debtor does not believe the best interests test applies to non-profit organizations such as the Debtor in light of the restrictions on the forced sale of a non-profit's assets under the Bankruptcy Code and applicable state law. If the Bankruptcy Court disagrees with this position, then the best interests test should apply only with respect to recoveries of claimants on account of their claims against the Debtor in a hypothetical liquidation of the Debtor. However, to the extent the Bankruptcy Court determines that the Plan must satisfy the best interests test, the Debtor will be prepared at confirmation to address those standards, including through the Liquidation Analysis, which shows that the Debtor satisfies the test, and/or through other expert testimony related to whether holders of Impaired Claims will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive in a liquidation under chapter 7. If the Bankruptcy Court determines that the Plan does not satisfy the requirements of the best interests test, to the extent it applies, the Plan may not be Confirmed or may only be Confirmed with modifications, including potential modifications to the nonconsensual third party releases included in the Plan. If the Plan cannot be Confirmed because of this issue, the Debtor's options going forward may be limited to: (1) reaching agreement on a fully consensual plan; (2) satisfying the best interest of creditors test; and (3) voluntary or involuntary dismissal.

**u.    Historical Financial Information of the Debtor**

As a result of the consummation of the Plan and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtor from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtor's historical financial statements.

**C.    Other Factors**

**a.    Plan Proponents Could Withdraw the Plan**

Subject to, and without prejudice to, the rights of any party in interest, the Plan may be revoked or withdrawn before the Confirmation Date by the Plan Proponents.

**b.    Plan Proponents Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Plan Proponents as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. Additionally, the Plan Proponents have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

**c.    No Representations Outside this Disclosure Statement Are Authorized**

No representations concerning or related to the Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this

140

4870-2885-4563, v. 2

Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

4870-2885-4563, v. 2

### d.  <u>No Legal or Tax Advice Is Provided by this Disclosure Statement</u>

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim should consult its own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest. This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

### e.  <u>No Admission Made</u>

Nothing contained herein or in the Plan shall constitute an admission of, or shall be deemed evidence of, the tax or other legal effects of the Plan on the Debtor or holders of Claims or Interests.

### ARTICLE XXVI.
### <u>FEASIBILITY OF THE PLAN</u>

As a condition to Confirmation, section 1129(a)(11) of the Bankruptcy Code involves the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of Debtor or any successor to Debtor under the Plan.

There are at least two important aspects of a feasibility analysis.  The first aspect considers whether Debtor will have enough cash on hand on the Effective Date of the Plan to pay all the claims and expenses that are entitled to be paid on such date.  The Debtor maintains that this aspect of feasibility is satisfied as illustrated here, based upon the value of the Debtor's assets.

The second aspect considers whether the Debtor will have enough cash over the life of the Plan to make the required Plan payments.  The Debtor believes that this second aspect of the feasibility requirement is met based on the work in progress and historical performance.  A copy of the Debtor's projections is annexed hereto as **<u>Exhibit B</u>**.  Accordingly, the Debtor believes, on the basis of the foregoing, that the Plan is feasible.

ALTHOUGH EVERY EFFORT WAS MADE TO BE ACCURATE, THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTS OR IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPALS IN THE UNITED STATES, THE FINANCIAL ACCOUNTING STANDARDS BOARD, OR THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION REGARDING PROJECTIONS. FURTHERMORE, NEITHER THE DEBTOR'S ACCOUNTANTS, NOR ANY OTHER ACCOUNTANTS, HAVE COMPILED, EXAMINED, OR PERFORMED ANY PROCEDURES WITH RESPECT TO THE PROJECTIONS CONTAINED HEREIN, NOR HAVE THEY EXPRESSED ANY OPINION OR ANY OTHER FORM OF ASSURANCE ON SUCH INFORMATION OR ITS ACHIEVABILITY, AND ASSUME NO RESPONSIBILITY FOR, AND DISCLAIM ANY ASSOCIATION WITH, THE PROSPECTIVE FINANCIAL INFORMATION. WHILE PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED ON A VARIETY OF ASSUMPTIONS, WHICH MAY NOT BE REALIZED, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND

4870-2885-4563, v. 2

CONTINGENCIES, WHICH ARE BEYOND THE CONTROL OF THE DEBTOR. CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTOR, OR ANY OTHER PERSON, THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS. HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATION AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS IN REACHING THEIR DETERMINATIONS OF WHETHER TO ACCEPT OR REJECT THE PLAN. THE DEBTOR'S FINANCIAL ADVISORS HAVE NOT EXPRESSED AN OPINION ON OR MADE A REPRESENTATION REGARDING THE ACHIEVABILITY OF THE FINANCIAL PROJECTIONS.

