FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>DIOCESE OF CAMDEN, NEW JERSEY,<br><br>Debtor. | Case No. 20-21257 (JNP)<br><br>Chapter 11 |

## MEMORANDUM DECISION DENYING MOTION
## TO APPROVE SETTLEMENT

**JERROLD N. POSLUSNY, JR., U.S. Bankruptcy Judge**

In January 2022, the Diocese of Camden, New Jersey (the "Debtor"), and certain insurers[1] reached a settlement (as amended, the "Insurance Settlement"), and the Debtor filed a motion for approval of the Insurance Settlement (as amended, the "Insurance Motion"). The Official Committee of Tort Claimant Creditors (the "Committee") opposes the Insurance Motion, and eventually filed a motion seeking a directed verdict denying the Insurance Motion (the "Motion for Judgment"). The Motion for Judgment was not fully briefed until after a joint trial to consider the Insurance Motion and the Debtor's and the Committee's jointly proposed Eighth Amended Plan (which is the subject of a separate opinion issued contemporaneously with this decision). For the reasons discussed below, the Court will deny the Motion for Judgment, but will also deny the Insurance Motion.[2]

### Jurisdiction

---

[1] These include Certain Underwriters at Lloyd's, London and Certain London Market Companies ("LMI"); Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America, Federal Insurance Company and Illinois Union Insurance Company ("Century"); Interstate Fire & Casualty Company ("Interstate"); Granite State Insurance Company, Lexington Insurance Company, and National Union Fire Insurance Company of Pittsburgh PA ("AIG"); and The National Catholic Risk Retention Group, Inc. ("Catholic Risk") (collectively, the "Insurers" and, together with the Debtor, (the "Movants").

[2] Individual exhibits are referred to as "PP" "JX" "LMI" or "IC" then followed by the exhibit number. Transcripts of hearings are referred to by the date and time of the trial, e.g. "Oct. 7 pm Transcript, Page No., Line No."

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1), and the Standing Order of the United States District Court dated July 10, 1984, as amended September 18, 2012. Venue is proper in this Court pursuant to 28 U.S.C. § 1408. Consideration of the motions constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (M), (N), and (O).

## Background

The Debtor is an ecclesiastical district within the Catholic Church comprised of the southern six counties of New Jersey – Camden, Gloucester, Atlantic, Cape May, Cumberland, and Salem counties. PP-0266 ¶ 25. The Diocese encompasses approximately 480,000 Catholics across 62 Parishes. Id. ¶¶ 25, 27, 55. There are four Missions and twenty-eight schools within the Debtor's district. Id. ¶¶ 58, 63-65. One of the missions and three of the high schools are affiliated with the Debtor but are separately incorporated. Id. ¶¶ 58, 65.

### A. History of Abuse

In 2002 both civil and church authorities recognized that the historic abuse and exploitation of minor children by priests was a serious problem that needed to be addressed to prevent such conduct from happening in the future. PP-0266 ¶ 46. The Debtor took steps, including entering into compacts with county prosecutors and the New Jersey Attorney General (the "2002 Memorandum of Understanding"), requiring fingerprint-facilitated criminal history background checks for every adult employee having regular contact with minors, and implementing zero tolerance policies regarding sexual abuse. Id. ¶ 7. In accordance with the 2002 Memorandum of Understanding, the Debtor reports every allegation of abuse of a minor by Diocesan priests to law enforcement authorities. Id. ¶ 48. The Debtor publicly released the names of 56 priests (which was reduced to 55 priests after further review) and one deacon of the Debtor who were credibly accused of abusing minors prior to the Petition Date. Id. ¶ 33. The Debtor offers therapeutic care to anyone who comes forward as a survivor of sexual abuse, amounting to an initial twenty-five counseling

sessions per survivor with the option to request additional sessions after a panel of psychologists reviews the survivor's case to determine if more sessions are warranted. Nov. 9 Transcript, 63:21-64:11. The Debtor has paid nearly $1 million to provide these services to date. Id. at 64:1-14.

From 1990 to 2019, the Debtor reached 99 settlements with abuse survivors totaling approximately $10,12 million. PP-0266 ¶ 36.

In December 2019, the State of New Jersey passed the New Jersey Child Victims Act (the "CVA"), which reopened the statute of limitations related to claims of child sexual abuse, allowing previously time-barred claims of this nature to be brought for a two-year period from the passage of the CVA, through November 30, 2021, as well as expanding the statute of limitations for any such claims which were not time barred as of the date of enactment. Oct. 6 pm Transcript, 67-68; N.J.S.A. § 2A:14-2a.

### B. The IVCP

Prior to the passage of the CVA, on June 15, 2019, the Debtor along with the other dioceses in New Jersey, established the Independent Victims Compensation Program ("IVCP"), a voluntary out of court settlement program in which the Debtor participated through July 31, 2020, to settle claims of this nature. LMI-1056 ("Eighth Amended Disclosure Statement") at 36. The IVCP was administered by two independent experts, Kenneth Feinberg and Camille Biros, (collectively the "IVCP Administrators"), who would review and evaluate claims using the following chart to determine compensation under the IVCP:

| IVCP SETTLEMENT COMPENSATION SUMMARY | | |
|---|---|---|
| Category | Description of Abuse | Range of Compensation |
| Category I | Sex talk, no physical touching | $0 - $25,000 |
| Category II | Nudity/Pornography – no physical touching | $25,000 - $50,000 |
| Category III | Fondling over clothes | $50,000 - $100,000 |
| Category IV | Fondling under clothes | $100,000 - $150,000 |
| Category V | Masturbation | $150,000 - $200,000 |
| Category VI | Oral sex | $200,000 - $350,000 |
| Category VII | Penetration | $350,000 - $500000 |

LMI-1056, at 80; PP-0065-A. Claims were reviewed, and the IVCP Administrators met with the claimants individually, making adjustments to the claim amounts as appropriate. Oct. 17 pm Transcript, 67:9-11. The Debtor resolved a total of 71 claims through the IVCP, with an average settlement amount of $114,000 for a total of $8,102,500. LMI-1056, at 36. Approximately fourteen of the 71 claims were resolved after the CVA became effective, and there is no evidence as to whether any of the settling claimants were represented by counsel. Oct. 17 am Transcript (corrected), 106:25-107:3. These settlements were entered into and paid without the Debtor seeking any compensation from its Insurers. Oct. 17 pm Transcript, 101:17-20.

### C.  The Insurance Policies

Since at least 1969, the Debtor has maintained an insurance program for itself, parishes, schools, cemeteries, and other Catholic entities located within the Diocese ("OCE").[3] JX-0001-0047; see also Dkt. No. 1087 ¶ 8. This included maintaining multiple liability insurance policies (the "Policies") issued by the Insurers, as well as its own self-insured retentions ("SIRs"). Id. Although these policies have different terms and cover different time frames, most of them require the Debtor to maintain SIRs. Oct. 7 Transcript (corrected), 23:22-24; 33:13-18. Some of the Policies contain clauses which permit or require the Insurers to be involved in the defense of any claim against the Debtor that implicates the Policies. Id. 158:10-15.

