FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re:<br><br>DIOCESE OF CAMDEN, NEW JERSEY,<br><br>Debtor. | Case No. 20-21257 (JNP)<br><br>Chapter 11 |

## MEMORANDUM DECISION DENYING CONFIRMATION OF EIGHTH AMENDED PLAN

**JERROLD N. POSLUSNY, JR., U.S. Bankruptcy Judge**

The Diocese of Camden, New Jersey (the "Debtor"), and the Official Committee of Tort Claimant Creditors (the "Committee," and with the Debtor, the "Plan Proponents") seek confirmation of their jointly proposed eighth amended plan of reorganization (the "Plan") along with the accompanying agreement creating a trust (the "Trust Agreement") and trust distribution procedures (the "TDPs"). Dkt. Nos. 1724, 1725. The only objection to confirmation was filed by certain insurers.[1] For the reasons discussed below, the Court will deny confirmation of the Plan.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court HEREBY FINDS, DETERMINES, AND CONCLUDES as follows:

The findings and conclusions set forth herein and in the record of the Confirmation Hearing constitute the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure ("Federal Rule") 52, made applicable by Federal Rule of Bankruptcy Procedure ("Rule") 7052, and 9014. To the extent any of the following conclusions of law shall be determined

---

[1] These include Certain Underwriters at Lloyd's, London and Certain London Market Companies ("LMI"); Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America, Federal Insurance Company and Illinois Union Insurance Company ("Century"); Interstate Fire & Casualty Company ("Interstate"); Granite State Insurance Company, Lexington Insurance Company, and National Union Fire Insurance Company of Pittsburgh PA ("AIG"); and The National Catholic Risk Retention Group, Inc. ("Catholic Risk") (collectively, the "Insurers"). AIG and Catholic Risk settled with the Plan Proponents during the confirmation process and no longer object.

to be a finding of fact, it shall be so deemed, or any of the following findings of fact shall be determined to be a conclusion of law, it shall be so deemed.

## Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1), and the Standing Order of the United States District Court dated July 10, 1984, as amended September 18, 2012. Venue is proper in this Court pursuant to 28 U.S.C. § 1408. Consideration of the Plan constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (L), (M), and (O).

The Debtor is eligible to be a debtor under section 109 of Title 11 of the United States Code (the "Bankruptcy Code") and the Plan Proponents are proper proponents of a plan under section 1121(a) of the Bankruptcy Code.

## Background

The Debtor is a nonprofit religious corporation formed on June 17, 1938, under N.J.S.A. §§ 16:15-9 to 15:15-17. PP-0266 ¶ 56.[2] Under N.J.S.A. § 16:15-10, the five trustees of the Debtor are the Bishop, the Vicar General, the Chancellor, and two priests of the Diocese. Id. The Debtor is an ecclesiastical district within the Catholic Church comprised of the southern six counties of New Jersey – Camden, Gloucester, Atlantic, Cape May, Cumberland, and Salem counties. Id. ¶ 25. The Diocese encompasses approximately 480,000 Catholics across 62 Parishes. Id. ¶¶ 25, 27, 55.

There are four Missions within the Debtor's district: three are organized and operated as nonprofit corporations in accordance with Title 15A of New Jersey Law although their respective corporate governance structures mirror that of a Title 16 parish; the fourth is a non-profit membership corporation of which the Debtor is the member. Id. ¶ 58. The Debtor operates or is

---

[2]Individual exhibits are referred to as "PP" "JX" "LMI" or "IC" then followed by the exhibit number. Transcripts of hearings are referred to by the date and time of the trial, e.g. "Oct. 7 pm Transcript, Page No., Line No."

2

affiliated with twenty-two elementary schools, a pre-school daycare, and five high schools. Id. ¶¶ 63-65. Three of the five high schools are separately incorporated as Title 15A non-profit corporations. Id. ¶ 65.

Additionally, there are separately incorporated non-profit Catholic Ministry Entities that carry out various ministries of the Catholic Church within the territory of the Debtor, which include, among others, the Catholic Charities Diocese of Camden Inc., Diocese of Camden Trusts, Inc. ("DOCT"), Diocese of Camden Healthcare Foundation, Inc., The Diocesan Housing Services Corporation of the Diocese of Camden, Inc., The Tuition Assistance Fund, Inc., and Padre Pio Shrine Buena Borough, NJ, Inc. Id. ¶¶ 72, 74-117. DOCT is a separately incorporated non-profit institution which provides funding and long-term capital to the Debtor. PP-0266 ¶ 98.  DOCT currently holds over $100 million in assets. Nov. 14 Transcript, 37:1-3. The Other Catholic Entities (the "OCE") consist of the Parishes, Missions, Schools, Catholic Ministry Entities, and all other entities listed under Article 2.2.80 of the Plan.[3] Plan Art. 2.2.80.

The Debtor holds cash and investment funds on behalf of the OCE in several accounts referred to as the "Revolving Fund" at PNC Bank. Pursuant to the "Parish Trust Agreements," the Revolving Fund is held in a series of investment accounts for the benefit of the OCE, which maintains their excess funds. Dkt. No. 1724 at 23 (the "Disclosure Statement"); Nov. 14 Transcript, 13:1–6; Nov. 10 Transcript, 148:2–12. The OCE deposit funds in excess of one month's operating expenses into the Revolving Fund and are paid 3% interest on their deposits. Nov. 10 Transcript, 148:2-12. The Revolving Fund lends money to the OCE, for large capital expenditures. Id. As of November 2022, the Revolving Fund held in excess of $90 million, which funds are invested. Id. at 148:13-14. The Debtor's cash assets and receivables are approximately $37.3 million, with a liquidation value of

---

[3] The OCE are listed in Attachment D. Dkt. No. 1144.

approximately $8 million. PP-0420. The Debtor also holds real property and equipment valued at $21.15 million, with a liquidation value of $19 million. Id.

The Debtor entered into a revolving loan agreement with PNC Bank (the "PNC Loan"), the outstanding balance of which was $22,807,500 as of September 30, 2020. Disclosure Statement, at 34; see also Nov. 10 Transcript, 135:22-25. DOCT has pledged its assets as security for this loan, and pursuant to the loan agreement, must maintain a balance of 200% of the outstanding loan amount, which required approximately $46 million as of December 2022. Id.; Dkt. No. 2919 ¶ 5c.[4]

The Debtor has approximately $7.1 million in restricted cash assets and the OCE have in excess of $30 million, according to the testimony of Allen Wilen. Nov. 14 Transcript, 40:10-17.

History of Abuse

In 2002 both civil and church authorities recognized that the historic abuse and exploitation of minor children by priests was a serious problem that needed to be addressed to prevent such conduct from happening in the future. PP-0266 ¶ 46. The Debtor took steps, including entering into compacts with county prosecutors and the New Jersey Attorney General (the "2002 Memorandum of Understanding"), requiring fingerprint-facilitated criminal history background checks for every adult employee having regular contact with minors, and implementing zero tolerance policies regarding sexual abuse. Id. ¶ 7. In accordance with the 2002 Memorandum of Understanding, the Debtor reports every allegation of abuse of a minor by Diocesan priests to law enforcement authorities. Id. ¶ 48. The Debtor publicly released the names of 56 priests (which was reduced to 55 priests after further review) and one deacon of the Debtor who were credibly accused of abusing minors prior to the Petition Date. Id. ¶ 33. The Debtor offers therapeutic care to anyone

---

[4] Neither party cited to any testimony or documentary evidence for these facts. However, the parties premised arguments upon these statements being facts, and they do not appear to be in reasonable dispute.

who comes forward as a survivor of sexual abuse, amounting to an initial twenty-five counseling sessions per survivor with the option to request additional sessions after a panel of psychologists reviews the survivor's case to determine if more sessions are warranted. Nov. 9 Transcript, 63:21-64:11. The Debtor has paid nearly $1 million to provide these services to date. Id. at 64:1-14.

From 1990 to 2019, the Diocese reached 99 settlements to abuse survivors totaling approximately $10.1 million. PP-0266 ¶ 36.

In December 2019, the State of New Jersey passed the New Jersey Child Victims Act (the "CVA") which reopened the statute of limitations related to claims of child sexual abuse, allowing previously time barred claims of this nature to be brought for a two-year period from the passage of the CVA, through November 30, 2021, as well as expanding the statute of limitations for any such claims which were not time barred as of the date enactment. Oct. 6 pm Transcript, 67-68; N.J.S.A. § 2A:14-2a.

The IVCP

Prior to the passage of the CVA, on June 15, 2019, the Debtor along with other Dioceses in New Jersey, established the Independent Victims Compensation Program ("IVCP"). The IVCP was a voluntary out of court program to settle child sex abuse claims. The Debtor participated in the IVCP through July 31, 2020. Disclosure Statement, at 36. As explained in more detail in the 9019 Decision (defined below), the IVCP was administered by two independent experts, Kenneth Feinberg and Camille Biros (the "IVCP Administrators"), who reviewed and evaluated claims, placing each claim into a category based on the allegations, with increasing ranges of compensation for more severe allegations of abuse. See id. at 75; PP-0065-A. Claims were reviewed, and the IVCP administrators met with the claimants individually, adjusting the claim amounts as appropriate. Oct. 17 pm Transcript, 67:9-11. The Debtor resolved a total of 71 claims through the IVCP, with an average settlement amount of $114,000 for a total of $8.1 million.

Disclosure Statement, at 36. Approximately 14 of the 71 claims were resolved after the CVA became effective. There is no evidence as to whether any of the settling claimants were represented by counsel. Oct. 17 am Transcript (corrected), 106:25-107:3. The Debtor entered into and paid these settlements without seeking any compensation from its liability insurance policies. Oct. 17 pm Transcript, 101:17-20.

The Insurance Policies

Since at least 1969, the Debtor has maintained an insurance program for itself, and the OCE. JX-0001-0047; see also Dkt. No. 1087 ¶ 8. This included maintaining multiple liability insurance policies (the "Policies") issued by the Insurers, many of which included a requirement that the Debtor maintain its own self-insured retentions ("SIRs"). Id. ¶10; Oct. 7 Transcript (corrected), 23:22-24; 33:13-18. Some of the Policies contain clauses which permit the Insurers to be involved in the defense of a claim against the Debtor that implicates the particular policy. Oct. 7 Transcript (corrected), at 158:10-15. Other Policies require the applicable Insurer to defend the Debtor in the wake of a claim against the Debtor under specific circumstances. See, e.g., JX-0002; JX-0004 § II.A.2.a.

The Policies are property of the Estate and therefore are subject to the exclusive core jurisdiction of this Court under section 541 of the Bankruptcy Code. See A.H. Robins Co. v. Piccinin, 788 F.2d 994, 1001 (4th Cir. 1986) (the weight of authority finds that insurance contracts are property of the estate); In re Davis, 730 F.2d 176, 184 (5th Cir.1984) (same) (citing In re Johns-Manville Corp., 40 B.R. 219, 231 (S.D.N.Y. 1984)). The assignment or sale of the Policies to fund the Plan in this case is within the Court's core jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(N). The Court has jurisdiction over the interests in the Policies (including the Channeled Claims against the OCE) because the Policies are being sold. 11 U.S.C. §§ 363(e) and (f), 1123(a)(5)(D) and (b)(4) and (5); 28 U.S.C. § 157(b)(2)(L), (N) and (O).

<u>The Bankruptcy</u>

The Debtor filed a petition under Chapter 11 the Bankruptcy Code on October 1, 2020 (the "Petition Date"), due in-part, to potential liability it faced for claims from sexual abuse survivors (the "Survivor Claims") as well as declining income due to the COVID-19 pandemic. <u>Disclosure Statement</u>, at 44. On October 23, 2020, the Office of the United States Trustee (the "UST") appointed the Committee. Dkt. No. 111. The UST appointed the official committee of unsecured trade creditors (the "Trade Committee") on December 23, 2020. Dkt. No. 293. Shortly after the Petition Date, the Debtor filed an adversary proceeding naming the Insurers as defendants (the "Insurance Action") seeking declaratory relief including a determination that the Policies imposed a contractual obligation for the Insurers to provide coverage for the Survivor Claims. Adv. Pro. No. 20-1573, Dkt. No. 1.

Beginning on December 4, 2020, Chief Judge Michael B. Kaplan served as mediator between the Debtor and the Committee, in an attempt to reach agreement on the claims bar date. <u>See</u> <u>Nov. 9 Transcript</u>, 66:2-7. The Most Reverend Dennis J. Sullivan, D.D. (the "Bishop"), Father Robert Hughes, Laura Montgomery, and counsel for both the Debtor and the Committee, and several attorneys for Survivors participated in the mediation. <u>Id.</u> That mediation was not successful, and the parties did not agree to a bar date. <u>Id.</u> 66:20-22.

In an order issued on February 11, 2021 (the "Bar Date Order" Dkt. No. 409) the Court established June 30, 2021, as the deadline for all Creditors to file proofs of claim in this Chapter 11 Case (the "Bankruptcy Case"). A total of 362 Survivor claims were filed by abuse survivors (the "Survivors"). JX-0048-0410. The parties agree that there are approximately 324 non-duplicative Survivor Claims. <u>Oct. 17 pm Transcript</u>, 77:7-9.

An order appointing the Honorable Jose L. Linares (Ret.) as mediator and referring the case to global mediation was entered on May 20, 2021. Dkt. No. 640. There were at least seventeen

7

mediation sessions between December 2020 and April 2022. Nov. 9 Transcript, 67:5-13. There were no less than eight mediation sessions held with the Insurers, the Committee, and the Debtor, over several months until the Debtor reached an agreement with the Insurers and filed a motion for approval of the settlement on January 5, 2022, which was amended on February 2, 2022. Dkt. Nos. 1087, 1144 (the "Insurance Motion").

On October 12, 2021, the Committee filed an adversary proceeding seeking declaratory relief that DOCT was not a separate entity, that the investment funds held by DOCT were not held in a valid trust and were property of the estate. Adv. No. 21-1393, Dkt. No. 12; Nov. 14 Transcript, 36:3-37-15.[5]

### The Insurance Settlement

As discussed in more detail in the 9019 Decision, the Insurance Motion was filed pursuant to Rule 9019 and section 363(f) the Bankruptcy Code seeking approval of the Insurance Settlement and the sale the Policies back to the Insurers. Dkt. Nos. 1087 and 1144. The Insurance Settlement provides that the Insurers would pay $30 million (the "Settlement Amount") into a trust (the "Fifth Plan Trust"), which was to be established as part of a Chapter 11 plan of reorganization which became the "Fifth Amended Plan" to satisfy the Survivor Claims. Id.; LMI-0013. Half of the Settlement Amount would have been treated as the purchase price to allow the Insurers to repurchase the Policies from the Debtor as well as any rights in the Policies held by the OCE. See id. at 5, 8, 18-20, 22. The other half would be treated as consideration for a channeling injunction, which would funnel any future claims related to abuse to the Fifth Plan Trust and an injunction, preventing any such potential claimants from pursuing the Insurers for those claims. Id. A trial

---

[5] The Committee filed two additional adversary proceedings on the same day for declaratory relief and recovery of alleged fraudulent transfers, both seeking findings that the Debtor's estate included assets the Debtor argued were not property of the estate. See Adv. Nos. 21-1394, 21-1395.

date of April 6, 2022 (the "Original Trial Date") was set to consider the Insurance Motion, which was adjourned to April 19, 2022. Dkt. Nos. 1219, 1360.

All parties, including the OCE, conducted extensive discovery related to the Insurance Motion and were involved in multiple discovery disputes. See, e.g., Dkt. Nos. 1139 (OCE's letter to Court arguing the Committee's discovery requests are overburdensome); 1152 (Debtor's letter updating Court on resolution of certain discovery disputes); 1153 (Insurers' letter to Court seeking a protective order ruling that the Insurers did not have to turn over any information of communications in furtherance of the Insurance Settlement or that would be otherwise covered by the mediation privilege); 1154 (OCE's letter regarding the scope of discovery); 1157 (Committee's letter to Court disputed discovery issues); see also Nov. 16 Transcript, 113:2-5.

