**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| *In re:* | Chapter 11 |
| THE DIOCESE OF CAMDEN, NEW JERSEY, | Case No. 20-21257 (JNP) |
| Debtor. | |

**FIRST MODIFIED EIGHTH AMENDED**
**<u>PLAN OF REORGANIZATION</u>**

| | |
|---|---|
| **TRENK ISABEL SIDDIQI &** **SHAHDANIAN P.C.** | **LOWENSTEIN SANDLER LLP** |
| Richard D. Trenk, Esq. | Jeffrey D. Prol, Esq. |
| Robert S. Roglieri, Esq. | Michael A. Kaplan, Esq. |
| 290 W. Mt. Pleasant Ave., Suite 2350 | Brent Weisenberg, Esq. |
| Livingston, NJ 07039 | One Lowenstein Drive |
| Telephone:  (973) 533-1000 | Roseland, NJ 07068 |
| Email:  rtrenk@trenkisabel.law | Telephone:  (973) 597-2500 |
| Email:  rroglieri@trenkisabel.law | Email:  jprol@lowenstein.com |
| | Email:  mkaplan@lowenstein.com |
| | Email:  bweisenberg@lowenstein.com |

*Counsel to The Diocese of Camden, New Jersey*    *Counsel to the Official Committee of Tort Claimant Creditors*

Dated:  September 22, 2023

## TABLE OF CONTENTS

**Page**

ARTICLE I          INTRODUCTION ........................................................................2

ARTICLE II         INTERPRETATION OF TERMS AND DEFINITIONS ...................................2

ARTICLE III        CLASSIFICATION OF CLAIMS ...................................................16

ARTICLE IV         TREATMENT OF UNCLASSIFIED CLAIMS ................................17

ARTICLE V          TREATMENT OF CLASSIFIED CLAIMS.....................................18

ARTICLE VI         ACCEPTANCE ........................................................................24

ARTICLE VII        THE TRUST ............................................................................24

ARTICLE VIII       TRUST DISTRIBUTION PLAN AND RELATED PROVISIONS ...............33

ARTICLE IX         SETTLING INSURERS .............................................................39

ARTICLE X          PRESERVATION OF NON-SETTLING INSURERS' RIGHTS ..................40

ARTICLE XI         EFFECT OF PLAN ON CLAIMS ....................................................42

ARTICLE XII        PROVISIONS GOVERNING DISTRIBUTIONS GENERALLY .................49

ARTICLE XIII       TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
                   LEASES ..................................................................................52

ARTICLE XIV        CONFIRMATION AND CONSUMMATION OF THIS PLAN ....................52

ARTICLE XV         EFFECTS OF CONFIRMATION .....................................................54

ARTICLE XVI        RETENTION OF JURISDICTION ..................................................56

ARTICLE XVII       BANKRUPTCY RULE 9019 REQUEST ........................................58

ARTICLE XVIII      INCORPORATION OF CHILD PROTECTION PROTOCOLS ....................59

ARTICLE XIX        MISCELLANEOUS PROVISIONS ...................................................59

The Diocese of Camden, New Jersey (the "**Diocese**" or the "**Debtor**") and its Official Committee of Tort Claimant Creditors (the "**Tort Committee**," and together with the Debtor, the "**Plan Proponents**") jointly submit this *First Modified Eighth Amended Plan of Reorganization* pursuant to chapter 11 of the Bankruptcy Code.

ARTICLE I
INTRODUCTION

The Diocese is the debtor-in-possession in the above captioned chapter 11 case.  On October 1, 2020, the Diocese commenced a bankruptcy case by filing a voluntary chapter 11 petition under the Bankruptcy Code (as defined herein).  On August 29, 2023, the Bankruptcy Court (as defined herein) issued the *Memorandum Decision Denying Confirmation of Eighth Amended Plan* [ECF 3336] (the "**Memorandum Decision**") pursuant to which it, among other things, set forth certain modifications that needed to be made before the *Eighth Amended Plan of Reorganization* [ECF 1725] could be confirmed.  This document modifies and restates the *Eighth Amended Plan of Reorganization* in accordance with the Memorandum Decision and is the "Plan" defined in Section 2 below.

For a discussion of the Debtor's history, mission, risk factors associated with this Plan and for a summary and analysis of this Plan and related matters, reference is made to the Disclosure Statement (as defined herein).  Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and any restrictions on modifications set forth herein, the Plan Proponents expressly reserve the right to alter, amend, or modify this Plan, one or more times before substantial consummation thereof.

The contents of this Plan should not be construed as legal, business, or tax advice.  Each holder of a Claim should consult its own legal counsel and accountant as to legal, tax, and other matters concerning their Claim.

ARTICLE II
INTERPRETATION OF TERMS AND DEFINITIONS

2.1.   **Interpretation**.

For purposes of this Plan:

2.1.1.   any term that is not defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable;

2.1.2.   the terms "including" or "include(s)" are intended to be illustrative and not exhaustive, and shall be construed as "including, but not limited to" or "includes, but is not limited to";

2.1.3.   the phrase "relating to" or "relates to" means "with regard to, with respect to, by reason of, on account of, based on, arising out of, relating to, or in any way connected with";

2

2.1.4.   whenever the context requires, terms shall include the plural as well as the singular number, and the masculine gender shall include the feminine and the feminine gender shall include the masculine;

2.1.5.   the rules of construction set forth in section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply;

2.1.6.   unless the context should otherwise require, all references to documents to be filed shall refer to filing with the Bankruptcy Court in accordance with the Bankruptcy Code and Bankruptcy Rules;

2.1.7.   any reference in this Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

2.1.8.   any reference in this Plan to an existing document or exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended, modified or supplemented;

2.1.9.   unless otherwise specified, all references in this Plan to "Articles," "Sections," "Schedules" and "Exhibits" are references to Articles, Sections, Schedules, and Exhibits of or to this Plan;

2.1.10.  the words "herein," "hereof," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan;

2.1.11.  captions and headings to Articles and Sections are inserted for ease of reference only and shall not be considered a part of this Plan or otherwise affect the interpretation of this Plan; and

2.1.12.  this Plan supersedes all prior drafts of this Plan, and all prior negotiations, agreements, and understandings with respect to this Plan, evidence of which shall not affect the interpretation of any provision of this Plan.

2.2.   **Definitions**.

Unless otherwise provided in this Plan, all terms used herein shall have the meanings assigned to such terms in the Bankruptcy Code or the Bankruptcy Rules.  For the purposes of this Plan, the following terms (which appear in this Plan in capitalized form) shall have the meanings set forth below, and such meanings shall be equally applicable to the singular and to the plural form of the terms defined, unless the context otherwise requires.

2.2.1.   "**Abuse Claim**" means all Claims relating to, in whole or in part, directly or indirectly, Abuse committed by any Person before the Effective Date for which a Covered Party is allegedly responsible, including any such Claim asserted against any Covered Party in connection with the Chapter 11 Case.  Except as otherwise provided herein, the term "Abuse

Claims" includes "Unknown Abuse Claims." The term "Abuse Claim" does not include Contribution Claims, Medicare Claims or Claims against Persons who are not Covered Parties.

2.2.2.  "**Abuse Claims Reviewer**" means Mr. Paul Finn, the Person appointed by the Tort Committee who will assess Class 5 and Class 6 Claims in accordance with the terms of this Plan, the Confirmation Order, and the Trust Agreement, or any successor appointed in accordance with such terms thereafter.

2.2.3.  "**Abuse**" means any actual, alleged or threatened sexual conduct, misbehavior, misconduct, abuse or molestation, any other sexually-related act, contact, or interaction, indecent assault and/or battery, rape, indecent or lascivious behavior, undue familiarity, harassment, pedophilia, ephebophilia, or any other contacts, or interactions of a sexual nature between a minor and an adult, or an adult and a non-consenting adult, assault, battery, corporal punishment, any other act causing physical, psychological, mental or emotional abuse, humiliation, or intimidation, incest, or use of a child in a sexual performance.  Abuse may occur whether or not this activity involves explicit force, whether or not it involves genital or other physical contact, and whether or not there is physical, psychological, or emotional harm to the person.

2.2.4.  "**Action**" means any lawsuit, proceeding, or other action in a court or any arbitration.

2.2.5.  "**Additional Debtor Contributions Security Agreement**" has the meaning ascribed to such term in Section 7.2.2 of this Plan.

2.2.6.  "**Additional Debtor Contributions**" has the meaning ascribed to such term in Section 7.2.2 of this Plan.

2.2.7.  "**Administrative Expense Claim**" means any Claim constituting an actual, necessary cost or expense of administering the Chapter 11 Case under sections 503(b)(1) through (8) and 507(a)(2) of the Bankruptcy Code including, (a) any actual and necessary costs and expenses of preserving the Estate, (b) all compensation and reimbursement of expenses under sections 330 or 503 of the Bankruptcy Code, (c) any fees or charges assessed against the Estate under section 1930 of chapter 123 of title 28 of the United States Code, and (d) all Claims arising under section 503(b)(9) of the Bankruptcy Code.

2.2.8.  "**Affiliate**" means any past, present, or future Person that controls, is controlled by, or is under control with, another Person, including parents, subsidiaries, merged Persons, consolidated Persons, holding Persons, and acquired Persons, or any predecessor to such Person.

2.2.9.  "**Agent**" means any past and present employee, officer, director, agent, shareholder, principal, teacher, staff, stockholder, member, partner, board member, trustee, administrator, priest, deacon, religious brother, religious sister, nun, clergy, Person bound by a monastic vow, volunteer, attorney, claim handling administrator, and representatives of a Person, in their capacity as such.  For the avoidance of doubt, when the term "Agent" is used in this Plan in the context of granting the Diocese or an Other Catholic Entity a release or discharge, the term "Agent" in that context shall not include:  (i) an individual who perpetrated an act of Abuse that

4

forms the basis of an Abuse Claim; (ii) a religious order, other diocese or archdiocese (other than the Diocese); (iii) Non-Settling Insurers; and (iv) Joint Tortfeasors.

2.2.10. "**AIG Insurers**" means, collectively, Granite State Insurance Company, Lexington Insurance Company and National Union Fire Insurance Company of Pittsburgh, PA.

2.2.11. "**Alleged Insured**" has the meaning ascribed to such term in Section 9.3 of this Plan.

2.2.12. "**Allowed**" or "**Allowance**" means, with reference to any Claim, proof of which was timely and properly filed or, if no Proof of Claim was filed, which has been or hereafter is listed by the Debtor in the Schedules, as liquidated in amount and not disputed or contingent and, in each case, as to which:  (A) no objection to allowance has been interposed within the applicable period fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or (B) an objection has been interposed and such Claim has been allowed, in whole or in part, by a Final Order.  Notwithstanding the foregoing, pursuant to the Trust Distribution Procedures, the Trust Administrator shall have the authority to deem any untimely Class 5 Claim Allowed even if such Claim was not filed by the Bar Date.

2.2.13. "**Avoidance Actions**" means any and all rights to recover or avoid transfers or Liens under Chapter 5 of the Bankruptcy Code or otherwise, including sections 506(d), 541, 542, 543, 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code, or otherwise under the Bankruptcy Code or under similar or related state or federal statutes and common law, including, all preference, fraudulent conveyance, fraudulent transfer, and/or other similar avoidance claims, rights, and causes of action, whether or not litigation has been commenced as of the Effective Date to prosecute such Avoidance Actions; subject, however, to any releases thereof provided in this Plan, the Confirmation Order, or any other Final Order of the Bankruptcy Court.

2.2.14. "**Bankruptcy Code**" means title 11 of the United States Code.

2.2.15. "**Bankruptcy Court**" means the United States Bankruptcy Court for the District of New Jersey or the District Court for the District of New Jersey, as applicable.

2.2.16. "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure promulgated under 28 U.S.C. § 2075.

2.2.17. "**Bar Date**" means June 30, 2021 at 11:59 p.m. as set forth in the Bankruptcy Court's *Order Granting the Diocese's Motion for Entry of an Order Establishing a Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* [ECF 409].

2.2.18. "**Bishop**" means The Most Reverend Dennis J. Sullivan, D.D., or any successor bishop of the Diocese.

2.2.19. "**Business Day**" means any day except Saturday, Sunday, and any other day on which commercial banks in New Jersey or the United States of America are authorized by law to close.

2.2.20. "**Cash**" means legal tender of the United States of America and equivalents thereof.

2.2.21. "**Catholic Ministry Entities**" means, collectively, the past and present nonprofit corporations that work to carry out various ministries of the Catholic Church within the territory of the Diocese, including, but not limited to:  (i) those entities listed on **Exhibit 2.2.21**; and (ii) those entities listed in Article V.b.d of the Disclosure Statement.  Nothing in the foregoing is intended to suggest that such Persons are an Agent of the Debtor or subject to its control.

2.2.22. "**Channeled Claim(s)**" means the Claims channeled to the Trust by the Channeling Injunction, including all (a) Abuse Claims and Indirect Claims, except for any portion of such Claims that are Non-Settling Insurer Policy Claims; (b) Contribution Claims; (c) Medicare Claims; and (d) Extra-Contractual Claims relating to the Claims listed in subsections (a)–(c) of above, and for which the Trust assumes liability, pursuant to this Plan, *provided, however*, that "Channeled Claims" shall not include any Claim against:  (i) an individual who perpetrated an act of Abuse that forms the basis of an Abuse Claim; (ii) a religious order, other diocese or archdiocese (other than the Diocese); (iii) Non-Settling Insurers; and (iv) Joint Tortfeasors.

2.2.23. "**Channeling Injunction**" means the injunction contained in Section 11.2 of this Plan.

2.2.24. "**Chapter 11 Case**" means the case under Chapter 11 of the Bankruptcy Code in which the Diocese is the Debtor.

2.2.25. "**Child Protection Protocols**" means the document entitled "*Child Protection Protocols*" attached as **Exhibit 2.2.25**.

2.2.26. "**Claim**" means (a) a claim as that term is defined in § 101(5) of the Bankruptcy Code; or (b) any claim, Action, assertion of right, complaint, cross-complaint, counterclaim, liabilities, obligations, rights, request, allegation, mediation, litigation, direct action, administrative proceeding, Cause of Action, Lien, encumbrances, indemnity, equitable indemnity, right of subrogation, equitable subrogation, defense, injunctive relief, controversy, contribution, exoneration, covenant, agreement, promise, act, omission, trespass, variance, damages, judgment, compensation, set-off, reimbursement, restitution, cost, expense, loss, exposure, execution, attorneys' fee, obligation, order, affirmative defense, writ, demand, inquiry, request, directive, obligation, Proof of Claim in a bankruptcy proceeding or submitted to a trust established pursuant to the Bankruptcy Code, government claim or Action, settlement, and/or any liability whatsoever, whether past, present or (to the extent it arises prior to the Effective Date) future, known or unknown, asserted or unasserted, foreseen or unforeseen, fixed or contingent, matured or unmatured, liquidated or unliquidated, direct, indirect or otherwise consequential, whether in law, equity, admiralty, under the Bankruptcy Code, or otherwise, whether currently known or unknown, whether compromised, settled or reduced to a consent judgment, that may exist now or hereinafter for property damages, compensatory damages (such as loss of consortium, wrongful death, survivorship, proximate, consequential, general and special damages), punitive damages, bodily injury, personal injury, public and private claims, or any other right to relief whether sounding in tort, contract, extra-contractual or bad faith, statute, strict liability, equity, nuisance, trespass, statutory violation, wrongful entry or eviction or other eviction or other invasion of the right of

6

private occupancy, and any amounts paid in respect of any judgment, order, decree, settlement, contract, or otherwise.  A Person who holds a Claim is a "**Claimant**."

2.2.27.  "**Class 5 Claim**" means an Abuse Claim.

2.2.28.  "**Class 6 Claim**" means an Unknown Abuse Claim.

2.2.29.  "**Class 8 Action**" has the meaning ascribed to such term in Section 5.9(c) of this Plan.

2.2.30.  "**Class 8 Fund**" has the meaning ascribed to such term in Section 5.9(c) of this Plan.

2.2.31.  "**Class**" means a grouping of substantially similar Claims for common treatment thereof pursuant to the terms of this Plan.

2.2.32.  "**CMS**" means the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services, located at 7500 Security Boulevard, Baltimore, MD 21244-1850 and/or any other Agent or successor Person responsible for monitoring, assessing, or receiving reports made under MMSEA for reimbursement of Medicare Claims.

2.2.33.  "**Confirmation Hearing**" means a hearing conducted by the Bankruptcy Court for the purpose of considering Confirmation.

2.2.34.  "**Confirmation Order**" means an Order of the Bankruptcy Court confirming this Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.  The form and substance of the Confirmation Order shall be mutually acceptable to the Plan Proponents, the Other Catholic Entities, and the Settling Insurers under the Insurance Settlement Agreements.

2.2.35.  "**Confirmation**" means the entry of an Order by the Bankruptcy Court approving this Plan in accordance with the provisions of the Bankruptcy Code.

2.2.36.  "**Contribution Claims**" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery, by an Insurer against any Settling Insurer for the payment of money where such Insurer contends that it has paid more than its equitable or proportionate share of an Abuse Claim against a Covered Party.

2.2.37.  "**Coverage Claims**" means all Claims against a Non-Settling Insurer under or relating to the policies issued by such Non-Settling Insurer.

2.2.38.  "**Covered Parties**" means (i) the Debtor and Reorganized Debtor, as applicable; (ii) the parties listed on **Exhibits 2.2.21, 2.2.75, 2.2.84** and **2.2.104** of this Plan; (iii) each of the foregoing Persons' respective past, present, and future Affiliates, related companies, divisions, and acquired companies; (iv) each of the foregoing Persons' respective predecessors, successors and assigns; and (v) solely to the extent of and in their capacity as such, any and all of the foregoing Persons' respective Agents.  Nothing in the foregoing is intended to suggest that

7

such Persons are "employees" or agents of the Debtor or subject to its control.  For the avoidance of doubt, "Covered Parties" does not include:  (i) an individual who perpetrated an act of Abuse that forms the basis of an Abuse Claim; (ii) a religious order, other diocese or archdiocese (other than the Diocese); (iii) Non-Settling Insurers; and (iv) Joint Tortfeasors.

2.2.39.  "**Covered Party Insurance Policy**" means any known or unknown contract, binder, certificate, or policy of insurance, in effect on or before the Effective Date, which actually, allegedly, or potentially insures any Covered Party, or any of their predecessors in interest, successors, or assigns, with respect to any Abuse Claim, *provided, however*, that if a contract, binder, certificate, or policy of insurance was not issued or subscribed on behalf of or allegedly issued to or subscribed on behalf of a Covered Party, but insures or covers both a Covered Party and any other Person, such contract, binder, certificate or policy of insurance, as applicable, is a "Covered Party Insurance Policy" to the extent it insures or covers the Debtor or any Covered Party, but not to the extent it insures or covers any other Person.

2.2.40.  "**Creditor**" means any person that has a Claim against the Debtor that arose on or before the Petition Date or a Claim against the Debtor's estate of any kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code.  This includes all Persons holding Claims against the Debtor.

2.2.41.  "**Debtor Cash Contribution**" has the meaning ascribed to such term in Section 7.2.2 of this Plan.

2.2.42.  "**Debtor**" means the Diocese.

2.2.43.  "**Defense Costs**" has the meaning ascribed to such term in Section 7.14.3 of this Plan.

2.2.44.  "**Diocese**" means The Diocese of Camden, New Jersey, which is the diocesan not for profit religious corporation formed pursuant to New Jersey Statutes Annotated Title 16 that is the public juridic person of the Roman Catholic Diocese of Camden, as now constituted or as it may have been constituted, and the Estate (pursuant to section 541 of the Bankruptcy Code).  "Diocesan" is the adjectival form of Diocese.

2.2.45.  "**Disbursing Agent**" has the meaning ascribed to such term in Section 12.1. of this Plan.

2.2.46.  "**Disclosure Statement**" means the Eighth Amended Disclosure Statement filed by the Debtor as required pursuant to section 1125, *et seq.* of the Bankruptcy Code as approved by the Bankruptcy Court.

2.2.47.  "**DOC Trusts**" means Diocese of Camden Trusts, Inc.

2.2.48.  "**DOCT Cash Contribution**" has the meaning ascribed to such term in Section 7.2.2 of this Plan.

2.2.49.  "**DOCT Loan**" has the meaning ascribed to such term in Section 7.2.2 of this Plan.

2.2.50. "**Effective Date**" means the date on which all of the conditions to Confirmation and conditions to the Effective Date have been satisfied or waived in accordance with the requirements of Article 14 of this Plan.

2.2.51. "**Estate**" means the estate of the Debtor created upon the commencement of the Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

2.2.52. "**Exculpated Party**" or "**Exculpated Parties**" means collectively, (i) the Debtor, the Tort Committee and the Trade Committee; (ii) professionals that were retained in the Chapter 11 Case by the Debtor, the Tort Committee and the Trade Committee; (iii) the officers and directors of the Debtor that served during the Chapter 11 Case; (iv) the members of the College of Consultors of the Debtor that served during the Chapter 11 Case; and (v) the members of the Finance Council of the Debtor that served during the Chapter 11 Case.

2.2.53. "**Executory Contract**" means any contract or unexpired lease entered into before the Petition Date between the Debtor and any other Person or Persons, pursuant to which parties to both sides of the contract or lease have remaining material duties such that the breach by one party would excuse the performance by the other parties thereto.

2.2.54. "**Expedited Distribution Election**" has the meaning ascribed to such term in Section 8.4. of this Plan.

2.2.55. "**Expedited Distribution**" has the meaning ascribed to such term in Section 8.4. of this Plan.

2.2.56. "**Extra-Contractual Claim(s)**" means any Claim against any Settling Insurer seeking any type of relief other than coverage or benefits under the Covered Party Insurance Policies, including, but not limited to, Claims for compensatory, exemplary, or punitive damages, or attorneys' fees, interests, costs or any other type of Claim with respect to (i) any Covered Party Insurance Policy; (ii) any Claim allegedly or actually covered under a Covered Party Insurance Policy; or (iii) the conduct of a Settling Insurer with respect to (i) or (ii). Extra-Contractual Claims include all Claims relating to the Settling Insurers' handling of any Coverage Claim under the Covered Party Insurance Policies and conduct in engaging in settlement negotiations related to any Coverage Claim.

2.2.57. "**Fee Claim**" means a Claim under sections 328, 330(a), 331, 363 or 503 of the Bankruptcy Code for professional compensation.

2.2.58. "**Final Decree**" means the decree contemplated under Bankruptcy Rule 3022.

2.2.59. "**Final Order**" means an order as to which the time to appeal, petition for certiorari, petition for review, or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for reargument or rehearing shall then be pending and in the event that an appeal, *writ of certiorari*, petition for review, or reargument or rehearing thereof has been sought, such order shall have been affirmed by the highest Bankruptcy Court to which such order was appealed, or *certiorari* or review has been denied or from which reargument or rehearing was sought, and the time to take any further appeal, petition for *certiorari*,

petition for review, or move for reargument or rehearing shall have expired; *provided*, *however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order shall not cause such order not to be a Final Order.  If any appeal of the Confirmation Order becomes equitably moot due to Substantial Consummation, the Confirmation Order shall be considered a Final Order as of the date that the order determining such appeal to be moot has become a Final Order.

2.2.60.  "**General Unsecured Claim**" means any Claim against the Debtor that arose or is deemed by the Bankruptcy Code or Bankruptcy Court, as applicable, to have arisen before the Petition Date and that is not:  (i) an Administrative Expense Claim, (ii) a Priority Tax Claim, (iii) a Non-Tax Priority Claim, (iv) a Secured Claim, (v) a Pension Claim; (vi) an Abuse Claim; (vii) an Unknown Abuse Claim or (viii) a Non-Abuse Litigation Claim.

2.2.61.  "**Holder**" means the beneficial holder of any Claim.

2.2.62.  "**Impaired**" means a Claim that is impaired within the meaning of section 1124 of the Bankruptcy Code.

2.2.63.  "**Indirect Claims**" means all Claims by a Joint Tortfeasor asserted against a Covered Party or a Settling Insurer for contribution, indemnity, equitable indemnity, subrogation, equitable subrogation, reimbursement, or any other indirect or derivative recovery, on account of, or with respect to, any Covered Party's actual or alleged liability, for any Claim relating to Abuse that is not an Abuse Claim.

2.2.64.  "**Initial Debtor Contribution**" has the meaning ascribed to such term in Section 7.2.2. of this Plan.

2.2.65.  "**Insurance Assignment**" means the assignment of the Transferred Insurance Interests to the Trust.

2.2.66.  "**Insurance Coverage Adversary Proceeding**" means the adversary proceeding captioned *The Diocese of Camden, New Jersey v. INA, et al.*, Adv. Pro. No. 20-1573 (JNP) (Dist. of N.J. Bankr.).

2.2.67.  "**Insurance Settlement Agreement(s)**" means (i) the *Settlement Agreement and Release* by and among (a) the AIG Insurers, (b) the Plan Proponents and (c) certain of the Other Catholic Entities [ECF 2946], (ii) the *Settlement Agreement and Release* by and among (a) National Catholic, (b) Vincent Ajuk, (c) Crystal Martrell Gibbs, (d) the Plan Proponents and (e) certain of the Other Catholic Entities [ECF 3231] and (iii) a settlement agreement among (a) any or all of the Covered Parties, (b) the Tort Committee and (c) the Settling Insurers which shall be filed as Plan Supplements if such agreements are fully executed prior to Confirmation and which shall be attached to the Confirmation Order if they are approved by the Bankruptcy Court.

2.2.68.  "**Insurance Settlement Approval Order(s)**" means the (i) *Order (I) Authorizing the Debtor and the Tort Committee to Enter into a Settlement Agreement and Release With the AIG Insurers, (II) Authorizing the Sale of the AIG Insurers' Insurance Policies Free and Clear of Liens, Claims, Interests and Other Encumbrances, (III) Approving the Settlement*

*Agreement and (IV) For Related Relief* [ECF 31090], (ii) *Order (I) Authorizing the Debtor and the Tort Committee to Enter Into a Settlement Agreement and Release With The National Catholic Risk Retention Group, Inc., Vincent Ajuk, and Crystal Martrell Gibbs, (II) Approving the Settlement Agreement and (III) For Related Relief* [ECF 3231] and (iii) an order of the Bankruptcy Court approving one or more Insurance Settlement Agreements.  The "Insurance Settlement Approval Order" may be the Confirmation Order if it approves an Insurance Settlement Agreement.

2.2.69.  "**Insurer**" means a Person (including all of its Affiliates, successors, and assigns) that has, or is alleged to have, issued, subscribed any interest in, assumed any liability for, or underwritten any risk in a Covered Party Insurance Policy.

2.2.70.  "**Interests**" means all Claims, including any "interests" as that term is used in section 363 of the Bankruptcy Code, and other rights of any nature, whether at law or in equity, including all interests or other rights under New Jersey law or any other applicable law.

2.2.71.  "**Joint Tortfeasor**" means any Person, who is not a Covered Party, and is alleged to be a joint tortfeasor with any Covered Party in connection with the Abuse relating to an Abuse Claim.  Any Person alleged to be a Joint Tortfeasor shall not be liable for any Covered Party's share of causal liability or fault or have any Claim against the Covered Parties and all such Claims are treated as Indirect Claims under this Plan.

2.2.72.  "**Lien**" means any mortgage, pledge, deed of trust, assessment, security interest, lease, lien, adverse claim, levy, charge or other encumbrance of any kind, including any "lien" as defined in section 101(37) of the Bankruptcy Code, or a conditional sale contract, title retention contract or other contract to give any of the foregoing.

2.2.73.  "**Medicare Claims**" means any and all Claims by CMS against the Trust, any Settling Insurer, or any Covered Party, under MMSEA and under MSP, that relate to any payments in respect of any Abuse Claims, including Claims for reimbursement of payments made to Abuse Claimants who recover or receive any distribution from the Trust and Claims by CMS relating to reporting obligations.

2.2.74.  "**Medicare Secondary Payor Act**" or "**MSP**" means 42 U.S.C. § 1395y et seq., or any other similar statute or regulation, and any related rules, regulations or guidance issued in connection therewith or amendments thereto.

2.2.75.  "**Missions**" means, collectively, all past and present missions located within the territory of the Diocese, including, but not limited to, those listed on **Exhibit 2.2.75**. Nothing in the foregoing is intended to suggest that such Persons are Agents of the Debtor or subject to its control.

2.2.76.  "**MMSEA**" means § 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L. 110-173), which imposes reporting obligations on those Persons with payment obligations under the MSP.

2.2.77.  "**National Catholic**" means The National Catholic Risk Retention Group, Inc.

2.2.78. "**Non-Abuse Litigation Claims**" means Claims arising out of litigation pending against the Debtor prior to the Petition Date asserting causes of action unrelated to Abuse.

2.2.79. "**Non-Settling Insurer Policy Claim**" means any Claim for which insurance coverage is provided or allegedly provided by a Non-Settling Insurer Policy.

2.2.80. "**Non-Settling Insurer Policy**" means any Insurance Policy any Non-Settling Insurer issued, subscribed any interest in, or has underwritten any risk in.

2.2.81. "**Non-Settling Insurer**" means any Insurer that is not a Settling Insurer by the Effective Date.

2.2.82. "**OCE Cash Contribution**" has the meaning ascribed to such term in Section 7.2.2 of this Plan.

2.2.83. "**Other Catholic Entities Insurance Assignment Agreement**" means that certain agreement to be attached to the Confirmation Order under which the Other Catholic Entities assign the proceeds of Non-Settling Insurer Policies and all Claims for such proceeds and all Claims against the Non-Settling Insurers concerning or arising from the Non-Settling Insurer Policies to the Trust as of the Effective Date.  The Other Catholic Entities Insurance Assignment Agreement shall provide that (i) the Other Catholic Entities make no representation or warranty about their ability to assign the Non-Settling Insurer Policies to the Trust and (ii) any post-Effective Date Claims arising under or related to the Other Catholic Entities Insurance Assignment Agreement shall be the responsibility of the Trust at its sole cost and expense.

2.2.84. "**Other Catholic Entities**" means all of the entities listed on **Exhibits 2.2.21, 2.2.75, 2.2.87** and **2.2.104** of this Plan, including, but not limited to:  (i) the Parishes; (ii) the Missions; (iii) the Schools; and (iv) the Catholic Ministry Entities.  Nothing in the foregoing is intended to suggest that such Persons are Agents of the Debtor or subject to its control.

2.2.85. "**Other Insured Entity**" or "**Other Insured Entities**" means those Persons that are, or allegedly are, insured or covered, under a Covered Party Insurance Policy, but do not include the Debtor, or the Other Catholic Entities.  A Person is an "Other Insured Entity" only to the extent it is insured under a Settling Insurer Policy.  An individual who perpetrated an act of Abuse that forms the basis of an Abuse Claim is not an Other Insured Entity.  No religious order, diocese or archdiocese (other than the Diocese) is an Other Insured Entity.

