<table>
<tr><td colspan="2" align="center"><b>UNITED STATES BANKRUPTCY COURT</b><br><b>DISTRICT OF NEW JERSEY</b><br>Caption In Compliance With D.N.J. LBR 9004-1</td></tr>
</table>

| | |
|---|---|
| **WHITE AND WILLIAMS LLP**<br>Siobhain P. Minarovich, Esq.<br>7 Times Square, Suite 2900<br>New York, NY 10036-6524<br>Tel: 212-244-9500<br>Fax: 212-631-1248<br>Email: minarovichs@whiteandwilliams.com<br><br>**PARKER, HUDSON, RAINER & DOBBS LLP**<br>Harris B. Winsberg, Esq. (*pro hac vice*)<br>Todd C. Jacobs, Esq. (*pro hac vice*)<br>John E. Bucheit, Esq. (*pro hac vice*)<br>Matthew M. Weiss, Esq. (*pro hac vice*)<br>Matthew G. Roberts, Esq. (*pro hac vice*)<br><br>*Attorneys for Interstate Fire and Casualty Company*<br><br>**DUANE MORRIS LLP**<br>Sommer L. Ross, Esq.<br>Russell W. Roten, Esq. (*pro hac vice*)<br>Jeff D. Kahane, Esq. (*pro hac vice*)<br>Andrew E. Mina, Esq. (*pro hac vice*)<br>1940 Route 70 East, Suite 100<br>Cherry Hill, NJ 08003-2171<br>Tel: 856-874-4200<br>SLRoss@duanemorris.com | **CLYDE & CO US LLP**<br>Catalina Sugayan, Esq. (*pro hac vice*)<br>Michael Norton, Esq. (*pro hac vice*)<br>55 West Monroe Street, Suite 3000<br>Chicago, IL 60603<br>Tel: (312) 635-7000<br><br>*Counsel for Certain Underwriters at Lloyd's, London and Certain London Market Insurers*<br><br>**STAMOULIS & WEINBLATT LLC**<br>Stamatios Stamoulis #01790-1999<br>800 N. West Street, Third Floor<br>Wilmington, DE 19801<br>Telephone: (302) 999-1540<br>stamoulis@swdelaw.com<br><br>**O'MELVENY & MYERS LLP**<br>Tancred Schiavoni, Esq. (*pro hac vice*)<br>Samantha M. Indelicato (*pro hac vice*)<br>7 Times Square<br>New York, NY 10036<br>Telephone: 212-326-2000<br>Email: tschiavoni@omm.com<br>Email: sindelicato@omm.com<br><br>*Counsel for Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America ("Century"), Federal Insurance Company ("Federal"), and Illinois Union Insurance Company ("Illinois Union")* |
| In re:<br><br>The Diocese of Camden, New Jersey,<br><br>        Debtor. | Case No.: 20-21257 (JNP)<br><br>Chapter: 11<br><br><br>Honorable Jerrold N. Poslusny, Jr. |

**INSURERS' EMERGENCY MOTION FOR STAY PENDING APPEAL OF ORDER CONFIRMING THIRD MODIFIED EIGHTH AMENDED PLAN OF REORGANIZATION OF THE DIOCESE OF CAMDEN**

# TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ................................................................................. 1

II.   STATEMENT OF FACTS .................................................................................... 4

III.  RELIEF REQUESTED.......................................................................................... 16

IV.  BASIS FOR RELIEF............................................................................................ 16

     A.    The Insurers Are Likely to Succeed on the Merits. ................................. 17

          1.    The Court Improperly Limited the Insurers' Standing to Object ............ 18

          2.    The Insurance Assignment Does Not Comply with the Bankruptcy
              Code ........................................................................................................ 19

          3.    The Plan Purports to Strip the Insurers' Rights and Defenses,
              Contrary to the Bankruptcy Code and Third Circuit Law
              Established in *Combustion Engineering* ................................................ 23

          4.    The Trust Governance is Biased and Will Lead to Results
              Inconsistent with the Bankruptcy Code .................................................. 23

     B.    Parties Will Suffer Irreparable Injury if a Stay Is Not Granted. ........................ 25

          1.    Efforts by the Plan Proponents to Ignore the Plan Terms and
              Prefund the Trust Will Irreparably Harm all Parities in Interest ............. 25

          2.    The Insurers Will be Irreparably Harmed if the Appeal Is
              Determined to be Equitably Moot............................................................ 27

          3.    Depriving the Insurers of Their Due Process Rights Constitutes
              Irreparable Harm. ................................................................................... 29

     C.    The Balance of Equities Favors a Stay. ................................................... 31

          1.    The Condition Precedent Requiring the Exhaustion of Appeals Is
              Integral to the Feasibility of the Plan...................................................... 31

          2.    The Plan Was Solicited on the Basis that the Effective Date of the
              Plan Would Be Subject to Delay by Appeals .......................................... 33

          3.    The Bankruptcy Court Rejected Requests to Override the Stay
              Implemented by Bankruptcy Rule 3020(e) on the Basis that there
              Would Be Appeals .................................................................................. 34

     D.    The Public Interest Strongly Favors a Stay............................................. 34

V.    CONCLUSION.................................................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Am. Home Mortg. Holdings*,
    402 B.R. 87 (Bankr. D. Del. 2009) .........................................................................................21

*In re American Capital Equipment*,
    405 B.R. 415 (Bankr. W.D. Pa. 2009) ..................................................................................7, 8

*Anytime Fitness, L.L.C. v. Thornhill Bros. Fitness, L.L.C. (In re Thornhill Bros. Fitness, L.L.C.)*,
    85 F.4th 321 (5th Cir. 2023) ..................................................................................................21

*AT&T v. Winback & Conserve Program, Inc.*,
    42 F.3d 1421 (3d Cir. 1994) ...................................................................................................36

*In re Boy Scouts of Am. & Delaware BSA, LLC*,
    No. 20-10343 (LSS), 2022 WL 20541782 (Bankr. D. Del. Sept. 8, 2022),
    aff'd, 650 B.R. 87 (D. Del. 2023) ...........................................................................................26

*In re Century Glove, Inc.*,
    1993 WL 239489 (D. Del. Feb. 10, 1993) ...............................................................................9

*Cinicola v. Scharffenberger*,
    248 F. 3d 110 (3rd Cir. 2001) ................................................................................................11

*In re Combustion Eng'g, Inc.*,
    391 F.3d 190 (3d Cir. 2004) .............................................................................................20, 21

*In re Congoleum Corp.*,
    426 F.3d 675 (3d Cir. 2005) ...................................................................................................12

*In re Country Squire Assocs. of Carle Place, L.P.*,
    203 B.R. 182 (B.A.P. 2d Cir. 1996) .......................................................................................29

*In re Crippin*,
    877 F.2d 594 (7th Cir. 1989) .................................................................................................20

*CW Capital Asset Mgmt. v. Burcam Capital II, LLC*,
    2013 WL 3288092 (E.D.N.C. June 28, 2013) ........................................................................29

*David Weinstein Co. Holdings, LLC*,
    No. 21-171 (MN), 2021 WL 979603 (D.16, 2021) ...............................................................10

# TABLE OF AUTHORITIES

(Continued)

Page(s)

*In re Diocese of Camden*,
2022 Bankr. LEXIS 2244 (Bankr. D.N.J. Aug. 12, 2022) ...................................................19

*In re Fed.-Mogul Glob. Inc.*,
2007 WL 4180545 (Bankr. D. Del. Nov. 16, 2007) ...........................................................9, 21

*In re Frontier Airlines, Inc.*,
93 B.R. 1014 (Bankr. D. Colo. 1988) ...................................................................................10

*In re Gen. Motor Corp.*,
409 B.R. 24 (Bankr. S.D.N.Y. 2009) .....................................................................................33

*In re Global Indus. Techs*.,
645 F.3d 201 (3d Cir. 2011) .......................................................................................11, 12, 30

*Harrington v. Purdue Pharma, L.P.*,
Case No. 23-124 (2023) .........................................................................................................17

*Haskell v. Goldman, Sachs & Co. (In re Genesis Health Ventures, Inc.)*,
367 B.R. 516 (Bankr D. Del. 2007) .......................................................................................17

*In re Highway Truck Drivers & Helpers Local Union No. 107*,
888 F.2d 293 (3d Cir. 1989).............................................................................................17, 29

*In re Italian Cook Oil Corp*,
190 F.2d 994 (3d Cir. 1951)....................................................................................................11

*In re Kaiser Gypsum Co., Inc.*,
60 F.4th 73 (4th Cir.), *cert. granted sub nom. Truck Ins. Exch. v. Kaiser
Gypsum Co*., 144 S. Ct. 325 (2023) ...............................................................................1, 6, 14

*In re Los Angeles Dodgers LLC*,
465 B.R. 18 (D. Del. 2011)...................................................................................28, 29, 30, 31

*In re Maremont Corp.*,
Case No. 19-10118-KJC (Bankr. D. Del.) ...............................................................................6

*In re MD Helicopters, Inc.*,
641 B.R. 96 (D. Del. 2022).....................................................................................................29

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,
139 S. Ct. 1652 (2019)............................................................................................................20

*In re MTE Holdings, LLC*,
2021 WL 4203339 (D. Del. Sept. 15, 2021)...........................................................................29

*New Jersey Dep't of Treasury v. Visara Int'l, Inc.*,
166 F. App'x 639 (3d Cir. 2006) ...........................................................................................23

# TABLE OF AUTHORITIES

### (Continued)

**Page(s)**

*NLRB v. Buildisco & Buildisco,*
465 U.S. 513 (1984)..........................................................................................11

*NLRB v. Gen. Motors Corp.,*
510 F. Supp. 341 (S.D. Ohio 1980) ...............................................................35, 36

*In re One2One Commc'ns, LLC,*
805 F.3d 428 (3d Cir. 2015) (Krause, J., concurring)...........................................29

*In re Purdue Pharma L.P.,*
633 B.R. 53 (Bankr. S.D.N.Y. 2021) ................................................................10

*In re Purdue Pharma L.P.,*
635 B.R. 26 (S.D.N.Y. Dec. 16, 2021) .............................................................10

*In re Pursue Pharma L.P. (Harrington v. Purdue Pharma, L.P.),*
69 F.4th 45 (2d Cir. 2022), *cert. granted* 216 L. Ed 2d 1300, 2023 U.S.
LEXIS 2872 (U.S. Aug. 10, 2023)....................................................................1, 15

*In re Revel AC, Inc.*
802 F.3d 558 (3d Cir. 2015)............................................................................35

*In re Revel AC, Inc.,*
No. 14-22654 GMB, 2015 WL 567015 (D.N.J. Feb. 10, 2015) ............................35

*S.S. Body Armor I., Inc. v. Carter Ledyard & Milburn LLP,*
927 F.3d 763 (3d Cir. 2019)............................................................17, 18, 25, 31

*In re Semcrude, L.P.,*
728 F.3d 314 (3d Cir. 2013)............................................................................28

*Spyglass Media Grp., LLC v. Bruce Cohen Prods. (In re Weinstein Co. Holdings, LLC),*
997 F.3d 497 (3d Cir. 2021)............................................................................21

*In re Stewart Foods, Inc.,*
64 F.3d 141 (4th Cir. 1995) .............................................................................21

*Sunoco, Inc. v. MX Wholesale Fuel Corp.,*
565 F. Supp. 2d 572 (D.N.J. 2008) ...................................................................22

