| UNITED STATES BANKRUPTCY COURT  DISTRICT OF NEW JERSEY  Caption in Compliance with D.N.J. LBR 9004-1(b) ||
|---|---|
| **TRENK ISABEL SIDDIQI & SHAHDANIAN P.C.**  Richard D. Trenk, Esq.  Robert S. Roglieri, Esq.  290 W. Mt. Pleasant Avenue, Suite 2370  Livingston, New Jersey 07039  Telephone:  (973) 533-1000  Email:  rtrenk@trenkisabel.law  Email:  rroglieri@trenkisabel.law   *Counsel to The Diocese of Camden, New Jersey* | **LOWENSTEIN SANDLER LLP**  Jeffrey D. Prol, Esq.  Michael A. Kaplan, Esq.  Brent Weisenberg, Esq.  Colleen M. Restel, Esq.  One Lowenstein Drive  Roseland, New Jersey 07068  Telephone:  (973) 597-2500  Email:  jprol@lowenstein.com  Email:  mkaplan@lowenstein.com  Email:  bweisenberg@lowenstein.com  Email:  crestel@lowenstein.com   *Counsel to the Official Committee of Tort Claimant Creditors* |
| *In re*:   THE DIOCESE OF CAMDEN, NEW JERSEY,                                Debtor. | Chapter 11   Case No. 20-21257 (JNP)   Hearing Date: April 17, 2024 at 11:00 a.m. |

## PLAN PROPONENTS' OBJECTION TO THE INSURERS' EMERGENCY MOTION FOR STAY PENDING APPEAL OF ORDER CONFIRMING THIRD MODIFIED EIGHTH AMENDED PLAN OF REORGANIZATION

## TABLE OF CONTENTS

**PAGES**

TABLE OF AUTHORITIES ........................................................................................ iii

PRELIMINARY STATEMENT .................................................................................... 1

RELEVANT BACKGROUND ...................................................................................... 2

I.    THE IMPORTANT BACKGROUND OF THE DIOCESE. ................................. 2

    A.    The Diocese's Contributions to the Community. ...................................... 2

    B.    The History of Sexual Abuse and the Diocese. ........................................ 4

II.    PLAN CONFIRMATION AND PLAN MODIFICATIONS. ............................... 5

III.    THE STANDING DECISION AND STANDING ISSUES
    THROUGHOUT THE CHAPTER 11 CASE ...................................................... 6

ARGUMENT ................................................................................................................. 7

I.    THE INSURERS DID NOT MEET THEIR BURDEN OF SHOWING
    THAT A STAY IS WARRANTED. .................................................................... 8

    A.    Likelihood of Success on the Merits. ....................................................... 9

        1.    The Bankruptcy Court Did Not Improperly Limit the
        Insurers' Standing to Object. ....................................................... 10

        2.    The Insurance Assignment Complies with the Bankruptcy
        Code. ............................................................................................. 14

        3.    The Plan Does Not Strip the Insurers of Their Rights and
        Defenses. ....................................................................................... 17

        4.    The Trust Governance is Not Biased. .......................................... 19

    B.    The Insurers Have Not Established That They Are Likely to Suffer
    Irreparable Injury Absent a Stay. ............................................................ 20

        1.    The Insurers Do Not Describe How the Possibility of a
        "Prefunded" Trust Harms Them. ................................................. 20

        2.    The Insurers Were Not Denied Any Due Process Rights. ........... 21

        3.    Equitable Mootness Is Not Irreparable Harm. ............................ 24

C.    The Balance of Equities Does Not Favor a Stay.....................................................25

    1.    The Insurers' Alleged Harm. ........................................................25

    2.    Harm to Plan Proponents. ...........................................................26

        a.    Survivors' Harm..............................................................27

        b.    The Diocese's Harm. ......................................................28

D.    The Public Interest Disfavors Imposing a Stay......................................................30

II.    THE INSURERS DID NOT PROPOSE TO POST A SUPERSEDEAS
BOND IN ORDER TO OBTAIN A STAY PENDING APPEAL. ..................................31

CONCLUSION.................................................................................................................32

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

C<small>ASES</small>

*In re Adelphia Commc'ns Corp.*,
   361 B.R. 337 (S.D.N.Y. 2007)................................................................................31

*In re ANC Rental Corp.*,
   No. 01-11220(MFW), 2002 WL 1058196 (D. Del. May 22, 2002) .......................27

*In re Boy Scouts of Am. & Del. BSA, LLC*,
   No. 20-10343-LSS, 2023 WL 2891519 (D. Del. Apr. 11, 2023) ................................ *passim*

*In re Boy Scouts of Am. and Del. BSA, LLC*,
   No. 20-10343-LSS, 2023 WL 6442586 (D. Del. Oct. 3, 2023).................................25, 27, 30

*CBD & Sons, Ltd. v. Setteducati*,
   No. 18-4276, 2019 WL 8268543 (D.N.J. Aug. 6, 2019) ........................................23

*Clinton v. Jones*,
   520 U.S. 681 (1997)...............................................................................................9, 30

*In re Combustion Eng'g, Inc.*,
   391 F.3d 190 (3d Cir. 2004)...............................................................12, 15, 16, 18

*In re Congoleum Corp.*,
   No. 03-51524, 2008 WL 4186899 (Bankr. D.N.J. Sept. 2, 2008) ..........................15

*El v. Marino*,
   722 F. App'x 262 (3d Cir. 2018) ..........................................................................8, 9

*Fagan v. Fischer*,
   No. 14-7013 (FLW) (TJB), 2019 WL 5587286 (D.N.J. Oct. 30, 2019)................................22

*In re Fed.-Mogul Glob. Inc.*,
   385 B.R. 560 (Bankr. D. Del. 2008) ......................................................................15

*In re Fed.-Mogul Glob. Inc.*,
   684 F.3d 355 (3d Cir. 2012).....................................................................................16

*In re FF Acquisition Corp.*,
   422 B.R. 64 (Bankr. N.D. Miss. 2009) ..................................................................16

*In re Garces Rest. Grp., Inc.*,
   No. 18-19054 (JNP), 2018 WL 2458807 (Bankr. D.N.J. May 30, 2018)...................... *passim*

*Givaudan Fragrances Corp. v. Aetna Cas. & Sur. Co.*,
   227 N.J. 322 (2017) ...............................................................................15

*Jurista v. Amerinox Processing, Inc.*,
   492 B.R. 707 (D.N.J. 2013) .................................................................32

*In re Kaiser Aluminum Corp.*,
   343 B.R. 88 (D. Del. 2006)..............................................................15, 16

*In re Kaiser Gypsum Co.*,
   60 F.4th 73 (4th Cir. 2023), *cert. granted sub nom.*
   *Truck Ins. Exch. v. Kaiser Gypsum Co.*, 144 S. Ct. 325 (2023) ..................................... *passim*

*In re L.A. Dodgers LLC*,
   465 B.R. 18 (D. Del. 2011)...................................................................24

*Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*,
   562 F.3d 553 (3d Cir. 2009).............................................................24, 25

*N.L.R.B. v. 710 Lone Ridge Rd. Operating Co. II, LLC*,
   No. 14-1542 (CCC), 2014 WL 1155539 (D.N.J. Mar. 21, 2014)................................9, 26, 27

*Nken v. Holder*,
   556 U.S. 418 (2009)...................................................................8, 9, 20

*Osborne v. Ohio*,
   495 U.S. 103 (1990)...............................................................................31

*In re Purdue Pharma L.P.*,
   69 F.4th 45 (2d Cir. 2023),
   *cert. granted Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 44 (2023)..................................8

*Riley v. Mut. Ins.*,
   No. 17-489, 2019 WL 9596537 (E.D. Pa. Jan. 8, 2019).........................................16

*S.S. Body Armor I., Inc. v. Carter Ledyard & Milburn LLP*,
   927 F.3d 763 (3d Cir. 2019)............................................................9, 20, 25

*Sampson v. Murray*,
   415 U.S. 61 (1974)...............................................................................23

*Shreenath Holding LLC v. Bezner*,
   No. 23-1721 (ZNQ), 2023 WL 2808165 (D.N.J. Apr. 6, 2023) ..................................... *passim*

*Sprint Commc'ns Co. L.P. v. CAT Commc'ns Int'l, Inc.*,
   335 F.3d 235 (3d Cir. 2003)..................................................................29

*In re Stone & Webster, Inc.*,
  373 B.R. 353 (Bankr. D. Del. 2007) ....................................................22

*In re Thors*,
  No. 15–17602 (JNP), 2017 WL 3314235 (Bankr. D.N.J. June 5, 2017) ................9, 10, 19, 20

*In re Trans World Airlines, Inc.*,
  No. 01-0056(PJW), 2001 WL 1820325 (Bankr. D. Del. Mar. 27, 2001) ...............................24