## ARTICLE XXVII.
### BEST INTERESTS TEST

Another confirmation requirement is the "Best Interest Test," which requires a liquidation analysis. Under the Best Interest Test, if a claimant is in an impaired class and that claimant does not vote to accept the Plan, then that claimant must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if the Debtor's assets were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, the Debtor's assets are usually sold by a Chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien. Administrative claims are paid next. Next, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims.

In order for the Bankruptcy Court to be able to confirm the Plan, the Bankruptcy Court must find that all creditors who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a Chapter 7 liquidation. The Debtor maintains that this requirement is met here for the following reasons:

Conversion of the case to Chapter 7 is not available because the Diocese is a nonprofit religious corporation. 11 U.S.C. § 303(a). Therefore, the only remedy available would be dismissal under 11 U.S.C. § 1112. If dismissal occurred, the "race to the courthouse" would ensue. In such event, it is highly likely that many creditors would be treated unfairly and inequitably because the first creditor(s) to obtain judgments would likely substantially deplete the available assets. In addition, the resources needed to adjudicate the claims would be substantial.

As such, the Debtor believes that secured, priority unsecured, and general unsecured creditors are better off by implementation of the Chapter 11 Plan of Reorganization, as opposed to dismissal of the case. A copy of the Debtor's liquidation analysis is annexed hereto as **Exhibit E**.

## ARTICLE XXVIII.
### PLAN PROPONENTS' RECOMMENDATION

THE PLAN PROPONENTS RECOMMEND THAT ALL STAKEHOLDERS VOTE TO "ACCEPT" THE PLAN. THE PLAN PROPONENTS BELIEVE THAT

4870-2885-4563, v. 2

CONFIRMATION OF THE PLAN IS PREFERABLE TO ANY OF THE ALTERNATIVES DESCRIBED ABOVE AND THAT THE PLAN IS DESIGNED TO PROVIDE GREATER RECOVERIES THAN THOSE AVAILABLE IN ANY OTHER FORM OF LIQUIDATION. ANY OTHER ALTERNATIVE WOULD CAUSE SIGNIFICANT DELAY AND UNCERTAINTY, AS WELL AS ADDITIONAL ADMINISTRATIVE COSTS.

3.

Dated:  May 2, 2022                        THE DIOCESE OF CAMDEN, NEW JERSEY

By: *Reverend Robert E. Hughes*
Reverend Robert E. Hughes,
Vicar General

and

Dated:  May 2, 2022                        TRENK ISABEL SIDDIQI
& SHAHDANIAN P.C.

*/s/ Richard D. Trenk*
Richard D. Trenk, Esq.
Robert S. Roglieri, Esq.
290 W. Mt. Pleasant Ave., Suite 2350
Livingston, New Jersey 07039
Telephone:  (973) 533-1000
Email:  rtrenk@trenkisabel.law
Email:  rroglieri@trenkisabel.law

*Counsel to The Diocese of Camden, New Jersey, Chapter 11 Debtor and Debtor-in-Possession*

ARTICLE XXIV.
TRADE COMMITTEE'S RECOMMENDATION

AS SET FORTH IN DETAIL IN THE TRADE COMMITTEE STATEMENT CIRCULATED HEREWITH, THE TRADE COMMITTEE RECOMMENDS THAT CLASS 3 CLAIMANTS VOTE TO "ACCEPT" THE PLAN. THE TRADE COMMITTEE BELIEVES THAT TREATMENT OF CLASS 3 CLAIMANTS UNDER THE PLAN IS FAIR AND EQUITABLE.

Dated: June 1, 2022                        Dated: June 1, 2022

THE DIOCESE OF CAMDEN,                      THE OFFICIAL COMMITTEE OF
NEW JERSEY                                  TORT CLAIMANT CREDITORS

By:  /s/ Rev. Robert E. Hughes             By:  /s/ John Collins

144

4870-2885-4563, v. 2

Reverend Robert E. Hughes,
Vicar General/Vice President

John Collins
*Co-Chairperson*

Dated: June 1, 2022

Dated: June 1, 2022

**TRENK ISABEL SIDDIQI &
SHAHDANIAN P.C.**

**LOWENSTEIN SANDLER LLP**

By: */s/ Richard D. Trenk*
Richard D. Trenk, Esq.
Robert S. Roglieri, Esq.

By: */s/ Jeffrey Prol*
Jeffrey Prol, Esq.
Michael Kaplan, Esq.
Brent Weisenberg, Esq.

*Counsel to The Diocese of Camden, New
Jersey*

*Counsel to the Official Committee
of Tort Claimant Creditors*

145