The Policies are property of the Estate and therefore are subject to the exclusive core jurisdiction of this Court. The sale of the Policies to fund the Plan in this case is within the Court's core jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(N). The Court has jurisdiction over the interests in the Policies (including the Channeled Claims against the Diocese Parties) because the Policies are being sold. 11 U.S.C. §§ 363(e) and (f), 1123(a)(5)(D) and 1123(b)(4) and (5); 28 U.S.C. § 157(b)(2)(L), (N) and (O).

---

[3] The OCE include parishes, schools, and other entities listed in Attachment D to Dkt. No. 1144.

4

D. <u>The Bankruptcy</u>

The Debtor filed for protection under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on October 1, 2020 (the "Petition Date"), due in-part, to potential liability it faced for claims from sexual abuse survivors (the "Survivor Claims"). LMI-0013, at 1. A total of 324 Survivor Claims were filed in the Debtor's case (the "Bankruptcy Case"). <u>Oct. 17 pm Transcript</u>, 77:7-9. Shortly after the Petition Date, the Debtor filed an adversary proceeding naming the Insurers as defendants (the "Insurance Action"), seeking declaratory relief including a determination that the Policies imposed a contractual obligation for the Insurers to provide coverage for any Survivor Claims. Adv. Pro. No. 20-1573, Dkt. No. 1. An order appointing the Honorable Jose L. Linares (Ret.) as mediator and referring the Bankruptcy Case and related adversary proceedings to global mediation was entered on May 20, 2021. Dkt. No. 640. There were many mediation sessions held with the Insurers, the Committee, and the Debtor, over several months until the Debtor and the Insurers reached the Insurance Settlement. The Debtor filed the Insurance Motion on January 5, 2022. Dkt. No. 1087 at 9. Later, the Debtor filed the supplement to the Insurance Motion, to reflect that the Insurers had increased the settlement amount to $30 million, making the entire amount to be paid towards Survivor Claims $90 million. Dkt. No. 1144.

E. <u>The Insurance Settlement</u>

The Insurance Motion was filed pursuant to Federal Rule of Bankruptcy Procedure ("Rule") 9019 and section 363(f) the Bankruptcy Code seeking approval of the Insurance Settlement and the sale the Policies back to the Insurers. Dkt. Nos. 1087 and 1144. The Insurance Settlement is between the Debtor and the OCE on one hand and the Insurers on the other. LMI-0023. The Insurance Settlement provides that the Insurers will pay $30 million (the "Settlement Amount") which would be paid to a trust (the "Plan Trust"), that was to be established as part of a Chapter 11 plan of reorganization (the "Fifth Amended Plan") to satisfy the Survivor Claims. <u>Id.</u>;

5

LMI-0013. Half of the Settlement Amount is treated as the purchase price to allow the Insurers to repurchase the Policies from the Debtor as well as any rights in the Policies held by OCE. See id. at 5, 8, 18-20, 22. The other half is treated as consideration for a channeling injunction, which would funnel any future claims related to abuse to the Plan Trust and an injunction, preventing any such potential claimants from pursuing the Insurers for those claims. Id. It is one settlement with each Insurer having several (but not joint) liability. See LMI-0023. A trial date of April 6, 2022 (the "Original Trial Date"), was set to consider the Insurance Motion. Dkt. No. 1219. This was later adjourned to April 19, 2022. Dkt. No. 1360.

All parties conducted extensive discovery related to the Insurance Motion and there were multiple discovery disputes. See, e.g., Dkt. Nos. 1139 (OCE's letter to Court arguing the Committee's discovery requests are overburdensome); 1152 (Debtor's letter updating Court on resolution of certain discovery disputes); 1153 (Insurers' letter to Court seeking a protective order ruling that the Insurers did not have to turn over any information of communications in furtherance of the Insurance Settlement or that would be otherwise covered by the mediation privilege); 1154 (OCE's letter regarding the scope of discovery); 1157 (Committee's letter to Court disputed discovery issues).

The Debtor filed multiple disclosure statements and proposed plans that incorporated the Insurance Settlement. Dkt. No. 1393. The Court approved the Fifth Amended Disclosure Statement in support of the Fifth Amended Plan on April 6, 2022. Dkt. No. 1447.

The Committee opposed the Insurance Motion and filed a motion for summary judgment seeking denial of the Insurance Settlement on April 6, 2022. Dkt. No. 1451. Throughout this time, the Debtor and the Committee continued to engage in mediation sessions, and at a mediation session on April 11, 2022, they reached a settlement (the "Committee Settlement"). April 12 Hrg. at 4:07 pm. The Debtor and the Committee informed the Court of the Committee Settlement at a

hearing on April 12. See id. The Debtor and the Committee (the "Plan Proponents") sought approval of that agreement and its corresponding plan of reorganization, which ultimately became the "Eighth Amended Plan." See Dkt. Nos. 1451, 1725, 2476. The Committee Settlement is mutually exclusive of the Insurance Settlement, and the Debtor ultimately decided to support the Eighth Amended Plan. See id.

At a hearing on May 20, 2022, the Court considered approval of the disclosure statement (the "Disclosure Statement") in connection with the Eighth Amended Plan, as well as the Insurers' request to schedule a hearing on the Insurance Motion. Dkt. No. 2293. Because the Debtor supports the Eighth Amended Plan, but also does not wish to withdraw the Insurance Motion, the Plan Proponents argued that approval of both matters should be heard at the same time. Dkt. No. 2293 at 16-17. Further, the Insurers argued that, because the Debtor no longer supports the Insurance Settlement, the Insurers should be granted authority to prosecute the Insurance Motion and call the Debtor's witnesses at the hearing as adverse witnesses. Id. at 19. A joint trial (the "Trial") was scheduled to consider approval of the Insurance Motion and confirmation of the Eighth Amended Plan (the "Plan Confirmation"). The final pretrial order for the Insurance Motion and Plan Confirmation specifies that the Debtor and the Insurers would each present three witnesses in support of the Insurance Settlement. Dkt. No. 2610. Specifically, there are three fact witnesses listed as Debtor witnesses: Father Robert Hughes; Laura Montgomery; and Allen Wilen[4] but no expert witnesses. Id. Father Hughes and Montgomery were not originally designated as witnesses in connection with the Insurance Motion, but instead only as witnesses for the Plan Confirmation. Dkt. No. 2610. Their testimony in relation to the Insurance Motion was limited to changed circumstances, (i.e. explaining and justifying the Debtor's support of the Eighth Amended Plan over the Insurance Motion). The Insurers presented three expert witnesses: Marc Scarcella; Rory

---

[4] Although Wilen was listed as a Debtor witness, the Insurers called Wilen as an adverse witness, and questioned him in support of the Insurance Settlement.