While discovery was ongoing, the Debtor filed disclosure statements and proposed plans which incorporated the Insurance Settlement. Dkt. No. 1393. The Court approved Fifth Amended Disclosure Statement in support of the Fifth Amended Plan on April 6, 2022. Dkt. No. 1447.

The Committee opposed the Insurance Motion and filed a motion for summary judgment seeking denial of the Insurance Settlement on April 6. Dkt. No. 1451. The Committee later filed a motion for judgment under Federal Rule 52(c), which effectively incorporated the summary judgment motion. Dkt. No. 2667. The decision on these motions (the "9019 Decision") is issued contemporaneously with this Decision.

The Committee Settlement

Throughout this time, the Debtor and the Committee continued to engage in mediation sessions. See, e.g., Nov. 16 Transcript, 113:6-17. At a mediation session on April 11, 2022, the Debtor and the Committee reached an agreement on the monetary portion of the settlement, and they continued to negotiate other terms of what became the committee settlement agreement (the

9

"Committee Settlement"). Apr. 12 Hrg., at 4:07 pm; Nov. 16 Transcript, 114:19-116:23; IC-102
("Weisenberg Dep. Transcript"), 82:15-83:15.

Following the agreement reached on April 11, the Committee used the Fifth Amended Plan
and its corresponding trust distribution procedures as an initial draft, revised those documents and
sent redlines to the Debtor's counsel. Nov. 16 Transcript, 117:24–118:1; JX-0434. The Plan
Proponents continued to negotiate and revise the documents, either during or following calls, with
one side or the other marking up the documents and sending the redline to the other side. Id. 118:1–
7; Weisenberg Dep. Transcript, 58:2-59:7. Negotiations between the Debtor and the Committee
regarding the Plan were contentious. Nov. 16 Transcript, 118:11–14.

Emails and redlines of documents reflect the editing process between the Debtor and the
Committee. See JX-0419–0449; JX-0451–0470; Weisenberg Dep. Transcript, 84:7-16. The
Debtor continued to negotiate the provisions of the TDPs. Id. at 149:14–16. For example, the
Committee initially proposed that the most severe of the Survivor Claims be liquidated through
jury trials in state court, and the Debtor objected to that proposal. Nov. 16 Transcript, 123:18–23,
124:8–9. That provision ultimately was not included in the Plan. In addition, the Debtor sought
reimbursement of defense costs that it might incur in defending abuse claims, to which the
Committee ultimately agreed. Weisenberg Dep. Transcript, 83:22-84:6.

### The Plan

As noted, the Disclosure Statement and Plan, along with the accompanying Trust
Agreement and the TDPs were filed on June 1, 2022. Dkt. Nos. 1724, 1725. The Plan Proponents
filed two supplements to the Plan. Dkt. Nos. 2006, 2089. The Plan is the only plan pending
approval before the Court. Dkt. No. 3069 at 27 (citing Dec. 28, 2022 Hrg. at 2:50).[6] The Plan

---

[6] The Fifth Amended Plan was filed by the Debtor and supported by the Insurers, but both have
now proposed new disclosure statements or plans. There is no indication the Fifth Amended Plan
was ever solicited, and no trial date for confirmation was set. Similarly, the Court ruled it will not
consider the Insurers' disclosure statement until after it rules on this Plan.

Proponents filed a revised proposed confirmation order (the "Revised Confirmation Order") altering certain language and aspects in the Plan on October 4, 2022. Dkt. No. 2586.

Article III of the Plan establishes nine classes of claims, and the claims in each class are substantially similar to the other claims in that class. Plan Art. 3.1–3.3. The Plan specifies that claims in Class 1 (Priority Non-Tax Claims) are unimpaired under the Plan and are conclusively presumed to have accepted the Plan. Plan Art. 5.1. The Plan designates claims in Class 2 (PNC Bank Claim), Class 3 (General Unsecured Claims), Class 4 (Pension Claims), Class 5 (Survivor Claims Other than Unknown Survivor Claims), Class 6 (Unknown Survivor Claims), Class 7A (Survivor Related Contingent Claims), Class 7B (Survivor Related Contingent Claims), and Class 8 (Non-Abuse Litigation Claims) (collectively, the "Impaired Classes") as impaired and specifies the treatment of the claims in these classes. Id. Arts. 5.2–5.9.

The Plan provides for the treatment of Unclassified Claims, including Administrative Expense Claims, Priority Tax Claims, U.S. Trustee Fees, and Fee Claims. Plan Arts. 4.1–4.4. The Plan provides that: "[a]ll U.S. Trustee Fees due and payable prior to the Effective Date shall be paid by the Debtor on the Effective Date. After the Effective Date, the Reorganized Debtor shall pay any and all U.S. Trustee [fees] when due and payable." Id. Art. 4.3. The payment of Fee Claims to retained professionals will be subject to final review by the Court under section 330 of the Bankruptcy Code. Id. Arts. 2.2.54, 4.4; Disclosure Statement, Art. X(f).

### i.    The Trust

Under the Plan, Survivors' Claims will be channeled to a trust (the "Trust") to be established on the Effective Date by a channeling injunction ("Channeling Injunction"). Plan Art. 11.2. Pursuant to the Plan, the Committee selected Michael Dundon to be the administrator (the "Trust Administrator"). Dkt. No. 2006. Either the Debtor, or the Trust Administrator may object to the Survivor Claims. Plan Arts. 8.6, 12.12. With respect to the Survivor Claims, including those

that are Unknown Survivor Claims, the Trust will be funded with: (i) $87.5 million by the Debtor and the OCE; (ii) any proceeds held by the Debtor or the Reorganized Debtor on account of Insurance Settlement Agreements as set forth in Article 7.2 of the Plan; and (iii) the Transferred Insurance Interests (defined below). Plan Art. 7.2.1.

The total $87.5 Million will be comprised of $67.25 million from the Debtor, $10 million from DOCT, $10 million from the OCE, and $250,000 from the Catholic Ministry Entities other than DOCT. Plan Art. 7.2.2 The Debtor's contribution of $67.25 million is comprised of $29.75 million on the effective date of the Plan (the "Initial Contribution"), and then $10 million on the first, second, and third anniversaries of the Effective Date, and $7.5 million on the fourth anniversary of the Effective Date. Id. Art. 7.2.2. The Initial Contribution will be comprised of $14.75 million in non-restricted cash accounts held by the Debtor, and a $15 million loan from DOCT (the "DOCT Loan"). Id.; PP-0419. The Debtor's yearly contributions will be funded by loans from DOCT. Plan Art. 7.2.2.

In addition to the $10 million contribution on the Effective Date of the Plan, the Parishes, Schools, and Missions will: (i) waive claims against the Debtor's estate, and (ii) grant a lien on their Revolving Fund assets to secure the Debtor's over-time payments to the Trust. Id.; Nov. 10 Transcript, 143:15–17. Similarly, in addition to its $10 million contribution, DOCT will contribute (i) a loan of $15 million to assist in funding the Initial Debtor Contribution, and (ii) a waiver of claims against the Debtor's estate. Plan Art. 7.2.2; Nov. 10 Transcript, 143:5–13. The Catholic Ministry Entities will contribute (i) $250,000 to the Trust on the Effective Date, and (ii) a waiver of claims against the Debtor's estate. Plan Art. 7.2.2; Nov. 10 Transcript, 143:15–19.

As noted, under the Plan, the Debtor's interest in the Policies will be transferred to the Trust. The Plan defines this as the Debtor's and the OCE's rights to receive Insurance Policy proceeds (the "Transferred Insurance Interests") and claims (the "Coverage Claims") under or

12

relating to the Insurance Policies issued by the Insurers are assigned to the Trust. Plan Arts. 2.2.34, 2.2.107, 7.2.3. Specifically, "Transferred Insurance Interests" is defined as "(a) the proceeds of such Non-Settling Insurer Policies and all claims for such proceeds; and (b) all coverage claims against the Non-Settling Insurers, including, but not limited to, all claims based on, or related to, the Non-Settling Insurers' conduct concerning insurance coverage for, or defense or settlement of, any [Survivor] Claim." Id. Art. 2.2.107. The Trust Agreement contemplates wind-down and termination of the Trust after (i) liquidation, administration, and distribution of the Trust assets, and (ii) its full performance of all other duties and functions set forth in the Plan, the Trust Agreement, and the TDPs. Id. Art. 7.13; Trust Agreement Art. 4.2. The Plan also provides that the Trust Advisory Committee ("TAC") will be established pursuant to the Trust Agreement on the Effective Date. Plan Art. 7.7. The TAC will be appointed by the Committee. Id.; Trust Agreement Art. VII. The TAC has the right to approve the Trust Administrator's compensation. Trust Agreement Art. VI. The First Supplement to the Plan discloses that the initial members of the TAC will be the members of the Committee. Dkt. No. 2006.

There are three mechanisms for valuing and resolving Survivor Claims: (i) the Expedited Distribution, (ii) the Initial Review Determination; and (iii) the Verdict Value Assessment. Plan, Art. 8; TDPs Arts. 4-8 The Expedited Distribution grants a $2,500 payment to resolve any Survivor Claim that is properly filed and signed if the Survivor elects such treatment. Plan Art. 8.3. The other Survivor Claims will be assessed by the abuse claims reviewer, Paul Finn (the "Survivor Claims Reviewer"), in accordance with the guidelines in the TDPs. Plan Arts. 2.2.2, 8.2. Finn was selected by the Committee. Dkt. No. 2006 (the "First Plan Supplement"). Under the Initial Review Determination, the Survivor Claims Reviewer will determine whether a claim is allowed and review the claim to determine the number of points to be assigned to any allowed claim, representing the Survivor's share of the Trust assets. TDPs Art. 1, 4; Plan Art. 8.3. This mechanism

does not impact the amounts to be paid into the Trust by any party, but instead only the percent of the Trust's assets paid to any specific claim. See Plan Art. 8.2. The Survivor Claims Reviewer can be removed for breaching his or her fiduciary obligations. Trust Agreement Art. 3.2.12.

Finally, the Plan and TDPs call for some claims to undergo a "Verdict Value Assessment," through which a retired judge, (the "Neutral"), will review the claim to estimate the amount of damages that a reasonable jury might award, referred to as the "Verdict Value." TDPs Art. 8. The Neutral will be selected by the Trust Administrator in consultation with the TAC and other parties and be subject to Court approval. Revised Confirmation Order ¶ 9; TDPs Art. 8(ii).

The Verdict Value Assessment process is described in Article 8 of the TDPs. Any Insurer whose policy is implicated by a claim undergoing this process will be notified and given "reasonable" opportunity to participate, including presenting potentially applicable defenses at its own expense. TDPs Art. 8(viii). A Survivor is required to participate by responding to "reasonable" discovery requests from the Debtor or Insurers, cooperating with the Neutral in establishing the value and validity of the claim, sitting for a single six-hour sworn deposition, and submitting to a mental health exam. TDPs Art. 8(v). The TDPs also specify that the Neutral is to consider evidence submitted by the Trust Administrator, the Survivor, the Debtor, or an Insurer, and the relative fault of other parties potentially responsible for the injury to the Survivor, as well as to apply the same standard of proof under applicable law. Id. Art. 8(vi). However, neither the Plan, the Trust Agreement, nor the TDPs list any specific criteria or factors of what would be necessary to establish that a claim be allowed, or how to determine the value of a given claim. See Plan; Hinton Declaration ¶¶ 27, 38; TDPs Arts. 11(i), 8(vi). In fact, the TDPs specify that the "precise method, manner and procedures" shall be determined by the Neutral upon written notice to parties. TDPs Art. 8(ix). Further, the TDPs limit discovery to ninety days, barring exceptional circumstances, as determined by the Neutral. Id. Art. 8(iv).

Under the TDPs, the Neutral issues a written Verdict Value decision. Only the Trust Administrator or the Survivor may appeal the Verdict Value through the "State Court Option." TDPs Arts. 8(xi) and 9(i).[7] Alternatively, the Trust Administrator may make seek satisfaction of the of the Verdict Value from any responsible Insurer. Id. Art. 8(xii). If the responsible Insurer does not satisfy the request within thirty days, the Trust Administrator can reduce the Verdict Value to a "stipulation of judgment" and pursue a coverage claim in state court against any such Insurer. Id. Art. 8(xiii). The Plan's language is inconsistent regarding the extent that the Plan and the TDPs impact the Insurers' potential defenses in any state court coverage action. See Plan Arts. 7.8.1.2, 10.1.1; TDPs Art. 9(v).

The Plan also contains an Exculpation Provision. Plan Art. 11.6. Exculpated parties include: the Debtor, the Estate, the Committee, the Trade Committee and professionals that:

> were retained in the Chapter 11 Case by the Debtor, the [Committee], and the Trade Committee; the officers and directors of the Debtor that served during the Chapter 11 Case; the members of the College of Consultors of the Debtor that served during the Chapter 11 Case; and the members of the finance council of the Debtor.

Dkt. No. 2586. The Exculpation Provision further states that none of these parties shall have any liability for:

> any claim to . . . any other party in interest, for any act or omission that occurred from the Petition Date through Effective Date in connection with the Chapter 11 Case, or the filing of the Chapter 11 Case or the formulation, negotiation or pursuit of confirmation of this Plan.

Id. However, the Exculpation Provision excludes acts of willful misconduct and gross negligence. See id.

---

[7] There is no definition of State Court Option in the Plan or the TDPs. The State Court Option is "described," but not in Article 9 of the TDPs, but this description is limited to its availability and certain aspects of its use. The Court cannot ascertain if the Trust Administrator must pursue a claim de novo, or by, in effect, appealing the "stipulation of judgment." Further, the meaning of the stipulation within the State Court system is not clear.

15

The Plan states the Debtor is not releasing claims against the OCE "related to loans made by the Debtor to an Other Catholic Entity or accounts receivable from an Other Catholic Entity." Plan Art. 2.2.97. The Insurers are the only party to file an objection to the Exculpation Provision or Debtor Release. The Court previously ruled that the Insurers have standing to object to this clause, in its decision resolving several discovery disputes (the "Discovery Decision"). Dkt. No. 2226.

The Plan also includes a "Judgment Reduction Clause." Plan Art. 9.3. The clause includes the following language: "[If] a reduction is not made as described above, then any Contribution Claim by any Non-Settling Insurer against any of the Settling Insurers shall be reduced by the Reduction Amount."

The Court approved the Disclosure Statement on June 20, 2022, and the Plan Proponents began the solicitation process. Dkt. Nos. 1724, 1818. The Plan was properly noticed and sent to creditors, which largely supported the Plan. Classes 2-6 voted in favor of the Plan, with a minimum acceptance level of 97.8%. Dkt. No. 2218 (the "Daloia Declaration") Ex. A. Classes 7A and 7B were deemed to reject the Plan and therefore did not vote. Class 8 initially voted to reject the Plan but the two voting creditors in the class have since settled with the Plan Proponents and have changed their votes to be in favor of the Plan. See Dkt. No. 3231.

The Trial

The Committee Settlement is mutually exclusive of the Insurance Settlement, and the Plan Proponents seek approval of their agreement through the Plan. See Dkt. Nos. 1451, 1725, 2476. A joint trial (the "Trial") was scheduled to consider approval of the Insurance Motion and confirmation of the Plan (the "Plan Confirmation").

The final pretrial order for the Insurance Motion and Plan Confirmation specifies that the Debtor and the Insurers would each present three witnesses in support of the Insurance Settlement. Dkt. No. 2610. Because of the Plan, the Debtor no longer supports the Insurance Motion. However,

the Insurers stepped in to present the case in favor of the Insurance Motion, using the witnesses the Debtor had previously designated to testify in support of the Insurance Motion. Specifically, the Insurers called Wilen (originally listed as the Debtor's witness) as a fact witness as well as Marc Scarcella; Rory Comiter; and Paul Hinton as expert witnesses. The Insurers did not call any of their own fact witnesses. The Debtor presented Father Hughes; and Montgomery as fact witnesses, but only to discuss the Debtor's asserted changed circumstances. Id. The Committee called two expert witnesses in opposition to the Insurance Motion, Kathryn McNally and Professor Tom Baker.