2.2.86. "**Parish Cash Contribution**" has the meaning ascribed to such term in Section 7.2.2 of this Plan.

2.2.87. "**Parishes**" means, collectively, all past and present parishes within Diocesan territory, including, but not limited to:  (i) any parishes located within the territory of the Diocese and incorporated under N.J.S.A. 16:15-1 to 16:15-8 and (ii) the entities listed on **Exhibit 2.2.87** to this Plan. Nothing in the foregoing is intended to suggest that such Persons are Agents of the Debtor or subject to its control.

2.2.88. "**Pensions**" means the (i) Pension Plan for Priests of the Diocese of Camden; (ii) Pension Plan for Certain Lay Employees of the Diocese of Camden and (iii) Post-Retirement Benefits Plan for Priests of the Diocese of Camden.

2.2.89. "**Person**" means an individual or entity, a corporation, limited liability company, partnership, general partnership, limited partnership, limited liability partnership, limited liability limited partnership, proprietorship, association, joint stock company, joint venture, estate, trust, trustee, personal executor or personal representative, unincorporated organization or association, federal, international, foreign, state, or local governmental or quasi-governmental entity, body, or political subdivision or any agency or instrumentality thereof; and any other individual or entity within the definitions of (i) "person" in section 101(41) of the Bankruptcy Code or (ii) "entity" in section 101(15) of the Bankruptcy Code.

2.2.90. "**Petition Date**" means October 1, 2020, the date on which the Debtor filed its petition for relief commencing the Chapter 11 Case.

2.2.91. "**Plan Documents**" means, collectively, (a) this Plan, (b) the Plan Supplement(s), (c) the Disclosure Statement, (d) the Trust Documents, (e) the Trust Distribution Plan, (f) all of the exhibits and schedules attached to any of the foregoing and (g) any other document or instrument necessary to implement this Plan.

2.2.92. "**Plan Proponents**" means the Debtor and the Tort Committee, together.

2.2.93. "**Plan Supplement(s)**" means any supplements to this Plan containing exhibits and schedules to this Plan, which will be filed in accordance with the terms of this Plan.

2.2.94. "**Plan**" means this *First Modified Eighth Amended Plan of Reorganization*, as the same may be amended, modified, or supplemented from time to time in accordance with the terms and provisions hereof.

2.2.95. "**PNC Bank**" means PNC Bank, National Association.

2.2.96. "**Priority Non-Tax Claim**" means a Claim entitled to priority under sections 507(a)(2), (3), (4), (5), (6) or (7) of the Bankruptcy Code, but only to the extent it is entitled to priority in payment under any such subsection.

2.2.97. "**Priority Tax Claim**" means any Claim entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code, but only to the extent it is entitled to priority under such subsection.

2.2.98. "**Proof of Claim**" means a proof of Claim filed pursuant to Bankruptcy Code section 501 and/or pursuant to any order of the Bankruptcy Court, together with supporting documents.

2.2.99. "**Reduction Amount**" has the meaning ascribed to such term in Section 9.3 of this Plan.

2.2.100. "**Released Party**" means collectively and in each case in their capacity as such: (i) the Debtor and Reorganized Debtor; and (ii) all Persons listed on **Exhibits 2.2.21, 2.2.75, 2.2.87** and **2.2.104** of this Plan as may be amended prior to Confirmation; and (iii) except as otherwise provided for by this Plan, with respect to each of the foregoing Persons in clauses (i) through (ii), such Persons' successors and assigns, Affiliates, and its and their current and former officers, directors, trustees, principals, shareholders and their Affiliates, and Agents, in their capacities of such.

2.2.101. "**Releasing Party**" means collectively and in each case in their capacity as such: (i) the Debtor and the Debtor's Estate; (ii) all Persons listed on **Exhibits 2.2.75, 2.2.87** and **2.2.104** of this Plan as may be amended prior to Confirmation and (iii) with respect to each of the foregoing Persons, such Persons' and the Debtor's Affiliates successors and assigns, and its and their current and former Agents, and such Persons' respective heirs, executors, estates, servants and nominees; *provided*, *however*, that the Debtor is not releasing Claims against the Other Catholic Entities related to loans made by the Debtor to an Other Catholic Entity or accounts receivable from an Other Catholic Entity.

2.2.102. "**Reorganized Debtor**" means the Diocese as it exists on and after the Effective Date.

2.2.103. "**Schedules**" means the schedules, statements, and lists filed by the Debtor with the Bankruptcy Court pursuant to Bankruptcy Rule 1007, as they have been amended or supplemented from time to time.

2.2.104. "**Schools**" means, collectively, all past and present Catholic schools which are or were owned and/or operated by parishes located within the territory of the Diocese, or whose corporate member is or was the Diocese or the Bishop of Camden, or whose corporate trustees were or are, ex officio, pastors of parishes within the Diocese including, but not limited to: the schools listed on **Exhibit 2.2.104**; and (ii) 22 schools owned and operated by certain Parishes; *provided*, *however*, Bishop Eustace Preparatory School in Pennsauken, New Jersey, St. Augustine Preparatory School in Richland, New Jersey, and Our Lady of Mercy Academy in Newfield, New Jersey are not "Schools" included in this definition. Nothing in the foregoing is intended to suggest that such Persons are Agents of the Debtor or subject to its control.

2.2.105. "**Secured Claim**" means a Claim (i) that is secured by a Lien on property in which the Estate has an Interest, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law, or a Claim that is subject to a valid right of the Creditor of setoff against amounts owed to the Debtor; to the extent of the value of the Holder's Interest in the Estate's Interest in such property or to the extent of the amount subject to a valid right of setoff, as applicable; and (iii) the amount of which (A) is undisputed by the Debtor or (B) if disputed by the Debtor, such dispute is settled by written agreement between the Debtor and the holder of such Claim or determined, resolved, or adjudicated by Final Order.

2.2.106. "**Settling Insurers**" means (i) the AIG Insurers, (ii) National Catholic and (iii) any Non-Settling Insurer upon the due execution and delivery of an Insurance Settlement

14

Agreement, entry of an Insurance Settlement Agreement Approval Order and the payment to the Trust of the settlement amount due thereunder.

2.2.107. "**Substantial Consummation**" means the substantial consummation of a chapter 11 plan as defined in section 1101(2) of the Bankruptcy Code.

2.2.108. "**Tax Code**" means the Internal Revenue Code of 1986, as amended.

2.2.109. "**Tort Committee**" means the Official Committee of Tort Claimant Creditors of The Diocese of Camden, New Jersey appointed by the U.S. Trustee in the Chapter 11 Case.

2.2.110. "**Trade Committee**" means the Official Committee of Unsecured Trade Creditors appointed by the U.S. Trustee in the Chapter 11 Case.

2.2.111. "**Transferred Insurance Interests**" means the following rights and interests of the Diocese in Non-Settling Insurer Policies in respect of actual or potential coverage for any Abuse Claim or Unknown Abuse Claim:  (a) the proceeds of such Non-Settling Insurer Policies and all Claims for such proceeds; and (b) all Coverage Claims against the Non-Settling Insurers, including, but not limited to, all Claims based on, or related to, the Non-Settling Insurers' conduct concerning insurance coverage for, or defense or settlement of, any Abuse Claim.

2.2.112. "**Treasury Regulations**" has the meaning ascribed to such term in Section 7.1. of this Plan.

2.2.113. "**Trust Administrator**" means Mr. Matthew Dundon, the Person appointed by the Tort Committee as the Trust Administrator of the Trust in accordance with the terms of this Plan, the Confirmation Order, and the Trust Agreement, or any successor appointed in accordance with such terms thereafter.

2.2.114. "**Trust Advisory Committee**" means the committee established pursuant to this Plan and the Trust Agreement and having the powers, duties and obligations set forth in this Plan and the Trust Agreement.

2.2.115. "**Trust Agreement**" means "The Diocese of Camden Plan Trust Agreement" establishing the Trust as may be amended, attached to this Plan as **Exhibit 2.2.115**.

2.2.116. "**Trust Assets**" means the Cash and other assets to be transferred to the Trust under this Plan.

2.2.117. "**Trust Distribution Plan**" means the Trust Distribution Plan attached to this Plan as **Exhibit 2.2.117**.

2.2.118. "**Trust Distribution Procedures**" means the procedures set forth in the Trust Distribution Plan to be implemented by the Trust Administrator pursuant to the terms and conditions of this Plan and the Trust Agreement to resolve, liquidate, and pay (if entitled to payment) Class 5 and Class 6 Claims as and to the extent set forth in such procedures.

2.2.119. "**Trust Documents**" means the Trust Agreement, together with such additional documents as may be executed in connection with the Trust Agreement.

2.2.120. "**Trust**" means the trust created for the benefit of Holders of Class 5 and 6 Claims in accordance with this Plan, the Confirmation Order and the Trust Agreement.

2.2.121. "**U.S. Trustee Fees**" means any and all fees payable to the U.S. Trustee pursuant to section 1930 of title 28 of the Bankruptcy Code and any interest thereupon.

2.2.122. "**U.S. Trustee**" means the Office of the United States Trustee for Region 3, which includes the District of New Jersey.

2.2.123. "**Unknown Abuse Claim**" means an Abuse Claim against a Covered Party arising out of Abuse which occurred on or before the Effective Date for which (a) no Proof of Claim is filed or deemed timely filed on or before the Bar Date and (b) a Proof of Claim is filed, or a submission is otherwise made to the Trust Administrator, after the Bar Date, if the Holder of such Abuse Claim (i) was under a disability recognized by any New Jersey state law or other applicable law suspending the running of the statute of limitation period as of the Bar Date, if any; (ii) neither discovered nor reasonably should have discovered before the Bar Date the alleged injury and its causal relationship to the act of Abuse; or (iii) has an Abuse Claim that was barred by the applicable statute of limitations as of the Effective Date but is no longer barred by the applicable statute of limitations for any reason, including, for example, the passage of legislation that revises such previously time-barred Abuse Claim.

2.2.124. "**Unknown Abuse Claims Reserve**" means $1,250,000.

2.2.125. "**Unknown Claims Representative**" means Judge Michael R. Hogan as provided by the *Order Authorizing the Appointment of Judge Michael R. Hogan as Unknown Claims Representative* [ECF 1237].

2.2.126. "**Unknown Claims Reserve Establishment Period**" has the meaning ascribed to such term in Section 7.3 of this Plan.

# ARTICLE III
# CLASSIFICATION OF CLAIMS

3.1.    **Classification**.    All Claims, as defined herein and in section 101(5) of the Bankruptcy Code, except the Fee Claims, Administrative Expense Claims, U.S. Trustee Fees, and Priority Tax Claims, are placed into the Classes set forth below.  Pursuant to section 1123(a)(1) of the Bankruptcy Code, Fee Claims, Administrative Expense Claims, U.S. Trustee Fees, and Priority Tax Claims, as described below, are not classified in this Plan, and the treatment of such Claims is set forth in Article III below.  A Claim is placed in a particular Class only to the extent that the Claim falls within the description of that Class and is classified in other Classes to the extent that any portion of such Claim falls within the description of such other Classes.  A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, discharged, released or otherwise settled prior to the Effective Date.

3.2.   **Unclassified Claims**.  The following are the unclassified Claims:  Fee Claims, Administrative Expense Claims, U.S. Trustee Fees, and Priority Tax Claims.  Unclassified Claims are not Impaired by this Plan.  Each Holder of an unclassified Claim is conclusively presumed to have accepted this Plan and, therefore, is not entitled to vote to accept or reject this Plan.

3.3.   **Classified Claims**.  As set forth in the table below, Class 1 is Unimpaired under this Plan, and, pursuant to section 1126(f) of the Bankruptcy Code, is conclusively presumed to have accepted this Plan.  Classes 7A and 7B are fully Impaired and are not receiving any Distributions under this Plan and, pursuant to section 1126(g) of the Bankruptcy Code, are conclusively presumed to have rejected this Plan.  Classes 2, 3, 4, 5, 6 and 8 are Impaired under this Plan and are entitled to vote on this Plan.

| Class | Claims & Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | PNC Bank Claim | Impaired | Entitled to Vote |
| 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Pension Claims | Impaired | Entitled to Vote |
| 5 | Abuse Claims Other Than Unknown Abuse Claims | Impaired | Entitled to Vote |
| 6 | Unknown Abuse Claims | Impaired | Entitled to Vote |
| 7A | Abuse Related Contingent Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7B | Abuse Related Contingent Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Non-Abuse Litigation Claims | Impaired | Entitled to Vote |

**ARTICLE IV**
**TREATMENT OF UNCLASSIFIED CLAIMS**

4.1.   **Administrative Expenses Claims**.  Administrative Expense Claims are Claims for costs or expenses of administering the Debtor's Chapter 11 Case, which are Allowed under Bankruptcy Code section 503(b) or otherwise.  The Bankruptcy Code requires that all administrative expenses be paid on the Effective Date, unless a particular Claimant agrees to different treatment.  The Debtor or Reorganized Debtor, as appropriate, shall pay each Holder of an Allowed Administrative Expense Claim in full, in Cash, on the later of (i) fifteen (15) days after the Effective Date; or (ii) fifteen (15) days after the date on which such Claim becomes an Allowed Administrative Expense Claim.  Notwithstanding anything in this Plan to the contrary, the Holder of an Allowed Administrative Claim may be paid on such other date and upon such other terms as may be agreed upon by the Holder of an Allowed Administrative Expense Claim and Debtor/Reorganized Debtor.

4.2.   **Priority Tax Claims**.  The Reorganized Debtor shall pay any Allowed Priority Tax Claims, in full, in Cash, without interest, as soon as practicable after the later of (i) fifteen (15) days after the Effective Date, (ii) fifteen (15) days after the date on which such Claim becomes an Allowed Priority Tax Claim, (iii) at the option of the Debtor prior to the Effective Date in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, in Cash, in an aggregate amount

of such Allowed Priority Tax Claim payable in regular quarterly installments over a period of not more than five (5) years from the Petition Date, or (iv) such other treatment agreed to by the Debtor and the Holder of such Allowed Priority Tax Claim; *provided*, *however*, that the Holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising with respect to, or in connection with any Priority Tax Claim.  Any demand for any such penalty will be deemed disallowed by Confirmation of this Plan.  The Debtor is unaware of any Priority Tax Claims.

4.3.   **U.S. Trustee Fees**.  All U.S. Trustee Fees due and payable prior to the Effective Date shall be paid by the Debtor on the Effective Date.  After the Effective Date, the Reorganized Debtor shall pay any and all U.S. Trustee when due and payable.  The Debtor shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR.  After the Effective Date, the Reorganized Debtor shall File with the Bankruptcy Court quarterly reports when they become due using UST Form 11-PCR.  The Debtor and the Reorganized Debtor shall remain obligated to pay U.S. Trustee Fees to the United States Trustee until the earliest of the Chapter 11 Case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.  The United States Trustee shall not be required to File any Administrative Expense Claim in the Chapter 11 Case and shall not be treated as providing any release under this Plan.

4.4.   **Fee Claims**.  All Persons seeking an award by the Bankruptcy Court of Fee Claims (i) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is 45 days after the Effective Date and (ii) shall be paid in full in such amounts as are Allowed by the Bankruptcy Court (a) on the date upon which the Order relating to any such Allowed Fee Claim is entered, or (b) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtor or Reorganized Debtor, as applicable.  The Reorganized Debtor is authorized to pay compensation for services rendered or reimbursement of expenses incurred after Confirmation in the ordinary course and without the need for Bankruptcy Court approval.

## ARTICLE V
## TREATMENT OF CLASSIFIED CLAIMS

5.1.   **Class 1 (Priority Non-Tax Claims)**.  Certain priority non-tax Claims that are referred to in Bankruptcy Code sections 507(a)(3), (4), (5), (6), and (7) are entitled to priority treatment.  These Claims are to be treated as follows:

(a)   **Classification**.  Class 1 consists of Priority Non-Tax Claims.

(b)   **Impairment and Voting**.  Class 1 is Unimpaired.  Holders of Allowed Class 1 Priority Non-Tax Claims are deemed to have accepted this Plan and, thus, are not entitled to vote to accept or reject this Plan.

(c)   **Treatment**.  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim and the Debtor shall have agreed in writing to a different treatment, each Holder of an Allowed Priority Non-Tax Claim shall receive, in full and final satisfaction of such Claim, payment in full in Cash, without

interest, in an amount equal to such Allowed Priority Non-Tax Claim as soon as reasonably practicable after the later of (a) the Effective Date and (b) the date when such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim.

5.2.    **Class 2 (PNC Bank Claim)**.

(a)    **Classification**.  PNC Bank is an unsecured creditor of the Diocese but is secured, *inter alia*, by a Pledge Agreement and Guaranty by DOC Trusts. Accordingly, PNC Bank is entitled to separate treatment under the Plan. PNC Bank's Claim is approximately $22.8 million.

(b)    **Impairment and Voting**.  Class 2 is Impaired and the Holder of the Class 2 Claim is entitled to vote to accept or reject the Plan.

(c)    **Treatment**.  On the Effective Date, the Diocese and DOC Trusts shall execute and deliver to PNC Bank amended and restated loan documents with PNC Bank and all such loan documents and provisions shall remain in full force and effect until all obligations of the Debtor have been indefeasibly paid in full and which shall include the material following terms:

1.    Confirmation of the Plan no later than June 30, 2022;

2.    The Diocese shall continue to make interest only payments through the date of Confirmation;

3.    5-year term of repayment as follows:  (i) first two years interest only payments; (ii) following three years with payments based on an amortization of 15 years until two-years from the Effective Date and (iii) a balloon payment of the balance of the loan on five-years from the Effective Date;

4.    The Diocese maintains the right to repay the balance of the loan at any time without penalty or premium;

5.    Interest rate at BSBY plus 100 (1%) basis points; and

6.    The Diocese (including its pension funds) and Other Catholic Entities shall keep total assets under management ("**AUM**") at PNC at no less than $250 million.  If AUM falls below that level, the interest rate increases to BSBY plus 400 basis points (4%).

5.3.    **Class 3 (General Unsecured Claims)**.

(a)    **Classification**.  General Unsecured Claims are unsecured Claims not entitled to priority under Bankruptcy Code section 507(a), which are not Abuse Claims, Unknown Abuse Claims or Non-Abuse Litigation Claims.

The unsecured Creditors include trade Creditors and total approximately $1,500,000.

(b)     **Impairment and Voting**.  Class 3 is Impaired, and each holder of a Class 3 Claim is entitled to vote to accept or reject the Plan.

(c)     **Treatment**.  The Diocese shall pay Allowed Class 3 Claims a 75% dividend within 5-years, payable as follows:

- A 15% payment shall be made upon the later of:  (i) 60 days of the Effective Date; or (ii) 15 days of the determination of a Claim being an Allowed Claim, as applicable;

- On the first anniversary of the Effective Date, a 15% payment shall be made;

- On the second anniversary of the Effective Date, a 15% payment shall be made;

- On the third anniversary of the Effective Date, a 15% payment shall be made; and

- On the fourth anniversary of the Effective Date, a final 15% payment shall be made.

Notwithstanding the above, Allowed Class 3 Claimants shall have the option to forego the 75% payment within 5-years and instead elect to receive a payment of 50% of their Allowed Claim in full satisfaction of their Allowed Claim upon the later of:  (i) 60 days after the Effective Date; or (ii) 5 business days after the Claim is deemed Allowed, as applicable.  Such election may be made through the Ballot or otherwise in writing to Debtor's counsel within 20 days of Confirmation.

5.4.    **Class 4 (Pension Claims)**.

(a)     **Classification**.  Pension Claims are unsecured Claims that are based on the Debtor's underfunded Pensions.  The Debtor estimates that these claims are approximately $45,439,291.

(b)     **Impairment and Voting**.  Class 4 is Impaired and the fiduciary charged with administering each of the Pensions is entitled to vote to accept or reject this Plan.

(c)     **Treatment**.  The Reorganized Debtor shall pay into the Pensions their pro rata share of a maximum of a $40 million distribution paid in equal annual installments over 20 years.  Payments may be made quarterly.

5.5.   **Class 5 (Abuse Claims Other Than Unknown Abuse Claims)**.

    (a)   **Classification**.   A Class 5 Claim means an Abuse Claim other than an Unknown Abuse Claim.

    (b)   **Impairment and Voting**.   Class 5 is Impaired and each holder of a Class 5 Claim is entitled to vote to accept or reject this Plan.

    (c)   **Treatment**.   This Plan creates a Trust to fund payments to Class 5 Claimants entitled to such payments under this Plan, the Trust Agreement and the Trust Distribution Plan.   Class 5 Claimants shall receive their allocable share of Trust Assets at the time and in the manner set forth in the Trust Distribution Plan.   It is intended that any payment on an Abuse Claim will constitute payment for damages on account of personal physical injuries or sickness arising from an occurrence, within the meaning of section 104(a)(2) of the Tax Code.

The settlement set forth in the *Order Approving Settlement of Controversy by and Among the Diocese and the RH Claimants Pursuant to Fed. R. Bankr. P. 9019(A)* entered on October 15, 2021 has expired by the terms of such order and is null and void.   The claimants set forth therein shall be treated as Class 5 Claimants in accordance with this Plan.

5.6.   **Class 6 (Unknown Abuse Claims)**.

    (a)   **Classification**.   A Class 6 Claim means an Unknown Abuse Claim.

    (b)   **Impairment and Voting**.   Class 6 is Impaired and the Unknown Claims Representative shall submit a single ballot on behalf of Class 6 Claimants.

    (c)   **Treatment**.   Class 6 Claimants shall receive their allocable share of the Unknown Abuse Claims Reserve at the time and in the manner set forth in the Trust Distribution Plan.   It is intended that any payment on an Abuse Claim will constitute payment for damages on account of personal physical injuries or sickness arising from an occurrence, within the meaning of section 104(a)(2) of the Tax Code.

5.7.   **Class 7A (Abuse Related Contingent Claims)**.

    (a)   **Classification**.   A Class 7A Claim means any Claim for contribution, indemnity or reimbursement arising out of or related to the Diocese's liability to pay or defend any Class 5 Claim.

    (b)   **Impairment and Voting**.   Class 7A is Impaired.   Class 7A is not receiving a distribution under this Plan, provided that the Other Catholic Entities receive the benefits of the Channeling Injunction, and, therefore, is deemed to reject this Plan.

21

(c)     **Treatment**.  Class 7A Claims shall be disallowed and extinguished as a result of the terms of this Plan by the waiver of such claims by the Other Catholic Entities in exchange for the release and Channeling Injunction provided in this Plan and Trust Distribution Procedures.  Class 7A Claims will receive no distribution under this Plan.

5.8.     **Class 7B (Abuse Related Contingent Claims)**.

(a)     **Classification**.   A Class 7B Claim means any Claim for contribution, indemnity or reimbursement arising out of or related to the Diocese's liability to pay or defend any Class 6 Claim.

(b)     **Impairment and Voting**.  Class 7B is Impaired by this Plan.  Class 7B is not receiving a distribution under this Plan provided that the Other Catholic Entities receive the benefits of the Channeling Injunction and, therefore, is deemed to reject this Plan.

(c)     **Treatment**.  Class 7B Claims shall be disallowed and extinguished as a result of the terms of this Plan by the waiver of such claims by the Other Catholic Entities in exchange for the release and Channeling Injunction provided in this Plan and Trust Distribution Procedures.  Class 7B Claims will receive no distribution under this Plan.

5.9.     **Class 8 (Non-Abuse Litigation Claims)**.

(a)     **Classification**.  Non-Abuse Litigation Claims are litigation Claims against the Diocese that are not Abuse Claims.

(b)     **Impairment and Voting**.  Class 8 is Impaired and each holder of a Class 8 Claim is entitled to vote to accept or reject this Plan.

(c)     **Treatment**.

1.     Allowed Class 8 Claims shall be paid a pro rata portion of $100,000 (the "**Class 8 Fund**").  The (i) Diocese shall contribute $50,000 to the Class 8 Fund and (ii) Catholic Charities and Diocese of Camden, Inc. shall transfer $50,000 to the Class 8 Fund within two (2) Business Days after the Confirmation Order has become a Final Order.   The forgoing contribution by Catholic Charities is contingent upon it being a Released Party under this Plan.

2.     Effective upon the Effective Date, Class 8 Claimants are granted relief from the automatic stay of 11 U.S.C. § 362 solely for the purpose of continuing to prosecute their Class 8 Claim in a court of competent jurisdiction (each, a "**Class 8 Action**"), including but not limited to, litigating such action through entry of a judgment, prosecution of any appeals and/or settlement of such action, subject to the terms and conditions set forth herein.

3.      Notwithstanding any provision to the contrary in the Plan Documents, Class 8 Claimants shall be entitled to prosecute and/or settle their respective Class 8 Action, provided that such Class 8 Claimant shall be limited to recovering from (i) the proceeds of any applicable insurance policy which provides coverage, or could provide coverage, with respect to such Class 8 Claim and (ii) its pro rata portion of the Class 8 Fund.  If any insurer denies and/or disclaims coverage, the Debtor shall reasonably cooperate at the sole cost of such Class 8 Claimant to assign to such Class 8 Claimant the right to pursue and receive the proceeds of any applicable coverage under the policy/ies.

4.      Effective upon the Effective Date, Class 8 Claimants shall be barred and enjoined from seeking recovery on any judgment or settlement obtained in their respective Class 8 Action from the assets of the Debtor or any Other Catholic Entities and the Trust, provided that such Class 8 Claimant shall not be barred or enjoined from recovery from (i) any insurance policy that may cover such Class 8 Claim and (ii) receiving its pro rata portion of the Class 8 Fund.  As such, the Class 8 Claimants shall be barred and enjoined from seeking recovery of the unpaid portion of any self-insured retention required under such insurance policy and the Class 8 Claimants' recovery from the proceeds of such insurance policies shall be limited to the extent to which any judgment entered in favor of such Class 8 Claimant exceeds the unpaid portion of any self-insured retention.

5.      All parties, including, but not limited to, any insurer under any relevant insurance policy applicable to a Class 8 Claim reserve, and specifically do not waive, any of their rights, remedies and/or defenses with respect to the Class 8 Claims.

6.      Nothing contained herein shall be deemed a representation or warranty concerning the availability, scope and interpretation of any insurance coverages which may or may not exist.

7.      The Debtor agrees that it may not, and will not, sell, transfer, extinguish its rights in, or otherwise enter into a compromise or settlement with respect to any applicable insurance policies in any manner which impairs or affects a Class 8 Claimant's ability to collect with respect to such insurance policy absent such Class 8 Claimants' and the Tort Committee's written consent. Notwithstanding anything to the contrary in the Plan Documents, the Transferred Insurance Interests shall not include the proceeds of, or coverage claims applicable to, the Class 8 Claims.

8.      All Class 8 Claims shall be permitted, but not required, to liquidate their Class 8 Claim in a court of competent jurisdiction in accordance with 28 U.S.C. § 157(b)(2)(B).

## ARTICLE VI
## ACCEPTANCE

6.1.    **Acceptance or Rejection of Plan**.  Each impaired class of Creditors with Claims against the Debtor's Estate shall be entitled to vote separately to accept or reject this Plan.  A Class of Creditors shall have accepted this Plan if this Plan is accepted by at least two-thirds in the aggregate dollar amount, and more than one-half in number of holders, of the allowed Claims of such class that have accepted or rejected this Plan.

6.2.    **Cramdown**.   To the extent necessary, the Plan Proponents shall request Confirmation of this Plan under section 1129(b) of the Bankruptcy Code.  The Plan Proponents reserve the right to modify, amend, or withdraw this Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

6.3.    **Modification of Treatment of Claims**.  The Debtor reserves the right to modify the treatment of any Allowed Claim (other than a Class 5 or Class 6 Claim) in any manner adverse only to the Holder of such Claim at any time after the Effective Date upon the consent of the Holder of the Claim whose Allowed Claim is being adversely affected, or as allowed by Bankruptcy Court Order, through the Effective Date.

## ARTICLE VII
## THE TRUST

7.1.    **Establishment of Trust.**

Effective as of the date the Confirmation Order is entered, the Trust shall be established in accordance with the Trust Documents for the purposes of assuming liability of Covered Parties and Settling Insurers for Channeled Claims and receiving, liquidating and distributing Trust Assets in accordance with this Plan and the Trust Distribution Plan.

As of the Effective Date, the liability of Covered Parties and Settling Insurers for all Channeled Claims shall be assumed fully by the Trust, without further act, deed or Bankruptcy Court order, and, pursuant to the Channeling Injunction provided for herein, the liability of Covered Parties and Settling Insurers for all Channeled Claims shall be satisfied solely from Trust Assets.

The Trust is intended to qualify as a "qualified settlement fund" pursuant to section 468B of the Tax Code and the regulations promulgated thereunder (the "**Treasury Regulations**").  The Debtor is the "transferor" within the meaning of Treasury Regulation Section 1.468B-1(d)(1).  The Trust Administrator shall be classified as the "administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3).  The Trust Documents, including the Trust Agreement, are incorporated herein by reference.

The Trust shall have no liability for Non-Abuse Litigation Claims and holders of Non-Abuse Litigation Claims shall have no recourse to the Trust with respect to such Claims.

7.2.    **Contributions to Trust.**

The Trust shall be funded with:  (i) $87.5 million by the Debtor and the Other Catholic Entities; (ii) any proceeds held by the Debtor or the Reorganized Debtor on account of Insurance Settlement Agreements as set forth in this Section 7.2 and (iii) the Transferred Insurance Interests.

The Diocese and Other Catholic Entities shall not use "Restricted Funds" for any payments they make under the Plan, including, but not limited to, the payments to be made to the Trust.

7.2.1.    **Debtor Cash Contribution and OCE Cash Contributions**.

On the Effective Date, the Debtor shall transfer $29.75 million in good funds to the Trust using wiring instructions provided by the Trust Administrator (the "**Initial Debtor Contribution**").  The Initial Debtor Contribution will be primarily comprised of funds from the following sources:  (i) $14.75 million in non-restricted cash accounts held by the Diocese; and (ii) $15 million in the form of a loan of non-restricted cash from DOC Trusts (the "**DOCT Loan**").

The Trust shall also be funded by the Debtor as set forth below (collectively, the "**Additional Debtor Contributions**" and together with the Initial Debtor Contribution, the "**Debtor Cash Contribution**"):

(a)    No later than one year after the Effective Date, the Debtor shall transfer $10 million in good funds to the Trust using wiring instructions provided by the Trust Administrator.

(b)    No later than two years after the Effective Date, the Debtor shall transfer an additional $10 million in good funds to the Trust using wiring instructions provided by the Trust Administrator.