*In re Superior Air Parts, Inc.,*
486 B.R. 728 (Bankr. N.D. Tex. 2012)...............................................................21

*In re TK Holdings,*
No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) ...........................................10

**TABLE OF AUTHORITIES**

(Continued)

**Page(s)**

*In re Weinstein Co. Holdings, LLC*,
   No. 21-1598, 2021 WL4429044 (3d Cir. 2021) ....................................................................10

**Statutes**

11 U.S.C. § 1109(b) ..............................................................................................................18

11 U.S.C. § 1128(b) ..............................................................................................................18

N.J. Stat. § 12A:2-210 (1) ....................................................................................................22

**Rules**

Fed. R. Bankr. P. 8007(b)(1)...........................................................................................16, 18

**Other Authorities**

Evan Ochsner, *Justices Lean Toward Insurer in Asbestos Bankruptcy Dispute (2)*,
   BLOOMBERG LAW (Mar. 19, 2024) .................................................................................15

Dietrich Knauth, *US Supreme Court appears to back insurers' participation in
   bankruptcy*, REUTERS (March 20, 2024)..........................................................................15

Century, Federal, Illinois Union, Interstate, and LMI (collectively, the "Insurers")[1] move

this Court, on an emergency basis and pursuant to Rule 8007 of the Bankruptcy Rules, for an order

granting a stay pending appeal of the *Order Confirming Third Modified Eighth Amended Plan of*

*Reorganization* (the "Confirmation Order"), entered on March 15, 2024 [Dkt. No. 3684] in the

above-captioned Chapter 11 Case, that confirmed the *Third Modified Eighth Amended Plan of*

*Reorganization* [Dkt. No. 3659] (the "Third Modified Plan" or the "Plan") filed by the Diocese of

Camden, New Jersey (the "Debtor" or the "Diocese") and the Official Committee of Tort Claimant

Creditors (the "Tort Committee" and collectively with the Debtor, the "Plan Proponents").  In

support of this Motion, the Insurers respectfully state as follows:

## I.    PRELIMINARY STATEMENT

The Supreme Court is about to rule on issues in two separate appeals that would have a

direct impact on this case.  The Supreme Court is poised to rule on The Supreme Court heard

argument in *Truck Insurance Exchange v. Kaiser Gypsum* ("*Kaiser Gypsum*")[2] on March 19, 2024,

addressing whether an insurer, based on its insurance contract with a debtor, has standing as a

"party in interest" under the Bankruptcy Code.  The Supreme Court has also heard argument and

poised to rule in *Harrington v. Purdue Pharma, L.P.* ("*Purdue*")[3] which addresses whether non-

consensual non-debtor releases and injunctions such as at those employed here are permissible.

The Third Circuit has recognized the importance of the pending *Purdue* decision by delaying oral

argument in the *Boy Scouts* appeal until after *Purdue* is decided.  While the Insurers take no

---

[1] The Insurers include the carriers identified in the signature blocks.  Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Third Modified Plan.

[2] *In re Kaiser Gypsum Co., Inc.*, 60 F.4th 73 (4th Cir.), *cert. granted sub nom. Truck Ins. Exch. v. Kaiser Gypsum Co.*, 144 S. Ct. 325 (2023).

[3] *In re Pursue Pharma L.P. (Harrington v. Purdue Pharma, L.P.)*, 69 F.4th 45 (2d Cir. 2022), *cert. granted* 216 L. Ed 2d 1300, 2023 U.S. LEXIS 2872 (U.S. Aug. 10, 2023).

position here on the merits of the arguments in the *Purdue* appeal, the outcome of the *Purdue* appeal could have a material impact on the rights of key stakeholders under the Plan.

There is more than at least a reasonable chance that the Supreme Court will find that insurers have standing to be heard on *any* issue under section 1109(b) of the Bankruptcy Code. If that is the rule, this Court erred in finding that the Insurers lacked standing to be heard on particular issues in this Chapter 11 Case. Before the Plan Proponents take any steps to implement the Plan, this Court should at least have the benefit of the Supreme Court's decision in *Kaiser Gypsum* and guidance on the non-consensual non-debtor releases and injunctions.

In its Memorandum Decision issued on August 29, 2023, the Bankruptcy Court denied confirmation of the Debtor's *Eighth Amended Plan of Reorganization* [Dkt. No. 1725] (the "Original Plan"). In response, the Plan Proponents sought approval for a modified Plan, without re-solicitation as provided for by the Code. Thereafter, the Bankruptcy Court issued two oral decisions denying confirmation of modified versions of the Plan. In its December 15, 2023 decision, the Court ruled that the Plan Proponents' modifications were not sufficient to remedy numerous defects, therefore the First Modified Plan was inconsistent with the Court's Memorandum Decision and could not be confirmed. In its February 16, 2024 decision, the Court found that the Second Modified Plan likewise could not be confirmed.

The December and February Decisions echoed the issues initially raised in the Memorandum Decision; the Plan Proponents' revisions in the modified versions of the Plan failed to remedy the fatal flaws identified in the Memorandum Decision—that the plans were not proposed in good faith, sought to transfer insurance policies inconsistent with applicable law, provided a biased process for recovery from insurers, and allowed recovery for deficient and invalid claims.

The Third Modified Plan was confirmed with the Bankruptcy Court prohibiting evidence about the modifications being offered and denying the Insurers standing to be heard on core aspects of the Plan, including with respect to the non-consensual non-debtor releases and injunctions around which the Plan is structured.  Like the prior two modified plans, the Third Modified Plan perpetuates or makes worse the same defects from the Original Plan in contravention to the findings made in the Memorandum Decision.

The Third Modified Plan that resulted from this process violates the Bankruptcy Code and other applicable law in at least three material ways—it violates longstanding Supreme Court precedent that a debtor may not use bankruptcy to re-write a contract, it impermissibly deploys non-consensual non-debtor releases and injunctions to strip the Insurers of their rights and defenses and excuse the Debtor and non-debtors of their contractual obligations, and it establishes a biased Trust governance and TDP process that create a machine to allow meritless claims with grossly inflated values.

Under the Plan, the Effective Date of the Plan is conditioned on the Confirmation Order being final and non-appealable.  The Plan was solicited and the contributions of unsophisticated non-debtor parishes, schools and missions committed on this basis.  The Plan Proponents understood that the extraordinary array of non-consensual non-debtor releases and injunctions and the manner in which the insurance contracts are rewritten would draw appeals and that this would delay distributions.  The contributions were staggered over five years for this reason.

If the Debtor, under pressure from the Tort Committee, acquiesces to ignoring the requirement for a final Confirmation Order and seeks to prefund the Trust, enormous harm will be done as such actions would be contrary to the funding scheme contemplated by the Plan, harm the

non-debtor contributors, and imperil the feasibility of this or any other plan in the future.  By implementing a stay, this Court will implement the intent of the Plan.[4]

## II.      STATEMENT OF FACTS[5]

**The Memorandum Decision Set Forth Numerous Fatal Flaws in the Plan**

In its Memorandum Decision issued on August 29, 2023, the Bankruptcy Court denied confirmation of the Original Plan finding that it "does not meet all of the requirements of section 1129 of the Bankruptcy Code"[6] and that the Original Plan was "too biased for the Court to make a good faith finding;"[7] failed in the "protection of the Insurers rights;"[8] would "allow compensation for claims which are facially invalid or fraudulent,"[9] could "artificially inflate the value of claims;"[10] and allowed attorneys to collect excessive contingency fees."[11]  The Insurers filed objections to the Original Plan as did the United States Trustee.[12]  The Bankruptcy Court entered a separate order denying confirmation of the Original Plan on October 16, 2023.[13]

---

[4] Article 14.4 of the Plan requires the Settling Insurers to waive the requirement for a final Confirmation Order and there is no indication that they are inclined to do so.

[5] The facts supporting the Motion are set forth more fully in the Insurers' prior filings.  *See Insurers' Post-Trial Brief in Opposition to the Eighth Amended Plan of Reorganization* [Dkt. No. 3079] (the "Insurers' Post-Trial Brief"), at 28-88; *Insurers' Objection to First Modified Eighth Amended Plan* [Dkt. No. 3493].The Bankruptcy Court also outlined the facts in its *Memorandum Decision Denying Confirmation of Eighth Amended Plan* [Dkt. No. 3336] (reported at 653 B.R. 309 (Bankr. D.N.J. 2023)) (the "Memorandum Decision"), *Transcript of Decision Related to Modified Eighth Amended Plan* [Dkt. No. 3574] (the "December Decision"), *Transcript of Rulings* [Dkt. No. 3649] (the "February Decision"), and *Transcript of Rulings Read into the Record* [Dkt. No. 3680] (the "March Decision", and with the Dec. and Feb. Decisions, the "Oral Decisions").

[6] Mem. Decision, p. 69.

[7] *Id.* p. 65.

[8] *Id.*

[9] *Id.* p. 66.

[10] *Id.* p. 61.

[11] *Id.* pp. 65, 68–69.

[12] *See* Dkt. Nos. 2401, 2410. On Oct. 6, 2022, the Court convened a 14-day evidentiary hearing (the "Bench Trial") to consider confirmation of the Original Plan.

[13] *Order Denying Confirmation of Eighth Amended Plan* (the "Order") [Dkt. No. 3435].

In response, the Plan Proponents sought approval of the *First Modified Eighth Amended Plan of Reorganization* (the "Fist Modified Plan"), without re-solicitation.[14]    Thereafter, the Bankruptcy Court issued two oral decisions denying confirmation of modified versions of that plan.  In its December 15, 2023 decision, the Court ruled that the Plan Proponents' modifications were not sufficient to remedy numerous defects, and that the First Modified Plan was inconsistent with the Court's Memorandum Decision and could not be confirmed.[15]    In its February 16, 2024 decision, the Court found that the Second Modified Plan likewise could not be confirmed.[16]    The December and February Decisions echoed the issues initially raised in the Memorandum Decision; the Plan Proponents' revisions in the modified versions of the Plan failed to remedy the fatal flaws identified in the Memorandum Decision.

### The Terms of the Third Modified Plan Perpetuate The Defects Identified in the Memorandum Decision That Rendered the Original Plan Unconfirmable

Even with the instructions from the Court, the Third Modified Plan perpetuates or makes worse the same defects from the Original Plan in contravention to the findings made in the Memorandum Decision.

- The Third Modified Plan is structured around an extraordinary array of non-consensual non-debtor releases, and injunctions on which the Bankruptcy Court denied the Insurers standing to be heard, and which do not come close to meeting the standards for granting such extraordinary relief.  The non-consensual injunctions are even used to enjoin the

---

[14] The *Order Regarding Resolicitation of Plan Proponents' First Modified Eighth Amended Plan of Reorganization* [Dkt. No. 3447] (the "Order Regarding Resolicitation") approved the Notice of First Modified Plan that was sent to all Abuse Claimants.  The Court did not require resolicitation of individual claimants. Abuse Claimants were merely given the opportunity to change their vote.  The Plan Proponents did not send out notice for the Second Modified Plan or Third Modified Plan.

[15] *See* Transcript of Decision Related to the Plan Proponents Modified Eighth Amended Plan Before the Honorable Jerrold N. Poslusny, Jr., United States Bankruptcy Judge (Dec. 15, 2023) [Dkt. 3581] ("December Decision Tr."), attached to the *Declaration of Samantha Indelicato* filed contemporaneously herewith (the "Indelicato Decl.") as Exh. 1, pp. 3:11–13, 24:17–23.