*In re W.R. Grace & Co.*,
  412 B.R. 657 (D. Del. 2009) ..............................................................31

*In re W.R. Grace & Co.*,
  475 B.R. 34 (D. Del. 2012) ........................................................ *passim*

*In re Wilton Armetale, Inc.*,
  968 F.3d 273 (3d Cir. 2020) ..........................................................11, 21

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ..........................................................................20

## STATUTES

11 U.S.C. § 365 ...............................................................................16

11 U.S.C. § 1109 ......................................................................10, 11, 12

S. 477, 218th Leg., § 1(a) (N.J. 2019) ....................................................4

## RULES

Fed. R. Bankr. P. 8007 ....................................................................31

## OTHER AUTHORITIES

Petition for a Writ of Certiorari, *Truck Ins. Exch. v. Kaiser Gypsum Co., et al.*,
  No. 22-1079, 2023 WL 3306520 (May 3, 2023) ..........................................11

The Diocese of Camden, New Jersey (the "**Diocese**") and its Official Committee of Tort Claimant Creditors (the "**Tort Committee**," and together with the Diocese, the "**Plan Proponents**") file this objection (this "**Objection**") to the *Emergency Motion for Stay Pending Appeal of Order Confirming Third Modified Eighth Amended Plan of Reorganization of the Diocese of Camden* [Dkt. 3701] (the "**Motion**") filed by Century, Federal, Illinois Union, Interstate, and LMI (collectively, the "**Insurers**").    In support of this Objection, the Plan Proponents state as follows:

## PRELIMINARY STATEMENT

Through their Motion, the Insurers ask for the extraordinary remedy of a stay that would (i) deprive Survivors of receiving any compensation for their unimaginable injuries until, at least, the Third Circuit resolves the parties' disputes and (ii) meaningfully impair the Diocese's ability to continue its critical mission without the shadow of this case looming over it, negatively impacting its charitable mission, and freezing its ability to pay the other classes of creditors that supported the Plan.    A stay may also (absent posting a bond) threaten depletion of the funds Survivors secured through hard-fought negotiations and litigation with the Diocese—pending the Insurers' appeal of the Confirmation Order.

Rather than meeting their heavy burden in proving the four factors necessary to show that a stay is warranted or addressing the bond requirement pending any stay of the Confirmation Order, the Insurers use the Motion to restate arguments this Court already found, *several times*, to lack merit.    For example, the Insurers identify no reason that the Court's findings were erroneous other than their own disagreement and improperly use the Motion to delay a ruling on their Appeal until the Supreme Court resolves two unrelated cases before it, without identifying any legal basis that would allow such a delay.

As established below, the Insurers have not met their heavy burden for entitlement to a stay pending appeal, and their Motion should be denied.  Indeed, the Insurers have not shown (i) a strong likelihood of success in their Appeal on any of the four issues they raised; (ii) that they will be irreparably harmed, because the only potential harm (equitable mootness) is economic in nature and not an irreparable harm on its own; (iii) the absence of harm to non-movants if the stay is granted (in fact, the Motion completely ignores the significant harm to the Diocese's mission—which aids the most impoverished communities in the state—and the recovery to, *inter alia*, Survivors—who have already waited decades to receive compensation for the heinous acts committed against them as children); nor (iv) that public interest supports the requested stay, as the only interests served by a stay are their own.

Even if this Court were inclined to grant a stay, such stay should be subject to the Insurers' posting of a supersedeas bond to preserve the status quo and protect the estate and Survivors from incurring costs incident to the stay.  Given the deficiencies in the Insurers' Motion, however, a stay is simply not warranted.

## **RELEVANT BACKGROUND**[1]

## I.    **THE IMPORTANT BACKGROUND OF THE DIOCESE.**

### A.    **The Diocese's Contributions to the Community.**

The Diocese is not the typical commercial debtor.  It is a non-profit religious organization whose mission aids countless individuals in its territory—which is comprised of several of the poorest counties in New Jersey.  [*See* Dkt. 3 ¶¶ 55, 57–58.]  The Diocese serves approximately 486,368 Catholics in its territory, which has an overall population of about 1.4 million.  [*See id.* ¶ 57.]  The Diocese, through Catholic Charities, aids, supports, advises, and conducts a wide variety

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed in the *Order Confirming Third Modified Eighth Amended Plan of Reorganization*, [Dkt. 3684], including all exhibits and attachments thereto.

of human services for the benefit of all people in need within the Diocese, without regard to religious, racial, ethnic, or economic background. [*Id.* ¶¶ 76–77.] In accordance with Catholic Social Teaching, Catholic Charities creates programs designed to serve the most vulnerable populations, while also guiding them towards a life of self-sufficiency. [*Id.* ¶ 77.] The Diocese and Catholic Charities also help homeless veterans find and procure safe and secure places to live. [*Id.* ¶ 81.] In 2019, Catholic Charities served 17,143 people within the Diocese's territory. [*Id.* ¶ 83.]

The Diocese, through Diocesan Housing Services, is a sponsor, developer, and/or the manager of many affordable housing developments (and related entities) for seniors, disabled individuals, and low-income families. [*Id.* ¶¶ 85, 89.]

The Diocese is further involved in the operation of twenty-two elementary schools, a pre-school daycare, and five high schools. [*Id.* ¶¶ 63–65.] Based on a projected census of 5,016 grammar school students for 2020-2021 and the sending municipality's per pupil expenditure to educate these students, a financial burden of over $108 million would be incurred if these students were educated in public schools. [*Id.* ¶ 70.] These figures do not include the students in the three grammar schools in Camden City and the one grammar school in Pennsauken Township, which are administered by Catholic Partnership Schools. [*Id.*] As for the high schools, based on a projected census of 2,446 high school students for 2020-2021 and the sending municipality's per pupil expenditure to educate these students, a financial burden of $51.2 million would be incurred if these students were educated in public schools. [*Id.* ¶ 71.] These figures do not include the students enrolled in the three private Catholic high schools (Bishop Eustace Preparatory School in Pennsauken, Our Lady of Mercy Academy in Newfield, and St. Augustine's Preparatory School in Richland). [*Id.*]

The Diocese's Tuition Fund provides tuition assistance to needy families whose children attend schools affiliated with the Diocese.  [*Id.* ¶ 99.]

**B.      The History of Sexual Abuse and the Diocese.**

By the time the sexual abuse scandal within the Catholic Church became publicized in 2002, and sexual abuse survivors across the country began coming forward in large numbers, the two paths to justice, criminal prosecution and civil lawsuits, were unavailable to most survivors because of the expiration of the then-applicable statute of limitations for their claims.  [Dkt. 327 ¶ 22.]  Before 2019, New Jersey, for example, capped the civil statutes of limitations to bring a claim for sexual abuse, including sexual abuse of a minor, at age 20 (the age of majority, 18, plus two years), with a two-year discovery rule that allowed victims to file a claim within two years of discovering an injury caused by their abuse.  [*Id.*]

On May 13, 2019, New Jersey passed S-477 (the "**New Jersey Child Victim's Act**"), which, *inter alia*, reopened the statute of limitations for a two-year period (the "**Revival Window**") to allow survivors for whom the statute of limitations had run to sue responsible parties, such as the archdiocese, diocese, parish, and school.  *See* S. 477, 218th Leg., § 1(a) (N.J. 2019).  The New Jersey Child Victim's Act went into effect, and the Revival Window opened on December 1, 2019, giving adults who were assaulted as children and for whom the statute of limitations had expired until November 30, 2021 to bring a claim.  *See id.*

The Diocese filed this Chapter 11 Case during the Revival Window, meaning that, by the time the Chapter 11 Case was filed and the time for filing proofs of claim was set, many Survivors had never disclosed their experiences and the harm they suffered.

Throughout the Chapter 11 Case, more than 300 brave Survivors came forward and shared their horrific experiences of sexual abuse that they experienced as children.  These Survivors set aside their distrust of the Diocese, ultimately voting, overwhelmingly, in favor of a settlement that

once seemed impossible, with the purpose of compensating the Survivors for their suffering and moving forward with the healing process.

## II.    PLAN CONFIRMATION AND PLAN MODIFICATIONS.

On August 29, 2023, the Bankruptcy Court issued the *Memorandum Decision Denying Confirmation of Eighth Amended Plan*, [Dkt. 3336] ("**Memorandum Decision**"), under which it, among other things, set forth certain modifications that needed to be made before the *Eighth Amended Plan of Reorganization*, [Dkt. 1725], could be confirmed.

On September 22, 2023, the Plan Proponents filed a *First Modified Eighth Amended Plan of Reorganization*, [Dkt. 3373] ("**First Modified Plan**"), to address the modifications set forth in the Memorandum Decision.

On December 15, 2023, the Bankruptcy Court issued an oral opinion, [Dkt. 3574] ("**Oral Opinion**"),[2] under which the Bankruptcy Court set forth additional modifications that were needed before confirmation.