Comiter; and Paul Hinton but did not call any of their own fact witnesses in support of the Insurance Motion. Id.  As noted, because of the Committee Settlement the Debtor no longer supports the Insurance Motion. However, the Insurers stepped in to present the case in favor of the Insurance Motion, using the witnesses the Debtor had previously designated to testify in support of the Insurance Motion. The Trial commenced on October 6, 2022 included fourteen days of trial, and concluded on December 1.

On October 22, 2022, the Committee filed the Motion for Judgment, seeking a directed verdict on the Insurance Motion. Dkt. No. 2667. The Committee argues that, at the close of the Insurers' case-in-chief, they failed to establish that the Insurance Settlement meets the lowest standards of reasonableness under Rule 9019 or section 363 of the Bankruptcy Code. The Insurers oppose the Motion for Judgment arguing that the standard for approval is very low, and they have met that burden. Dkt. No. 3010. The Committee filed a reply (the "Reply") arguing, among other things, that the Court should consider only the evidence the Movants presented in their case-in-chief, and that on that basis the Committee was entitled to a directed verdict denying the Settlement Motion. Dkt. No. 3024. The Insurers then filed a motion for leave to file a sur-reply, which the Court denied. See Dkt. Nos. 3161, 3191, 3205.

### Discussion

The Court will first consider the Motion for Judgment, and then will turn to the Settlement Motion, if necessary.

### A.  The Motion for Judgment

Federal Rule of Civil Procedure Rule ("Federal Rule") 52(c), made applicable by Rule 7052, states:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any

> judgment until the close of the evidence. A judgment on partial
> findings must be supported by findings of fact and conclusions of
> law as required by Rule 52(a).

Fed. R. Civ. P. 52(c).

A Federal Rule 52(c) motion permits the court to enter judgment on partial findings "when it can appropriately make a dispositive finding of fact on the evidence." Veracode, Inc. v. Appthority, Inc., 137 F. Supp. 3d 17, 36 (D. Mass. 2015). Either party in a case may make a motion under Federal Rule 52(c) at any time, or a court may enter such judgment sua sponte. 9C Wright & Miller Fed. Prac. & Proc. Civ. § 2573.1 (3d ed.). When considering whether to grant a judgment under Federal Rule 52(c), "the district court applies the same standard of proof and weighs the evidence as it would at the conclusion of the trial." DLG Mortgage Capital, Inc. v. Sheridan, 975 F.3d 358, 371 (3d Cir. 2020). "The district court does not view the evidence through a particular lens or draw inferences favorable to either party, and can appropriately make credibility determinations when necessary." Id.

Federal Rule 52(c) allows a court to render a judgment of partial findings "at any time during a bench trial, so long as the party against whom judgment is to be rendered has been 'fully heard' with respect to an issue essential to that party's case." EBC, Inc. v. Clark Bldg. Sys., Inc., 618 F.3d 253, 272 (3d Cir. 2010); see also First Virginia Banks, Inc. v. BP Expl. & Oil Inc., 206 F.3d 404, 407 (4th Cir. 2000). However, the requirement that a party be fully heard "does not amount to a right to introduce every shred of evidence that a party wishes, without regard to the probative value of that evidence." First Virginia, 206 F.3d at 407.

The Committee argues that, under Federal Rule 52(c), only the evidence presented as part of the Insurers' case-in-chief may be considered by the Court. Dkt. No. 3024. As such, the Committee argues the Court is limited to considering the testimony of Scarcella and Wilen on

October 6 and 17, respectively. Dkt. No. 3024 at 6-7.[5] However, the Committee did not cite any relevant case law to support this argument, see Dkt. No. 3024, and it appears there is no limitation as to what evidence a court may consider when deciding a Federal Rule 52(c) motion. See Grant v. Shaw Grp., Inc., 2012 WL 124399 at *2 (E.D. Tenn. Jan. 17, 2012) (a court could use its discretion to render a ruling on a Federal Rule 52(c) motion "after the close of all evidence, after due consideration of the evidence, testimony, and applicable law, and after the parties' post-trial submissions").

If a court finds it appropriate, a Federal Rule 52(c) motion "may be granted either for or against the plaintiff at the conclusion of plaintiff's case-in-chief." DLG Mortgage, 975 F.3d at 367. Alternatively, a court may wait to render judgment on a Federal Rule 52(c) motion until the close of all evidence. Grant, 2012 WL 124399 at *2. However, if a court reserves its judgment on a Federal Rule 52(c) motion until the conclusion of trial, "there is no practical difference between deciding the motion and rendering an opinion on the case in its entirety." LaMarca v. United States, 31 F. Supp. 2d 110, 124 (E.D.N.Y. 1998); See also Grant, 2012 WL 124399 at *2.

As such, although Federal Rule 52(c) permits the Court to render judgment at the conclusion of the Insurers' case-in-chief[6] or wait until the conclusion of trial, the Court is neither required to render judgment at that time nor is it limited to the evidence in the case-in-chief when considering the motion. Grant, 2012 WL 124399 at *2. Under Federal Rule 52(c), the only requirement to which the Court must adhere is to refrain from ruling on the motion at least until

---

[5] This is inconsistent with the argument initially made in the Motion for Judgment, in which the Committee lists the testimony of Scarcella, Comiter, and Wilen as part of the Insurers' case-in-chief, and list Hinton's testimony as rebuttal. Dkt. No. 2667 at 10, 2. However, in the Reply, the Committee argues that Comiter's testimony was also rebuttal. Dkt. No. 3024 at 6.

[6] The parties dispute the parameters of the case-in-chief. The Committee argues that the case-in-chief only includes the direct testimony of the Insurers' witnesses, while the Insurers argue that their case-in-chief included the testimony of all witnesses, including rebuttal witnesses. Dkt. No. 3162 at 3. Because the court will consider all evidence and testimony presented at trial, this issue is moot.

the Insurers, as the non-moving parties, have been fully heard as to probative evidence. EBC, 618 F.3d at 272. Even if the Court determines that there is no further probative evidence to consider outside of Scarcella's and Wilen's testimony, it is still within the discretion of the Court to hear and consider all of the Insurers' and the Committee's evidence before rendering judgment. Payne ex rel. Estate of Payne v. Equicredit Corp. of Am., 71 Fed. App'x 131, 133 (3d Cir. 2003) ("The district court . . . properly acted within its discretion to decline to render judgment until the close of all evidence."). Therefore, the Court is not limited to the testimony of Scarcella and Wilen in deciding the Motion for Judgement; the Court may consider evidence introduced by either party during the trial.