In support of confirmation of the Plan, the Plan Proponents put forth the same fact witnesses: Father Hughes, Montgomery, and Wilen. Additionally, the Committee called Jeffrey Prol as a fact witness and McNally, and Carl Salisbury as expert witnesses. The Insurers put forth the following expert witnesses: Comiter, Hinton, Scott Harrington, Dr. Eileen Treacy, Karen Bitar, and David McKnight.[8] Deposition testimony of several witnesses was also admitted including: Mathew Dundon IC-001; Paul Finn IC-069 and 75; Michael Hogan IC-087; Patrick McGrory IC-095; Brent Weisenberg IC-102; Stuart Phillips LMI-1187; and William Curtis LMI-1196.[9] The Trial commenced on October 6, 2022, and after fourteen days of trial, concluded on December 1, 2022.

Father Hughes testified regarding the Debtor's relationship with the OCE, and that, among other reasons, the bankruptcy was necessary to avoid mass litigation brought by Survivors against the Debtor and multiple OCE. See Nov. 9 Transcript; Nov. 10 Transcript. Father Hughes further testified that the releases and injunctions were essential to the Plan. Nov. 9 Transcript, 96:9-97:25;

---

[8] Although the Insurers listed Scarcella as only a witness for the 9019 Motion, they discussed his testimony in opposing the Plan. Dkt. No. 3079 at 21, 24, 26, 31-34.

[9] The Court approved designated portions of these depositions by Order dated December 6, 2022. Dkt. No. 2898.

118:21-119:7. Montgomery is the Debtor's finance officer and served as the secretary for administration and finance. Nov. 10 Transcript, 102:25-103:16. She testified as to the Debtor's annual revenues and expenses. Id. at 114:8-129:5. Montgomery further testified as to the Debtor's cash flow projections. Id. at 145:2-9. Wilen is a partner at Eisner, the Debtor's financial advisor for the Bankruptcy Case. Nov. 14 Transcript, 8:23-9:2. Wilen testified as to the contributions made by the OCE to the Plan and the value of their waivers of indemnification and contribution claims. Id. at 11:21-14:18. Finally, Prol testified regarding the mediation sessions between the Debtor and the Committee and negotiations over the Committee Settlement and the terms of the Plan and TDPs. Nov. 16 Transcript, 96:12–24; 107:8-109:21; 117:19-120:2; 124:8-127:25. All of these witnesses testified credibly.[10]

The Plan Proponents and the Insurers put forth several experts to testify regarding the value of the Survivor Claims and the Insurance Policies. McNally testified with respect to the Survivor Claims filed and their value. PP-0281 ¶ 25. Salisbury testified as an expert witness on behalf of the Plan Proponents regarding the Policies, the liability exposure of the Insurers, the potential coverage defenses, and cost to the Trust of pursuing coverage. PP-0280 ¶ 1. Salisbury testified that the Policies do not have aggregate limits, nor do they have exclusions for sexual abuse misconduct, and that under New Jersey law, the Policies could require the Insurers to cover many of the Survivor Claims, making the Policies very valuable. Id. ¶¶ 17-29, 33-34. However, because valuation of Survivor Claims is not a basis for distribution under the Plan, nor for confirmation of the Plan, the Court issues no opinion on the validity of these valuations.

The Insurers put forth several experts to rebut the Plan Proponents' experts, or to testify in their own right to the value of the Survivor Claims and Policies. Scarcella, Comiter and Hinton each offered testimony in rebuttal to McNally's valuation of the Survivor Claims, however, as

---

[10] As discussed in the 9019 Decision, Wilen was not credible as to the issue of valuing the Survivor Claims, but this did not impact his credibility when testifying about the Plan.

explained in the 9019 Decision, each of these experts based their opinions on the flawed valuation performed by Wilen, and therefore have limited value here. See 9019 Decision. Moreover, as noted above, so long as the Court finds that the value of the contributions to the Trust made by the Debtor and OCE is reasonable, there was limited value as to the remainder of this testimony. Hinton and Comiter both also offered opinions on the value of the Policies, but for much the same reasons, their testimony also offered little assistance. See LMI-1438-A ¶10; Oct. 20 pm Transcript.

The Insurers also presented several experts to testify regarding the TDPs and their potential impact on the Insurers. Harrington testified regarding the potential impact of the TDPs on the Insurers' contractual rights and liabilities under the Policies. LMI-1442 ¶ 8. Harrington testified that the Plan would fundamentally alter the contractual relationship between the Debtor and Insurers. Id. ¶ 49. Specifically, Harrington testified that the Plan improperly assigns the Policies to the Trust, and the TDPs create an incentive to increase recoveries from Insurers, eliminates Insurers' rights including the right to participate in the defense of claims and impairs the Insurers defenses to coverage. Id. ¶¶ 11, 58. Bitar similarly testified that the TDPs eliminate both procedural and substantive protections of the tort system. LMI-1441. Bitar testified that the TDPs do not have neutral decision makers, do not lay out criteria for the valuation of claims, and presumes all claims to be valid. Id. ¶¶ 7, 10. Hinton similarly observed that there are no criteria for disallowing claims in the Plan or TDPs, and that in his opinion the valuation procedures were too subjective. LMI-1438-A ¶¶ 8, 10. Hinton also testified that the TDPs did not ensure that the SIRs would be paid. Id. ¶¶ 40-44.

Dr. Treacy testified that the TDPs did not adequately prevent against fraudulent claims. LMI-1440 ¶ 10. Specifically, Dr. Treacy testified that in order to prevent such claims, the TDPs must include an in-person clinical interview and the administration of tests to measure the damages of any alleged abuse. Id. Finally, McKnight testified regarding the negotiations and drafting the of

the TDPs and the economics of the Insurance Settlement. IC-510 ¶ 2. McKnight testified that the Insurers invested significant resources in negotiating the Settlement and incurred over $2 million in legal costs due to the Debtor's bankruptcy. Id. ¶ 7. However, little if any of this portion of McKnight's testimony appears relevant to whether the Plan should be confirmed. McKnight also testified that the Debtor lost any economic stake in negotiating the terms of the TDPs once the Debtor and Committee agreed on the economic terms of the Committee Settlement. Id. ¶¶ 10-12. McKnight further opined that the Debtor's lack of economic interest, and the small number of billable hours its attorneys spent drafting the TDPs in comparison to the Committee's attorneys, shows that the Committee drafted with the TDPs without the Debtor being "heavily" involved. Id. ¶¶ 17-19.

On October 22, 2022, the Committee filed the Motion for Judgment, seeking a directed verdict in the Insurance Motion. Dkt. No. 2667. The 9019 Decision discusses that motion and the Insurance Motion.

The Insurers' Adversary Claim

On May 19, 2022, the Insurers filed an adversary complaint (the "Insurers' Adversary Claim") against the Debtor. Adv. No. 22-01123, Dkt. No. 1. The Court subsequently entered orders allowing the Committee and the Trade Committee to intervene in the Insurers' Adversary Claim. Id. Dkt. Nos. 29 and 30. On September 1, 2022, the Court entered an order denying the Debtor's motion to dismiss but extended the Debtor's deadline to file an answer until after a decision on the Plan. Id., Dkt. No. 32.

The Insurers' Adversary Claim alleges that the Debtor violated its implied duty of good faith and breached the Insurance Settlement when it reached the mutually exclusive agreement with the Committee. Id. Dkt. No. 1. According to the complaint, the Insurance Settlement required the Debtor to seek entry of a confirmation order for the Fifth Amended Plan. Additionally, the

Debtor was required to seek: (1) a finding from the Court that the Insurance Settlement was the result of long-term negotiations, (2) that the $30 million settlement was good and valuable consideration, (3) that the Insurance Settlement was necessary to the Fifth Amended Plan, and (4) was necessary to the success of the reorganization. The Insurers note that the Insurance Settlement did not contain a "fiduciary out" provision "allowing the Debtor to change its mind and refuse to seek approval of the [Fifth Amended] Plan based on fiduciary obligations or otherwise." Id. ¶ 39. The Insurers argue that the Debtor breached the Insurance Settlement by entering into the Committee Settlement, and then failing to seek approval of the Insurance Settlement and Fifth Amended Plan. The complaint seeks damages not only for the amounts expended by the Insurers in seeking approval of the Insurance Settlement, but also in any amount for which the Insurers are found to be liable above the $30 million required under the Insurance Settlement. See id. The Insurers argue that their claim is entitled to administrative expense priority (the "Administrative Claims").

**Discussion**

Section 1129 of the Bankruptcy Code requires the Court to confirm a Chapter 11 plan that meets certain requirements. In re Trenton Ridge Invs., LLC, 461 B.R. 440, 455 (Bankr. S.D. Ohio 2011). The Plan Proponents must establish by a preponderance of the evidence that each of the confirmation requirements in section 1129 has been met. In re Boy Scouts of Am. & Del. BSA, LLC, 642 B.R. 504, 553 (Bankr. D. Del. 2022), aff'd, 2023 WL 2662992 (D. Del. Mar. 28, 2023); In re Briscoe Enters., 994 F.2d 1160, 1165 (5th Cir.1993). The requirements vary depending on whether the plan is consensual or non-consensual. Trenton Ridge Invs., 461 B.R. at 455. For a non-consensual plan, confirmation occurs under section 1129(b) – if the plan meets all of the other requirements of that subsection with respect to each impaired, non-accepting class and if the plan satisfies the applicable requirements of section 1129(a) other than section 1129(a)(8). Id. at 458.

In this case, there were two classes presumed to reject the Plan, and one class that that voted against confirmation, however, each of those classes have since either settled, or their claims would be extinguished as part of the implementation of the Plan as explained above. As such, the Court will review each of the contested elements of section 1129(a) and (b) with respect to the Plan.

As noted, the Insurers filed the only objection to the Plan. As a threshold matter, the Court will review each of the uncontested elements of section 1129, and then will consider the portions to which the Insurers have standing to, and did, object.

<u>Uncontested Portions of Plan</u>

The Court notes that subsections 1129(a)(6) (approval of rate changes), (14) (domestic support obligations), and (15) (individual debtors) do not apply, and therefore, are not discussed below.

A.  <u>Section 1129(a)(1)</u>

Bankruptcy Code section 1129(a)(1) requires that "[t]he plan compl[y] with the applicable provisions of this title." 11 U.S.C. § 1129(a)(1).[11] Courts interpret this language to mean that a plan must meet the requirements of Bankruptcy Code sections 1122 and 1123. <u>See, e.g.</u>, <u>In re EnviroSolutions of New York, LLC</u>, 2010 WL 3373937, at *2-3 (Bankr. S.D.N.Y. July 22, 2010); <u>In re G-I Holdings Inc.</u>, 420 B.R. 216, 258 (D.N.J. 2009). Sections 1122 and 1123 govern classification of claims and contents of a plan, respectively. <u>Boy Scouts of Am.</u>, 642 B.R. at 633.

i.  *Section 1122*

Section 1122 requires that all claims which are classified together be substantially similar, which "insures that large claims of differing legal natures do not dictate other claims within a

---

[11] The Insurers argue that the Plan violates the Bankruptcy Code because it impermissibly transfers the Debtor's interest in the Policies to the Trust. This objection is considered in conjunction with the Insurers related objections that the transfer of the Policies is "forbidden by law" under section 1129(a)(3), below.

class." G-I Holdings, 420 B.R. at 258 (quoting In re Resorts Int'l, Inc., 145 B.R. 412, 447 (Bankr. D.N.J. 1990)).

Article III of the Plan separately classifies nine classes of claims: Class 1 contains priority non-tax claims; Class 2 contains the PNC loan claim(s); Class 3 contains all non-tort general unsecured claims; Class 4 contains all pension claims; Class 5 contains all known Abuse Claims; Class 6 contains all unknown Abuse Claims; Classes 7A and 7B include all indemnification and contribution claims of the OCE; and Class 8 contains all non-abuse tort litigation unsecured claims. Plan Arts. 3.1-3.3, 5.1-5.9. There are no objections to the classification of claims and because the division of these claims is based on sound financial rationales, the Plan Proponents have established by a preponderance of the evidence that the Plan's classification satisfies section 1122(a).

### ii. Section 1123

Section 1123(a)(1) addresses the contents of a plan and requires that a plan designate classes of claims and interests. 11 U.S.C. § 1123(a)(1). As described above and consistent with this requirement, Article III of the Plan adequately classifies the claims and interests. Administrative claims and priority tax claims do not require designation under Section 1123(a)(1). In re PC LIQUIDATION CORP., 2006 WL 4567044 (Bankr. E.D.N.Y. 2006). The Plan Proponents have established by a preponderance of the evidence that the Plan satisfies the requirements of section 1123(a)(1).

Section 1123(a)(2), (3) requires that a plan specify which classes are unimpaired and the treatment of any impaired classes under the plan. 11 U.S.C. § 1123(a)(2), (3). Here, the Plan designates which classes are impaired, and specifies their treatment, establishing by a preponderance of evidence that section 1123(a)(2), (3) is satisfied. Plan Arts. 3.1-3.3, 5.1-5.9.

Section 1123(a)(4) provides that a plan shall "provide the same treatment for each claim or interest of a particular class" unless the holder agrees to a less favorable treatment. The Third Circuit has concluded that this requirement means that all claimants must have the same opportunity to recover on their claims. Boy Scouts of Am., 642 B.R. at 636 (citing In re W.R. Grace & Co., 729 F.3d 311, 327 (3d Cir. 2013)). Here, the Plan provides for the same treatment of each claim within a particular class, establishing by a preponderance of evidence that section 1123(a)(4) is satisfied. Plan Art. 5.1-5.9.

Section 1123(a)(5) of the Bankruptcy Code provides that a plan must provide adequate means for its implementation. PC LIQUIDATION, 2006 WL 4567044. Here, the Plan provides for the establishment and funding of the Trust, and procedures for making distributions to all claim holders in the Bankruptcy Case. Plan Arts. 7.1-7.4, 8.1-8.4, 12.1-12.12. Further, the Plan provides for the funding of payments of all claims through ongoing operations.

Section 1123(a)(6) of the Bankruptcy Code requires a plan to provide for the inclusion in the charter of the debtor, if the debtor is a corporation, a provision prohibiting the issuance of non-voting equity securities. PC LIQUIDATION, 2006 WL 4567044. Section 1123(a)(6) of the Bankruptcy Code does not apply here because the Plan does not propose to issue any non-voting equity securities.

Section 1123(a)(7) requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan . . . ." 11 U.S.C. § 1123(a)(7). This section requires that a plan provide for the manner of selection of any director, officer or trustee of the reorganized debtor, or any successor to such officer, director or trustee, and such selection be consistent with the interests of creditors and equity security holders and with public policy.

Here, the Plan provides that the Debtor's officers will not be changed and as discussed below, all officers and directors of the Debtor are mandated by state law and are consistent with the interests of creditors. Accordingly, the Plan Proponents established by a preponderance of the evidence that the Plan satisfies the requirements of Section 1123(a)(7).[12]

Finally, section 1123(a)(8) involves individual debtors, and so does not apply. See 11 U.S.C. § 1123(a)(8).

The Plan Proponents have substantially complied with the Bankruptcy Code and Rules provisions regarding disclosure, notice, and solicitation with respect to the Plan, the Disclosure Statement, and other matters in connection with this Chapter 11 case. As permitted by section 1123(b)(2) of the Bankruptcy Code and Article XIII of the Plan, all executory contracts and unexpired leases not rejected on or before the date of a confirmation order will be deemed assumed as of the Effective Date. Plan Art. 13. The Debtor has exercised reasonable business judgment in determining to assume the executory contracts and unexpired leases under the Plan. The assumption of each executory contract or unexpired lease assumed under the Plan shall be binding on the Debtor and each non-debtor party to each such executory contract or unexpired lease. Id.