(c)    No later than three years after the Effective Date, the Debtor shall transfer an additional $10 million in good funds to the Trust using wiring instructions provided by the Trust Administrator.

(d)    No later than four years after the Effective Date, the Debtor shall transfer an additional $7.5 million in good funds to the Trust using wiring instructions provided by the Trust Administrator.

To secure the Additional Debtor Contributions, the Diocese shall grant the Trust a Lien and security interest on certain bank accounts, investment accounts and receivables to set forth in a Security Agreement to be executed and delivered on the Effective Date (such agreement being the "**Additional Debtor Contributions Security Agreement**").  The holders of any interest, whether such interest be equitable or legal in nature, in the funds identified in the Additional Debtor Contributions Security Agreement, including the Diocese and Other Catholic Entities, hereby consent to the granting of such Lien and security interests as provided for therein to secure the Additional Debtor Contributions and the Diocese is deemed to have all requisite authority to

enter into the Additional Debtor Contributions Security Agreement upon entry of the Confirmation Order.

On the Effective Date, the Parishes, Schools and Missions shall transfer $10 million in good funds to the Diocese, which shall be transferred by the Diocese together with the Initial Debtor Contribution to the Trust on the Effective Date using wiring instructions provided by the Trust Administrator (the "**Parish Cash Contribution**").  On the Effective Date, DOC Trusts shall transfer $10 million in good funds to the Diocese, which shall be transferred by the Diocese together with the Initial Debtor Contribution to the Trust on the Effective Date using wiring instructions provided by the Trust Administrator (the "**DOCT Cash Contribution**").  On the Effective Date, the Catholic Ministry Entities other than DOC Trusts shall transfer $250,000 in good funds to the Diocese, which shall be transferred by the Diocese together with the Initial Debtor Contribution to the Trust on the Effective Date using wiring instructions provided by the Trust Administrator (the "**Catholic Ministry Cash Contribution**," and collectively with the Parish Cash Contribution and DOCT Cash Contribution, the "**OCE Cash Contributions**").  In addition to the OCE Cash Contributions, in consideration for the Channeling Injunction and the release provided for herein, the Other Catholic Entities shall:  (i) waive all Claims against the Diocese and its Estate asserted in the Chapter 11 Case, including any rights to distributions under their Class 7A and 7B Claims; (ii) be deemed to have consented to the Diocese entering into the Additional Debtor Contributions Security Agreement to secure the Additional Debtor Contributions upon entry of the Confirmation Order; and (iii) consent to the transfer of the Transferred Insurance Interests to the Trust.

As additional consideration for the Channeling Injunction and release provided herein, DOC Trusts shall provide the DOCT Loan.

The Debtor Cash Contribution and the OCE Cash Contributions are being made in respect of the uninsured exposure of the Debtor and the Other Catholic Entities for Abuse Claims, including, but not limited to, years in which no Non-Settling Insurer Policies are available and, to the extent required under applicable law, when a self-insured retention or deductible must be satisfied to access coverage under Non-Settling Insurer Policies.  The Debtor Cash Contribution and the OCE Cash Contributions are not, and shall not be construed as, a discharge and/or release of any Abuse Claim covered or alleged to be covered under Non-Settling Insurer Policies.  Notwithstanding the forgoing, the Debtor and the Other Catholic Entities shall have no further financial obligations under this Plan or the Plan Documents other than the obligations required to be paid to the Trust in Section 7.2.2 of this Plan:

     7.2.2.    **Additional Trust Assets:  Transferred Insurance Interests and Other Catholic Entities Insurance Assignment Agreement**

          7.2.2.1.    Subject to the rights of the Non-Settling Insurers set forth in Article 10 of this Plan, in addition to the Debtor Cash Contribution and the OCE Cash Contributions being paid to the Trust (i) the Transferred Insurance Interests are automatically and without further act or deed assigned and transferred to the Trust on the Effective Date and (ii) the Other Catholic Entities shall execute and deliver to the Trust Administrator the Other Catholic Entities Insurance Assignment Agreement as required by Section 14.2(e) of this Plan.

7.2.2.2.    The foregoing assignments and transfers shall not be construed as assignments and transfers of the Non-Settling Insurer Policies but rather constitute an assignment of the right to receive insurance proceeds available under the Non-Settling Insurer Policies.

7.2.2.3.    Upon the assignment of the Transferred Insurance Interests to the Trust:

(a)    The Trust shall have full access to the coverage available under the Non-Settling Insurer Policies to the greatest extent permitted by law, in the same manner and to the same extent as the Diocese prior to the confirmation of this Plan.

(b)    The Trust shall have the right to pursue Claims against Non-Settling Insurers to determine Coverage Claims and other Claims relating to the Covered Parties' liability for Abuse Claims or the Non-Settling Insurers' obligations in respect of such Claims as set forth in the Trust Distribution Plan.  The foregoing transfer shall not be construed to entitle any Person to insurance coverage other than those Persons entitled to such coverage from Non-Settling Insurers.

(c)    The Trust shall be entitled to (i) all recoveries on account of Transferred Insurance Interests as set forth in this Plan, the Trust Distribution Plan and the Confirmation Order and to (ii) assert and/or assign to any Abuse Claimant all Claims that currently exist or may arise in the future against Non-Settling Insurers.

(d)    The Trust may act in its own name, or in the name of any Abuse Claimant or Covered Party, to enforce any right, title, or interest of any Covered Party in the Transferred Insurance Interests.

(e)    Any recovery by the Trust on Coverage Claims relating to the Covered Parties' liability for Abuse Claims shall become a Trust Asset and shall be distributed as provided in this Plan, the Trust Agreement and the Trust Distribution Plan.

(f)    The Trust's recourse to the Covered Parties shall be limited to the Transferred Insurance Interests and any other rights or interests expressly granted to the Trust under this Plan.

7.3.    **Determination of Validity of Insurance Assignment**.

7.3.1.1.    If any Person fails to timely file an objection to the proposed Insurance Assignment or other Plan terms related to the Non-Settling Insurer Policies, that Person shall be deemed to have irrevocably consented to the Insurance Assignment and such Plan terms and will be forever barred from asserting that the Insurance Assignment or other Plan terms affect the ability of the Trust or Abuse Claimants to pursue the Non-Settling Insurers, or any of them, for Coverage Claims.

7.3.1.2.    The Insurance Assignment is valid and complies with all applicable provisions of the Bankruptcy Code, and neither the Insurance Assignment nor the discharge and injunctions set forth in this Plan, void, defeat, or impair the ability of the Diocese, or the Trust, to pursue Coverage Claims.

7.3.1.3.    Following the Effective Date, if the validity of the Insurance Assignment or the Other Catholic Entities Insurance Assignment Agreement is challenged under state law, and a court of competent jurisdiction enters a Final Order determining that the Insurance Assignment is valid, the Trust shall assume responsibility for, and be bound by, only such obligations of the Covered Parties under the Non-Settling Insurer Policies as are necessary to enforce the Transferred Insurance Interests.

7.3.1.4.    If a court of competent jurisdiction enters a Final Order invalidating the Insurance Assignment or the Other Catholic Entities Insurance Assignment Agreement, then:

(a)    The Insurance Assignment and/ or the assignment made under the Other Catholic Entities Insurance Assignment Agreement shall not occur and, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, the Trust Administrator shall be appointed as the representative of the Debtor and/ or the Reorganized Debtor and the Other Catholic Entities for the purpose of retaining and enforcing all of the rights, Claims and Interests of the Debtor, Reorganized Debtor and the Estate against the Non-Settling Insurers with respect to Abuse Claims.

(b)    Any recoveries on such Interests and Claims by the Trust Administrator will be paid to the Trust.

(c)    The Trust Administrator shall assume responsibility for, and be bound by, only such obligations of the Covered Parties under the Non-Settling Insurer Policies as are necessary to act as the representative of the Debtor and the Estate for the purpose of retaining and enforcing their Interests and Claims, if any, against the Non-Settling Insurers.

Nothing contained in this Section shall affect the rights and remedies of a Person who is not a Covered Party but is an insured or additional insured with the Debtor or is asserting rights under a Non-Settling Insurer Policy.

7.3.1.5.    If a Final Order is entered holding that (i) the Insurance Assignment or (ii) the appointment of the Trust Administrator as the Debtor's and the Estate's representative are invalid then the assignment and/or appointment, as the case may be, will be deemed not to have been made, and each of the Covered Parties will retain their Interests under each Non-Settling Insurer Policy and:

(a)    at the request of the Trust, the Covered Parties will assert their Interests and Claims against a Non-Settling Insurer, including by filing an Action for recovery of policy proceeds;

(b)     the Covered Parties will select and retain counsel to pursue their Interests and Claims against Non-Settling Insurers, subject to the Trust Administrator's approval, which approval shall not be unreasonably withheld;

(c)     the Trust shall pay the reasonable attorneys' fees, costs and expenses that are incurred by the Covered Parties in pursuing their Interests and Claims against Non-Settling Insurers;

(d)     the Trust shall, in addition to reasonable attorneys' fees, costs and expenses provided for in this Section, reimburse Covered Parties for any reasonable out of pocket costs and expenses incurred as a direct consequence of pursuing their Interests and Claims against Non-Settling Insurers; *provided, however*, no compensation shall be paid to any Covered Party for any time any of its employees expended; and

(e)     upon receipt by a Covered Party, all recoveries received from Non-Settling Insurers shall be remitted to the Trust as soon as practicable.

7.4.    **Unknown Abuse Claims Reserve.**

Until the later of (a) four years after the Effective Date and (b) resolution of all Unknown Abuse Claims submitted to the Trust Administrator within four years after the Effective Date (the "**Unknown Claims Reserve Establishment Period**"), the Trust Administrator shall be obligated to maintain the Unknown Abuse Claim Reserve for the benefit of Unknown Abuse Claimants. The Unknown Abuse Claims Reserve shall be administered as provided in the Trust Agreement and Trust Distribution Plan.   At the expiration of the Unknown Abuse Claims Reserve Establishment Period, neither the Debtor, Reorganized Debtor, Trust, nor any other Covered Party or Settling Insurer shall have any liability for Unknown Abuse Claims.

7.5.    **Vesting**.

On the Effective Date, all Trust Assets shall vest in the Trust, and the Diocese and other Covered Parties shall be deemed for all purposes to have transferred all of their respective Interests in the Trust Assets to the Trust.  On the Effective Date, or as soon as practicable thereafter, the Reorganized Debtor, any other Covered Party, and Settling Insurers, as applicable, shall take all actions reasonably necessary to transfer any Trust Assets to the Trust.  Upon the transfer of control of Trust Assets in accordance with this paragraph, the Diocese, the other Covered Parties and the Settling Insurers shall have no further interest in or with respect to the Trust Assets except as otherwise explicitly provided in this Plan.

7.6.    **Appointment of the Trust Administrator**.

The Initial Trust Administrator shall be Matthew Dundon.  The Trust Administrator shall commence serving as the Trust Administrator as of the date set forth in the Trust Agreement and be permitted to act in accordance with the terms of the Trust Agreement from such date, as authorized jointly by the Plan Proponents.  Such actions may include opening bank accounts and taking all further actions necessary to establish the Trust prior to the Effective Date in accordance

with his or her duties under the Trust Agreement, for which the Trust Administrator shall be entitled to seek compensation in accordance with the terms of the Trust Agreement and this Plan.

7.7.    **Rights and Responsibilities of the Trust Administrator**.

The Trust Administrator shall be deemed the Estate's representative in accordance with section 1123 of the Bankruptcy Code and shall have all the rights, powers, authority, responsibilities, and benefits specified in this Plan, the Trust Agreement and the Trust Distribution Plan, including (to the extent necessary to enforce those rights, powers, authority, responsibilities, and benefits only) the powers of a trustee under sections 704, 108 and 1106 of the Bankruptcy Code and Bankruptcy Rule 2004 (including commencing, prosecuting or settling Causes of Action, enforcing contracts, and asserting Claims, defenses, offsets and privileges).  If there is any inconsistency or ambiguity between this Plan and Confirmation Order, on the one hand, and the Trust Agreement or the Trust Distribution Plan, on the other hand, with respect to the Trust Administrator's authority to act, the provisions of this Plan and Confirmation Order shall control. Among other things, the Trust Administrator:  (1) shall liquidate and convert to Cash the Trust Assets, make timely distributions and not unduly prolong the duration of the Trust; (2) may request an expedited determination of taxes of the Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Trust for all taxable periods through the dissolution of the Trust; (3) may retain professionals, including legal counsel, accountants, financial advisors, auditors and other agents on behalf of the Trust to carry out the obligations of the Trust Administrator hereunder and under the Trust Agreement, with payment to such professionals to be made solely from Trust Assets; (4) pursue Coverage Claims using Trust Assets against any Non-Settling Insurers in respect of the Transferred Insurance Interests; (5) defend and indemnify the Covered Parties against Abuse Claims as provided in the Trust Distribution Plan; (6) may take any action required to enforce the Insurance Settlement Agreements and (7) shall have all rights and powers vested in the Trust Administrator provided for in the Trust Distribution Plan.

Notwithstanding the foregoing, the Diocese, the Reorganized Debtor, and the Trust acting for itself and on behalf of the Estate, shall be deemed to have waived, effective upon the Effective Date:

(a)    Any and all Claims under sections 547, 548, 549, and 550 of the Bankruptcy Code for the recovery of any sums paid to any Person who provided goods and services to the Diocese in the ordinary course of business, including Creditors in Class 3, prior to the Effective Date.

(b)    Any and all Claims:  (i) seeking the substantive consolidation of the Diocese and any other Person or an order deeming any such Person and the Diocese to be an "alter-ego" of the other or any other similar Claim; (ii) to avoid, set aside or recover any payment or other transfer made to any Person under sections 547, 548, 549, and 550 of the Bankruptcy Code; and (iii) any proceeding to avoid or set aside any interest of a Person in property under section 544 of the Bankruptcy Code.

7.8. **Appointment of Trust Advisory Committee**.

On the Effective Date, the Trust Advisory Committee shall be established pursuant to the terms of the Trust Agreement.  The Trust Advisory Committee shall have the functions, duties and rights provided in the Trust Agreement.  Upon termination of the Trust, or as otherwise provided in the Trust Agreement, the Trust Advisory Committee shall be deemed dissolved and discharged of and from all further authority, duties, responsibilities, and obligations with respect to or in connection with the Trust and the Chapter 11 Case.

Except for the reimbursement of reasonable actual costs and expenses incurred in connection with their duties as members of the Trust Advisory Committee, the members of the Trust Advisory Committee shall serve without compensation.  Reasonable expenses incurred by members of the Trust Advisory Committee may be solely paid by the Trust without need for approval of the Bankruptcy Court.  For the avoidance of doubt, the Diocese and Other Catholic Entities shall not be responsible for any fees, costs, and/or expenses associated with the Trust Advisory Committee.

7.9. **Investment Powers; Permitted Cash Expenditures.**

All funds held by the Trust shall be invested in Cash or short-term highly liquid investments that are readily convertible to known amounts of Cash as more particularly described in the Trust Agreement.  The Trust Administrator may expend the Cash of the Trust.

7.10. **Registry of Beneficial Interests**.

To evidence the beneficial interest in the Trust of each holder of such an interest, the Trust Administrator shall maintain a registry of beneficiaries as provided for in the Trust Agreement.

7.11. **Non-Transferability of Interests**.

Any transfer of an interest in the Trust shall not be effective until and unless the Trust Administrator receives written notice of such transfer.

7.12. **Tax Matters**.

The Trust shall not be deemed to be the same legal entity as the Diocese but only the assignee of certain assets of the Diocese and a representative of the Estate for delineated purposes within the meaning of section 1123(b)(3) of the Bankruptcy Code.  The Trust Administrator shall file such income tax and other returns and documents as are required to comply with the applicable provisions of the Tax Code, the Treasury Regulations, and New Jersey law and the regulations promulgated thereunder, and shall pay from the Trust all taxes, assessments, and levies upon the Trust, if any.

7.13. **Termination**.

The Trust shall terminate after (i) its liquidation, administration, and distribution of the Trust Assets and (ii) its full performance of all other duties and functions set forth in this Plan, the Trust Agreement and the Trust Distribution Procedures.

31

7.14.  **Liability; Indemnification**.

7.14.1.  **No Liability for Reorganized Debtor or Trust Administrator**.

Neither (i) the Reorganized Debtor nor its Agents or (ii) the Trust Administrator nor its Agents, nor their respective employees, shall be liable for the acts or omissions of any other Agents of such Trust Administrator, except that the Trust Administrator shall be liable for its specific acts or omissions resulting from such Trust Administrator's gross negligence, fraud, or breach of the fiduciary duty of loyalty.  The Trust Administrator may, in connection with the performance of its functions and in its sole and absolute discretion, consult with its Agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Persons.  Notwithstanding such authority, the Trust Administrator shall not be under any obligation to consult with its Agents, and its determination not to do so shall not result in the imposition of liability on the Trust Administrator unless such determination is based on the Trust Administrator's recklessness, gross negligence, willful misconduct or fraud.

7.14.2.  **No Recourse Against Trust Administrator**.

No recourse shall ever be had, directly or indirectly, against the Trust Administrator personally, or against any Agent retained in accordance with the terms of the Trust Agreement or this Plan by the Trust Administrator, by legal or equitable proceedings or by virtue of any statute or otherwise, or upon any promise, contract, instrument, undertaking, obligation, covenant or Trust Agreement whatsoever executed by the Trust Administrator in implementation of the Trust Agreement or this Plan, or by reason of the creation of any indebtedness by the Trust Administrator under this Plan for any purpose authorized by the Trust Agreement or this Plan, it being expressly understood and agreed that all such Claims shall be enforceable only against and be satisfied only out of the Trust Assets.  Notwithstanding the foregoing, the Trust Administrator may be held liable for its recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud; and if liability on such grounds is established, recourse may be had directly against the Trust Administrator.  The Trust shall not be covered by a bond.

The Confirmation Order shall provide that, absent permission of the Bankruptcy Court, no Cause of Action may be commenced in any forum, other than the Bankruptcy Court, against the Trust Administrator in its official capacity, with respect to its status, duties, powers, acts, or omissions as Trust Administrator.

7.14.3.  **Indemnification by Trust**.

The Trust shall defend, indemnify, and hold harmless the Trust Administrator and its Agents to the fullest extent permitted under the laws of New Jersey in the performance of their duties under this Plan and under the Trust Agreement.

If the Debtor or the Other Catholic Entities are named as a defendant in an Action by an Abuse Claimant which is enjoined by the terms of this Plan and channeled to the Trust by the Channeling Injunction, the Debtor or the Other Catholic Entities shall tender the defense of such Action to the Trust and the Trust shall be responsible for all actions required to defend the Debtor or the Other Catholic Entities in such Action.

The Trust will fund all reasonable and necessary out of pocket attorneys' fees, costs and other expenses of the Debtor and the Other Catholic Entities in connection with their participation in the Trust Distribution Procedures ("**Defense Costs**"); *provided*, *however*, that if a Non-Settling Insurer defends the Debtor or the Other Catholic Entities in connection with their participation in the Trust Distribution Procedures, the Trust shall be relieved of its obligation to pay any Defense Costs; *provided, further, however*, that if a Non-Settling Insurer has a duty to defend, or has a duty to reimburse the defense costs of, the Debtor or the Other Catholic Entities but fails to honor that obligation, the Trust will advance or reimburse the Debtor or the Other Catholic Entities for reasonable and necessary Defense Costs.  The Debtor and the Other Catholic Entities' selection of legal counsel shall be consistent with the Debtor and the Other Catholic Entities' historical retention and use of such counsel, who shall exercise his or her professional judgment in accordance with the Rules of Professional Conduct and any other relevant rules governing the duties and obligations of attorneys to their clients.  For the purposes of clarify and avoidance of doubt:  (i) the Debtor and the Other Catholic Entities shall be made whole from the Trust for any actually expended or incurred Defense Costs for their participation in the Trust Distribution Procedures and (ii) any Defense Costs previously paid by the Trust to the Debtor and the Other Catholic Entities shall be reimbursed to the Trust upon the Non-Settling Insurer's satisfaction of any such amounts.

# ARTICLE VIII
## TRUST DISTRIBUTION PLAN AND RELATED PROVISIONS

8.1.    **Distributions and Payments from the Trust**.

The following distributions and payments will be made solely from the Trust.

(a)     **Distributions**.  Distributions on Class 5 and 6 Claims in accordance with this Plan, the Trust Agreement, and the Trust Distribution Plan.

(b)     **Abuse Claims Reviewer Fees**.  Fees payable to the Abuse Claims Reviewer for review of Class 5 and Class 6 Claims.

(c)     **Trust Administrative Fees**.  All fees, costs, and expenses of administering the Trust as provided in this Plan and the Trust Agreement, including:  (i) as reasonably necessary to meet current liabilities and to maintain the value of the respective Assets of the Trust; (ii) to pay reasonable administrative expenses (including any taxes imposed on the Trust and any professional fees); and (iii) to satisfy other liabilities incurred by the Trust in accordance with this Plan or the Trust Agreement.

(d)     **Indemnity**.  The Trust's obligations, if any, to defend, indemnify, or hold harmless any Person expressly set out in this Plan.

8.2.    **Trust Distribution Procedures**.

Each Abuse Claim will be assessed by the Abuse Claims Reviewer in accordance with the Trust Distribution Plan.  As more fully set forth in the Trust Distribution Plan, the Covered Parties will have an obligation to respond to reasonable requests for factual information in their

possession, custody or control, including, but not limited to, providing documents (subject to all applicable privileges) and reasonable access to witnesses within the Covered Parties' control in connection with any inquiries it may have in connection with the Trust Distribution Plan.

      8.3.   **Expedited Distributions**.

Abuse Claimants may elect to have their Abuse Claims treated pursuant to this Section to receive an expedited distribution of $2,500.00 (the "**Expedited Distribution**").  In order to receive an Expedited Distribution, the following requirements must be satisfied:  (i) the Abuse Claimant must have properly and substantially completed, and timely Filed, a Proof of Claim; (ii) the Abuse Claimant must have elected to resolve his or her Abuse Claim for the Expedited Distribution in accordance with the Ballot (the "**Expedited Distribution Election**"); (iii) the Abuse Claims Reviewer must Allow the Claim as set forth in the Trust Distribution Plan; (iv) the Abuse Claimant must execute and submit to the Abuse Claims Reviewer a declaration that the Abuse Claim and any supplements filed in the Chapter 11 Case or provided to the Abuse Claims Reviewer was not filed or provided in violation of 18 U.S.C. § 152; and (v) the Abuse Claimant must execute and deliver to the Trust Administrator a release in the form to be provided in a Plan Supplement.

Before the Trust Administrator may make an Expedited Distribution from the Trust to Holders of Allowed Abuse Claims who made the Expedited Distribution Election, (i) the Trust Administrator shall first advise the Holder of an Allowed Abuse Claim, in writing, of the maximum fees permitted to be charged by an attorney under New Jersey law and (ii) the attorney for the Holder of an Allowed Abuse Claim (if any) must file a declaration with the Bankruptcy Court attesting that the compensation it will seek to be paid on account of any distributions made to his or her client is permitted under New Jersey law (specifically, New Jersey Court Rule 1:21-7).  The Trust Administrator shall not make any Expedited Distribution to the Holder of an Allowed Abuse Claim until such declaration is filed with the Bankruptcy Court.

Abuse Claimants who make the Expedited Distribution Election will not be eligible to receive any further distribution on account of their Abuse Claim.

An Abuse Claimant who does not make the Expedited Distribution Election in accordance with the deadlines and procedures established herein may not later elect to receive the Expedited Distribution.

      8.4.   **Distributions to Abuse Claimants Who Do Not Elect the Expedited Distribution**.

An Abuse Claimant whom the Abuse Claims Reviewer determines to be entitled to a distribution in accordance with the Trust Distribution Plan will receive a distribution from the Trust in the amount(s) and at the time(s) provided for in the Trust Distribution Plan; *provided, however*, that the Unknown Abuse Claims Reserve Fund established and maintained by the Trust shall be the sole source of payment to Class 6 Claimants on account of Class 6 Claims.

8.5.    **Pending Litigation**.

      8.5.1.    **Stay in Effect**.

All Abuse-related lawsuits against a Covered Party currently pending in any state, federal or territorial court, whether in the United States of America or in any other country or jurisdiction (a "**Pending Abuse Lawsuit**"), are, and shall remain, stayed unless and until the Trust Administrator elects, under the Trust Distribution Plan, to continue prosecution of a Pending Abuse Lawsuit, including to seek recovery under a Non-Settling Insurer Policy.  Notwithstanding the foregoing, nothing in this Section shall permit any recoveries from any Covered Party except as provided for under this Plan.

      8.5.2.    **Dismissal**.

All Pending Abuse Lawsuits, other than Pending Abuse Lawsuits which have been settled or litigated to judgment, shall be dismissed with prejudice after all Coverage Claims have been settled or otherwise resolved through entry of a final order by a court of competent jurisdiction.

      8.5.3.    **Rights Against Non-Covered Parties Unaffected**.

Nothing in this Plan affects any rights against any Person who is not a Covered Party.

8.6.    **Objections and Litigation After the Effective Date**.

As of the Effective Date, the Trust Administrator, through the Abuse Claims Reviewer, shall have the exclusive right to object to Channeled Claims; *provided, however*, that the Diocese, the Reorganized Debtor, other Covered Parties and Non-Settling Insurers shall have the right to participate in such objections as provided in the Trust Distribution Procedures.

8.7.    **Release of Abuse Claim Required for a Distribution**.

An Abuse Claimant may not receive a distribution under this Plan on his or her Allowed Claim until such Abuse Claimant has executed a release agreement in favor of the Diocese, the Reorganized Debtor, the other Covered Parties and any Settling Insurers in a form agreeable to the Plan Proponents, the other Covered Parties and any Settling Insurers; *provided, however*, Abuse Claims will not be released or enjoined against the Covered Parties for any Abuse that may be covered under Non-Settling Insurer Policies until such claims are settled with the Covered Parties and the Non-Settling Insurers, or are fully adjudicated, resolved, and subject to a final order entered by a court of competent jurisdiction.

Notwithstanding anything herein to the contrary, Class 5 and 6 Claimants do not release any Claim(s) against other Persons (other than a Covered Party), including Joint Tortfeasors, co-defendants with the Diocese or an Other Catholic Entity in their state or federal court lawsuits, and Religious Institutes of Men or Woman, who will remain severally liable on any Claims for Abuse. Any Person (other than a Covered Party) that is, or was alleged to be a Joint Tortfeasor with any of the Covered Parties in connection with the Abuse that forms the basis of an Abuse Claim shall not be liable for any Covered Party's share of causal liability or fault.

8.8.    **Claim Withdrawal**.

An Abuse Claimant may withdraw his or her Abuse Claim at any time on written notice to the Trust Administrator.  If withdrawn, (a) the Abuse Claim will be withdrawn with prejudice and may not be reasserted, and such Abuse Claimant shall still be subject to the Channeling Injunction and the Supplemental Settling Insurer Injunction, as provided by this Plan; and (b) any reserve maintained by the Trust on account of such Abuse Claim shall revert to the Trust as a Trust Asset for distribution in accordance with this Plan and Trust Distribution Plan.

8.9.    **Medicare Procedures**.

With respect to all Abuse Claims, the Trust shall maintain sufficient funds to pay any Medicare Claims and to perform the following duties:

8.9.1.    It is the position of the Debtor that none of the Diocese, the Other Catholic Entities, the Trust, or the Settling Insurers will have any reporting obligations in respect of their contributions to the Trust, or in respect of any payments, settlements, resolutions, awards, or other Claim liquidations by the Trust, under the reporting provisions of MSP or MMSEA.  Prior to making any payments to any claimants, the Trust shall seek a statement or ruling from the United States Department of Health and Human Services that none of the Trust, the Diocese, the Other Catholic Entities, or Settling Insurers has any reporting obligations under MMSEA with respect to payments to the Trust by the Diocese, the Other Catholic Entities, or Settling Insurers or payments by the Trust to Claimants.  Unless and until there is definitive regulatory, legislative, or judicial authority (as embodied in a final non-appealable decision from the United States Court of Appeals for the Third Circuit or the United States Supreme Court), or written confirmation from the United States Department of Health and Human Services that none of the Diocese, the Other Catholic Entities, or the Settling Insurers has any reporting obligations under MMSEA with respect to any settlements, payments, or other awards made by the Trust or with respect to the contributions the Diocese, the Other Catholic Entities, and the Settling Insurers have made or will make to the Trust, the Trust shall, at its sole expense, in connection with the implementation of this Plan, act as a reporting agent for the Diocese, the Other Catholic Entities, and Settling Insurers, and shall timely submit all reports that would be required to be made by the Diocese or the Other Catholic Entities or Settling Insurer under MMSEA on account of any Claims settled, resolved, paid, or otherwise liquidated by the Trust or with respect to contributions to the Trust, including reports that would be required if the payments to the Trust by the Diocese or the Other Catholic Entities or Settling Insurer were determined to be made pursuant to "applicable plans" for purposes of MMSEA, or by the Diocese or the Other Catholic Entities or Settling Insurer were otherwise found to have MMSEA reporting requirements.  The Trust, in its role as reporting agent for the Diocese, the Other Catholic Entities, and Settling Insurers, shall follow all applicable guidance published by CMS to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

8.9.2.    If the Trust is required to act as a reporting agent for the Diocese or the Other Catholic Entities or Settling Insurer, the Trust shall provide a written certification to the Diocese and the Other Catholic Entities and Settling Insurers within twenty-one (21) days following the end of each calendar quarter, confirming that all reports to CMS have been submitted in a timely fashion, and identifying (a) any reports that were rejected or otherwise identified as

36

noncompliant by CMS, along with the basis for such rejection or noncompliance; and (b) any payments to Medicare Beneficiaries that the Trust did not report to CMS.

8.9.3.    With respect to any reports rejected or otherwise identified as noncompliant by CMS, the Trust shall, upon request by the Diocese or any of the Other Catholic Entities or Settling Insurers, promptly provide copies of the original reports submitted to CMS, as well as any response received from CMS with respect to such reports; *provided, however*, that the Trust may redact from such copies any information deemed confidential by the Trust Administrator.  With respect to any such reports, the Trust shall reasonably undertake to remedy any issues of noncompliance identified by CMS, resubmit such reports to CMS, and, upon request by the Diocese or the Other Catholic Entities or Settling Insurers, provide each of the Diocese or the Other Catholic Entities and Settling Insurers copies of such resubmissions; *provided, however*, that the Trust may redact any information deemed confidential by the Trust Administrator.  If the Trust is unable to remedy its noncompliance, the provisions of Section 8.9.7 shall apply.