[16] *See* Transcript of Rulings Read Into the Record Before the Honorable Jerrold N. Poslusny, Jr. United States Bankruptcy Judge (Feb. 16, 2024) [Dkt. No. 3649] ("February Decision Tr."), attached to Indelicato Decl. as Exh. 2, p. 3:15-18.

contract obligations owed by non-debtor entities to non-debtor insurers under contracts that the Debtor is neither a party to nor an insured.

- Under Article 7.3 of the Third Modified Plan, the Debtor severs the benefits of the insurance policies from their attendant burdens contrary to Supreme Court precedent that mandates a debtor assume contracts *cum onere*.

- The Third Modified Plan improperly seeks to delegate the duties under the Insurer Policies to the Trust in violation of New Jersey law, including those of non-debtors under contracts exclusively between non-debtors.

- The Third Modified Plan turns on its head the process for allowing and valuing claims by adopting a process that is inherently biased and prejudicial. Instead of claims being allowed and valued through the tort system or a truly independent process, as contemplated by the contracts, the Third Modified Plan has the Trust Administrator value claims through a fundamentally rigged system—a mediation or arbitration with no actual counterparty since the Debtor and Other Catholic Entities (the "OCEs") lack any interest in the outcome post-confirmation. This absurdly leaves a deeply conflicted party, the Trust Administrator who owes a fiduciary duty to the beneficiaries of the Trust, to pick the mediator or arbitrator, and conduct the mediation or arbitration. The Trust Administrator, the only one with an interest to be heard in the mediation or arbitration, is incentivized to inflate values.[17]

- The Third Modified Plan lacks any meaningful procedure for determining whether a claim is deficient or fraudulent.[18] The Debtor and OCEs have no economic incentive, nor meaningful ability or desire to prevent meritless claims or defend claim values post-confirmation once they are released and their obligations under the contracts are enjoined.[19]

---

[17] *Id.* p. 60.

[18] *See, e.g.*, *In re Kaiser Gypsum Co., Inc.*, Case No. 16-31602-JCW (Bankr. W.D.N.C.), Sept. 4, 2019 Hr'g Tr. [Dkt. No. 1785], pp. 64-66 ("I don't think . . . a federal court should approve a mechanism and a process that could lead to fraud, particularly in an area where the trusts have been subject to false claims . . . This is one that I'm concerned about of whether the plan, ultimately, is confirmable based on this."); *In re Maremont Corp.*, Case No. 19-10118-KJC (Bankr. D. Del.), March 18, 2019 Hr'g Tr. [Dkt. No. 166], pp. 6-7 (refusing to confirm plan because it lacked "provisions that will guard against the possibility that [] fraud should occur").

[19] Mem. Decision, p. 63 n.20 ("This may apply to any similar objections raised by the Insurers, including, as discussed above, that the transfer of the Policies to the Trust is invalid under State law, or that the Trust fails to provide procedures for an adversarial process. Correcting this language will preserve any defenses the Insurers hold under the Policies to be raised in any State coverage action."); Harrington Supp. Decl., ¶ 20 ("The Modified Plan's proposed Abuse Claim Value Assessment is fundamentally inconsistent with non-settling insurers' policy language concerning defense, assistance, and cooperation. It is incompatible with the economic basis for that language, which is to reduce moral hazard, claim costs, and premiums, including by discouraging an insured from taking actions that could increase the insurer's costs. It would thereby prejudice insurers by increasing their potential liabilities and the Trust Administrator's leverage to induce settlement.").

- The Third Modified Plan disregards entirely the Court's directive in its Memorandum Decision that there be guardrails of independence in fixing claim values. Now, instead of the former "Neutral" independently assessing claim values, determining necessary discovery, and considering what factors or evidence to consider, as directed by the Court,[20] the Third Modified Plan creates a process without any discovery whatsoever.[21] The Third Modified Plan removes the requirement that allowed at least some discovery or exchange of information regarding the facts of a claim to be asserted.

- The dual fee arrangement in the Third Modified Plan allows plaintiffs' lawyers for the Abuse Claimants to charge "maximum" contingency fees on top of and in addition to the fees charged by the Trust's lawyers and professionals, without the disclosure or oversight by the Court requested by the US Trustee (and Insurers), in a scheme that is both unconscionable and inconsistent with New Jersey law, rendering the Third Modified Plan unconfirmable.[22]

In these and other ways the Third Modified Plan purports to strip the Insurers of their contract rights and defenses, employs biased trust governance provisions, and is designed to allow claims that lack merit. This dynamic is similar to the plan proposed in *In re American Capital Equipment*.[23] There, the debtor was not "financially incentivized" to defend against claims, and, in fact, "there [was] really no valid reason for the [d]ebtor to even care" if the claims got settled.[24] The same is true here. The Debtor has no reason to care about the value of the Abuse Claims—and, as discussed above, is not even afforded the discovery necessary to defend against such claims.[25] And, as in *American Capital Equipment*, where the court denounced the "extreme extent to which due process protections/procedural safeguards afforded to the Insurers" had "been relaxed by relevant terms of the" plan,[26] the Modified TDP overrides the express terms of the

---

[20] *Id.* pp. 61-62.

[21] *Declaration of Paul J. Hinton Addressing Modifications to the First Modified Eighth Amended Plan of Reorganization* ("Hinton Supp. Decl.") [Dkt. No. 3493-2], ¶ 18.

[22] *See* Hinton Supp. Decl., ¶ 26.

[23] 405 B.R. 415 (Bankr. W.D. Pa. 2009).

[24] Insurers' Post-Trial Br., pp. 138-140, 151 of 234.

[25] *See* Sept. 21, 2022 Hr'g Tr., attached to Indelicato Decl. as Exh. 3, pp. 20:24-21:10 (the OCEs "had a motive, which was to get out" and "we didn't really care about the TDPs").

[26] 405 B.R. at 422-23.

contracts of insurance and deprives the Insurers of their bargained-for rights.[27]  By example only, the Modified TDP fails to provide the Insurers (as applicable) the right to defend or participate in the defense of the Abuse Claims.

**The Court Confirmed the Third Modified Plan by Denying Discovery, Prohibiting Evidence About the Modifications, Limiting Written Objections and Denying Standing**

On March 14, 2024, the Bankruptcy Court issued an Oral Decision, confirming the Third Modified Plan[28] after entering orders denying all discovery,[29] prohibiting any witnesses or other evidence by objectors about the modifications,[30] and limiting the written objections that could be submitted.[31]  When the Insurers submitted witness declarations with their objections to the First Modified Plan, the Court declined to consider that testimony because the Court ruled it would not be hearing any evidence.[32]

Contrary to the provisions of Section 1109(b) of the Bankruptcy Code, the Bankruptcy Court further denied the Insurers standing to be heard as parties-in-interest on issues core to the confirmability of the Third Modified Plan, including the impact of the modifications on the requirements for non-consensual non-debtor releases and injunctions.[33]  The Bankruptcy Court likewise took the matter of the Insurers' standing to assert claim objections under advisement and

---

[27] *See, e.g.*, TDP, § 8 (explaining the Abuse Claims Value Assessment, which outlines the process for the Trust seeking coverage from an insurers).

[28] *See* Transcript of Decision Confirming Plan Proponents' Third Modified Eighth Amended Plan Before the Honorable Jerrold N. Poslusny, Jr., United States Bankruptcy Judge (Mar. 14, 2024) [Dkt. 3680] ("March Decision Tr."), attached to the Indelicato Decl. as Exh. 4, p. 3:10–11. The Court, however, limited the scope of the Insurers' objections to only address the revisions in the Third Modified Plan.  *See id.*, p. 5:15–20. The Insurers could not object to language that was not modified even if it implicated other aspects of the Plan.  *Id.* at 7:2–10.

[29] *Memorandum Decision* [Dkt. No. 2226] ("Standing Decision") (Aug. 12, 2022), p. 11–12.

[30] *See* Nov. 15, 2023 Audio Ruling [Dkt. No. 3522].

[31] *See* February Decision Tr., p. 31:18–21; March Decision Tr., p. 4:15–20.

[32] November 15, 2023 Audio Ruling [Dkt. No. 3522] (noting that the issues to be addressed were purely legal questions and, therefore, any evidence is unnecessary).

[33] *See* Standing Decision, p. 1.

never ruled on the objections filed to the claims.[34]  This deprived the Insurers of the opportunity to be heard regarding potentially fraudulent or non-compensable claims that could implicate the Non-Settling Insurer Policies and harm claimants with meritorious claims.

As a result, the Bankruptcy Court ultimately assessed the Third Modified Plan—including whether the modifications met the good faith and other requirements of Section 1129, and the requirements for non-consensual non-debtor releases, injunctions, and contract assignments—as a matter of law with no evidence permitted, and with standing denied to the Insurers on anything having to do with the non-consensual releases and injunctions and other issues.[35]

### The Bankruptcy Court's Finding that the Modifications Were Not Material Makes it Legally Impossible that the Major Deficiencies in the Original Plan Were Remedied

The Insurers' research has not identified any case where a court denied confirmation because the plan lacked good faith and subsequently allowed the plan to be modified and confirmed without resolicitation.[36]  Rule 3019(a) specifies that post-solicitation modifications require  resolicitation if the modifications adversely change the treatment of parties who previously voted for the plan.[37]

Strict compliance with the solicitation rules is essential for a plan reliant on non-consensual third-party releases and injunctions because one of the requirements for such releases and

---

[34] *See* Dkt. Nos. 1547, 1548, 1604, 1613, 1634, 1644, 1646, 1695, 1696, 1749, 1750, 1752, 1753, 1761, 1765, 1848, 1849, 1850, 1851, 1852, 1853, 1949, 1951, 1952, 1954, 1972, 1986, 1987; *see also* Dkt. No. 2059.

[35] *See* Dkt. No. 3522 (declining to hear any evidence in connection with the First Modified Plan, including whether the Plan was proposed in good faith).

[36] The Plan Proponents sent notice to Abuse Claimants (or their counsel) (1) stating that the Court required changes to the Plan, (2) listing changes in the First Modified Plan, and (3) informing Abuse Claimants they could change their vote.  *See* Order Regarding Resolicitation, Exh. A.

[37] *In re Fed.-Mogul Glob. Inc.*, 2007 WL 4180545, at *39 (Bankr. D. Del. Nov. 16, 2007); *In re Century Glove, Inc.*, 1993 WL 239489, at *3 (D. Del. Feb. 10, 1993).

injunctions in this Circuit is overwhelming, informed consent.[38]  A change that merely has the potential to adversely impact a claimant's economic interests constitutes a material modification requiring resolicitation.[39]

In its Memorandum Decision, the Bankruptcy Court found **major** deficiencies in the Original Plan that required numerous material modifications.[40]  In finding that the modifications made thereafter were neither material nor adverse, as the Bankruptcy Court had to do here, the Plan Proponents could not have cured the defects in the Original Plan without resolicitation.   To the contrary, the fundamental nature of the defects that caused the Court to deny confirmation are by definition material.

In addition to these resolicitation defects, the Plan violates key provisions of the Bankruptcy Code.  The Insurance Assignment violates Third Circuit law that holds that contracts

---

[38] *See David Weinstein Co. Holdings, LLC*, No. 21-171 (MN), 2021 WL 979603, at *6 (D.16, 2021), *appeal dismissed sub nom. In re Weinstein Co. Holdings, LLC*, No. 21-1598, 2021 WL4429044 (3d Cir. 2021) (nonconsensual releases and injunctions need supermajority consent of the relief sought); *In re Purdue Pharma L.P.*, 633 B.R. 53, 73 (Bankr. S.D.N.Y. 2021), *vacated on other grounds by In re Purdue Pharma L.P.*, 635 B.R. 26 (S.D.N.Y. Dec. 16, 2021) (same); *In re TK Holdings*, No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) [Dkt. No. 2120] (relying on vote).