On December 29, 2023, the Plan Proponents filed a *Second Modified Eighth Amended Plan of Reorganization*, [Dkt. 3598] ("**Second Modified Plan**"), to address the modifications set forth in the Oral Opinion.

On February 16, 2024, the Bankruptcy Court issued another oral opinion, [Dkt. 3649] ("**Second Oral Opinion**"),[3] under which the Bankruptcy Court set forth additional modifications that were needed before confirmation.

On February 23, 2024, the Plan Proponents filed a *Third Modified Eighth Amended Plan of Reorganization*, [Dkt. 3659] ("**Third Modified Plan**" or "**Plan**"), to address the modifications

---

[2]    *See* Dkt. 3703-1 (attaching the certified transcript of the Oral Opinion).

[3]    *See* Dkt. 3703-2 (attaching the certified transcript of the Second Oral Opinion).

set forth in the Second Oral Opinion.  The Third Modified Plan addressed the Bankruptcy Court's prior concerns and ensured that the rights of Insurers were adequately preserved to the extent required by law.  (*See, e.g.*, Plan Art. X ("Preservation of Non-Settling Insurers' Rights").)

On March 14, 2024, the Bankruptcy Court issued another oral opinion, [Dkt. 3680] ("**Third Oral Opinion**"),[4] under which the Bankruptcy Court confirmed the Third Modified Plan. Following the Third Oral Opinion, on March 15, 2024, the Bankruptcy Court entered an order confirming the Third Modified Plan, [Dkt. 3684] (the "**Confirmation Order**").

On March 26, 2024, LMI, Interstate, and Century filed notices to appeal the Confirmation Order.  [*See* Dkts. 3697, 3699, 3700.]  On March 27, 2024, the Insurers filed this Motion.  [Dkt. 3701.]

## III.    THE STANDING DECISION AND STANDING ISSUES THROUGHOUT THE CHAPTER 11 CASE.

On August 12, 2022, the Bankruptcy Court issued a *Memorandum Decision*, [Dkt. 2226] (the "**Standing Decision**"), under which it determined the issues on which the Insurers had standing to object to confirmation.   Notwithstanding the Standing Decision, the Insurers consistently raised arguments during the plan confirmation proceedings on issues they were deemed to lack standing on.  The Bankruptcy Court heard those arguments and considered them when ruling on those same issues, regardless of standing.

The Insurers' Motion goes to great lengths to create the appearance that their arguments were not heard by this Court.  The table ("**Table**") attached to the Declaration of Michael A. Kaplan, Esq. ("**Kaplan Decl.**"),[5] however, contains a non-exhaustive list of instances in this Chapter 11 Case where the Insurers presented arguments to the Bankruptcy Court on issues they

---

[4]    *See* Dkt. 3703-4 (attaching the certified transcript of the Third Oral Opinion).

[5]    *See* Kaplan Decl., Ex. A (attaching the Table).

were found to lack standing yet the Bankruptcy Court considered the Insurers' arguments in rendering its rulings.

Though the Insurers were denied standing on issues unrelated to their "rights and obligations" and "issues that affect only third parties," (*see* Standing Decision at 7), the Table unequivocally demonstrates how the Bankruptcy Court still heard their arguments on those very issues throughout the Confirmation process. (*See generally* Table.)

## **ARGUMENT**

The Insurers carry the heavy burden of establishing the prerequisite for a stay pending appeal of the Confirmation Order. As established below, the Insurers cannot meet this burden because:

(i)     the Bankruptcy Court's well-reasoned decisions are unlikely to be overturned on appeal;

(ii)    the Insurers have not articulated, let alone provided evidence of, any plausible irreparable harm. Each of the harms forewarned by the Insurers boils down to possible equitable mootness—which is both an economic harm (and therefore not irreparable) and is not, absent other harm, a justification for a stay;

(iii)   a stay pending appeal will cause significant harm to, among others, the Diocese, the communities served by the Diocese, Survivors, and other creditors of the Diocese. To the Diocese, the stay creates undue delay, expense—every dollar of which takes away from serving the state's most impoverished communities and individuals—and uncertainty, which will continue to impact the Diocese and its mission negatively and irreparably. Courts have also considered the delay in recovery by Survivors to be a substantial harm. Indeed, the delay will impact Survivors by decreasing the present-day value of their recovery and costing them time—which, unlike the economic injury that the Insurers' claim will befall them, is not something any one can give back to these individuals who have already been waiting decades; and

(iv)    public interest favors a speedy resolution of the Chapter 11 Case and recovery by Survivors which—if the Motion is granted—will not be possible until after the Appeal (and the already-promised subsequent appeals) has been fully litigated, which will no doubt take several years.

Moreover, how the Supreme Court rules in *In re Kaiser Gypsum Co.*, 60 F.4th 73 (4th Cir. 2023), *cert. granted sub nom. Truck Insurance Exchange v. Kaiser Gypsum Co.*, 144 S. Ct. 325 (2023) (mem.) ("**Kaiser Gypsum**") and *In re Purdue Pharma L.P.*, 69 F.4th 45 (2d Cir. 2023), *cert. granted Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 44 (2023) (mem.) ("**Purdue**")[6] are unlikely to have any impact on this case, and as more fully explained below, mere conjecture about how a future case may impact the procedural course of this case is not grounds upon which a stay may be entered. These cases will not affect the law applicable to the Plan and thus also do not justify implementing a stay of confirmation.

Therefore, the Motion should be denied. The only party with an interest in the stay is the Insurers—who have collected millions of dollars in premiums from the Diocese and have yet to pay (and are not currently required to pay) anything on account of the Survivors' claims they contractually agreed to provide insurance coverage for.

Although it cannot remedy all the harm that will befall the Diocese and Survivors if the Motion is granted, if the Bankruptcy Court is inclined to grant a stay of the Confirmation Order pending the Appeal and the near-certain subsequent appeal, the Bankruptcy Court should require the Insurers to post a bond to protect non-movants from costs arising incident to the Insurers' stay.

## I.    THE INSURERS DID NOT MEET THEIR BURDEN OF SHOWING THAT A STAY IS WARRANTED.

A stay pending appeal is an "extraordinary remedy," *El v. Marino*, 722 F. App'x 262, 267 (3d Cir. 2018), "not a matter of right," *Nken v. Holder*, 556 U.S. 418, 427 (2009) (citation omitted).

---

[6]    The Insurers reference *Purdue* in their preliminary statement and in one sentence in their argument to note that the Supreme Court's decision will address the enforceability of ***non-consensual*** third-party releases. The *Purdue* decision, however, will have no effect on this Chapter 11 Case or the Plan because 97% of Survivors voted for the Plan, which included third-party releases, and no creditor objected to the third-party releases. Thus, the third-party releases in this case were ***consensual***.

The Insurers, as the moving parties, bear the burden of showing that a stay is warranted. *Clinton v. Jones*, 520 U.S. 681, 708 (1997).

"This is a 'heavy burden,' not easily met." *N.L.R.B. v. 710 Lone Ridge Rd. Operating Co. II, LLC*, No. 14-1542 (CCC), 2014 WL 1155539, at *1 (D.N.J. Mar. 21, 2014). The Insurers must prove that *each* of these four factors is satisfied for a stay to be granted:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*El*, 722 F. App'x at 267 (citation omitted). The first two factors are "the most critical." *Nken*, 556 U.S. at 434. In determining whether the Insurers have met their burden, "[t]he Court should employ a sliding scale approach" for the first two factors, and if "the chance of success is low and the likelihood of irreparable injury is also low, a stay should not be granted." *In re Garces Rest. Grp., Inc.*, No. 18-19054 (JNP), 2018 WL 2458807, at *2 (Bankr. D.N.J. May 30, 2018) (Poslusny, J.). The Bankruptcy Court need only consider the remaining factors upon the movant's "requisite showing on the first two factors." *Id.*

For the below reasons, the Insurers have not met their burden on any of these four factors and sought this stay without ensuring that they will secure the required bond. The Court should thus deny their Motion.

### A.    Likelihood of Success on the Merits.

The first stay factor, "a sufficient likelihood of success on the merits," requires the Court to determine whether the Insurers have shown that they have a "'significantly better than negligible' chance of succeeding on the merits of [their] pending" Appeal. *S.S. Body Armor I., Inc. v. Carter Ledyard & Milburn LLP*, 927 F.3d 763, 773–74 (3d Cir. 2019) (citation omitted). In other words, the Insurers must show they have a "reasonable chance, or probability, of winning."

*In re Thors*, No. 15–17602 (JNP), 2017 WL 3314235, at *3 (Bankr. D.N.J. June 5, 2017) (Poslusny, J.) (citation omitted).