Finally, Federal Rule 52(c) motions are intended to "conserve the time and resources of the parties and of th[e] Court." In re Gisondi, 487 B.R. 423, 427 (Bankr. E.D. Pa. 2013); see also Brotherston v. Putnam Invs., LLC, 2017 WL 2634361, at *2 (D. Mass. June 19, 2017) (explaining that Federal Rule 52(c) "promotes efficiency"). As such, even if the Court had adopted the Committee's reading of Federal Rule 52(c), the Court still would not grant the Motion for Judgment, as the trial has concluded, and the parties have presented all evidence and witnesses before the Court. Granting the Motion for Judgment at this stage would not conserve any time or resources. Granting a Federal Rule 52(c) motion after the conclusion of trial would not serve any benefit, and it is most reasonable for the court to deny the Motion for Judgment and instead consider the case in its entirety. LaMarca, 31 F. Supp.2d. at 124. Therefore, the Motion for Judgment is denied, and the Court turns to the merits of the Settlement Motion.

### B.  Settlement Motion

When a cause of action, such as a right to pursue insurance policies, is sold to a present or potential defendant, the transaction must be evaluated both under the sound business judgment test of section 363 and the fair and equitable test governing compromises under Rule 9019. Travelers

Cas. & Sur. Co. v. Future Claimants Representative, 2008 WL 821088, at *4 (D.N.J. Mar. 25, 2008) ("[T]he buy-back of insurance policies is both a sale of debtor's asset . . . and a compromise" and must meet both standards under section 363 and Rule 9019.); In re Lahijani, 325 B.R. 282, 284 (B.A.P. 9th Cir. 2005).

Determining whether a compromise is fair and equitable under Rule 9019 "requires a bankruptcy judge to assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." In re Martin, 91 F.3d 389, 393 (3d Cir. 1996) (citing 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed.1993)); In re Key3Media Grp., Inc., 336 B.R. 87, 93 (Bankr. D. Del. 2005), aff'd, 2006 WL 2842462 (D. Del. Oct. 2, 2006). Similarly, in order to satisfy the sound business judgment test under section 363 of the Bankruptcy Code, a party must establish that "the purchase price is fair and reasonable." In re Scimeca Found., Inc., 497 B.R. 753, 771 (Bankr. E.D. Pa. 2013) (citing In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 149-50 (3d Cir.1986)). The market value of the asset is the best indication that the purchase price is fair and reasonable price. See id. at 775 (citing Abbotts Dairies, 788 F.3d at 149); In re WBQ P'ship, 189 B.R. 97, 104 (Bankr. E.D. Va. 1995).

Under both standards, the value of the asset in question must be compared to the price being paid in order to determine whether the settlement and sale is reasonable. In this case, the assets being sold are the Policies, and the claim being compromised is the Insurance Action, which sought a judgment that the Policies obligated the Insurers to pay or reimburse the Debtor for liability incurred as a result of the Survivor Claims. Adv. Pro. 20-1573. Dkt. No. 1. The movant has the burden of proof under both Rule 9019 and section 363 of the Bankruptcy Code. In re Capmark Fin. Grp. Inc., 438 B.R. 471, 475 (Bankr. D. Del. 2010); In re Roman Catholic Diocese of Rockville Ctr., 647 B.R. 69 (Bankr. S.D.N.Y. 2022) (citing In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983)).

1.  Asset Valuation

The value of insurance policies is derived from the amounts the estate will be able to recover from those policies as a result of the covered claims against the estate. See Travelers, 2008 WL 821088, at *9 (the value of insurance policies is tied to the amounts that will be paid out by the estate as a result of asbestos claims covered by those policies and finding that the greater the present value of the claims is determined to be, the greater the present value of the policies). The Insurers concede that the value of the Policies is the amount of the claims that are covered by the Policies. Dkt. No. 3010 at 15.

The Insurers argue they have presented sufficient evidence to establish the value of the Survivor Claims and, therefore, the Policies. Id. Specifically, the Insurers argue that Wilen's testimony "is prima facie evidence that the total value of the [Survivor Claims] is $34 million." Id. at 16. This Court disagrees and finds that Wilen's testimony on this issue lacked credibility and is not prima facie evidence of the value of the Survivor Claims.

Wilen was designated as the Debtor's fact witness under Federal Rule 30(b)(6), made applicable by Rule 7030, and testified that he is a financial advisor to the Debtor. Oct. 17 pm Transcript, 87:20-23. Wilen is a financial analyst and C.P.A. but acknowledged in his testimony that he has no experience in valuing claims for sexual abuse, or tort claims of any kind. Id. at 27:16-28:1. Wilen testified that he used the IVCP chart described above to analyze the 324 Survivor Claims, placing them into what he believed were the appropriate categories based upon the allegations contained in each claim, and making adjustments to the award amounts based upon certain "factors," some of which he testified to as discussed below. Wilen testified that he was not involved with the IVCP program, and that he learned about the methodology by reading about it online. Id. at 60:12-22, 64:2-9. He also testified he did not strictly apply the IVCP guidelines, instead using them as a benchmark and attempt to "capture" what the IVCP Administrators did.

13

Id. at 89:14-22. Of the 324 claims, Wilen valued 224 claims according to what he believed the IVCP Administrators would do, based upon, but not strictly applying, the IVCP chart. Id. Of the remaining 100 Survivor Claims, 67 were what Wilen deemed "special" claims, and were valued at significantly lower amounts, due to allegations in those claims that he determined were either insufficiently detailed, inconsistent, or otherwise deficient. Id. at 77; LMI-0014 ("Wilen Declaration") at 4. Finally, Wilen valued the remaining 33 claims at $0, because he found that they made allegations against people not connected to the Debtor, or contained insufficient details. Id.

### a. Opinion Testimony

Wilen's testimony related to the Insurance Motion was as a fact witness for the value of the Survivor Claims. Oct. 17 pm Transcript, 87:24-88:1. Until the Survivor Claims are reduced to judgment, the value of any of the Survivor Claims is not a fact that can be testified to, and any value testified to is nothing more than an opinion. Wilen was not qualified as an expert witness under Federal Rule of Evidence ("FRE") 702, and none of his testimony or evidence introduced would require or permit this Court to find him qualified as an expert regarding the value of sexual abuse claims. Fed. R. Evid. 702.

As a financial advisor, Wilen testified he has no training or experience in valuing sexual abuse claims and that his experience in claim valuation is limited to contract related claims and "disputed claims coming out of buy-sell agreements." Oct. 17 pm Transcript, 27:11-28:1. Tort claims have radically different factors that effect their value, the face value of them is not written in any contract, and the damages cannot be shown on a balance sheet, or invoice of any kind. Therefore, his testimony regarding the value of the Survivor Claims could only be admissible under FRE 701.

Generally, FRE 701 allows a lay witness to testify only as to opinions rationally based on the witness' perception, and not based on scientific or other specialized knowledge. Fed. R. Evid.

14

701. However, courts have held lay opinion as to technical matters may sometimes be appropriate, but only when the "witness have a reasonable basis grounded either in experience or specialized knowledge for arriving at the opinion that he or she expresses." Eichorn v. AT&T Corp., 484 F.3d 644, 649 (3d Cir. 2007).