Under section 1123(b)(3) a plan may provide for "settlement of adjustment of any claim . . . belonging to the debtor or to the estate, or the retention and enforcement by the debtor . . . of any such claim." 11 U.S.C. § 1123(b). The Plan Proponents argue the Plan satisfies this requirement because the Plan provides that the Debtor or Reorganized Debtor, or the Trust Administrator, as applicable, shall have the right to pursue objections to Claims. Dkt. No. 3070 at 7-8 (citing Plan Arts. 8.6, 12.12). However, section 1123(b)(3) provides that a plan may provide

---

[12] The Insurers appear to object to confirmation of the Plan under section 1129(a)(7), however, the substance of those arguments consider appointment of allegedly conflicted fiduciaries, and do not refer to the best interest of creditors test. See, e.g., Dkt. No. 3079 at 96. This objection is overruled as the Insurers lack standing to object on these grounds. Moreover, there are no Directors or Officers being appointed, so this section does not appear to be applicable, as discussed below in related section 1129(a)(5).

for the settlement or adjustment of any claim or interest belonging to the debtor or to the estate, or

the retention and enforcement of any such claim or interest. See In re TCI 2 Holdings, LLC, 428

B.R. 117, 135 (Bankr. D.N.J. 2010) (citing 11 U.S.C. § 1123(b)(3)(A)) (emphasis added). The

Bankruptcy Court approves any such settlements under the same standard as described in Rule

9019. See In re One2One Commc'ns, LLC, 2016 WL 3398580 at *5 n.7 (D.N.J. June 14, 2016).

However, section 1123(b)(3) applies only to actions "belonging" to the estate, and not to actions

"against" the estate. In re Dynamic Brokers, Inc., 293 B.R. 489, 496 (B.A.P. 9th Cir. 2003). As

such, the Court does not accept the Plan Proponents' argument. Nevertheless, no party objected to

the Plan on the grounds that it violates section 1123(b)(3) by improperly settling or retaining any

action belonging to the estate, and the Court finds the Plan properly retains or settles all actions

belonging to the estate, excluding those being transferred to the Trust, which are considered below.

Therefore, section 1123(b)(3) is satisfied.

Section 1123(b)(6) states that a plan may include any provision not inconsistent with

applicable provisions of the Bankruptcy Code. See 11 U.S.C. § 1123(b)(6). In this case, the Plan

provides for third-party releases and includes the Exculpation Provision. Plan Art. 11.6; Dkt. No.

2586. The Exculpation Provision is discussed later in this decision.

Regarding the third-party releases, the Plan proposes to release the Survivors' claims

against the OCE. See Plan Art. 8.8. In In re Continental Airlines, 203 F.3d 203 (3d Cir. 2000), the

Third Circuit considered whether a plan's provisions enjoining suits against director and officers

was permissible. The court reviewed decisions from other circuits, and ultimately concluded that

the factual record before it was insufficient to meet the "hallmarks of permissible non-consensual

releases – fairness, necessity to the reorganization, and specific factual findings to support these

conclusions . . . ." Id. at 214.

Since Continental, "the Third Circuit and courts within the circuit have approved third-party releases when appropriate and consistent with Continental's guidelines." Boy Scouts of Am., 642 B.R. at 587 (citing United Artist Theatre Co. v. Walton (In re United Artists Theatre Co.), 315 F.3d 217, 227 (3d Cir. 2003); In re Global Indus. Tech., Inc., 645 F.3d 201, 206 (3d Cir. 2011)). Moreover, the Third Circuit has ruled that a bankruptcy court has statutory and constitutional authority to enter a final order confirming a plan with non-consensual third-party releases if those releases are "integral to the restructuring of the debtor-creditor relationship." In re Millenium Holdings, II, LLC, 945 F.3d 126 (3d Cir. 2019). The Third Circuit noted that the record supported the conclusion that the releases were critical to the success of the plan and that the released parties would not have contributed to the plan without receiving releases. Id. at 137.

Further, the Court has authority to grant the releases even though "the Bankruptcy Code does not explicitly authorize the release and permanent injunction of claims against non-debtors, except [when resolving asbestos claims.]" Continental, 203 F.3d at 211. However, the court in Boy Scouts of Am. concluded that sections 1123(a)(5) and (b)(6) provides statutory authority for third party releases. Boy Scouts of Am., 642 B.R. at 594-95. The Second Circuit reached the same conclusion in In re Purdue Pharma L.P., 69 F.4th 45 (2d Cir. 2023), cert. granted, --- S.Ct. ---, 2023 WL 5116031 (Aug. 10, 2023). Based upon those decisions, the Court concludes that third-party releases may be included in a plan.

Having determined that third party releases may be included in a plan, the Court turns to whether they are fair and necessary to the Debtor's reorganization. Continental, 203 F.3d at 214. In Boy Scouts of Am. the court reviewed factors set out in In re Master Mortg. Inv. Fund, Inc., 168 B.R. 935 (Bankr. W.D. Mo. 1994). In Purdue, the Second Circuit identified a seven-factor test, which incorporated the Master Mortg. factors. Purdue, 69 F.4th at 78-79. Those factors are whether: (1) there is an identity of interest between the debtor and the released parties; (2) the

claims against the debtor and released parties are factually and legally intertwined; (3) the scope
of the releases is appropriate; (4) the releases are essential to the reorganization; (5) the non-debtors
will contribute substantial assets to the reorganization; (6) the impacted class of creditors has
overwhelmingly voted in support of the plan; and (7) the plan calls for fair payment of the enjoined
claims. Id. As discussed below, after reviewing each of these factors, the Court concludes that the
releases are appropriate.

### a.  Identity of Interests

Purdue explained that the identity of interests test includes indemnification relationships
that could deplete the estate. Purdue, 69 F.4th at 78. Here, there was substantial evidence to show
an identity of interests. The Debtor and many of the OCE are the insured under the Policies and
the Debtor is required to indemnify the OCE for costs of litigation. See JX-0001-00015, 0471-
0480. In addition, Father Hughes testified that the Debtor and the OCE work together, in their
individual roles to carry out the overall mission of the Catholic Church as a whole. Nov. 9
Transcript, 36:1-56:22. Specifically, Father Hughes testified that the Debtor acts as a resource to
the Parishes, both financial and structural. Id. at 36:1-6. Father Hughes further testified about the
services provided by the OCE, through the schools, cemeteries, Parishes, and other services
provided within the Diocese. Id. at 38:17-41:25. He gave examples of the financial support
provided by the Debtor, including financial aid or tuition waivers, which allow the schools to carry
out their mission of education. Id. at 45:10-47:9. Further, as described above, both Montgomery
and Wilen testified regarding how intertwined the Debtor and OCE are financially, and that the
Revolving Fund "is the Diocesan Bank," and the Parishes deposit funds in excess of one month's
operating expense, and the Revolving fund lends money back to the Parishes for capital
expenditures. Nov. 10 Transcript, 13:1-6; Nov. 14 Transcript, 148:2-12. This is similar to Purdue,
where the court noted that the debtor was closely held, and ownership took a significant role in

running the debtor. See id. at 79-80. Therefore, the Court concludes that there is a substantial identity of interests between the Debtor and the OCE, and this factor weighs in favor of the releases.

### b.  The Claims Are Intertwined

The second factor requires the Court to consider whether the claims against the Debtor and the OCE are factually and legally intertwined. The Survivors' claims against the OCE are based on the same facts and law as would be raised against the Debtor. See JX-0048–0410. As a result, the witnesses and other evidence would largely be the same. Therefore, this factor weighs in favor of approving the releases.

### c.  The Releases are Necessary, and their Scope is Appropriate

The third factor, whether the releases are reasonable and scope, and the fourth factor, whether the releases are necessary, are often considered together. Purdue, 69 F.4th at 80. The court in Purdue stated that "a release is proper in scope when its 'breadth' is 'necessary to the Plan.'" Purdue, 69 F.4th at 78. A release is necessary if, "without the releases, 'there is little likelihood of [a plan's] success.'" Id. (quoting Master Mortg., 168 B.R. at 935).

In this case, the release is limited to channeled claims, which are defined in the Plan as: "all (a) [Survivor] Claims and Indirect Claims, except for any portion of such Claims that are Non-Settling Insurer Policy Claims; (b) Contribution Claims; (c) Medicare Claims; and (d) Extra-Contractual Claims relating to the Claims listed in subsections (a)–(c) of above." Plan Art. 2.2.21. As noted, the OCE have agreed to waive all contribution and indemnification claims against the Debtor and the Insurers related to the Survivor Claims in exchange for being released from such claims by the Survivors. Plan Art. 7.2.2. Montgomery testified that releases were necessary in order for the OCE to provide their contributions and waivers. Nov. 10 Transcript, 142:13-144:7. Additionally, the OCE will release their interests in the Policies related to the Survivor Claims.

Plan Arts. 2.2.34, 2.2.107, 7.2.3. Moreover, Prol testified that the transfer of the Policies was a significant portion of the consideration to the Committee. Nov. 16 Transcript, 119:14-25.

In Purdue, the court found the releases were necessary to ensure the trust funds set aside for the beneficiaries were not depleted. "Otherwise, the Debtors would . . . be required to litigate indemnity and contribution claims brought against them by the Sacklers, which would likely deplete the res, no matter the ultimate outcome of those claims." 69 F.4th at 80. Similarly here, without these releases, the OCE would not waive contribution and indemnity claims against the Debtor, and the funds placed in the Trust would be depleted litigating these claims, and possibly paying out some portion to the OCE on account of these claims. Further, it would not be possible for the Debtor to transfer its interest in the Policies to the Trust without transferring the OCE's interest in those Policies, and the transfer of the Policies was critical to the Committee Settlement. Additionally, the overall funding is dependent on the OCE's contributions, and the loans from DOCT. Finally, the releases are limited to claims related to the Survivor Claims. Given this, the Court finds the releases are appropriate in scope and necessary to the reorganization.

### d. Substantial Contribution

The Purdue court stated that, in evaluating whether the contribution is substantial, the "primary focus is on the impact of the financial contribution." 69 F.4th at 81. In this case, as described above, the released parties will be contributing $20.25 million. Plan Art. 7.2.2. Additionally, DOCT will provide the Debtor with annual loans to allow the Debtor to meet its payment obligations under the Plan. The OCE will be transferring their interests in the Policies and waiving their claims for indemnity and contribution against the Debtor. Wilen credibly testified that, when considering both the financial assets being contributed, and the claims and interests which the OCE were waiving, the contribution was substantial. Nov. 14 Transcript, 159:11-19. The Court agrees.

30

*e. Overwhelming approval by Creditors*

The sixth factor is whether the impacted class of creditors "overwhelmingly" voted in support of the plan with the releases. Purdue, 69 F.4th at 78 (citing Master Mortg., 168 B.R. at 935). The reference point to define "overwhelming" support for a plan requires approval by a minimum of 75% of voting creditors of the impacted class to approve the Plan. Id. (citing 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb)); Boy Scouts of Amer., 642 B.R. at 607. In Boy Scouts, the Court found overwhelming support where 82.41% and 85.72% of the affected classes voted in favor of the Plan. Id. at 606. In Purdue, the Court found overwhelming approval where over 95% of the affected class voted in favor of the Plan. Here, over 97% of the affected creditors approved of the Plan including the releases, which is more than sufficient to find overwhelming support. Dkt. No. 2218, Daloia Declaration.

*f. Fair payment of the enjoined claims*

The court in Purdue stated that "we are concerned with the fairness of the payment, as opposed to the final amount of payment." Purdue, 69 F.4th at 79. As such, the Court found that "the determinative question is not whether there is full payment, but rather whether the contributed sum permits the fair resolution of the enjoined claims." Id. In that case, the court noted that the estimated value of the claims far exceeded the amount of money contributed by the Sackler's, but that the claimants themselves were treated equally, and the overall settlement was fair and equitable. Id. at 82.

Similarly here, the value of all the Survivor Claims may exceed the funding within the Trust. However, the Plan creates an intricate system to resolve each of the Survivor Claims, ensuring that the Survivors themselves are treated equally and fairly, each awarded points representing their share of the Trust. TDP Art. 13. Additionally, any proceeds recovered from the Insurers under the Policies will added to the Trust and distributed on a pro rata basis depending on

a Survivor's total final points awarded and the available funds for distribution. Id. Therefore, the Court finds the payment to be fair. Because all of the Purdue factors weigh in favor of approving the third-party releases, the Court concludes that the releases are fair and necessary and comply with the law.

The remaining subsections of 1123(b) are either satisfied, or not applicable to this case. Similarly, section 1123(c) applies only to individuals and therefore is not applicable.

### B. Section 1129(a)(2)

Section 1129(a)(2) requires that "the proponent of the plan complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(2); G-I Holdings, 420 B.R. at 262 (citing In re PWS Holding Corp., 228 F.3d 224, 248 (3d Cir. 2000)). Courts interpret this language to require that the plan proponent comply with the disclosure and solicitation requirements set forth in Bankruptcy Code sections 1125 and 1126. See, e.g., G-I Holdings, 420 B.R. at 262; In re Johns-Manville Corp., 68 B.R. 618, 630 (Bankr. S.D.N.Y.1986).

The Plan Proponents have substantially complied with the Bankruptcy Code and Rules provisions regarding disclosure, notice, and solicitation with respect to the Plan, the Disclosure Statement, and other matters in connection with this Chapter 11 case.

As noted, the Court entered an Order approving the Disclosure Statement. Dkt. No. 1818. Thus, the Debtor has established by a preponderance of the evidence that the requirements of section 1129(a)(2) are met. The Plan was accepted by every class except classes 7A, 7B and 8, each of which are discussed below. Dkt. No. 2218. The Affidavit of Service of Solicitation Materials establishes that the Disclosure Statement and Plan were properly solicited. Dkt. No. 2093.

C.  Section 1129(a)(4)

Section 1129(a)(4) of the Bankruptcy Code requires that all payments made or to be made by the Debtor or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, have been approved by, or are subject to the approval of, the court as reasonable. PC LIQUIDATION, 2006 WL 4567044.

In this case, all payments made by the Debtor or to be made to professionals retained by orders of the Court will be subject to review and approval by this Court under section 330 of the Code. Plan Art. 2.2.54; Disclosure Statement Art. X(f). Further, the Court will retain jurisdiction to determine all fee applications and any disputes regarding the reasonableness of fees. Plan Art. XVI(g); Disclosure Statement Art XXI(g). Accordingly, the Plan satisfies section 1129(a)(4) of the Bankruptcy Code.

D.  Section 1129(a)(7)

Section 1129(a)(7), the "best interest of creditors test," is a protection for individual creditors whose claims are impaired. Even if voting shows a class has accepted treatment, a plan may not be confirmed unless each holder of a claim has accepted the plan or

> will receive or retain under the plan on account of such claim . . . value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

Boy Scouts of Am., 642 B.R. at 661.

The Debtor argues that section 1129(a)(7) does not apply to non-profits that cannot be liquidated. The Court disagrees. The court in Boy Scouts of Am. found that 1129(a)(7) applies to nonprofits because "there is nothing illogical about requiring a nonprofit to show that it can meet this requirement in order to obtain the benefits of a confirmed plan." Id. at 662.  A nonprofit can voluntarily file a bankruptcy case under either Chapter 11 or Chapter 7 or it can look to its state

33

law alternatives. But, to "obtain a discharge in bankruptcy, it must meet all applicable requirements
of § 1129." Id.

Here, all voting classes supported the Plan by two-thirds in amount and one-half in number.
Dkt. No. 2218. Further, the OCE have agreed to waive their potential claims in exchange for
releases. Plan Arts. 5.7(c), 5.8(c). Finally, the Liquidation Analysis and credible testimony of
Wilen regarding the Liquidation Analysis established that creditors will receive or retain under the
Plan, on account of such claim, property of a value, as of the Effective Date, that is not less than
the amount that such holder would receive or retain if the Debtor was liquidated under Chapter 7
of the Bankruptcy Code. PP-0420; Nov. 14 Transcript, 25:25-26:15.

The Liquidation Analysis provides that unsecured Creditors would receive, at best, a 3.4%
distribution in a hypothetical Chapter 7 liquidation. PP-0420. The methods and assumptions used
by Wilen in preparing the Liquidating Analysis were not credibly challenged by any party.
Unsecured Creditors would fare worse under the Liquidation Analysis if there was a finding that
the Class 5 Claims are worth more than Wilen's valuation of approximately $34 million. Id., Nov.
14 Transcript, 25:25-26:15. Under the Plan, unsecured trade claimants will receive a 75%
distribution. Plan Art. 5.3. The exact recovery for Survivor Claimants cannot be known, as those
claims have not yet been valued. However, assuming the Court were to accept McNally's highest
valuation of $785.1 million, and that the Policies transferred to the Trust have a value of $0, the
$87.5 million cash received from the Trust would still result in a recovery of over 11%. Therefore,
recoveries under the Plan are at least equal to those that would be available if the Debtor was
liquidated pursuant to Chapter 7 and, therefore, the Plan satisfies the requirements of Section
1129(a)(7) of the Bankruptcy Code. PP-0420.