8.9.4.    If the Trust is required to act as a reporting agent for the Diocese or the Other Catholic Entities or Settling Insurers pursuant to the provisions of Section 8.10.1, with respect to each Channeled Claim of a Medicare Beneficiary paid by the Trust and not disclosed to CMS, the Trust shall, upon request by the Diocese or the Other Catholic Entities or Settling Insurer, promptly provide the last four digits of the claimant's Social Security number, the year of the claimant's birth and any other information in the possession or control of the Trust that may be necessary in the reasonable judgment of the Diocese or the Other Catholic Entities or Settling Insurer to satisfy their obligations, if any, under MMSEA, as well as the basis for the Trust's failure to report the payment.  In the event the Diocese or the Other Catholic Entities or Settling Insurer informs the Trust that it disagrees with the Trust's decision not to report a Claim paid by the Trust, the Trust shall promptly report the payment to CMS.  All documentation relied upon by the Trust in making a determination that a payment did not have to be reported to CMS shall be maintained for a minimum of six (6) years following such determination.

8.9.5.    If the Trust is required to act as a reporting agent for the Diocese or any Other Catholic Entity or any Settling Insurer pursuant to the provisions of Section 8.9.1 hereof, the Trust shall make the reports and provide the certifications required by Section 8.9 until such time as such of the Diocese or the Other Catholic Entities or Settling Insurer determines, in its reasonable judgment, that it has no further legal obligation under MMSEA or otherwise to report any settlements, resolutions, payments, or liquidation determinations made by the Trust or contributions to the Trust.  Furthermore, following any permitted cessation of reporting, or if reporting has not previously commenced due to the satisfaction of one or more of the conditions set forth in Section 8.9.1, and if the Diocese or the Other Catholic Entities or Settling Insurer reasonably determines, based on subsequent legislative, administrative, regulatory, or judicial developments, that reporting is required, then the Trust shall promptly perform its obligations under Section 8.9.

8.9.6.    Section 8.10 of this Plan is intended to be purely prophylactic in nature, and does not imply, and shall not constitute an admission, that the Diocese, the Other Catholic Entities, and/or Settling Insurers have made payments pursuant to "applicable plans" within the meaning of MMSEA, or that they have any legal obligation to report any acts undertaken by the Trust or contributions to the Trust under MMSEA or any other statute or regulation.

8.9.7.    If CMS concludes that reporting done by the Trust in accordance with Section 8.9 of this Plan is or may be deficient in any way, and has not been corrected to the satisfaction of CMS in a timely manner, or if CMS communicates to the Trust, the Diocese or the Other Catholic Entities or Settling Insurer a concern with respect to the sufficiency or timeliness of such reporting, or there appears to the Diocese or the Other Catholic Entities or Settling Insurer a reasonable basis for a concern with respect to the sufficiency or timeliness of such reporting or non-reporting based upon the information received pursuant to Section 8.9 of this Plan, or other credible information, then each of the Diocese or the Other Catholic Entities and Settling Insurer shall have the right to submit its own reports to CMS under MMSEA, and the Trust shall provide to any Entity that elects to file its own reports such information in its possession or control as the electing party may reasonably require in order to comply with MMSEA, including the full reports filed by the Trust pursuant to Section 8.9 of this Plan, without any redactions.  The Diocese, the Other Catholic Entities, and Settling Insurers shall keep any information they receive from the Trust pursuant to this Section 8.9 of this Plan confidential and shall not use such information for any purpose other than meeting obligations under MMSEA.

8.9.8.    Notwithstanding any other provisions hereof, the Trust shall not be required to report as required by this Section 8.9 until the Person on whose behalf the Trust is required to report shall have provided its Medicare Reporting Number, if one exists.  Moreover, the Trust shall have no indemnification obligation under this Section 8.9 to such Person for any penalty, interest, or sanction with respect to a Claim that may arise on account of such Person's failure timely to provide its Medicare Reporting Number, if one exists, to the Trust in response to a timely request by the Trust for such Medicare Reporting Number.  However, nothing relieves the Trust from its reporting obligations with respect to each Person who provides the Trust with its Medicare Reporting Number.  The Trust shall indemnify each of the Diocese or the Other Catholic Entities and Settling Insurer for any failure to report payments to Medicare eligible Abuse Claimants on behalf of Persons who have timely supplied Medicare Reporting Numbers, if any exists.

8.9.9.    Prior to remittance of funds to any Channeled Claimant or counsel therefor, the Trust Administrator shall obtain in respect of any Channeled Claim a certification from the Claimant that said Claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under MSP relating to such Channeled Claim.  If the Trust receives no such certification, the Trust may withhold payment from any Claimant the funds sufficient to assure that all obligations owing or potentially owing under MSP relating to such Abuse Claim are paid to CMS.  The Trust shall provide a quarterly certification of its compliance with this Section 8.9.9 to each of the Diocese or the Other Catholic Entities and Settling Insurer, and permit reasonable audits by such Persons, no more often than annually, to confirm the Trust's compliance with this Section 8.10.9.  For the avoidance of doubt, the Trust shall be obligated to comply with the requirements of this Section 8.9.9 regardless of whether the Diocese or the Other Catholic Entities or Settling Insurer elects to file its own reports under MMSEA pursuant to Section 8.9.7.

8.9.10.  Compliance with the provisions of this Section 8.9 of this Plan shall be a material obligation of the Trust under this Plan, in favor of the Diocese, the Other Catholic Entities, and Settling Insurers under this Plan.

8.9.11. The Trust shall defend, indemnify, and hold harmless the Diocese, the Other Catholic Entities, and Settling Insurers from any Medicare Claims reporting and payment obligations relating to its payment of Channeled Claims, including any obligations owing or potentially owing under MMSEA or MSP, and any Claims related to the Trust's obligations under Section 8.9.

8.9.12. The Social Security Administration may change (or may have already changed) its processes and/or procedures in a manner that is inconsistent with the foregoing. The Trust Administrator shall make best efforts to comply meaningfully with the foregoing while adhering to the Social Security Administration's most recent processes, procedures, and requirements.

8.10. **Medicare Claims Indemnity**.

The Trust shall defend, indemnify, and hold harmless the Covered Parties and the Settling Insurers from any Medicare Claims and any Claims related to the Trust's obligations under this Plan.

**ARTICLE IX
SETTLING INSURERS**

9.1. **Settling Insurers**.

If, prior to Confirmation, an Insurer enters into an Insurance Settlement Agreement with the Debtor, who shall be required to obtain the written consent of the Tort Committee before entering into and executing such agreement, under which the Insurer would become a Settling Insurer under this Plan upon entry of the Confirmation Order, the Plan Proponents shall file a Plan Supplement providing for any provisions required by the proposed Settling Insurer, and agreed to by the Plan Proponents, to be made a part of this Plan. Any such provisions set forth in the Plan Supplement shall be included in this Section as part of the Plan attached to the Confirmation Order.

Any Insurer that becomes a Settling Insurer shall receive the treatment as may be provided in any Insurer Settlement Agreement approved by a Final Order.

9.2. **Contribution Claims**.

Each Settling Insurer agrees that it will not pursue any contribution claim that it might have against any other Insurer (a) whose Contribution Claim against Settling Insurers is satisfied and extinguished entirely; or (b) that does not make a Contribution Claim against the Settling Insurers, or any of them. If, in the future, a Non-Settling Insurer releases its Contribution Claims, if any such exist, that it may have against the Settling Insurers, then such released Settling Insurer shall release its Contribution Claims against such releasing Insurer.

If any Insurer asserts a Claim directly against the Trust arising from or concerning the Settling Insurer Policies, any Contribution Claim of the Settling Insurers shall be transferred to the Trust, and the Trust shall be authorized to assert the Contribution Claims of such Settling Insurer against such other Insurer.

9.3.    **Litigation/ Settlement Between an Alleged Insured or Abuse Claimant and Non-Settling Insurers**.

In any Action, including the Insurance Coverage Adversary Proceeding, involving the Debtor or an Other Catholic Entity, the Reorganized Debtor, or the Trust (collectively, "**Alleged Insured**") or an Abuse Claimant, as applicable, and one or more Non-Settling Insurers, where a Non-Settling Insurer has asserted, asserts, or could assert any Contribution Claim against any of the Settling Insurers, then any judgment or award obtained by such Alleged Insured or Abuse Claimant against such Non-Settling Insurer shall be automatically reduced by the amount, if any, that any of the Settling Insurers is liable to pay such Non-Settling Insurer as a result of its Contribution Claim, ("**Reduction Amount**") so that the Contribution Claim is thereby satisfied and extinguished entirely.

In any Action involving an Alleged Insured or Abuse Claimant against a Non-Settling Insurer, where any of the Settling Insurers are not a party, such Alleged Insured or Abuse Claimant shall obtain a finding from that court or arbitrator(s), as applicable, of the Reduction Amount before entry of judgment against such Non-Settling Insurer.

The Settling Insurers shall be required to cooperate in good faith with the Debtor and/or the Trust to take commercially reasonable steps to defend against any Contribution Claim.  In the event that application of the Reduction Amount eliminates the Non-Settling Insurer's Contribution Claim, then such Non-Settling Insurer shall fully reimburse the Settling Insurers their costs and expenses, including legal fees, incurred in responding to the Contribution Claim Action, including all costs, expenses and fees incurred in seeking relief from the Bankruptcy Court.

## ARTICLE X
## PRESERVATION OF NON-SETTLING INSURERS' RIGHTS

10.1.    **Preservation of Non-Settling Insurers' Rights Post Insurance Assignment**.

10.1.1.  Nothing in this Plan alters, modifies or amends any of the rights, claims and defenses of the Non-Settling Insurers under applicable law, except that the Non-Settling Insurers may not disclaim or deny coverage because of (i) the discharge the Debtor receives under the Bankruptcy Code; (ii) any distribution made by the Trust Administrator from the Trust to the Holder of an Allowed Class 5 Claim or (iii) the Insurance Assignment, *provided, however*, that nothing herein shall preclude the Non-Settling Insurers from asserting that the Insurance Assignment or the assignment provided for in the Other Catholic Entities Insurance Assignment Agreement is not a valid assignment under governing state law.

10.1.2.  Nothing in this Plan, the Confirmation Order, or any Plan Document shall impose any obligation on any Non-Settling Insurer to provide a defense for, settle, or pay any judgment with respect to, any Abuse Claim, or grant to any Person any right to sue any Non-Settling Insurer directly, relating to an Abuse Claim.  All such obligations with respect to Non-Settling Insurers shall be determined by and in accordance with the terms of the Non-Settling Insurer Policies and with applicable law.

10.2.    **Impact of Initial Review Determination**.

10.2.1.  The Allowance of Abuse Claims, assignment of points and distributions from the Trust to Holders of Allowed Class 5 Claims:

(a)    shall not (i) constitute an admission of liability by any Person with respect to such Abuse Claims; (ii) have any res judicata or collateral estoppel effect on any Person; (iii) constitute a settlement, release, accord, satisfaction, or novation of such Abuse Claims; (iv) be used by any third-party as a defense to any alleged joint liability; or (v) otherwise prejudice any rights of the Trust, Covered Parties, Settling Insurers, Non-Settling Insurers, or Abuse Claimants in all other contexts or forums;

(b)    shall be without prejudice to any and all rights of the Trust, the Non-Settling Insurers, and Abuse Claimants in all other contexts and forums, including, but not limited to, the Trust's right to bring Coverage Claims;

(c)    shall not be deemed to be a determination of liability of any Covered Party or a determination of whether, or the extent to which, such Abuse Claim is covered under any Non-Settling Insurer Policy;

(d)    shall have no effect upon any "no action" provisions contained in any Non-Settling Insurer Policy to the extent any such provision remains enforceable by a Non-Settling Insurer under applicable law; and

(e)    shall not affect the rights, claims and obligations of the Covered Parties under the Non-Settling Insurer Policies.

10.3.    **The Debtor's and Other Catholic Entities' Obligations Survive the Insurance Assignment**.

Notwithstanding the Insurance Assignment, the Debtor, the Reorganized Debtor and the Other Catholic Entities shall not be relieved of their duties or obligations under any Non-Settling Insurer Policies (except as to the contrary in any subsequent Insurance Settlement Agreement) and shall continue to perform such duties as required by such Non-Settling Insurer Policies and applicable law.  If the Trust asserts any Claim that the Debtor, the Reorganized Debtor or the Other Catholic Entities has breached such duties or obligations under the Non-Settling Insurer Policies resulting in a loss of coverage, it shall give such party notice and an opportunity to cure any alleged breach, and in any event, the Debtor, the Reorganized Debtor or the Other Catholic Entities shall not be liable for any alleged breach resulting in a loss of coverage except to the extent that (a) the breach relates to post-Effective Date conduct of the Debtor, the Reorganized Debtor or the Other Catholic Entities and (b) the Debtor, the Reorganized Debtor or the Other Catholic Entities willfully or intentionally fails to comply with its continuing obligations under the Non-Settling Insurer Policies.  In addition, any such Claim will not be automatically allowed; the Debtor, the Reorganized Debtor or the Other Catholic Entities will have the right to defend against such claim.

41

10.4.    **Insurance Coverage Adversary Proceeding**.

As of the Effective Date, the Trust shall be substituted as the named plaintiff in the Insurance Coverage Adversary Proceeding and have all rights of the Diocese and the Other Catholic Entities to pursue recoveries against any Non-Settling Insurers.

10.5.    **Becoming a Settling Insurer**.

A Non-Settling Insurer may become a Settling Insurer at any time upon the due execution and delivery of an Insurance Settlement Agreement, entry of an Insurance Settlement Agreement Approval Order and the payment to the Trust of the settlement amount due thereunder.  Any Settling Insurer shall be protected by the Channeling Injunction and Supplemental Settling Insurer Injunction and become entitled to benefit from all releases executed by Claimants and the other rights and protections of a Settling Insurer under this Plan, the Trust Documents, and the Insurance Settlement Approval Orders.

**ARTICLE XI**
**EFFECT OF PLAN ON CLAIMS**

11.1.    **General Injunction**.

**EXCEPT AS OTHERWISE PROVIDED IN THIS PLAN, THE CONFIRMATION ORDER WILL PROVIDE THAT ALL PERSONS AND ENTITIES WHO HELD, HOLD, OR MAY HOLD CLAIMS AGAINST THE DEBTOR ARE PERMANENTLY ENJOINED, ON AND AFTER THE EFFECTIVE DATE, FROM (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY SUCH CLAIM OR TAKING ANY ACT TO RECOVER SUCH CLAIM OUTSIDE OF THE TRUST DISTRIBUTION PROCEDURES DISCUSSED IN THIS PLAN AND THE BANKRUPTCY CODE AND BANKRUPTCY RULES, (B) THE ENFORCEMENT, ATTACHMENT, COLLECTION OR RECOVERY BY ANY MANNER OR MEANS OF ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST THE DEBTOR ON ACCOUNT OF ANY SUCH CLAIM, (C) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST THE DEBTOR OR AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE DEBTOR ON ACCOUNT OF ANY SUCH CLAIM AND (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTOR OR AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE DEBTOR ON ACCOUNT OF ANY SUCH CLAIM.**

11.2.    **Channeling Injunction**.

(a)    **IN CONSIDERATION OF THE UNDERTAKINGS UNDER THIS PLAN BY THE COVERED PARTIES AND SETTLING INSURERS (IF ANY), THEIR CONTRIBUTIONS TO THE TRUST, AND OTHER CONSIDERATION AND TO FURTHER PRESERVE AND PROMOTE THE AGREEMENTS AMONG THE COVERED PARTIES AND THE SETTLING INSURERS AND TO SUPPLEMENT WHERE NECESSARY THE INJUNCTIVE EFFECT**

**OF THE DISCHARGE AS PROVIDED IN SECTIONS 524 AND 1141 OF THE BANKRUPTCY CODE, AND PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE:**

i.  **ANY AND ALL CHANNELED CLAIMS ARE CHANNELED INTO THE TRUST AND SHALL BE TREATED, ADMINISTERED, DETERMINED, RESOLVED AND PAID IN THE AMOUNTS AS PROVIDED BY THE TRUST DISTRUBTION PLAN AND PROCEDURES ESTABLISHED UNDER THIS PLAN AND THE TRUST AGREEMENT AS THE SOLE AND EXCLUSIVE REMEDY FOR ALL HOLDERS OF CHANNELED CLAIMS; AND**

ii. **ALL PERSONS WHO HELD OR ASSERTED, HOLD OR ASSERT, OR MAY IN THE FUTURE HOLD OR ASSERT ANY CHANNELED CLAIMS ARE HEREBY PERMANENTLY STAYED, ENJOINED, BARRED AND RESTRAINED FROM TAKING ANY ACTION, DIRECTLY OR INDIRECTLY, FOR THE PURPOSES OF ASSERTING, ENFORCING, OR ATTEMPTING TO ASSERT OR ENFORCE ANY CHANNELED CLAIM AGAINST THE COVERED PARTIES AND THE SETTLING INSURERS, INCLUDING:**

    1. **COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY CHANNELED CLAIM AGAINST ANY OF THE COVERED PARTIES OR THE SETTLING INSURERS OR AGAINST THE PROPERTY OF ANY OF THE COVERED PARTIES OR THE SETTLING INSURERS;**

    2. **ENFORCING, ATTACHING, COLLECTING OR RECOVERING, BY ANY MANNER OR MEANS, FROM ANY OF THE COVERED PARTIES OR THE SETTLING INSURERS OR THE PROPERTY OF ANY OF THE COVERED PARTIES OR THE SETTLING INSURERS, ANY JUDGMENT, AWARD, DECREE, OR ORDER WITH RESPECT TO ANY CHANNELED CLAIM AGAINST ANY OF THE COVERED PARTIES OR THE SETTLING INSURERS;**

    3. **CREATING, PERFECTING OR ENFORCING ANY LIEN OF ANY KIND RELATING TO ANY CHANNELED CLAIM AGAINST ANY OF THE COVERED PARTIES OR THE SETTLING**

43

**INSURERS OR THE PROPERTY OF THE COVERED PARTIES OR THE SETTLING INSURERS;**

4. **ASSERTING, IMPLEMENTING OR EFFECTUATING ANY CHANNELED CLAIM OF ANY KIND AGAINST:**

   a. **ANY OBLIGATION DUE ANY OF THE COVERED PARTIES OR THE SETTLING INSURERS;**

   b. **ANY OF THE COVERED PARTIES OR THE SETTLING INSURERS; OR**

   c. **THE PROPERTY OF ANY OF THE COVERED PARTIES OR THE SETTLING INSURERS**.

5. **TAKING ANY ACT, IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO, OR COMPLY WITH, THE PROVISIONS OF THIS PLAN OR THE TRUST DISTRIBUTION PLAN; AND**

6. **ASSERTING OR ACCOMPLISHING ANY SETOFF, RIGHT OF INDEMNITY, SUBROGATION, CONTRIBUTION OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE TO ANY OF THE COVERED PARTIES OR THE SETTLING INSURERS.**

(b) **THE CHANNELING INJUNCTION IS AN INTEGRAL PART OF THIS PLAN AND IS ESSENTIAL TO THIS PLAN'S CONSUMMATION AND IMPLEMENTATION. IT IS INTENDED THAT THE CHANNELING OF THE CHANNELED CLAIMS AS PROVIDED IN THIS SECTION SHALL INURE TO THE BENEFIT OF THE COVERED PARTIES AND THE SETTLING INSURERS. IN ANY ACTION TO ENFORCE THE INJUNCTIVE PROVISIONS OF THIS SECTION AGAINST A CLAIMANT WHEREBY IT IS HELD BY A FINAL ORDER THAT THAT THE CLAIMANT WILLFULLY VIOLATED THE TERMS HEREOF, THE MOVING PARTY MAY SEEK AN AWARD OF COSTS (INCLUDING REASONABLE ATTORNEYS' FEES) AGAINST THE CLAIMANT, AND SUCH OTHER LEGAL OR EQUITABLE REMEDIES AS ARE JUST AND PROPER, AFTER NOTICE AND A HEARING**.

(c) **FOR THE AVOIDANCE OF DOUBT, THE CHANNELING INJUNCTION WILL NOT BE FOR THE BENEFIT OF ANY NON-**

44

SETTLING INSURER, EXCEPT TO THE EXTENT NON-SETTLING INSURER BECOME A SETTLING INSURER.

11.3. **Supplemental Settling Insurer Injunction.**

PURSUANT TO SECTIONS 105(A) AND 363 OF THE BANKRUPTCY CODE, AND IN CONSIDERATION OF THE UNDERTAKINGS OF THE SETTLING INSURERS PURSUANT TO THE INSURANCE SETTLEMENT AGREEMENTS, INCLUDING ANY SETTLING INSURERS' PURCHASE OF THE APPLICABLE SETTLING INSURER POLICIES FREE AND CLEAR OF ALL CLAIMS AND INTERESTS PURSUANT TO SECTION 363(F) OF THE BANKRUPTCY CODE, ANY AND ALL PERSONS WHO HAVE HELD, NOW HOLD, OR WHO MAY IN THE FUTURE HOLD ANY CLAIMS OR INTERESTS (INCLUDING ALL DEBT HOLDERS, ALL PERSONS HOLDING A CLAIM, GOVERNMENTAL, TAX AND REGULATORY AUTHORITIES, LENDERS, TRADE AND OTHER CREDITORS, ABUSE CLAIMANTS, NON-SETTLING INSURERS, PERPETRATORS AND ALL OTHERS HOLDING INTERESTS OF ANY KIND OR NATURE WHATSOEVER, INCLUDING THOSE CLAIMS RELEASED OR TO BE RELEASED PURSUANT TO AN INSURANCE SETTLEMENT AGREEMENT) AGAINST ANY OF THE COVERED PARTIES OR THE SETTLING INSURERS, WHICH, DIRECTLY OR INDIRECTLY, ARISE FROM, RELATE TO, OR ARE IN CONNECTION WITH ANY ABUSE CLAIMS THAT ARE COVERED OR ALLEGED TO BE COVERED UNDER THE SETTLING INSURER POLICIES, OR ANY CONTRIBUTION CLAIMS, ARE HEREBY PERMANENTLY STAYED, ENJOINED, BARRED, AND RESTRAINED FROM TAKING ANY ACTION, DIRECTLY OR INDIRECTLY, TO ASSERT, ENFORCE OR ATTEMPT TO ASSERT OR ENFORCE ANY SUCH CLAIM OR INTEREST AGAINST THE SETTLING INSURERS OR THE SETTLING INSURER POLICIES INCLUDING:

(a)    COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING, WHETHER LEGAL, EQUITABLE OR OTHERWISE, AGAINST THE SETTLING INSURERS OR THE PROPERTY OF THE SETTLING INSURERS;

(b)    ENFORCING, ATTACHING, COLLECTING, OR RECOVERING, OR SEEKING TO DO ANY OF THE PRECEDING, BY ANY MANNER OR MEANS, ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST THE SETTLING INSURERS OR THE PROPERTY OF THE SETTLING INSURERS;

(c)    CREATING, PERFECTING, OR ENFORCING, OR SEEKING TO DO ANY OF THE PRECEDING, ANY LIEN OF ANY KIND AGAINST THE SETTLING INSURERS OR THE PROPERTY OF THE SETTLING INSURERS;

(d)    ASSERTING OR ACCOMPLISHING ANY SETOFF, RIGHT OF INDEMNITY, SUBROGATION, CONTRIBUTION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION

45

**DUE TO THE SETTLING INSURERS OR THE PROPERTY OF THE SETTLING INSURERS; AND**

(e)      **TAKING ANY ACT, IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO, OR COMPLY WITH, THE PROVISIONS OF THIS PLAN**.

**THIS SUPPLEMENTAL SETTLING INSURER INJUNCTION WILL BE EFFECTIVE WITH RESPECT TO A SETTLING INSURER ONLY AS OF THE DATE THAT THE TRUST RECEIVES THE SETTLEMENT AMOUNT AS DEFINED IN THE INSURANCE SETTLEMENT AGREEMENT FOR SUCH SETTLING INSURER.  THE FOREGOING INJUNCTIVE PROVISIONS ARE AN INTEGRAL PART OF THIS PLAN AND ARE ESSENTIAL TO ITS IMPLEMENTATION.**

**FOR THE AVOIDANCE OF DOUBT, THE SUPPLEMENTAL SETTLING INSURER INJUNCTION WILL NOT BE FOR THE BENEFIT OF THE NON-SETTLING INSURERS, EXCEPT TO THE EXTENT A NON-SETTLING INSURER BECOMES A SETTLING INSURER**.

11.4.   **Release by Debtor**.

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS PLAN OR THE CONFIRMATION ORDER, AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE RELEASED PARTIES AND THE SETTLING INSURERS ARE DEEMED RELEASED AND DISCHARGED BY THE DEBTOR, ITS ESTATE AND ANY PERSON SEEKING TO EXERCISE THE RIGHTS OF THE DEBTOR OR ITS ESTATE AND ITS PROPERTY (AND EACH SUCH RELEASED PARTY SHALL BE DEEMED RELEASED BY THE DEBTOR AND ITS ESTATE AND ITS RESPECTIVE PROPERTY) FROM ANY AND ALL CLAIMS RELATING TO THE DEBTOR, ITS ESTATE OR ITS AFFILIATES, THE CONDUCT OF THE DEBTOR'S BUSINESS, THE FORMULATION, PREPARATION, SOLICITATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE DISCLOSURE STATEMENT OR PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH OR PURSUANT TO THE DISCLOSURE STATEMENT, THIS PLAN, THE FILING AND PROSECUTION OF THE CHAPTER 11 CASE, THE PURSUIT OF CONSUMMATION OF THIS PLAN, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THIS PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTOR, ITS ESTATE OR ITS AFFILIATES, ON THE ONE HAND, AND ANY RELEASED PARTY, ON THE OTHER HAND, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE BEFORE THE EFFECTIVE DATE; PROVIDED THAT, TO THE EXTENT THAT A CLAIM IS DETERMINED BY A FINAL ORDER TO HAVE RESULTED FROM FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT OF A RELEASED PARTY, SUCH CLAIM SHALL NOT BE SO**

RELEASED AGAINST SUCH RELEASED PARTY; PROVIDED FURTHER THAT, THE FOREGOING "DEBTOR RELEASE" SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS OF THE DEBTOR OR ITS CHAPTER 11 ESTATE AGAINST A RELEASED PARTY (OR OF A RELEASED PARTY AGAINST THE DEBTOR AND ITS CHAPTER 11 ESTATE) ARISING UNDER ANY CONTRACTUAL OBLIGATION OWED TO THE DEBTOR THAT IS ENTERED INTO OR ASSUMED PURSUANT TO THIS PLAN.

THE DEBTOR SHALL RELEASE ALL OF SETTLING INSURERS RESPECTIVE CURRENT AND FORMER OFFICERS, DIRECTORS, PRINCIPALS, STOCKHOLDERS (AND ANY FUND MANAGERS, FIDUCIARIES OR OTHER AGENTS OF STOCKHOLDERS WITH ANY INVOLVEMENT WITH THE DEBTOR), MEMBERS, PARTNERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, MANAGEMENT COMPANIES, FUND ADVISORS AND OTHER PROFESSIONALS, SOLELY TO THE EXTENT SUCH PERSONS AND ENTITIES ACTED ON THE BEHALF OF THE RELEASED PARTIES IN CONNECTION WITH THE MATTERS AS TO WHICH EXCULPATION OR RELEASES ARE PROVIDED IN THIS PLAN.

    11.5.  **Release by Holders of Claims**.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS PLAN OR THE CONFIRMATION ORDER, AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, THE RELEASING PARTIES AND HOLDERS OF CLAIMS SHALL BE DEEMED TO PROVIDE A FULL RELEASE TO THE RELEASED PARTIES AND THE SETTLING INSURERS AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS RELATING TO THE DEBTOR, ITS ESTATE OR ITS AFFILIATES, THE CONDUCT OF THE DEBTOR'S BUSINESS, THE FORMULATION, PREPARATION, SOLICITATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE DISCLOSURE STATEMENT OR PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH OR PURSUANT TO THE DISCLOSURE STATEMENT, THIS PLAN, THE FILING AND PROSECUTION OF THE CHAPTER 11 CASE, THE PURSUIT OF CONSUMMATION OF THIS PLAN, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THIS PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS AMONG THE RELEASING PARTIES, THE HOLDERS OF CLAIMS AND ANY RELEASED PARTY, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE BEFORE THE EFFECTIVE DATE; PROVIDED THAT, TO THE EXTENT THAT A CLAIM IS DETERMINED BY A FINAL ORDER TO HAVE RESULTED FROM FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT OF A RELEASED PARTY, SUCH CLAIM SHALL NOT BE SO RELEASED AGAINST SUCH RELEASED PARTY.

**HOLDERS OF CLAIMS SHALL RELEASE ALL OF THE SETTLING INSURERS RESPECTIVE CURRENT AND FORMER OFFICERS, DIRECTORS, PRINCIPALS, STOCKHOLDERS (AND ANY FUND MANAGERS, FIDUCIARIES OR OTHER AGENTS OF STOCKHOLDERS WITH ANY INVOLVEMENT WITH THE DEBTOR), MEMBERS, PARTNERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, MANAGEMENT COMPANIES, FUND ADVISORS AND OTHER PROFESSIONALS, SOLELY TO THE EXTENT SUCH PERSONS AND ENTITIES ACTED ON THE BEHALF OF THE RELEASED PARTIES IN CONNECTION WITH THE MATTERS AS TO WHICH EXCULPATION OR RELEASES ARE PROVIDED IN THIS PLAN.**

11.6.   <u>**Exculpation; Limitation of Liability**</u>.