[39] "If the modification adversely affects the interest of a creditor who has previously accepted the plan, in **more than a purely ministerial de minimis manner**, that creditor should have the opportunity to reconsider and change his or her vote."  *In re Frontier Airlines, Inc.*, 93 B.R. 1014, 1023 (Bankr. D. Colo. 1988) (emphasis added).

[40] The deficiencies the Bankruptcy Court found precluding confirmation were extensive and included such material issues as (1) the manner in which claims were to be assessed under the Plan was biased, and not "truly . . . neutral", Mem. Decision, p. 14, (2) the manner in which claims were to be valued under the Plan was inappropriate, *id.*, (3) the Plan allowed "compensation for claims which are facially invalid or fraudulent," *id*. p.66, (4) the Insurance Assignment was invalid, *id.* p.12-13, (5) the Insurers' rights and defenses were insufficiently preserved, *id.* pp. 62-63, (6) the exculpation provision was overly broad, *id*. pp. 63-64 (7) the judgment reduction clause was too convoluted, (8) the Plan improperly applied a good faith finding not required by section 1129(a)(3) of the Bankruptcy Code, *id*., pp. 64-65, and (9) the Plan allowed attorneys to collect contingency fees in excess of what is permitted under New Jersey law and what is reasonable. *Id*. pp 67-69.

are dealt with as a whole and do not change in bankruptcy.[41]   The Debtor, however, seeks to sever

the benefits of the insurance policies from their attendant burdens.[42]   Under the Third Modified

Plan, "the Trust shall assume responsibility for, and be bound by, only such obligations of the

Covered Parties under the Non-Settling Insurer Policies as are necessary to enforce the Transferred

Insurance Interests."[43]   However, under longstanding Supreme Court jurisprudence, the Plan

cannot decide only to assign certain rights under the contracts of insurance.[44]   Further, the Plan

and TDP provide for the liquidation of the Abuse Claims by the Trust in a manner that is contrary

to what the Debtor agreed, and to which the Insurers are entitled, under the Non-Settling Insurer

Policies.   It is black letter law that a debtor may not misuse bankruptcy to rewrite its prepetition

contracts.   Here, in violation of New Jersey law, the Debtor assigns the benefits while enjoining

its duties under the Non-Settling Insurer Policies.   A Debtor cannot alter or enlarge insurers'

contractual obligations.[45]

### The Bankruptcy Court Denied the Insurers' Standing on Issues Central to the Third Modified Plan

The Bankruptcy Court denied the Insurers' standing to be heard on anything to do with the

non-consensual releases and injunctions (including the Channeling Injunction) around which the

Original Plan and the subsequent Modified Plans are structured.[46]   In addition, the Court refused

to allow the Insurers to be heard on anything having to do with the disclosure statement or

---

[41] *Cinicola v. Scharffenberger,* 248 F. 3d 110, 119 (3rd Cir. 2001) ("must assume he executory contract entirely"); 3 Collier on Bankruptcy 365.02[1][b] (Lawerence B. King, *et. al.* eds., 15th ed. rev. 1997)("An executory contract may not be assumed in part and rejected in part.").

[42] Third Modified Plan, Art. 7.3.

[43] Third Modified Plan, Art. 7.3.3.

[44] *NLRB v. Buildisco & Buildisco*, 465 U.S. 513, 531 (1984) (stating that debtor must assume executory contracts "cum onere"); *In re Italian Cook Oil Corp*, 190 F.2d 994, 997 (3d Cir. 1951) (If the Trustee "receives the benefits he must adopt the burdens.").

[45] *See In re Global Indus. Techs.*, 645 F.3d 201, 213–14 (3d Cir. 2011).

[46] Standing Decision, p. 11-12 (limiting Insurers' standing to challenge confirmation to "assignment of the Policies; good faith; and the structure of the Trust").

solicitation procedures despite the requirements for non-consensual non-debtor releases and injunctions and their impact on the Insurers.[47] The Bankruptcy Court's limitations on the Insurers' standing adversely impacted the Insurers' ability to conduct discovery in connection with confirmation of the Plan and blocked the presentation of evidence.[48]

After the Plan Proponents filed the First Modified Plan, the Court further denied Insurers standing to be heard with respect to whether resolicitation of that plan was required.[49] The Court then precluded Insurers on lack of standing grounds from offering evidence on whether the modifications to the Original Plan continued to leave the Insurers' contract rights impaired.[50]

The Bankruptcy Court further denied Insurers standing on a host of other issues, and thereby limited the arguments the Insurers could raise and the evidence the Insurers could introduce in connection with confirmation of the Plan.[51] During the course of the Bench Trial, the

---

[47] *See* May 31, 2022 Transcript of Decision Before The Honorable Jerrold N. Poslusny, Jr. United States Bankruptcy Judge, attached to Indelicato Decl. as Exh. 5, p. 7 ("Insurers' objections are overruled as they lack standing to raise them during the Disclosure Statement phase of considering the Plan."). The Insurers are directly and materially impacted by whether the Plan was properly solicited. The central feature of the Third Modified Plan is how it impairs, modifies and deals with the Insurers. In a series of decisions, ranging from *In re Congoleum Corp.*, 426 F.3d 675 (3d Cir. 2005) to *In re Global Industrial Techs.,* 645 F.3d 201 (3d Cir. 2011**),** this circuit has held insurers have standing. In *In re Congoleum*, the court expressly found that the insurers have standing on issues going to the integrity of the process.

[48] *See* Aug. 26, 2022 Transcript of Ruling by the Court Before the Honorable Jerrold N. Poslusny, Jr., United States Bankruptcy Judge, attached to Indelicato Decl. as Exh. 6, p. 8 (refusing to compel production of documents responsive to requests "on which the insurers do not have standing, such as the valuation or review of abuse claims, the Debtor's or Other Catholic Entities' obligations on such claims and the Other Catholic Entities' contributions"); *id.* at pp. 12-13 (limiting deposition subpoena served on McGregory to "confirmation issues for which the insurers have standing"); Dkt. No. 3039, ¶ 2 (granting motion to compel but only "on issues for which the [insurers] have standing").

[49] Order Regarding Resolicitation, at p. 2.

[50] *See* Nov. 15, 2023 Audio Ruling [Dkt. No. 3522].

[51] The Court held it would only "consider[ed] the portions to which the Insurers have standing to, and did, object." Mem. Decision, p. 22.

Court sustained objections to the Insurers offering evidence on lack of standing grounds including on the following points central to the Plan:[52]

- Whether the Debtor's corporate board exercised good faith in connection with the assessment of the Section 1129 factors of the Bankruptcy Code.[53]

- Whether the method used to calculate the non-debtor parish contributions supporting their non-consensual injunctions was the same as the one that was used for the Debtor and the same used to value claims against insurers.[54]

- Whether the bishop was permitted to transfer property without authority from the corporate board or from the non-debtor entities.[55]

- Whether the non-debtor parishes exercised good faith.[56]  Specifically, the Court sustained objections to questions the Insurers asked about:

  o Whether the Debtor considered potential indemnity claims favoring the parishes when it conducted its financial calculations.[57]

  o The extent to which the parishes fundraised prior to initiation of the chapter 11 bankruptcy case, and any payables between the Debtor and the parishes.[58]

  o Whether the percent of the $12 million in Chapter 11 administrative fees attributable to the Committee fit within the "normal ratio" for committee counsel.[59]

- Whether the Debtor had drafted any corporate resolution concerning any decision related to this bankruptcy matter.[60]

- The Debtor's understanding of the meaning of "substantial contribution" within the parish contribution analysis.[61]

---

[52] During the Bench Trial, the Court sustained several objections which the Debtor raised to prevent the Insurers from offering evidence on lack of standing grounds.  *See* Transcript of Trial Before the Honorable Jerrold N. Poslusny, Jr., United States Bankruptcy Judge (Nov. 9, 2022), attached to Indelicato Decl. as Exh. 7; *see also* Transcript of Trial Before the Honorable Jerrold N. Poslusny, Jr., United States Bankruptcy Judge (Nov. 14, 2022), attached to Indelicato Decl. as Exh. 8; *see also* Transcript of Trial Before the Honorable Jerrold N. Poslusny, Jr., United States Bankruptcy Judge (Nov. 30, 2022), attached to Indelicato Decl. as Exh. 9.

[53] *See* Indelicato Decl., Exh. 7 (Nov. 9), pp. 163:4-15, 165:1-2.

[54] *See* Indelicato Decl. Exh. 9 (Nov. 30), pp. 138:20-25, 139:1-2.

[55] *Id.* at pp. 169:20-25, 174:19-20.

[56] *See* Indelicato Decl. Exh. 8 (Nov. 14), pp. 108:4-5.

[57] *See id.*, pp. 89:8-13, 91:6-7.

[58] *See id.*, pp. 87:22-24, 89:5-7.

[59] *See id.*, p. 108:4-25.

[60] *See id.*, pp. 156:15-21, 157:6-7.

[61] *See id.*, p. 160:2-9.

In its Memorandum Decision, the Bankruptcy Court further deemed the Insurers to lack standing be heard on certain persons appointed under the Plan, including the Abuse Claims Reviewer and Trust Administrator, both of whom impact the rights of Insurers.[62]

**The United States Supreme Court is Poised to Rule
Imminently on Insurer Standing in *Kaiser Gypsum***

On March 19, 2024, the United States Supreme Court heard oral argument in *Kaiser Gypsum* on whether insurers have standing to be heard in bankruptcy proceedings. The Office of United States Trustee submitted an amicus brief taking the position that insurers should have standing as a party-in-interest under section 1109(b) of the Bankruptcy Code.[63] Under section 1109(b), a party in interest "may raise and may appear and be heard on any issue in a case under this chapter."

At oral argument, Justices Roberts, Kagan, Sotomayor, Kavanaugh, Gorsuch, and Barrett all questioned the basis for saying an insurer should not have standing.[64] *Kaiser Gypsum* may establish—conclusively—that insurers have standing to be heard on *any* issue in a chapter 11 case, contrary to the standing rulings in this Chapter 11 Case.[65]

---

[62] Mem. Decision, p 47.

[63] *See* Brief for the United States as Amicus Curiae, at 15, filed on Dec. 14, 2023, in *In re Kaiser Gypsum Co., Inc.*, 60 F.4th 73 (4th Cir.), *cert. granted sub nom. Truck Ins. Exch. v. Kaiser Gypsum Co.*, 144 S. Ct. 325 (2023).

[64] *See* Indelicato Decl., Exh. 10, Transcript of Oral Argument, *Truck Ins. Exch. V. Kaiser Gypsum Co.*, U.S. (2024) (No. 22-1079). The justices expressed concerns about preserving an insurer's right to be heard in bankruptcy proceedings. Justice Kavanaugh asked, "Isn't it just common sense that an insurer…is going to have an interest in this because how much the insurer will have to pay will be affected by how the plan is structured?" *Id*. at 43:20-24. Justice Barrett inquired, "Why do you want Truck to not even be heard? Just what is your motivation to be fighting . . . so hard." *Id*. at 46:11-13. Justice Kagan framed the issue more directly: "I think what everybody is saying to you is, well, they do have an interest in these anti-fraud provisions. Not just a concern, they have an interest, a material interest." *See id*. at 48:21-25. These remarks from other justices reveal the strong possibility that the Court will issue a major precedent affecting mass tort bankruptcies including this case.