Here, the Insurers failed to prove that *any* of the four issues to be addressed on appeal—(1) the Insurers' standing; (2) whether the Insurance Assignment complies with the Bankruptcy Code, (3) whether the Plan alters the Insurers' rights contrary to the Bankruptcy Code and Third Circuit law established in *Combustion Engineering*, and (4) whether the Trust Governance is biased and will lead to results inconsistent with the Bankruptcy Code, (*see* Motion at 17–25)—have a reasonable chance of success.

### 1. The Bankruptcy Court Did Not Improperly Limit the Insurers' Standing to Object.

To argue that the Court should grant their Motion on the issue of insurer standing, the Insurers rely entirely on their hope that the Supreme Court's *forthcoming* decision in *Kaiser Gypsum* will provide for their desired outcome. (*See* Motion at 18–19.) This argument fails for several reasons.

***First***, the Insurers' speculation of the Supreme Court's future rulings does not make it reasonably likely that the Insurers will prevail on their standing claim on appeal, and the Insurers cite no authority to the contrary. In their Motion, the Insurers merely speculate that the Supreme Court will find that the insurer in *Kaiser Gypsum* has party-in-interest standing under 11 U.S.C. § 1109(b), and therefore, that the Insurers, here, will succeed on their Appeal. The Insurers, however, do not connect the dots between how their predictions on the Supreme Court's opinion in an unrelated case will impact how an appellate court will rule on the merits of the Appeal under the facts of this Chapter 11 Case.

The Insurers' "contentions and bald accusations" on how ***they*** believe the Supreme Court will or should rule in an unrelated asbestos tort matter "do not provide the Court with adequate

support to demonstrate that they will prevail on the merits." *See, e.g.*, *Shreenath Holding LLC v. Bezner*, No. 23-1721 (ZNQ), 2023 WL 2808165, at *3–4 (D.N.J. Apr. 6, 2023) (denying motion to stay pending appeal where movants failed to "supply legal or factual bases demonstrating how they will prevail on the merits of the claims"). Courts should not traffic in speculation to decide their cases, and the Insurers' speculations are not evidence of the Bankruptcy Court's alleged errors.

*Second*, the Insurers misstate the issue being considered by the Supreme Court in *Kaiser Gypsum.* The discrete issue is whether an insurer with financial responsibility for a bankruptcy claim is a "party in interest" that may object to a plan of reorganization under Chapter 11 of the Bankruptcy Code.[7] While the United States Trustee's office filed an amicus brief arguing that the insurer should be deemed a "party in interest" under Section 1109 of the Bankruptcy Code, that argument goes far beyond what the Supreme Court has been asked to decide. And, here, the Bankruptcy Court held that the Insurers were entitled to object to the Plan. (*See* Standing Decision at 1.)

*Third*, even if the Supreme Court issues a ruling that an insurer has *party-in-interest* standing as the Insurers surmise, that theoretical ruling would not result in an insurer's unfettered right to be heard on all issues in a bankruptcy case. The Third Circuit makes clear—and so has the Bankruptcy Court—that "[t]he statutory requirements of bankruptcy 'standing' exceed the three elements of constitutional standing." *See In re Wilton Armetale, Inc.*, 968 F.3d 273, 281 (3d Cir. 2020). A party must satisfy Article III standing, ***in addition to*** the requirements of *party-in-interest* standing to be heard on an issue in a bankruptcy case. *See id.*; (*see also* May 31, 2022

---

[7] *See* Petition for a Writ of Certiorari, *Truck Ins. Exch. v. Kaiser Gypsum Co., et al.*, No. 22-1079, 2023 WL 3306520, at *i (May 3, 2023).

Audio Ruling Tr. at 6:1–5 ("In the Bankruptcy context, a party must establish that it is the party in interest under Section 1109(b) **and** that it satisfies the minimum constitutional requirements for standing." (emphasis added))).

Along with standing under 11 U.S.C. § 1109(b), which entitles a party to be heard on "any issue in a case," Article III standing "is evaluated on an issue-by-issue basis." (*See, e.g.*, Standing Decision at 5–6 (citations omitted).)  As the Insurers do not address the Article III standing requirement as a basis for their Appeal, even if the Supreme Court issues a decision that supports the Insurers' hopeful expectations, the decision will not change the fact that the Insurers lack Article III standing and thus could not object to certain issues throughout this Chapter 11 Case. (*See, e.g.*, *id.* at 5–7 (articulating specific issues the Insurers lacked standing to be heard on because the issues did not impact the Insurers' legally protected interests).)  In addition, on appeal, the Insurers also have to overcome the hurdle of appellate standing, which, in the bankruptcy context, "is more restrictive than Article III standing."  *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 215 (3d Cir. 2004).

Moreover, the Insurers cite no case law or rule supporting their unfounded assertion that a decision from the Supreme Court in the *Kaiser Gypsum* case would "require the Bankruptcy Court to vacate the Confirmation Order and permit the Insurers to develop and present their objections on the matters where the Bankruptcy Court denied the Insurers standing."  (Motion at 19.)

**Fourth**, even if the Bankruptcy Court erred in not granting the Insurers standing to be heard on each and every issue in this case, such an error would *only* harm the Insurers if the Bankruptcy Court also erred in its ultimate conclusion on the merits of the issues on which the Insurers sought standing to be heard.  The Insurers cannot credibly argue (nor do they try to argue) there would be a change in the ultimate result with respect to confirmation of the Plan if the Insurers were granted

standing to be heard on every issue.  The Insurers made arguments, which the Bankruptcy Court heard and ultimately ruled on, with respect to every issue—even those which the Bankruptcy Court found the Insurers lacked standing.  As discussed in the Background, *see supra* Section II, even though the Bankruptcy Court denied the Insurers standing to raise certain objections to the Plan, those denials did not come without consideration of the Insurers' arguments.  (*See* Table.)  Indeed, the Bankruptcy Court often considered the Insurers' arguments, despite their lack of standing, in rendering its opinions.  (*See id.*)  Thus, even if the Bankruptcy Court granted the Insurers standing to be heard, the outcome of the Chapter 11 Case and entry of the Confirmation Order would remain unchanged.

Put simply – the Supreme Court's future decision in *Kaiser Gypsum* will not make it any more or less likely that the Insurers will succeed on their standing claims on their Appeal.

**Fifth**, the Insurers baldly assert that the Bankruptcy Court erred in denying them standing on various issues but do not identify any reason why the denial of standing was in error, nor do they provide any "substantive details concerning how the Bankruptcy Court" ruled in error. *Shreenath Holding*, 2023 WL 2808165, at *3.  Conclusory statements that the Bankruptcy Court erred in denying standing on certain issues—with no "legal or factual bases demonstrating how they will prevail on the merits of the [insurer standing] claim[]"—render the Insurers' showing "deficient as to their likelihood of success on the merits." *Id.*  Indeed, this Court has found that a party's disagreement with the Bankruptcy Court's decision, absent "any argument to suggest why the Court's" decision is wrong, fails to show "a strong likelihood of success on appeal." *See, e.g.*, *Garces Rest. Grp.*, 2018 WL 2458807, at *2.

Accordingly, the Insurers have not shown a reasonable possibility that (i) they will succeed in their arguments that the Bankruptcy Court erred in denying them standing with respect to certain

issues, or (ii) if they are granted standing, that an appellate court would overturn the Confirmation Order.

### 2.    The Insurance Assignment Complies with the Bankruptcy Code.

The Insurers do not provide any specific evidence to support how their claim that the Insurance Assignment does not comply with the Bankruptcy Code is reasonably likely to succeed on the merits. "[G]eneral arguments that the Plan is inconsistent with other 'overarching principles' or that the objectives and purposes of the Code were not 'fairly achieved,' does not demonstrate a strong showing of likelihood of success on appeal where no specific evidence has been proffered in support." *See, e.g.*, *In re Boy Scouts of Am. & Del. BSA, LLC*, No. 20-10343-LSS, 2023 WL 2891519, at *5 (D. Del. Apr. 11, 2023). On a motion to stay, the movant also cannot simply argue that the Bankruptcy Court erred—the movant must provide "adequate support to demonstrate that they will prevail on the merits." *Shreenath Holding*, 2023 WL 2808165, at *3. Here, the Insurers only rework the same arguments raised throughout this proceeding and point to "no substantive details concerning how the Bankruptcy Court" erred. *Id.*

Throughout this case, the Insurers repeatedly, and falsely, claimed that the TDP is "rigged" or inherently biased and will strip them of their rights and ability to protect their rights. (*See, e.g.*, Motion at 6–7, 19–20); [Dkt. 3072 ¶ 79.] The Insurers also argue that the Plan "allows for meritless and inflated claim values." (Motion at 20.) These arguments, now made in the Motion, are not new and merely repeat issues already addressed by the parties and the Bankruptcy Court several times. As the Bankruptcy Court is aware—because it heard these same arguments repeatedly— the Plan expressly preserves the Insurers' coverage defenses. (*See* Plan Art. X; Kaplan Decl., Ex. B ("**Nov. 17, 2022 Trial Tr.**") at 115:16–19.) Indeed, that very issue was at the heart of the Bankruptcy Court's four decisions.