There is no evidence that Wilen has any first-hand account knowledge of these incidents that would qualify him to give an opinion under FRE 701. He testified that he did not value the claims individually and did not conduct any interviews or meetings with the claimants. Oct. 17 pm Transcript 76:8-18. Moreover, Wilen testified that he has no experience dealing with or considering sexual abuse or the resulting damages. Id. at 27:24-28:1. Therefore, Wilen's fact or lay opinion testimony related to the value of the Survivor Claims lacks credibility.[7]

*b.  Wilen's Credibility*

As noted, Wilen was designated as a Federal Rule 30(b)(6) witness. Federal Rule 30(b)(6), provides, in relevant part:

> In its notice or subpoena, a party may name as the deponent a . . . corporation . . . and must describe with reasonable particularity the matters for examination. The named organization must then designate one or more . . . persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify . . . . The persons designated must testify about information known or reasonably available to the organization.

State Farm Mut. Auto. Ins. Co. v. New Horizont, Inc., 250 F.R.D. 203, 212 (E.D. Pa. 2008) (quoting Fed. R. Civ. P. 30(b)(6)). The testimony of the Rule 30(b)(6) designee is deemed to be the testimony of the corporation itself. Id. In short, Wilen testified on behalf of the Debtor. Therefore, asking Wilen the value of the claims is akin to asking the defendant in a tort action how

---

[7] Arguably, Wilen's testimony was inadmissible. Although the Committee objected to his testimony, this was withdrawn once the Insurers stated that Wilen would be offered as a fact witness only and was not offering either expert or lay opinion. July 13, 2022, Transcript, 109:9-110:17. The Court did not bar his testimony sua sponte because it was possible it would have some relevance.

much he believes he should have to pay for the damages he caused. While there may be some relevance to this, it is the antithesis of objective testimony, and for this additional reason, Wilen's testimony on the valuation of the Survivor Claims was not credible.

Moreover, even assuming that Wilen was qualified to give an opinion on the value of the Survivor Claims his testimony on cross examination revealed serious problems with his implementation of the IVCP, which strip his conclusions of whatever credibility they may have had initially. As discussed, Wilen has no experience with sexual abuse claims. He testified that he used the IVCP method to value the Survivor Claims. Oct. 17 pm Transcript, 65:7-12. However, he also testified he had no prior experience with implementing the IVCP and that he had learned about the methodology by reading about it online. Id. at 60:12-61:2; 64:6. Wilen testified that he "used the IVCP calculation and tried to get into the mind of [the IVCP Administrators] on how they addressed claims and tried to treat the claims pool as a similarly situated pool." Id. at 65:7-12. In short, with no experience, and no formal training in valuing tort claims, sexual abuse claims, or the IVCP specifically, Wilen attempted to deduce the psychology of the IVCP Administrators and apply their thoughts to value the Survivor Claims. This was not a credible method for valuing 324 sexual abuse claims which vary widely in the allegations of misconduct and damages experienced and sought.

Furthermore, the Court questions the underlying validity of the IVCP as a reliable method for valuing the Survivor Claims. As noted, the IVCP was an out of court settlement process, inherently making these values, at best, an indication of settlement values. There is no evidence as to the percentage of the claimants that settled their claims who were represented by counsel through the process, if any. Additionally, out of the 71 claims settled, 57 of those were claims for which the statute of limitations had already expired at the time they were settled. Oct. 17 am Transcript (corrected), 107:2-3. The value of a claim that is barred by the statute of limitations is

radically reduced. See Oct. 12 am Transcript, 86:8-18; 95:13-20. Using out of court settlements of time barred claims as a comparative valuation to the Survivor Claims, which are not time barred, greatly reduces the values, rendering the settlements amounts of little use for purposes of establishing the value of Survivor Claims that could be brought within the statute of limitations.

Finally, even assuming the IVCP was a reliable method for valuing the Survivor Claims, and that Wilen was qualified to implement the method; his implementation of the IVCP method further calls into question the reliability of his conclusions. As the chart above shows, each category of abuse has a range of potential recovery, determined by factors not explicitly stated to the Court. Oct. 17 pm Transcript, 67:19-68:5. As noted, Wilen stated he "tried to get into the mind of [the IVCP Administrators]" and apply similar adjustments. Id. at 65:7-12. However, while he testified that he applied several mitigating factors, he did not explain all of these factors or how he decided that they were appropriate under the IVCP methodology. For example, Wilen testified one of the mitigating factors he applied was the location where the abuse allegedly took place, which was not considered to be a mitigating factor by the IVCP Administrators. Id. at 91:4-92:4.

Further, Wilen's results show that he consistently awarded values at considerably less than the minimum payout under the IVCP Chart. See id. at 93-103. For example, there were 95 Survivor Claims in category 7, the most severe cases of abuse, with a recovery range under the IVCP of $350,000-$500,000. Yet Wilen valued every single category 7 claim at less than the minimum $350,000 recovery under the IVCP. Id. at 93:4-13; 103:14-18. Wilen testified that the recoveries were reduced due to adjustments or special circumstances. Id. However, the two claims to receive the highest value of $247,500 had no comments or notes attached to explain why the values were reduced to less than half the $500,000 potential award for such abuse under the IVCP category 7. Id. at 103:12-18; see also PP-0065-A. As a result of Wilen's "adjustments" the average recovery for category 7 claims was $234,067, less than half of the $500,000 recovery permitted under the

IVCP. Oct. 17 pm Transcript, 93:14-16. Even more concerning, is that this was true for all but one category of claims. Of the 69 category 6 claims, which the IVCP values between $200,000-$350,000, the average value given by Wilen was only $140,594, again less than half the potential value under the IVCP. Id. at 95:5-14. The 49 category 5 claims, which had a recovery range of $150,000-$200,000 under the IVCP, were awarded an average of $120,737 by Wilen. Id. at 96:8-15. The 37 category 4 claims, which had a minimum IVCP recovery range of $100,000 were awarded an average of $72,805. Id. at 97:14:21. The 34 category 3 claims, which had an IVCP recovery range of $50,000-$100,000 were awarded an average of $35,797, again below the minimum laid out by the IVCP. Id. at 98:19-25. In fact, the only Survivor Claims whose average value according to Wilen fell within the range laid out by the IVCP were 5 category 2 claims, which were given an average value of $30,000. Id. at 99. There were no claims that fell within category 1. As Wilen admitted, had the Survivor Claims all been valued at even the minimum range of the applicable category under the IVCP, the total value would be $59.925 million, over $25 million more than Wilen's $34.4 million valuation. Id. at 100:15-101:2. If they had each been valued at the high end of the applicable category range, the total value would have been over $90 million. Id. at 101:8-13.

Wilen testified that he made adjustments reducing the value of these Survivor Claims based upon several factors, some of which would not have been considered mitigating factors by the IVCP Administrators. Oct. 17 pm Transcript, 91:11-19. Wilen also admitted that he did not make any adjustment which increased the value of any of the Survivor Claims. Id. at 91:1-3. There were multiple claims which were given values below even the minimum recovery laid out by the IVCP without any explanation of Wilen's adjustments, or the reasons for those adjustments. For these additional reasons, Wilen's testimony regarding the valuation of the Survivor Claims was not credible.