E.  Section 1129(a)(8)

Bankruptcy Code section 1129(a)(8) provides that "[w]ith respect to each class of claims

or interests (A) such class has accepted the plan; or (B) such class is not impaired under the plan."

11 U.S.C. § 1129(a)(8). However, if the class is impaired, the court must determine whether the

class has accepted the plan. Boy Scouts of Am., 642 B.R. at 624–25. If it has, the inquiry stops as

to that class. Put simply, in the first instance, the creditors in the class speak for themselves as to

the "fairness" of their treatment. Id.

Classes 1-6 voted in favor of the Plan, and therefore section 1129(a)(8) is satisfied for those

classes. Class 8 voted to reject the Plan, however, the only creditors in Class 8 that cast ballots

have reached a settlement with the Debtor and as part of that settlement have recast their votes in

favor of the Plan. Dkt. No. 3231. This leaves only Classes 7A and B. Although the creditors in

these classes support the Plan, they are presumed to reject the Plan and their votes were not

solicited, and therefore the Court must take another step.

If an impaired class rejects the plan, then the Court must look to section 1129(b). Boy

Scouts of Am., 642 B.R. at 624–25. Section 1129(b)(1) provides that, despite a plan not complying

with section 1129(a)(8), the court shall confirm a plan if "it does not discriminate unfairly" and "is

fair and equitable" to that dissenting class. Section 1129(b)(2) specifies in detail how to determine

whether that standard is met. The court is required to make these findings because the plan is being

"crammed down" over the presumptive wishes of the class. Id.

"Discriminate unfairly" is a horizontal comparative assessment applied to similarly

situated creditors (here unsecured creditors) where a subset of those creditors is classified

separately, does not accept the plan, and claims inequitable treatment under it. In re Trib. Co., 972

F.3d 228, 232 (3d Cir. 2020) (citations omitted). "'[F]air and equitable' (a redundant term) should

be pictured vertically, as it 'regulates priority among classes of creditors having higher and lower

priorities.'" Id. (quoting Bruce A. Markell, A New Perspective on Unfair Discrimination in Chapter 11, 72 Am. Bankr. L.J. 227, 227-28 (1998)). For example, secured creditors are a higher priority for payment than unsecured creditors. Id.

In this case, Classes 7A and 7B are the OCE, whose claims are impaired because they will not receive a distribution under the Plan and will waive those claims as a contribution in exchange for a release from all claims of abuse for which they may be liable. Plan Art. 5.7-5.8. Given that the claims the OCE are waiving (i.e., claims for contribution and indemnification for liability for abuse actions) are premised on liability the OCE may face for such claims, the Court finds this treatment to be both fair and equitable, and not unfairly discriminatory. The OCE will also be making a payment of $10 million in exchange for releases under the Plan. Moreover, the OCE support the Plan, showing that they believe the treatment they are receiving is both fair and equitable. Therefore, this element is satisfied.

### F.  Section 1129(a)(10)

Section 1129(a)(10) requires that "if a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan." In re Mallinckrodt PLC, 639 B.R. 837, 893 (Bankr. D. Del. 2022). In this case, several Impaired Classes voted in favor of the Plan, including Classes 2–6 and 8. Plan Art. 4.3; Dkt. No. 2218. Therefore, the Plan Proponents have established that section 1129(a)(10) is satisfied.

### G.  Section 1129(a)(12)

Section 1129(a)(12) requires the payment of all fees payable under 28 U.S.C. § 1930. Mallinckrodt, 639 B.R. at 896. Here, the Plan provides that: "[a]ll U.S. Trustee Fees due and payable prior to the Effective Date shall be paid by the Debtor on the Effective Date. After the Effective Date, the Reorganized Debtor shall pay any and all U.S. Trustee [fees] when due and

payable." Plan Art. 4.3 Therefore, the Plan Proponents have met their burden and established that section 1129(a)(12) is satisfied.

## H.   Section 1129(a)(13)

Section 1129(a)(13) of the Code requires that the Plan provide for continued, post-confirmation payments of all retiree benefits at the levels established in accordance with section 1114 of the Code. Mallinckrodt, 639 B.R. at 896. Here, the Plan provides for the continued payments to the Debtor's pension plans, which are funded through Class 4 of the Plan. Plan Art. 4.3. As such, the Plan Proponents have met their burden and satisfied section 1129(a)(13).

## I.   Section 1129(a)(16)

Section 1129(a)(16) requires that all transfers of property under the plan shall be made in accordance with any applicable provisions of non-bankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation of trust. In re Pearl Res. LLC, 622 B.R. 236, 264 (Bankr. S.D. Tex. 2020).

Here, all transfers of property under the Plan will be made in accordance with any applicable provisions of non-bankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation of trust; accordingly, the Plan satisfies the requirements with section 1129(a)(16).

## J.   Section 1129(c)

Section 1129(c) provides that "[i]f the requirements of subsections (a) and (b) of this section are met with respect to more than one plan, the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm." 11 U.S.C. § 1129(c). In re Trib. Co., 464 B.R. 126, 207 (Bankr. D. Del.), on reconsideration in part, 464 B.R. 208 (Bankr. D. Del. 2011), aff'd sub nom. In re Trib. Media Co., 587 B.R. 606 (D. Del. 2018), aff'd sub nom. In re Trib. Co., 972 F.3d 228 (3d Cir. 2020), and aff'd in part sub nom. In re Trib. Media

Co., 587 B.R. 606 (D. Del. 2018), and aff'd sub nom. In re Trib. Co., 972 F.3d 228 (3d Cir. 2020).

As discussed, the Fifth Amended Plan was never solicited and therefore is not before the Court for

approval. Therefore, there is only one plan pending before the Court and so this section is not

applicable.

### K.  Section 1129(d)

Section 1129(d) of the Bankruptcy Code provides that, on request of a governmental unit,

the court may not confirm a plan if its principal purpose is the avoidance of taxes or the avoidance

of the application of section 5 of the Securities Act of 1933, as amended. PC LIQUIDATION,

2006 WL 4567044. Here, no government entity has objected to confirmation, and the Plan

Proponents have demonstrated by a preponderance of the evidence that the primary purpose of the

Plan is other than to avoid taxes or the application of the Securities Act.

### Disputed Portions of the Plan

### A.  1129(a)(9) and (11)

"Section 1129(a)(9) generally provides that holders of claims entitled to priority under

section 507(a) of the Code receive payment in full in cash [on the effective date of the plan] unless

the holder of a particular claim agrees to different treatment." Mallinckrodt, 639 B.R. at 893 (citing

11 U.S.C. § 1129(a)(9)). In this case, the Plan provides for the treatment of administrative expense,

priority tax and other claims entitled to priority under section 507(a)(1)-(8) as required under

1129(a)(9). Plan Art. 4.1-4.4.

However, the Insurers argue that the Plan does not provide for payment of their asserted

Administrative Expenses because the Plan does not create a reserve to pay the full amount of their

potential claims. The Insurers further object to confirmation on the grounds that the Plan is not

feasible because the Debtor lacks the funding to pay the full amount of their potential

Administrative Claims, as well as being unable to make payments to the Trust as required under the Plan.

The feasibility requirement under section 1129(a)(11) of the Bankruptcy Code provides that a court shall confirm a plan only if confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan. In re W.R. Grace & Co., 475 B.R. 34, 114 (D. Del. 2012), aff'd sub nom. In re WR Grace & Co., 729 F.3d 332 (3d Cir. 2013) (quoting 11 U.S.C. § 1129(a)(11)). However, the test under section 1129(a)(11) does not require a guarantee of success, merely that there "is a reasonable probability the provisions of the Plan can be performed." G-I Holdings, 420 B.R. at 267.

The Court first considers the Insurers' argument that it is not feasible for the Debtor to make payments to the Trust required by the Plan, and then whether the Debtor is able to treat the Administrative Claims as required by section 1129(a)(9).

The Debtor's recent income was $50.7 million in 2019, $49.5 million in 2020 and $43 million in 2021. Disclosure Statement at 52. The Debtor's income was impacted by the COVID pandemic in 2020-21. Id. at 39. The Debtor's cash flow projections provide for total (unrestricted and restricted) cash income of $49 million in 2022, $54 million in 2023, $57 million in 2024, $60 million in 2025, and $61 million in 2026. PP-0419. The Plan requires an initial $29.75 million transfer to the Trust on the effective date, comprised of $14.75 million from the Debtor and $15 million from DOCT. Plan Art. 7.2.2. Additionally, the Plan requires the Debtor to make a $10 million payment at the end of each of the first three anniversaries and a $7.5 million payment at the end of the fourth year after the effective date. Id.

The Insurers argue the Plan is not feasible for several reasons, chief among them, that neither the Debtor, nor DOCT can afford to make the payments required under the Plan. Dkt. No.

3079 at 172-77. The Insurers initially argue that the Debtor's cash flow projections are not supported and show large unexplained increases in income without justification. Id. at 175. The Insurers also, and seemingly inconsistently, argue that the Debtor's cash flow projections are premised on additional loans from DOCT that are not provided for in the Plan, and the cash flow projections are unrealistic without these loans being made. Dkt. No. 3079 at 171-72.

As to the reasonableness of the cash flow projections, the Debtor's income was reduced in 2020-22 due to COVID and the accompanying lockdown. PP-0226 ¶ 9. It is reasonable that as the lockdown ends and the fears associated with COVID subside, participation in Church services will increase as will donations. Further, the prior year's income shows a steady increase in charitable donations by parishioners since COVID has largely passed, providing support for the reasonableness of future cash flow projections. Dkt. No. 1724. Finally, Montgomery credibly testified as to the reasonableness of the cash flow projections. Nov. 10 Transcript, 145:7-146:25. She further testified as to the significant real property and other assets the Debtor has available to liquidate if necessary to make up for any shortfall. Id. at 147:1-5. As to the issue with DOCT making loans, the Insurers point out there is no provision in the Plan or the Disclosure Statement requiring DOCT to make these loans to the Debtor, however, DOCT's release is dependent upon the Plan being consummated, and therefore, DOCT has a vested interest in ensuring that happens. As such, the Court finds the Plan Proponents have met their burden under 1129(a)(11).

The Insurers next argue that DOCT cannot make the loan distributions, along with its other financial obligations without violating the requirement to maintain 200% of the PNC Loan balance in its accounts. Dkt. No. 3079 at 174-75. The Insurers argue that DOCT is required to make its own $10 million contribution to the Trust and also to lend the Debtor: (i) $14.75 million for the Initial Contribution, (ii) $12 million in DIP financing, and (iii) $37.5 million to assist the Debtor in funding its contributions to the Trust, for a total of $74.25 million. Id. The Insurers argue that

the Debtor has presented evidence that the current balance in DOCT is $110 million. Once the $74.25 million is removed, DOCT will be left with $35.75 million. See id. As noted above, this argument is not based on facts presented at Trial, as there was no evidence or testimony to support either that DOCT is required to maintain 200% of the balance of the PNC in its accounts, nor that DOCT was lending the Debtor $12 million as part of a DIP financing agreement (the "DIP Loan"). The Insurers cite to a certification filed after the Trial as part of a separate motion. See Dkt. No. 3079 at 374-75 (citing Dkt. No. 2919). This objection could be overruled on those grounds alone, but even if the Court accepts the allegations and the figures put forth by the Insurers, there are still flaws in this argument.

The Insurers' argument that DOCT cannot make these $10 million loans without violating the capital requirements for the PNC Loan is premised on the finances of DOCT and the Debtor remaining static over the next several years, which is not plausible. As noted, DOCT currently has approximately $110 million in funds; after its contribution to the Trust and the loans it must make to the Debtor through the DIP Loan and the Initial Contribution, it still is projected to have over $70 million. See Dkt. No. 3079 at 174-75; Nov. 14 Transcript, 37:1-3. Even taking the Insurers' argument and their figures at face value, DOCT would not be in any danger of its funds falling below the 200% threshold mandated by the PNC Loan agreement until year 5. See id. During that time, the Debtor expects to make its required payments on the PNC Loan, reducing the balance, and therefore the capital reserves DOCT is required to maintain. See PP-414; Nov. 10 Transcript, 135:22-137:17; Dkt. No. 3079. In fact, under the Debtor's projections, by year 5, DOCT will only be required to maintain $36 million in reserve. Dkt. No. 3079 at 175. Therefore, even assuming that DOCT does loan the Debtor a total of $74.25 million, as the Insurers argue it must, that would leave $35.75 million in reserve at the time DOCT funds the final $7.5 million. In the intervening years it is reasonable to assume that DOCT will continue to invest its funds, growing the principle

to make up the shortfall that would exist at that time, or that the Debtor could renegotiate the terms of the PNC Loan to alter the capital reserve requirements.[13] As discussed, section 1129(a)(11) does not require a guarantee of success, only that there "is a reasonable probability the provisions of the Plan can be performed." G-I Holdings, 420 B.R. at 267. The Court finds it is reasonably probable that DOCT will be able to loan the required funds to the Debtor and maintain the capital reserves required under the PNC Loan.

The Insurers next argue that the Plan is not feasible because the Debtor will not be able to pay the Administrative Claims asserted by the Insurers on the effective date, and that the Debtor must maintain a "reserve" sufficient to satisfy those administrative claims for the Plan to be feasible. Dkt. No. 3079 at 182. The Administrative Claims are based on the Debtor's alleged breach of the Insurance Settlement, which the Insurers argue caused them to incur additional fees and costs to advocate for the Insurance Settlement once the Debtor withdrew its support. Id. The Insurers argue that Insurance Settlement did not include a "fiduciary out" provision, and so the Debtor was not permitted to back out of the agreement based on its obligations to the estate. The Administrative Claims are for an unspecified amount, but the Insurers argue the claims total at least $2.4 million and could be as much as $123.5 million. See Dkt. No. 3079 at 182-85 (citing IC-510 (the "McKnight Declaration")). The amount is based on analysis detailed by McKnight, who stated that between September of 2021 and April 2022, "the Insurers incurred $2.4 million in legal fees and professional costs related to the Debtor's Bankruptcy [Case]." McKnight Declaration ¶ 7. This amount includes costs of hiring experts to testify in support and counsel fees to argue in

---

[13] Furthermore, it appears that the Insurers only considered the $12 million of additional debt in their argument - they did not reduce the administrative expenses which were paid from the DIP Loan proceeds. See Dkt. Nos. 2841, 2919. The $12 million DIP Loan was not included in the Debtor's projections because the DIP Loan was made after the Trial. See PP-0419. It appears that if the $12 million were added to Cash Sources, the Debtor would not be required to draw down on cash on hand. See Dkt. No. 2841; PP-0414. As such, it is likely the Debtor would have additional cash at the end of the final year to reduce the PNC Loan balance or pay back a portion of the loans from DOCT.

support of the Insurance Motion at trial. Id. ¶ 7; Dkt. No. 3079 at 183. Hinton similarly testified as

to the amount of money expended supporting the Insurance Settlement. Nov. 30 Transcript, 97:25-

98:6. As further support, the Insurers submitted fee statements (the "Fee Statements") that were so

heavily redacted making it impossible to determine what was done, for how long, or at what rate.

See IC-511-517. Finally, the Insurers argue the Administrative Claim includes any amount of

liability they face on Survivor Claims above the $30 million agreed to in the Insurance Settlement.

Dkt. No. 3079 at 183. This amount could be as much as $94 million according to Hinton. Hinton

Declaration ¶ 15.