**FROM AND AFTER THE EFFECTIVE DATE, NONE OF THE EXCULPATED PARTIES SHALL HAVE OR INCUR ANY LIABILITY FOR, ANY CLAIM TO ANY OTHER EXCULPATED PARTY, TO ANY HOLDER OF A CLAIM, OR TO ANY OTHER PARTY IN INTEREST, FOR ANY ACT OR OMISSION THAT OCCURRED FROM THE PETITION DATE THROUGH THE EFFECTIVE DATE IN CONNECTION WITH THE CHAPTER 11 CASE OR THE FILING OF THE CHAPTER 11 CASE, THE FORMULATION, NEGOTIATION, OR PURSUIT OF CONFIRMATION OF THIS PLAN, THE CONSUMMATION OF THIS PLAN, AND THE ADMINISTRATION OF THIS PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THIS PLAN, EXCEPT FOR CLAIMS ARISING FROM THE GROSS NEGLIGENCE, WILLFUL MISCONDUCT, FRAUD, OR BREACH OF THE FIDUCIARY DUTY OF LOYALTY OF ANY EXCULPATED PARTY, IN EACH CASE SUBJECT TO DETERMINATION OF SUCH BY FINAL ORDER OF A COURT OF COMPETENT JURISDICTION AND PROVIDED THAT ANY EXCULPATED PARTY SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO ITS DUTIES AND RESPONSIBILITIES (IF ANY) UNDER THIS PLAN.   WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE EXCULPATED PARTIES SHALL BE ENTITLED TO AND GRANTED THE BENEFITS OF SECTION 1125(e) OF THE BANKRUPTCY CODE.**

11.7.   <u>**Vesting of Assets in Reorganized Debtor.**</u>   Except as otherwise provided in the Plan Documents or the Trust Documents Plan, on the Effective Date, all property in the Estate, all Causes of Action, and any property acquired by the Debtor pursuant to this Plan shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances (except for Liens expressly preserved and continued under this Plan)**.**   On and after the Effective Date, except as otherwise provided in this Plan, the Reorganized Debtor may operate its businesses and may use, acquire or dispose of property and compromise or settle any Claims or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules**.**   Without limiting any of the foregoing, the Reorganized Debtor may pay the charges incurred on or after the Effective Date for Professionals' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

11.8.   **Causes of Action.**   Except as set forth otherwise herein, the Reorganized Debtor, on behalf of and for the benefit of the Debtor's estate, shall be vested with and shall retain and may enforce any and all Claims of any kind or nature whatsoever held by, through or on behalf of the Debtor and/or its Estate against any other Person, arising before the Effective Date that have not been fully resolved or disposed of prior to the Effective Date whether or not such Claims and Interests are specifically identified in the Disclosure Statement accompanying this Plan and whether or not litigation with respect to same has been commenced prior to the Effective Date.

11.9.   **Dismissal of Adversary Proceedings and Appeal.**   On the Effective Date, the Tort Committee shall dismiss with prejudice all adversary proceedings filed by the Tort Committee in the Debtor's Chapter 11 Case, including, but not limited to, Adv. Pro Nos. 21-01393 (JNP), 21-01394 (JNP), and 21-01493 (JNP). In addition, on the Effective Date, the Tort Committee shall dismiss the appeal of the *Order Denying Motion for Derivative Standing*, pending at Civil Action No. 22-cv-02047-NLH, with prejudice.  For the avoidance of doubt, this Section 11.9 does not pertain to the Insurance Coverage Adversary Proceeding.

## ARTICLE XII
## PROVISIONS GOVERNING DISTRIBUTIONS GENERALLY

The following provisions of this Plan shall not apply to the distributions to be made to Class 5 and Class 6 Claims under the Trust.

12.1.   **Disbursing Agent**.   The Reorganized Debtor shall be the "**Disbursing Agent**" for all payments to be made under this Plan except for payments made to Class 5 and Class 6 Claims under the Trust.  With respect to the Trust, the Trust Administrator shall be responsible for all distributions made under the Trust.

12.2.   **Manner of Payment**.   Any payment of Cash under this Plan may be made either by check drawn or by wire transfer from a domestic bank, at the option of the Disbursing Agent.

12.3.   **Payments and Distributions on Disputed Claims**.   As and when authorized by a Final Order, Disputed Claims that become Allowed Claims shall be paid from the Disputed Claim Reserve established under Section 12.4 of this Plan.  No distribution shall be made on a Claim where only a portion of such Claim is disputed until such dispute is resolved by settlement or Final Order.

12.4.   **Disputed Claim Reserve**.   To the extent that the Disbursing Agent makes a distribution hereunder to a Class prior to the resolution of all Disputed Claims of such Class, the Disbursing Agent shall reserve an amount for any Disputed Claims in such Class equal to the amount that such Holders of Disputed Claims in such Class would be entitled to receive under this Plan if such Disputed Claims were Allowed in the asserted amount of the Claim.

12.5.   **Transmittal of Distributions to Parties Entitled Thereto**.   All distributions by check shall be deemed made at the time such check is deposited in the United States mail, postage prepaid.  Any distributions by wire transfer shall be deemed made as of the date of the wire transfer is made.  Except as otherwise agreed with the Holder of an Allowed Claim in respect thereof or provided in this Plan, any distribution required under this Plan on account of an Allowed Claim, shall be mailed to (i) the latest mailing address filed for the Holder of an Allowed Claim entitled

to a distribution, (ii) the latest mailing address filed for a Holder of a filed power of attorney designated by the Holder of such Claim to receive distributions, (iii) the latest mailing address filed for the Holder's transferee as identified in a filed notice served on the Debtor pursuant to Bankruptcy Rule 3001(e), or (iv) if no such mailing address has been filed, the mailing address reflected on the Schedules or in the Debtor's books and records.  The Holder of a Claim shall be required to promptly notify the Reorganized Debtor and the Bankruptcy Court of any change in its mailing address.

      12.6.    **Distribution of Unclaimed Property**.  Except as otherwise provided in this Plan, any distribution under this Plan which is unclaimed after three (3) months following any Distribution Date shall be forfeited, and such distribution, together with any interest earned thereon, and shall return to and revest in the Reorganized Debtor.

      12.7.    **Saturday, Sunday or Legal Holiday**.  If any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the following Business Day but shall be deemed to have been completed as of the required date.

      12.8.    **Setoffs and Recoupment**.  Subject to the terms of this Plan and pursuant to section 553 of the Bankruptcy Code or applicable law, the Debtor or Reorganized Debtor, as appropriate, may but shall not be required to, setoff against or recoup from any Claim on which payments are to be made pursuant to this Plan, any Claims of any nature whatsoever the Debtor may have against the Holder of such Claim.

      12.9.    **Fractional Cents and De Minimis Distributions**.  Notwithstanding any other provisions of this Plan to the contrary, no payment of fractional cents will be made under this Plan. Cash will be issued to Holders entitled to receive a distribution of Cash in whole cents (rounded to the nearest whole cent when and as necessary).  Any distribution of less than $25.00 will be considered *de minimis*, and Holders of Allowed Claims that are entitled to an interim or final distribution of less than $25.00 will not receive any distribution.  Such funds will remain with and revest in the Reorganized Debtor.

      12.10.    **Prepayment**.  Except as otherwise provided herein or the Confirmation Order, the Disbursing Agent shall have the right to prepay, without penalty, all or any portion of an Allowed Claim.

      12.11.  **Allowance and Disallowance of Claims**.

          (a)    **Allowance of Claims**.  Except as expressly provided in this Plan, no Claims shall be deemed Allowed by virtue of this Plan or the Confirmation Order unless and until such Claim is deemed Allowed under the Bankruptcy Code, or the Bankruptcy Court enters a Final Order in the Chapter 11 Case allowing such Claim.  Notwithstanding the foregoing, any Claim included in the Debtor's Schedules that is not listed as contingent, unliquidated, and/or disputed shall be an Allowed Claim.  Any Proof of Claim Filed in an unliquidated amount shall be deemed Allowed in the amount listed in the Debtor's Schedules as liquidated, not contingent and not disputed.  The

Allowance and disallowance of Claims shall be in all respects subject to the provisions of section 502 of the Bankruptcy Code.

(b)    **Disallowance of Claims**.  Except as expressly provided in this Plan, all Claims held by Persons against whom the Debtor or Reorganized Debtor, as appropriate, have filed or commenced or may in the future file or commence a Claim under sections 542, 543, 544, 547, 548, 549, 550, 551, 553 or 724(a) of the Bankruptcy Code shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code.  The Holders of any and all Claims filed with the Bankruptcy Court after the Bar Date shall be deemed disallowed without further action by the Debtor or Reorganized Debtor and without any further notice to or action, order, or approval of the Bankruptcy Court.  The Holders of any and all Claims Filed with the Bankruptcy Court after the relevant Bar Date shall not be entitled to a distribution, unless otherwise allowed by Final Order of the Bankruptcy Court.

12.12.  <u>**Resolution of Disputed Administrative Expense Claims and Disputed Claims**</u>.

(a)    **Prosecution of Objections to Claims**.  Except as otherwise set forth herein, prior to the Effective Date, the Debtor shall have standing and the right to commence and pursue objections to Claims, and the Reorganized Debtor shall have such standing after the Effective Date.  All objections to Claims shall be Filed with the Bankruptcy Court and served upon the Holders of each of the Claims to which objections are made.  Any objection to a Class 3 Claim must be made pursuant to D.N.J. LBR 3007-1(b), such that it must be filed by the later of:  (1) 60 days after the entry of the order confirming this Plan; or (2) 60 days after the claim is filed or amended.  If no objection is filed pursuant to D.N.J. LBR 3007-1, a Class 3 Claim shall be deemed an Allowed Claim.  The Diocese reserves the right to seek an extension of such date in accordance with D.N.J. LBR 3007-1(c), *provided, however*, that such right shall be limited to two (2) extensions of ninety (90) days from the date provided for in D.N.J. LBR 3007-1(b).

(b)    **Objections to Claims**.  An objection to the allowance of a Claim shall be in writing and shall be Filed with the Bankruptcy Court by the Debtor or Reorganized Debtor, as applicable.  Except as expressly set forth herein, nothing herein, in the Confirmation Order or in any Order in aid of Confirmation, shall constitute, or be deemed to constitute, a waiver or release of any Claim, including any Avoidance Action, right of setoff or recoupment or other legal or equitable defense which the Debtor had immediately prior to the commencement of the Chapter 11 Case against or with respect to any Claim.  Except as set forth herein, upon Confirmation, the Debtor or Reorganized Debtor shall have, retain, reserve and be entitled to assert all such Claims, rights of setoff and recoupment and other legal or equitable defenses that the Debtor had immediately prior to the commencement of the Chapter 11 Case against or with respect to any Claim.

## ARTICLE XIII
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

13.1. **Executory Contracts and Unexpired Leases**.  On the Effective Date, all Executory Contracts and unexpired leases not rejected on or before Confirmation will be deemed assumed.  The Confirmation Order shall constitute an order approving such assumption as of the Effective Date.  No cure payments or adequate assurance of future performance shall be due.

13.2. **Bar to Rejection Damages**.  All Proofs of Claim for Claims arising from a rejection of an Executory Contract or unexpired leases must be filed with the Bankruptcy Court within the earlier of (i) the date set forth for filing claims in any order of the Bankruptcy Court approving such rejection; (ii) the date set forth in D.N.J. LBR 3003-1(b) or (ii) thirty (30) days after Confirmation.  Any Proofs of Claim that are not filed timely shall be barred forever from assertion.

## ARTICLE XIV
## CONFIRMATION AND CONSUMMATION OF THIS PLAN

14.1. **Conditions Precedent to Confirmation**.

Confirmation of this Plan shall not occur unless all of the following conditions precedent have been satisfied:

(a) the Plan Documents shall be in form and substance acceptable to the Debtor, the Other Catholic Entities, the Tort Committee and any Settling Insurers; and

(b) the Confirmation Order is in form and substance acceptable to the Debtor, the Other Catholic Entities, the Tort Committee and any Settling Insurers and in all events provides for the following:

(i) confirmation of this Plan;

(ii) specifically, and individually, ordering all Persons, as set forth in this Plan, to act or refrain from acting as specified in this Plan;

(iii) incorporating the terms and provisions of an Insurance Settlement Approval Order (if any) as though fully set forth therein;

(iv) ordering the Trust Administrator to perform the obligations, if any, imposed upon the Trust Administrator by this Plan;

(v) approving and implementing the Channeling Injunction and Supplemental Settling Insurer Injunction;

(vi) discharging the Other Catholic Entities from all Claims, except as otherwise provided for in this Plan;

(vii)   ordering all Channeled Claimants with pending state court Actions against any Covered Party to dismiss Channeled Claims and assert them against the Trust for resolution pursuant to the Trust Agreement; and

(viii)  incorporating the following factual findings and legal conclusions:

1.   The release granted to the Other Catholic Entities is fair and necessary to the Debtor's reorganization.

2.   There is a sufficient identity of interest between the Debtor and the Other Catholic Entities such that a suit against the Other Catholic Entities is, in essence, a suit against the Debtor or will deplete assets of the Estate.

3.   The DOCT Loan, the cash contribution by the Other Catholic Entities, waiver of claims by the Other Catholic Entities and grant of the Lien on assets of the Parishes provides significant and critical funding for this Plan constituting a substantial contribution to the success of this Plan.

4.   The Other Catholic Entities would not make a substantial contribution unless they obtained the benefits of the Channeling Injunction.

5.   The release granted to the Other Catholic Entities is necessary to the Debtor's reorganization and without it there is little likelihood of reorganization.

14.2.   **Conditions Precedent to the Effective Date**.

The Effective Date shall not occur, and this Plan shall not be consummated, unless and until each of the following conditions have been satisfied:

(a)   the Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Debtor, the Tort Committee and any Settling Insurers;

(b)   the Confirmation Order shall be a Final Order and no stay of the Confirmation Order shall then be in effect;

(c)   the Trust Administrator and the Debtor shall have executed the Trust Agreement and the Debtor shall have delivered to the Trust Administrator the Trust Agreement;

(d)   the Debtor shall have executed and delivered to the Trust Administrator the Additional Debtor Contributions Security Agreement;

(e)     the Other Catholic Entities shall have executed and delivered to the Trust Administrator the Other Catholic Entities Insurance Assignment Agreement;

(f)     the payments required to be made by or on the Effective Date under this Plan shall have been received in good funds by the Trust, including, but not limited to, the Initial Debtor Contribution, the OCE Cash Contribution and all proceeds held by the Debtor or the Reorganized Debtor on account of Insurance Settlement Agreements; and

(g)     this Plan has not been materially amended, altered, or modified as confirmed by the Confirmation Order, unless such material amendment, alteration, or modification has been made with consent of the Plan Proponents.

14.3.   **Notice of Effective Date**.

The Debtor shall file and serve on all Holders of Claims a Notice of Effective Date with the Bankruptcy Court within three (3) days after the occurrence of the Effective Date.  Such notice will include all relevant deadlines put into effect by the occurrence of the Effective Date.

14.4.   **Waiver of Conditions Precedent to the Effective Date**.

Each of the conditions precedent to the occurrence of the Effective Date set forth in Section 14 may only be waived in whole or in part by the Plan Proponents and any Settling Insurer without notice to or leave or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate this Plan.

14.5.   **Effect of Non-Occurrence of Conditions**.

If Substantial Consummation of this Plan does not occur, this Plan will be null and void in all respects and nothing contained in this Plan or the Disclosure Statement will:  (a) constitute a waiver or release of any Claims by or against the Covered Parties or Settling Insurers; (b) prejudice in any manner the rights of the Covered Parties, the Trust, or Settling Insurers; (c) constitute an admission, acknowledgement, offer, or undertaking by the Covered Parties or Settling Insurers in any respect, including but not limited to, in any proceeding or case against the Debtor; or (d) be admissible in any action, proceeding, or case against the Covered Parties or Settling Insurers in any Bankruptcy Court or other forum.

**ARTICLE XV**
**EFFECTS OF CONFIRMATION**

15.1.   <u>Authority to Effectuate Plan</u>.  Upon the Effective Date, all matters provided under this Plan shall be deemed to be authorized and approved without the requirement of further approval from the Bankruptcy Court or the Plan Proponents.  The Plan Proponents shall be authorized, without further application to or order of the Bankruptcy Court, to take whatever action necessary to achieve consummation and carry out this Plan and to effectuate the transactions provided for thereunder.

15.2.  **Binding Effect**.  Except as otherwise expressly provided in this Plan, on and after the Effective Date, this Plan shall bind all Holders of Claims.  Subject to the terms of this Plan, upon the Effective Date, every Holder of a Claim shall be precluded and permanently enjoined from asserting against the Debtor and/or Reorganized Debtor any Claim based on any document, instrument, judgment, award, order, act, omission, transaction or other activity of any kind or nature that occurred before the Petition Date.

15.3.  **Discharge and Release**.

(a)  Except as provided in this Plan, the Trust Distribution Plan or the Confirmation Order, upon the Effective Date, the Debtor shall be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in section 502 of the Bankruptcy Code, whether or not (i) a Proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code, (iii) a Claim based upon such debt is or has been disallowed by order of the Bankruptcy Court, or (iv) the Holder of a Claim based upon such debt accepted this Plan.

(b)  Except as provided in this Plan, the Trust Distribution Plan or the Confirmation Order, upon the Effective Date, all Persons shall be precluded from asserting against the Debtor, the Reorganized Debtor and their respective members, shareholders, officers, directors, partners, attorneys or advisors, any other or further Claims relating to the Debtor based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date.  In accordance with the foregoing, except as provided in this Plan, the Trust Distribution Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all Claims against the Debtor, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim.

(c)  Notwithstanding the foregoing and anything herein to the contrary, to preserve and maintain coverage under Non-Settling Insurer Policies:  (i) the Debtor will not be discharged from any Abuse Claim and (ii) an Abuse Claim will not be released or enjoined against the Diocese, the Reorganized Debtor, any relevant Covered Party and any relevant Non-Settling Insurer for any Abuse that may be covered under Non-Settling Insurer Policies, in both cases (i) and (ii) until an Abuse Claim is settled with the Diocese, the Reorganized Debtor, any relevant Covered Party and any relevant Non-Settling Insurer or is fully adjudicated, resolved and subject to Final Order, but recourse is limited as described below.  Under this Section, recourse to Abuse Claimants is limited to (i) the proceeds of Non-Settling Insurer Policies and (ii) all other amounts awardable against any Non-Settling

55

Insurers, including, but not limited to, extra-contractual damages, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs, that may be recoverable because of a Non-Settling Insurer's conduct concerning insurance coverage for, or defense or settlement of, any Abuse Claim.  For the avoidance of doubt, nothing herein requires any Class 5 and 6 Claimant to release any Claim(s) that is not a Channeled Claim.

(d)    Under no circumstances will the reservation of an Abuse Claimant's rights against any Person impair the discharge, Channeling Injunction, or Supplemental Settling Insurer Injunction with respect to any Covered Party or Settling Insurer to the extent provided in this Plan.

15.4.    **Release and Discharge of the Trade Committee**.  Effective on the Effective Date, the Trade Committee shall be disbanded, and it and its professionals released, from their duties and obligations.

15.5.    **Release and Discharge of the Tort Committee**.  Effective on the Effective Date, the Tort Committee and its professionals shall be disbanded, and it and its professionals released, from their duties and obligations.

## ARTICLE XVI
## RETENTION OF JURISDICTION

Until such time as a Final Decree is entered by the Bankruptcy Court, the Bankruptcy Court shall retain jurisdiction of this Chapter 11 Case pursuant to the provisions of chapter 11 of the Bankruptcy Code to make such orders as are necessary or appropriate to carry out the provisions of this Plan, and with respect to the following matters:

(a)    To enable the Plan Proponents to consummate this Plan and to resolve any disputes arising therefrom;

(b)    To adjudicate all controversies concerning the classification, estimation or allowance of any Claim herein (other than Class 5 and Class 6 Claims);

(c)    To determine the classification, estimation and priority of all claims against the Debtor and to re-examine any Claims (other than Class 5 and Class 6 Claims) which may have been allowed;

(d)    To determine applications for the rejection or assumption of Executory Contracts or unexpired leases pursuant to the provisions of this Plan which are not determined prior to Confirmation and to determine allowance of Claims for damages with respect to rejection of any such Executory Contracts or unexpired leases within such time as the Bankruptcy Court may direct;

(e)    To oversee and issue further appropriate orders respecting disbursement of amounts deposited as may be required by this Plan;

(f)     To conduct hearings on valuation, as necessary, and to determine whether any party in interest is entitled to recover against any Person any Claim, whether arising under section 506(c) of the Bankruptcy Code, or arising out of a voidable preference, a fraudulent transfer, or otherwise;

(g)     To hear and determine all applications for compensation and other Administrative Expense Claims;

(h)     To hear and determine any and all pending adversary proceedings or contested matters, including but not limited to, the Insurance Coverage Adversary Proceeding and all claims or causes of action related thereto or arising therefrom, whether or not presently asserted in the operative complaint therein;

(i)     To hear and determine any and all Claims and causes of action that belong to the Debtor or its Estate on or prior to the Effective Date, including but not limited to, such Claims and causes of action that vest in the Trust on the Effective Date pursuant to this Plan, whether or not asserted prior to the occurrence of the Effective Date, including but not limited to, all Claims and causes of action presently asserted in, or that could be asserted in, the Insurance Coverage Adversary Proceeding;

(j)     To determine all causes of action which may exist in favor of the Debtor or the Trust;

(k)     To determine any modification of this Plan after confirmation pursuant to section 1127 of the Bankruptcy Code;

(l)     To enter any order, including injunctions, necessary to establish and enforce the rights and powers of the Debtor, or the Trust, under this Plan;

(m)     To enter the Final Decree pursuant to Rule 3022 of the Bankruptcy Rules;

(n)     To hear and determine all controversies, suits and disputes, if any, as may arise in connection with the interpretation or enforcement of this Plan;

(o)     To hear and determine all controversies, suits and disputes, if any, as may arise with regard to orders of the Bankruptcy Court in the Chapter 11 Case entered on or before Confirmation;

(p)     To hear and determine any and all objections to payments to be made under this Plan;

(q)     To liquidate damages in connection with any disputed, contingent or unliquidated Claims;

(r)     To adjudicate all Claims to a security or ownership interest in any property of the Debtor or in any proceeds thereof;

(s)    To adjudicate all causes of action to recover all assets and properties of the Debtor or the Trust wherever located;

(t)    To enter any order, including injunctions, necessary to enforce the title, rights and powers of the Debtor and the Trust, and to impose such limitations, restrictions, terms and conditions on such title rights and powers as the Bankruptcy Court may deem necessary or appropriate;

(u)    Over matters related to the assets of the Estate or of the Trust, including the terms of the Trust, or the recovery, liquidation, or abandonment of Trust Assets;

(v)    Over conflicts and disputes among the Trust, the Reorganized Debtor and holders of Claims; and

(w)    To make such orders as are necessary or appropriate to carry out the provisions of this Plan, including but not limited to orders interpreting, or enforcing the provisions thereof.

In addition, the Bankruptcy Court shall retain jurisdiction to implement the provisions of this Plan in the manner as provided under section 1142, sub-paragraphs (a) and (b) of the Bankruptcy Code. If the Bankruptcy Court abstains from exercising, or declines to exercise jurisdiction, or is otherwise without jurisdiction over any matter set forth in this Section, or if the Plan Proponents, or their successors, elects to bring an action or proceeding in any other forum, then this Section shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court, public authority or commission having competent jurisdiction over such matters.

Notwithstanding anything in this Plan to the contrary, nothing contained herein concerning the retention of jurisdiction by the Bankruptcy Court shall be deemed to be a finding or conclusion that (1) the Bankruptcy Court in fact has jurisdiction with respect to any and all Claims and causes of action presently asserted in, or that could be asserted in, the Insurance Coverage Adversary Proceeding, (2) any such jurisdiction is exclusive with respect to all Claims and causes of action presently asserted in, or that could be asserted in, the Insurance Coverage Adversary Proceeding, or (3) abstention or dismissal of the Insurance Coverage Adversary Proceeding pending in the Bankruptcy Court or the District Court as an adversary proceeding is or is not advisable or warranted, so that another court can hear and determine such Insurance Coverage Adversary Proceeding. Any court other than the Bankruptcy Court that has jurisdiction over the Insurance Coverage Adversary Proceeding shall have the right to exercise such jurisdiction.

## ARTICLE XVII
## BANKRUPTCY RULE 9019 REQUEST

Pursuant to Bankruptcy Rule 9019 and through this Plan, the Plan Proponents request approval of all compromises and settlements included in this Plan.

## ARTICLE XVIII
## <u>INCORPORATION OF CHILD PROTECTION PROTOCOLS</u>

The Child Protection Protocols are incorporated into and made a part of this Plan as if fully set forth herein.

## ARTICLE XIX
## <u>MISCELLANEOUS PROVISIONS</u>

19.1. **<u>Amendment or Modification of this Plan</u>**. On or before the Effective Date, this Plan or any exhibits hereto may be amended, modified, or supplemented by the Plan Proponents in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code. In addition, after Confirmation, the Reorganized Debtor or Trust Administrator, as applicable, may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of this Plan. The Plan Proponents may make appropriate technical adjustments and modifications to this Plan prior to the Effective Date without further order or approval of the Bankruptcy Court.

19.2. **<u>Revocation or Withdrawal of this Plan</u>**. The Plan Proponents reserve the right to revoke or withdraw this Plan before Confirmation. If the Plan Proponents revoke or withdraw this Plan before Confirmation, then this Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against the Debtor or the Trust Administrator or to prejudice in any manner the rights of the Plan Proponents or the Trust Administrator in any further proceedings.

19.3. **<u>Final Decree</u>**. The Reorganized Debtor shall be responsible to request that a Final Decree be entered in this Chapter 11 Case.

19.4. **<u>Severability of Plan Provisions</u>**. If, prior to Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Plan Proponents, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may be altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

19.5. **<u>No Interest</u>**. Except as expressly stated in this Plan, no interest, penalty or late charge is allowed or shall be paid on any Claim.

19.6. **<u>Allocation of Distributions Between Principal and Interest</u>**. To the extent that any Allowed Claim entitled to a Distribution under this Plan comprises indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount of the

Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid prepetition interest.

19.7.   **Notices**.  Any notices or requests by parties in interest under or in connection with this Plan shall be in writing and served either by:  (i) certified mail, return receipt requested, postage prepaid, (ii) hand delivery, or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the following parties:

**IF TO THE DEBTOR:**

TRENK ISABEL SIDDIQI &
SHAHDANIAN P.C.
Richard D. Trenk, Esq.
Robert S. Roglieri, Esq.
290 Mt. Pleasant Avenue, Suite 2350
Livingston, NJ 07037
Email:  rtrenk@trenkisabel.law
Email:  rroglieri@trenkisabel.law

**IF TO THE TORT COMMITTEE:**

LOWENSTEIN SANDLER LLP
Jeffrey D. Prol, Esq.
Michael A. Kaplan, Esq.
Brent Weisenberg, Esq.
One Lowenstein Drive
Roseland, NJ 07068
Email:  jprol@lowenstein.com
Email:  mkaplan@lowenstein.com
Email:  bweisenberg@lowenstein.com

19.8.   **Controlling Documents**.  Notwithstanding anything to the contrary contained herein or in the Disclosure Statement, in the event and to the extent that any provision of this Plan is inconsistent with any provision of the Disclosure Statement, the provisions of this Plan shall control and take precedence.  In the event of any inconsistency between this Plan and the Confirmation Order, the Confirmation Order shall control.  In the event of any inconsistency among this Plan Documents, the Confirmation Order and any Insurance Settlement Agreement, the Insurance Settlement Agreement shall control.

19.9.   **Filing of Additional Documents**.  Prior to the Effective Date, the Plan Proponents may File with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan that are not inconsistent with the terms of this Plan.  On or after the Effective Date, the Reorganized Debtor or the Trust Administrator may file with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate to effectuate the terms and conditions of this Plan.

19.10.  **Reservation of Rights**.  If this Plan is not confirmed by the Bankruptcy Court for any reason, the rights of the Debtor, the Tort Committee and all parties in interest in the Bankruptcy Case shall and will be reserved in full.  Statements and provisions made in this Plan or in the Disclosure Statement are made only for the purpose(s) of this Plan.  If this Plan is withdrawn, the Confirmation Order is not entered, or if the Effective Date does not occur, no Person shall be bound by or deemed prejudiced by any such statement or provision.

19.11.  **Computation of Time**.  In computing any period of time prescribed or allowed by this Plan, unless otherwise specifically designated herein, the provisions of Bankruptcy Rule 9006(a) shall apply.

19.12.  **Successors and Assigns**.  The rights, duties and obligations of any Person named or referred to in this Plan, including all Creditors, shall be binding on, and shall inure to the benefit of, the successors and assigns of such Person.

19.13.  **Waiver of Subordination**.  Notwithstanding any provision of this Plan to the contrary, all holders of Claims shall be deemed to have waived any and all contractual subordination rights to which they may have with respect to the distributions made pursuant to this Plan and the Confirmation Order shall permanently enjoin, effective as of the Effective Date, all holders of Claims from enforcing or attempting to enforce any such rights against any Person receiving distributions under this Plan.

19.14.  **Post-Effective Date Professional Fees**.  The reasonable fees and actual and necessary expenses incurred after the Effective Date by professionals for the Reorganized Debtor shall be paid by the Reorganized Debtor upon the submission of an invoice to the Reorganized Debtor without the need for further notice to any Person or approval by the Bankruptcy Court.

19.15.  **Governing Law**.  Unless a rule of law or procedure is supplied by federal law, including the Bankruptcy Code and Bankruptcy Rules, (a) the construction and implementation of this Plan and any agreements, documents, and instruments executed in connection with this Plan and (b) governance matters shall be governed by the laws of the State of New Jersey, without giving effect to the principles of conflict of law thereof.

19.16.  **Headings**.  Headings are used in this Plan for convenience and reference only and shall not constitute a part of this Plan for any other purpose.

19.17.  **No Admissions**.  Notwithstanding anything herein to the contrary, nothing contained in this Plan shall be deemed an admission by any entity with respect to any matter set forth herein.

Dated:  September 22, 2023

**THE DIOCESE OF CAMDEN, NEW JERSEY**

By:  */s/ Rev. Robert E. Hughes*

Reverend Robert E. Hughes,
*Vicar General/Vice President*

Dated:  September 22, 2023

**TRENK ISABEL SIDDIQI & SHAHDANIAN P.C.**

By: */s/ Richard D. Trenk*
Richard D. Trenk, Esq.
Robert S. Roglieri, Esq.

*Counsel to The Diocese of Camden, New Jersey*

Dated:  September 22, 2023

**THE OFFICIAL COMMITTEE OF TORT CLAIMANT CREDITORS**

By:  */s/ John Collins*

John Collins
*Co-Chairperson*

Dated:  September 22, 2023

**LOWENSTEIN SANDLER LLP**

By: */s/ Jeffrey Prol*
Jeffrey Prol, Esq.
Michael Kaplan, Esq.
Brent Weisenberg, Esq.

*Counsel to the Official Committee of Tort Claimant Creditors*

**Exhibit 2.2.21**

CATHOLIC MINISTRY ENTITIES

Catholic Charities, Diocese of Camden, Inc.
1845 Haddon Avenue
Camden, NJ 08103

Diocese of Camden Trusts, Inc.
631 Market Street
Camden, New Jersey 08102

Diocese of Camden Healthcare Foundation, Inc.
631 Market Street
Camden, NJ 08103

The Diocesan Housing Services Corporation of the Diocese of Camden, Inc.
1845 Haddon Avenue
Camden, NJ 08103

The Tuition of Assistance Fund, Inc,
631 Market Street
Camden, NJ 08103

Padre Pio Shrine, Buena Borough, NJ, Inc.
3665 North Mill Road
Vineland, NJ 08360

**Exhibit 2.2.25**

4856-6996-4835, v. 1

## <u>CHILD PROTECTION PROTOCOLS</u>

Article XVIII of the Plan requires the Diocese, and where applicable, the Covered Parties, to comply with, and fulfill, the following "Child Protection Protocols," all of which shall be overseen by the Trust Advisory Committee.[1]  The Trust Advisory Committee shall serve without remuneration and the Diocese shall have no obligation to pay the members of the Trust Advisory Committee for their services on such Committee or reimburse any member of the Trust Advisory Committee or any professionals retained by them for any expenses.