[65] *See* Evan Ochsner, *Justices Lean Toward Insurer in Asbestos Bankruptcy Dispute (2)*, BLOOMBERG LAW (Mar. 19, 2024), *available at* https://news.bloomberglaw.com/bankruptcy-

**A Stay Pending Appeal Implements the Terms of the Modified Plan.**

Under the terms of the Third Modified Plan, the occurrence of the Effective Date of the Third Modified Plan is conditioned on the Confirmation Order being a Final Order.[66]  A Final Order requires that "no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending."[67]  The Third Modified Plan further provides that the Trust will not to be formed and contributions to the Trust will not be made until after the occurrence of the Effective Date.[68]

The contributions to the Trust are to be made over a period of five years after the occurrence of the Effective Date with $25 million of the $29 million initial contribution funded by non-debtors associated with the Debtor.[69]  Thus, if the Debtor (and the Settling Insurers) are pressured by the Committee to go effective prematurely, and the District Court declines to affirm non-consensual release and injunctions or the Bankruptcy Court is otherwise reversed following a decision in *Purdue*[70], the non-debtors could lose their funds.

While the Third Modified Plan provides that the Debtor, Committee and Settling Insurers may waive condition precedents to the Effective Date, there is no provision dealing with the mostly unsophisticated non-debtors who make the bulk of initial contribution.[71]

---

law/justices-lean-toward-insurer-in-asbestos-bankruptcy-dispute; ; Dietrich Knauth, *US Supreme Court appears to back insurers' participation in bankruptcy*, REUTERS (March 20, 2024), *available at* https://www.reuters.com/legal/government/us-supreme-court-appears-back-insurers-participation-bankruptcy-2024-03-19/.

[66] Third Modified Plan, Art. 14.2(b). Under Article 14.4 of the Plan, the Plan Proponents and any Settling Insurer may waive a condition precedent.

[67] Original Plan, Art. 2.2.56.

[68] *See* Third Modified Plan, Art. 7.2.1.

[69] DOC Trusts will transfer a $15 million loan of non-restricted cash to the Trust on the Effective Date and will transfer $10 million to the Debtor to be transferred to the Trust. *See id.*

[70] *In re Pursue Pharma L.P. (Harrington v. Purdue Pharma, L.P.)*, 69 F.4th 45 (2d Cir. 2022), *cert. granted* 216 L. Ed 2d 1300, 2023 U.S. LEXIS 2872 (U.S. Aug. 10, 2023).

[71] *See* Third Modified Plan, Art. 14.4.

Notices of appeals were timely filed by the Insurers prior to the expiration of the 14-day stay of the Confirmation Order provided for by Bankruptcy Rule 3020(e).[72]

### III.    RELIEF REQUESTED

Pursuant to Bankruptcy Rule 8007, the Insurers request that the Court stay the Confirmation Order pending appeal.

### IV.    BASIS FOR RELIEF

Bankruptcy Rule 8007 provides that "[o]rdinarily, a party must move first in the bankruptcy court for . . . a stay of a judgment, order, or decree of the bankruptcy court pending appeal."[73] But the motion also "may be made in the court where the appeal is pending,"[74] as long as it is accompanied by a statement that a similar motion was made in the bankruptcy court and "either state[s] that the court has not yet ruled on the motion, or state[s] that the court has ruled and set out any reasons given for the ruling."[75]

On March 15, 2024, the Court entered the Confirmation Order. The Insurers filed notices of appeal from the Confirmation Order, which pursuant to the rules of this Court, were docketed with the Bankruptcy Court.[76] Contemporaneously with the notices of appeal, the Insurers hereby request a stay of the Confirmation Order pending the adjudication of their appeal and an administrative stay of the Confirmation Order pending this Court's determination of this Motion.

The Insurers move this Court for a stay of the implementation of the Plan pending the Supreme Court's resolution of *Kaiser Gypsum*. The Insurers are seeking to pause any efforts of the Plan Proponents to go effective and/or implement the Plan at least until the Supreme Court

---

[72] *See* Dkt. Nos. 3697, 3699, 3700.
[73] FED. R. BANKR. P. 8007(a)(1)(A).
[74] FED. R. BANKR. P. 8007(b)(1).
[75] FED. R. BANKR. P. 8007(b)(2)(B).
[76] The notices of appeal are attached to Indelicato Decl. as **Exhibits 11, 12, and 13**.

issues a decision in *Kaiser Gypsum*, so the District Court will have the opportunity to resolve the pending appeals in accordance with applicable law.  The legality of non-consensual third-party releases, like the ones in the Third Modified Plan, will be decided in *Purdue* by June 2024.

The Third Circuit recognizes that "a myriad of circumstances can occur that would necessitate the grant of a stay pending appeal in order to preserve a party's position."[77] In considering a motion for stay pending appeal, the Court considers four factors:  "(1) whether the stay applicant has made a strong showing that it is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."

Although "none of the factors are determinative,"[78] the Third Circuit has indicated that the first two factors are "the most critical."[79]  As a result, Third Circuit courts apply a "sliding-scale" approach to evaluate a stay pending appeal.[80]  Under this approach, "the more likely the movant is to win, the less heavily need the balance of harms weigh in its favor; the less likely it is to win, the more heavily need the balance of harms weigh in its favor."[81]  Each of the four factors strongly favors staying the Confirmation Order.

A.    **The Insurers Are Likely to Succeed on the Merits.**

To establish a likelihood of success on the merits, the Insurers need only show that they have "a reasonable chance, or probability, of winning" on appeal.[82]  The probability of success

---

[77] *In re Highway Truck Drivers & Helpers Local Union No. 107*, 888 F.2d 293, 298 (3d Cir. 1989).

[78] *Haskell v. Goldman, Sachs & Co. (In re Genesis Health Ventures, Inc.)*, 367 B.R. 516, 519 (Bankr D. Del. 2007).

[79] *S.S. Body Armor*, 927 F.3d at 772.

[80] *Id.*

[81] *Id.*

[82] *Id.*

must be "significantly better than negligible," but does not need to be "more likely than not" or "greater than 50%."[83]

Without limiting the issues the Insurers may address on appeal, the Insurers have identified at least four substantial issues that warrant appellate review.

### 1.    The Court Improperly Limited the Insurers' Standing to Object

As a threshold matter, this Court erred in denying the Insurers standing on a number of issues that significantly impact the Plan.  Given the pending decision in *Kaiser Gypsum*, there is a reasonable chance that the Insurers would win on appeal.

*Kaiser Gypsum* presents a critical question of bankruptcy law also implicated in this case – an insurer's right to be heard on any issue in a case under chapter 11 pursuant to 11 U.S.C. § 1109(b) and § 1128(b).  *Kaiser Gypsum* may establish a new rule with respect to an insurer's right to appear and be heard on any issue in a chapter 11 case.  In this case, the Bankruptcy Court ruled that the Insurers did not have standing on many issues core to the Third Modified Plan. Instead, the Bankruptcy Court denied the Insurers standing with respect to several key aspect of the Plan, including the proposed injunction and non-consensual third party releases, the solicitation and voting procedures on the Plan that support the non-consensual releases and injunctions, the fiduciaries selected to serve under the TDP, the classification and treatment of other creditors, the claims review process, and the dual and duplicative attorneys' fees structure established under the Plan.[84]  Moreover, the Court noted that the Insurers' standing to address feasibility was "likely

---

[83] *Id.*

[84] *See In re Diocese of Camden*, 2022 Bankr. LEXIS 2244 (Bankr. D.N.J. Aug. 12, 2022); Mem. Decision, at pp. 25 at n.12 ("This objection is overruled as the Insurers lack standing to object on these grounds."); 47 ("The Insurers lack standing to object on the[] grounds [that the fiduciaries are conflicted], as this Court detailed in the Discovery Decision."); 67 ("While the Insurers do not have standing on th[e] [attorney fees] issue…"); 66, n.21 ("[T]he Insurers likely do not have standing on this issue"—the treatment of invalid claims); Order Regarding

limited in scope."[85]   The Insurers did not have standing to be heard on "any issues which relate only to the rights of third parties."[86]

Since the Plan was presented and confirmed by the Bankruptcy Court, the Supreme Court has called into question the authority to limit an insurer's standing, which is what occurred here. The Supreme Court has held oral argument in *Kaiser Gypsum*.  A ruling is expected by June 2024. The Insurers respectfully submit that this Court should stay the implementation of the Plan pending the Supreme Court's resolution of *Kaiser Gypsum*.  Given the recent developments of *Kaiser Gypsum*, there is more than a reasonable chance that the Supreme Court will hold that insurers have a right to appear and be heard on any issue in a chapter 11 case.  Such a decision may require the Bankruptcy Court to vacate the Confirmation Order and permit the Insurers to develop and present their objections on the matters where the Bankruptcy Court denied the Insurers standing.

### 2.      The Insurance Assignment Does Not Comply with the Bankruptcy Code

The Plan purports to rewrite the terms of the Non-Settling Insurer Policies through the Insurance Assignment.  Courts "do not have the power to rewrite contracts to allow debtors to continue to perform on more favorable terms."[87]  "Whatever limitation[s] on the debtor's property [apply] outside of bankruptcy … appl[y] inside of bankruptcy as well."[88]  In this case, the Plan fails to preserve and affirmatively recognize insurer rights, including the rights to investigate legal liability, to defend claims, to require the insured to cooperate with its insurers in the defense of

---

Resolicitation, at p. 2 ("The Insurers do not have standing with respect to whether resolicitation of the Modified Plan is required.").

[85] *See In re Diocese of Camden*, 2022 Bankr. LEXIS 2244, at *4.

[86] *Id.* at *5.

[87] *In re Crippin*, 877 F.2d 594, 598 (7th Cir. 1989).

[88] *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1663 (2019).

claims, to participate in the settlement or defense of any claims, to use a service organization, and to consent to any settlements.[89]

The Court agreed that the Plan could not re-write the Non-Settling Insurer Policies and strip away the Insurers' rights and defenses under the Non-Settling Insurer Policies. Nevertheless, the Plan that was confirmed does exactly that—it purports to impair the Insurers' rights under the Non-Settling Insurer Policies.

While the Plan includes some so-called insurance neutrality language, the treatment under the TDP allows for meritless and inflated claim values that the Trust Administrator will then seek to impose on Insurers. The Plan assigns the right to seek coverage for Abuse Claims to the Trust. The Insurers are still contractually obligated to pay claims in accordance with the policy terms, but the Plan does not require the Debtor or the OCEs to honor their obligations under the Insurers' Policies. Indeed, given the structure and provisions of the TDP that conflict with and violate the terms of the Non-Settling Insurer Policies, the performance by the Debtor and/or the OCEs of their obligations seems impossible. An assignment of insurance rights requires that contractual rights and obligations be preserved.[90]

The Debtor's rights under the Non-Settling Insurer Policies are being transferred without the accompanying obligations, including the obligation to defend and resolve Abuse Claims. But even though the Debtor is assigning its rights to coverage to the Trust, the Trust Administrator only has to honor the obligations under the insurance policies to the extent necessary to enforce

---

[89] *See, e.g., In re Combustion Eng'g, Inc.*, 391 F.3d 190, 209, 216-18 (3d Cir. 2004) (adding provision to make clear that insurers' rights were not impaired).