The Insurers' argument about the Plan's assignment of the rights to seek coverage for Abuse Claims, (*see* Motion at 20), ignores the Plan's express terms, which was discussed *at length* in several hearings and pleadings. As the Plan Proponents repeatedly explained, (*see, e.g.*, Dkt. 2479 ¶ 26): the Insurance Policies are not being assigned; the Plan assigns the right to insurance proceeds—*i.e.*, claims that have already been made against the Insurers under their occurrence-based policies—arising out of the Abuse Claims. (*See* Plan Art. II §§ 2.2.65, 2.2.111.) The Bankruptcy Court has also "repeatedly stated that, to the extent the [Diocese] failed to perform obligations under the policies . . . this is a potential defense the insurers could raise in a future coverage action that is brought by the [T]rust." (Third Oral Opinion at 7:17–22.)

The Third Circuit concluded that a plan of reorganization may assign insurance rights and proceeds to a personal injury trust despite the existence of anti-assignment clauses in those policies.[8] *See Combustion Eng'g*, 391 F.3d at 218 (providing that "even if the subject insurance policies purported to prohibit assignment of Combustion Engineering's insurance proceeds, these provisions would not prevent the assignment of proceeds to the bankruptcy estate"); *In re Congoleum Corp.*, No. 03-51524, 2008 WL 4186899, at *2 (Bankr. D.N.J. Sept. 2, 2008) ("[A] plan of reorganization may assign insurance policies to a personal injury trust despite the existence of anti-assignment clauses in those policies."); *In re Fed.-Mogul Glob. Inc.*, 385 B.R. 560, 571 (Bankr. D. Del. 2008) (permitting transfer of insurance policies to the trust); *see also In re Kaiser Aluminum Corp.*, 343 B.R. 88, 91, 95 (D. Del. 2006) (holding that the bankruptcy court did not err

---

[8] While the Bankruptcy Court did not decide this issue under state law, this is precisely the type of assignment that the New Jersey Supreme Court authorized in *Givaudan*. The anti-assignment provisions in the Insurance Policies are unenforceable as a matter of law as applied to the assignment of insurance proceeds contemplated by the Plan. *See, e.g., Givaudan Fragrances Corp. v. Aetna Cas. & Sur. Co.*, 227 N.J. 322, 333 (2017) (holding that insurance proceeds are freely assignable from the moment of injury—anti-assignment clause notwithstanding). The Insurers "have identified no authority that stands for the proposition that interests under their policies could not be assigned." *See Boy Scouts of Am.*, 2023 WL 2891519, at *3.

in concluding that the anti-assignment clauses in the debtors' insurance policies were preempted by the Bankruptcy Code and therefore did not prevent the assignment of the debtors' rights to receive insurance proceeds to a trust).

The legal analyses these cases employ turn on generally applicable provisions of the Bankruptcy Code and Chapter 11's confirmation requirements, including Sections 1123(a), 1141, and 541.  *See In re Fed.-Mogul Glob. Inc.*, 684 F.3d 355, 382 (3d Cir. 2012) (holding that the anti-assignment provisions in the relevant insurance policies are preempted by § 1123(a)(5)(B) to the extent they prohibit transfer to a § 524(g) trust); *Combustion Eng'g*, 391 F.3d at 218 n.27 (quoting Section 1123(a)(5)(B)'s language permitting a plan to transfer property of the estate to another entity and observing that Section 541 preempts contractual provisions that purport to limit or restrict the debtor's right to transfer or assign interests in bankruptcy).

The Bankruptcy Court, relying on "significant caselaw" from "[s]everal courts," correctly found that the Insurance Policies are not executory and could be transferred or assigned under Section 363.  (Memorandum Decision at 50); *see, e.g.*, *Riley v. Mut. Ins.*, No. 17-489, 2019 WL 9596537, at *8 (E.D. Pa. Jan. 8, 2019) ("Several courts have held that an insured's unfulfilled duty to defend under an insurance policy does not render the policy executory."); *In re FF Acquisition Corp.*, 422 B.R. 64, 67 (Bankr. N.D. Miss. 2009) ("[T]he court finds that the policy is not an executory contract, insofar as providing a defense is concerned, despite FF Acquisition's ongoing obligation to fund the SIR.").  To be thorough, the Bankruptcy Court also correctly concluded that if the Policies are executory, their transfer under Section 365 is also appropriate because the Plan provides for "adequate assurance of performance, in that the Trust will have sufficient funding to pay any defense and SIR costs."  (Memorandum Decision at 51.)

Likewise, in *In re Boy Scouts of America and Delaware BSA, LLC*, the District Court of Delaware found these very same arguments (by some of the very same insurance counsel), that "Courts do not have the power to rewrite contracts . . . and that the Plan fails to 'preserve and affirmatively recognize insurer rights, including the rights to investigate legal liability, to defend claims, to require the insured to cooperate with its insurers in the defense of claims, and to consent to any settlements,'" and that "failing to specifically find that the '*cum onere* principle' applies to the Insurance Assignment," are "unlikely to succeed." 2023 WL 2891519, at *4.

The Insurers' disagreement with how the Bankruptcy Court ruled on these issues—absent new argument on why those rulings were incorrect—does not show a strong likelihood of success on appeal. *See Garces Rest. Grp.*, 2018 WL 2458807, at *2.

### 3.    The Plan Does Not Strip the Insurers of Their Rights and Defenses.

Far from meeting their burden, the Insurers only offer conclusory statements that the Plan strips them of their rights and defenses in a way that is "not permissible under *Combustion Engineering*." (Motion at 23.) Indeed, they offer no "legal or factual bases demonstrating how they will prevail on the merits" of this claim. *Shreenath Holding*, 2023 WL 2808165, at *3. The Insurers fail to prove their likelihood of success on appeal. *See id.*

Over the course of four decisions, this Court examined whether the Plan was permissible under the Bankruptcy Code and Third Circuit law. It ultimately held that the Plan was insurance neutral. Indeed, the Plan Proponents make it abundantly clear in the Plan that it (i) preserves all of the Insurers' state law rights and remedies, other than those modified by federal law by virtue of the Diocese's bankruptcy, and (ii) does not rewrite or modify any of the applicable insurance policies in contravention of any requirements in the Bankruptcy Code. (*See* Plan Art. VII § 7.2.2.3, Art. X.) These provisions substantively mimic the "insurance neutral language"

the Third Circuit approved in *Combustion Engineering*.    In *Combustion Engineering*, the

Third Circuit interpreted the following language to be "insurance neutral":

> Notwithstanding anything to the contrary in this Order, the Plan or
> any of the Plan Documents, nothing in this Order, the Plan or any of
> the Plan documents (including any other provision that purports to
> be preemptory or supervening), shall in any way operate to, or have
> the effect of, impairing the insurers' legal, equitable or
> contractual rights, if any, in any respect . . . .  The rights of insurers
> shall be determined under the Subject Insurance Policies or
> Subject Insurance Settlement Agreements, as applicable.

391 F.3d at 211–12 (emphasis omitted).

Based on such language, the Third Circuit held that certain insurance companies did not

have appellate standing to challenge the plan of reorganization calling them to fund an asbestos

trust because the plan, through the "insurance neutral" provision, did not materially alter their

prepetition rights and obligations.  *See id.* at 217–18.  Similar to the provision in *Combustion*

*Engineering*, the insurance neutrality provisions of the Plan operate to preserve the Insurers'

prepetition rights and defenses (if any such rights and defenses exist under applicable state law), as

they relate to coverage obligations, other than those subject to modification by virtue of the

Chapter 11 Case itself.

As the Insurers cannot meet their heavy burden on whether they are likely to prevail on

their disapproval of the Plan's provisions governing distributions and the Insurance Assignment,

their Motion should be denied.  *See, e.g.*, *Garces Rest. Grp.*, 2018 WL 2458807, at *2, *4 (denying

motion to stay pending appeal where movants "did not provide any argument to suggest why the

Court's [decision] may not have been correct, or why their proposed interpretation should be

considered").