Wilen was not qualified as an expert, and likely would not have qualified as an expert for the purpose of valuing the Survivor Claims. He has no experience valuing tort claims, let alone sexual abuse claims, he has no experience implementing the IVCP methodology, and he was a 30(b)(6) witness who, in valuing the claims, made adjustments only reducing the value of the Survivor Claims, not increasing any of them, leading to results that valued virtually all of the Survivor Claims below even the minimum recovery called for under the IVCP Chart. Finally, the IVCP Chart is premised on out of court settlements, the vast majority of which settled time barred claims in which the claimants may or may not have been represented by counsel. The Court finds that Wilen's lay opinion on the value of the Survivor Claims does not meet even the most-lax standard for reliability or credibility. Based upon this, Wilen's testimony of the value of the claims is not prima facie evidence of the value of the Survivor Claims, indeed, it is not at all persuasive as to the value of the Survivor Claims.

The Insurers presented no other evidence of the value of the Survivor Claims, and acknowledge Wilen's testimony as the only evidence of their value of the Survivor Claims. Dkt. No. 3010. The expert witnesses who testified in support of the Insurance Motion each testified that they did not value the Survivor Claims themselves. Oct. 6 pm Transcript, 75:14-23 (Scarcella based his opinion and allocation on Wilen's analysis); Oct. 11 am Transcript, 80:25-81:4 (Comiter relied on Wilen's valuation of the claims); Oct. 20 am Transcript, 45:5-9 (Hinton relied on Wilen's and Colleen McNally's[8] valuations). These experts also testified that they based their analysis of the reasonableness of the sale and settlement on Wilen's valuation of the claims, and that, if that valuation changed, their conclusions would necessarily change. See Oct. 6 pm Transcript, 75:12-23 (Scarcella testifying that if the Wilen valuation changed, his allocation of the reasonable cost to the Insurer's would have to change); Oct. 7 am Transcript, 136:14-20 (Comiter acknowledging

---

[8] McNally was an expert that testified as to the value of the Survivor Claims on behalf of the Committee.

that if Wilen's valuation is incorrect, the valuation of everything that follows would also be incorrect).

Because there is no credible evidence from the Insurers as to the value of the Survivor Claims, the Court cannot determine the value of the Policies, the asset which is being sold in the Settlement Motion. [9]

### 2.    The Sale Cannot be Approved Under Section 363

To approve a sale of estate assets outside of the ordinary course of business under section 363(b) of the Bankruptcy Code, the sale proponent bears the burden of demonstrating, at minimum, that: (1) there is a sound business purpose for the sale; (2) the sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the buyer has acted in good faith. In re Exaeris, Inc., 380 B.R. 741, 744 (Bankr. D. Del. 2008) (citing In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991)); In re After Six, Inc., 154 B.R. 876, 881 (Bankr. E.D. Pa. 1993); see also In re United Healthcare Sys., Inc., 1997 WL 176574, at *4 (D.N.J. Mar. 26, 1997); In re Indus. Valley Refrigeration & Air Conditioning Supplies, Inc., 77 B.R. 12, 21 (Bankr. E.D. Pa. 1987). There is no dispute the notice requirement has been met. However, there are significant issues concerning whether the price is adequate and fair and whether the Insurance Settlement was entered into in good faith.

In order to determine whether the price paid was adequate, the Court must first know the value of the asset. "The [sale proponent] must provide some evidence regarding the value of the asset to be sold in order for the court to judge the fairness of the sale." In re Buerge, 479 B.R. 101, 107 (Bankr. D. Kan. 2012), aff'd in part, rev'd in part, 2014 WL 1309694 (B.A.P. 10th Cir. Apr.

---

[9] The Court has similar concerns with McNally's testimony. After considering McNally's declaration and the Insurers' cross-examination, the Court concludes her testimony was not reliable for several reasons including, for example, her failure to exclude or correct for several high-value verdicts that appear to skew her results to be unreasonably large. See, e.g., PP-0281 at 25; Oct. 12 pm Transcript, 84:22-86:22.

2, 2014) (citing <u>Abbotts Dairies</u>, 788 F.2d at 149); <u>see also</u> <u>Exaeris</u>, 380 B.R. at 744 (finding it could not approve a sale given the "absence of the value of the assets").

Similarly, the Third Circuit has found that "[t]he element of 'good faith' is of particular importance." <u>Exaeris</u>, 380 B.R. at 744 (citing <u>Abbotts Dairies</u>, 788 F.2d at 149–50 ("when a bankruptcy court authorizes a sale of assets pursuant to section 363(b)(1), it is required to make a finding with respect to the 'good faith' of the purchaser.")).

The Insurance Settlement specifies $15 million of the total payment will be consideration to repurchase the Policies. LMI-0013, at 5, 8, 18-20, 22. However, as noted above, the only evidence presented that $15 million is an adequate price for the Policies being sold was the testimony of Wilen. As already discussed, Wilen's testimony was not credible, and was not sufficient to establish the adequacy of the purchase price. In fact, the Policies may be worth considerably more than the $15 million. Regardless, the Court finds that the Insurers have not met their burden to establish the value of the asset. Scarcella's testimony, the only other evidence to which the Insurers point in support of establishing the reasonableness of the purchase price, is based on Wilen's valuation. Scarcella acknowledged that his conclusions would necessarily change if Wilen's valuation changed. <u>Oct. 6 pm Transcript</u>, 75:12-23.[10] The Court cannot determine that the sale price was adequate when there is no credible evidence as to the value of the Policies being sold. For this reason alone, the Settlement Motion will be denied.

Even if there was some evidence produced to establish the adequacy of the sale price, there was little if any evidence presented regarding the issue of good faith. "[N]either the Bankruptcy Code nor the Bankruptcy Rules attempts to define 'good faith.'" <u>Abbotts Dairies</u>, 788 F.2d at 147.

---

[10] The Insurers' Brief also discusses Professor Baker's testimony at length. However, Professor Baker testified that the price was not adequate. Although the Insurers discuss why they believe Professor Baker was mistaken, this is not evidence and does not establish a value for the Policies, nor that the price paid was adequate, even assuming their arguments are correct. <u>See</u> Dkt. No. 3010 at 21-23.