   Initially, the Court questions whether the Debtor is required to support an agreement that

is not in the best interest of the estate because it did not contain a "fiduciary out." "[I]t is

'Bankruptcy 101' that a debtor and its board of directors owe fiduciary duties to the debtor's

creditors to maximize the value of the estate, and each of the estates in a multi-debtor case." In re

Innkeepers USA Tr., 442 B.R. 227, 235 (Bankr. S.D.N.Y. 2010). In that case, the debtor had

entered into a sale agreement which included a fiduciary out allowing the debtor to take any action,

including a decision to terminate the agreement, if it determined such action was necessary to

fulfill its fiduciary obligations under applicable law. Id. However, there was an exception, stating

that the fiduciary out did not apply to any decision to "annul, modify, amend, or otherwise alter"

any portion of the agreement, unless doing so in "pursuit of an alternative transaction that will

provide [the other party] with a higher and better recovery" than that proposed under the sale

agreement. The court found that the language in this contract "prevents the Debtors from electing

to fully exercise their fiduciary duties to maximize the value of [the estate]." Id. at 235. The Court

finds this reasoning applicable here. The Insurers argue that, because the Insurance Settlement

contains no specific language about the Debtor's fiduciary obligations, the Debtor should be barred

from fulfilling those obligations even if another deal is proposed which would increase the value

of the estate. Adopting such reasoning would essentially permit a debtor to contract away its fiduciary obligations. As such, and without making any determination as to the Insurers Adversary Claim at this time, this argument does not persuade the Court that the Plan is not feasible.

More significantly, the Insurers have not established that the amount of the Administrative Claim would be large enough to render the Plan infeasible. The Fee Statements submitted for review were heavily redacted, making it impossible for the Court to determine which tasks were being charged, the reasonableness of those tasks, or the extent to which they were related to the Insurance Settlement or other aspects of the Bankruptcy Case, or whether they were tasks the Insurers would have otherwise incurred in support of the Insurance Settlement regardless of the Debtor's conduct. See IC-511-17. Moreover, under New Jersey law, damages resulting from a breach of contract are limited to damages that are a foreseeable consequence of the breach committed. Totaro, Duffy, Cannova & Co., L.L.C. v. Lane, Middleton & Co., L.L.C., 191 N.J. 1, 14 (2007) (citing Donovan v. Bachstadt, 91 N.J. 434, 445 (1982)). Because the Insurers took an active role supporting the Insurance Motion, they would have incurred much of these costs regardless of the Debtor's alleged breach, and so these costs are not compensable because they are not a consequence of the alleged breach. For example, the costs of the experts that the Insurers retained prior to the Debtor's alleged breach, and the amounts spent preparing those experts for trial are likely not compensable, as the Insurers would have incurred those costs regardless of whether the Debtor supported the Insurance Settlement.

In this case, both McKnight and Hinton testified as to the total fees and costs the Insurers incurred that were "related to the bankruptcy proceedings," but failed to specify which, if any were a consequence of the Debtor's alleged breach. See McKnight Declaration ¶ 7. Similarly, the Court questions the value of McKnight's analysis, since it was limited to costs and expenses incurred

from September 2021 through April 2022, prior to the Debtor's alleged breach.[14] For example,

McKnight includes Comiter's fees of $355,500, however, Comiter was hired and her report was

filed March 9, 2022, prior to the Debtor allegedly breaching and withdrawing its support for the

Insurance Settlement. See Dkt. Nos. 3079 ("the Debtor took no further actions to prosecute the

9019 Motion following April 11.") and 1453-27. Similarly, Scarcella's expert report was also filed

March 9, 2022, prior to the Debtor's alleged breach. Indeed, the original trial date for the Insurance

Motion was April 6, 2022. These costs were incurred prior to the Debtor's alleged breach and

therefore, are not a foreseeable consequence of that breach, as they would have been incurred even

assuming the Debtor had fully performed under the Insurance Settlement. While the Court is not

making any decision on the Insurers' Adversary Claim, it is required to determine the probability

of the Debtor's ability to pay the Administrative Claims, and based on the facts presented at the

Trial, the Court does not find it probable that the Administrative Claims will be as high as the

Insurers argue.

Finally, the Insurers' argument that the Administrative Claims will include all amounts for

which the Insurers are held liable above the $30 million agreed to in the Insurance Settlement is

similarly problematic. As explained in the 9019 Decision, the Court did not approve the Insurance

Settlement based upon a failure of the Insurers and the Debtor to meet their burden under either

Rule 9019 or section 363 of the Bankruptcy Code. See 9019 Decision. Although the Insurers may

argue that this was due to the Debtor's failure to support the Insurance Settlement, the Court notes

that both Comiter's and Hinton's expert reports were completed in March, prior to the Original

Trial Date of April 6, 2022, and the Debtor's alleged breach did not occur until after that date. See

---

[14] The Insurers appear to argue that the entire process of negotiating the Insurance Settlement was
a ruse and the Debtor never intended to support it. Dkt. No. 3079 at 135-137. However, the Insurers
have not provided support for this, and the testimony of Father Hughes, describing the Debtor
commitment to mediation and the Insurance Settlement was credible. Nov. 9 Transcript, 73:1-
76:25, 117:15-25.

45

Dkt. No. 1219. As noted, the Court does not make any findings regarding the legitimacy or extent of the Administrative Claims, which will be decided in the Insurer's Adversary Claim. The Court is merely evaluating the probable success of the Plan if confirmed based upon the evidence presented at Trial. The Insurers may have Administrative Claims, but the amounts of those claims were not established by the evidence presented at Trial and appears likely to be significantly less than the $2.4 million the Insurers allege. Based on this finding, and the Debtor's significant assets in cash reserves,[15] real estate, and other holdings, the Court finds it probable that the Debtor will have sufficient funds to pay the Administrative Claims as required by section 1129(a)(9), and that while success is not guaranteed, the Plan Proponents have met their burden of proof to show that the Plan is feasible under section 1129(a)(11).

B. Section 1129(a)(5)

Sections 1129(a)(5) and 1123(a)(7) of the Bankruptcy Code require the proponent of a plan to disclose the identity and affiliations of any individual proposed to serve, after confirmation, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor or a successor to the debtor under the plan, and to show that the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity security holders and with public policy. Section 1129(a)(5) also requires disclosure of the identity of any insider that will be employed by the reorganized debtor, and the nature of any compensation for such insider. PC LIQUIDATION, 2006 WL 4567044.

In this case, the directors and officers the Debtor are mandated by state law. Under N.J.S.A. § 16:15-10, the five trustees of the Debtor are the Bishop, the Vicar General, the Chancellor, and two priests of the Diocese whom they elect. PP-0266 ¶ 3. The Plan discloses that the Board of Trustees will not change following confirmation of the Plan. Moreover, to the extent applicable,

---

[15] Wilen testified that the Revolving Fund's balance was $74 million as of November 2022. Nov. 14 Transcript, 13:9-10.

the Plan Proponents have properly and adequately identified the members of the TAC and the

Trust Administrator as the parties that will govern the Trust. Dkt. No. 2006. Appointment of those

individuals is consistent with the interests of Survivors because the members of the TAC are the

current Committee members who have knowledge of the case and will continue to act in the

interests of Survivors.

The Insurers object under sections 1129(a)(5) and 1123(a)(7).[16] Specifically, the Insurers

argue that the Trust fiduciaries are conflicted, that Dundon and Finn both fail the disinterested test,

and under the TDPs have too much discretion. Dkt. No. 3079 at 96-97. This is particularly the case

where the Trust Administrator and the Abuse Claims Reviewer have influence in the valuation of

Survivor Claims. Id. The Insurers argue that Dundon has ties with the Committee's attorneys,

plaintiffs attorneys, and acts as advisor to claimants in other mass tort cases. IC-001 at 94:22-

95:14; 136:6-10. Similarly, the Abuse Claims Reviewer, Finn, acknowledged prior relationships

with a number of the firms representing Survivors in this case. IC-069 at 101:24-103:7.

The Insurers lack standing to object on these grounds, as this Court detailed in the

Discovery Decision. Dkt. No. 2226. However, to be thorough, the Court considers the merits of

the Insurers' position. This issue was addressed in Boy Scouts of Am., which noted that "[s]ections

1123(a)(7) and 1129(a)(5) do not apply to members of a trust advisory committee particularly in a

case, such as this one, where the debtor is reorganizing and will emerge post-confirmation." 642

B.R. at 640. However, the court went on to find that "to the extent that a trust advisory committee

with veto powers exercises them to prevent a trustee from fulfilling her duties, that trustee must be

able to petition the court for appropriate relief." Id. (citing In re Eagle-Picher Indus., Inc., 203 B.R.

256, 268 (S.D. Ohio 1996)). The court further noted that several revisions had been made to reduce

---

[16] The Insurers cite to section 1129(a)(7), and not section 1123(a)(7). See Dkt. No. 3079 at 96.
However, based on the content of the arguments made, it appears the Insurers' objection was on
the grounds listed under section 1123(a)(7).

the control or authority the trust advisory committee held over the trustee. Id. at 643. The trust

advisory committee in Boy Scouts of Am., originally had veto power over the selection of the

neutral, but that was removed and left in the sole discretion of the trustee. Id. The advisory

committee also lost veto power over many other provisions, including employment of outside

professionals and the questionnaires to be given to claimants. In the end, the court found the

remaining authority the trust advisory committee held over the trustee was limited and not such

that it would improperly constrain the trustee and that the trust advisory committee's powers now

"more accurately comports with its name – settlement trust advisory committee." Id. The court in

Boy Scouts of Am. thus overruled the objections raised on these grounds. Id.

The Court agrees with the analysis in Boy Scouts of Am. and finds it equally applicable

under these facts. As the TDPs are laid out in the Plan, the TAC would have significant authority

and power over the Trust, the Trust Administrator, and the Neutral. However, as explained above,

the Trust Administrator and Claims Reviewer do not directly impact the rights of the Insurers but

can only impact the rights of the Survivors. Further, the Revised Confirmation Order states that

the Trust Administrator is "authorized to . . . appear and be heard before the Bankruptcy Court on

all matters relating to the Chapter 11 Case." Dkt. No. 2586 at 9. Additionally, the Survivors whose

claims are determined under the TDPs have not objected, and the Plan was accepted by over 97%

of the Survivors. Dkt. No. 2218, Daloia Declaration. As such, the Court finds that the members of

the TAC are not subject to the provisions of section 1129(a)(5)(A)(i), and to the extent they are,

the Plan provisions are consistent with the requirements of the Bankruptcy Code.

However, the Neutral may have a significant impact on the Insurers' rights as the Neutral

will set the value of the Survivor Claims prior to the Trust seeking coverage from the Insurers. As

such, in order for the Neutral to live up to its title and truly be neutral, the TAC cannot have

influence over the Neutral. The Revised Confirmation Order requires that appointment of the

Neutral shall be by motion of the Trust Administrator and is subject to Bankruptcy Court approval. Id. at 10. However, the Court finds the standards laid out in the Revised Confirmation Order do not go far enough, and while Court approval is proper, at a minimum, the selection must be made either together with the Insurers, or at this Court's discretion after input from interested parties. For this reason, the Plan cannot be confirmed.

## C.  Section 1129(a)(1) and (3)

Section 1129(a)(3) provides that the court shall confirm a plan only if "[t]he plan has been proposed in good faith and not by any means forbidden by law." PWS Holding Corp., 228 F.3d at 242 (quoting 11 U.S.C. § 1129(a)(3)). The Court will first consider whether the Plan violates the Bankruptcy Code or state law, and then will consider the good faith requirements.

### i.    Transfer of the Policies

Initially, the Insurers object on the grounds that the transfer of the Policies under the Plan violates both the Bankruptcy Code and the state law. Dkt. No. 3079 at 66. The Insurers argue that, whether selling the Policies under section 363 of the Bankruptcy Code, or assigning them under section 365, the Bankruptcy Code does not allow a debtor to transfer the beneficial aspects of a contract without transferring its corresponding obligations. Id. at 70. Specifically, the Insurers argue that the Plan is attempting to transfer the right to recover under the Policies to the Trust, without transferring the obligations remaining in the Policies, specifically referencing the obligation to defend against any claims, and to pay the SIRs for any claims. Id. at 71. Moreover, the Insurers argue that, in this case, section 365 of the Bankruptcy Code must govern, because the contracts are executory, as the Debtor's duty to defend against claims, pay the SIR amounts and comply with other portions of the Policies are material obligations under the Policies. The Insurers argue the Debtor has not provided adequate assurance of the Trust's performance of these and

other obligations as required by section 365 of the Bankruptcy Code, and therefore the Plan is not confirmable under section 1129(a)(1). Id. at 72.

The Court has already established that the Policies are property of the estate. "Under the Bankruptcy Code, if a contract is not executory, a debtor may assign, delegate, or transfer rights and/or obligations under section 363 of the Bankruptcy Code, provided that the criteria of that section are satisfied." In re Boy Scouts of Am. & Delaware BSA, LLC, 650 B.R. 87, 144 (D. Del. 2023) (quoting Boy Scouts of Am., 642 B.R. at 668) (quoting In re Am. Home Mortg., 402 B.R. 87, 92-93 (Bankr. D. Del. 2009)). In circumstances similar to this case, the court in Boy Scouts of Am., found that the Bankruptcy Code permitted the debtors to "transfer their property rights consistent with applicable state law." 642 B.R. at 668. As such, to the extent section 363 of the Bankruptcy Code is applicable, the assignment of the Policies does not violate the Bankruptcy Code.

This Court finds that the that the Policies in this case are not executory. The "obligations" discussed by the Insurers do not render the Policies executory. Regarding the Insurers' argument that the Debtor's duty to defend renders the Policies executory, there is significant caselaw indicating that this is not the case. See Riley v. Mut. Ins. Co. Ltd., 2019 WL 9596537, at *8 (E.D. Pa. Jan. 8, 2019). "Several courts have held that an insured's unfulfilled duty to defend under an insurance policy does not render the policy executory." In re Ames Dep't Stores, Inc., 1995 WL 311764, at *1, 3-4 (S.D.N.Y. May 18, 1995) (insured's obligation to defend claims within the $50,000 deductible did not make the policy executory); In re Fed. Press Co., Inc., 104 B.R. 56, 62 (Bankr. N.D. Ind. 1989) (insured's obligation "to defend matters brought against it which are covered by the policies" did not make policies executory). Similarly, there is caselaw finding that payment of the SIRs are not prerequisites to the Insurers obligation to pay, and instead merely set a floor on the claim amounts below which the Insurers have not agreed to make any payments. See

Fed. Press, 104 B.R. at 63 (Under Indiana law, injury victims may "recover under a valid insurance policy from the insurer itself in the event the insured is unable to pay due to its insolvency or bankruptcy."); In re FF Acquisition Corp., 422 B.R. 64, 67 (Bankr. N.D. Miss. 2009) (The debtor's ongoing obligation to fund the SIR did not make the policy an executory contract, insofar as providing a defense is concerned.).

Further, even assuming that the Policies are executory, the Court finds that the Plan Proponents have provided adequate assurance of performance, in that the Trust will have sufficient funding to pay any defense and SIR costs. Moreover, as is discussed in the Insurance Neutrality section below, there is adequate assurance of future performance, because neither this nor any other plan can be confirmed unless the Insurers rights and defenses are preserved, including any defense related to the insured's failure to perform its obligations under the Policy. Therefore, the transfer of the Policies is permissible under section 365 of the Bankruptcy Code.

However, regarding the Insurers' objection that the transfer of the Policies violates New Jersey law, the issue is more complicated. There are dozens of Policies, the terms of which are not uniform, issued by multiple Insurers. The court in Boy Scouts of Am., was faced with a similar set of facts, and determined that it was appropriate to approve the transfer under the Bankruptcy Code, but to allow another court in the future to determine on a case-by-case basis, whether the transfers were permissible under state law given the debtors remaining obligations under the contract. 642 B.R. at 669. "Each contract will need to be interpreted under applicable law in the context of a specific dispute. All I can hold today is that, in the first instance, state law will determine that question." Id. "If the obligations are conditions precedent, then the Non-Settling Insurance Companies may be able to assert those conditions as a defense to performance." Id. This appears appropriate to this Court, given the number of Policies in question, and the fact that each claim for

coverage may have to be litigated individually according to its specific terms, and the specific facts of each claim.