The Diocese, and where applicable, the Covered Parties, shall provide an annual certification and affirmation in writing to the Trust Advisory Committee certifying that they have strictly complied with all of the following requirements, including that the Bishop has no knowledge of alleged, reported, admitted or otherwise claimed or substantiated allegations of Abuse after the Effective Date of the Plan or that any such knowledge has been reported to law enforcement subject to the applicable privileges protected by Article 5.3 of the 2002 Memorandum of Understanding filed at docket number 3-3 for a period of four (4) years following the Effective Date.

No claim or cause of action shall arise from the failure to comply with, or fulfill, the following requirements.  Rather, the Honorable Jose L. Linares, Chief Judge of the United States District Court for the District of New Jersey (ret.) (the "**<u>Mediator</u>**") shall have the sole and exclusive jurisdiction to mediate any disputes that arise hereunder other than disputes which arise under paragraph 6 below, which shall be resolved as set forth therein.[2]

1.      **Composition of the Diocesan Review Board.**  Within one-hundred and twenty (120) days after the Effective Date of the Plan, the Bishop, in consultation with the Trust Advisory Committee, shall appoint two survivors of sexual abuse (each a "**<u>Survivor</u>**") to the Diocesan Review Board.[3]  Two Survivors shall remain at all times on the Diocesan Review Board.  Any successor Survivor(s) will be appointed at the Bishop's discretion but in consultation with the Trust Advisory Committee so long as it remains in existence, and after it disbands, in consultation with a non-profit organization whose mission includes supporting or advocating for survivors of child abuse; *provided however*, if two (2) Survivors are not available or will not participate in a meeting of the Diocesan Review Board, such absence will not affect the determinations of the Diocesan Review Board.

2.      **Postings, Public Statements and Announcements.**

---

[1]     Capitalized terms used but not defined herein have the meaning ascribed to such term in the accompanying Eighth Amended Plan of Reorganization.

[2]     To the extent that Judge Linares is not available, the parties will agree on a new or substitute Mediator.  If the parties cannot agree after conferring in good faith, the parties shall jointly ask the Chief Judge of the United States Bankruptcy Court for the District of New Jersey to serve as Mediator or select a person whom he or she chooses after reasonable input from the parties.

[3]     Consultation shall not be interpreted to mean that the Trust Advisory Committee has the power to designate any particular person or persons.

2

The Diocese hereby agrees to:

- Continue posting the names of all known diocesan priests, nuns, teachers and/or other agents for whom childhood sexual abuse allegations were substantiated, admitted, or otherwise determined to be credible on the Diocese website for not less than 25 years after the Effective Date of the Plan.[4]

- Continue publishing the names of the diocesan priests who have been restricted from presenting themselves as priests as a result of credible childhood sexual allegations.

- Issue a public statement, which statement shall be reviewed and commented on by the Diocesan Review Board in advance, acknowledging that the Bishop is grateful that Survivors came forward.[5]

- Make an announcement on the Diocese website, which announcement shall be reviewed and commented on by the  Diocesan Review Board in advance, of (i) the full and complete release of all Survivors from any previous confidentiality requirement and (ii) a commitment and promise not to require any confidentiality provision concerning the sexual perpetrators or factual circumstances surrounding sexual abuse going forward, except upon written request of a settling Survivor.  Confidentiality shall be respected only to preserve the identity or privacy of the Survivor.

- For a period of two (2) years after the Effective Date, allow Survivors to publish their stories of abuse not to exceed 500 words in the Catholic Star Herald, subject to reasonable editing by the Catholic Star Herald.

- Provide contact information on the Diocese website for anonymously reporting abuse complaints and continue the Diocese's current whistleblower policy.

- Issue letters of apology to Survivors who request such letters.

- Display in each diocesan or parish school appropriate signage stating that sexual abuse of children and young people by any person, including priests, in that parish, church or school or anywhere, shall not be tolerated and advising that any report or complaint of child sexual abuse will be fully investigated in a manner that respects and protects the victim of such abuse.

    **3.    Compliance with the Charter and the Procedures Previously Implemented by the Diocese.**  The Diocese shall continue to strictly comply with (i) the *Charter for the Protection of Children and Young People* and the *Essential Norms for Diocesan Policies Dealing with*

---

[4]    A credible allegation is one that after review of available and relevant information, there is reason to believe the allegation may be true as determined by the Bishop.

[5]    This requirement was satisfied by the Diocese's press release issued on April 19, 2022.

4856-6996-4835, v. 1

*Allegations     of     Sexual     Abuse     of     Minors     by     Priests     or     Deacons*
(http://camdendiocese.org/images/safe_enviorment_office/B_Essential_Norms.pdf)        (the
"**Charter**") and any future documents issued by the U.S. Conference of Catholic Bishops and (ii)
the following guidelines and procedures, most of which are set forth in the Declaration of Reverent
Robert E. Hughes filed in this case

- Entered into compacts with the county prosecutors and the New Jersey Attorney General (the 2002 Memorandum of Understanding).

- Fingerprint-facilitated criminal history background checks for every adult having regular contact with minors.

- Zero tolerance policies.

- Every adult having regular contact with minors is required to take a safe environment training program.

- Utilization of the VIRTUS child abuse training awareness program entitled "Protecting God's Children."

- Required retraining every five years.

- Continuation of payment for therapy for all who have been harmed subject to Paragraph 4 below.

- Continued vigorous implementation of child protection programs, including mandatory psychological evaluations of new members of the Diocese clergy (seminarians, clergy transfers etc.) through the administration of the Child Abuse Protection Inventory (CAPI) and the Minnesota Multiphasic Personality Inventory (MMPI - latest edition) by a clinician independent from any association with the Diocese.

- Continued retention of StoneBridge Business Partners, or other reputable auditor. required to comply with the USCCB's Charter for the Protection of Children and Young People, which shall provide the Trust Advisory Committee with its written audit no less than thirty (30) days after its submission to the Diocese.

4.      **Therapy.**  Continue the Diocese's current policy to pay all therapeutic costs of
Survivors as administered by the Victim Assistance Coordinator for 25 sessions subject to increase
upon determination by the Clinical Advisory Panel, after consideration of the recommendation of
the Survivors' therapists.  Therapy shall be provided to Survivors regardless of whether a claim or
cause of action is asserted against a Covered Party by a Survivor.

5.      **Training, Protocols and Procedures.**
- Continued Diocese retention of a Victim Assistance Coordinator and implementation of the VIRTUS Program to, *inter alia*, develop, publish, and implement mandatory child abuse prevention protocols and procedures to be adopted by the Diocese, and to be reviewed annually, which shall include:

- All diocesan seminarians being required to attend a seminary which contains curriculum concerning child abuse prevention.

- Mandatory training on child abuse prevention in all schools and religious educational programs.

- Continued development, publication, and implementation of its child abuse prevention/safe environment curriculum for all Catholic Schools and religious education programs.

- Continued distribution of information on how to report sexual abuse.

- Distribution of the Code of Ethical Standards to all clergy.

- Continued addressing of topics of sexual abuse of minors, prevention, detection and reporting of same in the seminary formation program.

- Implementation of a Diocese policy requiring that the Bishop, diocesan leaders and diocesan spokespersons refer to clergy abuse survivors as "abuse survivors," "survivors of clergy sexual abuse," "victims of clergy sexual abuse," or other term(s) recommended by abuse survivor advocates, and not refer to substantiated abuse survivors as "alleged."

- For 25 years, the Diocese will continue to provide information to parishes and schools about reporting child sexual abuse.

- A commitment to never seek to eliminate the New Jersey existing mandatory child abuse reporting statutory requirements.

- The Bishop has been and will continue to be available for private conferences with Survivors upon reasonable notice.

6.    **Document Production**

A.    Within one hundred twenty (120) days after the later of (i) the date upon which all Claims are settled or otherwise resolved with all of the Diocese's insurers (the "**Litigation Cessation Date**") and (ii) the Effective Date, or (iii) as otherwise agreed between the Diocese and the Trust Advisory Committee, the Diocese will make available to the Trust Advisory Committee copies of the documents maintained by the Diocese (a) on all clergy (ordained or religious orders) and other agents, employees or volunteers who were included as perpetrators of sexual abuse on the Diocese of Camden Clergy Disclosure List (https://camdendiocese.org/clergylist/) because allegations of Abuse of a minor or young adult have been admitted, substantiated or determined or considered to be credible (the "**Credibly Accused List**") and (b) setting forth all policies and procedures that the Diocese had in place to protect children and others from Abuse by any agent or representative of the Diocese.[6]    The

---

[6]    The documents to be produced include the Separate Archive Files maintained by the Diocese.

4856-6996-4835, v. 1

Diocese may redact and/or remove from such production any privileged information, including attorney-client privileged, work product privileged information, unrelated personal information and communications, and medical information to the extent such information is not related to Abuse and any other information subject to privileges under New Jersey state or federal law (the "**Removed Documents or Information**").

      B.     The Diocese will identify for the Trust Advisory Committee the Removed Documents or Information in a detailed log that identifies with sufficient particularity the nature of the Removed Documents or Information. The Trust Advisory Committee and the Diocese agree to work cooperatively and in good faith to resolve any dispute regarding the Removed Documents or Information. If an agreement cannot be reached between the Diocese and the Trust Advisory Committee on any dispute regarding any Removed Documents or Information, the Honorable Jose L. Linares (ret.) (the "**Arbitrator**") will make a determination as to whether good cause exists to for the Diocese to provide the disputed Removed Documents or Information to the Trust Advisory Committee and/or publicly release the Removed Documents or Information. Both the Trust Advisory Committee and the Diocese will have the opportunity to submit their positions on the Removed Documents or Information to the Arbitrator, and the Arbitrator will make a determination, within 30 days of receiving the parties' submissions, whether good cause exists to publicly release the Removed Documents or Information. The decision of the Arbitrator as to the release of the Removed Documents or Information will be binding and final. Notwithstanding the foregoing provisions as to Removed Documents or Information, the Arbitrator shall not make any determinations as to any Removed Documents or Information, and no Removed Documents or Information shall be released, until the conclusion of the New Jersey Attorney General's Clergy Abuse Task Force investigation. Any perpetrator of sexual abuse named on the Credibly Accused List, or their respective attorney, agent, estate, executor, or otherwise, shall be noticed by the Trust Advisory Committee of the proceeding before the Arbitrator on no less than thirty (30) days' written notice and shall have a right to appear and be heard by the Arbitrator as to the release of any information, whether privileged or not, in that perpetrator's file. Nothing herein shall limit the rights of any perpetrator named on the Credibly Accused List from asserting any legal, equitable, or other rights with respect to the documents in that perpetrator's file referenced in this section 6.

      C.     Within one hundred twenty (120) days after the later of (i) the Litigation Cessation Date; (ii) the Effective Date; and/or (iii) as otherwise agreed between the Diocese and the Trust Advisory Committee, the Diocese will make available to the Trust Advisory Committee all documents maintained by the Diocese related to any claim of sexual abuse of a minor (i) that was asserted prior to the Effective Date but (ii) that did not meet the credible standard set forth in footnote 2 above (the "**Disputed Documents**"). The Disputed Documents will be subject to procedures set forth in this Paragraph 6 (including removal of Removed Documents or Information). The Trust Advisory Committee will have a reasonable period of time to notify the Diocese after receipt of the Disputed Documents, in writing, if the Trust Advisory Committee believes that any of the Disputed Documents should be made public. The Diocese will have a reasonable time after receipt of the Trust Advisory Committee's written notification pursuant to the preceding sentence to notify the Trust Advisory Committee, in writing, of its objection to public release of any Disputed Documents. The Trust Advisory Committee will not publicly release any of the Disputed Documents unless the Diocese affirmatively permits the public release

in accordance with the terms of this Paragraph 6.C. in writing or the Arbitrator has determined that the Trust Advisory Committee can release the Disputed Documents as set forth below.  The Trust Advisory Committee and the Diocese agree to work cooperatively and in good faith to resolve any dispute regarding the Disputed Documents.  If an agreement cannot be reached between the Diocese and the Trust Advisory Committee on any dispute regarding any Disputed Documents, the Arbitrator will make a determination as to whether good cause exists to for the Diocese to provide the disputed Removed Documents or Information to the Trust Advisory Committee and/or publicly release the Disputed Documents. Each of the Trust Advisory Committee and the Diocese will have the opportunity to submit their positions on the Disputed Documents to the Arbitrator, and the Arbitrator will make a determination within 30 days of receiving the parties' submissions whether "good cause" exists to deem the allegation a credible accusation and, therefore, publicly release the Disputed Documents.  The decision of the Arbitrator as to the release of the Removed Documents or Information will be binding and final and not subject to appeal or challenge of any kind.  Notwithstanding the foregoing provisions as to Removed Documents or Information, the Arbitrator shall not make any determinations as to any Removed Documents or Information, and no Removed Documents or Information shall be released, until the conclusion of the New Jersey Attorney General's Clergy Abuse Task Force investigation.  Any alleged perpetrator of sexual abuse whose file is the subject of this section or his respective attorney, agent, estate, executor, or otherwise, shall be noticed by the Trust Advisory Committee of the proceeding before the Arbitrator on no less than thirty (30) days' written notice and shall have a right to appear and be heard by the Arbitrator as to the release of any information, whether privileged or not, in that priest's file.  Nothing herein shall limit the rights of any priest named on the Credibly Accused List from asserting any legal, equitable, or other rights with respect to the documents in that priest's file referenced in this section 6.  Nothing contained herein shall relate to or require the production of any files related to non-Diocesan priests or personnel.

D.     The parties' expectation is that the Diocese or the Trust will publicly release any documents provided under paragraph 6.A, any documents that the parties agree can be made public in accordance with paragraphs 6.B and 6.C, and any documents determined by the Arbitrator to be appropriate for public release under paragraphs 6.B and 6.C.

4856-6996-4835, v. 1

**Exhibit 2.2.75**

MISSIONS - TITLE 15A

      Mater Ecclesiae Chapel, Inc.
      261 Cross Keys Road
      Berlin, NJ 08009

      St. Yi Yun Il John Korean Catholic Mission
      2001 Springdale Road
      Cherry Hill NJ 08003

      Saint Andrew Kim Korean Catholic Mission, Inc.
      631 Market Street
      Camden, New Jersey 08102

**Exhibit 2.2.87**

PARISHES & PARISH SCHOOLS – TITLE 16

Divine Mercy Parish, Vineland, N.J.
23 West Chestnut Avenue
Vineland, NJ 08360

The Church of Our Lady of the Angels, Cape May Court House, N.J.
35 East Mechanic Street
Cape May Court House, NJ 08210

Church of the Holy Family, Washington Township
226 Hurffville Road
Sewell, NJ 08080

Christ the Good Shepherd Parish, Vineland, N.J.
1655 Magnolia Road
Vineland, NJ 08361

Holy Angels Parish, Woodbury, N.J.
64 Cooper Street
Woodbury, NJ 08096

St. Peter's Catholic Church Merchantville, N.J.
43 West Maple Avenue
Merchantville, NJ 08109

Our Lady of Guadalupe Parish, Lindenwold, N.J.
135 North White Horse Pike
Lindenwold, NJ 08021

Mary, Mother of Mercy Parish, Glassboro
500 Greentree Road
Glassboro, NJ 08028

St. Joseph's Catholic Church, Sea Isle City, N.J.
126 44th Street
Sea Isle City, NJ 08243

Saint Gabriel the Archangel Parish, Carneys Point, N.J.
369 Georgetown Road
Carneys Point, NJ 08069

Church of Saint Elizabeth Ann Seton, Absecon, N.J.
591 New Jersey Avenue
Absecon, NJ 08201

Saint Simon Stock Parish, Berlin, N.J.
178 West White Horse Pike
Berlin, NJ 08009

The Church of Our Lady, Star of the Sea, Cape May
520 Lafayette Street
Cape May, NJ 08204

Catholic Community of the Holy Spirit, Mullica Hill, N.J.
17 Earlington Avenue
Mullica Hill, NJ 08062

The Parish of the Cathedral of the Immaculate Conception, Camden, N.J.
642 Market Street
Camden, NJ 08102

Mary, Queen of All Saints Parish, Pennsauken, N.J.
4824 Camden Avenue
Pennsauken, NJ 08110

Holy Child Parish, Runnemede, N.J.
13 East Evesham Road
Runnemede, NJ 08078

R.C. Church of the Incarnation, Township of Mantua, New Jersey
240 Main Street
Mantua, NJ 08051

Church of Our Lady of the Lakes, Collings Lakes, N. J.
19 Malaga Road
Collings Lakes, NJ 08094

Church of St. Rose of Lima, Haddon Heights, N.J.
300 Kings Highway
Haddon Heights, NJ 08035

The Church of the Sacred Heart
1739 Ferry Avenue
Camden, NJ 08104

The Church of Our Lady of Sorrows, Linwood, N.J.
724 Maple Avenue
Linwood, NJ 08221

St. Vincent de Paul Parish, Mays Landing, N.J.
5021 Harding Highway
Mays Landing, NJ 08330

Our Lady of the Blessed Sacrament Parish, Newfield, N.J.
104 Catawba Avenue
Newfield, NJ 08344

St. Mary's Church Gloucester
426 Monmouth Street
Gloucester, NJ 08030

St. Joseph's Catholic Church, East Camden
2907 Federal Street
Camden, NJ 08105

The Parish of All Saints, Millville, N.J.
621 Dock Street
Millville, NJ 08332

Saint Teresa of Calcutta Parish, Collingswood, N.J.
809 Park Avenue
Collingswood, NJ 08108

The Parish of St. Maximilian Kolbe, Marmora, N.J.
200 Tuckahoe Road
Marmora, NJ 08223

St. Brendan the Navigator Parish, Avalon, N.J.
5012 Dune Drive
Avalon, NJ 08202

St. Clare of Assisi Parish, Gibbstown, N.J.
140 Broad Street
Swedesboro, NJ 08085

Holy Trinity Parish, Margate, N.J.
11 North Kenyon Avenue
Margate, NJ 08402

St. Thomas' Catholic Church, Brigantine, N.J.
331 8th Street South
Brigantine, NJ 08203

Christ the Redeemer Parish, Atco, N.J.
318 Carl Hasselhan Drive
Atco, NJ 08004

St. Gianna Beretta Molla Parish, Northfield, N.J.
1417 New Road
Northfield, NJ 08225

Our Lady of Perpetual Help Parish, Galloway, N.J.
146 South Pitney Road
Galloway, NJ 08205

St. Andrew The Apostle's R. C. Church, Gibbsboro, N. J.
27 Kresson-Gibbsboro Road
Gibbsboro, NJ 08026

The Church of St. Charles Borromeo, Washington Township, N. J.
176 Stagecoach Road
Sicklerville, NJ 08081

Our Lady of Peace Parish, Monroe Township, N.J.
32 Carroll Avenue
Williamstown, NJ 08094

St. Joseph's Church, Somers Point, N.J.
606 Shore Road
Somers Point, NJ 08244

The Parish of Saint Monica, Atlantic City, N.J.
2651 Atlantic Avenue
Atlantic City, NJ 08401

The Church St. Thomas More, Cherry Hill, New Jersey
1439 Springdale Road
Cherry Hill, NJ 08003

Saint Damien Parish, Ocean City, N.J.
1337 Ocean Avenue
Ocean City, NJ 08226

Most Precious Blood Parish, Collingswood, N.J.
445 White Horse Pike
West Collingswood, NJ 08107

St. Joseph the Worker Parish, Haddon Township, N.J.
901 Hopkins Road
Haddon Township, NJ 08033

St. Mary's R.C. Church, Delaware Township, N.J.
2001 Springdale Road
Cherry Hill, NJ 08003

Infant Jesus Parish, Woodbury Heights, N.J.
334 Beach Avenue
Woodbury Heights, NJ 08097

The Catholic Community of Christ Our Light, Cherry Hill, N.J.
402 Kings Highway North
Cherry Hill, NJ 08034

Parish of St. Michael the Archangel, Franklinville, N.J.
49 West North Street
Clayton, NJ 08312

The Church of Saint Katharine Drexel, McKee City, New Jersey
6075 West Jersey Avenue
Egg Harbor Township NJ 08234

The Church of Saints Peter and Paul, Washington Township, N. J.
362 Ganttown Road
Turnersville, NJ 08012

Saint Mary of Mount Carmel Parish, Hammonton, N.J.
226 French Street
Hammonton, NJ 08037

St. Stephen's R. C. Church, Pennsauken Township, N. J.
6306 Browning Road
Pennsauken, NJ 08109

St. Bridget's Catholic Church Glassboro N.J.
202 Ellis Street
Glassboro, NJ 08028

Holy Eucharist Parish, Cherry Hill, N.J.
344 Kresson Road
Cherry Hill, NJ 08034

St. Padre Pio Parish, Vineland, N.J.
4680 Dante Avenue
Vineland, NJ 08360

The Parish of St. John Neumann, North Cape May, N.J.
680 Town Bank Road
North Cape May, NJ 08204

St. Joachim Parish, Bellmawr, N.J.
601 West Browning Road
Bellmawr, NJ 08031

Our Lady of Hope Parish, Blackwood, N.J.
701 Little Gloucester Road
Blackwood, NJ 08012

Church of Christ the King, Haddonfield, N.J.
300 Windsor Avenue
Haddonfield, NJ 08033

Notre Dame de la Mer Parish, Wildwood, N.J.
2900 Pacific Avenue
Wildwood, NJ 08260

The Parish of the Holy Cross, Bridgeton, N.J.
46 Central Avenue
Bridgeton, NJ 08302

**Exhibit 2.2.104**

SCHOOLS – TITLE 15A

Archbishop Damiano School
1145 Delsea Drive
Westville Grove, NJ 08093

Pope Paul VI High School, Haddon Township, N.J.
901 Hopkins Road
Haddonfield, NJ 08033

Camden Catholic High School, Cherry Hill, N.J.
Cuthbert Boulevard and Route 38
Cherry Hill, NJ 08002

Holy Spirit High School, Absecon, N.J.
500 South New Road
Absecon, NJ 08201

The Bishop James T. McHugh Regional School, Inc.
2221 NJ State Highway Route 9
Cape May Courthouse, NJ 08210

St. Joseph Child Development Center, Inc.
17 Church St.
Camden, NJ 08105

**Exhibit 2.2.115**

## THE DIOCESE OF CAMDEN PLAN TRUST AGREEMENT

This trust agreement (this "**Trust Agreement**") is made and entered into by and between The Diocese of Camden, New Jersey (the "**Diocese**") and Matthew Dundon (the "**Trust Administrator**") pursuant to the *First Modified Eighth Amended Chapter 11 Plan of Reorganization* dated September 22, 2023 (together with all amendments, exhibits, supplements, and schedules thereto, the "**Plan**") filed in the Diocese's chapter 11 bankruptcy case, Case No. 20-21257 (JNP), pending before the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**").  Unless otherwise stated in this Trust Agreement, capitalized terms used in this Trust Agreement shall have the meanings ascribed to them in the Plan, the Confirmation Order (defined below), and/or title 11 of the United States Code (the "**Bankruptcy Code**").

## RECITALS

A.    On the Petition Date, the Diocese filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Diocese continues to operate its business as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.    The Bankruptcy Court entered an order confirming the Plan (the "**Confirmation Order**") on [●], 2023.

C.    The Plan anticipates the creation of the Trust and the transfer and assignment to the Trust of the Trust Assets.

D.    Pursuant to the Plan, the Trust is to use the Trust Assets to pay Class 5 Claims and Class 6 Claims and carry out the purposes of the Plan, among other obligations set forth therein.

E.    Effective as of the date the Confirmation Order is entered, the Trust is established for the benefit of the Beneficiaries of the Trust (each defined below) and is intended to qualify as a "qualified settlement fund" within the meaning of Section 468B of the Internal Revenue Code of 1986, as amended (the "**Tax Code**") and Sections 1.468B-1 to -5 of the regulations promulgated under the Tax Code (the "**Treasury Regulations**").

**NOW, THEREFORE**, pursuant to the Plan and the Confirmation Order, in consideration of the premises and provisions in the Plan, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, it is agreed as follows:

## DECLARATION OF TRUST

Subject to approval by the Bankruptcy Court and effective as of the Effective Date, the Diocese hereby absolutely assigns to the Trust, and to its successors in trust and its successors and assigns, all rights, title, and interest of the Diocese in and to the Trust Assets;

**TO HAVE AND TO HOLD** unto the Trust and its successors in trust and its successors and assigns forever;

2

**IN TRUST NEVERTHELESS** upon the terms and subject to the conditions set forth in this Trust Agreement and for the benefit of the Beneficiaries, as defined below, as and to the extent provided in the Plan, and for the performance of, and compliance with, the terms of this Trust Agreement, the Plan, and the Confirmation Order;

**PROVIDED, HOWEVER**, that upon termination of the Trust in accordance with Article IV of this Trust Agreement, this Trust Agreement shall cease, terminate, and be of no further force and effect; and

**IT IS HEREBY FURTHER COVENANTED AND DECLARED** that the Trust Assets are to be held and applied by the Trust Administrator upon the further covenants and terms and subject to the conditions set forth in this Trust Agreement.

## ARTICLE I.
## AGREEMENT OF TRUST

1.1    <u>Creation and Name</u>.  Effective as of the date the Confirmation Order is entered, the Diocese hereby creates the Trust known as "The Diocese of Camden Plan Trust," which is the Trust provided for in the Plan.  In the event of any inconsistency between the Plan and this Trust Agreement, the terms of the Plan shall govern.

1.2    <u>Purpose</u>.  The purpose of the Trust is to assume responsibility for preserving, managing, and distributing Trust Assets to Class 5 Claimants and distributing the Unknown Abuse Claims Reserve to Class 6 Claimants in accordance with this Trust Agreement, the Plan, the Confirmation Order and the Trust Distribution Plan.

1.3    <u>Transfer of Trust Assets</u>.  Pursuant to the Plan and upon the Effective Date, the Diocese shall irrevocably transfer, absolutely grant, assign, convey, set over, and deliver to the Trust at all times as set forth in the Plan, all of the Diocese's rights, titles, and interests in and to the Trust Assets in accordance with the Plan to be held in trust and for the uses and purposes stated in this Trust Agreement and in the Plan.  The Trust Administrator is hereby authorized to file with the proper governmental authorities any and all documents necessary or helpful to establish the Trust as of the date the Confirmation Order is entered.

1.4    <u>Transfer of Confidential Information</u>.  The Trust Administrator shall maintain the confidentiality of all documents and follow the confidentiality procedures provided for in the Bankruptcy Court's *Order Establishing Deadlines for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof* [ECF 409].

1.5    <u>Irrevocability</u>.  The Trust shall be irrevocable.  The Diocese shall not alter, amend, revoke, or terminate the Trust.  The Diocese shall have no power or authority to direct the Trust Administrator to return any of the Trust Assets to the Diocese.

1.6    <u>Beneficiaries</u>.  The beneficiaries of the Trust are Class 5 Claimants and Class 6 Claimants under the Plan whose Claims are allowed by the Abuse Claims Reviewer (each a "**<u>Beneficiary</u>**" and collectively, the "**<u>Beneficiaries</u>**").

3

1.7     Acceptance of Assets and Assumption of Liabilities.

1.7.1    In furtherance of the purposes of the Trust, the Trust Administrator hereby accepts the role of trustee of the Trust and accepts the grant, assignment, transfer, conveyance and delivery of the Trust Assets to the Trust, subject to the terms and conditions set forth in this Trust Agreement, the Plan, the Confirmation Order and the Trust Distribution Plan.

1.7.2    In furtherance of the purposes of the Trust, the Trust Administrator, on behalf of the Trust, hereby expressly assumes all responsibility for preserving, managing and distributing Trust Assets to the Beneficiaries.  The Claims of the Beneficiaries will be evaluated by the Abuse Claims Reviewer in accordance with the Trust Distribution Plan.

1.7.3    The Trust Administrator shall have all of the rights, powers and duties set forth in this Trust Agreement, the Trust Distribution Plan, and the Plan, and available under applicable law, for accomplishing the purposes of the Trust.  The Trust Administrator's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the applicable provisions of the Plan, the purpose of the Trust, and applicable law.  The Trust Administrator shall have the authority to bind the Trust within the limitations set forth in this Trust Agreement, but shall be acting in the capacity as Trust Administrator, and not individually, for all purposes contained in this Trust Agreement.

1.7.4    In furtherance of the purposes of the Trust, the Trust Administrator assumes responsibility for (a) making payments to the Beneficiaries and Holders of Unknown Claims; (b) receiving, collecting, liquidating, maintaining, and distributing the Trust Assets; and (c) fulfilling all other obligations of the Trust under this Trust Agreement, the Plan, the Confirmation Order, and the Trust Distribution Plan.  The Trust will be administered consistent with the purpose of the Trust and with no objective to continue or to engage in the conduct of a trade or business, except to the extent reasonably necessary to preserve the value of the Trust Assets or as otherwise provided in the Plan, the Confirmation Order or the Trust Distribution Plan.

1.7.5    All Trust expenses and all liabilities of the Trust with respect to the Beneficiaries shall be payable solely by the Trust Administrator out of the Trust Assets.

## ARTICLE II.
## CORPUS OF THE TRUST

2.2     Trust Composition.  The Trust Assets shall include all property transferred to the Trust pursuant to the Plan, Confirmation Order, and any future orders of the Bankruptcy Court, including without limitation, all rights of every kind, nature, and description transferred to the Trust pursuant to the Plan.

2.3     Transfer to Trust.  Upon the Effective Date, pursuant to the Plan and Confirmation Order, title to and all rights and interests in the Trust Assets shall be transferred to the Trust free and clear of all Liens, claims, encumbrances or Interests of any kind in the Trust Assets of any other Person (including all Liens, claims, encumbrances or Interests of creditors of the Diocese) in accordance with sections 1123, 1141, and 1146(a) of the Bankruptcy Code, except as otherwise

4

provided for in the Plan. The Trust Administrator, on behalf of the Trust, shall receive the Trust Assets when they are transferred to the Trust.

2.4    <u>Trust Administrator's Right to and Title and Interest in Trust Assets</u>. Upon the transfer of the Trust Assets, the Trust succeeds to all of the Diocese's and the Estate's right to and title and Interest in the Trust Assets, and the Diocese and the Estate shall have no further right to, or title or Interest in or with respect to, the Trust Assets or the Trust.