[90] *See, e.g., In re Federal-Mogul Global Inc.*, 684 F.3d 355, 382 (3d Cir. 2012) (holding in a bankruptcy appeal that the Bankruptcy Code preempted only anti-assignment rights in insurance policies under certain circumstances); *In re Am. Home Mortg. Holdings*, 402 B.R. 87, 98 (Bankr. D. Del. 2009); *In re Combustion Eng'g, Inc.*, 391 F.3d at 217.

such policies and seek coverage.  "[T]he Trust shall assume responsibility for, and be bound by, only such obligations of the Covered Parties under the Non-Settling Insurer Policies as are necessary to enforce the Transferred Insurance Interests."[91]  Instead of determining what can be assigned under the Bankruptcy Code, the Court punted the decision, allowing a vague, partial assignment of the Non-Settling Insurer Policies.  But when assigning a contract, it is all or nothing.[92]  There is no legal basis for such treatment and ignoring the principle of *cum onere*.[93]

By approving the Third Modified Plan, the Bankruptcy Court allowed the Plan Proponents to transfer the Non-Settling Insurer Policies while splitting the benefits from the burdens thereunder.  Not only is that clear in Article 7.3 of the Plan but also by review of the biased TDP process approved by this Court.  The Plan and TDP provides for the liquidation of the Abuse Claims by the Trust in a manner that is contrary to what the Debtor agreed, and to which the Insurers are entitled, under the Non-Settling Insurer Policies.  The Bankruptcy Code, however, does not permit a debtor to do this.

Similarly, the Bankruptcy Court erred in finding that the Insurance Assignment did not violate the Bankruptcy Code.  The Plan improperly seeks to delegate the Debtor's duties under the Non-Settling Insurer Policies to the Trust.  As noted above, the Plan provides that the Trust is not

---

[91] *See* Third Modified Plan, Art. 7.3.3.

[92] *See Anytime Fitness, L.L.C. v. Thornhill Bros. Fitness, L.L.C. (In re Thornhill Bros. Fitness, L.L.C.)*, 85 F.4th 321, 325–26 (5th Cir. 2023) ("When it comes to assuming an executory contract, we have been clear that it's all or nothing: 'An executory contract must be assumed or rejected in its entirety.' . . . [W]hen a trustee relies on § 365(f) to assign an executory contract in bankruptcy, it must assign the contract in whole, not in part.").

[93] *See Spyglass Media Grp., LLC v. Bruce Cohen Prods. (In re Weinstein Co. Holdings, LLC)*, 997 F.3d 497 (3d Cir. 2021); *In re Stewart Foods, Inc.*, 64 F.3d 141, 145 (4th Cir. 1995) (holding that a debtor "remains bound by the debtor's obligations under [non-executory] contracts after the bankruptcy filing."); *In re Superior Air Parts, Inc.*, 486 B.R. 728, 738 (Bankr. N.D. Tex. 2012) ("[W]hen a contract is non-executory, the debtor remains bound to its obligations under that contract after the bankruptcy filing.").

assuming all obligations under the Policies.  There is nothing in the Bankruptcy Code or New Jersey law that allows the Debtor to delegate its duties under the Non-Settling Insurer Policies.

In fact, the New Jersey Commercial Code provides for the opposite.  The Commercial Code specifies, "No delegation of performance relieves the party delegating of any duty to perform or any liability for breach."[94]   "[B]ased on the clear language of the statute, we find that N.J.S.A. § 12A:2-210(1) is applicable and that [the delegator] is not relieved of its duty to perform or its liability for breach.  A party may delegate performance under the contract to another party, but cannot delegate its duty to perform or its liability for breach. For example, here, [the delegator] could delegate to [the delegatee] its right to purchase and sell [the contractual counterparty] gas, but could not under N.J.S.A. § 12A:2-210(1) delegate to [the delegatee] its duties or liabilities, such as [the delegator's] contractual duty to pay [the contractual counterparty], or [the contractual counterparty's] successors, for the gas."[95]  Under New Jersey law, delegation of obligations under the Non-Settling Insurer Policies is not binding on the Insurers.

The Debtor is not relieved of its contractual duties and must still perform all of its obligations under the Non-Settling Insurer Policies.  If the Trust fails to perform its obligation to maintain the effectiveness of the Non-Settling Insurer Policies, then the Debtor remains bound to the Insurers to do so.  The failure of the Debtor to perform would constitute a breach, which could nullify coverage under the Non-Settling Insurer Policies. [96]

---

[94] N.J. Stat. § 12A:2-210 (1).

[95] *Sunoco, Inc. v. MX Wholesale Fuel Corp.*, 565 F. Supp. 2d 572, 580 (D.N.J. 2008).

[96] *Id*. ("There is no language in the contract expressing an intent by the parties to relieve Monmouth of its duties under N.J.S.A. § 12A:2-210(1), or an intent to relieve Monmouth of its duty to perform or liability for breach.  Rather, the language in the contract appears to express an intent that the parties were to remain bound under the provisions of N.J.S.A. § 12A:2-210(1)."); *see also New Jersey Dep't of Treasury v. Visara Int'l, Inc.*, 166 F. App'x 639 (3d Cir. 2006) ("Assignor could not assign its obligations under contract without consent of other contracting party to which it was liable.")  .

This New Jersey law is consistent with the wording of the Non-Settling Insurer Policies.[97] The Non-Settling Insurer Policies contain consent-to-assignment clauses, which require the Debtor to obtain each Insurer's consent to any delegation of duties to the Trust.[98]   That contractual language—agreed to by both parties when the insurance became effective—evinces the Debtor's and the Insurers' intent to hold the Debtor bound by its obligations.  The Debtor has not obtained any Insurer's consent to the delegation.  Nor have any of the non-debtor entities sought consent. As there is no authority under the Bankruptcy Code concerning the delegation of duties of a non-executory contract, New Jersey law applies.   New Jersey law enforces the anti-assignment restriction in the Non-Settling Insurer Policies through N.J. Stat. § 12A:2-210 (1), set out above.

**3.    The Plan Purports to Strip the Insurers' Rights and Defenses, Contrary to the Bankruptcy Code and Third Circuit Law Established in *Combustion Engineering***

In confirming the Third Modified Plan, the Court gave in to the Plan Proponents and approved provisions that have no basis in law or fact and were not required to confirm the Plan under Section 1129 of the Bankruptcy Code—the provisions governing distributions and the Insurance Assignment.  Specifically, the Plan provides that (i) an interim distribution cannot, by itself, form a basis to deny coverage, and (ii) the Insurance Assignment cannot form a basis to deny coverage (subject to the Insurers' rights to challenge the assignment under state law).  This is not permissible under *Combustion Engineering*.

**4.    The Trust Governance is Biased and Will Lead to Results Inconsistent with the Bankruptcy Code**

In refusing to appoint a neutral party, the Plan Proponents ignored the Bankruptcy Court's prior rulings.   A neutral party is required to ensure independence from the Debtor and Tort

---

[97] "Assignment of interest, under this Insurance shall not bind the Underwriters until the Underwriters' consent is endorsed hereon."  LMI 1980-83 Policy (JX-036) at 36.
[98] *Id.*

Committee.   The Court in its February Decision determined that the "use of JAMS or AAA"

addressed its "concern that a neutral third-party will be responsible for valuing [Abuse Claims]."[99]

That process "ensures that the party valuing the [Abuse Claims] will be selected through a neutral

process."[100]   But Section 8(ii) of the TDP allows for the use of "the rules of any *other*"

(unidentified) "national alternate dispute resolution, arbitration or mediation association" when

selecting an arbitrator or mediator.[101]   That section, therefore, leaves open the possibility that the

Debtors—through the Trust—will rely on a mediator or arbitrator that is not selected to be neutral

and independent.

The Court's Memorandum Decision and Oral Decision required the independence of any

mediator or arbitrator selected to liquidate Abuse Claims.[102]   Notwithstanding the Court's

Memorandum Decision, the Court, in its March Decision, declined to accept the Insurers' proposal

to insert language into the Plan that would require the arbitrator or mediator chosen to be "neutral

and independent," whether under JAMS, AAA or otherwise.[103]   This was an error.   Lack of

independence is a tangible and critical concern.[104]   The result is a process that absurdly leaves the

conflicted Trust Administrator as the only party with an interest in the outcome to mediate or

arbitrate with himself.

The Debtor and the OCEs do not hold adverse positions to the Trust or the Abuse

Claimants.   The Plan has no incentives for the Debtor or the OCEs to contest any claims to the

---

[99] Feb. Decision Tr., p. 13:1-3.

[100] *Id.* at p. 13:8-10.

[101] TDP, ¶ 8(ii) (emphasis added).

[102] *See* Dec. Decision Tr., p. 14:10-17.

[103] *See* March Decision Tr., p. 9:6–13.

[104] The Court never permitted the Insurers to present evidence on this point regarding independence.   And the Insurers had no prior ability to do so because this concept was only introduced after the Court issued its Memorandum Decision on August 29, 2023.

mediator or arbitrator because their liability has already been capped.  In fact, as the Court has found since April 2022, the Debtor and the Tort Committee share common interests in the Plan.[105] For all of these reasons, the Insurers are likely to succeed in their appeals.

**B.**     **Parties Will Suffer Irreparable Injury if a Stay Is Not Granted.**

The Motion should be granted because irreparable injury is "more apt to occur than not" in the absence of a stay.[106]

### 1.     Efforts by the Plan Proponents to Ignore the Plan Terms and Prefund the Trust Will Irreparably Harm all Parities in Interest

If the Debtor under pressure from the Tort Committee acquiesces to ignoring the requirement for a final Confirmation Order and seeks to prefund the Trust, such actions would violate the terms of the Plan, impact many non-debtor parties and imperil the feasibility of this or any other plan in the future.

The Plan creates a multi-year arrangement to finance the Trust soundly.[107]  This arrangement is in many ways distinct from other mass-tort chapter 11 plans, such as the reorganization plan approved in the Boy Scouts of America (BSA) bankruptcy.  Unlike the BSA plan, which established a $1.9 billion cash settlement fund for the accompanying post-confirmation trust, the Third Modified Plan specifies a more methodical and layered distribution scheme tailored to this case that anticipated appeals and the need to resolve them before any distribution.[108]

Although the Trust Administrator must "make timely distributions and not unduly prolong the duration of the Trust," the Plan is premised on a five-year payment structure over time outlined

---

[105] *See* Aug. 26, 2022 Hr'g Tr. at 11:4–12.
[106] *S.S. Body Armor*, 927 F.3d at 772
[107] Third Modified Plan, Art. 7.2 ("Contributions to Trust").
[108] *See In re Boy Scouts of Am. & Delaware BSA, LLC*, No. 20-10343 (LSS), 2022 WL 20541782 (Bankr. D. Del. Sept. 8, 2022), aff'd, 650 B.R. 87 (D. Del. 2023).

under the TDP.[109]  By design, the Trust Assets would come from funds which are not readily distributable and for which it was not contemplated there would be distribution of funds contributed by non-debtors until after appeals were resolved.  The Plan, mindful of the Debtor's financial performance, permits the Debtor to pay into the Trust over five years so that distinct classes of claims will be paid out after the "Effective Date."[110]  As described in the accompanying declaration of Paul Hinton, early funding of the Trust would violate these practical terms of the Plan.[111]

In addition to violating the payment arrangement available under the Third Modified Plan, early funding runs roughshod over the rights of non-debtors.  Under the Plan, non-debtors: the OCEs—including the Parishes, the Missions, the Schools, and the Catholic Ministry Entities—hold a material portion of the funds which will be initially transferred to the Trust.[112]  Accordingly, efforts to rush implementation of the Plan will not only reduce the Debtor's anticipated investment income, but also force the non-debtors into a situation where they are asked to transfer funds promptly and before the District Court rules on the issuance of non-consensual non-debtor injunctions, even though they were never obligated to comply with pre-funding while an appeal is pending under the Plan's terms.