**4.    The Trust Governance is Not Biased.**

The final claim the Insurers seek to raise on appeal ignores the Bankruptcy Court's clear and well-reasoned rulings on this issue.  The Insurers assert that because "Section 8(ii) of the TDP allows for the use of 'the rules of any other' (unidentified) 'national alternate dispute resolution, arbitration or mediation association' when selecting an arbitrator or mediator," the section leaves open the possibility that the Diocese will rely on a mediator or arbitrator that is not neutral or independent.  (Motion at 24 (emphasis omitted).)  But this argument ignores the Bankruptcy Court's clear and well-reasoned rulings on this issue.  (*See* Third Oral Opinion at 9:11–17 (stating that it "previously rejected similar objections from the insurers, noting that the rules for JAMS and AAA and every other national ADR association of which I am aware requires the mediators and arbitrators to be neutral" and further that the Insurers did not identify any "organization that does not require such neutrality").)  Indeed, the Insurers fail to identify any basis in law or fact as to why this decision was an error—let alone why the Insurers would be reasonably likely to succeed on the merits of this claim.  Moreover, this issue "is not substantial, serious, difficult or doubtful" and thus has "no likelihood of success."  *See, e.g.*, *Thors*, 2017 WL 3314235, at *3.  The Bankruptcy Court already found this argument to lack merit, and, given the Insurers' failure to identify any ADR organization that does not require the requisite neutrality for mediators or arbitrators, (*see* Third Oral Opinion at 9:15–17), or any evidence contradicting the Bankruptcy Court's decision, the Insurers have not shown a strong likelihood that the appellate court will find that the Bankruptcy Court erred on deciding this issue.

The Insurers have not established the reasonable probability of success on any of their four issues, and, for this reason alone, the Motion should be denied.

**B.** **The Insurers Have Not Established That They Are Likely to Suffer Irreparable Injury Absent a Stay.**

Even if the Court finds a likelihood of success on the merits of any of the Insurers' four claims (which it should not), the Motion should be denied because the Insurers did not establish a likelihood of irreparable harm if the stay is not granted.

An applicant for a stay "must demonstrate a likelihood of irreparable injury—not just a possibility—in order to obtain" the stay. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008). "Likely" means "more apt to occur than not." *S.S. Body Armor I.*, 927 F.3d at 772 (citation omitted). A mere "possibility of irreparable injury" is not sufficient. *Nken*, 556 U.S. at 434–35.

Because two of the three purported "irreparable harms" are specious, and the remaining harm (equitable mootness) is insufficient on its own, the Insurers identify no irreparable harm to satisfy this factor.

**1.** **The Insurers Do Not Describe How the Possibility of a "Prefunded" Trust Harms Them.**

The first "irreparable harm" the Insurers identify is that if the Diocese "seeks to prefund the Trust," "many non-debtor parties" will be impacted. (Motion at 25.) This argument fails on its face because the Insurers, as the movants, identify no "irreparable harm" that would occur to **them** if the Trust were funded, as provided by the Plan and Confirmation Order. *See, e.g.*, *In re W.R. Grace & Co.*, 475 B.R. 34, 206–08 (D. Del. 2012) (considering the alleged harm **movant** will suffer); *Thors*, 2017 WL 3314235, at *3 (same); *Garces Rest. Grp.*, 2018 WL 2458807, at *3 (same). Indeed, the Insurers need not contribute a single penny to the Trust while the appeal is pending, which is why this claim of irreparable harm is particularly nonsensical and why a bond is essential if the Court is inclined to grant a stay (which it should not). Additionally, whether the Diocese seeks to fund the Trust before a resolution of the Appeal is a mere "hypothetical [that]

falls far short of posing an injury that is 'actual and imminent.'"  *Boy Scouts of Am.*, 2023 WL 2891519, at *8.

Even if the Insurers were somehow injured by the Diocese and OCEs contributing to the Trust, the Insurers offer no evidence that the Plan Proponents are ignoring the Plan's terms.  For example, the Insurers discuss certain conditions precedent to the Effective Date occurring, one of them being that "the Confirmation Order shall be a Final Order and no stay of the Confirmation Order shall then be in effect."  (Plan Art. XIV § 14.2(b).)  The Plan also contains a "Waiver of Conditions Precedent to the Effective Date" provision, which provides that each of those conditions precedent may be waived "without notice to or leave or order of the Bankruptcy Court." (*Id.* § 14.4.)  According to the Plan's own terms, the Plan Proponents may waive the condition requiring a final, non-appealable order without the Insurers' consent.  (*See id.*)  If the Plan Proponents waive this requirement, which the Plan explicitly entitles them to do, they are not "ignoring" the Plan's terms, as the Insurers allege.

The fact that the Plan may become effective is not an irreparable harm, and the Insurers do not claim to suffer any harm if the Plan goes effective, let alone present any evidence that this hypothetical harm would be actual, imminent, or irreparable.

### 2.      The Insurers Were Not Denied Any Due Process Rights.

The Insurers attempt to establish some form of irreparable harm by alleging a general denial of due process rights, (*see* Motion at 29–31), but this argument fails to establish irreparable harm for several reasons.

***First***, that the Bankruptcy Court denied the Insurers standing to be heard on certain issues is not a denial of due process rights.  To have standing means that an individual may pursue a cause of action. *See Wilton Armetale*, 968 F.3d at 280.  The Bankruptcy Court specifically found that the "Insurers have standing to raise issues as to the Plan only to the extent it affects their rights

and obligations and lack standing to object to confirmation as to issues that affect only third parties." (Standing Decision at 7 (citations omitted).) Despite this ruling, the Insurers proceeded as if they had standing on all issues in the case by filing countless briefs and arguing those issues before the Court. (*See, e.g.*, Table.) Even though Insurers lacked standing, and thus could not pursue certain objections to confirmation, they pursued those objections anyway and thus were very much "heard" by the Court. (*See id.*)

In other cases where a party is denied standing on an issue, that party does not maintain the right to participate in the proceedings as Insurers did here. *See, e.g.*, *In re Stone & Webster, Inc.*, 373 B.R. 353, 362 (Bankr. D. Del. 2007) (denying individual *party-in-interest* standing under 11 U.S.C. § 1109(b) and thus finding the individual lacked "standing to participate in the . . . Proceeding"). If the Insurers were actually deprived of a right to be heard, which is not a denial of due process, then they would have been denied the opportunity to brief the issues, present oral argument on the issues, raise the issues at trial, and file objections to plan modifications about the issues. *See, e.g.*, *id.*; *see also Fagan v. Fischer*, No. 14-7013 (FLW) (TJB), 2019 WL 5587286, at *6 (D.N.J. Oct. 30, 2019) (finding that because plaintiff "lacks standing to participate in this lawsuit . . . he is dismissed as a plaintiff"). Insurers were not dismissed from any aspect of this case, regardless of standing, and the record makes clear that not only did the Court "hear" their arguments on the issues they had no standing to assert, but the Court went so far as to consider those arguments for the sake of being "thorough." (*See, e.g.*, Memorandum Decision at 47.) A plain look at the docket here, and the length of the Plan confirmation proceedings, is enough evidence to show the Insurers were unquestionably heard.

This was not a denial of due process rights, and the Insurers offer no support to the contrary.

*Second*, the Plan tasks the Trust Administrator with the exclusion of fraudulent claims, rendering the Insurers' argument meritless that the Plan's alleged extinguishing of their Claim Objections subjects them to economic harm.  (*See* Plan Art. VII § 7.7; Motion at 30–31.)  Indeed, this Court specifically requested that the Plan do so explicitly.  (*See, e.g.*, Memorandum Decision at 67 (requiring that any future plan include "some mechanism for review and denial of claims that are facially deficient").)  In addition to this protection from fraudulent claims, the Insurers maintain all state law remedies to oppose any contractual obligation they may have to pay such claims.  (*See* Plan Art. X § 10.1.)  In any event, as the Plan Proponents demonstrated, the Trust Distribution Plan differentiates between the allowance of claims against the Trust as opposed to the prosecution of claims for purposes of insurance.  Only the latter has any impact on the Insurers, and the Insurers maintain all rights and remedies against any claims they believe are fraudulent in state court, which weighs against a finding of any harm, much less irreparable harm.  *See, e.g.*, *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.").

Moreover, even if the Insurers had no protection against fraudulent claims, the potential for the Insurers to incur costs for defending coverage claims is not an irreparable harm.  A "purely economic injury, compensable in money, cannot satisfy the irreparable injury requirement." *CBD & Sons, Ltd. v. Setteducati*, No. 18-4276, 2019 WL 8268543, at *6 (D.N.J. Aug. 6, 2019) (citation omitted).  That an insurance company may have to defend a claim asserted under its policy is "speculative and purely economic but not so great as to threaten the existence of business."  *Id.* This is an improper basis for irreparable harm.

The Insurers' meritless due process rights argument does not establish irreparable harm. Accordingly, the Motion must be denied.