As a result, courts look to traditional equitable principles, when determining good faith under section 363, "holding that the phrase encompasses one who purchases in 'good faith' and for 'value.'" Id. The Insurers carry the burden to show good faith. See In re Borders Grp., Inc., 453 B.R. 477, 484 (Bankr. S.D.N.Y. 2011) (citing 3 Collier on Bankruptcy ¶ 363.11) (the sale proponents bear the burden of showing good faith). However, in this case, the Debtor and the Insurers refused to waive the mediation privilege, and so there was no evidence of how they came to agree on $15 million. Oct. 17 pm Transcript, 49:14-20; 51:15-18. Indeed, the Insurers and the Debtor blocked any discovery of their discussions during mediation that led to the agreement for sale of the Policies. Id. at 48:22-49:7. As a result, there was no evidence presented as to the discussions between the parties, how they reached their agreement, or how they reached the settlement figure of $30 million. Additionally, the Insurers appear to argue that the mere fact that the sale was the result of mediation establishes that the purchase was made in good faith and for value. Dkt. No. 2478 at 66. However, they cite no caselaw to support the argument that engaging in mediation by itself, without any other evidence, establishes good faith under section 363 of the Bankruptcy Code, and the Court declines to adopt such a per se rule. The Insurers point to a single answer given during the testimony of Father Hughes as evidence of good faith. Dkt. No. 3010. The exchange on which the Insurers' hang their case was when Father Hughes was asked, "did you agree that the insurers worked with the Diocese in good faith?"; he responded, "That's my understanding." Nov. 9 Transcript, 150:7-10. However, even assuming that one answer was sufficient to establish good faith, Father Hughes' answer in this case does not assert a fact, there is no indication that he has first had knowledge of the Insurers' good faith, but that it is his understanding that they acted in good faith. Therefore, on this basis as well the Court denies approval of the sale under section 363(b).

Finally, there was also insufficient evidence put forth as to whether there was a sound business purpose for this sale. "In evaluating whether a sound business purpose justifies the use, sale or lease of property under Section 363(b), courts consider a variety of factors, which essentially represent a 'business judgment test.'" In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999). The court should consider all salient factors including:

> (1) the proportionate value of the asset to the estate as a whole, (2) the amount of elapsed time since the filing, (3) the likelihood that a plan of reorganization will be proposed and confirmed in the near future, (4) the effect of the proposed disposition on future plans of reorganization, (5) the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, (6) which of the alternatives of use, sale or lease the proposal envisions, and most importantly perhaps, (7) whether the asset is increasing or decreasing in value.

Id. (quoting Lionel Corp., 722 F.2d at 1070). Many of these factors require evidence of the value of the Policies. However, there is no credible evidence as to the value of the Policies before the Court. Therefore, the Court cannot determine the proportionate value of the asset to the estate as a whole, nor can it evaluate the proceeds obtained compared to the value of the property, here, the Policies. Therefore, the Court cannot conclude the first or the fifth factor weighs in favor of finding a sound business purpose for the sale. Additionally, the Eighth Amended Plan currently before the court requires the Policies to be retained and assigned to a trust rather than being sold back to the Insurers. As such, sale of the Policies would invalidate the currently proposed plan. Thus, the third and fourth factors both weigh against finding a sound business purpose of the sale. Similarly, the Eighth Amended Plan calls for the Policies to be retained and assigned to a trust rather than sold for the proceeds. Because the Survivors, as the only creditors that would benefit from the Policies, voted overwhelmingly in favor of that plan and an alternative use of the Policies, the sixth factor also weighs against finding a sound business purpose of the sale. Finally, the second, and seventh factors do not appear to impact the decision either way.

The underlying issue with the Insurance Motion is that the Insurers failed to present any credible evidence of the value of the asset being sold. Without a valuation of the Policies, the Court cannot determine whether the sale price is adequate, and therefore the Court cannot approve the sale. Additionally, there was insufficient evidence presented to determine whether the buyers were acting in good faith, or whether there was a sound business purpose for the sale. There is simply no evidence presented which would allow the Court to find that this sale was reasonable. The Insurers failed to meet their burden and therefore the Insurance Settlement is denied.

### 3.   The Court Cannot Approve the Settlement Under Rule 9019

The Court's decision to deny the Insurance Motion under section 363 of the Bankruptcy Code makes discussion of the Rule 9019 request unnecessary. See Exaeris, 380 B.R. at 746 ("The Court's decision to deny the [sale] Motion makes it unnecessary to rule upon the settlement.") However, even assuming the sale of the Policies was appropriate, the Insurers failed to establish that the Insurance Settlement should be approved under Rule 9019. As noted, determining whether a compromise is fair and equitable under Rule 9019 requires courts to balance the value of the claim being compromised against the value to the estate of accepting the proposed settlement. In re Nortel Networks, Inc., 522 B.R. 491, 509 (Bankr. D. Del. 2014) (citing Martin, 91 F.3d at 393). Here, the Insurance Action is the claim being compromised. As discussed above, that action seeks a judgment that the Policies cover at least some of the Survivor Claims, and therefore, the value of the Insurance Action is dependent on the value of the Policies. As a result, the Court is unable to determine whether this compromise is fair and equitable because the Insurers failed to present any credible evidence of the value of the claim being compromised (i.e., the Policies). In short, it is not possible to determine whether the Debtor's decision to settle the Insurance Action was fair and equitable, the Insurers also failed to present evidence of several factors under the Martin test. See Martin, 91 F.3d at 393.

Additionally, even assuming the Insurers had established the value of the Policies, the Court would still not be able to conduct the balancing test called for in <u>Martin</u>, because the Insurers failed to present sufficient evidence of the value of the compromise to the estate. The Third Circuit has listed four factors to consider in determining whether a compromise is fair and equitable: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors. <u>Martin,</u> 91 F.3d at 393.

### a.  Probability of Success on the Merits

The Insurers argue first that a movant is not required to make specific showings as to the likelihood of success, but merely to show that there is a persuasive argument that a debtor may not be successful in the action being settled. Dkt. No. 3010 at 31. Even assuming this was sufficient to approve a settlement, the Insurers failed to present sufficient evidence to meet that standard.

The Insurers also argue that the Court could infer a low probability of success based on <u>In re W.R. Grace & Co.</u>, 475 B.R. 34 (D. Del. 2012), because the litigation would be complicated due to the number of insurance policies at issue and the number of claimants. Dkt. No. 3010. However, this argument does not account for the facts of this specific case, and the large number of Survivor Claims only means that some percentage of claimants are likely to be successful, while some may not. The Insurers still needed to present some credible evidence as to the likelihood of success of the Survivor Claims, and the potential amount of such claims. These amounts would be dependent on the facts alleged in the Survivor Claims as well as the terms of the Policies, and as noted above, there was no credible evidence presented related to those issues.

The Insurers point to the testimony of Comiter and Scarcella regarding the Insurers' coverage defenses as evidence of the probability of success on the merits. As part of their argument the Insurers state "Scarcella . . . took coverage defenses into account in forming [his opinion.]"