Similarly, the Court finds that the Insurers are correct in their argument that this Court lacks jurisdiction to order or approve the transfer of the OCE's interest in the Policies, because the Court's jurisdiction is limited to property of the Debtor, or the estate. 11 U.S.C. § 541. Therefore, the Court does not rule on the transfer of the OCE's interests in the Policies, and the parties are free to raise this matter before a state court at the appropriate juncture. Instead, the Court merely finds that the Plan provisions do not violate the Bankruptcy Code, and therefore do not make the Plan unconfirmable, but this Court has no jurisdiction over OCE property, including its interest in the Policies.

### ii.  Good Faith

"[F]or purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 150 n.5 (3d Cir.1986)). The court estimates whether the plan (1) fosters a result consistent with the Bankruptcy Code's objectives; (2) has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected; and (3) exhibits a fundamental fairness in dealing with creditors. Boy Scouts of Am., 642 B.R. at 645 (citing W.R. Grace, 475 B.R. at 87-88.) The burden of proof is on the Plan Proponents. See In re Tamecki, 229 F.3d 205, 207 (3d Cir. 2000).

The court in Boy Scouts of Am. comprehensively reviewed the requirements of good faith under section 1129(a)(3) in a factual scenario similar to this case. 642 B.R. at 645. The court noted that "[g]ood faith is shown when the plan has been proposed for the purpose of reorganizing the debtor, preserving the value of the bankruptcy estate, and delivering value to creditors." Id.

(quoting In re Emerge Energy Servs. LP, 2019 WL 7634308, at *16 (Bankr. D. Del. Dec. 5, 2019)).
However, a court may determine a plan is not filed in good faith if it is the result of collusion, or
allows for breach of fiduciary duty. Id. (citing In re Am. Cap. Equip., LLC, 688 F.3d 145, 158 (3d
Cir. 2012), In re TCI 2 Holdings, LLC, 428 B.R. 117, 143 (Bankr. D.N.J. 2010)). Ultimately
though, "denial of bankruptcy relief based on a lack of good faith 'should be confined carefully
and is generally utilized only in . . . egregious cases.'" Id. (quoting In re Falch, 450 B.R. 88, 93
(Bankr. E.D. Pa. 2011)).

The history of this case, discussed above, shows that there has been considerable acrimony
between the parties, and the docket is replete with evidence of the disputes between the Committee,
the Insurers and the Debtor against each other. Among others, Prol testified as to the objections
raised by the Debtor to the Committee's fees and attempts to retain experts. He also testified about
the Committee's objections to the Debtor's proposed bar date and attempts to bring sanctions
against the Debtor. Nov. 16 Transcript, 95:10-96:11; 98:24-99:7. The Plan is the result of months
of mediation sessions and negotiations, some of which this Court attended, and evidence of which
has been provided through the credible testimony of, among others, Prol, Wilen, Hughes, and
Montgomery. Each witness testified as to the number of mediation sessions, and while his or her
involvement in those sessions varied, Prol gave details on the seventeen mediation sessions
between the parties, their initial positions and how they eventually came to resolution. Nov. 16
Transcript, 96:14-24; 104:22-105:23; 113:11-19; 114:19-116:16. Prol also testified as to the
negotiations between the Plan Proponents over the non-monetary terms of the Plan, including the
terms of the TDPs and Trust fiduciaries. Id. at 116:13-120:2; see also Weisenberg Dep. Transcript,
83:22-58:6. The resulting Plan is supported by all classes of creditors, including over 97% of the
Survivors. Dkt. No. 2218 Daloia Declaration. The Plan allows the Debtor to continue operating

while satisfying all creditors. As such, the Court finds that the Plan Proponents have presented

sufficient evidence that the Plan preserves the value to the estate and delivering value to creditors.

The Court finds that the Plan was proposed with honesty and good intentions as a basis for

expecting that reorganization can be effected and exhibits a fundamental fairness in dealing with

the creditors. See Boy Scouts of Am., 642 B.R. at 645. However, due to significant problems with

the terms of the Plan itself, discussed below, the Court cannot find that the Plan fosters a result

consistent with the Bankruptcy Code's objectives and cannot confirm the Plan under section

1129(a)(3).

The Insurers raise multiple objections arguing that the Plan does not comply with section

1129(a)(3) of the Bankruptcy Code. The majority of these objections argue that the second prong

of the good faith test has not been met because the Plan Proponents conduct amounts to bad faith

and therefore precludes a finding that the Plan was proposed with honesty and good intentions.

However, the Insurers also argue that the Plan itself, along with the TDPs create an inherently

biased result that will not foster a result consistent with the Bankruptcy Code's objectives. Dkt.

No. 3079. The Court first considers those objections that argue the conduct of the Plan Proponents

bars a good faith finding, and then considers the Plan itself.

The Insurers initially argue that the Plan Proponents have not presented any evidence of

good faith, and because the burden is on the proponent, the Plan cannot be confirmed. Id. at 133.

The Insurers argue that none of the Debtor's witnesses had personal knowledge of the mediation

sessions or the negotiations for the TDPs. See id. However, as detailed above, the record has more

than sufficient evidence of good faith as defined by the Third Circuit. See Boy Scouts of Am., 642

B.R. at 645. Hughes and Montgomery both testified credibly as to the Debtor's intent in filing

bankruptcy, its conduct and intentions during the Bankruptcy Case and the mediation sessions. See

Nov. 9 Transcript, 65:9-19; Nov. 10 Transcript, 132:9-18. Hughes also testified that he spent over

100 hours in mediation over seventeen sessions. Nov. 9 Transcript, 67:8-76:25. Montgomery testified as to negotiations with other parties including the Trade Committee and PNC. Nov. 10 Transcript, 134:15-20. Further, Prol's testimony described above was credible evidence of the Debtor's good faith conduct through the Bankruptcy Case, in particular as it relates to the mediations and the negotiations over the settlement with the Committee, the Plan, and accompanying Trust and TDPs. As such, the Insurers objection on this issue is overruled.

The Insurers next argue that the Debtor has demonstrated bad faith conduct throughout the Bankruptcy Case. Dkt. No. 3079 at 135. Specifically, the Insurers object to the Debtor's breach of the Insurance Settlement, arguing that the Debtor never intended to honor that agreement, instead using it only to obtain leverage over the Committee. Id. at 135-37. This argument is not persuasive. The Insurers presented no evidence to support their claim, other than the timeline of events that ignores facts that do not fit with their theory. The Insurers specifically refer to the testimony of Father Hughes, arguing that he "reversed" his testimony from his deposition to trial. At his deposition, Father Hughes stated that the Insurance Motion was before the Court that that "[i]f the Judge determines that that is the direction that it will go, then we will support it." The Insurers claim Father Hughes reversed himself at trial when he testified that the Debtor "would prefer the eighth amended plan." Id. at 138. There is nothing inconsistent in these statements, and the Court does not find this to be evidence of the Debtor "shroud[ing] its position" or acting in an "oblique" manner as the Insurers insist. Instead, the Court concludes that the Debtor took a practical strategy hoping to complete the bankruptcy process as quickly and inexpensively as possible, that it would accept and move forward with whichever settlement the Court approved, although it prefers one over the other. Moreover, the vast majority of the credible evidence simply does not support the Insurers' theory. There was nothing clandestine about the mediation sessions with the Committee, and those negotiations were discussed openly at many hearings in the Bankruptcy case.

Furthermore, as stated previously, Prol's testimony was credible, and shows that the Committee Settlement was the result of months of intense and at times hostile negotiations, and while the Insurance Settlement, along with several unfavorable decisions[17] by this Court, may have made the Committee more willing to negotiate along less rigid terms than it initially demanded, it is not evidence that the Debtor acted in bad faith.

The Insurers also argue that the Debtor acted in bad faith by "ceding the pen" to the Committee in the drafting the Plan and accompanying documents, allowing the Committee to dictate the terms of the TDPs and the Plan at large once the Debtor's liability was capped. Dkt. No. 3079 at 138. As for evidence to support this claim, the Insurers argue that the Debtor had no economic stake in the terms of the Trust or TDPs once it had capped its own liability; that the Committee spent fifteen times as many billable hours than the Debtor drafting the Plan, Trust Agreement and TDPs; and that specific terms in the Plan, Trust Agreement and TDPs that greatly favor the Committee are evidence that the Debtor allowed the Committee to draft these documents without any pushback or concern for other constituents in this case - specifically the Insurers. Id. at 139-42.

Initially, the Court notes that the Debtor's exclusive right to file a plan expired on April 1, 2022. See Dkt. No. 1215. Section 1121(c) of the Bankruptcy Code provides that, once exclusivity ends: "[a]ny party in interest including . . . a creditors' committee . . . may file a plan . . .." 11 U.S.C. § 1121(c). As such, the Court questions whether a plan is proposed in bad faith and unconfirmable merely because it was drafted primarily or even exclusively by a party other than the debtor. In other words, the Committee could have drafted and filed this exact plan without any involvement or agreement with the Debtor because the Debtor's exclusivity has expired. The relevant question is whether the contents and impact of the plan meets the standards of section

---

[17] For example, the Court approved the Fifth Amended Disclosure Statement over the Committee's Objection. Dkt. No. 1447.

1129, and not which party drafted that plan. However, even assuming the objection is valid, the

record reflects that the Debtor did not "cede the pen" to the Committee in drafting the Plan, the

TDPs or any other accompanying documents.

The Insurers cite to In re ACandS, Inc., in support of this argument. 311 B.R. 36 (Bankr.

D. Del. 2004). In that case, the court found, based on the record, that the debtor was a wholly

owned subsidiary of a much larger corporation, which had stripped its management of much of its

authority. Id. The court stated that:

> [T]he [committee had drafted] the [trust], and . . . chose the trustee .
> . . decided how the security agreement would be crafted and how
> many classes of security interests would be formed; and it was the
> [committee] that decided who was going to get what. [The debtor]
> was there to do their bidding, having been thrown overboard by [its
> corporate owner] to keep what was left of that company afloat.
> Given the unbridled dominance of the committee in the debtor's
> affairs and actions during the prepetition period, its continued
> influence flowing from its majority status on the post-petition
> creditors committee, and the obvious self-dealing that resulted from
> control of the debtor.

Id. at 43. The facts of this case are distinguishable. Here, there is no corporate owner that has undue

influence over the Debtor, nor was there heavy involvement in its management. The facts of this

case more closely resemble those in Boy Scouts of Am., in which the court found that the debtor

had not ceded the pen. 642 B.R. at 646. The court there noted that the debtor had drafted the initial

TDPs based on a previous version developed by the insurers, which included an expedited

distribution process. Id. Certain provisions were modified by the committee, and the parties

continued to make edits back and forth. The court "could not find that the debtors abdicated their

responsibility to negotiate a plan or proceed[] in bad faith," noting that "[t]here is nothing that

requires Debtors to negotiate a plan that is 'insurance neutral,' which is not a concept in the

Bankruptcy Code." Id. at 648.

Similarly, here, both the Debtor and the Committee stated that the parties used the Fifth Amended Plan and TDPs as initial drafts and edited those documents to reflect the agreement they had reached. Nov. 16 Transcript, 117:11-19; 162:2-6. As such, the Debtor presumably had already negotiated all the terms it found essential when negotiating with the Insurers, and then drafting and editing those terms. Therefore, it makes sense that the Committee, which had no involvement in drafting the previous plan, would spend considerably more time reviewing and marking up those documents to include the changes it wanted, while the Debtor would only need to review and negotiate over those changes. Therefore, the fact that the Committee spent many more billable hours on the Plan makes sense. Moreover, Prol credibly testified as to the negotiation process, which included the process of amending and editing the Fifth Amended Plan and accompanying documents. Id. 117:20-120:2. Prol testified that the Debtor sent the Committee complete Word versions of the Fifth Amended Plan and supporting documents, and the Committee sent redlined copies back for review. Id. He further testified that there were more than twenty conference calls discussing different provisions, and that the negotiations were contentious, and he gave specific examples of disputes over certain proposed changes, including the Debtor filing a sixth amended plan without the approval of the Committee. Id. 117:20-120:2; 123:18-124:14. Similarly, Weisenberg noted occasions where the Debtor negotiated additional changes to the Plan from the Committee's draft. Weisenberg Dep. Transcript, 83:12-84:11. On this record, the Court easily concludes the Debtor did not cede the pen, or otherwise collude with the Committee.

The Insurers next argue that the Plan Proponents' conduct during discovery is evidence of bad faith conduct that requires denial of confirmation. Dkt. No. 3079. The Insurers cite several examples of the Debtor allegedly refusing to share discoverable information most significantly a term sheet that was drafted in January 2022 (the "Term Sheet"). Id. at 144.[18] The Insurers argue

---

[18] The Insurers cite an exhibit that does not appear to be admitted, IC-343.

that the Plan Proponents falsely stated that there was no term sheet. However, the credible testimony of Prol established that the Term Sheet was the product of failed negotiations and was never agreed to by the parties, it was never signed, and was ultimately dropped. Nov. 16 Transcript, 108:15-21. Once they reached settlement on April 11, they did not create a new or final term sheet. See id. 115:20-22.

The Insurers' other arguments are not persuasive. Specifically, they argue the Committee's statement that the Committee Settlement was "a surprise to everyone" is evidence of bad faith because it is somehow contradicted by statements made by Weisenberg in his deposition that the Plan Proponents had met in advance to discuss how to achieve a successful mediation. Id. (citing Sept. 14 Hearing Transcript; IC-239 32:3-4; Weisenberg Dep. Transcript, 78:13-14). Initially, Court notes that there are multiple examples of all parties, including the attorneys for the Insurers, acting in a non-cooperative manner during this case and the discovery process in particular. There are numerous examples on the docket of disputes the Court was required to resolve because the parties were unable to conduct the discovery process in an appropriate manner, and the Court notes that it ruled against each of the parties on more than one occasion. Further, there are specific examples of both the Plan Proponents and the Insurers refusing to turn over requested documents or providing testimony on specific matters until the Court ruled on the issue, and although the Court ruled against each party on occasion, it is not bad faith to object to discovery when the dispute is legitimate. None of this rises to the level of bad faith, and none of it is sufficient to reach the level of egregious conduct that would justify denying a confirmation of the Plan. See Boy Scouts of Am., 642 B.R. at 645.

### iii. Insurance Neutrality

The Insurers argue that the Plan itself violates good faith because the TDPs create a biased Trust that strips the Insurers' rights in several ways. As the court in Boy Scouts of Am. noted, the

concept of Insurance Neutrality is not found in the Bankruptcy Code, see 642 B.R. at 648, however, this Court has already ruled that it will not confirm a plan which is so biased as to strip the Insurers of rights necessary to ensure the Plan is equitable. Dkt. No. 1722.

Initially, the Insurers argue that the overall structure of the Trust, the Committee's control over its fiduciaries, and the procedures laid out by the TDPs create a biased Trust which will artificially inflate the value of the Survivor Claims and harm the Insurers. As described above, the TAC would initially be comprised exclusively of members of the Committee, and the TAC would select the Trust Administrator and determine his compensation. Plan Art. 7.7. The Survivor Claims Reviewer would be selected by the Committee. Id. Art. 2.2.2. In turn, the Neutral is to be selected by the Trust Administrator albeit subject to approval of the Court. Dkt. No. 2586.

The majority of the fiduciaries do not impact the Insurers, and so their impartiality is not required. For example, as detailed above, the Survivor Claims Reviewer values the Survivor Claims solely for the purpose of assigning the assets of the Trust among the claimants, and not to determine the Insurers liability in any manner. See Plan Art. 8.3; TDPs Art. 4. As such, it is not necessary for the Survivor Claims Reviewer to be impartial as to the Insurers, as no decisions it makes impacts the Insurers. Further, the Trust Administrator owes a fiduciary obligation to the beneficiaries of the Trust, in this case, the Survivors, and so similarly is not required to be impartial as to the Insurers.