2.5    <u>No Tax on Transfers to Trust</u>. Pursuant to section 1146(a) of the Bankruptcy Code, the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Trust, including any deeds, bills of sale, or assignments executed in connection with any transfer to the Trust or receipt or disposition/sale of assets by the Trust contemplated by the Plan, shall not be subject to any stamp tax, real estate transfer tax, excise tax, sales tax, use tax, or similar tax.

2.6    <u>Spendthrift Provision</u>. To the fullest extent permitted by law, neither the principal nor income of the Trust, in whole or in part, shall be subject to (a) any legal or equitable claims of creditors of any Beneficiary or others, (b) legal process, or (c) voluntary or involuntary transfer, assignment, anticipation, pledge, or other form of alienation or encumbrance except as may be ordered by the Bankruptcy Court.

2.7    <u>Trust Corpus</u>. The entirety of the Trust's corpus shall be available to pay the Beneficiaries and authorized expenses. The Trust Corpus shall be allocated, administered, and distributed as provided in this Trust Agreement, the Plan, the Confirmation Order, and the Trust Distribution Plan.

2.8    <u>Unknown Abuse Claims Reserve</u>. $1,250,000 of the Trust Assets shall be set aside in a reserve fund owned by the Trust for Unknown Abuse Claims pursuant to the Plan (the "**Unknown Abuse Claims Reserve**"). The payments to holders of Unknown Abuse Claims shall be made in accordance with the Trust Distribution Plan. The Unknown Abuse Claims Reserve will terminate in accordance with the Plan and the Trust Distribution Plan. After the Unknown Claims Reserve Establishment Period terminates, to the extent there are any remaining funds after payment to all Unknown Abuse Claims pursuant to the Trust Distribution Plan, such remaining funds shall be retained by the Trust, with no further restrictions on the Trust's use of such funds except for the general restrictions on use of Trust Assets provided for herein. For the avoidance of doubt, the Unknown Abuse Claims Reserve shall be treated as assets of the Trust and the Class 6 Claimants shall be treated as Beneficiaries of the Trust to the extent otherwise provided in this Trust Agreement, the Plan, and the Trust Distribution Plan.

## ARTICLE III.
## POWERS AND DUTIES OF TRUST ADMINISTRATOR

3.1    <u>Trust Administrator's Bond</u>. The Trust Administrator shall not be required to post any bond, surety, or other security for the performance of the Trust Administrator's duties unless otherwise ordered by the Bankruptcy Court, and, in the event the Trust Administrator is so otherwise ordered, all reasonable costs and expenses of procuring any bond or surety shall be borne by the Trust and paid for from the Trust Assets.

5

4883-2962-4449, v. 2

3.2     <u>Powers and Duties</u>.  The Trust Administrator shall have, in addition to any other powers and duties conferred on the Trust Administrator by applicable trust law (to the extent not inconsistent with applicable bankruptcy law, the Plan, and the Confirmation Order), the Plan, the Confirmation Order, and the Trust Distribution Plan, the following powers and duties:

3.2.1    To act as custodian of, and to receive, control, manage, liquidate, monetize, and dispose of, all Trust Assets and the Unknown Abuse Claims Reserve for the benefit of the Beneficiaries as the Trust Administrator deems appropriate to accomplish the purpose of the Trust, in accordance with the terms contained in this Trust Agreement, the Plan, the Confirmation Order, and the Trust Distribution Plan.

3.2.2    To abandon any property which the Trust Administrator determines in the Trust Administrator's reasonable discretion to be of *de minimus* value or of more burden than value to the Trust.

3.2.3    To protect and enforce the rights in and to the Trust Assets and the Unknown Abuse Claims Reserve by any method deemed appropriate, including without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium, or similar law and general principles of equity.

3.2.4    To enter into contracts in the course of administering the Trust Assets and the Unknown Abuse Claims Reserve under this Trust Agreement, the Plan, the Confirmation Order, and the Trust Distribution Plan.

3.2.5    To open and maintain bank accounts on behalf of the Trust, deposit funds in the bank accounts, and draw checks on the bank accounts, as appropriate under this Trust Agreement, the Plan, and the Confirmation Order.  Notwithstanding anything herein to the contrary, the Trust Administrator may open and maintain bank accounts on behalf of the Trust after the date the Confirmation Order is entered but prior to the Effective Date.

3.2.6    To obtain all reasonably available insurance coverage with respect to any property that is, or may in the future become, a Trust Asset.

3.2.7    To incur on behalf of the Trust, and pay from the assets of the Trust, all fees, costs, and expenses of administering the Trust as provided this Trust Agreement, the Plan, the Confirmation Order, and the Trust Distribution Plan.  These fees, costs, and expenses include:  (a) the fees of bankruptcy claims and/or distribution agents, (b) the fees and costs of professionals employed by the Trust Administrator (the "**Professionals**"), including without limitation, the Abuse Claim Reviewer, investment advisors, accountants, agents, managers, attorneys-at-law, actuaries, or auditors, and (c) the premiums charged by insurers, including without limitation, professional liability insurers.

3.2.8    In accordance with the evaluation of the Abuse Claim Reviewer under the Trust Distribution Plan, to make distributions, in accordance with the Trust Distribution Plan, to Beneficiaries who have provided signed copies of all releases as required by the Plan.

6

3.2.9    In the Trust Administrator's discretion, to rely on the authenticity of the signature of the Abuse Claim Reviewer, and the accuracy of the information set forth by, and the reasonableness of the determination of, the Abuse Claim Reviewer in the administration of the Trust Distribution Plan and assessment of the Class 5 Claims and Class 6 Claims without any verification or confirmation.

3.2.10  In the Trust Administrator's discretion, as a party in interest, to seek enforcement of any provision of the Plan or Confirmation Order pertaining to the Trust.

3.2.11  To retain any attorney-at-law, consultant, expert, accountant, investment advisor, bankruptcy management company, or such other agents and advisors as are necessary and appropriate to effectuate the purpose of, and maintain and administer, the Trust and shall be entitled to rely on advice given by such advisors within his, her, or its areas of competence.

3.2.12  Subject to consultation with the Trust Advisory Committee (defined below), to remove the Abuse Claim Reviewer for cause.  For purposes of this Trust Agreement, "**cause**" shall mean (a) the willful and continued refusal by the Abuse Claim Reviewer to perform the Abuse Claim Reviewer's duties as set forth in this Trust Agreement, the Trust Distribution Plan, and the Plan, (b) gross negligence, gross misconduct, fraud, embezzlement, or theft, (c) a breach of fiduciary duty, or (d) other cause as the Trust Administrator shall in good faith determine.  In the event the Abuse Claim Reviewer resigns, is removed, or is otherwise unable to perform the Abuse Claim Reviewer's obligations, the Trust Administrator, but subject to consultation with the Trust Advisory Committee, shall have exclusive authority to appoint a new Abuse Claim Reviewer. Nothing contained in this Trust Agreement shall prohibit the Trust Administrator from also serving as the Abuse Claim Reviewer if the Trust Administrator determines, but subject to consultation with the Trust Advisory Committee, that serving as both the Trust Administrator and the Abuse Claim Reviewer is in the best interest of the Trust and the Beneficiaries.

3.2.13  To make, sign, execute, acknowledge, and deliver any documents that may be necessary or appropriate to effectuate the purpose of the Plan or the Trust or to maintain and administer the Trust.

3.2.14  To seek the examination of any Person under, and subject to, the provisions of the Bankruptcy Rules, including without limitation Bankruptcy Rule 2004.

3.2.15  To amend, modify, or alter this Trust Agreement by filing a motion with the Bankruptcy Court, with notice to the Beneficiaries (through their counsel when known, and otherwise directly), the Diocese, and any or all other parties in interest.  For the avoidance of doubt, the amendments, modifications, or alterations may not be inconsistent with the terms of the Plan, the terms of the Confirmation Order, or the purpose of the Trust, as identified in Section 1.2 of this Trust Agreement.

3.2.16  Upon any event terminating the Trust, to defer distribution of Trust Assets and the Unknown Abuse Claims Reserve for a reasonable time needed to wind up the

affairs of the Trust, including time needed to provide for payment of debts and expenses, although the Beneficiaries' rights to distributions shall vest immediately.

3.2.17  To comply with section 345 of the Bankruptcy Code with regard to the investment of the Trust Assets.  The Trust Administrator is relieved of any obligation to diversify.

3.2.18  To establish the accounts, funds, and reserves, as required by the Plan, for ease of administration.  Nothing in this provision shall restrict the Trust Administrator's authority to pool the accounts, funds, or reserves for investment purposes or shall require separate bank accounts for the accounts, funds, or reserves.

3.2.19  To be responsible for only the Trust Assets and the Unknown Abuse Claims Reserve delivered to the Trust and have no duty to make, nor incur any liability for failing to make, any search for unknown property or liabilities.

3.2.20  To defend and indemnify the Covered Parties against Abuse Claims as provided in the Plan, the Confirmation Order, and/or the Trust Distribution Plan;

3.2.21  To obtain all recoveries on account of Transferred Insurance Interests as set forth in the Trust Distribution Plan and to assert and/or assign to any Abuse Claimant all Coverage Claims and Extra-Contractual Claims that currently exist or may arise in the future against Non-Settling Insurers.

3.2.22  To commence Coverage Claims and Extra-Contractual Claims against any Non-Settling Insurers in respect of the Transferred Insurance Interests as set forth in the Trust Distribution Plan.

3.2.23  To request an expedited determination of taxes of the Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Trust for all taxable periods through the dissolution of the Trust; and

3.2.24  To take any action required to enforce the Insurance Settlement Agreements.

3.3      <u>Limitations on the Trust Administrator</u>.  Notwithstanding anything in this Trust Agreement to the contrary, the Trust Administrator shall not do or undertake any of the following:

3.3.1    Guaranty any debt other than as provided for in this Trust Agreement or as required by the Plan;

3.3.2    Make loan(s) of Trust Assets;

3.3.3    Make any transfer or distribution of Trust Assets other than those authorized in this Trust Agreement, the Plan, the Confirmation Order, or the Trust Distribution Plan;

3.3.4    Engage in any trade or business; or

8

3.3.5    Engage in any investments or activities inconsistent with the treatment of the Trust as a "qualified settlement fund."

# ARTICLE IV.
## TERMINATION OF THE TRUST

4.1    <u>Pre-Effective Date Termination</u>.  The Trust Administrator, with the written consent of the Tort Committee, may terminate the Trust if (a) the Plan does not become effective within one (1) year from the date the Confirmation Order is entered by the Bankruptcy Court or (b) the Chapter 11 Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code (the "**Pre-Effective Date Termination**").  Upon the Pre-Effective Date Termination of the Trust, the Trust Agreement shall be null and void and of no force and effect, with the Trust Administrator and the Diocese both discharged from any and all duties and obligations provided for in this Trust Agreement.

4.2    <u>Post-Effective Date Termination</u>.  The Trust Administrator shall terminate the Trust after (a) the Trust Administrator's liquidation, administration, and distribution of the Trust Assets and the Unknown Abuse Claims Reserve in accordance with this Trust Agreement, the Plan, the Confirmation Order, and/or the Trust Distribution Plan and (b) the Trust Administrator's full performance of all other duties and functions set forth in this Trust Agreement and the Plan (the "**Post-Effective Date Termination**").

4.3    <u>Post-Effective Date Termination Procedures</u>.    After the Post-Effective Date Termination of the Trust and solely for the purpose of liquidating and winding up its affairs, the Trust Administrator shall continue to act as Trust Administrator until the Trust Administrator's duties in this Trust Agreement have been fully performed.  The Trust Administrator shall retain the books, records, documents, and files that shall have been delivered to, or created by, the Trust Administrator until distribution of all the Trust Assets.  For purposes of this provision, the Trust Assets and the Unknown Abuse Claims Reserve will be deemed distributed when the total amount remaining in the Trust is less than $50,000 and the Trust Administrator has decided that he or she can no longer make a cost efficient pro rata distribution of such Trust Assets and/or Unknown Abuse Claims Reserve to Beneficiaries.  At the Trust Administrator's discretion, all of the books, records, documents, and files may be destroyed at any time following the later of: (a) the first anniversary of the final distribution of the Trust Assets and the Unknown Abuse Claims Reserve or (b) the date until which the Trust Administrator is required by applicable law to retain the books, records, documents, and files; provided that, notwithstanding the foregoing, the Trust Administrator shall not destroy or discard any books, records, documents, or files relating to the Trust without giving the Diocese and the Beneficiaries reasonable prior written notice.

4.4    <u>Post-Effective Date Termination Distribution</u>.    Upon Post-Effective Date Termination of the Trust, provided that all fees and expenses of the Trust have been paid or provided for in full, the Trust Administrator will deliver all funds and other investments in the Trust, if any, including any investment earnings to a non-profit organization whose mission includes supporting or advocating for survivors of child sexual abuse.

4.5    <u>Discharge, Exculpation, and Exoneration</u>.  Upon Post-Effective Date Termination of the Trust and accomplishment of all activities described in this Article, the Trust Administrator

and the Professionals shall be discharged and exculpated from liability, and the Trust Administrator's bond (if any), shall be exonerated except for acts or omissions resulting from the recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud of the Trust Administrator or his designated agents or representatives.  The Trust Administrator may, at the expense of the Trust, seek an order of the Bankruptcy Court confirming the discharges, exculpations, and exoneration referenced in this Section.

## ARTICLE V.
## IMMUNITY, LIABILITY, AND INDEMNIFICATION OF TRUST ADMINISTRATOR

5.1     <u>Limitations on Liability</u>.  Neither the Trust Administrator nor any of the Trust Administrator's duly designated agents, representatives, or Professionals shall be liable for any act or omission taken or omitted by the Trust Administrator in good faith, other than acts or omissions resulting from the recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud of the Trust Administrator or the Trust Administrator's designated agents, representatives, or Professionals.  The Trust Administrator may, in connection with the performance of the Trust Administrator's functions, and in the Trust Administrator's sole and absolute discretion, consult with the Professionals and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with the advice or opinions rendered by the Professionals.  Notwithstanding this authority, the Trust Administrator shall be under no obligation to consult with the Professionals, and the Trust Administrator's good faith determination not to consult with the Professionals shall not result in the imposition of liability on the Trust Administrator, unless the determination is based on the Trust Administrator's recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud.

5.2     <u>No Recourse Against the Trust Administrator Personally</u>.  No recourse shall be had, directly or indirectly, against the Trust Administrator personally, or against any employee, contractor, or Professional retained by the Trust Administrator in accordance with the terms of this Trust Agreement, Plan, or Confirmation Order, by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking, obligation, covenant, or trust agreement executed by the Trust Administrator in implementation of this Trust Agreement or the Plan or by reason of the creation of any indebtedness by the Trust Administrator under the Plan for any purposes authorized by this Trust Agreement or the Plan, it being expressly understood and agreed that any promise, contract, instrument, undertaking, obligation, covenant, or trust agreement entered into by the Trust Administrator, whether in writing or otherwise, shall be enforceable only against, and be satisfied only out of, the Trust Assets and shall be evidence only of a right of payment out of the Trust Assets.  The Trust Administrator may be held liable for the Trust Administrator's recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud; and if liability for these grounds is established, recourse may be had directly against the Trust Administrator.  The Trust will not be covered by a bond.

5.3     <u>Indemnification</u>.  The Trust Administrator, using Trust Assets, shall defend, indemnify, and hold harmless the Trust Administrator, the Trust Administrator's officers, directors, attorneys, agents, representatives, and employees to the fullest extent that a corporation or trust organized under the laws of the state of New Jersey is entitled to defend, indemnify, and hold harmless its trustees, officers, directors, attorneys, agents, representatives, and employees

10

against any and all costs (including attorneys' fees and costs), judgments, awards, amounts paid in settlement, liabilities, expenses, claims, damages, or losses incurred by them in the performance of their duties under this Trust Agreement; provided that neither the Trust Administrator nor the Trust Administrator's officers, directors, attorneys, agents, representatives, or employees shall be defended, indemnified, or held harmless in any way for any liability, expense, claim, damage, or loss for which they are ultimately held liable under Section 5.1 of this Trust Agreement.

## ARTICLE VI.
## COMPENSATION AND EXPENSE
## REIMBURSEMENT OF TRUST ADMINISTRATOR AND ITS AGENTS

The Trust Administrator shall receive fair and reasonable compensation for his or her services based upon his or her regular hourly rate, which are subject to adjustment from time to time, plus reimbursement of all reasonable and documented costs and expenses.  The Trust Administrator shall notify the Trust Advisory Committee of any increases in his or her hourly rate. The Trust Administrator's compensation structure may be modified by agreement between the Trust Administrator and the Trust Advisory Committee.

All Professionals retained by the Trust Administrator shall be entitled to reasonable compensation for services rendered and reimbursement of expenses reasonably incurred in rendering such services.

The payment of the fees and expenses of the Trust Administrator and Professionals retained by the Trust Administrator shall be made in the ordinary course of business and, unless otherwise required by an order of the Bankruptcy Court, shall not be subject to the approval of the Bankruptcy Court, but such payment shall be subject to the following procedures:

(i)     All Professionals retained by the Trust Administrator shall deliver their invoices or fee statements (which invoices and/or fee statements shall be reasonably detailed (but may include redactions for privilege) and, with respect to attorney fee statements, shall not be provided in summary fashion) on a monthly basis via electronic mail to the Trust Administrator before payment of such invoices or fee statements shall be approved.

(ii)    The Trust Administrator shall deliver reasonably detailed monthly invoices or fee statements via electronic mail to the members of the Trust Advisory Committee.

(iii)   The Trust Administrator and the Trust Advisory Committee, as applicable, shall have fourteen (14) days from the date of delivery of any invoice or fee statement to provide written notice of an objection to the invoice or fee statement to the Professional or Trust Administrator, as applicable, seeking compensation and/or reimbursement of expenses.

(iv)    For an objection to an invoice or fee statement to be valid, it shall set forth in reasonable detail the specific fees objected to and the basis for the objection, and be sent via electronic mail to the Trust Administrator or the Professional (with a copy to the Trust Administrator), as applicable.  The uncontested portion of each

11

invoice or fee statement shall be deemed approved and shall be paid within twenty (20) days after its original delivery to the Trust Administrator.

(v)     Any objection to an invoice or fee statement that remains unresolved fifteen (15) days after it is made in writing may be submitted for resolution to the Bankruptcy Court (via motion on notice to the Trust Administrator) by the party seeking payment.

## ARTICLE VII.
## TRUST ADVISORY COMMITTEE

7.1     <u>Members</u>.  The Trust Advisory Committee shall be appointed by the Tort Committee and formed as of the Effective Date to oversee certain actions of the Trust Administrator as set forth herein.  Upon the death or resignation of a member of the Trust Advisory Committee or removal for good cause shown, the remaining members of the Trust Advisory Committee may, but shall not be required to, fill the applicable vacancy on the Trust Advisory Committee with a new member, subject to the reasonable consent of the Trust Administrator, which consent shall not be unreasonably withheld.

7.2     <u>Term of Service</u>.  Upon the completion of all the Trust Administrator's duties, responsibilities, and obligations under the Plan and this Trust Agreement, the Trust Advisory Committee shall be automatically disbanded and its members shall have no further duties, responsibilities, and obligations in connection with the Chapter 11 Case or the Plan and its implementation.

7.3     <u>Reporting to the Trust Advisory Committee</u>.  After the Effective Date, and until the Trust Advisory Committee is disbanded, the Trust Administrator shall provide the Trust Advisory Committee with periodic updates on its and the Abuse Claims Reviewer's progress.  Nothing herein shall preclude the Trust Advisory Committee from reasonably requesting additional information from the Trust Administrator in the exercise of the Trust Advisory Committee's duties under the Plan or this Trust Agreement.

7.4     <u>Fiduciary</u>.  The members of the Trust Advisory Committee shall act in a fiduciary capacity on behalf of the interests of all Beneficiaries.

7.5     <u>No Compensation</u>.  Members of the Trust Advisory Committee shall receive no compensation from the Diocese, the Trust Administrator, or the Trust on account of their membership on the Trust Advisory Committee except for reimbursement of their reasonable and documented out of pocket expenses (which, for the avoidance of doubt, shall not include the fees or expenses of any professionals retained individually by any member of the Trust Advisory Committee).

12

## ARTICLE VIII.
## <u>SUCCESSOR TRUST ADMINISTRATOR</u>

8.1     <u>Vacancy Caused by the Trust Administrator's Resignation or Removal</u>.

  8.1.1   The Trust Administrator may resign at any time upon thirty (30) days written notice to be filed with the Bankruptcy Court.  The outgoing trustee (the "**<u>Outgoing Trust Administrator</u>**") shall, within thirty (30) days after the Outgoing Trust Administrator's resignation takes effect, deliver to the successor trustee (the "**<u>Successor Trust Administrator</u>**") all of the Trust Assets which were in the possession of the Outgoing Trust Administrator along with a complete list of Trust Assets and a complete accounting of all transactions engaged by the Outgoing Trust Administrator while serving as the Trust Administrator.

  8.1.2   The Bankruptcy Court may remove a Trust Administrator for cause, which cause shall include, but shall not be limited to, the factors set forth in any applicable New Jersey law.  The removal will take effect upon the date the Bankruptcy Court specifies.  In the event of removal, the Trust Administrator shall, within thirty (30) days after such removal takes effect, or at some earlier date as the Bankruptcy Court may specify, deliver to the Successor Trust Administrator all of the Trust Assets which were in the possession of the Outgoing Trust Administrator along with a complete list of Trust Assets and a complete accounting of all transactions engaged in by the Outgoing Trust Administrator while serving as such**.**

8.2     <u>Outgoing Trust Administrator Obligations</u>.  In the event of the resignation or the removal of the Trust Administrator, the Outgoing Trust Administrator, in addition to the duties imposed under Sections 8.1.1 or 8.1.2, shall:

  8.2.1   Execute and deliver by the effective date of the resignation or removal the documents, instruments, records, and other writings as may be reasonably requested by the Successor Trust Administrator to effect the resignation or removal of the Outgoing Trust Administrator and the conveyance of the Trust Assets and the Unknown Abuse Claims Reserve to the Successor Trust Administrator.

  8.2.2   Deliver to the Successor Trust Administrator all documents, instruments, records, and other writings relating to the Trust Assets and the Unknown Abuse Claims Reserve as may be in the possession or under the control of the Outgoing Trust Administrator.

  8.2.3   Otherwise assist and cooperate in effecting the assumption of the Outgoing Trust Administrator's obligations and functions by the Successor Trust Administrator.

  8.2.4   The Outgoing Trust Administrator hereby irrevocably appoints the Successor Trust Administrator (and any interim trustee) as the Outgoing Trust Administrator's attorney-in-fact and agent with full power of substitution for the Outgoing Trust Administrator and the Outgoing Trust Administrator's name, place, and stead to do any and all acts that the Outgoing Trust Administrator is obligated to perform under this Trust Agreement.  The appointment of the Successor Trust Administrator as the Outgoing

13

Trust Administrator's attorney-in-fact and agent shall not be affected by the subsequent disability or incompetence of the Outgoing Trust Administrator. The Bankruptcy Court may also enter any order necessary to effect the termination of the appointment of the Outgoing Trust Administrator and the subsequent appointment of the Successor Trust Administrator.

8.3    Appointment of Successor Trust Administrator. Any vacancy in the office of the Trust Administrator shall be filled by the nomination of a majority of the members of the Trust Advisory Committee

8.4    Preservation of Record of Changes in Trust Administrators. A copy of each instrument of resignation, removal, appointment, and acceptance of appointment shall be attached to an executed counterpart of this Trust Agreement.

## ARTICLE IX.
## TRUST ADMINISTRATOR REPORTING AND DISCHARGE

9.1    Annual Accountings. The Trust Administrator shall prepare, at least annually, a written accounting of the administration of the Trust listing the current Trust Assets and the Unknown Abuse Claims Reserve with fair market values and detailing all transactions that occurred during the period covered by the accounting. Each accounting shall be filed with the Bankruptcy Court no later than April 30 of the following year for as long as the Chapter 11 Case remains open and pending before the Bankruptcy Court. Copies of the accounting shall be available to the Beneficiaries upon request. However, the Trust Administrator shall redact any and all confidential and personal identifying information from any and all accountings or reports filed with the Bankruptcy Court or provided to any Beneficiary.

9.2    Approval of Accountings and Discharge of the Trust Administrator. At any time when the Chapter 11 Case is open, the Trust Administrator may file with the Bankruptcy Court a motion for approval of any accounting described in Section 9.1 of this Trust Agreement. Upon the entry of an order of the Bankruptcy Court approving the accounting, the Trust Administrator shall be discharged from all liability to the Trust, any Beneficiary, or any Person who has or may have a claim against the Trust Administrator or Trust for acts or omissions in the Trust Administrator's capacity as Trust Administrator with respect to all assets listed and transactions detailed in the accounting.

## ARTICLE X.
## SECTION 468B SETTLEMENT FUND

10.1    Qualification. In accordance with the Plan, the Trust Administrator shall take all reasonable steps to ensure that the Trust will qualify as, and remain, a "qualified settlement fund" within the meaning of Section 468B of the Tax Code and the Treasury Regulations. The Diocese shall be the "transferor" within the meaning of Treasury Regulation Section 1.468B-1(d)(1). The Trust Administrator shall be classified as the "administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3).

10.2    All Events Test and Economic Performance Requirement. It is intended that the transfer of the Trust Assets to the Trust shall satisfy the "All Events Test" and the "Economic

14

Performance" requirement of Section 461(h)(1) of the Tax Code and Treasury Regulation Section 1.461-1(a)(2).

10.3    Employer Identification Number.    Upon establishment of the Trust, the Trust Administrator shall apply for an employer identification number for the Trust in accordance with Treasury Regulation Section 1.468B-2(k)(4).

10.4    Relation-Back Election.    If applicable, the Trust Administrator and the Diocese shall fully cooperate in filing a relation-back election under Treasury Regulation Section 1.468B-1(j)(2) to treat the Trust as coming into existence as a settlement fund as of the earliest possible date.

10.5    Filing Requirements.    The Trust Administrator shall cause to be filed, on behalf of the Trust, all required federal, state, and local tax returns in accordance with the provisions of Treasury Regulation Section 1.468B-2(k)(1).    The Diocese shall supply to the Trust Administrator and to the Internal Revenue Service (the "**IRS**") the statement described in Treasury Regulation Section 1.468B-3(e)(2) no later than February 15 of the year following each calendar year in which the Diocese makes a transfer to the Trust.

10.6    Broad Powers of the Trust Administrator.    The Trust Administrator is empowered to take all actions, including any action consistent with those expressly set forth in Article IX of this Trust Agreement, as the Trust Administrator deems necessary to reasonably ensure that the Trust is treated as a "qualified settlement fund" under Section 468B of the Tax Code and the Treasury Regulations.    Further, the Trust Administrator may, unilaterally and without order from the Bankruptcy Court, amend, either in whole or in part, any administrative provision of this Trust Agreement which causes unanticipated tax consequences or liabilities inconsistent with this Article X of this Trust Agreement.

## ARTICLE XI.
## BENEFICIARIES

11.1    Register.    The Trust Administrator shall keep a register (the "**Register**") in which the Trust Administrator shall at all times maintain the names and addresses of the Beneficiaries and the actual distributions made to the Beneficiaries pursuant to the Plan and Trust Distribution Plan.    The Trust Administrator may rely upon the Register for the purposes of delivering distributions or notices.    In preparing and maintaining the Register, the Trust Administrator may rely on the name and address of each Holder of a Claim as set forth in a Proof of Claim filed by the Holder, or proper notice of a name or address change, which has been delivered by the Beneficiary to the Trust Administrator.    The Trust Administrator shall be obligated to maintain the confidentiality of all names, addresses, and any and all other personally identifying information of the Beneficiaries provided to the Trust Administrator.

11.2    Rights of Beneficiaries.    The rights of a Beneficiary under this Trust Agreement shall, upon the death or incapacity of an individual Beneficiary, pass to the legal representative of the Beneficiary.    A Beneficiary shall have no title to, right to, possession of, management of, or control of the Trust Assets or Unknown Abuse Claims Reserve, or any right to call for a partition or division of the Trust Assets.    Title to all the Trust Assets shall be vested in the Trust

15

Administrator, and the sole interest of the Beneficiaries shall be the rights and benefits given to the Beneficiaries under this Trust Agreement, the Plan, the Confirmation Order, and the Trust Distribution Plan.

      11.3   <u>Tax Identification Numbers</u>.  The Trust Administrator shall require any Beneficiary to furnish to the Trust Administrator the Beneficiary's employer or taxpayer identification number or social security number as assigned by the IRS, and other records or documents necessary to satisfy the Trust Administrator's tax reporting obligations (including, but not limited to, certificates of non-foreign status).  The Trust Administrator shall condition the payment of any distribution to any Beneficiary upon receipt of the number and records or documents.

**ARTICLE XII.**
**<u>MISCELLANEOUS PROVISIONS</u>**

      12.1   <u>Plan Incorporation</u>.  The terms of the Plan, the Confirmation Order, and the Trust Distribution Plan are incorporated into this Trust Agreement.  In the event of any conflict between the terms of this Trust Agreement and the Plan, the terms of the Plan shall govern.

      12.2   <u>Notices</u>.  All notices or deliveries required or permitted under this Trust Agreement shall be given as directed in the Plan, to the following:

| IF TO THE DEBTOR: | IF TO THE TORT COMMITTEE: |
|---|---|
| TRENK ISABEL SIDDIQI & SHAHDANIAN P.C.<br>Richard D. Trenk, Esq.<br>Robert S. Roglieri, Esq.<br>290 Mt. Pleasant Avenue, Suite 2350,<br>Livingston, New Jersey 07037<br>Email:  rtrenk@trenkisabel.law<br>Email:  rroglieri@trenkisabel.law | LOWENSTEIN SANDLER LLP<br>Jeffrey D. Prol, Esq.<br>Michael A. Kaplan, Esq.<br>Brent Weisenberg, Esq.<br>One Lowenstein Drive<br>Roseland, New Jersey 07068<br>Email:  jprol@lowenstein.com<br>Email:  mkaplan@lowenstein.com<br>Email:  bweisenberg@lowenstein.com |
| IF TO THE TRUST ADMINISTRATOR:<br><br>DUNDON ADVISERS LLC<br>Matthew Dundon<br>Ten Bank Street, Suite 1100<br>White Plains, New York 10606<br>Email:  md@dundon.com | |

      12.3   <u>Waiver</u>.  No failure or delay of any party to exercise any right or remedy pursuant to this Trust Agreement shall affect the right or remedy or constitute a waiver by the party of any right or remedy pursuant to this Trust Agreement.  Resort to one form of remedy shall not constitute a waiver of alternative remedies.