Certain non-debtors agreed to make an initial contribution payable starting at the Effective Date.  But, according to the Plan, the Effective Date cannot occur unless several conditions have been satisfied, including that the Confirmation Order entered by the Bankruptcy Court is a "Final Order, defined as "an order as to which the time to appeal, petition for certiorari, petition for

---

[109] Third Modified Plan, Art. 7.7 (Rights and Responsibilities of the Trust Administrator).

[110] Third Modified Plan, Art. 7.2.1 (Debtor Cash Contribution and OCE Cash Contributions).

[111] *See Declaration of Paul J. Hinton Addressing the Economic Effect of Early Plan Funding* (the "Hinton March 26 Declaration"), attached hereto as **Exhibit A.**

[112] Third Modified Plan, Art. 7.2.1 (Debtor Cash Contribution and OCE Cash Contributions).

review, or move for reargument or rehearing has expired and as to which no appeal, petition for

certiorari, or other proceedings for reargument or rehearing shall then be pending."[113]   The

Disclosure Statement reiterated this point.[114]  No evidence was offered to the Bankruptcy Court

that the non-debtor consented to the Debtor's efforts to waive conditions to the Effective Date.

If successful on appeal, the OCEs could lose their contributions to the Trust if any of the

non-debtor releases and injunctions fail—the Debtor can make the decision to waive conditions to

the Effective Date, but a significant amount of money comes from the OCEs.  The result would

imperil the feasibility of this Plan or could render infeasible any future plan.

Since the Plan does not contemplate early funding while an appeal is pending and the non-

debtors have not consented to this funding arrangement, this Court should not permit the Debtor

to run roughshod over the Plan's terms and the non-debtors' rights.[115]

## 2.      The Insurers Will be Irreparably Harmed if the Appeal Is Determined to be Equitably Moot.

The Plan provides that the Debtor may declare that the Effective Date of the Plan has

occurred so long as, among other things, no court has entered a stay of the Effective Date pending

an appeal.[116]  Upon the Effective Date, certain actions take place, including the transfer of the

Trust Assets (*i.e.*, the Cash Contributions) to the Trust.[117]  Once the transfer is complete, then

Abuse Claims can be valued and begin getting paid.

---

[113] *See* Third Modified Plan, Art. 2.2.59 (Final Order means "an order as to which the time to appeal, petition for certiorari, petition for review, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending.").
[114] Disclosure Statement, Art. XVIII.B.(b).
[115] No bond is necessary for a brief stay in this case.  Since the Confirmation Order does not require the Insurers to make any monetary payments, there is nothing for a bond to secure and there is "no need for a bond."  *See In re Los Angeles Dodgers LLC*, 465 B.R. 18, 38 (D. Del. 2011).
[116] *See* Third Modified Plan, Art. 14.2
[117] *See* Second Modified Plan, Art. 7.2.2

It is reasonable to assume that the Committee wishes to effectuate the Plan as soon as possible.  Thus, there is a substantial risk that the Committee will pressure the Debtor to do so to seek to moot the appeals and thus strip the Insurers of their appellate rights.  In fact, that was their basis for arguing that this Court should waive the automatic 14-day stay under Bankruptcy Rule 3020(e).[118]  The Plan Proponents will rush to transfer assets to the Trust in an attempt to "substantially consummate" the Plan, in a blatant attempt to deny the Insurers any appellate remedy.

The Plan Proponents should not be allowed to engineer a situation where the Plan may not be reviewable.[119]  In *In re One2One Communications, LLC*, Judge Krause questioned the utility of equitable mootness, suggesting that proponents of reorganization plans have rushed to implement such plans "so they may avail themselves of an equitable mootness defense."[120]

The Plan Proponents will try to game the system to strip the Insurers of their appellate rights guaranteed by Congress and the Constitution and expedite the contributions to the Trust.  That demonstrates the potential for serious irreparable harm that warrants a stay.  The loss of appellate rights alone is the "quintessential form of" irreparable harm.[121]

While the Insurers do not believe that the appeal could be equitably mooted because the issues on appeal primarily relate to issues other than the Debtor's contribution to the Trust, there is a substantial risk that the Plan will be promptly consummated and their appeals could be

---

[118] *See* Dkt. No. 3630.

[119] *In re Semcrude, L.P.*, 728 F.3d 314, 323 (3d Cir. 2013) (finding "equitable mootness was not a proper shield" to preclude appellate review of district court decision).

[120] *In re One2One Commc'ns, LLC*, 805 F.3d 428 (3d Cir. 2015) (Krause, J., concurring).

[121] *In re Highway Truck Drivers & Helpers Local Union No. 107*, 888 F.2d 293, 297-98 (3d Cir. 1989); *In re Country Squire Assocs. of Carle Place, L.P.*, 203 B.R. 182, 183 (B.A.P. 2d Cir. 1996); *CW Capital Asset Mgmt. v. Burcam Capital II, LLC*, 2013 WL 3288092, at *7 (E.D.N.C. June 28, 2013).

threatened by the doctrine.[122]    Irreparable harm exists where "there is a substantial risk of mootness, in addition to potential economic harm," as here.[123]    "[W]here the denial of a stay pending appeal risks mooting any appeal of significant claims of error, the irreparable harm requirement is satisfied."[124]    Thus, if a court were to determine that the Insurers' appeals should be dismissed as equitably moot, the Insurers would suffer irreparable injury, because their appeal addresses issues of significant error by the bankruptcy court that will cause the Insurers economic harm.

Immediately upon the Effective Date, the Debtor's contractual rights in its Non-Settling Insurer Policies would be transferred to the Trust.[125]    By this action, the Insurers would be independently harmed absent a stay because they would be subject to risks that run counter to the economic bargain in their contracts.  Regardless of whether they can "assert" defenses in coverage litigation, the Plan (as confirmed) would modify those rights under the TDP.  Permitting the Plan to go into effect despite this reality would create "enormous" costs and uncertainty for the Insurers, "even if [they] never pay a single dollar of indemnity" and ultimately prevail in their appeals.[126]

### 3. Depriving the Insurers of Their Due Process Rights Constitutes Irreparable Harm.

The Insurers will suffer irreparable harm if implementation of the Plan is not stayed pending the appeal because they were unable to exercise their due process rights.  As discussed

---

[122] *In re MTE Holdings, LLC*, 2021 WL 4203339, at *4 (D. Del. Sept. 15, 2021); *see also In re MD Helicopters, Inc.*, 641 B.R. 96, 109 (D. Del. 2022) (irreparable harm exists where "there is a substantial risk of mootness, in addition to potential economic harm"); *In re Los Angeles Dodgers LLC*, 465 B.R. at 36 ("[W]here the denial of a stay pending appeal risks mooting any appeal of significant claims of error, the irreparable harm requirement is satisfied.").

[123] *In re MTE Holdings, LLC*, 2021 WL 4203339, at *4 (D. Del. Sept. 15, 2021); *see also In re MD Helicopters, Inc.*, 641 B.R. 96, 109 (D. Del. 2022).

[124] *In re Los Angeles Dodgers LLC*, 465 B.R. at 36.

[125] *See* Third Modified Plan, Art. 7.2.2.

[126] *In re Global Indus. Techs.*, 645 F.3d at 213–14; *see also L.A. Dodgers*, 465 B.R. at 35–36.

above in Section IV.A, the Insurers are parties-in-interest and are entitled to be heard on any issue. The Court limited the scope of the Insurers' discovery and what issues they could raise as objections in the plan confirmation process.[127]

In addition, the Insurers have the right to object to fraudulent and otherwise unmeritorious claims, and attempted to exercise that right.  For example, LMI objected to sixteen Abuse Claims due to the claims' facial invalidity.[128] The Court never ruled on these Objections.  LMI have bargained-for protections that would limit fraudulent or non-compensable claims, including the Debtor: (i) notifying LMI of claims; (ii) utilizing a Service Organization; (iii) providing LMI with records; (iv) cooperating with LMI; (v) permitting LMI to be associated in the defense of claims, all in order to ensure that the Debtor pays only valid claims.  Century likewise objected to Abuse Claims.[129]  LMI's and Century's objection to the Original Plan referenced the claims objections, arguing, "The Plan's allowance of unenforceable Abuse Claims is in bad faith," due to depriving LMI and Century of such rights and paying the facially invalid claims.[130]  The Bankruptcy Court did not reference the claims objections in its Memorandum Decision denying confirmation of the Original Plan.[131]  However, the Plan improperly extinguishes the claim objections.[132]

Such injury would inevitably lead to the Trust tendering such invalid claims to the Insurers for payment. [133]  Permitting the Plan to go into effect despite this reality would create "enormous"

---

[127] *See* Dkt. Nos. 2226, 2321.
[128] *See* Dkt. Nos. 1547, 1548, 1604, 1613, 1634, 1644, 1646, 1749, 1752, 1753, 1951, 1954, 1949, 1952, 1972, and 1750.  The Claims Objections hearings were adjourned to Aug. 10, 2022.
[129] *See* Dkt. Nos. 1547, 1548, 1604, 1613, 1634, 1644, 1646, 1695, 1696, 1749, 1750, 1752, 1753, 1761, 1765, 1848, 1849, 1850, 1851, 1852, 1853, 1949, 1951, 1952, 1954, 1972, 1986, 1987.
[130] Dkt. No. 2401, at 68-70.
[131] Dkt. No. 3336.
[132] Third Modified Plan, Art. 8.6.
[133] *See* TDP at 1.

costs and uncertainty for the Insurers, "even if [they] never pay a single dollar of indemnity" and ultimately prevail in their appeals.[134]

All of these protections are extinguished by the Plan and TDP, irreparably harming the Insurers by subjecting them to millions of dollars defending coverage claims for facially invalid Abuse Claims.[135]  Such costs can never be recovered.

**C.      The Balance of Equities Favors a Stay.**

In determining whether any party in interest will suffer "substantial" injury if a stay is granted, a court must balance the likely harm to the movant absent a stay (*i.e.*, the second factor) against the likely harm to stay opponents if the stay is granted (*i.e.*, the third factor).[136]

The Insurers will be irreparably harmed if a stay is not granted, as discussed in section IV.B (2)-(3).  The Insurers could be deprived of their right to appeal serious reversible error, which adversely affects their contractual and due process rights.

In contrast to the Insurers, the Debtor and other parties in interest will suffer little to no harm if the court grants a stay.  A stay will not impair the Debtor's ability to consummate the Plan if the Confirmation Order is affirmed on appeal.[137]

**1.      The Condition Precedent Requiring the Exhaustion of
    Appeals Is Integral to the Feasibility of the Plan**

The conditions to the Trust required by the Plan precedent to the Effective Date require no appeals be pending because it was anticipated there would be appeals and the premature

---

[134] *Global Indus. Techs.*, 645 F.3d at 213-214; *see, e.g.*, *L.A. Dodgers*, 465 B.R. at 35-36 (finding irreparable harm where party would have "less leverage than it contracted for").