### 3.    Equitable Mootness Is Not Irreparable Harm.

The crux of the Insurers' irreparable harm argument boils down to their fear that the Appeal will become equitably moot during the Appeal's pendency.  "The Third Circuit and courts within its appellate jurisdiction have previously recognized, however, that the risk of equitable mootness by itself is insufficient to demonstrate irreparable injury for purposes of a stay." *W.R. Grace & Co.*, 475 B.R. at 206; *In re Trans World Airlines, Inc.*, No. 01-0056(PJW), 2001 WL 1820325, at *10 (Bankr. D. Del. Mar. 27, 2001) ("[I]t is well settled that an appeal being rendered moot does not itself constitute irreparable harm." (citations omitted)), *aff'd* 322 F.3d 283 (3d Cir. 2003). Indeed, "[i]f the possibility of mootness alone w[as] sufficient to show irreparable injury, 'a stay would be issued in every case of this nature pending appeal.'"  *Boy Scouts of Am.*, 2023 WL 2891519, at *7 (citation omitted).  Thus, the possibility of the Appeal becoming equitably moot is not irreparable harm that justifies a stay pending appeal.

The Insurers cite no in-circuit cases to support their argument that equitable mootness alone constitutes irreparable harm, and in fact, the case law cited by the Insurers supports the Plan Proponents' position.  (*See* Motion at 27–29 (citing *In re L.A. Dodgers LLC*, 465 B.R. 18 (D. Del. 2011))); *but see L.A. Dodgers*, 465 B.R. at 36 ("[T]he risk of equitable mootness is not, by itself, sufficient to demonstrate irreparable harm to justify a stay pending appeal.").

Even if the Insurers were to show irreparable harm to pair with their equitable mootness claim or could persuade the Court to ignore prior case law that equitable mootness alone is insufficient harm to grant a stay, the Insurers admit that the injury they would suffer if their Appeal was dismissed on equitable mootness is "economic harm."  (*See* Motion at 29.)  It is well established that "an injury measured solely in monetary terms cannot constitute irreparable harm."

*Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 562 F.3d 553, 557 (3d Cir. 2009).  As such, the

Insurers' alleged suffering of "risks that run counter to the economic bargain in their contracts"

does not establish irreparable harm.  *See, e.g.*, *Boy Scouts of Am.*, 2023 WL 2891519, at *8 (finding

that the loss of the "benefit of their bargain with respect to their rights under the policies" is not an

actual or imminent injury).  And where the "[i]nsurers' defenses are preserved," as they are here,

"the usual enforcement actions exist, and so, unlike 'irreparable harm,' any harms that [the

insurers] may face can be 'redressed by a legal or equitable remedy.'"  *Id.* (quoting *Instant Air

Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989)).

Thus, because the Insurers identify no irreparable harm on top of equitable mootness, the

potential for equitable mootness does not establish an irreparable injury.

### C.    The Balance of Equities Does Not Favor a Stay.

Because the Insurers have not made "the requisite showing on the first two factors, the

Court need not consider the remaining factors."  *Garces Rest. Grp.*, 2018 WL 2458807, at *2; *see

S.S. Body Armor I.*, 927 F.3d at 772 ("*Upon satisfaction of the first two factors*, courts assess the

harm to the opposing parties and weigh the public interest." (emphasis added and citation

omitted)).  That said, if the Court considers the harm to non-movants and the public's interest in

the stay, the Court should find that the Insurers also failed to meet those requirements.

This third factor requires the Court to "balance the harms by weighing the likely harm to

the movant absent a stay, [irreparable harm to the Insurers], against the likely harm to stay

opponents if the stay is granted . . . ."  *In re Boy Scouts of Am. and Del. BSA, LLC*, No. 20-10343-

LSS, 2023 WL 6442586, at *9 (D. Del. Oct. 3, 2023).

### 1.    The Insurers' Alleged Harm.

As discussed *supra*, the Insurers will suffer no irreparable harm if their Motion is denied

and admit that any harm to "contractual and due process rights" could only occur if they are

"deprived of their right to appeal," which alone is not an irreparable harm. (Motion at 29–31); *see Boy Scouts of Am.*, 2023 WL 2891519, at *8. That non-debtors (who are not the Insurers) would have to contribute to the Trust at an earlier date if a stay is denied does not prejudice the Insurers.

Nor is there any evidence in the record to support the Insurers' contention that the Plan Proponents drafted the Plan to provide for contributions to the Trust over time to account for delay caused by appeals. (*See* Motion at 33–34.) The Plan explicitly provides the Plan Proponents the right to waive the non-appealable order contingency if they choose. (*See* Plan Art. XIV § 14.4.) This provision alone dispels the Insurers' assertion, and the Court should ignore all allegations that the parties decided on the five-year payment structure with appeals in mind.

Finally, the Bankruptcy Court's acceptance of the Insurers' modification to impose a 14-day stay under Rule 3020 was likewise not "on the [b]asis that there [w]ould [b]e [a]ppeals." (*See* Motion at 34.) Rather, the Bankruptcy Court stated the Plan Proponents did not establish a basis for whether it should grant or deny the stay and noted that it "will only cause complications if the insurers decide to appeal." (Second Oral Opinion at 30:14–17.)

In any event, the possibility of future appeals does not matter to the Bankruptcy Court's balancing of the Insurers' harms on this Motion.

### 2. Harm to Plan Proponents.

To satisfy the third factor, the Insurers must "present satisfactory evidence that imposition of a stay will not substantially injure other parties in the litigation." *W.R. Grace & Co.*, 475 B.R. at 208. It is therefore the Insurers' burden to establish "the *absence* of harm to non-movants." *710 Lone Ridge Rd. Operating Co.*, 2014 WL 1155539, at *3 ("[T]he [stay movant] bears the burden of establishing the *absence* of harm to non-movants, rather than [non-movants] bearing the burden of establishing its existence.").

To "address" the harm to Plan Proponents, Insurers briefly note that the "Plan Proponents will argue that this appeal will further delay the case" and counter that the Plan was "designed and solicited with [delay and potential appeals] in mind." (Motion at 34.)  Insurers also blanketly assert that there is no harm to the Diocese or non-debtors, without any evidence supporting this statement. (*Id.*)  These conclusory statements fall short of establishing the absence of harm as required.  *See, e.g.*, *710 Lone Ridge Rd. Operating Co.*, 2014 WL 1155539, at *3 (denying motion for stay, in part, "[w]here there has been no evidentiary showing made by the moving party" regarding the harm to other parties).

While the Plan Proponents do not bear the burden of establishing harm as non-movants, the Court should consider the harms facing non-movants that the Insurers failed to address.

### a.    Survivors' Harm.

Despite the Insurers severely downplaying the issue, a stay here will cause substantial harm to more than 300 Survivors—over 97% of whom supported the Plan—who have already waited **decades** to be compensated for unimaginable harm.  "With respect to such abuse claimants, Courts recognize that a delay in distributions is a tangible and substantial harm."  *Boy Scouts of Am.*, 2023 WL 6442586, at *9.  Indeed, even just a "one year delay in implementing the plan might well seriously jeopardize the plan."  *See In re ANC Rental Corp.*, No. 01-11220(MFW), 2002 WL 1058196, at *3 (D. Del. May 22, 2002).  The Insurers concede that "[e]ven without the Stay, the Abuse Claimants will have to wait at least four years to receive their full claim amounts." (Motion at 32–33.)  The Survivors have also borne the emotional toll that comes with litigation of this kind—*i.e.*, the reliving of horrific acts of sex abuse perpetrated against them while they were children.  Through this Chapter 11 Case, these Survivors set aside their distrust of the Diocese, ultimately voting, overwhelmingly, in favor of a settlement that once seemed impossible, with the purpose of compensating the Survivors for their suffering and moving forward with the healing

process.  Insurers have forestalled the resolution of the Survivors' claims for years in this Chapter 11 Case, and, through the Motion, they seek to leave the Survivors in limbo once more.  A stay at this time will unnecessarily draw out their search for closure and a semblance of justice.

**b.    The Diocese's Harm.**

A stay will continue to prevent the Diocese from emerging from bankruptcy to continue its charitable, humanitarian, and religious mission for the betterment of the communities it serves. *See W.R. Grace & Co.*, 475 B.R. at 208 (noting that allowing a stay "would have detrimental effects for both [the debtor] and its thousands of creditors, who at this point are more than entitled to take steps forward towards emergence from bankruptcy and obtaining payment of their long-awaited claims").  The Diocese is not the typical commercial Chapter 11 debtor.  It is a nonprofit religious institution which provides much needed charitable work to those in the southern part of New Jersey.  In filing for bankruptcy, the Diocese wanted to "[e]nsure that [it] could continue the mission" due to the cost of the sex abuse cases, which "was beginning to affect the life of the Diocese," its "ability to fundraise," and the "well-being of [its] parishes."  (*See* Kaplan Decl., Ex. C ("**Nov. 9, 2022 Trial Tr.**") at 35:13–21.)