Dkt. No. 3010 at 32. Contrary to this argument, Scarcella testified that he did <u>not</u> analyze the coverage defenses to quantify or handicap the likelihood of any of those defenses. <u>Oct. 6 Transcript</u> 75:24-76:4; 86:5-14. Indeed, none of the Insurers' experts reviewed all of the of the Insurance Policies and coverage defenses in forming their opinions. Comiter acknowledged that she reviewed only the LMI policies in full and did not review any of the other policies' coverage defenses, nor did she do a complete review of the terms of all of the other policies, despite acknowledging that there are differences between them. <u>Oct. 11 am Transcript</u>, 121:5-13; 139:6-9; <u>Oct. 7 Transcript (corrected)</u>, 16:11-16; 17:8-24. She also testified she did not analyze the success rate of coverage defenses against the Survivor Claims even for LMI's coverage defenses. <u>Id.</u> 138:6-11. Finally, Hinton testified that he reviewed only the Century policies, and only reviewed the Survivor Claims which fell within the period covered by those policies. <u>Oct. 20 am Transcript</u>, 70:24-71:4; 102:4-8. Therefore, the experts' conclusions are all based on partial data, each having reviewed only some of the Policies, and coverage defenses. Moreover, each expert incorporated Wilen's valuations into his or her conclusions regarding these coverage defenses, which further calls the reliability of those conclusions into question.

Because this in one settlement between the Debtor and the Insurers, not several settlements between the Debtor and each of the Insurers, the total value of the Policies must be compared to the total compensation offered. The Insurers could have retained one expert to review all of the Policies, the coverage defenses, and the Survivor Claims, and then issue one report indicating the probability of success and potential impact of the available coverage defenses. However, the Insurers chose not to do that. Instead, each expert reviewed only certain policies and certain Survivor Claims, and none of the Insurers' experts actually valued the Survivor Claims, instead relying on Wilen's analysis. As a result, the Court finds the expert opinions are not helpful in forming an estimate of the likelihood of success because they lack any specific or even rough

estimate of the impact of the coverage defenses to the Survivor Claims. Therefore, the Court finds the opinions are less credible, as no expert applied a single methodology to all Policies and Claims. On this basis, the Court finds the Insurers did not establish this factor. After reviewing all the testimony, the Court is no closer to understanding the likelihood of success on the merits of the Survivor Claims than it would be without this evidence. Therefore, this factor falls in favor of denying approval of the Insurance Settlement.

### b.  Likely Difficulties in Collection

Similarly, the Insurers put forth little, if any, evidence of the Debtor's difficulty in collecting against the Insurers if the Insurance Settlement is not approved. The Insurers point to Comiter's testimony, which states that two LMI companies are already insolvent, and to Scarcella's testimony that Midland Insurance Company is insolvent. Dkt. No. 3010 at 37. However, there was no evidence that these already insolvent entities have any impact on the remaining Insurers' ability to pay that for which they may be held liable. To the extent any specific insurer is already insolvent, it is not contributing to the Settlement, and there is no evidence the remaining Insurers will pay any of the liability of these insolvent carriers through the Insurance Settlement. Therefore, the ability to collect from insolvent insurers (if at all) is the same regardless of whether the Court approves the Insurance Settlement, and this is not a relevant factor.

Further, there was no credible evidence presented that the Insurers would be unable to pay in the future. The Insurers point to Baker's testimony that Century is in runoff as evidence of the risk of non-payment. Id. However, there was no evidence presented that this would create difficulty in collecting from Century, which can still earn profits through investments and other income driven activities. There was also no credible evidence regarding the Insurers' current financial condition, nor their ability to pay any amounts for which they may be held liable for under their respective policies.

The Insurers could have provided evidence to show that they face financial hardship or may not be able to pay claims in the future, but they chose not to do so. There was no evidence presented regarding any difficulty the estate would have in collecting on amounts found to be owed by the Insurers under the terms of the Policies. There was no evidence presented to show that any of the Insurers are on the verge of insolvency. In the end, there is no credible evidence that the Insurers may not be able to pay in the future. Therefore, the Court finds the Movants failed to establish there would be any difficulty in collecting at all, and this factor also weighs against approval of the Insurance Settlement.

### c. Cost and Complexity of the Litigation Involved

The Insurers did present evidence that any litigation would be costly and time consuming. The Insurers argue that the expert testimony given by Karen Bitar, indicates that the Trust under the Eighth Amended Plan may not have sufficient funds to litigate each of the Survivor Claims through to judgment. See Nov. 30 Transcript, 41:7-12. First, the Court notes that Bitar's testimony was not offered in relation to the Insurance Motion.[11] Therefore, even assuming Bitar's testimony was credible, the Court does not consider it for the Insurance Motion. Moreover, without credible evidence of the potential recovery available for these claims it is not possible to find that this factor weighs in favor of approval of the Insurance Settlement. As noted, approval of a settlement requires the court to balance the value of the claim being compromised, against the value to the estate of accepting the settlement. Nortel Networks, 522 B.R. at 509 (citing Martin, 91 F.3d at 393). Here, there was no credible evidence presented as to the value of the Policies, which is necessary to determine the value of the pending Insurance Action. While the cost and delay in litigating the Survivor Claims may reduce their present value, without knowing what present value is, it is not possible to say whether it has been reduced to at or near the $15 million being offered

---

[11] Bitar testified as an expert on behalf of the Insurers in relation to the Confirmation of the Eighth Amended Plan, but she was not offered as support for the Insurance Motion.

through the Insurance Settlement. As such, this factor is neutral at best and may likely weigh in favor of not approving the Insurance Settlement, given that the Insurers' experts assign a potential value of the Survivor Claims close to $100 million. Oct. 6 pm Transcript, 17:9-14.

### d. Paramount Interest of Creditors

In this case, there is evidence that the litigation would be both costly and time consuming. However, without any credible evidence of the potential recovery being given up in favor of $15 million, the Court cannot find that the Insurance Settlement is in the paramount interest of creditors. The Insurance Settlement was originally intended to be part of a plan that was never put to a vote, so the Court cannot look to any voting returns to find whether creditors are in favor of the Insurance Settlement. However, the Court notes that the Tort Committee represents the only group that would benefit from the Policies, namely, the Survivors[12] and the Tort Committee has opposed approval of the Insurance Settlement. Although this does not necessarily mean that all or a majority of the Survivors would be opposed to the Insurance Settlement, the Court also notes that more than 97% of Survivors voted in favor of the Eighth Amended Plan, which allows the trust created under the Eighth Amended Plan to pursue the Policies rather than sell them back to the Insurers. Dkt. No. 2218. As such, the Court finds that this factor also weighs against approval of the Insurance Settlement. Therefore, the Settlement will not be approved.

---

[12] There are three non-abuse tort claimants that would potentially be able to recover from the National Catholic Risk Policies.

### Conclusion

The Movants failed to present any credible evidence of the value of the Policies, and therefore, the Court cannot find, under either the section 363 or Rule 9019 standards, that the value being received in exchange for the asset is fair and reasonable. Accordingly, the Insurance Motion is denied.


Dated: August 29, 2023

JERROLD N. POSLUSNY, JR.
U.S. BANKRUPTCY COURT JUDGE