However, the Neutral does play a significant role in determining the potential liability of the Insurers. The Neutral would be selected by the Trust Administrator in consultation with the TAC and other parties, subject to Court approval, and the Trust Administrator would be selected by the Committee. See Dkt. No. 2586; Plan Art. 2.2.109. The Insurers argue this offers the Committee an inappropriate degree of influence over the Neutral. Similarly, the Insurers argue that the use of "Verdict Value Assessment" is inherently biased, and will require the Neutral to adopt

60

McNally's valuation method, artificially inflating the value of the Survivor Claims, because the

Neutral will be forced to assess the value of each Survivor Claim as if it were to receive a jury

verdict award, without assessing the accompanying risk and costs that are associated with bringing

a claim all the way to verdict. Dkt. No. 3079 at 127-28.[19] Further, the Insurers argue that the limited

scope and time offered for discovery further limits the autonomy of the Neutral, as the Neutral is

permitted to extend discovery only in "exceptional circumstances." TDPs Art. 8(iv).

     The Court agrees, because the Neutral can directly impact the rights of the Insurers, it must

be independent from the Committee, the Trust Administrator, or other influences in order to fulfill

its role and ensure he or she is truly neutral. As described by Hinton, the use of the Verdict Value

Assessment may create a subjective criterion which ignores the risks and costs of the tort system,

and artificially inflate the value of claims. Hinton Declaration ¶¶ 38-39. Similarly, it is possible

that the Neutral could feel compelled to adopt McNally's methodology and valuation factors,

rather than developing his or her own factors independently, which could further skew the claim

values. Further, Bitar testified that the limits placed on discovery cause problems and prevent the

Verdict Value Assessment from functioning like a tort or adversarial system. Nov. 30 Transcript,

30:9-32:3. In order for the Neutral to fulfill its role, it must be independent, and function more as

an arbitrator, with independence from all parties involved, and free to assess the value of a given

claim based on the merits of the facts presented, which includes control over discovery deadlines

as it see fit on a claim-by-claim basis, and a directive to determine the value of a claim, rather than

the "verdict value" a claim could receive if it went to a jury verdict. The Neutral must be able to

---

[19] The Insurers also object on the grounds that this creates two separate valuation methods for the
same claims, arguing Wilen's valuation was used to calculate the value for the Survivor Claims
for purposes of determining the Debtor and OCE's contribution to the Trust. However, the
contribution amounts the Debtor and OCE were required to pay to the Trust were part of the
Committee Settlement and represent an amount to which the parties agreed. Parties are free to
settle their claims for less than the face value, and this happens regularly both in and out of
bankruptcy. Therefore, this objection is overruled.

determine what discovery is necessary and to consider whatever factors or evidence it deems appropriate in making its determination on the issue before it. As proposed, the Neutral may be too easily influenced by the Trust Administrator and is too restricted under the terms of the TDPs for the Court to approve the Plan.

Another significant problem raised by the Insurers is the inconsistent and insufficient language in the Plan and the TDPs preserving the Insurers' rights under the Policies. Dkt. No. 3079 at 80, 152. The Insurers point specifically to Article 10.1.1 of the Plan, which reads "Insurers retain any defenses that they would be able to raise if the Claim for coverage of any Abuse Claim were brought by any Covered Party, except any defense arising from the Insurance Assignment." Plan Art. 10.1.1. Other sections of the Plan, and the TDPs create additional exceptions, including that that the terms of the Plan do not create any defenses to claims. Plan Art. 7.8.1.2. Further, the TDPs provide that all defenses shall be available to all parties, "except as otherwise provided in the Plan." TDP Art. 9(v).

For the Court to approve the Plan, the Plan Proponents must provide more clarity over which, if any, of the Insurers' defenses are preserved or eliminated under the Plan. For example, the Insurers object that the TDPs violate Insurance Neutrality because, under the TDPs, there is no party with any incentive to defend against the Survivor Claims that is required to do so, nor is there any mechanism under the TDPs to dismiss a Survivor Claim. Dkt. No. 3079 at 109. The Insurers argue that the insured's failure to defend is a material breach that excuses the insurer from being required to perform. Id. at 73.

Further, the provisions governing the Insurers' defenses must be streamlined, rather than requiring readers to review different sections of the Plan and TDPs to understand what impact the Plan will have on these defenses. Currently, a party must review several different provisions from multiple documents to find all of the provisions governing the Plan's impact on the Insurers'

defenses. Specifying which coverage defenses remain or not will likely resolve several other objections raised by the Insurers.[20]

There are additional provisions in the Plan and the accompanying documents over which the Insurers have raised concerns. Most notably the Exculpation Provision and judgment reduction clause, which the Insurers argue are each fatally flawed. As to the Exculpation Provision, the Insurers argue the Plan Proponents have crafted a clause which is overly broad, including parties that may not be released under the law.

Section 1103(c) of the Bankruptcy Code specifically offers "a limited grant of immunity to committee members . . . for actions within the scope of their duties." PWS Holding, 228 F.3d at 246. Other courts have found that this limited grant does not extend to parties that are not fiduciaries of the estate. In re Washington Mut., Inc., 442 B.R. 314, 350–51 (Bankr. D. Del. 2011). Article 11.6 of the Plan details the Exculpation Provision, and Article 2.2.49 of the Plan defines the parties that are exculpated. Plan Arts. 2.2.49; 11.6. However, the revised Confirmation Order modifies these articles, stating that none of the Exculpated Parties shall incur any liability for "any act or omission that occurred from the Petition Date, through the Effective Date, in connection with the [Bankruptcy case], the formulation, negotiation, or pursuit of confirmation of this Plan . . .." Dkt. No. 2586 ¶ 22. Further, the Revised Confirmation Order expands the definition of "Exculpated Party" to include:

> (i) the Debtor, the Estate, the [Committee and their professionals]; the officers and directors of the Debtor; (iv) the members of the College of Consultors of the Debtor that have served during the [Bankruptcy Case]; and (v) the members of the Finance Council of the Debtor that served during the [Bankruptcy Case].

---

[20] This may apply to any similar objections raised by the Insurers, including, as discussed above, that the transfer of the Policies to the Trust is invalid under State law, or that the Trust fails to provide procedures for an adversarial process. Correcting this language will preserve any defenses the Insurers hold under the Policies to be raised in any State Court coverage action.

Id. The proposed language is overly broad, because the estate itself cannot be granted immunity, nor can consultative bodies that do not qualify as "fiduciaries" under the Bankruptcy Code. Moreover, as the Insurers point out, the language exculpating the Debtor's estate itself, could act as a bar to the Insurers' Adversary Claim. This language violates the provisions of section 1103 of the Bankruptcy Code, and therefore the Plan cannot be confirmed because it "otherwise violates the law."

Similarly, the language in the judgment reduction clause is also flawed. A "typical judgment reduction clause provides that the plaintiffs agree that any judgment obtained against the nonsettling defendants will be reduced by the amount of the settlement." Joint liability, contribution, partial settlement and contribution bars under the Securities Act, 3C Sec. & Fed. Corp. Law § 16:174 2d ed.; see also In re Fraser's Boiler Serv., 2019 U.S. Dist. LEXIS 37840, at *28 (W.D. Wash. Mar. 8, 2019) (discussing a judgment reduction clause providing that "any judgment on any claim against one or more Non-Settled Insurers shall be reduced by the adjudicated amount of any Contribution Claim such Non-Settled Insurer would have been able to successfully assert against the Insurers.").

In this case, the judgment reduction clause provides: "[i]f a reduction is not made as described above, then any Contribution claim by any non-settling insurer against any of the settling insurers shall be reduced by the reduction amount." This seemingly would reduce any non-settling Insurers contribution claim, rather than reducing the judgment against the non-settling Insurer by the settlement amount. Ultimately, the language used is too confusing to definitively determine the potential impact of the judgment reduction clause and therefore, must be clarified in any future plan.

Finally, the Insurers object to the language in the Revised Confirmation Order, that applies a good faith finding not only to the Plan, but to all accompanying documents:

64

> The Plan and all documents and agreements necessary to implement
> the Plan, and all other relevant and necessary documents, have been
> negotiated in good faith and at arm's length, do not conflict with
> applicable non-bankruptcy law, and shall, upon completion of
> documentation and execution, each be a valid, binding, and
> enforceable agreement.

Dkt. No. 2586 ¶ B. The Insurers cite to section 1129(a)(3), which only requires a court find that

the "plan has been proposed in good faith and not by any means forbidden by law." This Court

agrees with Boy Scouts of Am., which noted that this is sufficient to satisfy the requirements of

section 1129(a)(3). See Boy Scouts of Am., 642 B.R. at 631-33. While it may be permissible for

a court to make these findings as to other documents, it is not required to confirm a plan, and this

Court declines to do so. Therefore, this portion of a confirmation order related to a future plan

must be revised.

As such, the Court cannot find that the Plan satisfies the requirements of 1129(a)(3) as

currently proposed. While the Court overrules the Insurers' objections related to the Debtor's

conduct in negotiating, drafting or trying the confirmation of the Plan, the terms of the Plan and

the TDPs are currently too biased for the Court to make a good faith finding. However, modifying

the language related to the protection of the Insurers rights and defenses under the Policies, and

the terms of the TDPs, so as to ensure that a neutral party seeks to assign a claim value to the

Survivors claims might resolve these issues.

### Remaining Issues

There are two remaining issues which the Court has yet to address, although they were

raised by the Insurers.

### A. Invalid Claims

The Insurers raise two separate objections on these grounds. The first is that the Plan does

not have specific procedures for allowing and valuing claims. Dkt. No. 3079 at 107-08.  As

discussed, the Court has already found that the Plan need not provide specific criteria for the Neutral to determine which claims are allowed and value those claims.

However, the Insurers also object to the Plan's proposed treatment of claims under the "Expedited Distribution" option.[21] As noted, under this option, the Plan provides for a $2,500 payment to any Survivor that has properly filed and signed the proof of claim form, and elects such treatment. Plan Art. 8.3. This provision allows certain claimants to receive a distribution of $2,500 without having to prove any part of their claim, and the wording of the Plan indicates that there is no party with the power to object to claims, regardless of the validity or relevancy of the allegations. This Court has read every Survivor Claim, and there are many that make no allegations against the Debtor, instead alleging abuse from other individuals or entities. See, e.g., JX-0295, JX-0356. Similarly, other Survivor Claims make no allegation of abuse of minors. See, e.g., JX-0283.

Convenience classes are permissible, and do not prevent a plan from being confirmed. See generally, In re Armstrong World Indus., Inc., 348 B.R. 136, 147 (D. Del. 2006) (Finding a convenience class for claims of $10,000 or less is reasonable and necessary for the administration of the estate). However, as currently drafted, the Plan appears to allow compensation for claims which are facially invalid or fraudulent. The Expedited Distribution cannot be an avenue for claims that are facially invalid or fraudulent to receive a distribution. For this additional reason, the Plan cannot be confirmed. If objections to these claims had been filed, the claims likely would have been disallowed, and in certain cases the attorneys that filed these claims may have been subject to sanctions under Federal Rule 11 or the New Jersey Rules of Professional Conduct (the "RPC"). The fact that the claims review is being handled by the Trust does not mean that this Court does not have jurisdiction over these claims, nor that it can allow facially invalid or fraudulent claims

---

[21] While the Insurers likely do not have standing on this issue, the Court has its own, similar, concerns.

to be paid out without any form of review. Any future plan may include a convenience class, but there must be some mechanism for review and denial of claims that are facially deficient.

## B. Attorney Fees

Finally, the Insurers argue the Plan would allow certain attorneys representing Survivors to receive fees in excess of those permitted under New Jersey law. Dkt. No. 3079 at 206. While the Insurers do not have standing on this issue, this Court previously warned the Plan Proponents that it had serious concerns about the fees being charged by certain personal injury attorneys in this case, and further, that it was "unlikely to confirm any plan unless and until there is method of informing claimants of the maximum fees allowed to be charged under New Jersey law, and the potential that the fees being charged to them are unlawful." Dkt. No. 1567 at 16:00.

Courts have inherent authority, and indeed "responsibility to supervise the members of its bar in both individual and mass actions, including the right to review contingency fee contracts for fairness." In re Guidant Corp. Implantable Defibrillators Prod. Liab. Litig., 2008 WL 682174, at *18 (D. Minn. Mar. 7, 2008), amended in part, 2008 WL 3896006 (D. Minn. Aug. 21, 2008) (citing Int'l Travel Arrangers, Inc. v. W. Airlines, Inc., 623 F.2d 1255, 1277 (8th Cir.1980) ("The court has the power and the responsibility to monitor contingency fee agreements for reasonableness."); Rosquist v. The Soo Line R.R., 692 F.2d 1107, 1111 (7th Cir.1982) ("The district court's appraisal of the amount of the fee is . . . justified by the court's inherent right to supervise members of its bar."); Taylor v. Bemiss, 110 U.S. 42, 45–46 (1884) ("This . . . does not remove the suspicion which naturally attaches to such [contingency] contracts, and where it can be shown . . . that the compensation is clearly excessive, . . . the court will in a proper case protect the party aggrieved.")). "Even when the validity of the fee contract itself has not been challenged by the parties, it is within the court's inherent power of supervision over the bar to examine the attorney's fee for conformance with the reasonable standard of the Code of Ethics." Id. (quoting Rosquist, 692 F.2d

at 1111). This authority to supervise and regulate the ethics and contingency fees of members of

the bar extends to those admitted pro hac vice. Elder v. Metro. Freight Carriers, Inc., 543 F.2d 513,

518 (3d Cir. 1976). Moreover, "[w]hen a creditor files a proof of claim, it subjects itself to the

jurisdiction of the Bankruptcy Court to hear all matters related to the allowance of that claim." In

re PRS Ins. Grp., Inc., 331 B.R. 580, 586 (Bankr. D. Del. 2005) (citing Gardner v. New Jersey,

329 U.S. 565, 573–74 (1947)). This extends to contingency fees being paid to attorneys that file

those claims on behalf of the creditor, and certainly the attorney filing a claim in this Court equally

subjects himself or herself to this Court's jurisdiction and is bound to obey the RPCs governing

those who appear before this Court.

RPC 1.5 governs attorney fees, and local Bankruptcy Rule ("Local Rule") 9010-1

incorporates the RPCs into Bankruptcy Cases. Specifically, RPC 1.5 requires an attorney's fee to

be reasonable, when considering, among things the time, labor and skill required to complete the

work. See N.J. Rules Prof'l Conduct 1.5. Part of the consideration for contingency fees is the risk

involved in prosecuting a case that is ultimately not successful, and the attorney faced with taking

on the costs of that prosecution without any payment. See Rendine v. Pantzer, 141 N.J. 292, 339

(1995).

The Survivor proof of claim form contains nine pages of questions, many of which require

the claimant or attorney completing the form to check a box. See generally, JX-0048-0410. As

such, not only was there very limited time or skill required to file many of these claims, but indeed

the risk of non-payment is small and the cost incurred by the attorneys in many cases was virtually

nothing, especially under the TDPs. However, many of the contingency fee agreements call for the

attorney that filled out this nine-page form to receive fees of 40% of any recovery the Survivor

may receive. This is particularly unreasonable given that some of the retainer agreements eliminate

all risk or the attorney by including language which limits the representation only to scenario where

the defendant has filed bankruptcy or allows an attorney to withdraw if the case might go to trial.

See, e.g., Dkt. No. 1496.

Furthermore, as discussed above, several of the claims filed are invalid on their face, and yet the Plan would permit these claims to be paid, and the attorneys that filed these invalid and potentially fraudulent claims to receive one-third, or more, of the $2,500 expedited distribution.[22] The Court cannot approve a Plan which allows attorneys to file invalid and fraudulent claims without consequence. Nor can the Court allow attorneys to collect contingency fees in excess of what is permitted under New Jersey law, or in excess of what is reasonable for the work required and risk taken. Any future plan must take steps to ensure that the Survivors' attorneys are not violating the RPCs and taking advantage of the Survivors.

### Conclusion

The Plan does not meet all of the requirements of section 1129 of the Bankruptcy Code, and therefore, the Court cannot confirm the Plan.

Dated: August 29, 2023

JERROLD N. POSLUSNY, JR.
U.S. BANKRUPTCY COURT JUDGE

---

[22] It appears from reviewing the retainer agreements, that at least one law firm may not have had authority to file any claims in this case. See Dkt. No. 1496.

69