16

12.4    <u>Reimbursement of Costs</u>.  If the Trust Administrator or the Trust, as the case may be, is the prevailing party in a dispute regarding the provisions of this Trust Agreement or the enforcement of a provision of this Trust Agreement, the Trust Administrator or the Trust, as the case may be, shall be entitled to collect from the non-prevailing party any and all costs, reasonable and documented out-of-pocket expenses and fees, including attorneys' fees, incurred in connection with the dispute or enforcement action.

12.5    <u>Entirety of Trust Agreement</u>.  This Trust Agreement supersedes any and all prior oral discussions and agreements with respect to the subject matter in this Trust Agreement.  This Trust Agreement, together with the Exhibits to the Trust Agreement, the Plan, and the Confirmation Order, contain the sole and entire Trust Agreement and understanding with respect to the matters addressed in the Trust Agreement.  It is acknowledged that there are no communications or oral understandings that are contrary to, or that in any way restrict, this Trust Agreement and that all prior agreements or understandings within the scope of the subject matter of this Trust Agreement are, upon execution and delivery of this Trust Agreement, superseded, null, and void.

12.6    <u>Counterparts</u>.  This Trust Agreement may be executed in two or more counterparts, with the same effect as if all signatures on the counterparts appeared on one document, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Facsimile signatures or signatures delivered by any other electronic means shall have the same force and effect as original signatures.

12.7    <u>Captions</u>.  The captions of Articles and Sections are included for convenience only and are to be disregarded in interpreting this Trust Agreement.

12.8    <u>Representation</u>.  It is acknowledged that each of the parties to this Trust Agreement has reviewed this Trust Agreement and has consulted counsel, or knowingly chose not to consult counsel, before executing this Trust Agreement.  Each of the parties to this Trust Agreement relied upon its own judgment and that of its counsel in executing this Trust Agreement and has not relied on, or been induced by, any representation, statement, or act by any party that is not referred to in this instrument.  It is specifically acknowledged and understood that this Trust Agreement has not been submitted to, nor reviewed or approved by, the IRS or the taxing authorities of any state or territory of the United States of America.  Each of the parties entered into this Trust Agreement voluntarily, with full knowledge of its significance, and the Trust Agreement is, in all respects, complete and final.

12.9    <u>Interpretation</u>.  This Trust Agreement has been reached through negotiations between the parties to this Trust Agreement.  Each of the parties to this Trust Agreement acknowledges that the party has participated in the drafting of this Trust Agreement and reviewed the terms of the Trust Agreement and, as such, no rule of construction shall apply which might result in this Trust Agreement being construed in favor or against any of the parties, including without limitation, any rule of construction to the effect that ambiguities ought to be resolved against the drafting party.  The parties to this Trust Agreement have used their own judgment in entering into this Trust Agreement.

17

12.10   <u>Savings Clause</u>.  If any clause or provision of this Trust Agreement shall for any reason be held invalid or unenforceable by the Bankruptcy Court or any other court with competent jurisdiction, such invalidity or unenforceability shall not affect any other clause or provision in this Trust Agreement, but this Trust Agreement shall be construed, insofar as reasonable to effectuate the purpose of this Trust Agreement, as if the invalid or unenforceable provision had never been contained in the Trust Agreement.

12.11   <u>Applicable Law</u>.  This Trust Agreement shall be administered under, governed by, and enforced according to the laws of the State of New Jersey applicable to contracts and trust agreements made and to be performed in this Trust Agreement, except that all matters of federal tax law and the Trust's compliance with Section 468B of the Tax Code and any Treasury Regulations shall be governed by federal tax law and all matters of federal bankruptcy law shall be governed by the Bankruptcy Code and federal bankruptcy law.

Dated:  [●], 2023

**THE DIOCESE OF CAMDEN, NEW JERSEY**

By: _____

Reverend Robert E. Hughes,
Vicar General/Vice President

Dated:  [●], 2023

**TRENK ISABEL SIDDIQI & SHAHDANIAN P.C.**

_____
Richard D. Trenk, Esq.
Robert S. Roglieri, Esq.

*Counsel to The Diocese of Camden, New Jersey*

Dated:  [●], 2023

**THE TRUST ADMINISTRATOR**

By: _____

Name:  <u>Matthew Dundon</u>

18

4883-2962-4449, v. 2

**Exhibit 2.2.117**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| *In re:* | Chapter 11 |
| THE DIOCESE OF CAMDEN, NEW JERSEY, | Case No. 20-21257 (JNP) |
| Debtor. | |

**TRUST DISTRIBUTION PLAN IN CONNECTION WITH**
**FIRST MODIFIED EIGHTH AMENDED**
**PLAN OF REORGANIZATION**

This document is the "Trust Distribution Plan" and the procedures set forth herein are the "Trust Distribution Procedures" defined in the *First Modified Eighth Amended Plan of Reorganization* (the "**Plan**"). The terms of the Plan shall prevail if there is any discrepancy between the terms of the Plan and the terms of this Trust Distribution Plan.[1]

1.    **Abuse Claims Reviewer**. Mr. Paul Finn is the Abuse Claims Reviewer. The Abuse Claims Reviewer shall conduct a review of each of (i) the Proofs of Claim filed by Holders of Class 5 Claims against the Debtor in the Chapter 11 Case (each an "**Abuse Claim**," and the holder of an Abuse Claim being an "**Abuse Claimant**"), including Abuse Claimants who have made the Expedited Distribution Election, and (ii) the Claims Filed by Unknown Abuse Claimants (if any) within 4 years of the Effective Date in order to (a) determine if such Abuse Claim should be Allowed, and (b) if such Claim is Allowed, and the Abuse Claimant has not made the Expedited Distribution Election, value the Abuse Claim using the Evaluation Factors set forth below.

2.    **Document Submission Deadline**. No later than 30 days after the Effective Date (the "**Document Submission Deadline**"), the Diocese, the Other Catholic Entities (together with the Diocese, the "**Diocese Affiliated Entities**") and the Non-Settling Insurers may, but are not required to, provide the Abuse Claims Reviewer and the relevant Abuse Claimant, and his or her counsel (if any), with documents that might assist the Abuse Claims Reviewer in determining whether to Allow an Abuse Claim.

3.    **Abuse Claim Supplement Deadline**. No later than 30 days after the Document Submission Deadline (such date being the "**Abuse Claim Supplement Deadline**"), Abuse Claimants shall be permitted to supplement their Abuse Claim by providing the Abuse Claims Reviewer with a supplement to their Proof of Claim, not to exceed 5 typed pages, addressing the Evaluation Factors (defined below) and any other issue bearing on the evaluation of the Abuse Claim. ***By the Abuse Claim Supplement Deadline, both the Holder of an Abuse Claim and his or her counsel (if any) must execute and submit to the Abuse Claims Reviewer a declaration***

---

[1]    All capitalized terms not defined below have the meaning ascribed to such term in the Plan.

*that the Abuse Claim and any supplements filed in the Chapter 11 Case or provided to the Abuse Claims Reviewer was not filed or provided in violation of 18 U.S.C. § 152.*

4.    **The Initial Review of Class 5 Claims**. Beginning within 30 days of the Abuse Claim Supplement Deadline, the Abuse Claims Reviewer will review (the "**Initial Review Determination**") each Proof of Claim filed by the Holder of a Class 5 Claim, as may have been supplemented in accordance with Paragraph 3 herein, and shall:

(i)    Allow or disallow each Abuse Claim (if an Abuse Claim is Allowed, the Abuse Claimant is an "**Allowed Claimholder**," and its claim, an "**Allowed Claim**"); and

(ii)    If an Abuse Claim is an Allowed Claim (and the Abuse Claimant has not made the Expedited Distribution Election), use the Evaluation Factors set forth below to assign points to the Allowed Claim (the "**Proposed Allowed Claim Amount**").

5.    **Right to Request Additional Information**. Before making an Initial Review Determination, the Abuse Claims Reviewer may request that an Abuse Claimant provide additional documentation with respect to the allowance or value of his or her Abuse Claim.  The Abuse Claims Reviewer's deadline to issue the Initial Claims Review Determination Letter (defined below) shall be extended if such request for additional information is made of an Abuse Claimant.

6.    **Determinations Made Under Initial Claims Review**. Within 60 days of the Abuse Claim Supplement Deadline, or as soon thereafter as is reasonably practicable, the Abuse Claims Reviewer will provide written notice to each Abuse Claimant and his or her counsel (if any) of whether the Abuse Claim is Allowed and if so, the valuation of the Allowed Claim (the "**Initial Claims Review Determination Letter**").

The Initial Claims Review Determination Letter will be sent in accordance with the Abuse Claimant's preference for communication method selected in Part 2 of his or her Proof of Claim; *provided*, *however*, that if an Abuse Claimant is not represented by counsel <u>and</u> selected home voicemail or cell voicemail as his or her preferred communication method, the Initial Claims Review Determination Letter shall be sent via electronic email if an email address was provided on the Proof of Claim. If an email address was not provided, the Initial Claims Review Determination Letter shall be mailed by certified mail, return receipt requested, postage prepaid.

If an Abuse Claimant is sent the Initial Claims Review Determination Letter by email, the Initial Claims Review Determination Letter shall be deemed received upon being sent unless an error message is received by the sender indicating that such email address is invalid, no longer in use or the email has otherwise not been delivered, in which case the Initial Claims Review Determination Letter shall be mailed by certified mail, return receipt requested, postage prepaid.

7.    **Acceptance or Reconsideration of the Initial Claims Review**.  Abuse Claimants may:

(i)    Accept the determinations set forth in the Initial Claims Review Determination Letter; or

(ii)    Seek reconsideration of the determinations set forth in the Initial Claims Review Determination Letter.

(a)    **Acceptance of the Initial Claims Review Determination Letter**.  If the Abuse Claimant accepts the determinations set forth in the Initial Claims Review Determination Letter, the Abuse Claimant need not take any further action other than as provided in the Initial Claims Review Determination Letter.

If an Allowed Claimholder accepts the determinations set forth in the Initial Claims Review Determination Letter, the Allowed Claimholder shall have the right to distributions from the Trust as provided for in paragraph 13 below.

(b)    **Reconsideration Requests**.  To appeal any of the determinations set forth in the Initial Claims Review Determination Letter, an Abuse Claimant must first make a written request for reconsideration to the Abuse Claims Reviewer of (i) the disallowance of his or her Abuse Claim or (ii) the valuation of the Allowed Claim (a "**Reconsideration Request**") within 10 days of receiving the Initial Claims Review Determination Letter (the "**Reconsideration Deadline**").

Any Abuse Claimant who does not submit a Reconsideration Request to the Abuse Claims Reviewer by the Reconsideration Deadline shall be deemed to accept all determinations made in the Initial Claims Review Determination Letter.

Each Reconsideration Request must be accompanied by payment of $500 as an administration fee for reconsideration (the "**Reconsideration Administration Fee**"), which reflects a good faith estimate of the cost to the Trust of reconsidering the allowance and/ or value of the Abuse Claim. The Reconsideration Administration Fee is non-refundable irrespective of the decision ultimately made by the Abuse Claims Reviewer.

Upon receipt of a Reconsideration Request and payment of the Reconsideration Administration Fee by the Reconsideration Deadline, the Abuse Claims Reviewer will reconsider the Abuse Claim and will have the discretion to maintain the prior determination or modify the prior determinations, including disallowing a previously Allowed Claim or reducing the Proposed Allowed Claim Amount.

The Abuse Claims Reviewer shall notify all Abuse Claimants timely submitting a Reconsideration Request and paying the Reconsideration Administration Fee of its final determination within 90 days of the Reconsideration Deadline (the "**Reconsideration Decision**").

An Abuse Claimant's sole recourse to appeal the Reconsideration Decision shall be to commence an action in a state court of competent jurisdiction as

permitted by Section 9 of these Trust Distribution Procedures (the "**State Court Option**").

8.    **Abuse Claim Value Assessment**.  If an Abuse Claimant and the Trust Administrator agree, an Abuse Claimant will submit its Abuse Claim for review under the following procedures (the "**Abuse Claim Value Assessment**").  An Abuse Claim reviewed under these procedures shall be referred to herein as an "**Independent Review Claim**" and the holder of such claim shall be referred to herein as an "**Independent Review Claimholder**."

The commencement of the Abuse Claim Value Assessment need not await completion of the Initial Review Determination, but all Abuse Claims must proceed through the Initial Review Determination so that they receive the points (if any) contemplated by the Evaluation Factors used below.

**NOTHING IN THIS TRUST DISTRIBUTION PLAN ALTERS, MODIFIES OR AMENDS ANY OF THE RIGHTS, CLAIMS AND DEFENSES OF THE NON-SETTLING INSURERS UNDER APPLICABLE LAW EXCEPT AS SET FORTH IN ARTICLE 10 OF THE PLAN.**

(i)    <u>Order of Consideration of Independent Review Claims</u>. The Trust Administrator shall have sole authority to determine the order in which Independent Review Claims are adjudicated in accordance with the procedures below.

(ii)    <u>Assessment in Accordance with Governing Law</u>. The Abuse Claim Value Assessment shall be conducted in accordance with any means permitted by applicable law, including, but not limited to, the use of an arbitrator or mediator, or the commencement or continued prosecution of lawsuits in courts of competent jurisdiction for judgments in favor of Holders of Abuse Claims or for judgments against Non-Settling Insurers in insurance coverage actions.

(iii)    <u>Costs Paid By the Trust</u>.  The costs associated with the Abuse Claim Value Assessment shall be paid by the Trust.  Recovery of such costs may be sought from any Non-Settling Insurer subject to applicable law.  Any recoveries by the Trust on account of such costs will become Trust Assets to be distributed in accordance with the Trust Agreement and this Trust Distribution Plan.

(iv)    <u>Participation of Independent Review Claimant in Abuse Claim Value Assessment</u>. Each Independent Review Claimant shall reasonably cooperate in connection with the prosecution of his or her Independent Review Claim.

(v)    <u>Diocese Affiliated Entities Participation</u>.  The Diocese Affiliated Entities will participate in the Abuse Claim Value Assessment to defend the Diocese Affiliated Entities.  If a Diocese Affiliated Entity's participation in the Abuse Claim Value Assessment is required, the relevant Diocese Affiliated Entity shall be entitled to select its own professionals in connection with the Abuse Claim Value Assessment, including but not limited to, (i) experts and (ii) legal counsel, but the selection of legal counsel shall be consistent with the relevant Diocese Affiliated Entity's historical retention and use of such counsel, who shall exercise his or her

4

professional judgment in accordance with the Rules of Professional Conduct and any other relevant rules governing the duties and obligations of attorneys to their clients. The Trust shall be responsible for the payment of all reasonable and necessary Defense Costs (defined below) as provided in Section 10 hereof.

(vi)    <u>Insurer Participation</u>.

(a)    The Trust Administrator will provide prompt notice to any potentially responsible Non-Settling Insurer(s) ("**Responsible Insurer(s)**") of any claim for which the Independent Review Claimholder has elected the Abuse Claim Value Assessment.

(b)    Any Responsible Insurer shall be given a reasonable opportunity to participate in the Abuse Claim Value Assessment as permitted by applicable law at its sole expense.

(vii)   <u>Distribution Enhancements</u>.

(a)    If (i) a settlement is reached with a Responsible Insurer(s) on an Independent Review Claim or (ii) the Trust obtains a judgment against a Responsible Insurer and the Responsible Insurer pays any such amounts to the Trust (in either case, the "**Responsible Insurer Recovery**"), then the proceeds comprising the Responsible Insurer Recovery will be distributed as follows:

> <u>FIRST</u>, to reimburse the Trust for all reasonable attorneys' fees, expenses and costs expended in obtaining the Responsible Insurer Recovery, including reimbursement for payment of any Defense Costs;

> <u>SECOND</u>, to the extent not already paid by the Trust, to reimburse the Diocese Affiliated Entities for any indemnification claims they have against the Trust as specified below; and

> <u>THIRD</u>, as follows:

> (1)    If a settlement is obtained with the Responsible Insurer(s) on an Independent Review Claimant's Independent Review Claim prior to entry of judgment in court of competent jurisdiction holding a Responsible Insurer liable to pay the Abuse Claim of an Independent Review Claimholder, then the Independent Review Claimholder shall receive 10% of the Responsible Insurer Recovery in addition to the Distribution determined by the Abuse Claims Reviewer hereunder, with the remainder to go to the Trust.

> (2)    If a judgment is obtained against the Responsible Insurer(s) on an Independent Review Claimant's Independent Review

5

Claim, then the Independent Review Claimholder shall receive 25% of the Responsible Insurer Recovery in addition to the Distribution determined by the Abuse Claims Reviewer hereunder, with the remainder to go to the Trust.

(3)     If a settlement resolving any and all Abuse Claims is reached with any Responsible Insurer, then all Independent Review Claimholders who have commenced active participation in the Abuse Claim Value Assessment with claims implicating a policy or policies issued by that Responsible Insurer shall receive an enhancement of its distribution of the proceeds of that settlement under the point system of no less than 10% but no more than 25%, as awarded in the reasonable discretion of the Trust Administrator.

9.      **The State Court Option**.

(i)     <u>Availability of the State Court Option</u>.  These Trust Distribution Procedures permit the use of the State Court Option only if:

(a)     An Abuse Claimant's Abuse Claim is not Allowed by the Abuse Claims Reviewer after a Reconsideration Request; or

(b)     An Allowed Claim is not Allowed in an amount acceptable to the Allowed Claimholder after a Reconsideration Request.

For the avoidance of doubt, nothing in this Section impairs the rights of the Diocese Affiliated Entities, the Trust and the Holders of Abuse Claims to commence or continue to prosecute Coverage Claims.

(ii)    <u>Use of the State Court Option</u>.

(a)     If the State Court Option is exercised, the Abuse Claimant (in such instance the Abuse Claimant shall be referred to herein as the "**State Court Option Claimant**," and its claim, the "**State Court Option Claim**") may commence an action in a court of competent jurisdiction (the "**State Court**") against the Trust, as successor in interest to the Diocese Affiliated Entities.

1.      The State Court Option Claimant shall be responsible for all of its costs and expenses and shall not be entitled to reimbursement of costs or expenses incurred from the Trust.

2.      If the State Court Option is exercised, the State Court shall conduct a trial to adjudicate the State Court Option Claim.

(b)     If the State Court Option is exercised, the Trust shall be responsible for all of the relevant Diocese Affiliated Entity's Defense Costs as set forth in Section 10 below.

(iii)   <u>Parties to Lawsuit</u>.  If the State Court Option is exercised, any lawsuit must be filed by the Abuse Claimant in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit, unless otherwise agreed to by the Trust Administrator.  The Abuse Claimant may assert his or her Abuse Claim against the Trust as if the Abuse Claimant were asserting such claim against the Diocese Affiliated Entities and the discharge and injunctions in the Plan had not been issued.  The Abuse Claimant may name any person or entity that is not a Covered Party, including Responsible Insurers to the extent permitted by applicable law.  Abuse Claimants may pursue in any manner or take any action otherwise permitted by law against persons or entities that are not Covered Parties.

(iv)   <u>Trust Liability for, and Allowance of, State Court Option Claims</u>.

1.     A State Court Option Claimant who pursues a State Court Option Claim shall have an Allowed Claim Amount equal to zero if the litigation is dismissed or the claim is denied.

2.     If a State Court Option Claimant's Abuse Claim is Allowed through the State Court Option, the Allowed Amount of the State Court Option Claim shall be determined by the Abuse Claims Reviewer in accordance with these Trust Distribution Procedures consistent with a court of competent jurisdiction's ruling.

10.    **Defense Costs**. The Trust will fund all reasonable and necessary out of pocket attorneys' fees, costs and other expenses of each Diocese Affiliated Entity in connection with their participation in the Trust Distribution Procedures ("**Defense Costs**"); *provided, however*, that if a Responsible Insurer defends the Diocese Affiliated Entity in connection with their participation in the Trust Distribution Procedures, the Trust shall be relieved of its obligation to pay any Defense Costs; *provided, further, however*, that if a Non-Settling Insurer has a duty to defend, or has a duty to reimburse the defense costs of, a Diocese Affiliated Entity but fails to honor that obligation, the Trust will advance or reimburse the Diocese Affiliated Entity for reasonable and necessary Defense Costs.  A Diocese Affiliated Entity's selection of legal counsel shall be consistent with the relevant Diocese Affiliated Entity's historical retention and use of such counsel, who shall exercise his or her professional judgment in accordance with the Rules of Professional Conduct and any other relevant rules governing the duties and obligations of attorneys to their clients. For the purposes of clarity and avoidance of doubt: (i) the Diocese Affiliated Entities shall be made whole from the Trust for any actually expended or incurred Defense Costs for their participation in the Trust Distribution Procedures and (ii) any Defense Costs previously paid by the Trust to a Diocese Affiliated Entity shall be reimbursed to the Trust upon the Responsible Insurer's satisfaction of any such amounts.

11.    **Evaluation of Abuse Claims Under Initial Review Determination.**  If an Abuse Claim is Allowed, the Abuse Claims Reviewer shall determine the value of such Allowed Claim by assigning such Allowed Claim a point value pursuant to the following factors (the "**Evaluation Factors**").  Although the factors below collectively comprise the methodology that must be applied in reviewing Allowed Claims, the Abuse Claims Reviewer may, as indicated below, take into account considerations in addition to those identified herein when evaluating an Allowed Claim within the parameters of the delineated factors.

(i)    <u>Nature of Abuse & Circumstances</u>. A point value ranging from 0 to 55 should be allocated for this section.

Considerations should include, but are not limited to, the following factors:

(a)    The duration and/or frequency of the abuse;

(b)    Type of abuse: e.g. penetration, attempted penetration, masturbation, oral sex, touching under the clothing, touching over the clothing, removing of clothing covering genitals, exposure of perpetrator's genitals, kissing, sexualized talk, etc.;

(c)    Circumstances of abuse:

1.    grooming behaviors including but not limited to special privileges, special activities, and attention, social relationship with parents, personal relationship with claimant, opportunity to experience sports or activities, isolation from others, use of alcohol or illicit drugs by abuser or claimant or use of or exposure to pornography;

2.    coercion or threat or use of force or violence, stalking;

3.    relationship of claimant to perpetrator including but not limited to whether claimant was a parishioner or student, held perpetrator in high regard, whether perpetrator was in position of trust, whether perpetrator had unsupervised access to claimant, and whether claimant valued relationship with perpetrator; and

4.    Diocese's legal responsibility including but not limited to whether the perpetrator is identified by name, whether the perpetrator was a Diocese priest, cleric, employee or agent, whether there were multiple allegations/claims/lawsuits against the perpetrator, whether the perpetrator appears on the Diocese's credibly accused list, and whether the perpetrator appears on any credibly accused list.

(ii)    <u>Impact of the Abuse</u>.  A point value ranging from 0 to 40 should be allocated for this section.

Overall, this category will evaluate how the abuse impacted the Allowed Claimholder. This includes how the abuse impacted the Allowed Claimholder's

8

mental health, physical health, spiritual well-being, inter- personal relationships, vocational capacity or success, academic capacity or success, and whether the abuse at issue resulted in legal difficulties for the claimant. Some of these considerations may include the below factors, but the below list is not intended to be exhaustive.

The Abuse Claims Reviewer should consider, along with any and all other relevant factors, whether the abuse at issue manifested, or otherwise led the claimant to experience, or engage in behaviors resulting from:

(a)     <u>Mental Health Issues</u>: This includes but is not limited to anxiety, depression, post-traumatic stress disorder, substance abuse, addiction, embarrassment, fear, flashbacks, nightmares, sleep issues, sleep disturbances, exaggerated startle response, boundary issues, self-destructive behaviors, guilt, grief, homophobia, hostility, humiliation, anger, isolation, hollowness, regret, shame, isolation, sexual addiction, sexual problems, sexual identity confusion, low self-esteem or self-image, bitterness, suicidal ideation and suicide attempts.

(b)     <u>Physical Health Issues</u>: This includes but is not limited to physical manifestations of emotional distress, gastrointestinal issues, headaches, high blood pressure, physical manifestations of anxiety, erectile dysfunction, heart palpitations, sexually-transmitted diseases, physical damage caused by acts of abuse, reproductive damage, self- cutting and other self-injurious behavior.

(c)     <u>Spiritual Wellbeing</u>: This includes but is not limited to loss of faith in God, loss of faith and trust in religion and spiritual distress.

(d)     <u>Interpersonal Relationships</u>: This includes but is not limited to problems with authority figures, hypervigilance, sexual problems, marital difficulties, problems with intimacy, lack of trust, isolation, betrayal, impaired relations, secrecy, social discreditation and isolation; damage to family relationships, and fear of children or parenting.

(e)     <u>Vocational Capacity</u>: This includes but is not limited to under- and un-employment, difficulty with authority figures, difficulty changing and maintaining employment, feeling of unworthiness or guilt related to financial success.

(f)     <u>Academic Capacity</u>: This includes but is not limited to school behavior problems.

(g)     <u>Legal Difficulties</u>: This includes but is not limited to criminal difficulties, bankruptcy.

(iii)     <u>Claimant Involvement</u>.  A point value ranging from 0 to 5 should be allocated for this section. The Abuse Claims Reviewer shall consider that all Allowed Claimholders have benefited from the work and cost incurred by those Abuse

9

Claimants who asserted claims against the Diocese before the bankruptcy was filed and have participated in the legal and factual development of claims against the Diocese. The Abuse Claims Reviewer should consider factors, including, but not limited to, whether the Allowed Claimholder filed a pre- petition lawsuit; whether the Allowed Claimholder and/or the Allowed Claimholder's family has been subject to a deposition, mediation or interview; whether the Allowed Claimholder has participated on the Tort Committee; and whether the Allowed Claimholder participated in publicizing the issue of clergy sex abuse which has benefitted all claimants.

(iv)    <u>Reduction</u>.  If the Allowed Claimholder's abuser(s) belonged to a religious order or was affiliated with the Boy Scouts of America, the Allowed Claimholder's final points distribution shall be reduced by 33%.

If the Abuse Claimant received a monetary distribution from another diocese or archdiocese on account of the same Abuse that is the subject of his or her Abuse Claim, or received a monetary distribution from the Diocese of Camden for which the legitimacy of any claimed settlement has been reasonably contested by the Abuse Claimant, the Abuse Claimant's final points distribution shall be reduced by 50%.

(v)    <u>Minimum Point Allocation</u>.  Notwithstanding anything to the contrary herein or in the Plan, every holder of an Allowed Claim shall receive a point allocation of at least 15, unless the Abuse Claim is disallowed in its entirety by a Final Order of a court of competent jurisdiction.

12.    **Establishing Reserves**. The Trust Administrator is vested with authority to establish, and subsequently modify, any and all reserves required to fund all costs and expenses of the Trust before distributions are made to Holders of Allowed Abuse Claims.

13.    **Distributions to Abuse Claimants Who Do Not Elect the Expedited Distribution**. After the Abuse Claims Reviewer has made all determinations regarding whether an Abuse Claim is an Allowed Claim and the amount of such Claim is final under the procedures set forth herein, the Abuse Claims Reviewer shall determine the dollar value of each Abuse Claimant's actual distribution based on the Class 5 Claimant's pro rata share of the total final points assigned and the available funds for Distribution; *provided*, *however*, at the Trust Administrator's discretion, each Holder of an Allowed Abuse Claim may receive an initial distribution from the Trust and subsequent distributions from the Trust as proceeds become available, including from settlements with Responsible Insurers, until all Trust Assets have been substantially disbursed such that the Trust Administrator can no longer make a cost-effective and meaningful distribution to Holders of Allowed Class 5 Claims.

14.    **Distributions to Abuse Claimants Elect the Expedited Distribution**. If the Abuse Claims Reviewer Allows the Abuse Claim of a Holder who made the Expedited Distribution Election, he shall promptly make the Expedited Distribution to such Holder in accordance with these Trust Distribution Procedures.

15.    __Declarations Confirming Compliance with New Jersey Law__.  *Before the Trust Administrator may make distributions from the Trust to Holders of Allowed Abuse Claims, (i) the Trust Administrator shall first advise the Holder of an Allowed Abuse Claim, in writing, of the maximum fees permitted to be charged by an attorney under New Jersey law and (ii) the attorney for the Holder of an Allowed Abuse Claim (if any) must file a declaration with the Bankruptcy Court attesting that the compensation he or she will seek to be paid on account of any distributions made to his or her client is permitted under New Jersey law (specifically, New Jersey Court Rule 1:21-7).  The Trust Administrator shall not make any distribution to the Holder of an Allowed Abuse Claim until such declaration is filed with the Bankruptcy Court.*

16.    __The Review of Class 6 Claims__. The Abuse Claims Reviewer shall evaluate Class 6 Claims in accordance with the procedures set forth herein provided that the relevant deadlines for doing so shall be set forth in a letter substantially similar to the Initial Claims Review Determination Letter.

Holders of Unknown Abuse Claims shall receive a pro rata distribution from the Unknown Abuse Claim Reserve Fund established by the Trust Administrator.  The distribution to each Unknown Abuse Claimant shall be determined by taking the points assigned to each Unknown Abuse Claim, divided by the combined total points assigned to all Unknown Abuse Claims, multiplied by the amount held in the Unknown Abuse Claim Reserve Fund.  No Unknown Abuse Claimant shall receive more than he or she would have as a Class 5 Claimant.  The Trust Administrator shall make an immediate distribution of up to $20,000 to the holders of Allowed Unknown Abuse Claims immediately upon determination by the Abuse Claims Reviewer, with the remaining portion of the Allowed Abuse Claim paid at the termination of the Unknown Abuse Claim Reserve Fund as provided for in the Trust Agreement.

17.    __Tolling of Limitations Period__. The running of any relevant statute of limitation shall be tolled as to each Abuse Claimant's Abuse Claim until all Abuse Claims are resolved under these Trust Distribution Procedures or are otherwise resolved by a Final Order.

18.    __Reservation of Rights__.

(i)    If a court of competent jurisdiction enters a Final Order holding that the Trust Distribution Plan constitutes a default under, or is a breach of, any Non-Settling Insurer Policy, then all rights vested in the Trust, as successor to the Diocese Affiliated Entities, under the Plan are reserved and preserved to prosecute any claims under those policies in accordance with applicable law.

(ii)    The Trust Administrator and the Abuse Claims Reviewer reserve the right to modify the terms of these Trust Distribution Procedures, in consultation with the Trust Advisory Committee, in any manner that is not inconsistent with or otherwise in contravention of the terms of the Plan and the Confirmation Order and at all times to the ends of making certain that Abuse Claimants are treated fairly, equitably and reasonably in light of the finite assets available to satisfy such claims.

11