[135] *See* Declaration of Carl A. Salisbury [Dkt. No. 2516] ¶19 ("I estimate that coverage litigation with the Insurers would occur over three to five years and cost in a range of $7 million to $10.6 million.").

[136] *See S.S. Body Armor*, 927 F.3d. at 772.

[137] *See generally* Hinton March 26 Declaration.

declaration of the Effective Date would put at risk the contributions of non-debtors, which are dependent on the non-consensual, non-debtor releases and injunctions.

The contributions to the Trust required by the Plan are to be made over time with the initial payment of $29.75 million to be transferred to the Trust after the occurrence of the Effective Date. More than half of the initial payment is funded by non-debtor parishes, schools and other such entities.[138] The rest of the contributions are required to be made over a five-year period following the occurrence of the Effective Date and are to be funded by a mix of Debtor and non-debtor funds.[139]  The non-debtor releases, injunctions, assignments and exculpations (including the Channeling Injunction) provided in the Plan with respect to these entities are controversial.  If the Committee successfully pressures the Debtor to declare the Effective Date prematurely before appeals are exhausted, the non-debtor entities could lose their contribution.

Further, while in some cases a stay could delay distributions, that is not true here.  The claims process will be lengthy and time consuming.  All of the Abuse Claims must go through this evaluation process before a dollar value can be assigned to any claim.  Essentially, all of the points must be added up, so that each Abuse Claimant can be assigned a fractional interest in the total. That fraction is then applied to the total amount of money available to the Trust for distribution, which is currently unknown.  Even without the stay, the Abuse Claimants will have to wait at least

---

[138] *See* Third Modified Plan, Art. 7.2.1 ($15 million of the $29.75 million initial contribution is in the form of a loan of non-restricted cash from DOC Trusts; in addition, $10 million shall be transferred to the Debtor from DOC Trusts, which shall then be transferred by the Debtor (together with the Initial Debtor Contribution) to the Trust on the Effective Date.

[139] *See* Third Modified Plan, Art. 7.2.1.

four years to receive their full claim amounts.  And, even if there were to be some delay, that is hardly a sufficient reason not to issue a stay.[140]

With appeals pending, any contribution made at this stage would be subject to reserves and contingencies.

### 2.    The Plan Was Solicited on the Basis that the Effective Date of the Plan Would Be Subject to Delay by Appeals

The payment structure was disclosed in the Disclosure Statement and part of the Original Plan that Abuse Claimants voted to support.[141]  The fact that payments were being made over a period of time was known—and those payments would not start until after any appeals of a confirmation order were exhausted or the time to appeal had expired.  Because the contributions to the Trust are only made after the Effective Date, the Plan does not contemplate any payments before all appeals have expired.[142]

The Disclosure Statement on which the Original Plan was solicited clearly stated and advised all interested parties that there are conditions precedent to the Effective Date.[143]  The Effective Date—which must occur before any distribution may be made—requires that there be no appeal pending and no stay of the Confirmation Order.[144]

The Plan Proponents represented in the Disclosure Statement that the risks associated with the Plan included that the Plan would be objected to, that terms of the Plan might not be upheld and specifically that the third party releases, injunctions, assignments and exculpations (including

---

[140] *See In re Gen. Motor Corp.*, 409 B.R. 24, 33 (Bankr. S.D.N.Y. 2009) (recognizing line of cases "expressing a willingness to grant a brief stay pending expedited appeal" where stay only "delay[s] distributions to creditors for a little longer").

[141] *See* Original Plan, Art. 7.2.2.

[142] *See* Third Modified Plan, Art. 7.2.1.

[143] *See* Disclosure Statement, Art. XVIII.B.

[144] Disclosure Statement, Art. XVIII.B.(b).

the Channeling Injunction) provided in the Plan may not be sustained.[145]  As a result, the

Disclosure Statement specifically disclosed that the timing of the consummation of the Plan and

any distribution was uncertain and could be delayed or might not occur at all.[146]

### 3. The Bankruptcy Court Rejected Requests to Override the Stay Implemented by Bankruptcy Rule 3020(e) on the Basis that there Would Be Appeals

The Bankruptcy Court reinforced the Disclosure Statement's warnings that there would be

appeals throughout the proceedings, most recently rejecting the Plan Proponents' request to

override the 14-day stay of effectiveness under Bankruptcy Rule 3020(e).[147]

Undoubtedly, the Plan Proponents will argue that this appeal will further delay the case,

which has been pending for over three years, and distributions to creditors, including the Abuse

Claimants.  However, the Plan was designed and solicited with this in mind.  The harm to the

Insurers outweighs any alleged harm to the Abuse Claimants.  There is no harm to the Debtor or

the non-debtors.  The record has made clear that the Plan Proponents expect that there would be

an appeal and, therefore, the Plan cannot go effective immediately.

### D.  The Public Interest Strongly Favors a Stay.

The public interest also weighs strongly in favor of a stay.  The District Court for the

District of New Jersey has held that "public interest favor[s] the correct application of the law."[148]

That is especially true "where property rights are at stake."[149]  The issues on appeal present

---

[145] Disclosure Statement, Art. XXV.p.

[146] Disclosure Statement, Art. XXV.h ("There can be no certainty as to the precise amount that will be distributed by the Trust in any particular time period or when the Abuse Claims will be resolved by the Trust.").

[147] Feb. Decision Tr., p. 30:12–17 ("The Plan Proponents have not established a basis why I should avoid or void or waive the 14-day stay and I can see that this will only cause complications if the insurers decide to appeal.").

[148] *In re Revel AC, Inc.*, No. 14-22654 GMB, 2015 WL 567015, at *5 (D.N.J. Feb. 10, 2015).

[149] *In re Revel AC, Inc.* 802 F.3d 558, 573 (3d Cir. 2015).

significant issues of law, which will undoubtedly affect Diocesan bankruptcy cases now and in the future.

Many prior Diocesan bankruptcy cases have been settled by mutual consent. However, with a few exceptions, that process has broken down. This case is the first contested Diocesan case wherein a plan of reorganization has been confirmed over the strenuous objections of the parties targeted by that plan to provide the majority of the funding under that plan, *i.e.*, the Insurers. The Insurers' objections go to matters of grave importance, not merely for this case, but for many of the pending Diocesan bankruptcies as well as cases that have not yet been filed. The Insurers respectfully submit that reversible errors were made in this case, affecting their contract and due process rights. These issues should be resolved by the Third Circuit so that the pending Diocesan bankruptcies will have the benefit of the Third Circuit's review of this Plan. This appeal is a matter of tremendous public interest.

There is also a strong public interest in ensuring that litigants have an ability to pursue their appellate rights.[150] Courts have stated, "[w]e agree that an expedient process of justice is in the public interest, but emphasize that the preservation of the . . . right to appeal is also within the public interest. If a trade-off is necessary, it must favor rights, not expediency."[151]

"As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff."[152] The Insurers will suffer irreparable harm upon consummation of the Plan. Therefore,

---

[150] *See NLRB v. Gen. Motors Corp.*, 510 F. Supp. 341, 343 (S.D. Ohio 1980) ("We agree that an expedient process of justice is in the public interest, but emphasize that the preservation of the . . . right to appeal is also within the public interest. If a trade-off is necessary, it must favor rights, not expediency.").

[151] *Id.* at 343.

[152] *See AT&T v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994).

granting the Insurers a stay pending appeal is consistent with the public interest of preserving the ability of a party to exercise effectively its right to a meaningful review through a full and fair appeal process.[153]

## V.    CONCLUSION

WHEREFORE, for the reasons set forth herein, the Insurers respectfully request that the Court (i) stay the Confirmation Order pending final appellate review or, in the alternative, temporarily stay the Confirmation Order to allow the District Court to consider the appeal, and (ii) grant such other and further relief as the Court deems just and proper.

Dated: March 26, 2024

Respectfully submitted,

**STAMOULIS & WEINBLATT LLC**

By: */s/ Stamatios Stamoulis*
Stamatios Stamoulis #01790-1999
800 N. West Street, Third Floor
Wilmington, DE 19801
Telephone: (302) 999-1540
stamoulis@swdelaw.com

- and -

**O'MELVENY & MYERS LLP**
Tancred Schiavoni, Esq. (admitted *pro hac vice*)
Samantha M. Indelicato (admitted *pro hac vice*)
Times Square Tower
7 Times Square
New York, NY 10036
Telephone:  212-326-2000
Email:  tschiavoni@omm.com
Email:  sindelicato@omm.com

*Counsel for Century Indemnity Company, as*

---

[153] *See id.*

*successor to CCI Insurance Company, as successor to Insurance Company of North America ("Century"), Federal Insurance Company ("Federal"), and Illinois Union Insurance Company ("Illinois Union")*

**WHITE AND WILLIAMS LLP**

By: */s/ Siobhain P. Minarovich*
Siobhain P. Minarovich, Esq.
7 Times Square, Suite 2900
New York, NY 10036-6524
Telephone: (212) 631-4415
Facsimile: (212) 631-1248
E-mail: minarovichs@whiteandwilliams.com

- and -

**PARKER, HUDSON, RAINER & DOBBS LLP**
Harris B. Winsberg, Esq. (Admitted *pro hac vice*)
Matthew M. Weiss, Esq. (Admitted *pro hac vice*)
Matthew G. Roberts, Esq. (Admitted *pro hac vice*)
303 Peachtree Street, Suite 3600
Atlanta, GA 30308
Telephone: (404) 523-5300
Facsimile: (404) 522-8409
E-mail: hwinsberg@phrd.com
            mweiss@phrd.com
            mroberts@phrd.com

- and -

**PARKER, HUDSON, RAINER & DOBBS LLP**
Todd C. Jacobs, Esq. (Admitted *pro hac vice*)
John E. Bucheit, Esq. (Admitted *pro hac vice*)
Two N. Riverside Plaza, Suite 1850
Chicago, IL 60606
Telephone: (312) 281-0295
E-mail: tjacobs@phrd.com
            jbucheit@phrd.com

*Counsel for Interstate Fire and Casualty Company*

- and -

By: */s/ Sommer L. Ross*

Sommer L. Ross, Esq.
NJ Bar No. 004112005
**Duane Morris LLP**
1940 Route 70 East, Suite 100
Cherry Hill, NJ 08003-2171
Telephone: 856.874.4200
Email: SLRoss@duanemorris.com

and

Russell W. Roten, Esq. (Admitted *Pro Hac Vice*)
Jeff D. Kahane, Esq. (Admitted *Pro Hac Vice*)
Andrew E. Mina, Esq. (Admitted *Pro Hac Vice*)
**Duane Morris LLP**
865 South Figueroa Street, Suite 3100
Los Angeles, CA 90017-5450
Telephone: (213) 689-7400
Facsimile: (213) 402-7079
E-mail: rwroten@duanemorris.com
E-mail: jkahane@duanemorris.com
E-mail: amina@duanemorris.com

and

Catalina Sugayan, Esq. (Admitted *Pro Hac Vice*)
Michael Norton, Esq. (Admitted *Pro Hac Vice*)
**Clyde & Co US LLP.**
55 West Monroe Street, Suite 3000
Chicago, IL 60603
Telephone: (312) 635-7000
E-mail: catalina.sugayan@clydeco.us
       michael.norton@clydeco.us

*Counsel for Certain Underwriters at Lloyd's,
London and Certain London Market Companies*