Only after the Diocese finally emerges from bankruptcy can it singularly focus on its mission of aiding countless individuals in its territory—which consists of several of the poorest counties in New Jersey.  [*See* Dkt. 3 ¶¶ 55, 57–58.]  In furtherance of this mission, the Diocese, through Catholic Charities, aids, supports, advises, and conducts, a wide variety of human services for the benefit of all people in need within the Diocese, without regard to religious, racial, ethnic, or economic background.  [*Id.* ¶¶ 76–77.]  It also is a sponsor or developer and/or the manager of affordable housing developments (and related entities) for seniors, disabled individuals, and low-income families.  [*Id.* ¶¶ 85, 89.]  Along with serving its community, the Diocese operates dozens of schools in the community.  [*See id.* ¶¶ 63–71.]  If the Diocese did not operate these schools, the

public would face a financial burden of over $150 million in educating the students the Diocese

cares for.  [*See id.* ¶¶ 70–71.]  That the Diocese must remain in bankruptcy due to the Insurers'

delay tactics is, in fact, a substantial harm.  And that harm not only affects the Diocese but also the

hundreds of thousands of people in the community the Diocese serves.  [*See generally id.*]  Thus,

this substantial harm outweighs any risk of harm, irreparable or otherwise, that the Insurers face.

Moreover, if this matter is stayed pending the Insurers' Appeal, the Trust would lose the

benefit of holding millions of dollars for the Diocese's creditors and earning interest on those

dollars.  Indeed, this fact supports requiring the Insurers to post a bond if they choose to move

forward with their Appeal.  *See, e.g.*, *Sprint Commc'ns Co. L.P. v. CAT Commc'ns Int'l, Inc.*, 335

F.3d 235, 239–40 (3d Cir. 2003) (explaining how injunction bonds protect enjoined parties because

they typically consist of "such costs and damages [that] may be incurred or suffered by any party

who is found to have been wrongfully enjoined" (citation omitted)).

Other creditors receiving treatment under the Plan are similarly harmed by the imposition

of a stay pending Appeal.  For example, the Diocese's general unsecured creditors—who have

waited over three years for payment, yet continue to support the Diocese's day-to-day operations

and mission—will have to continue to wait for payment on trade debt while the Insurers wage their

futile war against the Confirmation Order.  (*See* Plan Art. V § 5.3.)  Similarly, PNC Bank, the

Diocese's largest liquidated creditor, receives interest-only payments on its approximately $23

million claim pending the effectiveness of the Plan.  (*Id.* § 5.2.)  These parties have waited and

negotiated with the Diocese in good faith throughout this process and should not have to continue

to wait for payment where the Insurers cannot even establish a likelihood of success on the merits.

The balance of the Insurers' lack of irreparable harm with these recognized harms to the

Plan Proponents weighs against the Insurers' request for a stay.

**D.      The Public Interest Disfavors Imposing a Stay.**

On the final factor of this Court's analysis, the burden is on the Insurers to show that a stay

is in the public interest.  *See Clinton*, 520 U.S. at 708.  The Insurers' inability to meet their burden

on the first three factors demonstrates that the public has no interest in a stay.  And whether or not

the Third Circuit should address the substance of the issues on appeal does not show why a *stay of*

*proceedings* is in the public's interest.  Moreover, for the same reasons the Insurers' right to an

appeal does not establish irreparable harm, the Insurers' argument that appellate rights are in the

public interest—using an out-of-circuit case from over forty years ago—also lacks merit.  (*See*

Motion at 35.)

The Insurers also disregard several other relevant public interest factors.  For example,

"[i]n weighing a request for a stay pending appeal, courts 'consider the good of the case as a

whole,' because the 'public interest cannot tolerate any scenario under which private agendas can

thwart the maximization of value for all.'"  *Boy Scouts of Am.*, 2023 WL 6442586, at *9.  Here, a

stay only benefits the Insurers and their purely economic interests.  This is not a basis on which

the Court should grant the extraordinary relief of a stay pending appeal.

The public also has a strong interest in the consummation of the Plan and in Survivors

receiving compensation for the abuse they suffered without further delay.  *See W.R. Grace &* Co.,

475 B.R. at 208 ("In the bankruptcy context, there is a general public policy weighing in favor of

affording finality to bankruptcy judgments."); *see also Boy Scouts of Am.*, 2023 WL 6442586, at

*9 ("Abuse survivors with claims . . . are a largely aged group who should not continue to wait for

compensation or closure.  This factor also weighs against granting a stay." (citation omitted)).

Further, the "timely resolution of the bankruptcy estate is . . . in the public interest," and

"[a]ctions that needlessly delay a fair settlement agreement deprive claimants of their proceeds

while preventing the debtor from completing its reorganization," which "does not benefit the

public interest." *In re W.R. Grace & Co.*, 412 B.R. 657, 666 (D. Del. 2009). Here, the public interest also consists of the 400,000 plus persons the Diocese serves, together with its charities, housing services, and private schools. [*See generally* Dkt. 3.] Allowing a charitable organization to resume its charitable activities outside of bankruptcy undoubtedly benefits the public interest.

The public also has a clear interest in ensuring just compensation for victims of childhood sexual abuse, as shown by New Jersey's statute of limitations reform and that of other states. *See Osborne v. Ohio*, 495 U.S. 103, 109 (1990) ("It is evident beyond the need for elaboration that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling." (internal quotation marks and citation omitted)). These strong public interests weigh against imposition of a stay pending appeal.

In sum, all four factors weigh against imposing a stay, and the Motion should be denied.

## II.  THE INSURERS DID NOT PROPOSE TO POST A SUPERSEDEAS BOND IN ORDER TO OBTAIN A STAY PENDING APPEAL.

In their Motion, the Insurers failed "to even acknowledge that a party seeking a stay under such circumstances may be required to post a supersedeas bond in order to preserve the status quo and protect the bankruptcy estate and its creditors from incurring costs incident to the stay." *W.R. Grace & Co.*, 475 B.R. at 209; Fed. R. Bankr. P. 8007(c) ("The district court, BAP, or court of appeals may condition relief on filing a bond or other security with the bankruptcy court."). "If a stay pending appeal is likely to cause harm by diminishing the value of an estate or 'endanger [the non-moving parties'] interest in the ultimate recovery,'" without a "good reason not to require the posting of a bond, then the court should set a bond at or near the full amount of the potential harm to the non-moving parties." *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 351 (S.D.N.Y. 2007).

When a movant "seeks the imposition of a stay without a bond" and fails to meet its "burden of demonstrating why the court should deviate from the ordinary full security

requirement," courts consider this failure "as another factor weighing against the imposition of a stay under these circumstances." *See, e.g.*, *W.R. Grace & Co.*, 475 B.R. at 209 (citations omitted); *Jurista v. Amerinox Processing, Inc.*, 492 B.R. 707, 784 (D.N.J. 2013) (holding that the movant's failure to acknowledge the bond requirement or provide an estimate of the amount of such a bond was "another factor weighing against the imposition of an injunction").

Because the Insurers "fail[] to even acknowledge the bond requirement, let alone provide an estimate of the amount of such a bond," "rather than engage in an extensive analysis of the bond requirement, the Court [should] merely consider[ the Insurers'] failure to acknowledge this point as another factor weighing against the imposition of [a stay] under these circumstances." *Jurista*, 492 B.R. at 784.  If the Court does consider whether the Insurers are required to post a bond for this Appeal, the Court should require the Insurers to post a bond of 120% of the $158,589,291 at stake here.

Given that the Insurers failed to produce sufficient evidence on all four stay factors, "coupled with [their] failure to acknowledge the necessity of a bond under such circumstances," the Court should deny the Insurers' Motion.  *See, e.g.*, *id.*  And if the Court grants the Insurers' Motion, it should require the Insurers to post a sufficient bond.

## **CONCLUSION**

For all these reasons, the Court should deny the Insurers' Motion for a stay pending appeal. If the Court grants a stay, it should require the Insurers to post a substantial bond.

Dated: April 10, 2024

**TRENK ISABEL SIDDIQI &**
**SHAHDANIAN P.C.**

<u>/s/ Richard D. Trenk</u>
Richard D. Trenk, Esq.
Robert S. Roglieri, Esq.
290 W. Mt. Pleasant Avenue, Suite 2370
Livingston, New Jersey 07039
Telephone:  (973) 533-1000
Email:  rtrenk@trenkisabel.law
Email:  rroglieri@trenkisabel.law

*Counsel to The Diocese of Camden, New*
*Jersey*

**LOWENSTEIN SANDLER LLP**

<u>/s/ Jeffrey D. Prol</u>
Jeffrey D. Prol, Esq.
Michael A. Kaplan, Esq.
Brent Weisenberg, Esq.
Colleen M. Restel, Esq.
One Lowenstein Drive
Roseland, New Jersey 07068
Telephone:  (973) 597-2500
Email:  jprol@lowenstein.com
Email:  mkaplan@lowenstein.com
Email:  bweisenberg@lowenstein.com
Email:  crestel@lowenstein.com

*Counsel to the Official Committee*
*of Tort Claimant Creditors*